UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA            :
                                    :   **INDICTMENT**
           v.                       :
                                    :   18 Cr.
AKSHAY AIYER,                       :
                                    :
                       Defendant.   :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JUDGE KOELTL

**18 CRIM 333**

### COUNT ONE

**(Conspiracy to Restrain Trade – 15 U.S.C. § 1)**

THE GRAND JURY CHARGES THAT, AT TIMES RELEVANT TO THIS INDICTMENT:

### General Allegations

1. The foreign currency exchange ("FX") market is a global market in which participants trade currencies in pairs. In a currency pair, each currency is valued relative to the other. The ratio that expresses the value of one currency in relation to the other is called the "exchange rate," "rate," or simply "price." The price sets out how many units of a "counter" currency one party is willing to either receive or deliver to another party in exchange for a stated quantity of a "base" currency. With respect to trading in Central and Eastern European, Middle Eastern, and African Emerging Markets currencies ("CEEMEA" currencies), common counter currencies include the South African rand ("ZAR"), the Russian ruble ("RUB"), the Turkish lira ("TRY"), the Hungarian forint ("HUF"), the Polish zloty ("PLN"), the Czech crown ("CZK"), the Israeli shekel ("ILS"), and the Romanian leu ("RON"). Common base currencies that are traded against these counter currencies include the United States dollar ("USD") and the euro ("EUR").

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: MAY 1 0 2018

2.      There is no single, official marketplace for FX transactions. Instead, customers trade directly with FX dealer banks. Dealers, also known as "market makers," are typically global banks that stand ready to exchange the major world currencies, in large amounts, upon request. The dealers' customers include corporations, money managers, insurance companies, pension funds, hedge funds, central banks, and investment companies, among other types of entities.

3.      Dealer banks employ FX traders to, among other tasks, formulate prices to be quoted to customers for various FX transactions. Frequently, prices quoted to customers are in the form of verbal "two-way" price quotes, comprised of the "bid" (the price at which the dealer will buy the base currency from the customer, in exchange for an agreed-upon amount of the counter currency) and the "offer" (the price at which the dealer will sell the base currency to the customer, in exchange for an agreed-upon amount of the counter currency). A customer will often ask two or more dealers to quote prices for a particular FX order, and then choose to transact with the dealer that has quoted the best bid or the best offer, as suits the customer's interest at that moment. In this way, among others, traders at rival banks compete with each other to win customer orders.

4.      Customers that wish to exchange currencies can do so in a variety of ways. FX "spot" trades are the most common method of trading currencies. FX spot trades involve one party agreeing to receive a particular currency in exchange for delivering a different currency, at an agreed-upon price and quantity, with the actual exchange of currencies (the trade "settlement") typically taking place one to two days after the trade date.

5. FX "forward" transactions are like spot trades, only the trade settlement occurs on a more distant, agreed-upon date following the trade date. Forward transactions commonly settle one month, three months, six months, or a year after the trade is entered into.

6. Another common customer FX order is known as a fix order. A fix order is a request by a customer to buy or sell a specific quantity of currency, in exchange for another, at a particular benchmark rate to be determined subsequently, by a process called a "fix." The fix generates the benchmark rate based on a sampling of actual trading activity in a currency pair that occurs within a predetermined, and short, window of time. In addition to setting the final prices for FX fix orders, fix rates are also used as important points of reference by market participants. For example, fix rates are used for valuing portfolios of assets at the end of each day, among other uses.

7. Customers can also place "limit" orders, whereby a customer places an order to buy or sell a particular currency, in exchange for another, on the understanding that the dealer will execute the order only if the market price of that currency pair reaches or exceeds a set price level. Limit orders are, in this way, conditional upon future pricing levels. "Stop-loss" orders are one type of limit order typically placed by a customer that wishes to sell a currency, in exchange for another, if the market price descends to a particular level. If the specified level is reached, the customer's position is sold. Traders often refer to this type of customer order as simply a "stop" order.

