**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x
|
UNITED STATES OF AMERICA                         |
|
v.                                    |
|                    Case No. 1:18-cr-00333 (JGK)
AKSHAY AIYER,                                    |
|
Defendant.                          |
|
-----------------------------------------------------------------x

**THE UNITED STATES' OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S MOTIONS TO DISMISS THE INDICTMENT**

## <u>TABLE OF CONTENTS</u>

Introduction ......................................................................................................................... 1

Legal Standard .................................................................................................................... 2

Argument ............................................................................................................................ 3

    I.     The indictment properly alleges a *per se* violation of the Sherman Act, so the
          Court should deny Aiyer's motion to dismiss for failure to allege a crime. ................... 4

      A.    The charged offense constitutes a *per se* Sherman Act violation. .............................. 4

      B.    Aiyer's arguments to the contrary have no merit. ...................................................... 7

    II.    The indictment sufficiently alleges a single crime in a single count, so the
          Court should deny Aiyer's motion to dismiss the indictment as duplicitous. ............... 24

      A.    The indictment properly alleges a single overarching price-fixing and
            bid-rigging conspiracy constituting a *per se* violation of the Sherman Act. .............. 25

      B.    Aiyer's arguments to the contrary have no merit. ...................................................... 26

      C.    The single conspiracy alleged in the indictment falls
            within the statute of limitations. .............................................................................. 29

Conclusion ........................................................................................................................ 30

## TABLE OF AUTHORITIES

**Cases**

*Am. Tobacco Co. v. United States,*
   328 U.S. 781 (1946) ........................................................................................... 26

*Apex Oil Co. v. DiMauro,*
   713 F. Supp. 587 (S.D.N.Y. 1989) ...................................................................... 14

*Arizona v. Maricopa Cty. Med. Soc'y,*
   457 U.S. 332 (1982) ........................................................................................... 16

*Bd. of Trade of City of Chicago v. United States,*
   246 U.S. 231 (1918) ...................................................................................... 14, 15

*Boyce Motor Lines, Inc. v. United States,*
   342 U.S. 337 (1952) ............................................................................................. 3

*Braverman v. United States,*
   317 U.S. 49 (1942) ............................................................................................. 28

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.,*
   441 U.S. 1 (1979) ............................................................................................... 16

*Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.,*
   No. 10 Civ. 8 (DAB), 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ..................... 22

*Gelboim v. Bank of America Corp.,*
   823 F.3d 759 (2d Cir. 2016) ........................................................................ passim

*Granite Partners, L.P. v. Bear Stearns Co. Inc.,*
   17 F. Supp. 2d 275 (S.D.N.Y. 1998) ............................................................. 12, 13

*Granite Partners, L.P. v. Bear Stearns Co. Inc.,*
   58 F. Supp. 2d 228 (S.D.N.Y. 1999) .................................................................. 14

*Hamling v. United States,*
   418 U.S. 87 (1974) ............................................................................................... 2

*In re ATM Fee Antitrust Litig.,*
   554 F. Supp. 2d 1003 (N.D. Cal. 2008) .............................................................. 17

*In re Foreign Exchange Benchmark Rates Antitrust Litig.,*
   74 F. Supp. 3d 581 (S.D.N.Y. 2015) ............................................................ passim

*In re Sulfuric Acid Antitrust Litig.,*
   703 F.3d 1004 (7th Cir. 2012) ........................................................................... 22

*K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.,*
    61 F.3d 123 (2d Cir. 1995) ................................................................... 14

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007) ....................................................................... 16, 22

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Oklahoma,*
    468 U.S. 85 (1984) ..................................................................... 6, 7, 20

*nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.,*
    No. 1:11-CV-3728-AT, 2012 WL 13009231 (N.D. Ga. July 24, 2012) ................................. 17

*N. Pac. Ry. Co. v. United States,*
    356 U.S. 1 (1958) ................................................................................. 4

*Philip Morris Inc. v. Heinrich,*
    No. 95 CIV 328 (LMM), 1996 WL 363156 (S.D.N.Y. June 28, 1996) ................................. 6

*Polk Bros. v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985) ................................................................. 17

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.,*
    792 F.2d 210 (D.C. Cir. 1986) ............................................................... 17

*Sanabria v. United States,*
    437 U.S. 54 (1978) ........................................................................... 27

*United States v. Abakporo,*
    959 F. Supp. 2d 382 (S.D.N.Y. 2013) ....................................................... 29

*United States v. Alessi,*
    638 F.2d 466 (2d Cir. 1980) ............................................................. 24, 28

*United States v. Alfonso,*
    143 F.3d 772 (2d Cir. 1998) ........................................................... passim

*United States v. Apple, Inc.,*
    791 F.3d 290 (2d Cir. 2015) ................................................................. 27

*United States v. Aracri,*
    968 F.2d 1512 (2d Cir. 1992) ..................................................... 24, 25, 27, 28

*United States v. Berger,*
    224 F.3d 107 (2d Cir. 2000) ................................................................. 28

*United States v. Brighton Bldg. & Maint. Co.,*
    598 F.2d 1101 (7th Cir. 1979) ................................................................. 4

iii

*United States v. Crosby*,
   294 F.2d 928 (2d Cir. 1961)............................................................... 27

*United States v. De La Pava*,
   268 F.3d 157 (2d Cir. 2001)................................................................. 3

*United States v. Droms*,
   566 F.2d 361 (2d Cir. 1977)............................................................... 27

*United States v. Eppolito*,
   543 F.3d 25 (2d Cir. 2008)................................................................. 28

*United States v. Joyce*,
   895 F.3d 673 (9th Cir. 2018) ............................................................. 12

*United States v. Kemp & Assocs., Inc.*,
   907 F.3d 1264 (10th Cir. 2018) ......................................................... 11

*United States v. Kogan*,
   283 F. Supp. 3d 127 (S.D.N.Y. 2017)............................................... 30

*United States v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981)....................................................... 4, 6, 21

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)......................................................... 25, 28

*United States v. Murray*,
   618 F.2d 892 (2d Cir. 1980)......................................................... 24, 29

*United States v. Nai Fook Li*,
   206 F.3d 56 (1st Cir. 2000)................................................................. 3

*United States v. Nersesian*,
   824 F.2d 1294 (2d Cir. 1987)............................................................. 28

*United States v. Ohle*,
   678 F. Supp. 2d 215 (S.D.N.Y. 2010)...................................... 24, 25, 29

*United States v. Peters*,
   543 F. App'x 5 (2d Cir. 2013) ........................................................... 29

*United States v. Rajaratnam*,
   736 F. Supp. 2d 683 (S.D.N.Y. 2010)............................................... 25

*United States v. Rajaratnam*,
   No. 13 CR. 211 (NRB), 2014 WL 1554078 (S.D.N.Y. Apr. 17, 2014) .................................. 10

*United States v. Restrepo*,
   547 F. App'x 34 (2d Cir. 2013) ............................................................ 29

*United States v. Sampson*,
   898 F.3d 270 (2d Cir. 2018) ................................................................... 3

*United States v. Silverman*,
   430 F.2d 106 (2d Cir. 1971) ............................................................. 9, 10

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940) ............................................................... 4, 5, 6, 16

*United States v. Srulowitz*,
   819 F.2d 37 (2d Cir. 1987) ................................................................. 30

*United States v. Stavroulakis*,
   952 F.2d 686 (2d Cir. 1992) ......................................................... 3, 9, 10

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001) ........................................................... 24, 29

*United States v. Szur*,
   No. S5 97 CR 108 (JGK), 1998 WL 132942 (S.D.N.Y. Mar. 20, 1998) .......... 24, 29

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972) ..................................................................... 18, 19

*United States v. Tramunti*,
   513 F.2d 1087 (2d Cir. 1975) ............................................................... 3

*United States v. Usher*,
   No. 17 CR 19 (RMB), 2018 WL 2424555 (S.D.N.Y. May 4, 2018) ............... passim

*United States v. Vilar*,
   729 F.3d 62 (2d Cir. 2013) ................................................................. 24

**Statutes**

15 U.S.C. § 1 .............................................................................. 1, 2, 25, 29

18 U.S.C. § 3282(a) .............................................................................. 29

**Rules**

Fed. R. Crim. P. 7(c)(1) .................................................................... 2, 27

Fed. R. Crim. P. 8(a) ........................................................................... 24

**Other Authorities**

Charles A. Wright & Arthur R. Miller, et al.,
    *Federal Practice & Procedure* § 142 (4th ed. 2018) ............................................................... 27

**INTRODUCTION**

On May 10, 2018, a federal grand jury in this district indicted defendant Akshay Aiyer for knowingly entering into and engaging in a conspiracy to restrain trade in violation of Section One of the Sherman Act, 15 U.S.C. § 1.  During the period charged in the indictment, Aiyer was a New York-based trader of Central and Eastern European, Middle Eastern, and African ("CEEMEA") currencies at a major multinational bank.  His co-conspirators, including Jason Katz, Christopher Cummins, and CW-1, were New York-based CEEMEA traders at competing banks, each trading billions of dollars per year in CEEMEA currencies.

