UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA      :      18 Cr. 333 (JGK)

           v.                 :

AKSHAY AIYER,                :

           Defendant.      :

------------------------------------------------------x

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## <u>DEFENDANT'S MOTIONS TO DISMISS</u>

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Michael S. Schachter
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT .............................................................................................................4

I.    The Government Cannot Substitute Its Own Conclusions For The Court's
Reasoned Analysis Of The Conduct Underlying The Indictment ...................4

    A.    The Indictment's Conclusory Allegations Of "Fixing Prices" And
"Rigging Bids" Do Not Determine The Applicability Of The Per Se
Rule ...........................................................................................................5

    B.    The Likely Effects Of The Alleged Conduct Are The Crux Of Whether
The Per Se Rule Applies ...........................................................................6

II.    The Government Ignores Mr. Aiyer's Arguments That The Conduct Actually
At Issue Is Not A Per Se Violation ...............................................................7

    A.    The Challenged Coordinated Trading In The Interdealer Market Is Not
A Per Se Violation ....................................................................................7

        1.    The Challenged Coordinated Trading In The Interdealer
Market Is Neither Bid Rigging Nor Price Fixing..................8

        2.    The Government Completely Ignores The Context In Which
The Alleged Coordinated Trading In The Interdealer Market
Occurred...............................................................................10

    B.    The Alleged Conduct Related To Ruble Trading Between Mr. Aiyer
And Mr. Katz Is Not A Per Se Violation .................................................13

        1.    The Government Mischaracterizes The Vertical Relationship
Between Mr. Aiyer And Mr. Katz In The Ruble Market....................14

III.    Resolution Of The Threshold Legal Issue In The Antitrust Motion Need Not
Wait Until After The Presentation Of Evidence At Trial ............................17

IV.    Mr. Aiyer's Duplicity Motion Should Be Granted ...................................21

    A.    The Indictment Alleges Distinct, Disconnected Behaviors That
Amount To Separate Potential Antitrust Crimes ...........................21

    B.    The Government's Conclusory Assertion That The Behaviors Are
"Means And Methods" Of A "Price-Fixing And Bid-Rigging
Conspiracy" Does Not Resolve The Issue Of Duplicity................22

    C.    Mr. Aiyer Is Prejudiced By The Duplicitous Indictment................23

CONCLUSION.........................................................................................24

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Apex Oil Co. v. DiMauro*,
   713 F. Supp. 587 (S.D.N.Y. 1989).............................................................2, 4

*In re ATM Fee Antitrust Litig.*,
   554 F. Supp. 2d 1003 (N.D. Cal. 2008) .............................................12

*Blanksteen v. N.Y. Mercantile Exch.*,
   879 F. Supp. 363 (S.D.N.Y. 1995)......................................................6

*Board of Trade of City of Chicago v. United States*,
   246 U.S. (1918)...................................................................................7

*Broadcast Music, Inc., v. Columbia Broadcasting Systems, Inc. ("BMI")*
   441 U.S. 1 (1979)...............................................................5, 6, 10, 12

*Craftsmen Limousine, Inc. v. Ford Motor Co.*,
   363 F.3d 761 (8th Cir. 2004) .........................................................2, 18

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
   74 F. Supp. 3d 581 (S.D.N.Y. 2015)...................................................9

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*
   No. 10 Civ. 8 (DAB), 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) .............................14

*Gelboim v. Bank of America Corp.*,
   823 F.3d 759 (2d. Cir. 2016)...............................................................9

*Granite Partners, L.P. v. Bear, Sterns & Co.*,
   58 F. Supp. 2d 228 (S.D.N.Y. 1999)....................................................8

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)..........................................................6, 10, 12, 14

*Medical Center at Elizabeth Place, LLC v. Atrium Health System, et al.*,
   No. 17-3863, 2019 WL 1848532 (6th Cir. Apr. 25, 2019)....................................3, 18, 19

*nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*,
   No. 11 Civ. 3728 (AT), 2012 WL 13009231 (N.D. Ga. July 24, 2012)....................12, 14

*NYNEX Corp. v. Discon, Inc.*,
   525 U.S. 128 (1998)..............................................................................8

*Pennsylvania Ave. Funds v. Borey*,
   569 F. Supp. 2d 1126 (W.D. Wash. 2008)..................................................................8, 19

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
   776 F.2d 185 (7th Cir. 1985) ...........................................................................12, 13, 15

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
   792 F.2d 210 (D.C. Cir. 1986)........................................................................................13

*Skilling v. United States*,
   561 U.S. 358 (2010)..................................................................................................3, 20

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997)....................................................................................................10, 14

*United States v. Abakporo*,
   959 F. Supp. 2d 382 (S.D.N.Y. 2013)......................................................................22, 23

*United States v. Aracri*,
   968 F.2d 1512 (2d Cir. 1992.....................................................................................22, 23

*United States v. Aviv*,
   No. 95 Cr. 386 (LLS), 1996 WL 48611 (S.D.N.Y. Feb. 6, 1996),
   *adhered to on reconsideration*, 923 F. Supp. 35 (S.D.N.Y. 1996) ......................................4

*United States v. Bell*,
   584 F.3d 478 (2d Cir. 2009)..........................................................................................23

*United States v. Jones*,
   542 F.2d 661 (6th Cir. 1976) ...........................................................................................5

*United States v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981)....................................................................................15, 16

*United States v. Pierce*,
   479 F.3d 546 (8th Cir. 2007) ........................................................................................23

*United States v. Pirro*,
   212 F.3d 86 (2d Cir. 2000).............................................................................................4

*United States v. Sampson*,
   898 F.3d 270 (2d Cir. 2018)..........................................................................................18

*United States v. Ulbricht*,
   No. 14 Cr. 68 (KBF), 2015 WL 413426 (S.D.N.Y. Feb. 2, 2015) ...................................23

*United States v. U.S. Gypsum Co.*,
   438 U.S. 422 (1978)................................................................................................6, 18

*United States v. Usher*,
   No. 17 CR 19 (RMB), 2018 WL 2424555 (S.D.N.Y. May 4, 2018)..................................9


**Statutes, Rules and Regulations**

Fed. R. Crim. P. 29 (a) ...........................................................................................................1, 18


