UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | 18 Cr. 333 (JGK) |
| v. | : | |
| AKSHAY AIYER, | : | |
| Defendant. | : | |

-------------------------------------------------------x

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OR ARGUMENT RELATED TO
BANK COMPLIANCE POLICIES AND DEFENDANT'S TERMINATION**

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

**TABLE OF CONTENTS**

Page(s)

PRELIMINARY STATEMENT ................................................................................................1

ARGUMENT...................................................................................................................................2

    I.    Evidence Of Bank Compliance Policies And Mr. Aiyer's Termination Is Not Relevant And Should Be Excluded Under Rule 402. ............................................2

    II.    Evidence Of Bank Compliance Policies And Mr. Aiyer's Termination Is Extremely Prejudicial And Should Be Excluded Under Rule 403. .........................5

        A.    The Probative Value Of Evidence Of Bank Compliance Policies Is Substantially Outweighed By Its Prejudice And Tendency To Mislead Or Confuse The Jury. ......................................................................................5

        B.    The Probative Value Of Evidence Of Mr. Aiyer's Termination Is Substantially Outweighed By Its Prejudice And Potential To Cause Undue Delay. ................................................................................................10

    III.    In The Alternative, The Court Should Exclude The Admission Of Bank Compliance Documents That Were Not Received And Reviewed By Mr. Aiyer Or His Alleged Coconspirators. ............................................................................11

CONCLUSION................................................................................................................................12

# TABLE OF AUTHORITIES

Case                                                                                                                                    Page(s)

*Chalco v. Belair*,
    No. 15-cv-340 (VLB), 2019 WL 456162 (D. Conn. Feb. 5, 2019) ......................... 3, 10, 11

*English v. D.C.*,
    651 F.3d 1 (D.C. Cir. 2011) ................................................................................................ 11

*MM Steel, LP v. Reliance Steel & Aluminum Co.*,
    No. 12-cv-1227, 2013 WL 6588836 (S.D. Tex. Dec. 16, 2013) .......................................... 6

*Old Chief v. United States*,
    519 U.S. 172 (1997) ............................................................................................................ 10

*In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*,
    No. 1:14-md-02503-DJC (D. Mass. Mar. 8, 2018) ............................................................... 3

*United States v. Aboumoussallem*,
    726 F.2d 906 (2d Cir. 1984) ................................................................................................ 11

*United States v. Citizens & S. Nat'l Bank*,
    422 U.S. 86 (1975) ................................................................................................................ 9

*United States v. North*,
    No. 06-cr-323 (CFD), 2007 WL 1630366 (D. Conn. June 5, 2007) ............................. 5, 6, 7

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) .............................................................................................................. 9

*In re Urethane Antitrust Litig.*,
    No. 08-5169 (WJM-MF), 2016 WL 475339 (D.N.J. Feb. 8, 2016) ........................... *passim*

Statues, Rules and Regulations

Fed. R. Evid. 401 ............................................................................................................................ 2

Fed. R. Evid. 402 ............................................................................................................................ 2

Fed. R. Evid. 403 ............................................................................................................. 5, 10, 11

Defendant Akshay Aiyer respectfully submits this Memorandum of Law in Support of his Motion *in Limine* to Exclude Evidence or Argument Related to Bank Compliance Policies and Defendant's Termination.

## PRELIMINARY STATEMENT

The Government seeks to admit into evidence various records reflecting compliance policies that were in effect at J.P. Morgan Chase ("J.P. Morgan"), Citibank, Barclays, and BNP Paribas—the former employers of Mr. Aiyer and his three alleged coconspirators—before, during, and after the time period of the charged conspiracy.[1]  The Government also seeks to admit J.P. Morgan personnel records that state, with no additional explanation, that J.P. Morgan terminated Mr. Aiyer for "misconduct."[2]  This evidence is both irrelevant and highly prejudicial, and it should be excluded.

The FX market is largely unregulated, and bank compliance policies during the relevant time period did not specifically address the charged conduct here.  To the extent that antitrust concerns were documented at all, these policies were ambiguous, unexplained, and addressed matters far beyond the charged conduct and even the antitrust laws.  The existence of the policies has no bearing on whether Mr. Aiyer entered into a criminal price fixing conspiracy.  This evidence is irrelevant.

