**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
|
UNITED STATES OF AMERICA                              |
|
    v.                                                       |
|         Case No. 1:18-cr-00333 (JGK)
AKSHAY AIYER,                                         |
|
    Defendant.                                          |
|
---------------------------------------------------------------x


**THE UNITED STATES' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANT'S STANDING MOTION *IN LIMINE* TO**
**EXCLUDE EVIDENCE OF COORDINATED INTERDEALER TRADING**
**AND COORDINATED RUBLE TRADING**

# **TABLE OF CONTENTS**

Introduction...................................................................................................................... 1

Argument .......................................................................................................................... 1

    I.    Coordinated trading in the interdealer market is relevant to the charged *per se* conspiracy. ................................................................................................................ 2

    II.   Coordinated ruble pricing is relevant to the charged *per se* conspiracy. ............................ 6

    III.  Evidence of coordinated trading in the interdealer market and coordinated ruble pricing satisfies Rule 403's balancing test. ................................................. 8

Conclusion ....................................................................................................................... 8

## **TABLE OF AUTHORITIES**

**Cases**

*Am. Tobacco Co. v. United States,*
  328 U.S. 781 (1946).................................................................................................. 2

*Apex Oil v. DiMauro,*
  713 F. Supp. 587 (S.D.N.Y. 1989)........................................................................... 4

*Arizona v. Maricopa Cty. Medical Soc'y,*
  457 U.S. 332 (1982).................................................................................................. 5

*Gelboim v. Bank of America Corp.,*
  823 F.3d 759 (2d Cir. 2016).............................................................................. 5, 6, 7

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
  58 F. Supp. 2d 228 (S.D.N.Y. 1999)........................................................................ 4

*In re Foreign Exch. Benchmark Rates Antitrust Litig.,*
  74 F. Supp. 3d 581 (S.D.N.Y. 2015)..................................................................... 3, 7

*N. Pac. Ry. Co. v. United States,*
  356 U.S. 1 (1958)...................................................................................................... 6

*United States v. Apple, Inc.,*
  791 F.3d 290 (2d Cir. 2015)..................................................................................... 2

*United States v. Brighton Bldg. & Maint. Co.,*
  598 F.2d 1101 (7th Cir. 1979) ................................................................................. 3

*United States v. Joyce,*
  895 F.3d 673 (9th Cir. 2018) ........................................................................... 2, 5, 6

*United States v. Kemp & Assocs., Inc.,*
  907 F.3d 1264 (10th Cir. 2018) ............................................................................... 5

*United States v. Koppers Co.,*
  652 F.2d 290 (2d Cir. 1981)............................................................................. 2, 7, 8

*United States v. Socony-Vacuum Oil Co.,*
  310 U.S. 150 (1940)......................................................................................... 2, 5, 6

*United States v. Topco Assocs., Inc.,*
  405 U.S. 596 (1972).................................................................................................. 7

*United States v. Usher*,
   No. 17 CR 19 (RMB), 2018 WL 2424555 (S.D.N.Y. May 4, 2018)................................. 3, 4, 7

**Rules**

Fed. R. Evid. 401 ........................................................................................................ 1

Fed. R. Evid. 402 ........................................................................................................ 1

Fed. R. Evid. 403 ..................................................................................................... 1, 8

## INTRODUCTION

The Court should deny Defendant's Standing Motion *in Limine* to Exclude Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading (ECF No. 98).  The indictment alleges that Defendant knowingly participated in a conspiracy to fix prices and rig bids in violation of the Sherman Act.  Coordinated trading in the interdealer market and coordinated ruble pricing are direct evidence of this conspiracy and therefore are relevant and admissible under Federal Rules of Evidence 401 and 402.  Given the high probative value of the evidence and the lack of danger of unfair prejudice, the evidence also is admissible under Rule 403.

## ARGUMENT

As he did in his motions to dismiss, Defendant singles out two particular means and methods by which the conspiracy was implemented—coordinated trading in the interdealer market and coordinated ruble pricing—and inappropriately argues that because this conduct allegedly is subject to the rule of reason, instead of the *per se* rule, it is irrelevant to the charged conspiracy.

