UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA          :          18 Cr. 333 (JGK)

              v.          :

AKSHAY AIYER,          :

           Defendant.          :

-------------------------------------------------------x


**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO THE
UNITED STATES' MOTIONS IN LIMINE NOS. 4-7**


WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

# **TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ............................................................................1

ARGUMENT ....................................................................................................2

I.     The Government's Motion In Limine No. 4 To Exclude Evidence And
       Argument Regarding Industry Custom And Practice And Supervisor
       Knowledge Should Be Denied...................................................................4

       A.     Evidence Regarding Industry Custom And Practice And
              Supervisor Knowledge Will Assist The Court In Determining
              Which Mode Of Antitrust Analysis To Apply...............................6

       B.     Evidence Regarding Industry Custom And Practice And
              Supervisor Knowledge Is Relevant To Establish That There Was
              No Agreement. ...............................................................................8

       C.     Evidence Regarding Industry Custom And Practice And
              Supervisor Knowledge Is Relevant To Establish That Mr. Aiyer
              Did Not Intend To Fix Prices And Rig Bids..................................9

       D.     Absent Evidence Regarding Industry Custom And Practice And
              Supervisor Knowledge, Mr. Aiyer Will Be Prejudiced. ...........11

       E.     Evidence Regarding Supervisor Knowledge Directly Rebuts The
              Indictment's Allegations Of Concealment................................13

II.    The Government's Motion In Limine No. 5 To Exclude Evidence And
       Argument Regarding Lack Of Anticompetitive Effects Should Be Denied..........13

       A.     Evidence Regarding Lack Of Anticompetitive Effects Will Assist
              The Court In Determining Which Mode Of Antitrust Analysis To
              Apply............................................................................................13

       B.     Evidence Regarding Lack Of Anticompetitive Effects Is Relevant
              To Establish That Mr. Aiyer Did Not Enter Into An Agreement
              With The Requisite Intent. .........................................................16

III.   The Government's Motion In Limine No. 6 To Exclude A Joint Venture
       Defense Should Be Denied. .....................................................................16

IV.    The Government's Motion In Limine No. 7 To Exclude Expert Testimony
       Offering Legal Conclusions And Opining On Intent And Motive Should
       Be Denied..................................................................................................19

CONCLUSION....................................................................................................................................22

# TABLE OF AUTHORITIES

**Cases**                                                  **Page(s)**

*Apex Oil Co. v. DiMauro*,
713 F.Supp. 587 (S.D.N.Y. 1989).................................................................8

*Atlantic Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)...................................................................................15

*In re ATM Fee Antitrust Litig.*,
554 F. Supp. 2d 1003 (N.D. Cal. 2008) ......................................................17

*Arizona v. Maricopa County Medical Society*,
457 U.S. 332 (1982)...................................................................................14

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................8

*Blanksteen v. N.Y. Mercantile Exch.*,
879 F. Supp. 363 (S.D.N.Y. 1995)..............................................................14

*Bradford v. New York Times Co.*,
501 F.2d 51 (2d Cir. 1974)..........................................................................18

*Branta, LLC v. Newfield Prod. Co.*,
310 F. Supp. 3d 1166 (D. Co. 2018) .............................................................9

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,* ("*BMI*"),
441 U.S. 1 (1979)..................................................................3, 6, 8, 14, 16

*Bus. Electronics Corp. v. Sharp Electronics Corp.*,
485 U.S. 717 (1988)...................................................................................18

*Cement Mfrs. Protective Ass'n v. United States*,
268 U.S. 588 (1925)...................................................................................11

*Cont'l Baking Co. v. United States*,
281 F.2d 137 (6th Cir. 1960) ..................................................................9, 22

*Copy-Data Sys., Inc. v. Toshiba America, Inc.*,
663 F.2d 405 (2d Cir. 1981).....................................................................6, 21

*Eichorn v. AT&T Corp.*,
248 F.3d 131 (3d Cir. 2001)........................................................................18

*In re Elevator Antitrust Litig.*,
502 F.3d 47 (2d Cir. 2007)............................................................................8

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)..............................................................................3

*LaSalle Bank Nat'l Ass'n v. CIBC Inc.*,
    No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785 (S.D.N.Y. Feb. 14, 2012)...............12

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................................4, 7, 14, 15, 21

*Link v. Mercedes-Benz of N. Am., Inc.*,
    788 F.2d 918 (3d Cir. 1986)......................................................................................9

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986).................................................................................................16

*Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*,
    922 F. 3d 713 (6th Cir. 2019) ..................................................................................15

*Polk Bros., Inc. v. Forest City Enters., Inc.*,
    776 F.2d 185 (7th Cir. 1985) ..................................................................................18

*Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*,
    792 F.2d 210 (D.C. Cir. 1986) ................................................................................18

*State Oil Co. v. Khan*,
    522 U.S. 3 (1997)....................................................................................................15

*In re Sulfuric Acid Antitrust Litig.*,
    703 F. 3d 1004 (7th Cir. 2012) ..........................................................................17, 22

*Texaco Inc. v. Dagher*,
    547 U.S. 1 (2006)......................................................................................................6

*Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*,
    346 U.S. 537 (1954)..................................................................................................8

*In re Titanium Dioxide Antitrust Litig.*,
    No. RDB-10-0318, 2013 WL 1855980 (D. Md. May 1, 2013) .....................................22

*United States v. Apple Inc.*,
    952 F. Supp. 2d 638 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015) ......................5

*United States v. Bestway Disposal Corp.*,
    724 F. Supp. 62 (W.D.N.Y. 1988)..........................................................................4, 6

*United States v. Coleman Am. Moving Services, Inc.*,
    Crim. No. 86-24-N (M.D. Ala. Aug. 8, 1986) ...............................................................7

*United States v. Connolly,*
    16 Cr. 370 (CM), 2018 WL 2411217 (S.D.N.Y. May 15, 2018) ...............................4, 10

*United States v. Daly,*
    842 F.2d 1380 (2d Cir. 1998)..........................................................................................12

