j9o2aiyC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4            v.                            18 Cr. 333(JGK)

5   AKSHAY AIYER,

6               Defendant.

7   ------------------------------x        Conference

8                                          September 24, 2019
                                           1:40 p.m.
9

10  Before:

11                 HON. JOHN G. KOELTL,

12                                         District Judge

13

14                      APPEARANCES

15

16  U.S. DEPARTMENT OF JUSTICE
        Antitrust Division
17  BY:  KEVIN B. HART
        DAVID CHU
18      KATHERINE J. CALLE

19

20  WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendant
21  BY:  MARTIN B. KLOTZ
        JOCELYN M. SHER
22      JOSEPH T. BAIO
        SAMUEL M. KALAR

23

24

25

1        (Case called)

2        THE DEPUTY CLERK:  Parties state who they are for the

3   record.

4        MR. HART:  Good afternoon, your Honor.  For the United

5   States, it is Kevin Hart, David Chu, and Katherine Calle.

6        THE COURT:  Good afternoon.

7        MR. KLOTZ:  Good afternoon, your Honor.  For

8   Mr. Aiyer, Martin Klotz, Jocelyn Sher, Mr. Aiyer is seated in

9   the middle, Joseph Baio, and Samuel Kalar.

10       THE COURT:  Okay.  Good afternoon, all.  Thank you all

11  for accommodating the slightly revised schedule.

12       Let me start with the government's motions *in limine*.

13  There are nine motions *in limine*.

14       First, the government seeks to introduce evidence of

15  the defendant's compensation and that of his alleged

16  coconspirators as evidence of motive.  The parties agree that

17  the defendant's compensation and that of his alleged

18  coconspirators consisted of a base salary and a bonus that was

19  linked to performance because the conspiracy allegedly

20  increased trading profits and the net income of the defendant's

21  employer.  The government argues that the defendant's actual

22  compensation and that of his coconspirators is direct evidence

23  of motive.  The defendant does not object to evidence of the

24  way in which his compensation was calculated, but does object

25  to any evidence of the amount of his compensation as

1  insufficiently relevant and unfairly prejudicial under Federal

2  Rules of Evidence 401 and 403.

3  Based on the parties' proffers to date, the

4  government's motion is denied without prejudice to any proffer

5  at trial of the specific amount of bonus that could be tied to

6  the net profit to the defendant's employer from the alleged

7  illegal trading profits.  Thus far, no such proffer has been

8  made, but the government should not seek to refer to any such

9  evidence or make any argument based on the specific amount of

10  the bonus without raising the issue with the court outside the

11  presence of the jury.  Without prior court approval, the

12  government should not introduce any evidence of the specific

13  amounts of the defendant's compensation -- either the salary or

14  bonus components -- although the government can introduce

15  evidence of the manner in which the compensation and that of

16  his coconspirators was calculated.  That is a point that the

17  defendant does not object to.

18  Based on the proffers, the defendant was earning in

19  excess of $1 million before the alleged conspiracy began and

20  his actual compensation declined in a couple of the years of

21  the alleged conspiracy.  The amount of the net profit to his

22  employer from trades that were affected by the conspiracy was

23  relatively small compared to the trading profits that the

24  defendant obtained from trades that were not alleged to be part

25  of the conspiracy.  In the cases cited by the government in

1 which specific amounts evidence was admitted, there was a much

2 closer connection between the alleged crime and what the

3 defendant stood to gain in income from the alleged criminal

4 activities than exists in this case*. See United States v.*

5 *Quattrone*, 441 F.3d 153, 187 (2d Cir. 2006*); United States v.*

6 *Logan*, 250 F.3d 350, 369 (6th Cir. 2001); *United States v.*

7 *Peake*, 143 F.Supp.3d 1, 18 (D.P.R. 2013). Given the facts, the

8 amount of the bonus, and the total compensation would be

9 insufficiently relevant and any relevance would be outweighed

10 by the danger of unfair prejudice.

11 Second, the government seeks to admit the testimony of

12 alleged coconspirators interpreting statements in conversations

13 in which they were participants, as well as statements in

14 conversations in which they were not participants, including

15 the meaning of statements made by the defendant in these

16 conversations. The defendant objects to the entire motion on

17 the grounds that the government has failed to elicit a

18 sufficient foundation for the testimony it seeks to admit and

19 urges that the motion should be denied under Federal Rule of

20 Evidence 701.

21 It is plain that participants to a conversation should

22 be allowed to provide the jury with their understanding of the

23 conversation, particularly when the conversation includes

24 jargon and code words. *See generally United States v. Yanotti*,

25 541 F.3d 112, 126 (2d Cir. 2008) ("Individuals engaging in

1   illicit activity rarely describe their transactions in an open

2   or transparent manner, and the government may call witnesses to

3   provide insight into coded language through lay opinion

4   testimony齀."). The foundation is established by the witness's

5   participation in the conversation and the witness's testimony

6   about the basis for the witness's understanding of the terms

7   that were used. *See United States v. Rubin/Chambers, Dunhill*

8   *Insurance Services*, 828 F.Supp.2d 698, 703 (S.D.N.Y. 2011).

9   ("Accordingly, a proper foundation will be readily established

10  where the witness was a participant in the conversation.").

11      The government should therefore attempt to establish

12  at trial the foundation for the testimony of the participants

13  to the conversations in which the participants participated as

14  to the meaning of various words and phrases in the

15  conversation. *See id.*

16      Similarly, while the government did not provide

17  specific examples, the government should be allowed to lay the

18  foundation at trial for coconspirators to explain the meaning

19  of jargon used in conversations in furtherance of the alleged

20  conspiracy of which they were members even if they did not

21  participate in the specific conversations. *See id.* at 703.

22  ("Therefore, if the government establishes that a witness's

23  participation in the alleged conspiracy informed the witness's

24  knowledge about the contents of the recorded conversation, the

25  personal knowledge requirement of Federal Rule of Evidence 701

1    may be satisfied even as to conversations in which the witness

2    did not participate."); *see also Yanotti*, 541 F.3d at 126 n.8

3    ("An undercover agent whose infiltration of a criminal scheme

4    has afforded him particular perceptions of the methods of

5    operation may offer helpful lay opinion testimony under Rule

6    701 even as to coconspirators' actions that he did not witness

7    directly.").

8        Two cautions are appropriate:

9        First, the testimony about the meaning of the terms

10    used in the conversations must be helpful to the jury under

11    Rule 701. Simply repeating what is in the conversations or

12    attempting to interpret conversations that are plain on their

13    face would not be helpful to the jury under Federal Rule of

14    Evidence 701(b). But to the extent the conversations use

15    jargon or are not understandable to a lay juror, the testimony

16    about the meaning of the conversations would be helpful to the

17    jury.

18        Second, as the defense points out, to the extent that

19    the government seeks to admit testimony about what the

20    defendant meant in conversations, that testimony runs the risk

21    of having a witness testify about the defendant's state of

22    mind, which would impermissibly infringe upon the province of

23    the jury. *See, e.g., United States v. Grinage*, 390 F.3d 746,

24    750 (2d Cir. 2004) ("The agent interpreted both the calls that

25    the jury heard and the calls that the jury does not hear. In

1    doing so, he usurped the function of the jury to decide what to

2    infer from the content of the calls."); *Munoz v. United States*

3    No. 07-cv-2080, 2008 WL 294861 at *19 (E.D.N.Y. July 28, 2008.

4    ("Opinion testimony is not helpful to the jury in determining

5    facts when it attempts to usurp the jury's role by dictating

6    the inferences the jury should draw from the objective facts of

7    the case.").  As Judge Marrero helpfully explained, "The

8    government should be mindful to avoid inviting the witnesses to

9    instruct the jury regarding their conclusions as to the

10   defendant's state of mind." *Rubin/Chambers*, 828 F.Supp.2d at

11   705.

12        It is apparent from the examples provide by the

13   government that there are conversations that include financial

14   jargon that would be difficult to understand without a lay

15   participant in the alleged conspiracy explaining what was going

16   on in the conversations based on the lay witness's background

17   in the conspiracy and participation in similar conversations.

18   Therefore, presuming that the government lays the proper

19   foundation at trial, witnesses should be permitted to testify

20   about their understanding of such conversations in which they

21   participated.  And, similarly, providing that there is a

22   sufficient foundation, such participants in the alleged

23   conspiracy should be permitted to interpret conversations

24   allegedly in furtherance of the conspiracy in which they did

25   not participate.  To that extent, the government's motion is

1    granted without prejudice to the ability of the defendant to

2    object at trial if a proper foundation has not been laid at

3    trial.

4              Third, the parties are in agreement that the parties

5    should not refer to any punishment or sentence that may result

6    from conviction because it is irrelevant.  The issue of

7    punishment is for the court alone.  The parties also agree that

8    the parties should not refer to the immigration consequences of

9    any conviction.  The defendant therefore suggests that the

10   court deny the motion as moot.  *See United States v. Walia*, No.