8. When a trader acquires currency from customers and continues to hold that currency, he is said to be "long" that currency. When a trader sells a quantity of currency to customers greater than what he has on hand, the trader is said to be "short" that currency. The trader must then decide whether and for how long to hold the long or short "position." If the

trader wishes to return to a neutral equilibrium in a given currency pair (known as being "flat"), the trader must sell the currency pair if he is long, or buy back the currency pair if he is short. Alternatively, the trader can continue to hold the long or short position, or even increase the extent to which he is long or short. In both cases, there is always the risk that prices can move quickly and in an unfavorable direction to the trader's position. It is the trader's job to manage this, with the goal of profiting and avoiding loss. As a general matter, the trader profits by buying a currency low and selling it for a higher price, or by selling a currency high and buying it back when the price is lower.

9. When FX traders seek to offset positions that resulted from customer orders, or when they believe price in a currency pair will increase or decrease and they want to trade on that view, they can trade with each other. They do so by contacting each other directly, by using brokers who act as intermediaries, and by using anonymous electronic trading platforms. Collectively, this type of trading among FX traders is referred to as the "interdealer market." CEEEMA traders at rival banks are in continuous competition with each other in the interdealer market as they seek to make profits and avoid losses on behalf of their respective employers.

10. Over time, electronic trading platforms have become the primary method for interdealer spot FX trades. One of the most commonly used interdealer electronic trading platforms for CEEMEA currency trading is the Thomson Reuters Dealing platform ("Reuters"). On Reuters, competing traders anonymously post the price and quantity at which they are willing to exchange different CEEMEA currency pairs, and they can deal directly on any posted "bid" or "offer," so long as they have sufficient credit with the counterparty. A trader makes a "bid" on Reuters by posting the amount of the base currency he wants to buy in exchange for the counter currency, at a particular exchange rate. A trader makes an "offer" on Reuters by posting the

4

amount of the base currency he wants to sell in exchange for receiving the counter currency, at a particular exchange rate. Price is determined on Reuters through the constant interplay of traders' competing bids, offers, and completed trades. When one trader's interest to buy and another trader's interest to sell a particular currency pair coincide with respect to price and amount, a trade "match" occurs. A trader learns the identity of the counterparty to the trade when the trade match is confirmed by Reuters.

11. The best bid, best offer, and last traded price in each currency pair are updated on Reuters in real time and displayed to traders who make trading decisions on the basis of that information. The Reuters information also feeds into a variety of other platforms through which market participants trade currencies.

12. Electronic Broking Services, or EBS, is another electronic trading platform used by traders for interdealer FX trades in certain CEEMEA currencies, such as the ruble.

### The Defendant and his Co-Conspirators

13. From in or about July 2006, through in or about March 2015, the exact dates being unknown to the Grand Jury, Defendant AKSHAY AIYER, a resident of New York, was employed as an FX analyst and then later, an FX trader, by Bank A, which had an FX trading desk located in the Southern District of New York. AIYER sat on that New York trading desk trading a variety of CEEMEA currencies on behalf of his employer. AIYER held the title of Analyst from in or about 2006 until 2009, when he became an Associate. AIYER was promoted to Vice President in 2011, and became an Executive Director in 2014.

14. During the period of October 2010 to July 2013, Jason Katz ("Katz") was also employed as an FX trader of CEEMEA currencies, in New York, by Bank B and Bank C. He

worked for Bank B between October 2010 and June 2011, and Bank C between September 2011 and July 2013.

15.     During the period of October 2010 to July 2013, Christopher Cummins ("Cummins") was employed as an FX trader of CEEMEA currencies, in New York, at Bank D.

16.     From July 2011 to July 2013, cooperating witness one ("CW1") was employed as an FX trader of CEEMEA currencies, in New York, at Bank B (where Katz had previously worked between October 2010 and June 2011).

17.     AIYER, Katz, Cummins, and CW1, acting on behalf of rival banks A, B, C, and D, were competitors in the trading of CEEMEA currencies with customers and in the interdealer market. Each traded billions of dollars of CEEMEA currencies per year, in spot, forward, and fix-related trades, among other types of FX transactions, on behalf of their respective banks.

18.     Various entities and individuals, not made defendants in this Indictment, participated as co-conspirators in the offense charged and performed acts, and made statements, in furtherance thereof.