In his two motions to dismiss, Aiyer constructively redrafts the indictment, converting means and methods into substantive charges and adding potential trial evidence and expert testimony through affidavits.  As a result, his motions read more like premature Rule 29 motions than pretrial motions to dismiss.  The Court should disregard the many invocations of potential trial evidence by Aiyer's lawyer, as well as the opinions of Aiyer's two experts, and instead focus its inquiry on the allegations set forth within the four corners of the indictment.

The indictment properly alleges a single *per se* violation of the Sherman Act.  The indictment alleges that Aiyer and his co-conspirators "knowingly entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere" and that this conspiracy "consisted of a continuing agreement, understanding, and concert of action." (Indictment ¶¶ 20–21, ECF No. 1.)[1]  In addition, the indictment appropriately sets forth seven

---

[1]     On January 4, 2017, Katz pled guilty to a one-count information charging a violation of the Sherman Act, based on his participation in this conspiracy.  On January 12, 2017, Cummins pled guilty to a one-count information charging a violation of the Sherman Act, based on his participation in this conspiracy.  On January 26, 2018, Bank C also pled guilty to a one-count

means and methods by which this *per se* illegal agreement was effectuated.  Accordingly, the indictment properly alleges the offense, and the Court should deny Aiyer's two motions.

First, the Court should deny his Motion to Dismiss the Indictment in Part For Failure to Allege a Crime, (ECF No. 49), because the conspiracy alleged in the indictment constitutes a *per se* violation of the Sherman Act, 15 U.S.C. § 1.  It alleges that Aiyer and his co-conspirators were competitors in the foreign currency exchange ("FX") market and that they conspired to suppress and eliminate competition by fixing prices and rigging bids.  It is settled law in this circuit that price fixing and bid rigging are subject to the *per se* rule.

Second, the Court should deny Aiyer's Motion to Dismiss the Indictment as Duplicitous, (ECF No. 47), because the indictment properly charges a single overarching conspiracy along with seven means and methods for carrying out that conspiracy.  It is settled law in this circuit that an indictment that alleges a single conspiracy carried out through various means and methods is not duplicitous.

## LEGAL STANDARD

An indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged."  Fed. R. Crim. P. 7(c)(1).  An indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend," and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense."  *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir. 1998) (quoting *Hamling v. United States*, 418 U.S. 87, 117 (1974)).  The Court of Appeals for the Second Circuit has "often stated that 'an indictment need do little more than to track the

---

information charging a violation of the Sherman Act, based on Katz's participation in this conspiracy.

language of the statute charged and state the time and place (in approximate terms) of the alleged crime.'" *United States v. Stavroulakis*, 952 F.2d 686, 693 (2d Cir. 1992) (quoting *United States v. Tramunti*, 513 F.2d 1087, 1113 (2d Cir. 1975)).

At the pretrial motion to dismiss stage, the court must accept all allegations in the indictment as true, *Boyce Motor Lines, Inc. v. United States*, 342 U.S. 337, 343 n.16 (1952), and may not address the sufficiency of the evidence, *Alfonso*, 143 F.3d at 777. [2]  Accordingly, when considering a pre-trial motion to dismiss, the Court may not "look[] beyond the face of the indictment and [draw] inferences as to the proof that would be introduced by the government at trial." *Alfonso*, 143 F.3d at 776.

Finally, "[t]he dismissal of an indictment is an 'extraordinary remedy' reserved only for extremely limited circumstances implicating fundamental rights." *United States v. De La Pava*, 268 F.3d 157, 165 (2d Cir. 2001) (quoting *United States v. Nai Fook Li*, 206 F.3d 56, 61 (1st Cir. 2000)).

## ARGUMENT

The Court should deny Aiyer's motions to dismiss because (1) the indictment properly alleges a *per se* violation of the Sherman Act, and (2) the indictment properly alleges this one crime in a single count.

---

[2]     An "extraordinarily narrow" exception to this rule exists when the Government has made a "detailed presentation of the entirety of the evidence" before the district court prior to the filing of a pretrial motion to dismiss.  *United States v. Sampson*, 898 F.3d 270, 282 (2d Cir. 2018) (quoting *Alfonso*, 143 F.3d at 777).  Aiyer does not contend, nor could he, that the list of dates provided voluntarily by the Government to Aiyer could place this case within the exception.

I.     **The indictment properly alleges a *per se* violation of the Sherman Act, so the Court should deny Aiyer's motion to dismiss for failure to allege a crime.**

Courts long have held that certain restraints of trade are *per se* illegal under the Sherman Act "because of their pernicious effect on competition and lack of any redeeming virtue." *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy.").  Among those *per se* illegal restraints are horizontal price-fixing conspiracies, agreements "formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price." *Socony-Vacuum Oil Co.*, 310 U.S. at 223; *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("Horizontal price-fixing conspiracies among competitors are unlawful *per se*.").  Likewise, bid-rigging conspiracies, agreements to coordinate the submission or withholding of bids, are also *per se* illegal. *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" (quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979))).

A.     **The charged offense constitutes a *per se* Sherman Act violation.**

The indictment alleges a *per se* violation of the Sherman Act because it alleges that competing CEEMEA traders at competing banks entered into an agreement to fix prices and rig bids.  The indictment alleges that Aiyer and his co-conspirators were traders at "rival banks," (*see* Indictment ¶ 17), who were in continuous competition with each other in the FX market: they competed with each other to win customer orders, (*see* Indictment ¶ 3), and they competed

in the interdealer market, including on electronic platforms, as they sought to offset positions resulting from customer orders, (*see* Indictment ¶ 9). As such, they were competitors. The indictment alleges that, rather than competing with each other, as they should have, they agreed to "suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere." (Indictment ¶ 20.) This agreement was carried out by, *inter alia*, revealing customer information, risk positions, and trading strategies, (Indictment ¶ 22(a)); agreeing to coordinate, and in fact coordinating, trading in the interdealer market in order to increase, decrease, and stabilize the prices and fix rates of CEEMEA currencies, (Indictment ¶ 22(b)–(d)); filling customer orders at prices that the conspiracy sought to increase, decrease, or stabilize, (Indictment ¶ 22(e)); and agreeing on prices to quote to customers, (Indictment ¶ 22 (f)).

Aiyer does not dispute that a price-fixing agreement between competitors carried out, in part, by agreeing on a price to quote to their customers is a *per se* offense. *See Socony-Vacuum*, 310 U.S. at 222 ("[P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon."). A price-fixing and bid-rigging agreement carried out, in part, by coordinating the submission of bids and offers on an electronic trading platform also is a *per se* violation of Section One of the Sherman Act. *See id.* at 223 (Regardless of "the machinery employed[,] . . . . a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*."). As the indictment alleges, the Reuters platform is "[o]ne of the most commonly used interdealer electronic platforms for CEEMEA

currency trading."  (Indictment ¶ 10.)  Traders at rival banks compete with one another on the

Reuters platform by placing bids to buy currency and offers to sell currency.  (Indictment ¶ 10.)