**Other Authorities**

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 1909b (2018) ....................5, 18

Federal Trade Commission and U.S. Department of Justice Antitrust Division:
   Antitrust Guidelines for Collaborations Among Competitors (Apr. 2000)..........8

U.S. Department of Justice Antitrust Division: Antitrust Division manual
   (Apr. 2015)....................................................................................................................3

Defendant Akshay Aiyer respectfully submits this Reply Memorandum of Law in further support of his Motion to Dismiss the Indictment in Part for Failure to Allege a Crime (ECF No. 50 (the "Antitrust Motion")) and his Motion to Dismiss the Indictment as Impermissibly Duplicitous (ECF No. 48 (the "Duplicity Motion")) (together, the "Motions to Dismiss").[1]

## PRELIMINARY STATEMENT

Mr. Aiyer seeks a determination that most of the conduct charged in the Indictment is not classic per se price fixing or bid rigging, and thus cannot be prosecuted criminally.  The Government has described this request as a "premature Rule 29 motion."  (Opp. at 1.)  But this characterization is inapt, as Mr. Aiyer's Antitrust Motion does not seek a ruling that "the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  Instead, the motion takes facts identified by the Government to show the actual conduct underlying the Indictment and seeks a threshold legal determination—whether the conduct, if proven, should be treated as a per se antitrust violation or analyzed under the rule of reason.  This determination is properly made by the Court before trial.

On May 10, 2018, the Government charged Mr. Aiyer with a single conclusory count of conspiracy to violate Section 1 of the Sherman Act by "fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere."  (Indictment ¶¶ 20-23.)  On April 19, 2019, in response to Mr. Aiyer's request for more particulars, and pursuant to the Court's December 17, 2018 scheduling order (ECF No. 43), the Government provided Mr. Aiyer with a revised list of 60 allegedly collusive trading-related episodes among the Rand Chat

---

[1] This single Memorandum in support of the Antitrust Motion and the Duplicity Motion comes in response to the United States' Omnibus Memorandum of Law in Opposition to Defendant's Motions to Dismiss the Indictment (ECF No. 55 (the "Opposition" or "Opp.")).  Unless otherwise noted, all capitalized terms herein shall have the meanings set forth in Mr. Aiyer's Motions to Dismiss.

Room members that occurred on 54 days that the Government may feature in its case-in-chief.[2]
Mr. Aiyer's Motions to Dismiss establish that the Indictment, as amplified by the Government's
list of 60 trading-related episodes, charges at least three distinct behaviors: 1) coordinated trading
on the interdealer platform; 2) coordinated ruble trading; and 3) coordinated trading directly
affecting customers.  The first two of these behaviors cannot constitute price fixing or bid
rigging.

The Government does not dispute Mr. Aiyer's characterization of these three distinct
behaviors, arguing instead that any challenges to its incantations of the words "price fixing" and
"bid rigging" must wait until after its full presentation of evidence at trial.  The Government is
mistaken.  Such a finding would effectively immunize all Sherman Act charges from pretrial
scrutiny, as the simple recitation of these terms, together with the Government's invocation of its
"four corners of the indictment" argument, would sustain any indictment.  This is not the law,
and courts have consistently held that "the mere talismanic invocation of the term 'price-fixing'
… is [insufficient] to bring the *per se* rule to bear."  *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587,
596 (S.D.N.Y. 1989).

Whether conduct should be analyzed as a per se violation or under the rule of reason is a
question of law for the Court.  *See Craftsmen Limousine, Inc. v. Ford Motor Co*., 363 F.3d 761,
772 (8th Cir. 2004).  This decision requires that the allegedly anticompetitive conduct be
considered in context and based on its likely economic effects.  The Court must then determine
whether the presumptive rule of reason applies, or if the conduct at issue fits within a classic per
se category.  This finding is separate and apart from the question of fact of whether the
Government's evidence proves that the conduct occurred as alleged.

---

[2] For each date on the list, the Government identified the currency pair(s) at issue.

In making this determination, the Court need not wait for a complete trial on the merits or for the resolution of all factual disputes between the parties about the likely effects of the conduct at issue.  The Court of Appeals for the Sixth Circuit recently held that "even where a factual dispute exists between the parties over whether a challenged restraint is obviously anticompetitive—and therefore deserving of per se treatment—the defendants producing 'evidence that the agreement at issue may have had procompetitive aspects … indicate[s] that this situation would not fall into the categories of *per se* unreasonable restraints on trade.'" *Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.,* No. 17-3863, 2019 WL 1848532, *10 (6th Cir. Apr. 25, 2019) (citing *In re Se. Milk Antitrust Litig.*, 739 F. 3d 262, 294 (6th Cir. 2014)).  The court concluded:  "If the record … reveals a plausible way in which the challenged restraints contribute to the procompetitive efficiencies of the joint venture, then 'the possibility of countervailing procompetitive effects' is not remote and per se treatment is improper." *Id*. at 16 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)).

Mr. Aiyer has advanced entirely plausible procompetitive justifications for the alleged coordinated trading in the interdealer market and coordinated ruble trading, rendering such behavior inappropriate for per se condemnation.  If the Court rules that this conduct is not properly treated as a per se antitrust violation, then the Government's own guidelines require that the conduct be dropped from the case.  *See* U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION: ANTITRUST DIVISION MANUAL, at 54 (Apr. 2015) (reserving "criminal investigation and prosecution" for "*per se* unlawful agreements" only).  Moreover, as Mr. Aiyer demonstrated in the Antitrust Motion, this outcome is not simply a matter of Government discretion, but is required by principles of due process.  *See Skilling v. United States*, 561 U.S. 358, 402-03 (2010)

(if statute is construed to apply beyond traditionally recognized contexts, it would pose

constitutional void for vagueness issues).

There is also an eminently practical reason for resolving Mr. Aiyer's Antitrust Motion

prior to trial.  An early ruling on the Antitrust Motion could eliminate most of the Government's

case: 46 of the 60 trading-related episodes on the Government's revised list about which it may

introduce evidence at trial concern alleged coordinated trading in the interdealer market, ruble

trading, or both.  By dismissing these portions of the case prior to trial, the Court would

streamline the case enormously, allowing the trial to focus on conduct that, if it occurred as

alleged, is properly the subject of a criminal charge.  The case would be much shorter to present,

much clearer to the jury, and much fairer to Mr. Aiyer.