---

[1] *See* Ex. 1, U.S. v. Aiyer Government Preliminary Exhibit List, Training-Policies.  Representative examples include the following: Ex. 2, May 28, 2008 J.P. Morgan Compliance Bulletin re "Yellow Flags"; Ex. 3, excerpt from April 2011 J.P. Morgan Code of Conduct concerning antitrust and anti-tying; Ex. 4, May 2012 J.P. Morgan Antitrust/Competition Compliance Training for IB Markets; Ex. 5, May 29, 2012 email from J.P. Morgan General Counsel to all J.P. Morgan employees re Antitrust and Competition Policy; Ex. 6, J.P. Morgan Antitrust Policies August 2012 presentation; Ex. 7, J.P. Morgan Anti-Fraud, Anti-Manipulation and Other Prohibited Trade Practices Policy; Ex. 8, antitrust and market manipulation excerpts from Citibank 2013 Annual Compliance Meeting Presentation; Ex. 9, September 2013 Barclays Competition Guidance on Exchanging Information with Competitors.

[2] *See* Ex. 10, an example of the personnel records identified on the Government's preliminary exhibit list.  As confirmed through statements made by counsel, the Government plans to use this evidence in its case-in-chief.

The same is true of evidence related to Mr. Aiyer's termination. J.P. Morgan terminated Mr. Aiyer in March 2015, nearly two years after the end of the alleged conspiracy and more than three years before Mr. Aiyer was indicted. J.P. Morgan never provided Mr. Aiyer with an explanation for his termination, and only a year earlier—in the middle of the Government's investigation into Mr. Aiyer and the FX trading industry as a whole—had promoted him. During this period of intense regulatory scrutiny, dozens of FX traders around the world were terminated or suspended for a wide variety of often vague or ill-defined reasons.

Evidence of compliance policies and Mr. Aiyer's termination is also highly prejudicial. It would be improper for the Government to assert or imply that noncompliance with bank policies is evidence of the alleged crime or that Mr. Aiyer was terminated due to the same conduct with which he has now been charged. A jury should not be forced to distinguish between internal bank compliance concerns or employment actions and the legal standards applicable to the charged Sherman Act violation. Parsing evidence of potential bank policy noncompliance and J.P. Morgan's finding of "misconduct" would necessarily conflate compliance issues with illegality, creating a risk of confusion and prejudice to Mr. Aiyer. Under the Federal Rules of Evidence, this material and any related argument cannot properly be used as evidence of Mr. Aiyer's guilt, and it should be excluded.

## ARGUMENT

**I.  Evidence Of Bank Compliance Policies And Mr. Aiyer's Termination Is Not Relevant And Should Be Excluded Under Rule 402.**

Bank compliance policies should be excluded as irrelevant because they have no tendency to make any fact "of consequence" to this action more or less probable.[3] Fed. R. Evid.

---

[3] This is especially true for Citibank, Barclays, and BNP Paribas compliance documents, which make up a significant portion of the Government's preliminary set of compliance-related exhibits. These three institutions never employed Mr. Aiyer and their policies could not possibly have any bearing on his conduct.

401, 402. The key inquiry here is whether Mr. Aiyer "knowingly entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere." (Indictment ¶ 20.) The fact that Mr. Aiyer or his alleged coconspirators were aware of or failed to comply with bank policies bears no relation to the facts necessary to prove these allegations.

The Government's compliance evidence—much of which consists of policies that predate or postdate Mr. Aiyer's and his alleged coconspirators' employment or address issues that are unrelated to FX trading, the charged conduct, or even the antitrust laws—has no tendency to make Mr. Aiyer's intent to participate or actual participation in the alleged conspiracy more or less probable. *See, e.g.*, *In re Urethane Antitrust Litig.*, No. 08-5169 (WJM-MF), 2016 WL 475339, at *2 (D.N.J. Feb. 8, 2016) (excluding company antitrust policies and guidelines as irrelevant to whether defendant violated antitrust laws); Electronic Order, *In re Solodyn (Minocycline Hydrochloride) Antitrust Litig.*, No. 1:14-md-02503-DJC (D. Mass. Mar. 8, 2018), ECF No. 1089 (excluding company policies against price fixing as irrelevant and unduly prejudicial with respect to claims under the antitrust laws); *see also Chalco v. Belair*, No. 15-cv-340 (VLB), 2019 WL 456162, at *8 (D. Conn. Feb. 5, 2019) (excluding evidence of police department policies as irrelevant to whether police officer's use of force was in violation of applicable legal standards).