As a threshold matter, Defendant again misconstrues the general nature of conspiracy law and the indictment returned against him.  The indictment against Defendant alleges a "single overarching conspiracy" to violate Section 1 of the Sherman Act.  (June 3, 2019 Hr'g Tr. 42:9–13).  Specifically, it alleges that Defendant "knowingly entered into and participated in a combination and conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies."  (Indictment ¶ 20, ECF No. 1.).  This conspiracy was implemented through various means and methods, including coordinated trading in the interdealer market and coordinated pricing to customers.  (*See* Indictment ¶ 22(d), (f).)  These means and methods "must be considered in relation to the overall conspiracy.  It is irrelevant that certain activity set forth in the indictment may not alone constitute a *per se* crime.

What is relevant is that those acts enable the defendant and his coconspirators to carry out an unlawful conspiracy." (June 3, 2019 Hr'g Tr. 43:1–7 (citing *United States v. Apple, Inc.*, 791 F.3d 290, 325 (2d Cir. 2015)); *see also Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946) ("It is not the form of the combination or the particular means used but the result to be achieved that the statute condemns.  It is not of importance whether the means used to accomplish the unlawful objective are in themselves lawful or unlawful.  Acts done to give effect to the conspiracy may be in themselves wholly innocent acts.  Yet, if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition.").  The *per se* rule applies to the object of the conspiracy (i.e., price fixing and bid rigging), not to the individual acts the co-conspirators committed to accomplish this object.

Although the conduct Defendant challenged in the instant motion—coordinated trading in the interdealer market and the coordinated ruble pricing—need not be a *per se* violation standing alone, the conduct constitutes price fixing and bid rigging, and is therefore direct evidence of the charged price-fixing and bid-rigging conspiracy.

### I.    Coordinated trading in the interdealer market is relevant to the charged *per se* conspiracy.

Coordinated trading in the interdealer market is a form of price fixing and bid rigging, which have long been held to be a *per se* illegal restraints under the Sherman Act.  *See United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (regardless of "the machinery employed[,] . . . . a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity in interstate or foreign commerce is illegal *per se*."); *United States v. Joyce*, 895 F.3d 673, 677 (9th Cir. 2018) ("[B]id rigging is a form of horizontal price fixing."); *United States v. Koppers Co.*, 652 F.2d 290, 294

(2d Cir. 1981) ("In cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'" (quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979))).  Accordingly, this conduct is highly probative of the existence of a conspiracy whose object is price fixing and bid rigging.

An example of the type of coordinated trading in the interdealer market at issue in this case is as follows: members of the conspiracy reveal their trading positions and discover that two of them both need to buy or both need to sell.  The one with the smaller position (i.e., the one who needs to buy or sell a smaller quantity), agrees to withhold his orders (i.e., refrain from submitting competing bids to buy or offers to sell) to avoid moving the price against his co-conspirator with a larger position (who thus has a greater potential to make or lose money).  Refraining from bidding is a form of bid rigging, and therefore is relevant to proving the existence of the charged conspiracy.  Indeed, courts in this circuit have applied the *per se* rule to alleged conspiracies involving similar conduct in the foreign exchange interdealer market.  *See United States v. Usher*, No. 17 CR 19 (RMB), 2018 WL 2424555, at *4 (S.D.N.Y. May 4, 2018) (indictment sufficiently alleged *per se* violation of the Sherman Act based on agreement to fix prices and rig bids by coordinating trading in the FX interdealer market); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 594 (S.D.N.Y. 2015) (complaint sufficiently alleged *per se* violation of the Sherman Act based on agreement to fix prices by executing "concerted trading strategies" on the interdealer FX platform designed to affect the WMR fix price).

Defendant incorrectly contends that coordinated trading in the interdealer market is not conduct that is *per se* unlawful because it (1) only affected prices paid by "counterparties" on the