*United States v. Gaspard,*
    744 F.2d 438 (5th Cir. 1984) ..........................................................................................10

*United States v. Goodman,*
    850 F.2d 1473 (11th Cir. 1988) ..................................................................................9, 13

*United States v. Koppers Co.,*
    652 F.2d 290 (2d Cir. 1981)............................................................................................10

*United States v. Litvak,*
    808 F.3d 160 (2d Cir. 2015)............................................................................................10

*United States v. Realty Multi-List, Inc.,*
    629 F.2d 1351 (5th Cir. 1980) ........................................................................................15

*United States v. U.S. Gypsum Co.,*
    438 U.S. 422 (1978)...................................................................3, 4, 10, 11, 14, 16

*United States v. Usher,*
    No. 17 CR 19 (S.D.N.Y. 2018)........................................................................................5

*Volvo N. Am. Corp. v. Men's Int'l. Prof. Tennis Council,*
    857 F.2d 55 (2d Cir. 1988)...................................................................................7, 15, 18

**Other Authorities**

Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization* (4th ed. 2015)........20

Defendant Akshay Aiyer respectfully submits this Memorandum of Law in Opposition to the United States' Motions in Limine Nos. 4-7.

## PRELIMINARY STATEMENT

In its Motions in Limine Nos. 4-7 (ECF No. 93 (the "Motions")), the Government seeks to exclude evidence of industry custom and practice, supervisor knowledge, procompetitive justifications or lack of anticompetitive effects, the existence of a cooperative venture, and verticality among the alleged coconspirators. The basis for these Motions, as the Government argues repeatedly, is that such evidence is impermissible "in this per se case." (*See, e.g.*, Motions at 24, 25, 28.) But this argument improperly assumes its conclusion and is premised on a mischaracterization of the Court's ruling on Mr. Aiyer's motions to dismiss. The Court did not determine that the conduct at issue *is* a per se violation of Section 1 of the Sherman Act, but merely that the language of the Indictment "is sufficient to *state*" such a violation. (ECF No. 87, Motion to Dismiss Hearing Transcript ("Hearing Tr."), at 43:13-14 (emphasis added).) It remains an open question whether any of the conduct the Government actually proves constitutes a per se violation.

Until this question is resolved, evidence related to the determination of whether any challenged conduct should be assessed under the per se rule—rather than conduct requiring a rule of reason analysis—remains highly relevant. As the Court explained during the motion to dismiss hearing, such determinations first require a full presentation of the evidence. (Hearing Tr., at 7:15-18 ("I can't tell at this stage, without a full presentation of the evidence, whether evidence of those -- of what happened on those days may be relevant to prove undisputed illegal ends of the conspiracy.").) The Motions improperly seek to exclude the very evidence needed to resolve this fundamental issue.

Even if the Court were to determine that some of the conduct presented by the Government at trial may constitute per se price fixing or bid rigging, much of the Government's trial evidence will still relate in substantial part to conduct that is entirely legal and appropriate (such as information sharing, direct trading, and Mr. Aiyer's support of lesser dealers in the ruble market) or that raises issues of potential impropriety that are nonetheless irrelevant to the Government's antitrust charges (such as alleged disclosures of confidential information or deceptive trade execution strategies).  Evidence that explains these practices, puts them in context, or shows how they may promote competition is relevant to help jurors understand what conduct is lawful and routine and to distinguish it from conduct that may be unlawful.

Finally, even as to conduct, if any, that the Court rules would be a per se antitrust violation, if it occurred, the evidence at issue in the Motions would be relevant both to the question of whether the alleged coconspirators acted pursuant to an agreement, and, if they did, whether this agreement had as its object price fixing or bid rigging, as distinct from some other purpose.

Mr. Aiyer does not intend to introduce any evidence to mount an "everybody was doing it" defense or to excuse illegal conduct, as the Government contends.  (*See* Motions at 18-19.) Instead, Mr. Aiyer's defense will be, among other things, that he did not knowingly and intentionally enter into an agreement with the intention of price fixing or bid rigging.  The evidence that the Motions seek to exclude is relevant and permissible to resolve that question.

## **ARGUMENT**

The Government does not dispute that the selection of the appropriate mode of antitrust analysis is a question of law to be decided by the Court.  (*See* Motions at 29 ("The parties agree that the decision whether to apply the *per se* rule or the rule of reason is a matter of law for the

Court.").)  Nevertheless, in its Motions, the Government assumes that, solely because the Indictment contains bare allegations of "fixing prices and rigging bids," the per se rule applies. This is incorrect.

In *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.* ("*BMI*"), the Supreme Court held that per se treatment may not be appropriate even when "two or more potential competitors have literally 'fixed' a 'price.'"  441 U.S. 1, 9 (1979).  The court also held that a "literal approach does not establish that this particular practice is one of those [per se] types [ ] that is 'plainly anticompetitive' and very likely without 'redeeming virtue.' … *[I]t is necessary to characterize the challenged conduct* as falling within or without that category of behavior to which we apply the '*per se* price-fixing.'"  *Id.* at 8-9 (emphasis added); *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998) ("Affixing certain labels to alleged conduct is insufficient to invoke *per se* treatment.").  The fact that the Indictment contains per se language provides no basis to exclude evidence relevant to the Court's ultimate decision on this issue, a decision the Court has yet to make.

Even to the extent the jury is focused on behavior found by the Court to constitute price fixing or bid rigging, it remains the case that the antitrust crimes of price fixing and bid rigging are not strict liability offenses.  *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 435-36 (1978) ("[W]e hold that a defendant's state of mind or intent is an element of a criminal antitrust offense … [and] cannot be taken from the trier of fact through reliance on a legal presumption of wrongful intent . . . We are unwilling to construe the Sherman Act as mandating a regime of strict-liability criminal offenses.").