11   14-cr-213, 2014 WL 3734522 at *4 (E.D.N.Y. July 25, 2014) ("As

12   the parties agree that it would be improper for the jury to

13   consider the potential punishment and immigration consequences

14   of a conviction in this case, the portion of the government's

15   motion seeking to preclude such evidence or argument is denied

16   as moot.").  However, the papers raise an issue as to whether

17   any evidence relating to the defendant's status in the United

18   States as a green card holder may be relevant, particularly

19   because there are some references in the transcripts to the

20   defendant's relationship with his employer and the significance

21   of that relationship to his status as a green card holder.  The

22   defense points out that this is separate from the immigration

23   consequences of any conviction.  *See id.* ("To the extent the

24   government is seeking to preclude any mention of the

25   defendant's immigration status during trial, the court reserves

1    decision on this issue in light of the defendant's position

2    that his immigration status directly rebuts the anticipated

3    arguments by the government.").

4            It is plain that the parties should not refer to

5    punishment or any possible consequences of punishment from a

6    conviction, including immigration consequences.  Before

7    introducing any evidence with respect to the defendant's

8    immigration status in the United States, the parties should

9    raise the issue outside the presence of the jury before

10   referring to the evidence before the jury.  The parties will

11   then have the opportunity to explain the relevance of that

12   evidence and the possible consequences of seeking to introduce

13   it.

14           Next, the government argues that the defendant should

15   not be entitled to introduce evidence of industry custom or

16   practice or supervisor knowledge to argue that the defendant

17   did not have the requisite intent.  The government argues that

18   such evidence is irrelevant because the defendant is accused of

19   *per se* violations of the Sherman Act, namely, price fixing and

20   bid rigging.  To prove *per se* violations of the Sherman Act,

21   the government must prove that the defendant entered into a

22   conspiracy to fix prices or rig bids as alleged in the

23   indictment.  *See United States v. Koppers Co., Inc.*, 652 F.2d

24   290, 295 n.6 (2d Cir. 1981).  The specific intent that is

25   required is the intent to enter into the conspiracy to fix

1  prices or rig bids.  The government fears that the defendant

2  will use evidence of industry custom or practice and supervisor

3  knowledge to substantiate a "good faith" argument, which is not

4  a defense, or an "everyone does it" argument, which is also not

5  a defense.  Thus, in a *per se* case, evidence that goes to the

6  specific intent of the defendant to harm competition is

7  inadmissible because it is irrelevant.  *See United States v.*

8  *Stop & Shop Companies, Inc.*, Crim. No. B 84-51, 1984 WL 3196 at

9  *1 (D. Conn Nov. 9, 1984) (Cabranes J.) (denying a motion *in*

10 *limine* and thereby excluding evidence of economic

11 justification).  For good reason, the defendant disclaims both

12 arguments and notes that the court could give limiting

13 instructions that those arguments are not proper and could

14 prevent the defendant from making any such arguments, which, in

15 any event, the defendant disclaims any intent to make.

16       However, the defendant proffers legitimate reasons for

17 offering arguments of industry custom and practice and

18 supervisor knowledge.  For example, the defendant explains that

19 some of the government's evidence will touch on practices that

20 are not in fact bid rigging or price fixing, including

21 information sharing.  *See SourceOne Dental, Inc., v. Patterson*

22 *Companies, Inc.,* 310 F.Supp.3d 346, 363 (E.D.N.Y. 2018).

23 ("Information sharing is not a *per se* violation of the Sherman

24 Act, but courts have recognized the claim under the Rule of

25 reason.").  The defendant is correct that he should be given

1    the opportunity to explain that these possibly suspicious

2    practices are the benign practices the defense claims them to

3    be.  *See United States v. Usher*, No. 17-cr-19 (S.D.N.Y. Sept.

4    28, 2018), ECF No. 158, at page 33.  ("We don't want to

5    infringe on the defense, who's got a lot at stake here, ability

6    to rebut the elements of the crime with which each defendant is

7    charged."  Moreover, supervisor knowledge would be relevant at

8    the very least to counter the government's argument that the

9    defendant deliberately concealed his activity because he knew

10   it was unlawful.  *See id.* at page 33.  ("I am acutely aware

11   that the defense, although it doesn't have to present a case,

12   though, should be given the appropriate latitude to refute the

13   government's case.").

14         Therefore, the motion is granted to the extent that

15   the defendants cannot put forward a "good faith" or "everyone

16   does it" defense, but the motion is otherwise denied.  To the

17   extent that the motion is denied, it is denied without

18   prejudice to a showing at trial by the government that any

19   specific evidence can have no other purpose than to support a

20   "good faith" or "everyone does it" defense.

21         Next, the government moves to exclude any argument or

22   evidence of the lack of anticompetitive effects of the alleged

23   bid rigging or price fixing.  The government argues correctly

24   that if the transactions that the alleged coconspirators

25   entered into were in furtherance of a horizontal conspiracy to

fix prices or rig bids, then evidence of the lack of

anticompetitive effects would be irrelevant because price

fixing and bid rigging are *per se* illegal. *See United States*

*v. Guillory*, 740 F.App'x 555, 556 (9th Cir. 2018). ("The

district court did not preclude any relevant evidence by

granting the government's motion *in limine* to prohibit *Guillory*

from introducing evidence or argument that the bid-rigging

agreements were reasonable. Bid rigging is a *per se* violation

of the Sherman Act.") (quotations and alterations omitted).

The defense responds that some transactions are

difficult to characterize as *per se* illegal. *See, e.g.*,

*Broadcast Music, Inc. v. Columbia Broadcasting Systems, Inc.*,

441 U.S. 1, 9 (1979) ("It is necessary to characterize the

challenged conduct as falling within or without that category

of behavior to which we apply the label *'per se* price fixing.'

That will often, but not always, be a simple matter.")

(collecting cases). In ruling on the defendant's motion to

dismiss the indictment for failure to state a criminal

violation of the Sherman Act, the court has already considered

many of these arguments and has concluded that the allegations

in the indictment are "sufficient to state a *per se* violation

of the Sherman Act." Dkt. No. 66 at 43, lines 13 and 14.

In any event, as the Second Circuit Court of Appeals

has noted, "the decisions falling in the *BMI* line are narrow"

and are "limited to situations where the restraints on

competition are essential if the product is to be available at all." *United States v. Apple*, 791 F.3d 290, 325-26 (2d Cir. 2015) (quoting *American Needle, Inc. v. National Football League*, 560 U.S. 183, 203 (2010)). These narrow circumstances are not present here. Whatever difficulties there may be with characterizing conduct in some instances as *per se* price fixing or not are inapposite in this case in which the government proffers that the transactions are classic bid rigging and price fixing among competitors, and the defendant has not attempted to argue, as he could not, that the price fixing here was essential to make the products at issue available at all. *See Apple*, 791 F.3d at 326 ("The Supreme Court has for nearly 100 years held that horizontal collusion to raise prices is the archetypal example of a *per se* unlawful restraint of trade.") (quoting *Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980); *Koppers*, 652 F.2d at 294 ("In cases involving behavior such as bid rigging, which has been classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'") (quoting *United States v. Brighton Building & Maintenance Co.*, 598 F.2d 1101, 1106 (2d Cir. 1979).

Thus, if the price fixing charges are substantiated, evidence of anticompetitive effects is irrelevant or pro-competitive effects. *See In re: Publication Paper Antitrust Litigation,* 690 F.3d 51, 61 (2d Cir. 2012). ("An

1    agreement between competitors to fix prices, known as a

2    horizontal price-fixing agreement, categorically constitutes an

3    unreasonable restraint and, accordingly, is unlawful *per se*."

4    *United States v. Marr*, No. 14-cr-00580, 2017 WL 1540815 at *5

5    (N.D. Cal. Apr. 28, 2017), *aff'd sub nom. United States v.*

6    *Sanchez*, 760 F. App'x 533 (9th Cir. 2019).  ("Because evidence

7    of reasonableness or pro-competitive justification for bid

8    rigging is not relevant in a *per se* case, it is not admissible

9    under Federal Rule of Evidence 402."  The categorical ban on

10   price fixing and bid rigging follows from the determination by

11   the Supreme Court that those practices are *per se* illegal

12   without a consideration of their anticompetitive effects under

13   the rule of reason.  *See Arizona v. Maricopa County Medical*

14   *Society,* 457 U.S. 332, 345 (1982) ("Thirteen years later, the

15   court could report that 'for over 40 years, this court has

16   consistently and without deviation adhered to the principle

17   that price-fixing agreements are unlawful *per se* under the

18   Sherman Act and that no showing of so-called competitive abuses

19   or evils which those agreements were designed to eliminate or

20   alleviate may be interposed as a defense.'") (quoting *United*

21   *States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 218 (1940)).

22        It is clear that the defendant should not be able to

23   argue that the pro-competitive effects of horizontal bid

24   rigging or price fixing make such practices legal or prevent

25   them from being illegal.  The defendant argues that the

1  evidence may be admissible for another purpose, such as to show

2  the lack of intent by the defendant to enter into an agreement

3  to fix prices or rig bids.  *See Guillory*, 740 F.App'x at 556

4  ("Guillory remained free to argue that he lacked intent to join

5  or participate in the conspiracy to rig bids.").  But without

6  some further explanation of the specific evidence that is at

7  issue, it is impossible to determine whether that is a

8  reasonable basis for the proffer of any such evidence.  Indeed,

9  neither the government nor the defense has articulated the

10  specific evidence that is the subject of this motion.