19.     Whenever in this Indictment reference is made to any act, deed or transaction of any corporation, the allegation means that the corporation engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

### Description of the Offense

20.     From at least as early as October 2010 and continuing until at least July 2013 (the "relevant period"), the exact dates being unknown to the Grand Jury, in the Southern District of New York and elsewhere, AIYER and his co-conspirators, and others known and unknown, knowingly entered into and participated in a combination and conspiracy to suppress and

eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere. The combination and conspiracy engaged in by AIYER and his co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section One of the Sherman Act (15 U.S.C. § 1).

21. The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among AIYER and his co-conspirators, the substantial terms of which were to suppress and eliminate competition for the purchase and sale of CEEMEA currencies by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere.

### Means and Methods of the Conspiracy

22. For the purpose of forming and carrying out the charged combination and conspiracy, AIYER and his co-conspirators did those things that they combined and conspired to do, including, among other things:

(a) engaging in near-daily conversations through private electronic chat rooms, phone calls, text messages, and other means of communication, to reveal their currency positions, trading strategies, bids and offers on Reuters, customer identities, customer limit order price levels, upcoming customer orders, and planned pricing for customer orders, among other information;

(b) agreeing to suppress and eliminate competition among themselves for the purchase and sale of CEEMEA currencies by coordinating their bidding, offering, and trading, including, at times, by refraining from bidding, offering, and trading against each other;

(c) coordinating their bidding, offering, and trading of CEEMEA currencies on electronic trading platforms such as Reuters and elsewhere in the interdealer market including, at times, by refraining from bidding, offering, and trading against each other, in order to increase, decrease, and stabilize the prices of CEEMEA currencies;

(d) coordinating their bidding, offering, and trading of CEEMEA currencies in and around the times of certain fixes, in order to increase, decrease, and stabilize the fix prices of CEEMEA currencies;

(e) filling customers' orders at prices that the conspirators sought to increase, decrease, and stabilize;

(f) agreeing on pricing to quote to customers, including customers who had solicited competing prices in the same CEEMEA currency pair from two or more of the co-conspirators; and

(g) employing measures to conceal their actions by, among other steps, using code names when discussing customers, communicating with each other using text messages and other cell phone applications, calling one another on personal cell phones during work hours, and meeting in person in the Southern District of New York to discuss particular customers and trading strategies.

### Trade and Commerce

23.  During the relevant period covered by this Indictment, the business activities of AIYER and his co-conspirators that are the subject of this indictment involved, were within the flow of, and substantially affected, interstate trade and commerce. Among other activities, AIYER and his co-conspirators, in a continuous and uninterrupted flow of interstate trade and commerce, entered into FX CEEMEA transactions subject to the conspiracy with counterparties

located in different states, and caused the transfer of substantial sums of money across state lines in connection with those transactions.

**ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1**

**A TRUE BILL**

_____ Dated: 5/10/2018
GRAND JURY FOREPERSON

5/9/18

_____
MAKAN DELRAHIM
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

_____
MARVIN N. PRICE, Jr.
Acting Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

_____
ANN O'BRIEN
Acting Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

_____
GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

_____
JEFFREY D. MARTINO
Chief, New York Office
Antitrust Division
U.S. Department of Justice

_____
JOSEPH MUOIO
Assistant Chief, New York Office
Antitrust Division
U.S. Department of Justice

_____
BENJAMIN SIROTA
ERIC HOFFMANN
GRACE PYUN
BRYAN SERINO
DAVID CHU
KATHERINE CALLE

Trial Attorneys, Antitrust Division
U.S. Department of Justice
26 Federal Plaza, Room 3630
New York, New York 10278
212-335-8000

10

Form No. USA-33s-274 (Ed. 9-25-58)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

AKSHAY AIYER

Defendant.

INDICTMENT

18 Cr. _____

15 U.S.C. § 1

GEOFFREY S. BERMAN
United States Attorney for the Southern District of New York
(212) 637-2200

A TRUE BILL

_____
Foreperson.

5/10/18  FILED INDICTMENT CASE ASSIGN TO J. KOELTL

COTT, US MJ