The interplay between these bids and offers determines the price of the currency.  (Indictment

¶ 10.)  Accordingly, an agreement to coordinate bidding, offering, and trading on an electronic

platform so as to increase, decrease, or stabilize that price is a quintessential *per se* unlawful

restraint of trade.  *See Socony-Vacuum*, 310 U.S. at 223; *see also Philip Morris Inc. v. Heinrich*,

No. 95 CIV 328 (LMM), 1996 WL 363156, at *8–9 (S.D.N.Y. June 28, 1996) (recognizing bid

rigging as a form of price fixing) (citing *Koppers*, 652 F.2d at 294)).

Courts in this circuit have considered allegations similar to those in this indictment and

consistently have concluded that the allegations establish a *per se* violation of the Sherman Act.

Most recently, in *United States v. Usher*, the court considered an indictment alleging that the

defendants, traders at competing banks, "coordinate[d] their bidding, offering, and trading

(including their agreement to refrain from bidding, offering, and trading) in and around the time

of ECB and WMR 'fixes[]' . . . . 'for the purpose of increasing, decreasing, maintaining, and

stabilizing the price of EUR/USD.'"  No. 17 CR 19 (RMB), 2018 WL 2424555, at *4 (S.D.N.Y.

May 4, 2018).  The court concluded that the indictment alleged a *per se* violation because it

alleged "an agreement among competitors at the same level of the market, *i.e.*, they were traders

working for dealers in the FX spot market who agreed 'on the way in which they will compete

with one another.'"  *Id.* (quoting *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of

Oklahoma*, 468 U.S. 85, 99 (1984) ("*NCAA*")).

Similarly, in *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, the court

considered allegations that traders at competing banks coordinated their trading strategies to

manipulate the WM/Reuters fix rate.  74 F. Supp. 3d 581, 587 (S.D.N.Y. 2015) ("*In re Foreign*

6

*Exchange*").  The court found that the plaintiffs' complaint sufficiently alleged a *per se* price-fixing conspiracy among horizontal competitors because the complaint alleged that competing banks in the FX market conspired together to manipulate a benchmark fix rate, that the benchmark fix rate was a price for the currency being exchanged, that plaintiffs bought financial instruments at that price, and defendants manipulated that price.  *Id.* at 592.  Likewise, in *Gelboim*, the Court of Appeals for the Second Circuit considered allegations that defendant banks, who were "horizontal competitors in the sale of financial instruments," colluded to depress the London Interbank Offered Rate ("LIBOR"), thereby increasing the cost to plaintiffs, which included the banks' customers.  823 F.3d at 766, 771.  The court concluded that such allegations stated a "horizontal price-fixing conspiracy, 'perhaps the paradigm of an unreasonable restraint of trade.'"  *Id.* at 771 (quoting *NCAA*, 468 U.S. at 100).

Therefore, consistent with long-standing precedent, including precedent in this circuit addressing similar conduct in the financial industry, the indictment in this case sufficiently alleges a *per se* violation of the Sherman Act.

## B.    Aiyer's arguments to the contrary have no merit.

Aiyer effectively concedes that much of the conduct alleged in the indictment constitutes a *per se* violation of the Sherman Act.  (*See* Mem. Supp. Def.'s Mot. Dismiss Indictment at 6–7, ECF No. 50.)  He nonetheless improperly isolates two of the seven means and methods set forth therein, inappropriately "amplifie[s]" them using material not contained in the indictment, and then argues that such conduct cannot be part of a *per se* case.  (ECF No. 50 at 5.)

First, he challenges certain types of coordinated trading in the interdealer market.  The indictment alleges that one of the means and methods by which Aiyer and his co-conspirators effectuated their conspiracy was by "coordinating their bidding, offering, and trading of

7

CEEMEA currencies . . . in the interdealer market . . . in order to increase, decrease, and stabilize the prices of CEEMEA currencies."  (Indictment ¶ 22(c).)  Aiyer erroneously argues that such coordinated trading cannot be part of a *per se* violation because (1) it does not constitute traditional bid rigging or price fixing and (2) it is justified by procompetitive benefits.[3]

Second, he challenges particular instances of coordinated price quotes to customers.  The indictment alleges that another one of the means and methods by which Aiyer and his co-conspirators effectuated their conspiracy was by "agreeing on pricing to quote to customers." (Indictment ¶ 22(f).)  Looking beyond the four corners of the indictment, Aiyer unpersuasively argues that certain instances of coordinated pricing to customers cannot be part of a *per* se violation because in those instances he and Katz were in a "vertical" relationship.

Aiyer's arguments are flawed as a matter of procedure and substance.  First, they are improperly based on reference to materials found outside the four corners of the indictment. Second, they are legally insufficient.

**1.   Aiyer's arguments are impermissibly based on facts and evidence outside the four corners of the indictment.**

Aiyer's motion inappropriately relies on potential trial evidence and expert opinions.  On November 19, 2018, Aiyer filed a motion for a bill of particulars, seeking a list of "60 incidents of conduct" that might be at issue at trial to be produced by January 15, 2019.  (Mem. Supp. Def.'s Mot. Bill Particulars at 2, ECF No. 33.)  At a status conference before the Court on December 11, 2018, the Government agreed to provide to Aiyer a list of 100 dates about which it

---

[3]     Citing to evidence outside the indictment, Aiyer also argues that evidence that he and/or his co-conspirators engaged in what he characterizes as "spoofing" or "fictitious trades" does not constitute "classic price fixing, bid rigging, or any other *per se* antitrust violation."  (ECF No. 50 at 22–23.)  The proper vehicle for challenging the type of evidence the Government is permitted to offer at trial is a motion in limine, not a pretrial motion to dismiss.

might present evidence at trial, and the Court subsequently denied the motion for a bill of particular as moot.  (Order, ECF No. 41.)  On January 31, 2019, the Government provided Aiyer with a list of 70 dates about which it might present evidence at trial.  Aiyer's repeated citation to this list, along with reference to affidavits of two potential experts, is improper at this stage.  *See Alfonso*, 143 F.3d at 776 (when considering a pretrial motion to dismiss, a district court may not ordinarily "look[] beyond the face of the indictment and dr[a]w inferences as to the proof that would be introduced by the government at trial").

Nonetheless, Aiyer incorrectly attempts to justify consideration of trial evidence at the pretrial motion to dismiss stage by invoking the principle that "[a]n indictment must be read to include facts which are necessarily implied by the specific allegations made."  *Stavroulakis*, 952 F.2d at 693 (quoting *United States v. Silverman*, 430 F.2d 106, 111 (2d Cir. 1971)).  (*See* ECF No. 50 at 6 n.1 ("It is perfectly permissible for the Court to consider these additional facts when ruling on this Motion."); Mem. Supp. Def.'s Mot. Dismiss Indictment at 4 n.1, ECF No. 48 ("In assessing the Indictment's duplicity, the Court may be guided by the specific instances of trading-related conduct the Government has now identified as conduct potentially at issue at trial.")）  Aiyer misapplies this principle in an attempt to shoehorn trial evidence into his pretrial motions to dismiss.  When courts invoke this principle, it is to justify a "common sense" reading of an indictment.  *See Stavroulakis*, 952 F.2d at 693.  For example, the Court of Appeals for the Second Circuit invoked this rule when it reasoned that "use of the words 'labor organization' . . . necessarily implies the fact that the labor organization is engaged in an industry affecting commerce . . .  so the use of that term of art in the indictment necessarily implies that the essential element of interstate commerce is charged in the indictment."  *Silverman*, 430 F.2d at 111.  Similarly, the court in *United States v. Rajaratnam* invoked this principle, reasoning that

allegations that "the tippers disclosed the inside information in breach of their fiduciary duties . . . . necessarily implie[d] a personal benefit" to the tippers.  No. 13 CR. 211 (NRB), 2014 WL 1554078, at *2 (S.D.N.Y. Apr. 17, 2014).