## ARGUMENT

### I.      The Government Cannot Substitute Its Own Conclusions For The Court's Reasoned Analysis Of The Conduct Underlying The Indictment

The Government's mantra that the Court must limit itself to "the four corners of the

indictment" misstates the law and misapprehends the Antitrust Motion.  The Court must look

beyond the labels used by the Indictment to determine whether the per se rule applies.  *Apex Oil*,

713 F. Supp. at 596.  It is both proper and necessary for the Court to consider the actual conduct

underlying the allegations, including the specific instances of trading-related conduct that have

been identified by the Government.  In making this determination, the Court is not limited to the

Indictment itself, but may also consider "additional documents submitted by the government in

lieu of a bill of particulars." *United States v. Aviv*, No. 95 Cr. 386 (LLS), 1996 WL 48611, at *2

(S.D.N.Y. Feb. 6, 1996), *adhered to on reconsideration*, 923 F. Supp. 35 (S.D.N.Y. 1996)

(internal citation omitted); *see also United States v. Pirro*, 212 F.3d 86, 90 (2d Cir. 2000)

(affirming district court's dismissal of a portion of the indictment upon consideration of the

indictment, responses to request for particulars, and the government's response to the motion to dismiss); *United States v. Jones*, 542 F.2d 661, 664 (6th Cir. 1976) (finding that the district court did not erroneously consider facts disclosed in the bill of particulars and defendant's affidavit in ruling on the motion to dismiss).

A.    The Indictment's Conclusory Allegations Of "Fixing Prices" And "Rigging Bids" Do Not Determine The Applicability Of The Per Se Rule

The Government does not dispute that "the selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by the Court.  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 1909b (2018).  However, the Government argues that, to determine whether the Indictment describes conduct that clearly falls within a traditional per se category, the Court's analysis should begin and end with the Indictment's bare allegation of "fixing prices and rigging bids."  (Opp. at 1, 2, 4, 5, 14, 15, 17, 26, 27, 30.)  But the Government's mere characterization of behavior as price fixing or bid rigging does not make it so.

The Government's argument fails because it indulges in a Sherman Act "literalness" that courts have consistently rejected.  As the Supreme Court summarized in the watershed case of *Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.* ("*BMI*"):

> [T]his is not a question simply of determining whether two or more potential competitors have literally "fixed" a "price."  As generally used in the antitrust field, "price fixing" is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable.  The Court of Appeals' literal approach does not alone establish that this particular practice is one of those types or that it is "plainly anticompetitive" and very likely without "redeeming virtue."  Literalness is overly simplistic and often overbroad.  When two partners set the price of their goods or services they are literally "price fixing," but they are not *per se* in violation of the Sherman Act … Thus, it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label "*per se* price fixing."

441 U.S. 1, 8-9 (1979) (citation omitted).

B.    The Likely Effects Of The Alleged Conduct Are The Crux Of Whether The Per Se Rule Applies

The Government also contends that "[s]o long as there is an allegation of a *per se* violation, no further showing of actual adverse effects in the marketplace is necessary" (Opp. at 11 (internal citation omitted)) and "[c]onsideration of any purported procompetitive benefits is improper in a *per se* case."  (*Id.* at 16.)  But this is completely circular logic and a reversal of the proper order of analysis.  Conduct does not rise to the level of per se illegality *regardless* of its effects on the marketplace, but *because* of the likelihood of those effects.  *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 440 (1978) (concluding that conduct can only be "regarded as *per se* illegal because of its unquestionably anticompetitive effects"); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects, and lack any redeeming virtue.") (internal citations and quotations omitted).[3]

Absent apparent likely anticompetitive effects, conduct that may look like, or be labeled by an adverse party as, traditional per se conduct is not subject to the per se rule.  *Blanksteen v. N.Y. Mercantile Exch.*, 879 F. Supp. 363, 369 (S.D.N.Y. 1995) (Koeltl, J.) ("Even if this case were somehow shoehorned into the plaintiff's characterization of a group boycott, it is clear that the defendant's actions do not fall into a category of actions likely to have predominately anticompetitive effects.  Consequently, per se analysis is not warranted.").  Even the literal fixing of a price may not constitute a per se antitrust violation absent such apparent likely anticompetitive effects.  *BMI*, 441 U.S. at 8-9.

---

[3] If the Court determines that certain conduct, if proven to have occurred, is illegal per se, Mr. Aiyer reserves the right to argue that a prohibition of any evidence relating to actual effects could raise a serious constitutional issue, as a necessary element of a criminal offense—intent—would be taken away from the jury.  *See U.S. Gypsum Co.*, 438 U.S. at 435-36 (intent is an element of a criminal antitrust offense that cannot be taken from the trier of fact through reliance on a legal presumption).

This core feature of antitrust law has persisted for more than 100 years.  In *Board of Trade of City of Chicago v. United States*, the Supreme Court addressed the precise issue Mr. Aiyer now raises: whether collaborative conduct in a trading venue should be condemned on the "bald proposition" that it constituted price fixing, or whether its history, purpose, and effects should be considered.  246 U.S. 231, 238-39 (1918).  Curiously, while maintaining that the likely or intended effects of *Mr. Aiyer's* conduct are irrelevant, the Government attempts to distinguish *Board of Trade* by emphasizing the positive effects—the "increas[ed] pricing transparency and competition"—of the conduct at issue there.  (Opp. at 14.)  The Government therefore implicitly concedes that the likely effects must be considered before concluding that conduct is per se illegal.  Moreover, the Government misses the Supreme Court's broader point.  Even when competitors literally fix a price—there, specifying that grain could only be sold at a specified price during a specified period of time—conduct runs afoul of the antitrust laws only when it was "designed to" or "had the effect of limiting [output] … or of raising or depressing prices" or when it "resulted in hardship to anyone."  *Board of Trade*, 246 U.S. at 238.  The conduct that is the subject of Mr. Aiyer's Antitrust Motion exhibits none of these features, and the Government's attempts to insulate these shortcomings from pretrial judicial scrutiny should be disregarded.