Evidence or argument related to Mr. Aiyer's termination or J.P. Morgan's conclusory finding of "misconduct" are similarly irrelevant because they have no bearing on Mr. Aiyer's potential guilt under the standards applicable to the charged Sherman Act violation. Fed. R. Evid. 401. Neither the fact of Mr. Aiyer's termination nor J.P. Morgan's justification for his termination are "of consequence" in this matter. *Id.*

The circumstances surrounding Mr. Aiyer's termination highlight its irrelevance here. At the time, a number of domestic and international regulators were scrutinizing a wide variety of FX trading practices under varying theories of potential wrongdoing. The Government's own investigation of the FX trading industry began as a fraud investigation. Partially in response to these inquiries, dozens of FX traders lost their jobs, including some of Mr. Aiyer's coworkers at J.P. Morgan. Most of these individuals were never charged with any crime. The Government has identified no evidence indicating that Mr. Aiyer's termination or J.P. Morgan's finding of "misconduct," in the context of this broad, industry-wide upheaval, had any connection at all to the antitrust laws or the conduct at issue in this case. *See Chalco*, 2019 WL 456162, at *9 (granting motion to exclude "evidence of Defendant's termination" as a police officer because there was no indication "that Defendant's termination decision was governed by any standard relevant to this case").

Direct testimony from J.P. Morgan compliance personnel would not make this evidence relevant. On its preliminary witness list, the Government has included several J.P. Morgan compliance employees. Although its preliminary exhibit list contains no such evidence, presumably the Government may ask these witnesses to testify about the connection between J.P. Morgan's "misconduct" determination and any antitrust concerns related to Mr. Aiyer's behavior. But even if J.P. Morgan's finding of "misconduct" was made through an application of its internal antitrust guidelines, and explained by J.P. Morgan compliance personnel, evidence of Mr. Aiyer's termination would still not be relevant. Corporate guidelines and their interpretation—even if explicitly aimed at antitrust concerns—are not relevant to whether anyone accountable to those guidelines violated the Sherman Act and especially the specific per se conduct that is charged in this case. *See, e.g.*, *In re Urethane Antitrust Litig.*, 2016 WL

475339, at *2 ("This case turns on whether [the defendant corporation] violated antitrust laws. … [T]he manner in which [the corporation] interpreted its own antitrust policies is irrelevant.") (citing Fed. R. Evid. 401).  J.P. Morgan's opinions and conclusions as to the propriety of Mr. Aiyer's conduct from an antitrust standpoint or any other compliance perspective are irrelevant.

There is no fact at issue in this case that is made more or less probable through the introduction of evidence or argument related to bank compliance policies or Mr. Aiyer's termination.  The existence of these policies and the fact that Mr. Aiyer was terminated for "misconduct" are not probative of whether Mr. Aiyer participated in a criminal antitrust conspiracy.  This evidence is irrelevant and should be excluded.  Fed. R. Evid. 402.

**II.     Evidence Of Bank Compliance Policies And Mr. Aiyer's Termination Is Extremely Prejudicial And Should Be Excluded Under Rule 403.**

    A.     <u>The Probative Value Of Evidence Of Bank Compliance Policies Is Substantially Outweighed By Its Prejudice And Tendency To Mislead Or Confuse The Jury.</u>

Even if bank compliance policies had tangential probative value, their relevance would be substantially outweighed by the risk that they will mislead the jury on the law, confuse the issues, and unduly prejudice Mr. Aiyer.  Fed. R. Evid. 403.  Compliance policies and related arguments should be excluded because they reflect legal conclusions about conduct that violates—or could be construed or perceived as violating—antitrust or other laws.  It is well settled that "[e]vidence 'embodying legal conclusions that encroach upon the court's duty to instruct the law' is inadmissible." *United States v. North*, No. 06-cr-323 (CFD), 2007 WL 1630366, at *1 (D. Conn. June 5, 2007) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)).