interdealer platform, as opposed to "customers," (2) "did not reduce the volume of currency trading," and (3) had "procompetitive purposes and likely effect." (*See* Mem. Supp. of Def.'s Standing Mot. in Lim. to Exclude Evid. of Coordinated Interdealer Trading and Coordinated Ruble Trading ("Def.'s Mem.") at 2–4, ECF No. 99.). Defendant's arguments have no merit. First, there is no legal distinction, for Sherman Act purposes, between "counterparties" on the interdealer platform and "customers," who might transact with dealer banks. Defendant cites two cases for this proposition: *Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 246 (S.D.N.Y. 1999) and *Apex Oil v. DiMauro*, 713 F. Supp. 587, 595 (S.D.N.Y. 1989). However, as discussed in the government's opposition to Defendant's motions to dismiss, neither case stands for that proposition. (*See* Gov't Mem. Opp. to Def.'s Mots. to Dismiss, at 10–15, ECF No. 55.) A conspiracy between competitors to affect (i.e., raise or lower) prices is a *per se* violation, regardless of whether the price intended to be affected is a price paid by a "counterparty" on the interdealer platform or a "customer" calling the sales desk of a bank. In fact, in *Usher*, the defendants were alleged to have affected the price of EUR/USD solely through coordinated trading in the interdealer market. *See Usher*, 2018 WL 2424555, at *4 ("Defendants are alleged to have agreed to 'rig the euro-dollar auction that sets th[e] market price by coordinating their trading, and thus fixing the market price of the very product over which they compete.'" (quoting Hr'g Tr. dated March 26, 2018, at 17)).

Second, contrary to Defendant's assertion, the government need not demonstrate an anticompetitive effect on customer prices or trading volume. As the Court of Appeals for the Second Circuit held in *Gelboim v. Bank of America Corporation*, when a *per se* conspiracy is adequately alleged, "[n]o further showing of actual adverse effect in the marketplace is necessary. This attribute separates evaluation of *per se* violations—which are presumed

illegal—from rule of reason violations, which demand appraisal of the marketplace consequences that flow from a particular violation." 823 F.3d 759, 776 (2d Cir. 2016). *See also United States v. Kemp & Assocs., Inc.*, 907 F.3d 1264, 1277 (10th Cir. 2018) (when considering whether the *per se* rule applies, it does not "matter that the alleged agreement would only affect a small number of potential customers"); *Joyce*, 895 F.3d at 677 (rejecting defendant's argument that "the *per se* rule should not apply to the [bid rigging] scheme in which he participated because that scheme, which he says involved 'a few participants in a narrow set of public foreclosure auctions,' did not have any 'demonstrable effect on the pricing or quantity of the real estate sold'"). Accordingly, Defendant's argument as to effect on pricing or trading volume has no merit.

Third, Defendant inappropriately contends that coordinated trading in the interdealer market is not *per se* unlawful because the conduct allegedly had a "procompetitive purpose and likely effect." (Def.'s Mem. at 4.) In so arguing, Defendant seeks to turn the *per se* rule on its head; he argues that because (in his view) this conduct had procompetitive benefits and a lack of effect, it should be excluded in this *per se* case. To the contrary, it is well-established that procompetitive justifications or lack of effect are not excuses for *per se* illegal agreements. As the Supreme Court held in *Arizona v. Maricopa County Medical Society*,

> The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications. The argument indicates a misunderstanding of the *per se* concept. The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.

457 U.S. 332, 351 (1982); *see also Socony-Vacuum*, 310 U.S. at 218 ("Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-called

5

competitive abuses or evils which those agreements were designed to eliminate or alleviate may be interposed as a defense.").  That members of the conspiracy also shared market information with one another does not excuse their illegal activity.  Nor could any potential lack of anticompetitive effect.  *See Joyce*, 895 F.3d at 677–78 ("The *per se* rule eliminates the need to inquire into the specific effects of certain restraints of trade.  The very purpose of the per se rule is to 'avoid[ ] the necessity for an incredibly complicated and prolonged economic investigation into the entire history of the industry involved, as well as related industries, in an effort to determine at large whether a particular restraint has been unreasonable.'" (alteration in original) (quoting *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958))).  It is in light of this decades-long precedent that the government has moved to exclude procompetitive justifications or lack of anticompetitive effects.  (*See* Mem. Supp. of Gov't's Mots. in Lim. at 24–27, ECF No. 93.)

## II.    Coordinated ruble pricing is relevant to the charged *per se* conspiracy.

Coordinated ruble pricing to customers is an example of price fixing, which has long been considered a *per se* illegal restraint under the Sherman Act.  *Socony-Vacuum*, 310 U.S. at 223; *Gelboim*, 823 F.3d at 771 ("Horizontal price-fixing conspiracies among competitors are unlawful *per se*.").  An example of the coordinated ruble pricing in this case is as follows: several members of the conspiracy are asked by the same customer for a price in the U.S. dollar/Russian ruble currency pair.  The members of the conspiracy then agreed with one another on the prices to quote to the customer.  This is price-fixing.  *See Socony-Vacuum*, 310 U.S. at 222 ("[P]rices are fixed . . . if the range within which purchases or sales will be made is agreed upon, if the prices paid or charged are to be at a certain level or on ascending or descending scales, if they are to be uniform, or if by various formulae they are related to the market prices. They are fixed because they are agreed upon.").  The behavior therefore necessarily is relevant to the charged conspiracy.