The Government may not need to show that Mr. Aiyer intended to violate the law, or even that he intended to injure competition, but it must show that he intended to fix prices or rig

bids, as those terms of art are used in antitrust law.  *Id.* at 444 n.20 ("In a conspiracy, two different types of intent are generally required – the basic intent to agree, which is necessary to establish the existence of the conspiracy, and the more traditional intent to effectuate the object of the conspiracy."); *see also United States v. Bestway Disposal Corp.*, 724 F. Supp. 62, 67 (W.D.N.Y. 1988) ("[T]he Government must prove the [critical] element of criminal intent to [effect the object of an antitrust conspiracy] beyond a reasonable doubt in order to establish that an agreement is then subject to *per se* analysis").  That is, the Government must show that Mr. Aiyer intended to engage in manifestly anticompetitive conduct with no redeeming features.  *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) (per se treatment requires that a restraint have "manifestly anticompetitive effects" and lack "any redeeming virtue") (internal citations and quotations omitted).  The evidence the Government seeks to exclude is relevant to whether Mr. Aiyer entered into an agreement with the intent to fix prices or rig bids.

To the extent the Government is concerned that these arguments will improperly invoke an "everybody was doing it" defense, the Court can easily cure any risk that arises from the admission of such evidence with a jury instruction.  *United States v. Connolly,* 16 Cr. 370 (CM), 2018 WL 2411217, at \*4 (S.D.N.Y. May 15, 2018) ("The Government has long been concerned that defendants would try to mount an 'everybody's doing it' defense, but this court is fully capable of making sure that the jury understands that 'everybody's doing it' is not a defense.").

I.      **The Government's Motion In Limine No. 4 To Exclude Evidence And Argument Regarding Industry Custom And Practice And Supervisor Knowledge Should Be Denied.**

The thrust of the Government's Motion in Limine No. 4 is that Mr. Aiyer seeks to introduce for improper purposes evidence relating to FX industry custom and practice, as well as evidence that Mr. Aiyer's and his alleged coconspirators' supervisors knew what they were

doing—to show that "[Mr. Aiyer] was not knowingly violating the law" or to mount an "everybody was doing it" defense.[1]  (Motions at 18-19.)   But the Government mischaracterizes Mr. Aiyer's intended use of such evidence.  Mr. Aiyer intends to offer such evidence to negate the characterization of the charged conduct as obviously and nakedly anticompetitive, and thus subject to the per se rule.  To the extent the Court rules that any of the challenged behavior is subject to per se adjudication, Mr. Aiyer will offer this evidence to refute both elements of the per se claim: (1) that the defendant entered into a horizontal agreement (2) with the intention of fixing prices and rigging bids.[2]  Additionally, Mr. Aiyer will offer this evidence to rebut the allegations of concealment that the Indictment itself explicitly puts at issue.

---

[1] The Government relies on *United States v. Apple Inc.* to argue that the Court should preclude custom and practice evidence.  *Apple* is distinguishable on multiple grounds.  Most importantly, the *Apple* court *did* consider this evidence as part of its ruling, and it did not suggest that the evidence should have been excluded.  952 F. Supp. 2d 638, 699 (S.D.N.Y. 2013), *aff'd*, 791 F.3d 290 (2d Cir. 2015).  Moreover, the *Apple* defendants referred to industry custom and practice as part of an "everybody does it" defense. *Id.* ("Apple also argues that it is particularly unfair to find that it engaged in illegal conduct since Amazon and Google, among others, used similar negotiating tactics and included nearly identical terms . . . when they subsequently executed their own agency agreements with the Publishers.").  Mr. Aiyer does not intend to assert such a defense.

[2] The court in *United States v. Usher* denied the government's motion to exclude evidence of industry custom and practice and supervisor knowledge for precisely these reasons: "[T]he defense … should be given the appropriate latitude to refute the government's case. … [W]e don't want to infringe on … [their] ability to rebut the elements of the crime with which each defendant is charged."  (Transcript of Oral Argument at 33:2-4; 33:17-19, *United States v. Usher*, No. 17 CR 19 (S.D.N.Y. Sept. 28, 2018), ECF No. 158.)  With little context or explanation, the Government attempts to distract from this plain, unqualified ruling with mention of a possible "quid pro quo" involving the bank guilty pleas that were also at issue in *Usher*.  (Motions at 23.)  This position reverses the logic of the decision.  The *Usher* court did not allow evidence of industry custom and practice and supervisor knowledge *because* it allowed the government to introduce the bank pleas; it allowed the bank pleas to *rebut* the already-allowed custom and practice evidence.  (*See* Decision & Order at 3, *United States v. Usher*, No. 17 CR 19 (S.D.N.Y. Sept. 24, 2018), ECF No. 152 ("The Government wishes to enter the Bank Pleas into evidence to rebut these defenses [based on industry customs and norms]. … The Court finds that the Government may introduce into evidence the Bank Pleas [for this rebuttal purpose].").)  To the extent there was any trade-off at all, it had no bearing on the *Usher* court's denial of the same motion the Government now makes here.

A.     Evidence Regarding Industry Custom And Practice And Supervisor Knowledge
       Will Assist The Court In Determining Which Mode Of Antitrust Analysis To
       Apply.

Criminal prosecution under the Sherman Act is limited to obvious, naked restraints of

trade that can have no legitimate explanation.  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006)

("*Per se* liability is reserved for only those agreements that are 'so plainly anticompetitive that

no elaborate study of the industry is needed to establish their illegality.'") (quoting *Nat'l Soc. of

Professional Engineers v. United States*, 435 U.S. 679, 692 (1978)).  Three types of restraints—

classic price fixing, bid rigging, and customer allocation—are deemed per se unlawful.