11  Therefore, at this point, the motion to exclude

12  arguments about the competitive effects of price fixing and bid

13  rigging is granted.  The motion to exclude evidence of

14  pro-competitive effects of price fixing and bid rigging is

15  granted without prejudice to the ability of the parties to

16  raise the issue with respect to specific evidence at trial.

17  Any such proffers should be made outside the presence of the

18  jury before such evidence is offered or referred to.

19  Next, the government seeks to preclude the defendant

20  from raising a "joint venture" defense pursuant to which the

21  alleged price fixing and bid rigging were simply ancillary

22  restraints.  Without delving too deeply into the various

23  nuances of joint ventures and the *per se* rule, it is enough for

24  now to note a few aspects of the law in this area.

25  The "joint venture" defense is available when "the

j9o2aiyC kjc

pricing policy challenged amounts to little more than price

setting by a single entity -- albeit within the context of a

joint venture -- and not a price-fixing agreement between

competing entities with respect to their competing products."

*Texaco, Inc.*, v. *Dagher*, 547 U.S. 1, 6 (2006). Thus, "the

pricing decisions of a legitimate joint venture do not fall

within the narrow category of activity that is *per se* unlawful

under Section 1 of the Sherman Act." *Id.* at 8. While it is

true that one factor in determining the existence of a joint

venture is the potential efficiency of the venture -- *see*

*Apple*, 791 F.3d at 326 -- it is also the case that the Supreme

Court's decision in *Dagher* rested on a relatively singular set

of facts in which "Texaco and Shell had formed a joint venture

called Equilon Enterprises, that 'was approved by consent

decree, subject to certain divestments and other modifications,

by the Federal Trade Commission in order to refine and sell

gasoline.'" *Iowa Public Employees' Retirement System v.*

*Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 340 F.Supp.3d 285,

327 (S.D.N.Y. 2018) (quoting *Dagher*, 547 U.S. at 4). Further,

it remains the case that "A and B cannot simply get around the

*per se* rule by agreeing to set the price of X through a

third-party intermediary or joint venture if the purpose and

effect of the agreement is to raise, depress, fix, peg, or

stabilize the price of X." *Major League Baseball Properties,*

*Inc.* v. *Salvino, Inc.*, 542 F.3d 290, 336 (2d Cir. 2008)

j9o2aiyC kjc

1    (Sotomayor J., concurring in the judgment).

2          The government argues that the categorization of an

3    agreement as a joint venture is a matter of law and that if the

4    defense intends to raise such a defense, the court should hold

5    a pretrial hearing to determine if there is sufficient evidence

6    to support the existence of a joint venture.  The defense is

7    correct that such a pretrial hearing would be immensely

8    inefficient because the various alleged coconspirators would be

9    required to testify.  While the definition of a joint venture

10   may be a question of law, if there are disputed issues of fact,

11   then those factual issues would raise questions of fact for the

12   jury.  At this point, there is no proffered evidence to support

13   a conclusion as a matter of law that a joint venture existed in

14   this case and, in any event, whether there could be a joint

15   venture would depend on all of the evidence adduced at trial.

16   The defense would be seriously ill-advised to attempt to

17   proffer a defense at trial that would be rejected by the jury

18   or eventually precluded by the court in final instructions.

19   Without a specific proffer of the potential evidence that is

20   sought to be excluded, however, the court could not grant this

21   motion *in limine*.  The motion *in limine* is therefore denied

22   without prejudice to being raised at trial particularly in

23   connection with the proffer of any specific evidence at trial.

24

25          Next, there is no dispute between the parties that the

1    defendant's experts should not be permitted to opine on legal

2    conclusions and the defendant's state of mind.  Therefore, the

3    defendant suggests that this motion should be denied as moot.

4         It is well established that "expert testimony that

5    usurps either the role of the trial judge in determining the

6    applicable law or to the role of the trier of fact in applying

7    that law to the facts before it is inadmissible because it by

8    definition does not aid the trier of fact in making a

9    decision."  *In re: LIBOR-Based Financial Instruments Antitrust*

10   *Litigation,* 299 F.Supp.3d 430, 469 (S.D.N.Y. 2018) (citing

11   *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005)

12   (quotations and alterations omitted).  Further, "inferences

13   about the intent or motive of parties or others lie outside the

14   bounds of expert testimony."  *On Track Innovations Ltd. v.*

15   *T-Mobile USA, Inc.,* 106 F.Supp.3d 369, 412 (S.D.N.Y. 2015)

16   (quoting *In re: Rezulin Products Liability Litigation*, 309

17   F.Supp.2d 531, 547 (S.D.N.Y. 2004)).

18        However, these broad and uncontroversial principles do

19   not mean that the government's motion *in limine* should be

20   granted in this case.  The specific examples that the

21   government is concerned about are statements that Katz and the

22   defendant were in a vertical relationship.  The government

23   contends that the defendant and Katz were in a horizontal

24   relationship.  But "horizontal relationship" and "vertical

25   relationship" are economic terms, although they are certainly

building blocks for legal conclusions.  Experts should be

permitted to describe, based on their expertise, the economic

relationship among the parties.  That is not a legal

conclusion.  The defendant has foresworn having its experts

testify as to legal inclusions or the motive or the intent of

the defendant.  That is sufficient for now.  *Cf. U.S.*

*Information Systems, Inc. v. International Brotherhood of*

*Electrical Workers Local Union No. 3, AFL-CIO,* 313 F.Supp.2d

213, 240-41 (S.D.N.Y. 2004) (permitting an economic expert in

an antitrust case to testify about factors that would tend to

show anticompetitive conduct in a market while excluding expert

testimony concluding that the defendant had or had not engaged

in "anticompetitive conduct").  The government has not pointed

to any specific legal conclusions or opinions as to the

defendant's state of mind that the experts may give.  Any such

opinions would be excluded if and when the experts attempt to

testify as to those matters.  Therefore, the motion is denied

without prejudice as moot.  The government may raise specific

objections at trial to specific aspects of the expert's

testimony.

The government moves to dismiss records of statements

by traders by e-mails or in chat rooms on the grounds that such

records do not constitute business records under Federal Rule

of Evidence 803(6) and therefore are inadmissible hearsay under

Federal Rule of Evidence 801.

1          There is no way that the court could exclude all such

2    communications without specific proffers as to each of the

3    communications to determine whether the communications are

4    being offered for the truth of the statements and are therefore

5    hearsay unless there is an applicable exception or are not

6    being offered for the truth of the statements, but simply for

7    the fact that the statements were made, in which event they

8    would not be hearsay.  The defendant represents that the vast

9    bulk of any trader communications he would seek to offer are

10   not being offered for the truth of the statements, but simply

11   for the fact that the statements were made.  This is credible,

12   given the paucity of the communications proffered by the

13   government and the reasonable proffers by the defendant as to

14   nonhearsay purposes for the statements.  For example, trader

15   communications that show that supervisors were aware of the

16   activities of the defendant or alleged coconspirators could be

17   used for the nonhearsay purpose of showing that the supervisors

18   were aware of the activities challenged by the government and

19   that the coconspirators were not attempting to conceal those

20   activities as the government alleges.  *See, e.g.*,

21   *Hosain-Bhuiyan* v. *Barr Labs, Inc.*, No. 17-cv-114, 2019 WL

22   3740614 at *5 n.4 ("The content of the communications

23   themselves are not offered for their truth, but to show the

24   plaintiff sent such e-mail.  Therefore, these portions of the

25   report are not hearsay.").*

1          The defendant also asserts that some e-mail

2     communications may in fact be business records, for example,

3     records of performance reviews, if a proper business records

4     foundation can be laid. *See* Federal Rule of Evidence

5     803(6)(A)-(E); *cf. Park West Radiology v. CareCore Nature, LLC,*

6     675 F.Supp.2d 314, 333 (S.D.N.Y. 2009) ("Employees were not

7     under an obligation to create the e-mails as a record of

8     regularly conducted business activity.  Though an e-mail may

9     satisfy the business records exception under appropriate

10     circumstances, plaintiffs do not show that these e-mails

11     qualify.").

12          As such, the admissibility of these records will

13     depend on the specific proffers at trial.  Documents not being

14     offered for the truth could be admitted with an instruction

15     that the documents are being admitted not for the truth of the

16     contents, but for some other purpose.  There will have to be a

17     proper foundation at trial for documents be offered for the

18     truth of the contents, whether based on the business records

19     exception or some other exception.  Documents authored by the

20     defendant could be admitted under Federal Rule of Evidence

21     801(d)(2)(A) and alleged coconspirator statements could be

22     admitted using the procedure for the admission of such

23     statements. *See* Federal Rule of Evidence 801(d)(2)(E) and all

24     of the necessary preliminaries with respect to the acceptance

25     of alleged coconspirator statements which are taken subject to

1  connection.

2      Therefore, the motion to exclude all allegedly hearsay

3  trader communications is denied without prejudice to objections

4  being raised at trial to specific documents.

5      Next, the government speculates that the defendant's

6  expert witnesses -- Professor Lyons and Professor Carlton --

7  will be used to transmit impermissibly hearsay communications

8  from traders that otherwise would not be admitted in evidence.