The potential trial evidence Aiyer asks the Court to consider (e.g., chats, investigative reports, and expert opinions) is a far cry from the type of facts that courts may properly consider when using "common sense" and reading the indictment "to include facts which are necessarily implied by the specific allegations made."  *Stavroulakis*, 952 F.2d at 693 (quoting *Silverman*, 430 F.2d at 111).  Accordingly, the Court must disregard Aiyer's repeated reference to and interpretations of the list of dates that the Government voluntarily provided to Aiyer, the potential trial evidence attached as exhibits to his motions, and the analysis offered by Aiyer's two experts.  To do otherwise would be to convert these pretrial motions to dismiss into premature Rule 29 motions based on hypothetical trial evidence.[4]

### 2.  Coordinated trading in an interdealer market can properly be part of a *per se* conspiracy.

Aiyer erroneously argues that coordinated trading in the interdealer market cannot not be part of a *per se* case because it does not constitute "traditional bid rigging or price fixing."  (ECF No. 50 at 12–17.)  In advancing this argument, Aiyer ignores the recent financial markets cases in this circuit in which courts have held directly to the contrary.  *See Usher*, 2018 WL 2424555, at *4 (indictment sufficiently alleged *per se* violation of the Sherman Act based on agreement to fix prices by coordinating trading in the FX interdealer market to affect WMR and ECB fix price); *In re Foreign Exchange*, 74 F. Supp. 3d at 587, 594 (complaint sufficiently alleged *per se*

---

[4]     A timely Rule 29 motion brought after the close of the Government's case at trial would be based not on Aiyer's cherry-picked hypothetical trial evidence but instead on the entirety of the evidence—including incriminating chats, audio recordings, text messages, trading data, and testimony from cooperating witnesses—that the Government will present.

violation of the Sherman Act based on agreement to fix prices by executing "concerted trading strategies" on the interdealer FX platform designed to affect the WMR fix price).[5]

Notwithstanding this clear precedent, Aiyer argues that the coordinated submission of bids or offers by competitors on the Reuters platform cannot constitute bid rigging or price fixing because "supply (or demand) in the interdealer market is not eliminated, but at most deferred," and because such coordinated trading may only "disadvantage a counterparty in a specific transaction at a specific moment, but it is not expected to influence output or price to end-users." (ECF No. 50 at 13.)  Aiyer's argument is based on several non-existent legal requirements.

As to his first argument, whether an indictment sufficiently alleges bid rigging has nothing to do with how long supply and demand is affected, whether there is an impact on the "total activity level in the interdealer market," or how many victims are harmed.  (*See* ECF No. 50 at 13.)  So long as there is an allegation of a *per se* violation, "[n]o further showing of actual adverse effect in the marketplace is necessary.  This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations."  *Gelboim*, 823 F.3d at 776; *see also United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018) (when considering whether the *per se* rule applies, it does not "matter that the alleged agreement would

---

[5]     Aiyer may argue that these cases are distinguishable because the central issue in those cases was manipulation of fix or benchmark rates.  Indeed, this may be why he concedes that it would be inappropriate for him to challenge allegations that he and his co-conspirators "conspired to manipulate benchmark currency prices set during a 'fix.'"  (*See* ECF No. 50 at 6–7.)  To the extent that he intends to distinguish conduct intended to influence benchmark rates from conduct intended to influence real-time prices of CEEMEA currencies, such a distinction is meaningless.  In the financial markets cases discussed above, the courts concluded that agreements to manipulate benchmark rates constituted price fixing because the benchmark rate was a price or a component thereof.  *See, e.g.*, *In re Foreign Exchange*, 74 F. Supp. 3d at 592. Here, the indictment alleges that coordinated trading (separate from coordinated trading around fixes) was intended to affect the current price of CEEMEA currencies on the interdealer platform.

only affect a small number of potential customers"); *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) (rejecting defendant's argument that "the *per se* rule should not apply to the [bid rigging] scheme in which he participated because that scheme, which he says involved 'a few participants in a narrow set of public foreclosure auctions,' did not have any 'demonstrable effect on the pricing or quantity of the real estate sold'").

Second, he wrongly suggests that coordinated trading on an interdealer platform cannot be part of a *per se* bid-rigging or price-fixing case unless it has a "tendency" to affect consumers outside this interdealer platform.  (ECF No. 50 at 13, 15.)  This argument misconstrues the nature of the FX market and the conspiracy alleged in the indictment.  As alleged in the indictment, dealers in the FX market, and traders working on their behalf, compete with each other in two main ways: they compete with each other to win customer orders, (Indictment ¶ 3), and they compete with each other in the interdealer market as they seek to offset positions resulting from these customer orders, (Indictment ¶ 9).  As part of their overall conspiracy to suppress and eliminate competition for CEEMEA currencies, Aiyer and his co-conspirators curtailed their competition by agreeing on prices to quote to customers, (Indictment ¶ 22(f)), and coordinating their trading and pricing strategies on the interdealer market, (Indictment ¶ 22(c), (d)). Accordingly, their overarching agreement to suppress and eliminate competition for CEEMEA currencies was with respect both to prices paid by customers that approached the sales desks of their respective banks *and* to prices paid by other counterparties on the interdealer platform.

Not only is Aiyer's argument based on a mischaracterization of the FX market, he also cites no case law supporting the proposition that an indictment alleging a *per se* violation carried out, in part, through coordinated trading on an interdealer platform must also allege that such coordinated trading had a tendency to affect the price quoted to a customer.  He relies on *Granite*

12

*Partners, L.P. v. Bear Stearns Co. Inc.*, 17 F. Supp. 2d 275 (S.D.N.Y. 1998), to support the drawing of a material distinction between counterparties on an interdealer market and "end-user" customers, but the court in that case did not make that distinction in deciding to apply the rule of reason.

*Granite Partners* involved a civil case where the plaintiffs alleged numerous theories, including breach of contract, breach of fiduciary duty, torts, fraud, and antitrust, including a claim under the Sherman Act. *Granite Partners*, 17 F. Supp. 2d at 281. The court held that the rule of reason applied to the Sherman Act claim, but this conclusion did not depend on any kind of "counterparty"/"end-user" distinction. Rather, the court held that the rule of reason applied due to the specific facts of the case, a contractual dispute arising out of contractual provisions that allowed concerted action in an opaque market created by the defendants:

> [T]he traditional "horizontal price-fixing" paradigm does not contemplate a business practice and circumstance, such as the one alleged here, in which an unprecedented multibillion dollar liquidation took place in a falling market, where the liquidation was governed by contract under which deemed sales were expressly permitted, where all parties understood that the contract permitted some form of concerted action as a mechanism by which to gauge prices, where there was no "widely distributed or readily available" price quotations for [the securities at issue] by which to set a standard price . . . and where all of the Brokers alleged to have created the market were on the "sell" side.

*Id.* at 297. Thus, the court's decision to apply the rule of reason is cabined to its unique facts and is inapplicable here.[6]

---

[6]     Aiyer quotes a section of a subsequent opinion in the same case wherein the court points out that "the [plaintiff] has not alleged that the collusion itself had any impact whatsoever on the secondary market for [the securities], or upon the price at which the Funds' [securities] were resold." (ECF No. 50 at 21 (quoting *Granite Partners, L.P. v. Bear Stearns Co. Inc.*, 58 F. Supp. 2d 228, 243 (S.D.N.Y 1999)).) He seemingly cites to this section in order to argue that collusion must have an impact on the market as a whole, as opposed to merely on particular counterparties. However, this quotation is taken from a section of the court's opinion in which the court was conducting the first step of the rule of reason inquiry. The first step requires the court to determine whether the plaintiff had alleged an "actual adverse effect on competition as a whole

Aiyer inappropriately relies on *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989) for the proposition that "coordinated trading that affects price as a collateral consequence of disadvantaging a counterparty is not price fixing." (ECF No. 50 at 15.) Again, the court did not make that distinction, and the decision cannot be interpreted to support that proposition. Contrary to how Aiyer would like to interpret the holding of that case, the court decided to apply the rule of reason at the summary judgment stage (rather than on a motion to dismiss) because, under the unique facts of that case, the plaintiff had failed to show that the purpose of the conspiracy was price fixing. *Apex*, 713 F. Supp. at 597. In contrast, the indictment here is plain on its face that the alleged conspiracy was formed for the purpose of suppressing and eliminating competition by price fixing and bid rigging. (Indictment ¶ 20.)