## II.     The Government Ignores Mr. Aiyer's Arguments That The Conduct Actually At Issue Is Not A Per Se Violation

### A.     <u>The Challenged Coordinated Trading In The Interdealer Market Is Not A Per Se Violation</u>

Basing its entire Opposition on its use of the words "price-fixing" and "bid-rigging" in the Indictment, the Government skirts the issue of whether coordinated trading by two or more alleged coconspirators in the interdealer market actually constitutes a per se antitrust violation.  Mr. Aiyer has offered compelling reasons that it does not.

1.    *The Challenged Coordinated Trading In The Interdealer Market Is Neither Bid Rigging Nor Price Fixing.*

Per se violations like bid rigging and price fixing necessarily "tend[ ] to raise price or to reduce output." FEDERAL TRADE COMMISSION AND U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION: ANTITRUST GUIDELINES FOR COLLABORATIONS AMONG COMPETITORS, at 3 (Apr. 2000).  As the Government itself points out, traditional price fixing agreements occur when competitors "agree[ ] on a price to quote to their *customers*."  (Opp. at 5 (emphasis added).)  The alleged coordinated trading in the interdealer market that is the subject of the Antitrust Motion does not tend to reduce output or raise prices, and it does not involve prices paid by customers.[4]

Coordinated behavior between competitors that disadvantages a counterparty, rather than the market at large, is not price fixing or bid rigging.  *See Granite Partners, L.P. v. Bear, Sterns & Co.*, 58 F. Supp. 2d 228, 246 (S.D.N.Y. 1999);[5] *see also NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128, 134 (1998) (the per se rule applies when there is harm to the "competitive process," not a single competitor); *Pennsylvania Ave. Funds v. Borey*, 569 F. Supp. 2d 1126, 1133 (W.D. Wash. 2008) (price fixing in certain contexts "can promote rather than suppress competition").  Here, the alleged coordinated trading in the interdealer market at most injured a single counterparty, but it did not necessarily have an impact on customer prices.  (*See* Lyons Aff. ¶ 37 ("None of the coordinated trading strategies [in the interdealer market] necessarily affects end-user flows; and if they don't affect those flows, they should not affect the final equilibrium price.").)

---

[4] With the exception of transactions between Mr. Aiyer and Mr. Katz in the ruble, the Antitrust Motion does not seek pretrial dismissal of any of the Government's claims of coordination affecting "prices paid by customers."

[5] The Government urges the Court to disregard the second *Granite* opinion on the grounds that it is discussing a rule of reason analysis, not a per se analysis.  The *Granite Partners, L.P.* court made clear, however, that adequately alleging "anti-competitive effect … is a necessary predicate to all antitrust violations" and that "the ultimate aim of the Sherman Act is to protect competition, as opposed to competitors."  58 F. Supp. 2d at 239-40 (emphasis added).

Before it can characterize conduct as per se illegal, the Court must be able to conclude that the challenged interdealer conduct, by its nature, necessarily affected customer prices, as any doubt about probable effect must be resolved by the rule of reason.  The Government impliedly admits that the Indictment does not contain any allegation that the "coordinated trading had a tendency to affect the price quoted to a customer" (Opp. at 12) and thus precludes a finding of a per se violation based on the "four corners of the indictment."

The Government relies on three financial cases for the proposition that other courts in this circuit have found that similar allegations could survive a motion to dismiss.  (*See* Opp. at 6-7, 10-11 (citing *Gelboim v. Bank of America Corp.*, 823 F.3d 759 (2d Cir. 2016), *United States v. Usher*, No. 17 Cr. 19 (RMB), 2018 WL 2424555 (S.D.N.Y. May 4, 2018), and *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 587 (S.D.N.Y. 2015).)  But these cases are inapposite because, unlike the behaviors challenged in the Antitrust Motion, the courts dealt only with conduct that had the potential to impact a benchmark rate.[6]  As the courts in all three cases found, there were allegations that the benchmark rates directly affected prices paid by *customers*—an assertion completely missing from the allegations regarding coordinated trading in the interdealer market at issue here.  *See Gelboim*, 823 F.3d at 771 (plaintiffs alleged that competing banks colluded to depress LIBOR, thereby increasing costs to the banks' customers); *Usher*, 2018 WL 2424555, at *1 ("Defendants allegedly filled customer orders at prices determined by such fix rates."); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d at 587 ("The core allegation in the U.S. Complaint is that 'Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate' the Fix"

---

[6] As explained in the Antitrust Motion, Mr. Aiyer does not dispute that there may be questions of fact that preclude the Court from currently ruling on the sufficiency of the Government's allegations of coordinated trading to influence the "fix."  (Antitrust Motion at 6-7.)

and that customers "bought FX instruments from Defendants priced at or by the Fix.").  These cases do not control.

    2. *The Government Completely Ignores The Context In Which The Alleged Coordinated Trading In The Interdealer Market Occurred.*

   Consideration of an alleged restraint's intended or likely effects is also essential to determining whether the restraint is illegal per se.  *See, e.g.*, *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 887.  In assessing the likelihood of anticompetitive effects, it is perfectly permissible, and in fact necessary, for the Court to consider the context in which the alleged restraint took place and the relationship between the parties.  *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (expressing "reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious") (internal quotations and citations omitted).  The Government insists that it is improper for the Court to consider procompetitive benefits.  (*See* Opp. at 15.)  Yet probable procompetitive benefits provide the context necessary to understand the conduct at issue.  Even if conduct may have some anticompetitive effects, it cannot be per se illegal if it has a plausible procompetitive justification.  *BMI*, 441 U.S. at 9.

   As explained more fully in the Antitrust Motion and accompanying papers, the FX market is an opaque, decentralized, over the counter market.  (Antitrust Motion at 3.)  Individual FX traders can see only their own end-user customer orders and thus have an incomplete picture of the market.  (Lyons Aff. ¶ 23.)  The more information an FX trader can learn "about the universe of end-user customer orders, the better he can predict intra-day price fluctuations, and in turn better manage his risk."  (*Id.*)  The Rand Chat Room operated as a venue for the exchange of this critical market information, and the Indictment acknowledges as much.  (Indictment ¶ 22(a).)