The compliance policies the Government seeks to admit threaten to mislead the jury as to the proper scope and interpretation of the Sherman Act.  *See North*, 2007 WL 1630366, at *1 ("The Court concludes that … the Compliance Policy present[s] legal conclusions as to the scope

and meaning of the Sherman Act that would undermine the Court's role as the jury's sole source of law applicable to this case."); *see also In re Urethane Antitrust Litig.*, 2016 WL 475339, at *2 ("Even if [company antitrust policy] evidence were relevant, it would be substantially outweighed by prejudice because the testimony could confuse the jury on what the governing law was."); *MM Steel, LP v. Reliance Steel & Aluminum Co.*, No. 12-cv-1227, 2013 WL 6588836, at *3 (S.D. Tex. Dec. 16, 2013) ("The Court is of the opinion that the various [antitrust] compliance policies … 'present a significant risk that the jury will be misled as to the Sherman Act's proper scope and interpretation.'") (citing *North*, 2007 WL 1630366, at *1). The antitrust laws themselves contain numerous standards for liability (rule of reason, per se liability, vertical restraints, monopolistic behavior) and the policies touch on all of those areas. The bank policies here not only contain legal conclusions about conduct that might constitute some type of antitrust violation, they broadly caution against conduct that is not prohibited by the Sherman Act, thereby creating obligations that are different from—and even stricter than—the law that is applicable in this case.

*United States v. North*, a criminal antitrust case in the District of Connecticut, is particularly instructive here. Like Mr. Aiyer, the defendant corporation in *North* was charged with "a combination and conspiracy to fix [prices] … in violation of Section 1 of the Sherman Act." Indictment at ¶ 1, *United States v. North*, No. 3:06-cr-323 (D. Conn. Dec. 13, 2006), ECF No. 1. There, the Government also sought to introduce evidence of a corporate antitrust and trade regulation compliance policy, portions of which purported to describe the federal antitrust laws, including Section 1 of the Sherman Act, and to define the conduct the company believed to be in violation of those laws. *North*, 2007 WL 1630366, at *1; Brief in Support of Defendant's Motion *in Limine*, at 2-4, *United States v. North*, No. 3:06-cr-323 (D. Conn. Feb. 23, 2007), ECF

No. 35.[4]  The policy provided a summary of the principal antitrust and trade regulation laws of the United States, including the Sherman Act, and, among other things, defined price fixing and provided examples of what the company considered to be per se violations of the law.  *Id.*  Additionally, the policy prohibited price discussions with competitors, noting such discussions "are extremely dangerous and always violate this policy and the Law."  *Id.* at 4.

Expressly relying on Second Circuit precedent, the *North* court granted the defendant's motion to exclude this compliance policy evidence.  2007 WL 1630366, at *1 (citing *Bilzerian*, 926 F.2d at 1294; *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977)).  The court agreed with the defendant that the compliance policy presented legal conclusions as to the scope and meaning of the Sherman Act, which would undermine the court's role as the jury's sole source of law applicable to the case.  *Id.*  The court also found that this compliance evidence would create a substantial risk of unfair prejudice to the defendant and a significant risk that the jury would be misled as to the Sherman Act's proper scope and interpretation.  *Id.*  Given these concerns, the court concluded that this evidence was inadmissible under Rule 403.  *Id.*

Similarly, in *In re Urethane* the district court granted the defendant's request to exclude evidence of corporate antitrust policies and internal guidelines in part because of the substantial risk of confusing the jury as to the proper legal standard.  The policy documents at issue included an internal list of "Antitrust Principles" that purported to summarize the law and define what was legal and illegal as well as guidance on "Price Communications 'DO's & DON'T's,'" which offered advice on how to avoid even "the appearance of misconduct."  *See* Brief in Support of Defendant's Motion *in Limine* Concerning Antitrust Compliance Policies [#2], at 1-2, *In re*

---

[4] A copy of the brief in support of the defendant's motion *in limine* in *United States v. North* is attached hereto as Ex. 11.  The relevant portions of the corporate antitrust and trade regulation compliance policy that the defendant sought to exclude are attached as Ex. A to the defendant's brief.