Defendant incorrectly argues that Defendant and Katz were in a "classic vertical arrangement," with Defendant as "an upstream, risk-taking wholesaler of rubles" and Katz as a "downstream distributor of rubles." (Def.'s Mem. at 4.) He argues that this vertical arrangement removes their price-fixing behavior from the realm of *per se* conduct. (*Id.*) Defendant mischaracterizes the relationship between Defendant and Katz. Defendant and Katz were both market makers in rubles, standing ready to buy and sell rubles to customers. To the customer seeking to trade rubles, Defendant and Katz were at the same distribution level; in other words, they were competitors. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (characterizing a horizontal agreement as one between competitors, i.e., persons "at the same level of the market structure"). Indeed, it is well-established in this circuit that traders at competing banks are in a horizontal relationship with one another. *See Gelboim*, 823 F.3d at 771 ("Although LIBOR was set jointly, the Banks remained horizontal competitors in the sale of financial instruments."); *Usher*, 2018 WL 2424555, at *4 ("Defendants' alleged behavior constitutes a horizontal restraint of trade because it is an agreement among competitors at the same level of the market, i.e., they were traders working for dealers in the FX spot market . . . . Defendants in this case were competing at the 'same level' of the market whether or not they were buying or selling at any given moment."); *In re Foreign Exchange*, 74 F. Supp. 3d at 594–95 (concluding that defendant banks were "'horizontal competitors in the FX market' who compete for customers by supplying different bid and ask quotations").

Even though, at times, Defendant and Katz may have traded rubles with one another, this does not change the fundamental horizontal nature of their relationship. *Koppers* is intructive on this point. In *Koppers*, the defendant company and its co-conspirator were alleged to have entered into a horizontal conspiracy to rig bids and allocate territories for the sale of road tar

throughout Connecticut.  652 F.2d at 291.  At times throughout the conspiracy, the defendant was also a supplier of tar to its co-conspirator, ultimately becoming the co-conspirator's sole supplier.  *Id.* at 292.  Based on this fact, the defendant argued that it could not be said to have engaged in a horizontal conspiracy because it was in a vertical relationship with its co-conspirator.  *Id.* at 296.  The court rejected this argument because the defendant and his co-conspirator entered into the agreement to rig bids and allocate markets as horizontal competitors; the fact that the defendant ended up supplying its co-conspirator as well did not have "any effect" on the fundamental nature of their relationship as competitors.  *Id.* at 297.  So, too, here. Even if Katz offset his position with Defendant after trading with a customer, that does not alter the fundamentally competitive relationship between them.

### III.    Evidence of coordinated trading in the interdealer market and coordinated ruble pricing satisfies Rule 403's balancing test.

Defendant's argument that this evidence should be precluded under Rule 403 rests on his misplaced assumption that neither type of conduct can be the means of effectuating a *per se* conspiracy.  As discussed above, even though the means of effectuating a *per se* conspiracy need not be *per se* violations standing alone, both types of conduct challenged in this motion are price fixing and bid rigging, and therefore are direct evidence of the charged conspiracy.  Accordingly, the probative value of the evidence is high, and there is no risk of jury confusion, unfair prejudice, undue delay, or needless expense.  This probative value is not substantially outweighed by any danger of unfair prejudice, so it is admissible under Rule 403.

### CONCLUSION

For the foregoing reasons, the Court should deny Defendant's Standing Motion *in Limine* to Exclude Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading (ECF No. 98).

Dated: August 16, 2019
      New York, New York

      Respectfully submitted,

      /s/ Katherine Calle

      Kevin Hart
      Katherine Calle
      David Chu
      Eric Hoffmann

      U.S. Department of Justice, Antitrust Division
      New York Office
      26 Federal Plaza, Room 3630
      New York, NY 10278
      212-335-8000