However, to warrant per se condemnation, the Court must conclude that the conduct

unmistakably fits a well-defined per se category.  *BMI*, 441 U.S. at 8-9 ("The Court of Appeals'

literal approach does not alone establish that this particular practice is one of those types or that

it is 'plainly anticompetitive' and very likely without 'redeeming virtue.' … *[I]t is necessary to

characterize the challenged conduct* as falling within or without that category of behavior to

which we apply the label '*per se* price-fixing.'") (emphasis added); *see also Copy-Data Sys., Inc.

v. Toshiba America, Inc.*, 663 F.2d 405, 411 (2d Cir. 1981) ("Expansion of the per se rule should

be 'approached with great caution.'") (quoting *Abadir & Co. v. First Mississippi Corp.*, 651 F.2d

422, 428 (5th Cir. 1981)).[3]

---

[3] On the application of the per se rule in a criminal case, a court in the Western District of New York, following
Supreme Court and Second Circuit law, observed: "'[T]here is often no bright line separating *per se* from Rule of
Reason analysis,' … [and] '*per se* rules are appropriate only for conduct that is manifestly anticompetitive.' …
Furthermore, in a recent decision, the Second Circuit Court of Appeals cautioned the Court below that on remand it
should carefully consider any justifications to price fixing allegations posited by a defendant in a civil anti-trust
action and stated that '[t]he relevant inquiry … involves more than a question simply of determining whether two or
more potential competitors have literally fixed a price.' … This language suggests that the *per se* analysis in anti-
trust cases should be applied sparingly."  *Bestway Disposal Corp.*, 724 F. Supp. at 66 n.6 (citing *Nat'l Collegiate
Athletic Ass'n v. Bd. of Regents of University of Oklahoma*, 468 U.S. 85, 104 n.26 (1984); *Bus. Electronics Corp. v.
Sharp Electronics Corp.*, 485 U.S. 717, 723 (1988); *Volvo N. Am. Corp. v. Men's Int'l. Prof. Tennis Council*, 857
F.2d 55, 71 (2d Cir. 1988)).

Whether the challenged behavior is to be judged pursuant to the rule of reason or subjected to per se condemnation requires the allegedly anticompetitive conduct to be considered in context and based on its likely economic effects.  *See Leegin,* 551 U.S. at 886 ("*per se* rule[ ] is confined to restraints" that courts, after extensive examination, have determined are "manifestly anticompetitive"); *Volvo N. Am. Corp.*, 857 F.2d at 71-72 ("determining when a practice should be so characterized [as per se] can be very difficult, and may involve a fair amount of sophisticated economic inquiry") (citing H. Hovenkamp, *Economics and Federal Antitrust Law*, § 4.4, at 128 (1985)); *see also United States v. Coleman Am. Moving Services, Inc.*, Crim. No. 86-24-N, slip op. at 3 (M.D. Ala. Aug. 8, 1986) (it is permissible for the Court to "make 'considerable inquiry into market conditions before [concluding that] the evidence justifies a presumption of anticompetitive conduct'") (citing *Nat'l Collegiate Athletic Ass'n*, 468 U.S. at 104 n.26).

Without a proper basis, the Government concludes that, because the Indictment contains allegations of price fixing and big rigging, it can proceed to trial under a per se theory.  But Mr. Aiyer is entitled to demonstrate with evidence that certain conduct at issue—namely, his interdealer trading strategies and execution and his trading in the ruble—is not classic per se price fixing or bid rigging, and thus cannot be prosecuted criminally.

As part of his defense, Mr. Aiyer intends to introduce evidence that a Bloomberg chat room was the vehicle through which he and his alleged coconspirators collaborated.  Evidence will be adduced that Mr. Aiyer's and his alleged coconspirators' supervisors encouraged the use of chat rooms—an industry-wide practice at the time—because these forums allowed FX traders to obtain helpful market information, transact more efficiently, reduce risk management costs, and serve customers more effectively.  Mr. Aiyer also intends to offer evidence that his

information sharing and trade execution strategies were common and accepted in the currency trading world.  Mr. Aiyer should be granted the opportunity to place the behavior at issue in context and to refute the proposition that the challenged conduct is a per se unlawful naked restraint of trade.  *BMI*, 441 U.S. at 20 (finding that the per se label was not applicable to a blanket licensing agreement because it was "not a 'naked restrain[t] of trade with no purpose except stifling of competition,' but rather accompanies the integration of sales, monitoring, and enforcement against unauthorized copyright use.") (internal citations omitted); *Apex Oil Co. v. DiMauro*, 713 F.Supp. 587, 596 (S.D.N.Y. 1989) ("[I]f the purpose of the alleged conspiracy is not price-fixing, but prices are nevertheless affected by the challenged behavior, that behavior must be judged under the Rule of Reason.").

> B.  Evidence Regarding Industry Custom And Practice And Supervisor Knowledge Is Relevant To Establish That There Was No Agreement.

Even if the Court were to determine that some of the alleged behavior is per se illegal, the Government has the burden to prove that Mr. Aiyer entered into an illegal agreement with his alleged coconspirators.  Independent, parallel behavior negates the agreement element of a Sherman Act charge.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556-557 (2007) ("Without more, parallel conduct does not suggest conspiracy[.]"); *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540-42 (1954) (upholding the denial of a directed verdict for plaintiff on the ground that proof of parallelism was not proof of conspiracy); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 51 (2d Cir. 2007) ("[W]hile that conduct is 'consistent with conspiracy, [it is] just as much in line with a wide swath of rational and competitive business strategy unilaterally prompted by common perceptions of the market.'") (citing *Twombly*, 550 U.S. at 557).

To show parallelism, rather than an agreement, courts have routinely permitted defendants to introduce evidence of industry norms and supervisor knowledge. *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 927 (3d Cir. 1986) ("[R]easonable inference was that use of the time guides occurred due to independent action motivated by competitive forces and *industry practice*") (emphasis added); *Branta, LLC v. Newfield Prod. Co.*, 310 F. Supp. 3d 1166 (D. Co. 2018) ("Seller … failed to establish that purchaser of assets and [purchaser's partner] engaged in conspiracy to rig bids at auction, … where it was custom and practice in the industry … [to] not bid against each other for assets … because doing so was economically irrational, and purchaser was far larger and the better capitalized than partner, and thus logical company to take the lead in effort to acquire assets."). The law affords Mr. Aiyer the opportunity to provide the jury with an alternate explanation of the behavior at issue, namely, that he acted independently and in accordance with the custom and practice of the industry. *See United States v. Goodman*, 850 F.2d 1473, 1479 (11th Cir. 1988) ("The trial court may not exclude relevant evidence which is crucial to the establishment of a valid defense."); *Cont'l Baking Co. v. United States*, 281 F.2d 137, 144 (6th Cir. 1960) ("The defendant should … be entitled to set before the jury their explanation of what brought about similar prices.").