9  It is of course well established that "a party cannot call an

10  expert simply as a conduit for introducing hearsay under the

11  guise that the testifying expert used the hearsay as the basis

12  for his testimony." *Marvel Characters, Inc*. v. *Kirby*, 726 F.3d

13  119, 136 (2d Cir. 2013).  However, the government does not

14  point to any portion of the expert disclosures of

15  Professor Lyons and Professor Carlton that in fact

16  impermissibly communicate hearsay communication of traders.

17  Communications by traders may not be hearsay if offered for a

18  purpose other than the truth of the statements, such as to show

19  that the statements were made.  And while experts cannot simply

20  be used to place hearsay statements before the jury, they may,

21  for example, "testify to opinions based on inadmissible

22  evidence, including hearsay if experts in the field reasonably

23  rely on such evidence in forming their opinions." *United*

24  *States v. Gatto*, No. 17-cr-686, 2019 WL 266944 at *6 (S.D.N.Y.

25  Jan. 17, 2019) (quoting *United States v. Mejia*, 545 F.3d 197,

1   197 (Second Circuit 2008*)); see* Federal Rule of Evidence 703.

2   The defendant denies any intent to use the experts for an

3   improper purpose, and the government has failed to identify in

4   specific terms how the expert disclosures impermissibly seek to

5   place hearsay statements before the jury.

6           To the extent that the experts may be used to

7   interpret trader communications -- and the parties have failed

8   to point to the specific communications that might be

9   interpreted -- the defendant says that the experts have the

10  expertise to do so.  Because no specific communications have

11  been identified and because the defendant proffers that there

12  is expertise to interpret such communications, there is no

13  issue before the court at this point.  If there is an objection

14  at trial, the defendant will have to show that the expert's

15  expertise to support the witness's testimony has been

16  established.  *See Daubert* v. *Merrell Dow Pharmaceuticals, Inc.,*

17  509 U.S. 579 (1993).

18          Next, the government argues that the witnesses should

19  not be permitted to opine on intent and motivation.  When

20  experts "speculate as to the motivations and intentions of

21  certain parties," they infringe upon the province of the

22  factfinder, whose job it is to assess "witnesses' credibility

23  and draw inferences from their testimony."  *Marvel Characters*,

24  726 F.3d at 136.  However, the defendant disclaims any intent

25  to have the experts testify about intent and motivation, and

1    the government has failed to point to any portion of the

2    experts' disclosures where the experts attempt to opine about

3    intent and motivation.

4          Finally, the government argues that the expert

5    testimony of Professors Carlton and Lyons will be redundant on

6    the discussion of general market dynamics and therefore, under

7    the prohibition of cumulative testimony, only one of the two

8    experts should be permitted to testify.  Duplicative expert

9    testimony can be excluded.  *See Price v. Fox Entertainment*

10   *Group, Inc.*, 499 F.Supp.2d 382, 390 (S.D.N.Y. 2007).  However,

11   when experts differ either as to their qualifications or their

12   perspective, the testimony is not cumulative simply because

13   they will cover the same topic.  *See Royal Bahamian*

14   *Association, Inc., v. QBE Insurance Corp.,* No. 10-21511-CIV,

15   2010 WL 4225947 at *2 (S.D. Fla. Oct. 21, 2010).

16          A careful review of the disclosures made by

17   Professors Lyons and Carlton show that their testimony will not

18   be unduly duplicative.  Professor Lyons researches in the area

19   of foreign exchange microstructure.  He will testify about

20   foreign exchange markets and the types of users and parties who

21   participate in these markets, and his affidavit demonstrates

22   that his focus will be on the internal dynamics of foreign

23   exchange markets.  Lyons Aff. at 1-4.  Professor Carlton

24   researches in the area of industrial organization economics.

25   In contrast to Professor Lyons, Professor Carlton intends to

1   testify on the external market effects of the conduct at issue

2   in this case carried out by the defendant and his

3   coconspirators.  Carlton Aff. at 1-8.  It may be possible that

4   discrete aspects of the testimony by Professor Lyons and

5   Professor Carlton may be duplicative at trial, and if testimony

6   is adduced that is unduly cumulative, the government may make

7   an appropriate objection at the appropriate time.  However, it

8   cannot be said at this point that the two experts will testify

9   in such substantially similar ways that only one expert may

10  testify at the outset.

11        Therefore, the motion *in limine* is denied without

12  prejudice to any arguments for exclusion or any specific

13  portions of the expert's testimony if a proper foundation is

14  not laid at trial.

15        The government's motions *in limine* are decided as

16  explained above.

17        We turn now to the defendant's motions *in limine*.

18  First, the defendant moves to exclude the expert testimony of

19  Ross Waller and Dr. David DeRosa on the grounds that there is

20  insufficient disclosure of their expert testimony.  Does the

21  defendant still press that motion?  Because there were

22  subsequent disclosures by the government, including a prior

23  transcript of the testimony.

24        MR. KLOTZ:  Yes.  Judge, I don't think we press the

25  motion at this point.

1          THE COURT:  Okay.

2          MR. KLOTZ:  I'm in a position where I honestly don't

3    know whether -- I think I know what these witnesses are going

4    to testify, and if they testify what I think they are going to

5    testify, then I probably don't have a problem with it.  My

6    concern is, I'm not sure if they are going to go beyond that

7    and to the extent they do, I have no disclosure.  But I would

8    say for now I don't ask your Honor to rule on it except with

9    respect to the narrow carveout of testimony about fictitious

10   trades.

11         THE COURT:  I'm sorry?

12         MR. KLOTZ:  Except with respect to the narrow carveout

13   of Professor DeRosa's testimony about the purpose of fictitious

14   trades or canceled trades.

15         THE COURT:  Okay.  First of all, I take it that the

16   government has provided expert disclosure with respect to both

17   of the witnesses and a transcript of what DeRosa testified to

18   in the *Usher* case, and the expert testimony will obviously be

19   governed, restricted by the disclosure that the government has

20   made as to what the nature and scope of those expert witnesses

21   will testify to.  So if the expert witnesses go beyond the

22   disclosure, the defense can raise an objection at trial.

23         So the one objection that the defendant wants me to

24   rule on is the defendant objects to any testimony about

25   fictitious and wash sales by Dr. DeRosa.  The government

1    offered to eliminate that topic from Dr. DeRosa's testimony on

2    fictitious and wash sales if the defense experts also did not

3    testify about that subject.  The defense declined the

4    invitation.

5         Because that is a subject that may arise at trial and

6    because the jury may be unfamiliar with the terms, an industry

7    expert should be permitted to explain the terms and their use

8    in the industry.  As I understand from the government papers,

9    Dr. DeRosa is not being proffered as a witness to testify about

10   specific transactions in this case, but he certainly should be

11   allowed to testify about the meaning of terms such as "wash

12   sales," particularly since the defendant has not foresworn

13   having his experts testify about the subject.

14        So the motion to exclude the testimony of the two

15   government experts is withdrawn except with respect to the

16   issue of fictitious and wash sales, as to which the motion is

17   denied.

18        The defense moves to exclude any evidence of bank

19   compliance policies, specifically those relating to

20   prohibitions against antitrust violations and most particularly

21   against price fixing and bid rigging and any evidence of the

22   defendant's termination for misconduct.  The defense argues

23   that the policies are irrelevant and prejudicial because, among

24   other reasons, the issues in this case are whether the

25   government has proved beyond a reasonable doubt that the

1    defendant entered into a conspiracy in violation of the Sherman

2    Act to fix prices and rig bids and not whether the defendant

3    violated his bank policies or whether alleged coconspirators

4    violated their bank policies.  *See* Federal Rule of Evidence

5    401-403.  The government agrees and states that it does not

6    intend to offer such evidence unless the defendant opens the

7    door to such evidence in the opening statement, through

8    cross-examination, or in its direct case, by arguing that what

9    the defendant did was standard industry practice or that his

10   supervisors were well aware of what the defendant was doing.

11        Therefore, the motion to exclude this evidence is

12   denied as moot at this point.  If the defense raises arguments

13   as to which this evidence is responsive and relevant, the court

14   will then have to make the necessary findings as to the

15   relevance of the evidence and the Rule 403 balancing analysis.

16   Plainly, the evidence should not be referred to until the court

17   has determined that it can be admitted.

18        The defendant moves to exclude any argument or

19   evidence concerning spoofing -- making bids or offers that the

20   maker had no intent to complete -- or canceled trades.  The

21   defendant argues that these practices are not unlawful for

22   foreign exchange traders, are irrelevant and unfairly

23   prejudicial.  The government responds that these practices are

24   integral to the story of the antitrust conspiracy to fix prices

25   and rig bids.  They were used on some occasions to facilitate

1    bid rigging and price fixing and on other occasions showed the

2    course of dealing among the conspirators that showed their

3    trust and confidence in each other. Therefore, the

4    transactions are necessary to complete the description of the

5    course of the conspiracy. There is plainly a sufficient

6    showing of the relevance of these transactions. There is also

7    no need to subject such evidence to analysis under Rule 404(b)

8    because the evidence is "inextricably intertwined with the

9    evidence regarding the charged offenses, and it is necessary to

10    complete the story of the crime on trial." *United States v.*

11    *Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quoting *United States*

12    *v. Gonzalez*, 110 F.3d 936, 942 (2d Cir. 1997).