Finally, Aiyer wrongly invokes *Board of Trade of City of Chicago v. United States*, 246 U.S. 231 (1918), to argue that the Court must "assess[] the nature of the restraint for the likelihood of anticompetitive effects in order to justify *per se* treatment." (ECF No. 50 at 16.) The nature of the restraint at issue in *Board of Trade* was notably different than the restraint alleged in the indictment here. In that case, the Board of Trade sought to create a public market for a certain type of grain order by restricting the period of price-making. *Bd. of Trade*, 246 U.S. at 240. While the restriction on the "period of price-making" impacted pricing in the sense that all bids during a specific period had to be a specific price, the rule had the effect of taking the private transactions into the public market, increasing pricing transparency and competition for grain to arrive. *Id.* On this specific set of facts, the Supreme Court found that the restraint

---

in the relevant market." *Granite*, 58 F. Supp. 2d at 239 (quoting *K.M.B. Warehouse Distribs., Inc. v. Walker Mfg. Co.*, 61 F.3d 123, 127 (2d Cir. 1995)). This inquiry was wholly unrelated to the court's analysis as to whether the *per se* rule applied and is wholly unrelated to the issue here.

created by the rule was reasonable. *Id.* at 241.  In contrast, the indictment here alleges that Aiyer

and his co-conspirators agreed to *suppress* competition by fixing prices and rigging bids,

arguably decreasing price transparency and competition.

In sum, Aiyer's argument is flawed because he mischaracterizes the nature of the FX

market and the competitive relationship of Aiyer and his co-conspirators.  Furthermore, his

reliance on fact-specific, inapposite cases addressing notably different conduct, rather than recent

cases in this circuit addressing similar conduct in the financial markets industry, reveals the

weakness of his argument.  Consistent with the relevant precedent addressing this conduct in this

industry, the indictment against Aiyer plainly alleges price fixing and bid rigging and the *per se*

rule therefore applies.

### 3. Consideration of any purported procompetitive benefits is improper in a *per se* case.

Aiyer unpersuasively argues that the coordinated trading conduct was ancillary to a

procompetitive enterprise and, therefore, the rule of reason should apply.  (ECF No. 50 at 17–

22.)  More specifically, he asks the Court to accept his factual assertion that the chatroom

between Aiyer and his co-conspirators was a "joint venture" created for the purpose of sharing

information and sourcing liquidity and that the agreement with respect to coordinated trading on

the interdealer platform was a restraint ancillary to this joint venture.  As a threshold matter,

none of the justifications offered by Aiyer—e.g., the need to share information, source liquidity,

or manage risk—are based on facts alleged in the indictment.  (*See* ECF No. 50 at 17–22.)

Accordingly, the Court may not properly consider them at this stage as a procedural matter.

*Alfonso*, 143 F.3d at 776–77.

Second, as a matter of law, the Court may not consider procompetitive benefits in a *per*

*se* case.  Aiyer's argument that the supposed benefits render this conspiracy subject to the rule of

reason misapprehends the nature of a *per se* violation.  Once a court determines that nature of the

restraint at issue falls into one of the categories deemed to be *per se* unlawful, then any

consideration of purported procompetitive benefits is improper.  *See Leegin Creative Leather*

*Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (*per se* application "eliminates the need to

study the reasonableness of an individual restraint in light of the real market forces at work");

*Gelboim*, 823 F.3d at 771 ("Horizontal price-fixing conspiracies among competitors are unlawful

*per se*, that is, without further inquiry.").  As the Supreme Court explained in *Arizona v.*

*Maricopa County Medical Society*:

> The respondents' principal argument is that the *per se* rule is inapplicable because
> their agreements are alleged to have procompetitive justifications. The argument
> indicates a misunderstanding of the *per se* concept. The anticompetitive potential
> inherent in all price-fixing agreements justifies their facial invalidation even if
> procompetitive justifications are offered for some.

457 U.S. 332, 351 (1982).  This has been the law for over a century, as the Supreme Court "has

consistently and without deviation adhered to the principle that price-fixing agreements are

unlawful *per se* under the Sherman Act and that no showing of so-called competitive abuses or

evils which those agreements were designed to eliminate or alleviate may be interposed as a

defense."  *Socony-Vacuum*, 310 U.S. at 218.  Accordingly, Aiyer's purported justifications have

no place in this case.

   As a result, Aiyer's reliance on cases addressing joint ventures and ancillary restraints is

misplaced.  (*See* ECF No. 50 at 17–22.)  In each of the three cases he cites addressing joint

ventures, the agreement at issue was a bona fide joint venture that allowed for the creation of a

new enterprise that, absent the existence of the joint venture, would not otherwise exist.  *See*

*Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 21–22 (1979) (plaintiff challenged

blanket license arrangement that was "truly greater than the sum of its parts; it is, to some extent,

a different product"); *nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 1:11-CV-3728-AT, 2012 WL 13009231 at *6 (N.D. Ga. July 24, 2012) (plaintiff challenged right of "bona fide joint venture" to set pricing schedule for centralized prepaid card reload network that was the purpose of the joint venture); *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1017 (N.D. Cal. 2008) (plaintiffs challenged ATM network's setting of fixed interchange fees, which court concluded was the "core activity" of joint venture and necessary if the venture's product was to be available at all). That is not the case here. Indeed, while the Government does not dispute that some chatroom activities may have been legitimate, that does not somehow transform *all* chatroom activities into those of a "joint venture." What the Government alleges in the indictment is that *some* of those chatroom activities were in furtherance of a *per se* unlawful conspiracy.

Moreover, by participating in that conspiracy, Aiyer and his co-conspirators did not enter into a "bona fide joint venture" for the purpose of creating some new product the price of which they might be entitled to set; instead, as the indictment alleges, the FX market is a global market that includes CEEMEA currencies, and the defendant and his co-conspirators conspired "to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies." (Indictment ¶¶ 1, 20). For the same reasons, the cases that Aiyer cites regarding the doctrine of ancillary restraints also do not apply. *See Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (doctrine of ancillary restraints applied to exclusivity agreement between nationwide van line and carrier agents because they facilitated "contract integration or joint venture" that constituted the nationwide van line by "eliminating the problem of the free ride"); *Polk Bros. v. Forest City Enters., Inc.*, 776 F.2d 185, 190 (7th Cir. 1985) (doctrine of ancillary restraints applied to horizontal restrictive covenant

entered into by two businesses that sold complementary products when covenant enabled creation of a cooperative venture, a new store that would house both entities).  There is no joint venture alleged in the indictment that could have justified any ancillary restraint of trade.

Aiyer's comparison to the *Usher* case is telling.  Aiyer notes that "the trading coordination the Government challenges here was front and center in [*Usher*]" and argues that "[b]ecause these behaviors advanced legitimate purposes of interdealer coordination, they cannot be treated as *per se* violations of the antitrust laws."  (ECF No. 50 at 22.)  Some of the conduct identified by Aiyer was indeed similar to the conduct at issue in *Usher*, but the *Usher* court nonetheless denied the defendants' motion to dismiss, which raised the same argument Aiyer makes now, and held that the indictment alleged a *per se* violation of the Sherman Act.  2018 WL 2424555, at *2 n.2 (rejecting all arguments raised by the defendants in their motion to dismiss); Mem. Law Supp. Defs.' Mot. Dismiss Indictment at 13–16, *United States v. Usher*, No. 17 CR 19 (RMB) (S.D.N.Y. Nov. 17, 2017), ECF No. 63 (arguing the purported procompetitive benefits of exchanging information and sourcing liquidity).  The Court should do so here as well.