The Rand Chat Room also served as a new trading venue where the participants "contact[ed] each other directly" in order to "return to a neutral equilibrium" and thereby manage risk.  (*Id.* ¶¶ 8, 9, 22(a).)  The advantages of direct trading among the Rand Chat Room members, and the Rand Chat Room itself, were enormous, and included significant cost savings and efficient risk management.  (Lyons Aff. ¶¶ 22-29.)  The Government has made no attempt to dispute these facts.

Instead, the Government attempts to side-step the question of procompetitive benefits of the Rand Chat Room participants' cooperation with each other by asserting, without qualification, that market makers in the interdealer market are competitors of each other as they "seek to offset positions resulting from [their] customer orders."  (Opp. at 12; *see also id.* at 6.)  By definition, however, every trade in the interdealer maker has another market maker as a counterparty, not a competitor.  And where counterparties can conduct these necessary trades directly, using direct communication or a chat room, both parties benefit in a legitimate way that involves cooperation rather than competition.  As described in Mr. Aiyer's Antitrust Motion and accompanying affidavits, the coordinated conduct that the Government challenges made that direct trading possible.  (*See* Antitrust Motion at 11; Lyons Aff. ¶¶ 31-36; Carlton Aff. ¶¶ 20-21.)

The Government also returns to its "four corners" mantra and argues that "none of the justifications offered by Aiyer—e.g., the need to share information, source liquidity, or manage risk—are based on the facts alleged in the Indictment."  (Opp. at 15.)  But in its Opposition, the Government admits that "some chatroom activities may have been legitimate."  (*Id.* at 17.)  Moreover, the Indictment does contain allegations that illustrate the procompetitive aspects of the Rand Chat Room: "If the trader wishes to return to a neutral equilibrium in a given currency pair … the trader must sell the currency pair if he is long, or buy back the currency pair if he is

short. … [T]here is always the risk that prices can move quickly and in an unfavorable direction to the trader's position.  It is the trader's job to manage this, with the goal of profiting and avoiding loss." (Indictment ¶ 8.)  Traders can "offset positions that resulted from customer orders … by contacting each other directly."  (*Id.* ¶ 9.)

Where, as here, cooperation between potential competitors is undertaken in a legitimate, procompetitive context or cooperative venture, the cooperation does not run afoul of the antitrust laws.  *BMI*, 441 U.S. at 23; *see also nFinanSe, Inc. v. Interactive Commc'ns Int'l, Inc.*, No. 11 Civ. 3728 (AT), 2012 WL 13009231, at *6 (N.D. Ga. July 24, 2012).  This is so even when "two or more potential competitors have literally 'fixed' a 'price.'"  *BMI*, 441 U.S. at 9.  For a court to find that a collaboration is lawful, it is not necessary for its participants to be formally integrated. *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1016-17 (N.D. Cal. 2008).

The Government attempts to distinguish these cases by arguing that in each one the defendants "enter[ed] into a 'bona fide joint venture' for the purpose of creating some *new product* the price of which they might be entitled to set."  (Opp. at 17 (emphasis added).)  But it is not a requirement of antitrust law that parties to a joint venture create a new product to avoid antitrust scrutiny.  The determination of the legitimacy of the collaborative venture turns on whether it increased *productivity*.  *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.).  The Rand Chat Room created a new *service*, a trading venue that permitted direct trading between traders at lower costs and greater efficiency than Reuters.

Once a court has determined that there was a bona fide cooperative venture, it must assess whether the challenged restraint was ancillary—as having "arguably" "contribute[d] to the success of a cooperative venture that promises greater productivity and output"—or was "naked."  *Polk Bros., Inc.*, 776 F.2d at 189.  The challenged interdealer coordinated trading—

such as the Rand Chat Room members' practice of not exploiting shared information by using it to trade against each other—contributed to the cooperative efforts of the Rand Chat Room to manage risk.  (*See* Antitrust Motion at 20-22; Lyons Aff. ¶¶ 31-36; Carlton Aff. ¶ 24.)  The Indictment lacks any allegations that the challenged activities and the procompetitive aspects of the chat room were unrelated.  The Government's Opposition does nothing to dispute the relationship between the two.

Based entirely on the words in the Indictment and the Government's Opposition, it is at least plausible that the alleged interdealer coordinated trading behaviors were bona fide and part of a procompetitive cooperative venture.  *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (A restraint "that is part of an integration of the economic activities of the parties and appears capable of enhancing the group's efficiency, is to be judged according to its purpose and effect.").  Accordingly, the only appropriate standard by which to judge the challenged restraints is the rule of reason.[7]  *Polk Bros., Inc.*, 776 F.2d at 189 ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment.").

    B.    <u>The Alleged Conduct Related To Ruble Trading Between Mr. Aiyer And Mr. Katz Is Not A Per Se Violation</u>

In its Opposition, the Government states repeatedly and in conclusory fashion that the instances of ruble trading it has identified between Mr. Katz and Mr. Aiyer demonstrate a

---

[7] The Government argues that Mr. Aiyer's reference to *Usher* is "telling" because the *Usher* court denied the defendants' motion to dismiss.  (Opp. at 18.)  As discussed above, the *Usher* case was focused on entirely different trading behavior relating to benchmark rates.  Moreover, the *Usher* defendants argued that because their relationship was at times and in part vertical, all of their conduct needed to be analyzed under the rule of reason.  Mr. Aiyer makes no such sweeping argument and concedes that certain behaviors at issue in this case cannot be resolved without additional facts.

"horizontal agreement" between competitors "operating at the same level of the market structure" that therefore should be subject to the per se rule.[8]  (Opp. at 18-19; *see also id.* at 20, 21, 23.)  The Government misunderstands both the market and the law.  The vertical nature of Mr. Aiyer and Mr. Katz's ruble trading behavior requires that it be analyzed under the rule of reason.  *See Leegin Creative Leather Prods., Inc.*, 551 U.S. at 882; *State Oil Co.*, 522 U.S. at 7; *Gatt Commc'ns, Inc. v. PMC Assocs., LLC*, No. 10 Civ. 8 (DAB), 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011); *nFinanSe, Inc.*, 2012 WL 13009231, at *6.