*Urethane Antitrust Litigation*, No. 2:08-5169 (D.N.J. Sept. 3, 2015), ECF No. 116.[5] The court agreed that even if such evidence were relevant to whether the defendant violated the antitrust laws—which it was not—it carried an extremely high risk of confusing and misleading the jury into applying a legal standard that would be inconsistent with the court's instructions. *See id.*; *In re Urethane Antitrust Litig.*, 2016 WL 475339, at *2.

The legal interpretations and advice contained in the compliance policies and guidelines that the Government seeks to admit here are analogous to, if not broader than, those at issue in *North* and *In re Urethane*. First, the policies and guidelines purport to interpret and define federal antitrust and other laws, including Section 1 of the Sherman Act, and to provide specific examples of conduct the banks believed constituted antitrust violations. (*See, e.g.*, Ex. 3 at 15 (noting that U.S. antitrust laws and the laws of other jurisdictions prohibit certain conduct that is deemed collusive or anti-competitive and listing as examples price fixing and bid rigging agreements); Ex. 4 at 6-9 (explaining per se illegal conduct and defining price fixing and bid rigging); Ex. 6 at 8-16 (describing what amounts to an anti-competitive agreement and providing specific price fixing and bid rigging scenarios); Ex. 8 at 26 (listing "do's and don'ts" to avoid "running afoul of the antitrust laws").) Second, the policies prohibit and/or caution against conduct that is not, by itself, an antitrust violation. For example, the Government seeks to admit the following:

- Policies that prohibit, among other things, "fictitious trades," wash trades, spoofing, and front-running. (*See, e.g.*, Ex. 7, at 4; Ex. 8, at 56; *see also* Ex. 2, at 1 (marking wash sales and "fictitious" trading activity as "yellow flags"

---

[5] A copy of the brief in support of the defendant's motion *in limine* in *In re Urethane* is attached hereto as Ex. 12. The relevant portions of the corporate antitrust policy and internal guidelines that the defendant sought to exclude are attached as Ex. C to the defendant's brief.

indicating potential wrongdoing on the part of counterparties, clients, or vendors that employees should be on the lookout for and should escalate).)

- Guidelines that flag certain information exchanges as problematic, including the discussion of prices, spreads, bids, or customers with a competitor as well as the sharing of confidential client information. (*See, e.g.*, Ex. 4, at 1, 12-13 (instructing employees to always consider antitrust/competition implications when interacting with competitors, even in a social setting, and further providing that "[d]iscussions of certain topics with competitors (even if seemingly not anti-competitive) may be viewed as soliciting or supporting an anti-competitive agreement and must be avoided"); Ex. 8 (instructing employees not to share with competitors proprietary or confidential information, including client information, or to participate in discussions with competitors on "competitively sensitive topics" including pricing); Ex. 9, at 1 (cautioning that "[a]n illegal information exchange can arise out of an isolated conversation (e.g. a single meeting or chat in a chat room) and even if the communication is only one way" and providing specific "Do's and Don'ts" of exchanging information with competitors).)

None of these prohibitions address conduct that is itself illegal under the Sherman Act.[6] However, if this evidence is admitted, there is a substantial risk that the jury would rely upon or adopt the banks' characterization of these behaviors as forbidden or problematic and therefore be more inclined to find Mr. Aiyer guilty of the charged criminal wrongdoing under the Sherman Act. The proper inquiry is whether Mr. Aiyer intended to and did in fact enter into a price fixing

---

[6] The implication that the exchange of information between competitors is inherently illegal is contrary to the law. *See, e.g.*, *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n. 16 (1978); *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975).

conspiracy, not whether he or his alleged coconspirators knew of or violated various bank policies.  The risk of prejudice resulting from jurors confusing compliance standards set by the banks with actual legal standards is too great for such evidence to be admissible.