C.   Evidence Regarding Industry Custom And Practice And Supervisor Knowledge Is Relevant To Establish That Mr. Aiyer Did Not Intend To Fix Prices And Rig Bids.

The Government emphasizes that, to satisfy the intent element of a per se Sherman Act claim, it need not prove that the "defendant specifically intended to produce anticompetitive effects or specifically intended to violate the law." (Motions at 16 (internal citation omitted).) Mr. Aiyer does not argue otherwise. Nonetheless, a Sherman Act charge is not a strict liability crime, and the Government is required to establish that Mr. Aiyer intended to fix prices or rig bids. *U.S. Gypsum Co.*, 438 U.S. at 443 ("[T]he criminal offenses defined by the Sherman Act

should be construed as including intent as an element."); *United States v. Koppers Co.*, 652 F.2d 290, 295 (2d Cir. 1981) ("[T]he jury was properly instructed that to convict it must find an intent to rig prices.").

Industry custom and practice and supervisor knowledge evidence is admissible to refute the suggestion that Mr. Aiyer knowingly and intentionally engaged in the charged conspiracy. *United States v. Litvak*, 808 F.3d 160, 189-90 (2d Cir. 2015) (testimony that the defendant's employer approved of conduct by other employees that was similar to the defendant's conduct should not have been excluded as irrelevant to the question of intent); *United States v. Connolly*, 16 Cr. 370 (CM), 2018 WL 2411217, at *4 (S.D.N.Y. May 15, 2018) (defense entitled to take testimony of banking association's former LIBOR head, as his testimony was relevant to banking association's expectations regarding LIBOR submissions and to the issue of falsity in wire fraud case)*; see also United States v. Gaspard*, 744 F.2d 438, 440 (5th Cir. 1984) (evidence admitted at trial on the issue of intent in mail fraud case to show defendant's employer's knowledge of defendant's involvement with other companies allegedly used to defraud employer).  Mr. Aiyer intends to present evidence that, at the suggestion of his supervisors, he, along with almost all other FX traders during the charged conspiracy period, used chat rooms to exchange market information, solicit and ultimately transact with other FX traders, and implement trade execution strategies.  Mr. Aiyer is entitled to argue that, rather than intending to fix prices and rig bids, he intended to engage in a widespread, commonly understood industry norm that reduced risk management costs and improved customer service.  Instead of amounting to a "good faith" or an "everybody was doing it" defense, submission of such evidence is perfectly permissible to rebut a substantive element of the Government's case.

D.     Absent Evidence Regarding Industry Custom And Practice And Supervisor
       Knowledge, Mr. Aiyer Will Be Prejudiced.

From the representations made by the Government at the motion to dismiss hearing, it is clear that the Government contends that all of the behaviors on which it intends to offer evidence were either specific instances of price fixing or bid rigging, or were committed in furtherance of the price fixing and bid rigging conspiracy charged.  (Hearing Tr. at 30:11-31:6.)  One such behavior, information sharing, has a prominent role in the Government's case, as highlighted by the allegations in the Indictment:  Mr. Aiyer and his alleged coconspirators carried out their conspiracy by "engaging in near-daily conversations through private electronic chat rooms … to reveal their currency positions, trading strategies, bids and offers on Reuters, customer identities, customer limit order price levels, upcoming customer orders, and planned pricing for customer orders, among other information."  (Indictment ¶ 22(a).)

Notwithstanding the Government's focus on this behavior, information sharing is not a per se violation of the Sherman Act.  *U.S. Gypsum Co.*, 438 U.S. at 441 n.16 ("The exchange of price data and other information among competitors … can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.  For this reason, we have held that such exchanges of information do not constitute a *per se* violation of the Sherman Act."); *see also Cement Mfrs. Protective Ass'n v. United States*, 268 U.S. 588, 604 (1925) ("[W]e cannot regard the … dissemination of information which tends to prevent the procuring of fraudulent contracts … as an unlawful restraint of trade.").  Absent an explanation regarding the potential benefits and commonality of this practice, the Government will attempt to persuade the jury that information sharing is either illegal itself or, at best, in furtherance of the alleged crime.  *See United States v. Daly*, 842 F.2d 1380, 1388 (2d Cir. 1998) ("Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an

explanation of the understanding or intent with which certain acts were performed.") (internal citation omitted).

The introduction of industry custom and practice and supervisor knowledge evidence will be similarly important with respect to common, though facially complex, trade execution strategies, with which the jury is likely to have had little or no experience. *LaSalle Bank Nat'l Ass'n v. CIBC Inc.*, No. 08 Civ. 8426 (WHP) (HBP), 2012 WL 466785, at *5 (S.D.N.Y. Feb. 14, 2012) ("[E]xpert testimony describing relevant background information, such as customary and industry practice in a given field, is frequently admissible if it will be helpful to the jury."). Without explanation, spoofing and cancelled trades, two such trade execution practices, may imply a degree of misrepresentation or deception, which jurors may consider generally blameworthy. Both practices, however, can either be procompetitive insofar as they invite increases in liquidity or competitively neutral, having no impact on competition.