13         Moreover, there is no basis to exclude the evidence

14    under Rule 403. The evidence is not unduly prejudicial. It is

15    not an appeal to passion or an appeal to have the jury decide

16    the issues in this case on an impermissible basis. *See, e.g.*,

17    *United States v. Morgan*, 786 F.3d, 227, 232-33 (2d Cir. 2015).

18    The transactions are no more inflammatory than the transactions

19    for which the defendant was indicted and perhaps less so. Any

20    possible prejudice is substantially outweighed by the relevance

21    of the evidence. Just as in *Usher*, the motion to exclude this

22    evidence is denied. 17-cr-19, Dkt. No. 158, at 87:1-6. If the

23    defendant wishes, the court will give the limiting instructions

24    suggested by the government at page 10 of its brief or any

25    reasonable instructions suggested by the defendant.

1          Next, the defendant acknowledges that there is no

2     basis at this time to exclude evidence of coordinated trading

3     in the interdealer market or coordinated ruble pricing between

4     the defendant and alleged coconspirator Katz.  But the

5     defendant hopes that this evidence at trial will convince the

6     court that this evidence should be excluded.  The government

7     maintains that this evidence is direct evidence of the

8     conspiracy to fix prices and rig bids.  Therefore, the motion

9     must be denied at this time.  The defense is of course free to

10    raise any arguments it wishes in the course of the trial, but

11    the argumentation in the present motion does not presage much

12    success for any renewed motion.  In particular, the defense

13    again argues that there were pro-competitive purposes for the

14    defendant's conduct.  But if, as alleged, the defendant engaged

15    in a conspiracy to fix prices or to rig bids, then the

16    pro-competitive effects are not relevant.  Bid rigging and

17    price fixing are *per se* violations of the Sherman Act despite

18    any individual's belief that such practice are a good idea

19    because they are in fact pro-competitive.  *See In re:*

20    *Publication Paper Antitrust Litigation, 690* F.3d 51, 61 (2d

21    Cir. 2012*); United States v. Koppers Co., Inc.*, 652 F.2d 290,

22    295 n.6 (2d Cir. 1981).  ("Where *per se* conduct is found, a

23    finding of intent to conspire to commit the offense is

24    sufficient.  A requirement that the intent go further and

25    envision actual anticompetitive results would reopen the very

1    questions of reasonableness which the *per se* rule is designed

2    to avoid."); *United States v. Marr*, No. 14 Cr. 580, 2017 WL

3    1540815 at *5 (N.D. Cal. Apr. 28, 2017), *aff'd sub nom. United*

4    *States v. Sanchez*, 760 F.App'x (9th Cir. 2019) ("Evidence of

5    reasonableness or pro-competitive justification for bid rigging

6    is not relevant in a *per se* case.").

7              The motion is denied at this time.

8              The defendant's motions *in limine* are decided as

9    explained above.

10             Next there is a defendant's motion under *Brady*.  There

11   are two pretrial motions filed by the defendant concerning

12   issues under Federal Rule of Criminal Procedure 17(c) and

13   *Brady*.

14             The defendant has moved under Federal Rule of Criminal

15   Procedure 17(c) for a subpoena to issue compelling cooperating

16   witness Nicholas Williams to produce documents prior to trial

17   relating to Mr. Williams' interviews with South African

18   regulators.

19             Is this motion still active?

20             MR. KLOTZ:  It is, your Honor.

21             THE COURT:  Okay.

22             MR. KLOTZ:  We ask that your Honor issue the subpoena.

23   Obviously, Mr. Williams' attorney is not present, and I have no

24   doubt that she has views on this.  But we would still ask your

25   Honor to issue the subpoena so we can tee the issue up.

1          THE COURT:  Right.

2          The government opposed.  The government filed its

3   opposition, and I don't recall that Williams was heard on the

4   motion.  I think it was the government as an interested party.

5          MR. KLOTZ:  Correct.  I think the government has

6   opposed it, and I think we gave our views of the government's

7   position, and your Honor has, I think, complete briefing on

8   that issue.

9          THE COURT:  Okay.

10         So the defendant has moved under Federal Rule of

11  Criminal Procedure 17(c) for a subpoena to issue compelling

12  cooperating witness Nicholas Williams to produce documents

13  prior to trial relating to Mr. Williams' interviews with South

14  African regulators.

15         As a threshold matter, the government has standing to

16  challenge the issuance of the subpoena even though the subpoena

17  would be served on an nonparty, Mr. Williams, and the defendant

18  does not challenge that standing.  *See, e.g.*, *United States v.*

19  *Carton*, No. 17-cr-680, 2018 WL 5818107 at *2 (S.D.N.Y. Oct. 19,

20  2018)*; United States v. Vasquez* 258 F.R.D. 68, 71-72 (E.D.N.Y.

21  2009).  Moreover, the court has an independent responsibility

22  to ensure that subpoenas issue for a proper purpose and comply

23  with Rule 17(c) regardless of the government's standing.  *See*

24  *United States v. Weissman*, No. 01-Cr-529, 2002 WL 31875410 at

25  *1 n.1 (S.D.N.Y. Dec. 26, 2002).

1          Parties in a criminal case may issue subpoenas that

2     "order the witness to produce any books, papers, documents,

3     data, or other objects the subpoena designates."  Federal Rule

4     of Criminal Procedure 17(c)(1).  Courts may quash or modify a

5     subpoena "if compliance would be unreasonable or oppressive."

6     Federal Rule of Criminal Procedure 17(c)(2).  When the

7     documents are to be produced prior to trial, the Supreme Court

8     has adopted the four-part test set out by Judge Weinfeld in

9     *United States v. Iozia* 13 F.R.D. 335, 338 (S.D.N.Y. 1952), to

10    determine whether the subpoena complies with Rule 17.  The

11    moving party must show:

12          "(1) that the documents are evidentiary and relevant;

13          "(2) that they are not otherwise procurable reasonably

14    in advance of trial by exercise of due diligence;

15          "(3) that the parties cannot properly prepare for

16    trial without such production and inspection in advance of

17    trial and that the failure to obtain such inspection may tend

18    unreasonably to delay the trial; and

19          "(4) that the application is made in good faith and is

20    not intended as a general fishing expedition."

21    *United States v. Nixon*, 418 U.S. 683, 699-700 (1974).  The

22    defendant's request fails because the documents it seeks are

23    not "evidentiary and relevant" within the mean of Rule 17(c).

24          Specifically, evidence produced through Rule 17(c)

25    must be admissible at the time the subpoena issues.

1  Impeachment evidence, which may be admissible at trial only if

2  and when the witness testifies, is not subject to pretrial

3  production under Rule 17(c) because it is not admissible until

4  the pertinent witness testifies. *See Nixon*, 418 U.S. at 701

5  ("Generally, the need for evidence to impeach witnesses is

6  insufficient to require its production in advance of trial."

7  *United States v. Cherry*, 876 F.Supp. 547, 553 (S.D.N.Y. 1995)

8  ("Documents are not evidentiary for Rule 17(c) purposes if

9  their use is limited to impeachment.").

10        The defendant acknowledges that Rule 17(c) may not be

11  used to obtain impeachment evidence, but argues that

12  Mr. Williams' communications with South African regulators are

13  admissible to demonstrate to the jury his bias or motivation

14  because of his decision to cooperate with the government.  The

15  defendant also argues that Mr. Williams' statements may

16  exculpate Mr. Williams, thereby portraying his behavior, and by

17  extension the defendant's, as legitimate.  In his supplemental

18  letter dated July 1, 2019, the defendant drew the court's

19  attention to what he claimed was an example of such an

20  exculpatory statement, which was Mr. Williams' failure to say

21  that there was an "agreement" among the alleged coconspirators.

22        In support of his argument, the defendant cites three

23  cases in which courts within this district have permitted

24  Rule 17(c) subpoenas to issue to obtain evidence that purported

25  to establish the bias of the witness.  *See United States v.*

*Seabrook*, No. 16-cr-467, 2017 WL 4838311 (S.D.N.Y. Oct. 23, 2017); *United States v. Zhu*, No. 13-cr-761, 2014 WL 5366107 (S.D.N.Y. Oct. 14, 2014); *United States v. Carollo*, No. 10-cr-654, 2012 WL 1195194 (S.D.N.Y. Apr. 9, 2012).

However, as the government correctly points out, in *Seabrook*, *Zhu* and *Carollo*, the evidence of bias was independent of the prospective trial testimony. In *Seabrook*, the defendant sought documents that were collateral to the cooperating witness's statements to the government. *Seabrook*, 2017 WL 4838311 at *3. In *Zhu*, the defendant sought communications between the New York University Medical Center and Siemens that would tend to show that the New York University Medical Center was biased towards the defendant when it urged the United States to pursue criminal charges against the defendant. *Zhu* 2014 WL 5366107 at *5. In *Carollo*, the defendants sought bank records and tax returns from a cooperating witness, an unindicted coconspirator, that would tend to show bias on the part of the witness prior to and during the period of cooperation. *Carollo*, 2012 WL 1195194 at *2.