### 4.  The indictment alleges a horizontal, not vertical, agreement.

Aiyer's argument that he and his co-conspirators were not always competitors, but were instead in a "vertical" buyer-seller relationship, (ECF No. 50 at 23–26), is also meritless.  A horizontal agreement is one between persons at "the *same level* of the market structure," *i.e.*, competitors, whereas a vertical agreement is one between persons at "*different levels* of the market structure," such as manufacturers and distributors.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (emphasis added).  The indictment alleges that Aiyer and his co-conspirators, as CEEMEA traders at rival banks, were at all relevant times competitors in the FX market.  (*See* Indictment ¶ 3 ("[T]raders at rival banks compete with each other to win customer

18

orders."); Indictment ¶ 9 ("CEEMEA traders at rival banks are in continuous competition with each other in the interdealer market.")).  As traders from rival banks competing in the FX market, Aiyer and his co-conspirators were operating at the same level of the market structure.

Courts in this circuit have repeatedly recognized that banks, and the traders working on their behalf, were indeed competitors capable of committing *per se* violations of Section One of the Sherman Act.  These financial markets cases are closely analogous to this case, and again Aiyer fails to distinguish them.  The defendants in *Usher*, for example, made almost the exact same argument that Aiyer makes here, and the district court rejected it.  There the defendants argued that the indictment failed to allege a horizontal restraint of trade because the defendants "were not always buyers, or always sellers, in the FX spot market" and "they were regularly potential counterparties of one another, standing in vertical relationships—on different sides of the market—and continually making euro-dollar sales with each other, just as they did with other market participants."  Mem. Law Supp. Defs.' Mot. Dismiss Indictment at 10, *United States v. Usher*, No. 17 CR 19 (RMB) (S.D.N.Y. Nov. 17, 2017), ECF No. 63.  The court rejected this argument, concluding, "Defendants' alleged behavior constitutes a horizontal restraint of trade because it is an agreement among competitors at the same level of the market, *i.e.*, they were traders working for dealers in the FX spot market . . . .  Defendants in this case were competing at the 'same level' of the market whether or not they were buying or selling at any given moment."  *Usher*, 2018 WL 2424555, at *4 (citing *Topco*, 405 U.S. at 608; *In re Foreign Exchange*, 74 F. Supp. 3d at 592).

Similarly, in *In re Foreign Exchange*, the court held that the plaintiffs had sufficiently alleged a horizontal price-fixing conspiracy because the Complaint alleged that defendant banks were "'horizontal competitors in the FX market' who compete for customers by supplying

19

different bid and ask quotations," and also that many customers choose to transact at the fix rate, which was "set on the basis of transactions in which [defendant banks] are supposed to be offering competitive bid and ask quotes." 74 F. Supp. 3d at 594–95.  Likewise, in *Gelboim*, the Court of Appeals for the Second Circuit concluded that "[a]lthough LIBOR was set jointly, the Banks remained horizontal competitors in the sale of financial instruments" and that by pleading that the banks colluded to depress the LIBOR rate, the plaintiffs had sufficiently alleged a horizontal price-fixing conspiracy subject to *per se* analysis.  823 F.3d at 766, 771.  It is no different in this case; Aiyer and his co-conspirators were at all times traders at rival banks competing on the same level of the market and, acting in their capacities as competitors (*i.e.*, in a horizontal relationship), they agreed "on the way in which they [would] compete with one another," *NCAA*, 468 U.S. at 99, in order to affect the price of CEEMEA currencies.

Aiyer inappropriately looks beyond the four corners of the indictment to assert that, according to his lawyer's affidavit, the relationship he had with Katz for ruble trading was vertical, (*see* Decl. of Martin Klotz ("Klotz Decl.") ¶ 11, ECF No. 51) and, thus, any agreement between them with respect to price should be subject to the rule of reason.  (*See* ECF No. 50 at 23–26.)  In particular incidents described in Aiyer's lawyer's affidavit, Aiyer and Katz, both ruble traders, agreed on the price to be quoted to a customer, the customer traded with Katz, and Katz subsequently engaged in an offsetting trade with Aiyer.  (Klotz Decl. ¶ 11, ECF No. 51.) Aiyer erroneously argues that in such instances Aiyer and Katz were in a vertical relationship "with Mr. Aiyer as the supplier and Mr. Katz as a distributor."  (ECF No. 50 at 24.)[7]  Not only is

---

[7]    Aiyer concedes that "if [he] and his alleged coconspirators agreed on prices to quote specific customers at specific times, this practice would look like a . . . type of horizontal price fixing" subject to the *per se* rule. (ECF No. 48 at 6–7.)

this argument based on facts outside the four corners of the indictment, but it is also wrong as a matter of law.

Although these facts are wholly outside the indictment, even if the indictment had specifically alleged this conduct, the agreement would still properly be characterized as horizontal.  The agreement between Katz and Aiyer on what price to quote a customer was horizontal because, as competing dealers making prices to customers, they were operating at the same market level of the structure.  This is true even if Aiyer supplied Katz with rubles after the fact.  Indeed, the Court of Appeals for the Second Circuit, has applied the *per se* rule to similar conduct.

In *Koppers*, the defendant company and its co-conspirator were alleged to have entered into a horizontal conspiracy to rig bids and allocate territories for the sale of road tar throughout Connecticut.  652 F.2d at 291.  At times throughout the conspiracy, the defendant was also a supplier of tar to its co-conspirator, ultimately becoming the co-conspirator's sole supplier.  *Id.* at 292.  Based on this fact, the defendant argued that it could not be said to have engaged in a horizontal conspiracy because it was in a vertical relationship with its co-conspirator.  *Id.* at 296. The court rejected this argument because the defendant and his co-conspirator entered into the agreement to rig bids and allocate markets as horizontal competitors; the fact that the defendant ended up supplying its co-conspirator as well did not have "any effect on the basic non-competitive relationship between the companies."  *Id.* at 297.  So, too, here.  Even if Katz did offset his position with Aiyer after trading with a customer, that does not have any effect on the basic competitive relationship between Aiyer and Katz at the time they agreed on prices to quote to customers.

21

The cases relied upon by Aiyer are inapposite.  Two of these cases are not analogous because the agreements at issue were entered into by entities that were, at the time, operating at different levels of the market structure.  *See, e.g.*, *Leegin*, 551 U.S. at 883–84 (considering agreement between manufacturer and distributors regarding minimum price that distributor could charge); *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, No. 10 Civ. 8 (DAB), 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) (considering agreement between manufacturer's dual distributor, acting on behalf of manufacturer, and dealer regarding intra-brand competition).

The third case, *In re Sulfuric Acid Antitrust Litigation*, addresses a unique circumstance more akin to a joint venture.  703 F.3d 1004 (7th Cir. 2012).  In *Sulfuric Acid*, the court considered an agreement between Canadian mining companies that were involuntary producers of sulfuric acid and U.S. chemical companies that were both producers and distributors of sulfuric acid.  *Id.* at 1008–09.  For environmental reasons, the Canadian government required mining companies to convert sulfur dioxide into sulfuric acid and the Canadian market for sulfuric was not large enough to accommodate all of their sulfuric acid.  *Id.* at 1008.  Meanwhile, there was demand for sulfuric acid in the United States, but the U.S. companies were not able to very profitably produce sulfuric acid.  *Id.* at 1009.  Consequently, the Canadian companies struck a deal with the U.S. companies: the U.S. companies would distribute the comparatively cheaper Canadian sulfuric acid to U.S. customers, and the U.S. companies would stop producing their more expensive sulfuric acid.  *Id.*  The Canadian companies would sell sulfuric acid to the U.S. companies at a lower price to make distribution more profitable than production.  *Id.*

The plaintiffs were purchasers of sulfuric acid and they argued that these "shutdown agreements" constituted a *per se* price-fixing offense because the agreements restricted output and therefore raised prices.  *Id.*  The Court of Appeals for the Seventh Circuit held that, although

there was a literal output restriction (U.S. companies would stop producing their more expensive sulfuric acid), the agreement was unlike the price-fixing agreement in *Socony-Vacuum* because "the only aim and effect of the price-fixing agreement in *Socony-Vacuum* were to raise price; in this case the aim was to facilitate entry [of cheaper Canadian sulfuric acid] into the U.S. market, which would (and eventually did, as we'll see) lower prices and prevent the shutdown of Canadian smelting operations, which would have reduced output and raised the price of sulfuric acid in the United States." *Id.* at 1012. Those conclusions, along with the peculiar facts of the involuntary nature of the Canadian production and potential antidumping exposure if the Canadian companies attempted to sell directly in the United States, counseled for the application of the rule of reason. *Id.* at 1011–12.