       1.    *The Government Mischaracterizes The Vertical Relationship Between Mr. Aiyer And Mr. Katz In The Ruble Market.*

The Government does not dispute, nor could it reasonably dispute in good faith, Mr. Aiyer's description of the dynamics of his relationship with Mr. Katz in trading of the ruble, or Mr. Aiyer's preeminent position in the ruble market.  Mr. Aiyer's trading volume in the ruble was more than 40 times greater than Mr. Katz's ruble trading volume, all three of the Government's cooperating witnesses recognized Mr. Aiyer as a dominant market maker in the ruble who consistently quoted the best prices, and Mr. Katz was uncomfortable pricing the ruble and reluctant to quote prices to customers without the ability to immediately offset his risk position by trading with Mr. Aiyer.  (Lyons Aff. ¶¶ 39-40; Klotz Decl. ¶¶ 7, 9.)  The Government concludes that the relationship between the two traders was nonetheless necessarily horizontal because they were "competing dealers making prices to customers" and were therefore

---

[8] The Government seems to suggest that the examples of ruble trading examined in the materials accompanying Mr. Aiyer's Motions to Dismiss were selected by Mr. Aiyer.  The Government describes these examples as "particular incidents described in Aiyer's lawyer's affidavit."  (Opp. at 20.)  It bears remembering, however, that it was the Government itself that selected these instances as evidence of problematic trading behavior.  Professor Lyons' analysis of ruble trading was based not on examples he selected, but on the universe of examples the Government selected.  (Lyons Aff. ¶¶ 40-41.)

"operating at the same market level of the structure" (Opp. at 21),[9] disregarding the significant

fact that, in all but one instance in which Mr. Katz asked Mr. Aiyer what price to quote a

customer and won the customer business, "Aiyer supplied Katz with rubles." (*Id.*)

Mr. Aiyer and Mr. Katz did not compete for business in the ruble as they competed in

other currencies, in large part because Mr. Katz knew that his inability or unwillingness to price

the ruble and assume the risk of an open ruble position prevented him from competing with Mr.

Aiyer's aggressive ruble prices. (Klotz Decl. ¶¶ 7, 9.) Rather than exit the ruble market entirely

and turn away his bank's regular customers, Mr. Katz frequently chose instead to act as a

distributor for Mr. Aiyer. When he played his role, Mr. Katz quoted Mr. Aiyer's ruble prices to

his customers and subsequently transferred his ruble positions to Mr. Aiyer.

There is nothing wrong with Mr. Katz's decision to operate in this manner in the ruble

market. Individuals and companies routinely conclude that they cannot compete effectively in a

particular product or service and do not attempt to do so. Since these individuals and companies

have no obligation to compete in every available product or service, such a decision is not

problematic. *Polk Bros., Inc.*, 776 F.2d at 188 ("Cooperation is the basis of productivity. … The

war of all against all is not a good model for any economy.").

The Government mistakenly relies on *United States v. Koppers Co.*, 652 F.2d 290 (2d

Cir. 1981) to argue that the relationship between Mr. Aiyer and Mr. Katz in the ruble was

horizontal, not vertical. (Opp. at 21.) *Koppers* is inapposite because it involved an obviously

horizontal relationship between competitors that evolved to include a minimal vertical

component six years after the formation of the competitors' agreement. 652 F.2d at 297. The

court placed great weight on the fact that "the conspiracy between [the coconspirators] to rig bids

---

[9] This conclusion overlooks the fact that, to the extent Mr. Aiyer and Mr. Katz both acted as market makers, they occupied very different "tiers" of the market. (Lyons Aff. ¶¶ 39-40.)

originated as an agreement among competing retailers and was not automatically transformed into something different at the moment when its vertical elements … became more prominent." *Id.*  The court ultimately concluded that the emergence of a vertical element in the parties' relationship had not affected the "basic non-competitive relationship" and ultimately "had no legal significance in antitrust terms." *Id.*  By contrast, the verticality between Mr. Aiyer and Mr. Katz in the ruble market is the sum and substance of their relationship and existed throughout the entirety of the alleged conspiracy. (Klotz Decl. ¶¶ 10-11.)  Unlike the purported "distributor" in *Koppers*, which was not reliant on the purported "supplier"—and indeed was supplied through other means for part of the alleged conspiracy—the Government does not dispute that Mr. Katz was not capable of trading the ruble competitively without Mr. Aiyer and effectively did not do so throughout the duration of the alleged conspiracy.

In addition, the *Koppers* court concluded that per se treatment was appropriate, in part because the "sole purpose" of the scheme was to enable the coconspirators to "fix higher prices while maintaining the pretense of price-based competition," and the scheme "could not have had any effect except an anti-competitive one." 652 F.2d at 297.  The arrangement between Mr. Aiyer and Mr. Katz, on the other hand, appears to have been procompetitive and to have resulted in better prices for customers.  Certainly the Indictment does not allege, and the Government's Opposition does not argue, that the collaboration between Mr. Aiyer and Mr. Katz resulted in worse prices for customers.  Quite simply, the Government ignores the *Koppers* court's insistence that, in assessing the nature of the relationship between alleged coconspirators, "economic realities, including the possibility of pro-competitive activities, rather than legal formalisms should control." *Id*.

One controlling "economic realit[y]" of the arrangement between Mr. Katz and Mr. Aiyer is that it benefited both the traders themselves and their customers.  Mr. Katz was able to participate actively in the ruble market because his relationship with Mr. Aiyer allowed him to price the ruble competitively, which in turn benefited Mr. Katz's customers, who received better prices.  The relationship also allowed Mr. Katz to be more nearly a full-service market maker to his bank's customers, quoting prices in a full range of currencies and thus helping retain the customers' repeat business.  Mr. Aiyer benefited from the arrangement because it gave him access to customers that might not otherwise have approached him for ruble pricing.  The Government's argument that customers could go to any market maker for pricing—and therefore that all ruble market makers are "at the same distribution level" (Opp. at 23)—ignores the fact that bank customers, like law firm clients, often have preferred providers.  A customer that approached Mr. Katz for a ruble price would not necessarily have approached Mr. Aiyer. Indeed, in almost all the instances of supposedly problematic ruble trading identified by the Government, it is apparent that the customer did *not* approach Mr. Aiyer.  (Klotz Decl. ¶ 10.) The arrangement between Mr. Aiyer and Mr. Katz therefore provided Mr. Aiyer with access to a customer base that otherwise may have been unavailable to him.