Finally, the fact that Mr. Aiyer may have received certain policies or company-wide compliance emails or attended certain compliance training sessions does not mitigate the substantial risk that such compliance evidence will confuse and mislead the jury about its legal implications.  *See Chalco*, 2019 WL 456162, *at 8 (defendant's familiarity with department policies outweighed by danger of confusing issues and misleading jury).  The same is true for each of Mr. Aiyer's alleged coconspirators.  Additionally, a barrage of evidence concerning internal antitrust policies (as opposed to antitrust law) will create prejudice that cannot be cured by a limiting instruction.  *In re Urethane Antitrust Litig.*, 2016 WL 475339, at *2.

      B.    <u>The Probative Value Of Evidence Of Mr. Aiyer's Termination Is Substantially Outweighed By Its Prejudice And Potential To Cause Undue Delay.</u>

Like the bank compliance policies, even if evidence or argument regarding Mr. Aiyer's termination were marginally relevant, it should still be excluded because its admission would cause unfair prejudice and confusion of the issues.  Fed. R. Evid. 403.  As the Supreme Court has explained, "'unfair prejudice,' as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged."  *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

If admitted, evidence of Mr. Aiyer's termination for "misconduct" would conflate this finding by J.P. Morgan with the legal standards and specific facts at issue in this case.  Allowing the Government to blur these lines creates a clear risk that the jury will be "lure[d]" into finding Mr. Aiyer guilty on the basis of his being terminated for "misconduct," rather than proof specific

to the charged antitrust conspiracy. *Id.* This concern is especially acute given the quasi-legal nature of internal compliance and policy matters and the authority a juror may afford J.P. Morgan's finding of "misconduct." *Chalco*, 2019 WL 456162, at *2 ("Unfairness may be found in any form of evidence that may cause a jury to base its decision on something other than the established propositions in the case."); s*ee also In re Urethane Antitrust Litig.*, 2016 WL 475339, at *2.

In addition to this strong risk of prejudice, the proposed termination evidence should be excluded due to the undue delay it could create. Fed. R. Evid. 403. Evidence or argument that Mr. Aiyer was terminated for "misconduct" would potentially require a trial within the trial in order to determine the standards and procedures used by J.P. Morgan in making this finding and the facts and analysis on which the company relied. This is the precise sort of undertaking that Rule 403 was designed to prevent. *See, e.g.*, *United States v. Aboumoussallem*, 726 F.2d 906, 912 (2d Cir. 1984) (affirming the exclusion of evidence under Rule 403 because "the proposed testimony would require … in effect, a 'trial within a trial'"); *English v. D.C.*, 651 F.3d 1, 10 (D.C. Cir. 2011) (affirming the exclusion of internal "policy violation" evidence and findings in a police misconduct matter because such evidence would require a "trial within a trial" on the entire compliance system).

### III. In The Alternative, The Court Should Exclude The Admission Of Bank Compliance Documents That Were Not Received And Reviewed By Mr. Aiyer Or His Alleged Coconspirators.

In the event that the Court decides not to exclude categorically all bank compliance policies, the Court should at the very least allow only those policies or related documents that address the antitrust laws and were received and reviewed by Mr. Aiyer or his alleged coconspirators. Out of the 173 compliance documents on the Government's preliminary exhibit list, at least 19 appear to be undated or were distributed prior to or following Mr. Aiyer's or his

alleged coconspirators' employment with the relevant bank.  In addition, dozens of other compliance documents on the Government's preliminary exhibit list lack any indication that they were ever received by or shown to Mr. Aiyer or his alleged coconspirators.  Policies and related documents that were not specifically received or reviewed by Mr. Aiyer or his alleged coconspirators have no bearing on the charged Sherman Act conspiracy, and accordingly should be precluded.  The same is true of documents that do not address the antitrust laws.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Aiyer's Motion *in Limine* to Exclude Evidence or Argument Related to Bank Compliance Policies and Defendant's Termination.

Dated: July 26, 2019
New York, New York

By: /s/ Martin Klotz
WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*