As for spoofing, the federal prohibition of this practice specifically exempts FX trading, and no relevant regulation prohibits cancelled trades. More importantly, FX traders use the term "spoofing" loosely to describe a wide variety of common behaviors, some of which, as noted, are liquidity-enhancing. The handful of examples of cancelled trades that the Government has identified are ambiguous and have (at best) uncertain antitrust significance. Mr. Aiyer is entitled to explain to the jurors that these behaviors, which the Government will present as at least deceptive, and likely as anticompetitive and illegal, were commonly utilized trade execution strategies in the FX industry. Without a counter-explanation from Mr. Aiyer, the Government's

inclusion of these trading behaviors as part of its case would be unfair, misleading, and prejudicial.[4]

      E.      <u>Evidence Regarding Supervisor Knowledge Directly Rebuts The Indictment's Allegations Of Concealment.</u>

Through the explicit language of the Indictment, the Government has put at issue whether Mr. Aiyer and his alleged coconspirators "employ[ed] measures to conceal their actions." (Indictment ¶ 22(g); *see also* Hearing Tr. at 30:21 (explaining that the Government will offer evidence regarding "how [Mr. Aiyer and his alleged coconspirators] concealed their actions.").) Evidence that Mr. Aiyer's supervisors were aware of his interactions with his alleged coconspirators, and that Mr. Aiyer affirmatively informed his supervisors of this conduct, directly rebuts this claim.  *Goodman*, 850 F.2d at 1478 (once the government put a fact in issue, even if it was "not an actual element" of an antitrust claim, "the door was open for the appellants to rebut the same").  It would be highly prejudicial to deny Mr. Aiyer the opportunity to refute, using clear, relevant evidence, a key issue in the Government's case.

## II.    The Government's Motion In Limine No. 5 To Exclude Evidence And Argument Regarding Lack Of Anticompetitive Effects Should Be Denied.

      A.      <u>Evidence Regarding Lack Of Anticompetitive Effects Will Assist The Court In Determining Which Mode Of Antitrust Analysis To Apply.</u>

Evidence that Mr. Aiyer will seek to admit regarding the lack of anticompetitive effects—evidence that the Government labels as "irrelevant"—is critical to the Court's determination of what behavior at issue, if any, is per se illegal.  The Government argues that the evidence of lack of anticompetitive effects is not relevant in a per se case.[5]  This argument

---

[4] For the reasons provided in Mr. Aiyer's Motion *in Limine* to Exclude Evidence or Argument Concerning "Spoofing" or Cancelled Trades (ECF No. 97), the Government should be precluded from presenting any evidence or argument of these trading practices.

[5] The Government attempts to bolster its position that procompetitive justifications are irrelevant by citing to *Arizona v. Maricopa County Medical Society*, 457 U.S. 332 (1982).  This decision is easily distinguishable.  In

ignores the principle that conduct does not rise to the level of per se illegality *regardless* of its effects on the marketplace, but *because* of the likelihood of those effects.  *See, e.g.*, *U.S. Gypsum Co.*, 438 U.S. at 440 (conduct can only be "regarded as *per se* illegal because of its unquestionably anticompetitive effects"); *Leegin*, 551 U.S. at 886 ("To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects, and lack any redeeming virtue.") (internal citations and quotations omitted).

When conduct falls into the "gray zone" of uncertain effects—some or all of which may be procompetitive—the per se standard does not apply, regardless of the label given by an adverse party.  *See U.S. Gypsum Co.*, 438 U.S. at 440-41 ("With certain exceptions for conduct regarded as *per se* illegal because of its unquestionably anticompetitive effects, the behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct."); *see also BMI*, 441 U.S. at 8-9 (holding that the "literal" fixing of a price may not constitute a per se antitrust violation absent such apparently likely anticompetitive effects); *Blanksteen v. N.Y. Mercantile Exch.*, 879 F. Supp. 363, 369 (S.D.N.Y. 1995) (Koeltl, J.) ("Even if this case were somehow shoehorned into the plaintiff's characterization of a group boycott, it is clear that the defendant's actions do not fall into a category of actions likely to have predominately anticompetitive effects.").

---

*Maricopa*, a foundation of doctors set the maximum prices its member doctors could charge to patients under certain insurance plans.  As an initial matter, there was no dispute over the fact that the doctors, through the foundation, agreed to and set standard prices.  Moreover, and importantly, the foundation did not provide for the integration or the sharing of risk among the members doctors, and the price fixing by the foundation was not necessary for the implementation of the insurance plans.  *Id.* at 340 (noting that the foundation's "participating doctors [ ] have no financial interest in the operation of the foundation" and that there were no allegations presented by the foundation that its administrative functions "make it necessary for them to engage in the practice of establishing maximum-fee schedules" for the implementation of the insurance plans).  Here, Mr. Aiyer intends to demonstrate that the Rand Chat Room—and even the challenged trading practices that took place in the chat room—allowed the members to transact, reduce risk and risk management costs, and exchange useful market color.  These benefits, in turn, allowed Mr. Aiyer and the other alleged coconspirators to offer their customers better service and pricing.

To decide whether the challenged conduct falls within a traditional per se category, the Court must consider evidence presented by Mr. Aiyer regarding the context in which the alleged restraint took place and its likely effects.  *See Leegin,* 551 U.S. at 886 (the per se rule applies only to conduct that courts have determined is "manifestly anticompetitive"); *Volvo N. Am. Corp.*, 857 F.2d at 71 ("[O]n remand, the district court should carefully consider whatever arguments [defendants] may offer in support of their practices relating to player compensation before deciding whether the *per se* rule or the Rule of Reason should apply"); *Medical Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.,* 922 F. 3d 713, 724 (6th Cir. 2019) ("[D]efendants producing 'evidence that the agreement at issue may have had procompetitive aspects … indicate[s] that this situation would not fall into the categories of *per se* unreasonable restraints on trade.'") (citing *In re Se. Milk Antitrust Litig.*, 739 F. 3d 262, 294 (6th Cir. 2014)).

Possible procompetitive benefits, completely neutral effects, or even the possible absence of obvious anticompetitive effects would preclude the application of the per se rule.  *See id.*; *see also State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997) (expressing "reluctance to adopt per se rules with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious") (internal quotations and citations omitted); *United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365 (5th Cir. 1980) ("When the Courts are uncertain of the competitive significance of a particular type of restraint, they decline to apply the per se label."); *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 343-44 (1990) ("Conduct in violation of the antitrust laws may have three effects, often interwoven: In some respects the conduct may reduce competition, in other respects it may increase competition, and in still other respects effects may be neutral as to competition.").  Even if conduct may have some anticompetitive effects, it cannot be per se illegal if it has a plausible

procompetitive justification or is related to a plausible productive enterprise.  *BMI*, 441 U.S. at 9.