In contrast, the defendant seeks communications between Mr. Williams and the South African regulators as well as documentation surrounding those communications. This material is not collateral to Mr. Williams' supposed trial testimony, but simply constitutes statements of the potential witness that the defense speculates may be inconsistent with

1    his trial testimony.  For example, evidence of Mr. Williams'

2    failure to state that there was an "agreement" among the

3    alleged coconspirators will be admissible, if at all, only if

4    it is inconsistent with Mr. Williams' trial testimony.

5    Mr. Williams' statements about an agreement or lack thereof

6    among alleged coconspirators is not probative of any bias or

7    motive on Mr. Williams' part.

8            Therefore, the requested documents are not within the

9    scope of a Rule 17(c) pretrial subpoena.  When and if

10   Mr. Williams testifies at trial, the defense can renew a

11   subpoena for materials that may be admissible at trial.

12           Separately, the government argues that Rule 17(h) bars

13   the defendant's requested subpoena insofar as the defendant

14   requests a statement of a witness or a prospective witness.

15   However, Rule 17(h) and corresponding Rule 26.2 do not apply to

16   documents that are not in the possession of the government or

17   the defendant.  Rather, the rules apply to situations in which

18   a party seeks to compel "any statement of the witness that is

19   in the possession of an attorney for the government or the

20   defendant and that relates to the subject matter of the

21   witness's testimony."  Federal Rule of Criminal Procedure

22   26.2(a) see *United States v. Hosain*, No. 16-cr-462-CRB, 2018 WL

23   1091083 at *2 (N.D. Cal. February 28, 2018) ("The advisory

24   committee's notes to the amendments adding Rule 17(h) reflect

25   an intention to make the rules coherent, not to change them.

1    That is, they do not reflect an intention to make third-party

2    witnesses undiscoverable.").  In this case, the government

3    denies that it is in possession of these documents.  Therefore,

4    Rule 17(h) is not an independent basis to exclude the

5    production of the documents.

6           The defendant has also moved under *Brady v. Maryland*,

7    373 U.S. 83 (1963), to compel the government to identify lists

8    of exhibits shown during all reverse proffers made in

9    connection with this case.  Specifically, the defendant

10   requests the exhibits shown during reverse proffers with

11   Mr. Cummins, although the defendant's request includes "reverse

12   proffers with any persons or entities referenced in the

13   indictment or counsel for such persons or entities."  Dkt. No.

14   72.  The government represents that it has already produced all

15   such documents, including the final plea agreement with

16   Mr. Cummins, Mr. Cummins' proffers letters, Mr. Cummins'

17   interview memoranda from before and after the reverse proffer,

18   and the notes and information relating to proffers made by

19   Mr. Cummins' counsel.  Nevertheless, the defendant seeks a list

20   of the exhibits shown to Mr. Cummins and potential targets of

21   the government's investigations in order to convince the

22   targets to plead guilty or cooperate.

23          *Brady* requires the production of evidence favorable to

24   the accused, but it is difficult to see how the government's

25   selection of exhibits to show potential witnesses that may

1   implicate those witnesses is evidence that is favorable to the

2   defendant.  There is no case where the government's selection

3   of documents to show a potentially cooperating witness has been

4   found to be covered by *Brady*.  Moreover, the exhibits

5   themselves have already been produced to the defendants and are

6   readily searchable.  The government has produced all of the

7   communications with the cooperating witnesses, including any

8   proffer agreements and cooperation agreements, and will produce

9   all prior statements by the witnesses on the schedule

10  previously set by the court.

11          The government represents that it has complied with

12  its *Brady* obligations and will continue to do so.  That is

13  sufficient.  *See, e.g.*, *United States v. Mohamed*, 148 F.Supp.3d

14  232, 246 (E.D.N.Y. 2015) (collecting cases demonstrating that

15  *Brady* is satisfied when the government represents that it will

16  comply with its *Brady* obligations and the defense provides no

17  reason to suspect otherwise).

18          The defendant's motion for the issuance of a Rule

19  17(c) subpoena is denied.  The defense motion to compel the

20  identification of reverse proffer exhibits is also denied.

21          Then there is a random motion by the government to

22  exclude the testimony of George Dowd, which Mr. Dowd was

23  designated late, but the defendant says it was not so easy to

24  find the expert and, when it finally found him, it identified

25  him.

1          The government now moves to preclude the potential

2     expert testimony of George T. Dowd, III, who the defendant

3     proffers as an expert in industry customs and practices.  The

4     government argues that the expert disclosure is untimely and

5     that the testimony should be exclude as irrelevant or that, at

6     the very least, the court should hold a *Daubert* hearing before

7     the testimony.

8          First, the court will not exclude the potential

9     testimony as untimely.  The scheduling order provided that the

10    parties will exchange "preliminary" lists of witnesses by June

11    28, 2019.  The final list of witnesses was to be produced on

12    September 23, 2019, yesterday.  The government points to the

13    fact that the deadline for motions *in limine* was July 26, 2019,

14    but that deadline would not preclude a motion that could not

15    have been made prior to that time.  Indeed, as the defendant

16    itself writes in its response to the government's letter motion

17    (ECF No. 111), "We have advised the government that, because of

18    the timing of our disclosure, we do not object to their

19    supplementing their already-filed motion *in limine* or their

20    filing of a new motion challenging Mr. Dowd's testimony."  In

21    any event, preclusion is a drastic remedy, and the disclosure

22    of a potential witness on the subject of custom and practice

23    about two months before the scheduled trial date is not

24    prejudicial to the government. *See Softel, Inc. v. Dragon*

25    *Medical & Scientific Communications, Inc.,* 118 F.3d 955, 961-63

1    (2d Cir. 1997); *United States v. Raniere*, 384 F.Supp.3d 282,

2    327 (E.D.N.Y. 2019) ("But the defendant has not shown that the

3    extreme remedy of preclusion is warranted here, where the

4    government disclosed two experts and disclosed the topic of its

5    third expert testimony nearly two months before the trial.").

6    There is ample time to prepare for that testimony and to make

7    any appropriate motions directed to that witness, particularly

8    because the witness would only testify in the defense case.

9         Second, the government argues that the witness should

10   be precluded because his testimony will simply support an

11   impermissible defense of "everyone does it" or an impermissible

12   argument that the advantages of price fixing or bid rigging can

13   justify those practices.  Those are impermissible arguments, as

14   the court has already made clear, and which the defendants have

15   said they are not making.  However, there are plainly subjects

16   about which this witness could testify that do not come close

17   to making such arguments, including the prevalence of chat

18   rooms, how chat rooms work, the common participants in those

19   chat rooms, and the advantages of information exchanges.

20   Therefore, a blanket exclusion of an industry practice's expert

21   would not be appropriate any more than excluding the

22   government's industry expert would be appropriate.

23        That leaves the government request for a *Daubert*

24   hearing.  But the government has failed to make a showing why

25   there should be a *Daubert* hearing.  The defense has provided a

detailed description of the testimony of Mr. Dowd.  The
government has failed to point to specific opinions that the
government contends should be excluded on the basis of *Daubert*.
The government is welcome to file a motion directed to any
specific opinions by the expert and explain why, under *Daubert*,
they are impermissible for some reason.  It is not clear that
would require a hearing any more than the motions directed to
the other experts has required a *Daubert* hearing, but the
government is free to make any such motion it seeks to preclude
the expert from testifying about certain matters.  *See United*
*States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("The
trial court's admission of the expert's testimony constituted
an implicit determination that there was a sufficient basis for
doing so.  The formality of a separate hearing was not
required.").  Indeed, "whether to hold a separate *Daubert*
hearing in advance of admitting expert testimony is within the
trial court's discretion." *United States v. Ashburn*, 88
F.Supp.3d 239,243 (2d Cir. 2015).  The government is free to
make any motion *in limine* it wishes with respect to Mr. Dowd's
testimony.  Any such motion should be made within one week.
Any response should be made one week thereafter.

              So ordered.

              You are free to make the motion *in limine*.  I would
simply caution against it.  I don't see a basis for excluding
an industry expert who is being put up to help the jury

1    understand industry terms, how transactions work, and the like.

2         I also think it would be very difficult to make a

3    *Daubert* motion with respect to the witness because if the

4    witness is describing industry customs and practices, it is not

5    the kind of testimony that can be challenged because the

6    opinions are based on an unreliable methodology or that the

7    opinions don't flow from a reliable methodology.  But you are

8    free to make such a motion within one week.

9         Which brings me, then, to the last motion, which is a

10   defense motion *in limine* to preclude the testimony of

11   representatives of counterparties.  The defense made the

12   motion, the government responded by saying the motion is

13   untimely, you know, that time for motions *in limine* has passed.

14   Think about that.  In fact, think about motions before you make

15   them.  What's the alternative?  The defense says that, in the

16   course of disclosures about witnesses, there are some items

17   that prospective witnesses would testify to that should be

18   excluded.  The government says that motion is untimely, the

19   time for motion *in limine* has passed.  So if I thought that

20   that was true or that that precluded the defense from making

21   that motion, what's the alternative?  Government calls the

22   witnesses at trial, and the day the witnesses are going to

23   testify, the defense gets up and says:  Don't let them testify

24   about these subjects.  Not a very good way of efficiently

25   running the trial.