In contrast here, there was no such relationship between Aiyer and Katz. Katz did not have customers who were otherwise unavailable to Aiyer; they were both market makers in rubles working at major banks, meaning that customers could come to both of them for ruble trades. To the customer seeking to transact in rubles with a market maker, Aiyer and Katz were at the same distribution level; in other words, they were competitors.

As discussed, *supra*, numerous courts in this circuit have considered facts and allegations very similar to those presented in the indictment against Aiyer. These courts uniformly rejected arguments that the defendant banks, and traders working for them, were not competitors capable of *per se* violations of the Sherman Act. *Gelboim*, 823 F.3d at 766, 771; *Usher*, 2018 WL 2424555, at *4; *In re Foreign Exchange*, 74 F. Supp. 3d at 594–95. In light of this precedent, and long-standing precedent interpreting the Sherman Act, the indictment plainly alleges a horizontal conspiracy between competitors at the same level of the market structure, and the *per se* rule applies.

II.     **The indictment sufficiently alleges a single crime in a single count, so the Court should deny Aiyer's motion to dismiss the indictment as duplicitous.**

A conspiracy charge does not become duplicitous when it alleges multiple means and methods.  "An indictment is impermissibly duplicitous where: 1) it combines two or more distinct crimes into one count in contravention of Fed. R. Crim. P. 8(a)'s requirement that there be a separate count for each offense, and 2) the defendant is prejudiced thereby."  *United States v. Vilar*, 729 F.3d 62, 79 (2d Cir. 2013) (quoting *United States v. Sturdivant*, 244 F.3d 71, 75 (2d Cir. 2001)).  The Court of Appeals for the Second Circuit has cautioned that "[a] conspiracy indictment presents 'unique issues' in the duplicity analysis because 'a single agreement may encompass multiple illegal objects.'"  *United States v. Aracri*, 968 F.2d 1512, 1518 (2d Cir. 1992) (quoting *United States v. Murray*, 618 F.2d 892, 896 (2d Cir. 1980)).  Courts must be keen, therefore, to distinguish "[a] duplicitous indictment, which alleges several offenses in the same count" from "'the allegation in a single count of the commission of a crime by several means.'  The latter is not duplicitous."  *Id.* (quoting *Murray*, 618 F.2d at 896).

When an "[i]ndictment on its face sufficiently alleges a single conspiracy, the question of whether a single or multiple conspiracies exist is a question for the jury and is not a basis to dismiss the conspiracy count."  *United States v. Szur*, No. S5 97 CR 108 (JGK), 1998 WL 132942, at *11 (S.D.N.Y. Mar. 20, 1998); *see also Aracri*, 968 F.2d at 1519 ("Whether the government has proved a single conspiracy or has instead proved 'multiple other independent conspiracies is a question of fact for a properly instructed jury.'" (quoting *United States v. Alessi*, 638 F.2d 466, 472 (2d Cir. 1980))).  Courts in this circuit have held that "boilerplate allegations of a single conspiracy" survive this "facial test."  *United States v. Ohle*, 678 F. Supp. 2d 215, 222 (S.D.N.Y. 2010).  Applying this standard, "courts in this Circuit have repeatedly denied motions

24

to dismiss a count as duplicitous." *United States v. Rajaratnam*, 736 F. Supp. 2d 683, 688

(S.D.N.Y. 2010) (quoting *Ohle*, 678 F. Supp. 2d at 222).

### A. The indictment properly alleges a single overarching price-fixing and bid-rigging conspiracy constituting a *per se* violation of the Sherman Act.

The sole count in this indictment properly alleges a single overarching conspiracy.

Specifically, the indictment alleges that

> AIYER and his co-conspirators, and others known and unknown, knowingly entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere. The combination and conspiracy engaged in by AIYER and his co-conspirators was in unreasonable restraint of interstate trade and commerce in violation of Section One of the Sherman Act (15 U.S.C. § 1).

(Indictment ¶ 20.) The indictment further alleges:

> The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among Aiyer and his co-conspirators, the substantial terms of which were to suppress and eliminate competition for the purchase and sale of CEEMEA currencies by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere.

(Indictment ¶ 21.) The foregoing allegations are sufficient as a matter of law to allege a single

conspiracy because they allege a "collective venture directed toward a common goal." *See*

*Aracri*, 968 F.2d at 1521 ("The essence of the crime of conspiracy is the agreement. '[I]n order

to prove a single conspiracy, the government must show that each alleged member agreed to

participate in what he knew to be a collective venture directed toward a common goal.'" (quoting

*United States v. Maldonado-Rivera*, 922 F.2d 934, 963 (2d Cir. 1990)). The indictment alleges

one agreement with one common goal—"to suppress and eliminate competition by fixing prices

of, and rigging bids and offers for, CEEMEA currencies." (Indictment ¶ 20.) As such, this

conspiracy is properly alleged in one count.

25

**B.**     **Aiyer's arguments to the contrary have no merit.**

As discussed, *supra*, the alleged price-fixing and bid-rigging agreement is subject to the

*per se* rule.  Aiyer unpersuasively attempts to redraft the indictment and insert facts outside the

indictment in order to allege two separate conspiracy counts—one subject to the rule of reason,

one subject to the *per se* rule.  To the extent that Aiyer's argument relies on evidence and

allegations outside the four corners of the indictment, (*see, e.g.*, ECF No. 48 at 10–11 (describing

specific instances of trading between Aiyer and Katz)), the Court must disregard that evidence.

*Alfonso*, 143 F.3d at 776–77.  To the extent that Aiyer's argument is based on the allegations in

the indictment, (*see, e.g.*, ECF No. 48 at 8 (arguing that information sharing as alleged in

paragraph 22(a) does not constitute a *per se* violation of the Sherman Act)), his argument is

fundamentally flawed as a matter of law because he erroneously treats the means and methods

set forth in paragraph 22 of the indictment as standalone crimes.

The Government need not show that each of the means and methods is, standing alone,

unlawful.  Rather, the means and methods alleged must be considered in relation to the overall

conspiracy.  Here, it is irrelevant that certain activities such as revealing customer information,

risk positions, and trading strategies as set forth in paragraph 22(a) may not alone constitute a

*per se* crime; what is relevant is that revealing such information enabled Aiyer and his co-

conspirators to carry out a conspiracy prohibited under the Sherman Act.  As explained in

*American Tobacco Company v. United States*:

> It is not of importance whether the means used to accomplish the unlawful objective
> are in themselves lawful or unlawful.  Acts done to give effect to the conspiracy
> may be in themselves wholly innocent acts.  Yet, if they are part of the sum of the
> acts which are relied upon to effectuate the conspiracy which the statute forbids,
> they come within its prohibition.