### III. Resolution Of The Threshold Legal Issue In The Antitrust Motion Need Not Wait Until After The Presentation Of Evidence At Trial

The Government attempts to characterize the Antitrust Motion as a "premature Rule 29 motion."  (Opp. at 10.)  But this misconstrues both the motion and the law.  The sole issue presented in the Antitrust Motion is which mode of analysis applies to certain behaviors the

Government intends to include as part of its Sherman Act claim.  This issue does not turn on the weight of the evidence and is not premature.[10]

Federal Rule of Criminal Procedure 29 governs motions for judgments of acquittal.  The Rule provides that "after the government closes its evidence or after the close of all the evidence, the court . . . must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  The Antitrust Motion does not request that the Court enter a judgment of acquittal or assess the sufficiency of the evidence.

Rather, the motion seeks resolution of the issue of which antitrust standard of analysis applies: the per se rule or the rule of reason.  The decision of which standard applies is a crucial legal determination that a court must make prior to analyzing any claim brought under the Sherman Act.  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 1909b (2018) ("[T]he selection of a [standard] is entirely a question of law."); *see also Craftsmen Limousine, Inc.*, 363 F.3d at 772.

The Sixth Circuit's recent decision in *Medical Center at Elizabeth Place*, explains the precise legal framework a court should follow to determine, prior to trial, whether challenged conduct is to be analyzed under the per se rule.  It makes clear that this determination need not await resolution of disputed issues of fact but can and should be made prior to trial.

In *Medical Center at Elizabeth Place*, a for-profit hospital sued a group of competing not-for-profit hospitals that allegedly drove it out of business by organizing patients and physicians in a group boycott of its operations.  2019 WL 1848532, at *1-3.  The original district

---

[10] The Government admits that certain types of behavior contained in the Indictment could properly be challenged before trial, through a "motion in limine, [rather than] a pretrial motion to dismiss."  (Opp. at 8 n.3.)  But the evidentiary record will be identical at the motion *in limine* stage, and a ruling then will still require the Court to determine whether the actual conduct charged in the Indictment necessarily caused "unquestionably anticompetitive effects."  *U.S. Gypsum Co.*, 438 U.S. at 440; *see also United States v. Sampson*, 898 F.3d 270, 281 (2d Cir. 2018) (courts can make preliminary factual determinations "that do not implicate the general issue of a defendant's guilt").

court judge in the case denied the defendants' motion for summary judgment, but a successor judge reversed this ruling and granted summary judgment, and the Sixth Circuit affirmed.  *Id.* at *4-6.  Without determining whether the defendants' conduct was on balance procompetitive, it found that the plaintiff had not alleged a per se violation of the Sherman Act.

The Sixth Circuit held that the original district court judge's denial of summary judgment rested on two erroneous legal rulings: that only restraints "*necessary* to a joint venture's efficiency-enhancing purposes" qualify for analysis under the rule of reason and that a defendant must eliminate issues of fact by offering "undisputed proof that the restraint is necessary."  *Id.* at *7-8 (emphasis in original).  Instead, relying on Judge (now Justice) Sotomayor's concurring opinion in *Major League Baseball Props.*, *Inc. v. Salvino*, 542 F.3d 290 (2d Cir. 2008), as well as on Judge Easterbrook's opinion in *Polk Bros Inc. v. Forest City Enterprises, Inc.*., 776 F.2d 185 (7th Cir. 1985) and Judge Posner's opinion in *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004 (7th Cir. 2012), the Sixth Circuit held that a defendant need show only a "plausible procompetitive rationale for the restraint."  *Id.* at *8-9 (emphasis omitted).

Moreover, the defendant need not show an absence of disputed issues of fact concerning the procompetitive rationale for its conduct:  "If the record in this case reveals a plausible way in which the challenged restraints contribute to the procompetitive efficiencies of the joint venture, then 'the possibility of countervailing procompetitive effects' is not remote and per se treatment is improper."  *Id.* at *10 (citing *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*, 472 U.S. 284, 294 (1985)); *see also Pennsylvania Ave. Funds*, 569 F. Supp. 2d at 1133 ("So long as there are plausible arguments that a practice enhances overall efficiency and makes markets more competitive, application of the *per se* rule is not appropriate.") (internal citation and quotations omitted).

Mr. Aiyer has offered plausible potentially procompetitive explanations for all of the conduct at issue in the Antitrust Motion.  The Government has not bothered to dispute these explanations, retreating to its claim that these are per se violations because the Government says so and evidence of procompetitive benefits is irrelevant.  As *Medical Center at Elizabeth Place* makes clear, this is not the law.

Although the issue of the appropriate antitrust standard *could* be addressed through a Rule 29 motion, there are compelling reasons of trial management and judicial economy to rule on this Antitrust Motion in advance of trial.  Deciding the motion now has the potential to streamline the case significantly, because conduct that is not a per se antitrust violation cannot be prosecuted criminally, either under the Antitrust Division's own guidelines or under principles of due process, *Skilling*, 561 U.S. at 402-03, and evidence of such conduct should be inadmissible. The Government's argument that the Antitrust Motion attacks only "two of the seven means and methods set forth [in the Indictment]" overlooks the fact that the two behaviors are the majority of the Government's case.  (*See* Opp. at 7.)  Of the 60 trading-related incidents identified by the Government, 46 involve the behaviors challenged in the Antitrust Motion—ruble trading, coordinated trading on an interdealer platform, or both.

Deferring the decision of a threshold legal issue to a later stage in the case thus presents a serious risk that the Government will introduce extensive evidence that is irrelevant and should have been inadmissible based on a proper, pretrial legal characterization of the conduct.  The time, cost, and judicial resources expended in the presentation of such evidence could prove to be a significant waste.  The confusion and prejudice of the jury that could result from the presentation of evidence that must later be disregarded are also significant risks that counsel for a decision now.

**IV.      Mr. Aiyer's Duplicity Motion Should Be Granted**

The Government seeks to criminalize several temporally disparate, factually disconnected behaviors as a "single overarching conspiracy" in contravention of the rule against duplicity. (Opp. at 25.)  The Government's response can be distilled to an insistence on labels—that the various behaviors constitute "means and methods" of one "price-fixing and bid-rigging" conspiracy—without further analysis.  But as explained, the Government's say-so does not suffice to invoke per se treatment.  (*See supra* at 4-5.)  It does not suffice to resolve the duplicity issue either.