Accordingly, the Court should allow Mr. Aiyer to introduce evidence regarding lack of

anticompetitive effects of the disputed conduct to refute the allegation that such conduct is per se

illegal.

> B.    Evidence Regarding Lack Of Anticompetitive Effects Is Relevant To Establish
>       That Mr. Aiyer Did Not Enter Into An Agreement With The Requisite Intent.

Even if the Court were to rule that certain conduct, if it occurred, would constitute a per

se violation, evidence of the possible lack of anticompetitive effects is admissible to establish

that Mr. Aiyer never entered into an agreement with his alleged coconspirators.  As the Supreme

Court recognized in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, the absence of

effects over time implies the absence of any agreement.  475 U.S. 574, 592 (1986) ("The alleged

conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong

evidence that the conspiracy does not in fact exist.").  And even if an agreement were proven,

evidence of possible procompetitive benefits, neutral effects, or the possible absence of

anticompetitive effects, would be relevant to Mr. Aiyer's argument that he did not knowingly

agree to fix prices or rig bids.  *See U.S. Gypsum Co.*, 438 U.S. at 444, 446 (defining intent as a

function of "requisite anticompetitive effects" and the defendant's "knowledge of [those] likely

effects").

**III.    The Government's Motion In Limine No. 6 To Exclude A Joint Venture Defense
          Should Be Denied.**

The Government insists that it would be improper for Mr. Aiyer to present a joint venture

defense—and that, consequently, the ancillary restraints doctrine does not apply—because Mr.

Aiyer and his alleged coconspirators never formed a formal joint venture.[6]  (*See* Motions at 28 ("[T]here is no evidence that there was an actual, legitimate joint venture between Banks A, B, C, and D, the banks that employed the alleged coconspirators, regarding the conduct alleged in the indictment. … Because there was no actual joint venture between the banks, the ancillary restraints doctrine does not apply.").)  In making its motion to exclude evidence of the productive collaboration, the Government does not dispute, as it previously admitted, that the chat room through which Mr. Aiyer and his alleged coconspirators interacted had some procompetitive purposes and effects.  (*See* ECF No. 55, Government's Opposition to Mr. Aiyer's Motion to Dismiss, at 17 ("[T]he Government does not dispute that some chatroom activities may have been legitimate").)  The Government is attempting to foreclose the jury from learning about those procompetitive purposes and effects on the specious ground that the four banks at issue did not enter into a formal joint venture.

This is nothing more than a restatement by the Government of its earlier erroneous argument that the Sherman Act does not recognize any collaboration unless it constitutes a formal joint venture that "creat[es] some new *product* the price of which they might be entitled to set."  (*See id.*) (emphasis added.)  But there is no legal requirement that a collaborative venture either create a new product or be formally or contractually organized.  *In re Sulfuric Acid Antitrust Litig.*, 703 F. 3d 1004, 1011 (7th Cir. 2012) ("'[P]roduct' talk is an unnecessary and distracting embellishment of the rule of reason."); *In re ATM Fee Antitrust Litig.*, 554 F. Supp. 2d 1003, 1016 (N.D. Cal. 2008) ("This case concerns a joint venture that—although not *economically* integrated—is highly integrated in the sense that members create a new market by

---

[6] The Government also suggests that Mr. Aiyer should present a pretrial proffer of evidence that supports his joint venture defense.  Any such hearing would be inefficient and a waste of resources, as it would require testimony from all of the alleged coconspirators and would closely mirror the full trial.

fusing complementary resources."); *see also Volvo N. Am. Corp.*, 857 F.2d at 72 ("[W]e recognize that professional sporting events cannot exist unless the producers of such events agree to cooperate with one another to a certain extent, and that the antitrust laws do not condemn such agreements when coordination is essential if the activity is to be carried out at all.").

The determination of the legitimacy of a collaborative venture turns on whether it increased *productivity*, not on some formalistic definition of a "joint venture."  *See Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) (Easterbrook, J.) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted. If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment."); *Rothery Storage & Van Co. v. Atlas Van Lines, Inc.*, 792 F.2d 210, 229 (D.C. Cir. 1986) (A restraint "that is part of an integration of the economic activities of the parties and appears capable of enhancing the group's efficiency, is to be judged according to its purpose and effect.").  Once a court has determined that a collaboration enhanced productivity, it must assess whether the challenged restraint was ancillary or related to that collaboration—as having "arguably" "contribute[d] to the success of a cooperative venture that promises greater productivity and output"—or was "naked."  *Polk Bros., Inc.*, 776 F.2d at 189.[7]

Mr. Aiyer should be afforded the opportunity to argue that the cooperation at issue— including the practice of not exploiting information shared in a chat room to disadvantage other chat room members—enabled Mr. Aiyer and his alleged coconspirators to effectively manage risk and consequently offer better service and pricing to their customers.  Mr. Aiyer intends to

---

[7] There are many familiar examples of agreements not to compete that do not arise in the joint venture context but that nonetheless are held permissible under the ancillary restraints doctrine.  Non-compete clauses in employment agreements are one such example.  *See Bradford v. New York Times Co.*, 501 F.2d 51, 59-60 (2d Cir. 1974); *Eichorn v. AT&T Corp.*, 248 F.3d 131, 146-47 (3d Cir. 2001).  Another is an agreement by a seller of a business not to compete with the business sold to the buyer.  *Bus. Electronics Corp.*¸ 485 U.S. at 729 n.3.

offer evidence that he and his alleged coconspirators provided each other with valuable information, actively traded with one another, and cooperated to reduce trade execution and risk management costs in the interdealer market, thereby allowing each other's banks to compete more effectively for FX customer business and serve those customers well.  The arguments advanced by the Government fail to negate the prospect that the procompetitive aspects of Mr. Aiyer's relationships and communications with his alleged coconspirators were intertwined with the challenged interdealer trading behaviors, and Mr. Aiyer should be able to further his defense with evidence to this effect.