1      I ask that evidentiary issues be brought to my

2  attention -- and I will do this at the final pretrial

3  conference also -- before the issues arise so that I can

4  reasonably decide them in a reasoned way.  So I accept faxes in

5  the course of the trial, I meet with the lawyers before the

6  trial day begins with the jury, at lunchtime, at the end of the

7  day, and I ask that the lawyers anticipate what evidentiary

8  issues are going to arise.  I accept faxes so that you could

9  fax me at night if issues are coming up, and I will deal with

10  them first thing in the morning before the jury arrives and

11  again at the end of the day.  But it is actually a benefit to

12  all concerned to raise issues as soon as possible so that they

13  can be considered and decided.  There have been an unusual

14  number of motions *in limine* in this case, but that's been

15  helpful because it helps to provide guidance for the trial and

16  hopefully result in a more efficient trial.

17      So we have this final motion.

18      The defense moves to preclude testimony by

19  representatives of counterparties in transactions in which the

20  defendant allegedly engaged and which the government contends

21  are examples of price fixing and bid rigging.  The counterparty

22  witnesses did not deal directly with the defendant, but the

23  government contends that the witnesses will testify that the

24  defendant's employer and the employers of the other members of

25  the conspiracy were competitors so as to establish one of the

1    elements of a *per se* violation of the Sherman Act, namely, bid

2    rigging or price fixing among horizontal competitors.  The

3    counterparty representatives will testify allegedly that the

4    employers of the alleged conspirators were competitors and that

5    the counterparties attempted to get the best bids based on

6    price and other considerations.  Some of the original interview

7    memos pointed to by the defense suggested that these witnesses

8    will testify about what they consider to be "ethical."  The

9    government denies any such intent to introduce testimony from

10    employees of counterparties about what was ethical, and for

11    good reason.  The government does not seek to offer testimony

12    about what the counterparties' -- obviously the issue in the

13    case is not what is ethical but, rather, what is permissible or

14    not permissible under the Sherman Act.

15           The government does seek to offer testimony about what

16    the counterparties expected the employers of the defendant and

17    the other alleged conspirators to do, such as not to share

18    price information.  The government says that that testimony

19    would help to explain that the employers of the defendant and

20    the counterparties were in fact competitors in a horizontal

21    relationship, but this testimony actually appears to go too

22    far.  What the expectations of employers of the counterparties

23    were could be based on numerous factors, including what those

24    people thought was ethical or not ethical.  It is enough for

25    representatives of the counterparties to explain the

1  competitive relationship among the employers of the defendant

2  and the other alleged coconspirators that is reflected in the

3  practice of the counterparties, for example, shopping around

4  for the best bids among the employers of the defendant and the

5  coconspirators.

6       So given the suggested testimony that the defendants

7  focused on, the government does not intend to offer testimony

8  about what the counterparties thought was ethical, and the

9  government should not elicit testimony about what the

10  counterparties expected the employers of the defendant and the

11  other alleged coconspirators would do.  Rather, the

12  representatives of the counterparties should testify about what

13  in fact happened and what the counterparties did, which would

14  reflect the fact that the counterparties viewed the employers

15  of the defendant and the other coconspirators as competitors in

16  the market.  Clear enough?

17       Okay.  That completes all of the motions that were

18  before me.

19       MR. KLOTZ:  Before we move -- I think we have a couple

20  of other housekeeping details that we would like to raise with

21  your Honor, but I have a couple of questions about the rulings

22  as it relates to expert testimony, which is a central portion

23  of the defense.

24       Obviously I will review the transcript of your Honor's

25  rulings carefully.  To the extent that your Honor excluded once

1    and for all certain areas of expert testimony, I think, in

2    order to protect my record, I would like to make an offer of

3    proof of what would be excluded to have a little more clarity.

4    I also, however, think I understood your Honor to say that

5    virtually with respect to every specific area of expert

6    testimony you would reserve decision until trial to see if it

7    appeared to be relevant to something that had been raised up

8    until that point and was offered for a permissible purpose,

9    because part of our argument is virtually all of the expert

10   testimony, we think, goes to multiple purposes and probably has

11   a reason to be in under any circumstances.

12           THE COURT:  Well, I think that is fair.  You can

13   certainly isolate the specific proffers of expert testimony

14   that you think are appropriate and that you think I have

15   excluded, and the government can respond.

16           I will make a general observation, which is, after

17   deciding various motions to dismiss and numerous motions *in*

18   *limine*, I would have thought that the gist of the government's

19   case is that there is a series of specific transactions that

20   will demonstrate beyond a reasonable doubt that the defendant

21   was part of a conspiracy to fix prices or rig bids on specific

22   transactions in the market in which the defendant was and the

23   other alleged coconspirators were operating, and some of what

24   the government has tried to put in seems to be somewhat

25   extraneous to that very straightforward and simple proposition.

1   Some of what the defendant attempts to do seems to not go

2   directly to that direct and simple proposition.  So if in fact

3   there is a series of bids, trades, which are part of a

4   price-fixing or bid-rigging conspiracy, evidence or comments by

5   or testimony by experts about how really good and

6   pro-competitive these individual transactions were in a bigger

7   scheme of things, however you want to describe it, should not

8   generally be allowed either because it attempts to raise

9   impermissible defenses or because it is not relevant.

10          Now, I ruled on all of the motions *in limine* but was

11  careful to say in many of them I was not directed to specific

12  testimony or specific pieces of evidence, and therefore I

13  couldn't decide on specific pieces of evidence.  But that is

14  the basic framework.

15          MR. KLOTZ:  Understood and, your Honor, I don't think

16  I disagree with you.

17          THE COURT:  I'm sorry?

18          MR. KLOTZ:  I said I don't think I disagree with you.

19  I think what I want the evidence in for is to show that a

20  substantial portion of the government's case is not *per se*

21  price fixing or bid rigging.  It just isn't.

22          THE COURT:  I have read the papers carefully.  There

23  is nothing in the papers that directs me to that kind of

24  evidence.  It would seem that if you have two or three traders

25  getting together on a bid or a price, you have a bid-rigging or

1    price-fixing conspiracy.  The government is either able to

2    prove that beyond a reasonable doubt or not.

3              There have been, I know, from the course of discovery,

4    a reasonable number of specific transactions that have been

5    isolated.  Whether the government will be able to prove beyond

6    a reasonable doubt that these various transactions were in fact

7    price fixing or bid rigging, you know, remains to be seen.  But

8    the parties haven't alerted me to the kinds of specific

9    evidence that on a granular level, if you will, should be

10   either permitted or excluded other than in general, as I have

11   tried to lay out in deciding the various motions *in limine*.

12             So if the next round of motions directs me more

13   specifically, so be it.  I don't know how far the pretrial

14   motions will go.  I assume that they could go to a quite

15   granular level, but that's not usually the way in which they

16   go.  There is a reasonable number of transactions that have

17   been identified and which would be the subject of evidence at

18   trial.  Does the defense intend to say, no, that transaction

19   number 53 was not an example of price fixing or bid rigging?

20             MR. KLOTZ:  I think we do.  I think we --

21             THE COURT:  Okay.

22             MR. KLOTZ:  I think, and if I could just broadly speak

23   to it, I think we think there are two different markets in

24   which the actors in this case are active.  With respect to

25   dealing with customers, I completely understand your Honor's

1  view of what the issue is, and if competing dealers got

2  together and agreed on prices to quote customers, that would be

3  a really serious problem and it would not be a defense, oh,

4  this had great benefits for the world at large or nobody was

5  harmed or anything like that.  It is very important to our

6  defense that we contend that the interdealer market is a

7  totally different kettle of fish, and that is what much of our

8  expert testimony is directed to.

9       We also think, although I think your Honor ruled in

10  our favor on this, that evidence of whether the relationship

11  between our client and the other alleged members of the

12  conspiracy with respect to ruble transactions was horizontal or

13  vertical is quite important.  But as I understand it, your

14  Honor will entertain testimony on that subject.

15       THE COURT:  I didn't exclude it.

16       MR. KLOTZ:  Right.  No, and I didn't mean to suggest

17  that you said it is perfectly admissible, but it could be.

18       THE COURT:  Okay.

19       MR. KLOTZ:  I think I understand where we are.  Thank

20  you.

21       THE COURT:  Okay.  Anything else?

22       MR. CHU:  Your Honor, in the spirit of fronting

23  discovery issues or any sort of evidentiary issues before

24  trial, we have two housekeeping matters.

25       The first is 26.2 statements.  So these are statements

1    that need to be produced by the defense for their witnesses.

2    According to the scheduling order, the government has produced

3    the Jencks or 3500 material for total witnesses, and we did

4    that pursuant -- I think it was yesterday, September 23.  We

5    have not received any 26.2 statements, the reciprocal

6    statements, from the defense.  Specifically, the government is

7    concerned with respect to statements of their experts that

8    could be in their possession.

9          We have discussed the matter with defense counsel.

10   Defense counsel has raised a potential defense that such

11   statements could be subject to work product.  The government

12   disagrees.  Specifically, with respect to that portion under a

13   Supreme Court case *United States v. Noble*, as well as *Goldberg*,

14   and so that is just an issue.