328 U.S. 781, 809 (1946).  Thus, whether application of the *per se* rule is appropriate depends on

the nature of the conspiracy, not the means and methods by which it was effectuated.  *See, e.g.*,

*United States v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015) (*per se* rule applies to price-fixing

conspiracy, even though it was implemented in part through vertical agreements with

distributors).  Here, because the indictment alleges a single conspiracy to fix prices and rig bids,

the *per se* rule applies regardless of whether particular means and methods may or may not

amount to *per se* violations standing alone.

Furthermore, the fact that more than one means or method was used to effectuate the

single conspiracy does not render the indictment duplicitous.  Federal Rule of Criminal

Procedure 7(c)(1) explicitly provides for this: "A count may allege . . . that the defendant

committed [the offense] by one or more specified means."  Fed. R. Crim. P. 7(c)(1); *see also* 1A

Charles A. Wright & Arthur R. Miller, et al., *Federal Practice & Procedure* § 142 (4th ed. 2018)

("Rule 7(c) permits a single count of an indictment to allege that the defendant committed an

offense by one or more specified means, and so there is no bar to stating a charge in a single

count if a statute is read to create a single crime but provides for various ways to commit it.

Indeed, the charge must be brought in one count, since the use of several counts in such a case

would be multiplicitous.").  The Court of Appeals for the Second Circuit has held that a

conspiracy "may involve a multiplicity of ways and means of action and procedure." *Aracri*, 968

F.2d at 1522 (quoting *United States v. Crosby*, 294 F.2d 928, 945 (2d Cir. 1961)); *United States*

*v. Droms*, 566 F.2d 361, 363 (2d Cir. 1977) ("Fed. R. Crim. P. 7(c)(1) permits allegation in a

single count that an offense has been committed in a multiplicity of ways; such a count is not

duplicitous.").

The Supreme Court has even stated that it is preferable that "[a] single offense . . . be

charged in one count rather than several, even if different means of committing the offense are

alleged."  *Sanabria v. United States*, 437 U.S. 54, 66 n.20 (1978).  With respect to conspiracies,

specifically, the Supreme Court has reiterated that "[t]he single agreement is the prohibited conspiracy, and however diverse its objects it violates but a single statute." *Braverman v. United States*, 317 U.S. 49, 54 (1942). Here, the fact that different means and methods (e.g., revealing sensitive information, (Indictment ¶ 22(a)); coordinating bidding offering, and trading, (Indictment ¶ 22(b), (c)); or agreeing on pricing to quote to customers, (Indictment ¶ 22(f))), are alleged does not render the indictment duplicitous because all of these means and methods are alleged to have effectuated a single unlawful agreement.

Likewise, that different members of the conspiracy were involved in different types of conduct and at different times also does not transform a single conspiracy into multiple conspiracies. It is well-settled that a single conspiracy is not necessarily transformed into multiple conspiracies merely by the virtue of "lapse of time, change in membership, or a shifting emphasis on its locale of operations." *Aracri*, 968 F.2d at 1521 (quoting *United States v. Nersesian*, 824 F.2d 1294, 1303 (2d Cir. 1987)). It is not even necessary that each co-conspirator "'was aware of all acts committed in furtherance of' the conspiracy." *Id.* (quoting *Alessi*, 638 F.2d at 473). A single conspiracy is alleged if it is alleged that the conspirators "agreed to participate in what he knew to be a collective venture directed towards a common goal"; simply put, they must have "agreed on the essential nature of the plan." *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (quoting *United States v. Berger*, 224 F.3d 107, 114 (2d Cir. 2000) (quoting *Maldonado-Rivera*, 922 F.2d at 963)). Here, although the indictment alleges that the conspiracy was effectuated through various means and methods that may have been employed by different members of the conspiracy at different times, employment of these means and methods was for the furtherance of *one* purpose—to suppress and eliminate competition by

fixing prices of, and rigging bids and offers for, CEEMEA currencies.  Accordingly, the

indictment sufficiently alleges a single overarching conspiracy.

Aiyer's analogy to *United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013)

is inapt.  (*See* ECF No. 48 at 12.)  In that case, the indictment alleged, in Count One, conspiracy

to commit wire fraud and conspiracy to commit bank fraud.  The court concluded that the

indictment was duplicitous, distinguishing it from an indictment that may have properly alleged

"a single count of conspiracy [that] include[d] the commission of several crimes as its objective."

*Abakporo*, 959 F. Supp. 2d at 390.  That is not the case here.  The indictment alleges a single

overarching conspiracy unified by a single purpose—suppressing and eliminating competition by

fixing prices of, and rigging bids and offers for, CEEMEA currencies, in violation of 15 U.S.C.

§ 1.  Accordingly, the offense is appropriately charged in one count.[8]

### C.    The single conspiracy alleged in the indictment falls within the statute of limitations.

The indictment alleges that the conspiracy took place "[f]rom at least as early as October

2010 and continuing until at least July 2013."  (Indictment ¶ 20.)  The statute of limitations in a

criminal case brought under the Sherman Act is five years.  18 U.S.C. § 3282(a) ("[N]o person

---

[8]       Even if the indictment were deemed to be duplicitous, "[d]uplicity does not necessarily
require dismissal of an indictment."  *Sturdivant*, 244 F.3d at 79.  Among the remedies available
to avoid prejudice is a multiple-conspiracies jury instruction.  *Id*; *Ohle*, 678 F. Supp. 2d at 223
n.7 ("Courts have noted that much of the risk of prejudice created by a potentially duplicative
charge can be cured through proper instructions at trial." (citing *Szur*, 1998 WL 132942, at
*11; *Murray*, 618 F.2d at 898)).  Contrary to Aiyer's assertion, (*see* ECF No. 48 at 15), it is not
erroneous for a district court to give a multiple-conspiracies jury instruction in a single-defendant
trial if appropriate based on the evidence.  *See, e.g.*, *United States v. Restrepo*, 547 F. App'x 34,
40–41 (2d Cir. 2013) (concluding, without deciding if instruction was required, that district
court's multiple-conspiracies jury instruction in a single-defendant trial was sufficient); *United
States v. Peters*, 543 F. App'x 5, 8 (2d Cir. 2013) (multiple-conspiracies jury instruction in a
single-defendant trial was sufficient).

shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found

or the information is instituted within five years next after such offense shall have been

committed.").  The grand jury in this case returned the indictment on May 10, 2018, and it was

filed on the same day, thus "finding" the indictment within five years of the alleged offense.

*United States v. Srulowitz*, 819 F.2d 37, 40 (2d Cir. 1987) ("For the purpose of tolling the statute

of limitations, an indictment is 'found' when it is returned by the grand jury and filed.").  On its

face, the indictment alleges a conspiracy that falls within the statute of limitations, so it is not

time-barred.  *United States v. Kogan*, 283 F. Supp. 3d 127, 134 (S.D.N.Y. 2017) ("In the specific

context of a motion based on statute of limitations grounds, a pre-trial motion to dismiss is

premature if the indictment is facially sufficient and the defendant's argument in favor of

dismissal requires a determination of factual issues.").

## CONCLUSION

Courts long have recognized that a horizontal price-fixing and bid-rigging agreement is

*per se* illegal under the Sherman Act.  The indictment against Aiyer properly alleges a single

conspiracy in which Aiyer and his co-conspirators, competitors in the FX market, agreed to

suppress and eliminate competition by fixing prices of, and rigging bids and offers for,

CEEMEA currencies, which is a *per se* violation of the Sherman Act.  The allegations contained

in the four corners of the indictment constitute a single overarching conspiracy to fix prices and

rig bids carried out through multiple means and methods, and is therefore not duplicitous.  The

Court should reject Aiyer's improper invitation to evaluate individual means and methods as

separate charges and to prematurely evaluate the sufficiency of trial evidence.  Accordingly, the

Court should deny Aiyer's motions to dismiss.

Respectfully submitted,


/s/ Katherine Calle

Kevin Hart
Katherine Calle
David Chu
Eric Hoffmann

U.S. Department of Justice, Antitrust Division
New York Office
26 Federal Plaza, Room 3630
New York, NY 10278
212-335-8048
katherine.calle@usdoj.gov