A.      The Indictment Alleges Distinct, Disconnected Behaviors That Amount To Separate Potential Antitrust Crimes

The Indictment alleges at least three distinct antitrust crimes based, in part, on the Government's identification of conduct underlying the Indictment and the Government's concessions in its Opposition.  The behaviors include "agreeing on prices to quote to customers" and "coordinating [] trading and pricing strategies on the interdealer market" (*see* Opp. at 12), as well as vertical ruble transactions between Mr. Katz and Mr. Aiyer.

These behaviors are discrete potential antitrust violations subject to differing antitrust standards, with differing elements.  Because the Sherman Act is general and imprecise, it prohibits conduct that may be subject to one of two different analytic standards, only one of which—per se—is properly the subject of criminal prosecution.  (*See* Antitrust Motion at 7-8.) The Government seeks to capitalize on this imprecision by alleging that a wide variety of behaviors all come within the purview of the statute as "means and methods" of a conspiracy alleged, in conclusory terms, to be a per se "price-fixing and bid-rigging conspiracy."  (*See* Opp. at 7-8, 24-29.)  In fact, however, the behaviors are separate potential antitrust offenses subject to different modes of analysis.  The customer-facing behaviors resemble the traditional antitrust

violation of price fixing and thus are likelier, if proven, to be subject to per se treatment.  By contrast, coordinated trading in the interdealer market and vertical ruble transactions are plausibly procompetitive and thus subject to the rule of reason.  (*See supra* at 14-17.)  That two fundamentally different analytic approaches, requiring different sets of legal elements, must be applied to the conduct the Government has alleged shows the impropriety of charging the conduct as a single count.  *United States v. Abakporo*, 959 F. Supp. 2d 382, 391 (S.D.N.Y. 2013) (holding the indictment was duplicitous because crimes with "different elements" cannot be the subject of a single conspiracy).

     B.     <u>The Government's Conclusory Assertion That The Behaviors Are "Means And Methods" Of A "Price-Fixing And Bid-Rigging Conspiracy" Does Not Resolve The Issue Of Duplicity</u>

The Government responds by arguing that Mr. Aiyer is "converting means and methods into substantive charges."  (Opp. at 1.)  Just the reverse: the Government cannot label the behaviors in the Indictment as "means and methods" to disguise the distinctness of the behaviors and evade the very analysis undertaken above.  (*See id.* at 26 (citing *American Tobacco Company v. United States*, 328 U.S. 781, 809 (1946)).)  That "means and methods" is an erroneous characterization of the behaviors here is only highlighted by *United States v. Aracri*, 968 F.2d 1512 (2d Cir. 1992), which the Government cites in support of its assertion.  (*See* Opp. at 28.)  In *Aracri*, the charge was a conspiracy to defraud the United States government to avoid the payment of gasoline excise taxes through fictitious documentation.  968 F.2d at 1515-16. The court rejected the duplicity challenge, concluding that the use of different shell companies in a series of transactions aimed at transferring tax liability to conceal the non-payment of taxes did not amount to distinct offenses.  *Id.* at 1519.  What the Government characterizes as "means" stands in stark contrast to what the *Aracri* court properly deemed "means."  There, the many means were the *same* type of behavior—the transference of tax liability to a shell company—

occurring in a series of different transactions with different companies but with a clear connection to a single scheme to avoid the payment of taxes. *Id.* at 1519. Here, however, the behaviors are markedly different and, crucially, have no demonstrable connection to an overarching conspiracy to fix prices to the detriment of customers. Without any common thread, the behaviors are discrete and the Indictment impermissibly duplicitous.

### C.   Mr. Aiyer Is Prejudiced By The Duplicitous Indictment

A duplicitous indictment prejudices Mr. Aiyer and implicates the core policy concerns underlying the doctrine. *See Abakporo*, 959 F. Supp. 2d at 391 (charging different conspiracies in a single count "invite[s] the very problems to which the prohibition against duplicity is directed (jury unanimity, notice, sentencing)"). If the case proceeds to trial on the Indictment, it would be unclear which behavior formed the basis of a guilty verdict and whether unanimity was reached as to that behavior. Mr. Aiyer can be convicted only based on acts the jury unanimously believes he committed and on acts within the statute of limitations.

Jury instructions or special interrogatories would not be a sufficient remedy. "Multiple conspiracies" instructions may, in other cases, remedy the potential "spill over effect of permitting testimony regarding one conspiracy to prejudice the mind of the jury against the defendant who is not part of that conspiracy but another." *United States v. Ulbricht*, No. 14 Cr. 68 (KBF), 2015 WL 413426, at *1 (S.D.N.Y. Feb. 2, 2015) (internal citation omitted). This justification does not apply in the trial of a single defendant and, even if it did, would not provide any relief to Mr. Aiyer because spillover is not the prejudice from which he seeks relief.

Special interrogatories should, "[a]s a general rule," be "avoid[ed] … because of their potential for confusing a jury." *United States v. Pierce*, 479 F.3d 546, 551 (8th Cir. 2007) (internal citation and quotations omitted); *see also United States v. Bell*, 584 F.3d 478, 484 (2d Cir. 2009). In light of this risk, the use of such interrogatories would be especially inappropriate

in this case.  Asking jurors to respond to special interrogatories would only add complexity to an already complex financial case, and there is no guarantee that the interrogatories would alleviate the prejudice from the Indictment.  The only appropriate remedy is to dismiss the Indictment.

## CONCLUSION

For the foregoing reasons, the Court should enter an order dismissing the Indictment (1) to the extent it alleges coordinated trading in the interdealer market; and (2) to the extent it alleges that Mr. Aiyer and Mr. Katz cooperated on ruble transactions.

In the alternative, for the foregoing reasons, the Court should enter an order dismissing the Indictment as impermissibly duplicitous and require the Government to replead.

Dated:  May 3, 2019
     New York, New York

By:  /s/ Martin Klotz

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Michael S. Schachter
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
E: mklotz@willkie.com
T: (212) 728-8000
*Attorneys for Defendant Akshay Aiyer*