## IV.   The Government's Motion In Limine No. 7 To Exclude Expert Testimony Offering Legal Conclusions And Opining On Intent And Motive Should Be Denied.

In another effort to constrain Mr. Aiyer from presenting a full defense, the Government argues that Mr. Aiyer's expert testimony should be excluded because it will offer legal conclusions or opine on the intent and motive of Mr. Aiyer and his alleged coconspirators.  (*See* Motions at 30-32.)  The Government misconstrues Mr. Aiyer's proposed expert testimony.  Mr. Aiyer neither seeks nor intends to introduce expert testimony that offers any legal conclusion or that speaks to the intent or motives of the alleged coconspirators, and to the extent the Government's Motion seeks to exclude such evidence, it should be denied as moot.[8]

Beyond these general concerns, the Government specifically seeks to exclude any "[e]xpert testimony that Defendant and Katz were in a vertical relationship" with respect to their ruble trading activities.  (*Id.* at 32.)  The Government insists that verticality is a "legal conclusion" and that "[i]t is the role of the Court to instruct the jury on the elements of a

---

[8] Contrary to the Government's assertions (*see* Motions at 32), there is nothing in the expert disclosures of Professors Dennis Carlton or Richard Lyons that suggests either expert will testify regarding whether the conduct at issue constitutes price fixing, or regarding any similar legal concept.

horizontal price-fixing conspiracy." (*See id.* at 31, 32.)  There are two fundamental problems with the Government's argument.

As an initial matter, whether the alleged coconspirators were in a vertical relationship is a purely economic fact that is independent of any legal conclusion that may follow from it.  *See* Dennis W. Carlton and Jeffrey M. Perloff, *Modern Industrial Organization*, at 414-37 (4th ed. 2015) (analyzing vertical restrictions as an industrial organization concept within the field of economics).  Mr. Aiyer's experts should be allowed to testify about the nature of the economic relationship between Mr. Aiyer and his coconspirators, based on their qualifications and extensive training in economics—qualifications the Government does not contest.  The Government itself intends to "present evidence that Defendant and Katz were at the same level of the market structure," and thus in a horizontal relationship, rather than "at different levels of the market structure," and thus in a vertical relationship.  (Motions at 32 n.8 (internal citation omitted).)  The proposed expert testimony the Government now attacks will address this precise issue—*i.e.*, whether Mr. Aiyer, and other members of the Rand Chat Room, especially Mr. Katz, were in substance at different levels of the market and therefore in a vertical relationship with respect to ruble trading.  The Government cannot plausibly contend that the Rules of Evidence allow it to present evidence of a horizontal relationship, but this evidence must remain unrebutted by evidence indicating a vertical relationship.

Second, the Government's argument is premised on its improper conclusion that the Court has made a determination with respect to per se illegality.  (*Id.* at 32.)  Like the remainder of Mr. Aiyer's conduct, whether or not the interdealer ruble trading at issue is to be judged in accordance with the per se framework remains unanswered.  Mr. Aiyer has the fundamental right to present a full defense, which should include testimony from his experts regarding the

economic reality of the relationship between Mr. Aiyer and the other members of the Rand Chat Room in the ruble. Such testimony will assist the Court with its determination regarding whether this challenged behavior is properly subject to the per se rule. *See Leegin*, 551 U.S. at 882 ("[V]ertical price restraints are to be judged by the rule of reason."); *Copy-Data Systems, Inc.*, 663 F.2d at 409, 411 (declining to apply the per se rule to a vertical dual-distribution "business structure in which one party … operates a branch or dealership on the same market level as one or more of its customers").

In any event, if the Government is concerned with the jurors' being unduly swayed by certain terminology, Mr. Aiyer's experts can, and intend to, describe the relationship between Mr. Aiyer and the other members of the Rand Chat Room without using legal jargon. However, the experts expect, and must be permitted to use, terminology proper to their respective fields of expertise.

The Government also objects to the proposed expert testimony regarding procompetitive benefits, suggesting that evidence of procompetitive benefits will be offered to show motive or intent. But in addressing the procompetitive benefits and/or absence of identifiable anticompetitive effects of the challenged conduct, the experts will not opine on Mr. Aiyer's subjective intent. This testimony is offered to provide the relevant context of the challenged conduct so that the necessary findings can be made regarding whether the per se rule applies and whether Mr. Aiyer intended to fix prices or rig bids.

Finally, expert testimony will be particularly important to assist the jury in understanding conduct about which they will have heard substantial testimony but that, Mr. Aiyer contends, is not, by itself, an antitrust violation. The Government's Motions fail to acknowledge that expert testimony regarding economic principles, including whether the conduct is indicative of

competition or collusion, is routinely proffered in per se cases. *See Cont'l Baking Co.*, 281 F.2d at 141, 145 (holding that it was reversible error for the district court to exclude defendants' "explanatory economic evidence," including "proofs of similarity of costs, operations, marketing procedures, and other economic factors affecting price changes," along with expert testimony); *In re Sulfuric Acid*, 743 F. Supp. 2d at 866 (noting that defendants offered "volumes of evidentiary support, including economic data, expert testimony, and industry publications, to show that their methods were not only ancillary to a plainly lawful purpose, but also necessary for the benefit of the consumer"); *In re Titanium Dioxide Antitrust Litig.*, No. RDB-10-0318, 2013 WL 1855980, at *4 (D. Md. May 1, 2013) (in rejecting defendants' assertions that the proposed expert testimony improperly addressed the ultimate legal issue, the court permitted expert testimony that, based on the expert's economic analysis, defendants' behavior was more consistent with collusion than competition).

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should deny the United States' Motions in Limine Nos. 4-7.

Dated: August 16, 2019
        New York, New York

By:     /s/ Martin Klotz_____
        WILLKIE FARR & GALLAGHER LLP
        Martin Klotz
        Joseph T. Baio
        Jocelyn M. Sher
        Samuel M. Kalar
        787 Seventh Avenue
        New York, New York 10019
        T: (212) 728-8000

        *Attorneys for Defendant Akshay Aiyer*