15         We have not received any statements so far from 26.2.

16   We have not received a date that we are going to get such

17   statements.  So we just, as your Honor alluded to, we want an

18   efficient trial, and so the sooner we get the statements, the

19   sooner we can evaluate what is there or not there would be

20   helpful to us.

21         THE COURT:  Okay.  Mr. Klotz.

22         MR. KLOTZ:  Yes, Judge.  I have said to the

23   government -- first of all, the scheduling order doesn't set a

24   date for us to provide 26.2 statements.  I have said to the

25   government, if you look at the rule, they are only due after

1   the witness has concluded his direct testimony.  I'm not going

2   to do that.  I'm going to give whatever we have well in advance

3   and in ample time for you to review them.

4         I think the bigger issue is we have a disagreement

5   about what is covered as prior statements of expert witnesses.

6   My view is that what is covered as prior statements of expert

7   witnesses is if they did a draft report or drafted something in

8   their own hand or affirmed their commitment to a draft that

9   somebody else had drafted, that would count as a prior

10  statement and we would produce it.  It is my belief that we

11  have very little material that fits that description.

12        It is my understanding that the government's view of

13  what counts as a prior statement is essentially anything the

14  testifying witness wrote to anybody at any time that is on the

15  subject of his testimony, and I think that is vastly intrusive

16  in the process of preparing for trial.  It is the type of

17  material that would be clearly excluded under the civil rules.

18  There is no provision in the criminal rules for anything other

19  than prior statements, and honestly I have never seen anything

20  like that in a criminal case.

21        THE COURT:  Would you expect the government to have

22  produced comparable statements for its witnesses?

23        MR. KLOTZ:  No.  My specific statement to the

24  government was, I don't think this is covered and I don't think

25  you are required to produce it either.  I haven't looked at

1    what they did produce, to be honest.  I don't think it is very

2    much.

3            But this raises two issues.

4            One is, I think it is simply my experts are an

5    integral part of the trial team.  We are all working together

6    to try to frame issues in a way that's comprehensible to a jury

7    that addresses the government's argument, and I think to

8    subject all of the back-and-forth on that subject, including

9    presumably communications to me personally or one of my other

10   attorneys is just not permitted.  Rule 26.2, which governs

11   prior statements of witnesses, expressly contemplates that

12   materials protected by privilege are not required to be

13   produced.

14           But this also, in addition to an issue of, I think,

15   impropriety and overreach on the government's part, also goes

16   to the timing question, because it is one thing to find are

17   there prior statements of the witnesses and produce those --

18   that obviously can be done quite quickly -- but I have three

19   different experts, and if I have to do an e-mail search and

20   note search and go through document by document and try to make

21   privilege determinations, I think that is a very time-consuming

22   project.

23           I think the case the government cites is readily

24   distinguishable.  It is much narrower.  It doesn't involve an

25   expert witness.  It involved a fact witness.  It involves a

1    single document that is directly relevant to the trial

2    proceeding.

3         THE COURT:  What are you doing with respect to prior

4    testimony by the witness as experts in other cases?

5         MR. KLOTZ:  I don't think that's -- I don't think even

6    the government contends that that's called for because it

7    wouldn't relate directly to the testimony in this case.  At

8    least that's my understanding.

9         THE COURT:  All right.

10        MR. CHU:  Your Honor, may I respond?

11        THE COURT:  Sure.  Quickly.  I have to leave soon.

12        MR. CHU:  Understood, your Honor.

13        Simply that, as your Honor alluded to, written

14   communications are 3500 material, such as e-mails, letters,

15   things like that.  That's obviously something that the

16   prosecution searches their files for and turns over as a matter

17   of course, and so that is something that we view as statements

18   that are covered by 26.2.

19        MR. KLOTZ:  Judge, I would request, if the government

20   is going to press this, and as I have said, my view is that

21   this is reciprocal and I don't expect them to produce anything

22   that I don't propose to produce, but I would propose that we be

23   given an opportunity to brief this because it is, in my mind,

24   quite an important issue.

25        THE COURT:  Yes.  The parties can discuss it and if

there is a dispute, give me your memos on what you think should

be produced and when.  I don't want to undermine your

good-faith negotiations over this issue.  I would like it to be

resolved.  I would like to rely on the defense statements that

they are not going to wait until the witness testifies on

direct.  Under 3500, the government has no obligation to

produce prior statements until the witness has testified.  If

they stand on that, then a lot of stuff gets produced and we

have to have a recess while the defense considers that.  So the

standard practice is, even though the rules say I couldn't

require that, the government turns over the 3500 material

reasonably in advance every trial.  It differs from case to

case.

        With respect to the reciprocal discovery from the

defendant -- and, again, I don't mean to undermine productive,

cooperative disclosure -- the defendant could rest after the

government has completed its case by never calling any

witnesses.  So there are lots of cases where the defense takes

the position:  We don't know, so we can't give you the

materials for a witness who is going to testify because we

don't know whether there is going to be a defense case until we

have heard the conclusion of the government case.

        So the defense talks about the experts who are going

to be presented.  Okay.  There are always downsides as well as

upsides to producing witnesses because witnesses are subject to

1    cross-examination.  So to the extent that there is defense

2    production before trial or before the government has concluded

3    its case, the government is benefited by that.  And certainly

4    if there are disputes about what the scope of the government

5    production would have to be, it is helpful to try and sort

6    those out.

7         I went along with the parties' suggestions for the

8    pretrial schedule in this case.  The parties didn't provide for

9    the reciprocal discovery by the defense.  If there was a

10   dispute about that in setting the schedule before trial, and

11   the defendant said, We don't have to do that, we don't know

12   whether we are going to be producing witnesses or not, I would

13   have agreed.  So you don't have a date for the reciprocal

14   defense production because the parties didn't provide for it.

15   If there was a dispute before trial, you wouldn't have had it

16   either.  Mr. Klotz says he is not going to do that, he is not

17   going to actually put on a case and reserve reciprocal

18   discovery until the witness has completed direct.  That's good,

19   because we don't want to keep the jury waiting, and we would

20   rather not have to make decisions about how much time is

21   necessary to look over the reciprocal discovery and prepare for

22   the cross of the witness.

23        So I urge you to try and work that out, and if I have

24   to decide any motion with respect to what the scope of the

25   production is, of course, give it to me.

j9o2aiyC kjc

1            We have another conference, don't we, scheduled?

2            MR. KLOTZ:  We do not.  That was on our schedule, to

3      ask your Honor for a convenient date.

4            THE COURT:  Sure.  I have to have a final pretrial

5      conference to dispose of issues like *voir dire* and all.

6      Refresh my recollection on the trial date.

7            MR. KLOTZ:  The trial date is October 21, and we were

8      thinking that a date sometime at the beginning of the preceding

9      week would be ideal.

10           THE COURT:  Yes.  I will probably actually be almost

11     surely on trial.  I start another trial, which is only supposed

12     to last about a week, on October 10.  So let's say final

13     pretrial conference -- I alert you to the fact that I may have

14     to delay the trial a week to begin if the other trial is still

15     going on, but it shouldn't be more than a week.  You will go

16     right after the other trial is finished.  So let's say a final

17     pretrial conference October 15 at 4:30 p.m., and I would go

18     over with you trial rules and *voir dire*.

19           In preparation for that, if you haven't already done

20     it, you should get my trial rules.

21           MR. KLOTZ:  Yes, your Honor.

22           THE COURT:  And you should get my jury rules.  And if

23     you haven't already gotten them, Mr. Fletcher will give them to

24     you and be prepared to e-mail them to you.  I use the struck

25     jury panel.

1          Okay?

2          MR. KLOTZ:  Yes, your Honor.

3          THE COURT:  Anything else?

4          MR. HART:  No, your Honor.

5          MR. KLOTZ:  The very last issue is, we filed the

6    motion about customer testimony originally in the public

7    record, and the government asked that we refile it under seal,

8    and we don't think it was required to be filed under seal.

9    Personally, I don't think any of us care whether it is filed

10   under seal or not, but in general I'm inclined to think it is a

11   nuisance to have to worry about filing documents under seal,

12   and I don't understand why this would be an exception.

13         THE COURT:  That was the most recent motion?

14         MR. KLOTZ:  Yes.

15         THE COURT:  Yes.

16         MR. KLOTZ:  Yes.  We attached to our motion a couple

17   of government interview memos that otherwise would have been

18   covered by the confidentiality order which expressly says you

19   can use any of this to make court filings.

20         MR. HART:  Yes, your Honor.  The reason why we made

21   such a request is because we view the information in those 302s

22   to be personal in nature.  If they were found on the public

23   record -- we don't know who is following the docket -- they

24   could contact those individuals.  So out of an abundance of

25   caution, to protect privacy, we would request them to be filed

j9o2aiyC kjc

1   under seal.

2          THE COURT:  I will leave it under seal.  It was filed

3   under seal, right?

4          MR. KLOTZ:  Yes, we refiled it, your Honor.

5          THE COURT:  Okay.  Anything else?

6          MR. HART:  No, your Honor.

7          MR. KLOTZ:  No, your Honor.

8          THE COURT:  All right.  Good to see you all.

9                              oOo

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25