UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------x

UNITED STATES OF AMERICA             :        18 Cr. 333 (JGK)

                         v.                          :

AKSHAY AIYER,                                    :

                         Defendant.            :

-------------------------------------------------------x


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
RULE 29 MOTION**




WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ...........................................................................................1

ARGUMENT ....................................................................................................................2

I.    The Conduct Evidenced At Trial Cannot Properly Be Characterized As Per Se
Price Fixing And Bid Rigging ................................................................................2

    A.    The Supreme Court, The Second Circuit, And Other Circuits Require A
Judicial Characterization Of The Challenged Conduct Independent Of The
Facial Allegations ....................................................................................2

    B.    Characterization Goes To The Particulars Of The Alleged Conduct, Not
The Sufficiency Of The Indictment .........................................................5

    C.    Characterization Is Guided By The Presence Or Absence Of Productive
Collaboration ...........................................................................................6

    D.    Mr. Aiyer's Challenged Conduct Was Plausibly Related To, And Part Of,
A Productive Collaboration. .....................................................................7

    E.    The Conduct Alleged Against Mr. Aiyer Cannot Be Characterized As Per
Se Price Fixing And Bid Rigging ............................................................9

II.    No Rational Juror Could Find Beyond A Reasonable Doubt That Mr. Aiyer
Entered Into An Agreement To Fix Prices And Rig Bids And A Judgment Of
Acquittal Should Be Entered Under Rule 29 ..........................................................9

III.    Certain Conduct Should Be Dismissed From The Indictment As A Matter Of Law .......13

    A.    The Indictment Should Be Dismissed As A Matter Of Law To The Extent
It Challenges Conduct In The Interdealer Market Because This Conduct
Does Not Constitute Price Fixing Or Bid Rigging ................................13

    B.    The Indictment Should Be Dismissed As A Matter Of Law To The Extent
It Challenges Conduct Involving Transactions In The Ruble Because This
Conduct Does Not Constitute Price Fixing Or Bid Rigging .................18

    C.    The Indictment Should Be Dismissed As A Matter of Law To The Extent
It Challenges Trading Around the Alleged Coconspirators' January 18,
2012 Stop-Loss Orders ..........................................................................20

    D.    The Indictment Should Be Dismissed As A Matter Of Law To The Extent
It Challenges Trading Around The Fix ...................................................22

IV.     The Extensive Presentation At Trial Of Evidence That Does Not Constitute Price
        Fixing Or Bid Rigging Has Unfairly Prejudiced Mr. Aiyer And Warrants A
        Mistrial.................................................................................................................23

V.      As Applied To Mr. Aiyer And The Conduct At Issue, The Sherman Act Is Void
        For Vagueness.....................................................................................................25

CONCLUSION...............................................................................................................27

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Apex Oil Co. v. DiMauro,*
713 F. Supp. 587 (S.D.N.Y. 1989)..................................................................*passim*

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
441 U.S.  1 (1979)...........................................................................................2, 6

*Cenedella v. Metro. Museum of Art,*
348 F. Supp. 3d 346 (S.D.N.Y. 2018) (Koeltl, J.) ....................................10

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*
No. 10 Civ. 8 (DAB), 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ....................20

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
17 F. Supp. 2d 275 (S.D.N.Y. 1998).........................................................6

*In re Interest Swaps Antitrust Litig.,*
261 F.Supp.3d 430 (S.D.N.Y. 2017).........................................................12

*Kolender v. Lawson,*
461 U.S. 352 (1983).........................................................................26

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
551 U.S. 877 (2007)...................................................................*passim*

*Medical Center at Elizabeth Place, LLC v. Atrium Health Systems,*
922 F.3d 713 (6th Cir.  2019) ...........................................................3, 6, 7

*Monsanto Co. v. Spray-Rite Serv. Corp.,*
465 U.S. 752 (1984).........................................................................12

*Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.,*
270 F. Supp. 2d 1043 (E.D. Wis. 2003).......................................................16

*Polk Bros., Inc. v. Forest City Enters., Inc.,*
776 F.2d 185 (7th Cir.  1985) .............................................................7

*Ratino v. Medical Service of District of Columbia (Blue Shield),*
718 F.2d 1260, 1269-70 (4th Cir.  1983) ...................................................3, 6

*Renico v. Lett,*
559 U.S. 766 (2010).........................................................................24

*Skilling v. United States,*
561 U.S. 358 (2010).........................................................................25, 26

*State of N.Y. v. Hendrickson Bros.,*
   840 F.2d 1065 (2d Cir. 1988) ..................................................................................17

*In re Sulfuric Acid Antitrust Litig.,*
   703 F.3d 1004 (7th Cir. 2012) ................................................................................6, 7

*Texaco Inc. v. Dagher,*
   547 U.S. 1 (2006) .........................................................................................................2

*Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.,*
   875 F.2d 1369 (9th Cir. 1989) ...............................................................................24

*United States v. Bogucki,*
   No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ..............26

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005) ....................................................................................12

*United States v. DiNome,*
   954 F.2d 839 (2d Cir. 1992) ...............................................................................24, 25

*United States v. Heffernan,*
   43 F.3d 1144 (7th Cir. 1994) ...............................................................................16, 17

*United States v. Pauling,*
   924 F.3d 649 (2d Cir. 2019) .....................................................................................9

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978) ......................................................................................2, 12, 25

*Volvo v. North America Corp. v. Men's Int'l Professional Tennis Council,*
   857 F.2d 55 (2d Cir. 1988) .......................................................................................3

*In re Zinc Antitrust Litig.,*
   155 F. Supp. 3d 337 (S.D.N.Y. 2016) ....................................................................19

**Other Authorities**

Fed. R. Crim. P. 29(a) ..................................................................................................9

U.S. DEPARTMENT OF JUSTICE ANTITRUST RESOURCE MANUAL (Nov. 2017) ..............20

Defendant Akshay Aiyer respectfully submits this memorandum of law in support of his
motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  The testimony
and documentary evidence set forth at trial are insufficient to sustain a criminal conviction under
Section 1 of the Sherman Act and a judgement of acquittal should be entered.

## PRELIMINARY STATEMENT

In order for a jury to convict Mr. Aiyer of a per se violation of the Sherman Act, the
Court must first characterize the actual conduct at issue as falling within or outside of an
established per se category.  This analysis does not consist of weighing potential justifications
for otherwise per se conduct, which the Court has recognized is improper, but requires
scrutinizing the alleged conduct in order to determine whether the per se label applies in the first
place.  As the Supreme Court and Second Circuit have made clear, the Court's characterization
requires an inquiry that goes well beyond the charging allegations.  In short, it is insufficient that
the Indictment alleges price fixing and bid rigging, because the Court must examine the actual
conduct underlying the allegations—now detailed through evidence at trial—in order to
determine whether that conduct is so nakedly anticompetitive as to warrant per se treatment.
Here, it is clear that the conduct alleged does not meet this threshold, and the Indictment should
be dismissed.

Even if certain allegations could be characterized as price fixing and bid rigging, the
evidence presented at trial does not support the charge against Mr. Aiyer.  The Indictment
charges a single count of "knowingly enter[ing] into and participat[ing] in a combination and
conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers
for, CEEMEA currencies."  (Indictment ¶ 20.)  This conspiracy is alleged to have lasted from "at
least as early as October 2010 and continuing until at least July 2013."  (*Id.*)  Even when viewed
in the light most favorable to the Government, the trial evidence demonstrates at most a sporadic,

disjointed collection of communications and trading interactions lacking any of the hallmarks of a continuous price fixing and bid rigging conspiracy. Although it sponsored a constant refrain from its cooperating witnesses that various behaviors were "wrong," the Government has failed to meet the precise legal standards for conviction under the Sherman Act, and the Indictment should be dismissed as a matter of law.

## <u>ARGUMENT</u>

I. **The Conduct Evidenced At Trial Cannot Properly Be Characterized As Per Se Price Fixing And Bid Rigging**

    A.    <u>The Supreme Court, The Second Circuit, And Other Circuits Require A Judicial Characterization Of The Challenged Conduct Independent Of The Facial Allegations</u>

The Court may not accept the Government's allegations, even if sufficient to survive a motion to dismiss, as controlling the application of the per se rule. The law imposes on the Court the fact-specific task of closely scrutinizing the particular behavior at issue and characterizing whether the challenged conduct is properly evaluated under the per se rule, or if the presumptive rule of reason applies. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006) ("[T]his Court presumptively applies rule of reason analysis[.]") As the Supreme Court has put it, the Court must "*characterize the challenged conduct* as falling within or without that category of behavior to which we apply the label '*per se* price fixing.'" *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979) ("*BMI*") (emphasis added).[1]

---

[1] As the Court's decisions in this case confirm, civil antitrust case law is applicable in a criminal case. (*See, e.g.,* Transcript of Proceedings on Motions in Limine, ECF No. 119 (citing numerous civil antitrust cases in decision on motions in limine)); *see also United States v. U.S. Gypsum Co.*, 438 U.S. 422, 474 (1978) (Stevens, J. concurring in part and dissenting in part) ("[S]ince 1890 when the Sherman Act was enacted, the statute has had the same substantive reach in criminal and civil cases.").

The Second Circuit has also recognized the importance of the Court's obligation to characterize the alleged behavior independent of the charging allegations:

> The relevant inquiry, however, involves more than "a question simply of determining whether two or more potential competitors have literally 'fixed' a 'price.'" *BMI*, 441 U.S. at 9, 99 S.Ct. at 1557.  Instead, "'price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable." *Id.  See also* Hovenkamp § 4.4, at 128 ("Once a court has properly *characterized* a practice as price fixing, it is *per se* illegal.  However, determining when a practice should be so *characterized* can be very difficult, and may involve a fair amount of sophisticated economic inquiry."). … Thus, on remand, the district court should carefully consider whatever arguments appellees may offer in support of their practices … before deciding whether the *per se* rule or the Rule of Reason should apply.

*Volvo v. North America Corp. v. Men's Int'l Professional Tennis Council*, 857 F.2d 55, 71-72 (2d Cir.  1988) (emphasis added).

Other circuits agree.  In *Ratino v. Medical Service of District of Columbia (Blue Shield)*, the Fourth Circuit, following *BMI,* required the judicial characterization of the alleged restraint before applying the per se rule.  718 F.2d 1260, 1269-70 (4th Cir. 1983).  This year, the Sixth Circuit similarly acknowledged and followed the rule of characterization, following in the footsteps of the First Circuit:  "[T]he propriety of per se treatment 'is normally a question of *legal characterization*.'"  *Medical Center at Elizabeth Place, LLC v. Atrium Health Systems*, 922 F.3d 713, 724 (6th Cir.  2019) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir.  2004)) (emphasis added); *see also id*. at 727 ("Whether challenged conduct belongs in the per se category is question of law.").

*Apex Oil Co. v. DiMauro* demonstrates how the characterization analysis has been applied by a court in this jurisdiction.  713 F.Supp. 587 (S.D.N.Y. 1989).  In *Apex Oil*, the plaintiff—a holder of short positions in heating oil futures—claimed that the defendants— holders of long positions—violated the Sherman Act by, *inter alia*, conspiring to nominate futures contracts for early delivery for the purpose of raising heating oil prices.  The plaintiff

alleged price fixing, and thus claimed that the per se rule applied to the alleged conspiracy. *Id.* at 596.

Judge Walker, then a judge for the Southern District of New York, noted that "[t]he decision whether to apply the Rule of Reason or the *per se* rule is a question of law even though it is predicated on a factual inquiry into the restraint's competitive effect." *Id.* at 595 (internal citations and quotation marks omitted). He then cited *BMI* for the proposition that "it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se*' price fixing" *id.* at 596 (quoting *BMI*, 441 U.S. at 9), and explained that it is typically "necessary to scrutinize a challenged practice and the industry affected before deciding whether the Rule of Reason should be applied or the practice condemned as a *per se* violation." *Id.*

Judge Walker then conducted a close analysis of the alleged wrongful conduct and the market in which it occurred. *Id.* at 592-93. He looked beyond the per se label used by the plaintiff, and concluded that the rule of reason was the appropriate standard to apply. *Id.* at 596. The decision noted that the plaintiff "wrongly concludes that the mere talismanic invocation of the term 'price-fixing'… is sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators," and determined that the conduct at issue looked more like "constructive price fixing" (meaning conduct that is not intended to fix prices but that nevertheless has some impact on price) than the type of price fixing that is per se illegal, and therefore the rule of reason applied. *Id.* at 596.

To properly characterize the conduct in which Mr. Aiyer is alleged to have engaged, a similar inquiry—scrutinizing the "challenged practice and the industry affected—is necessary here. *Id.*

B.    Characterization Goes To The Particulars Of The Alleged Conduct, Not The
      Sufficiency Of The Indictment

In denying Mr. Aiyer's motion to dismiss, the Court found that the Indictment
sufficiently charged a per se price fixing and bid rigging conspiracy:  "The indictment alleges
that the defendant conspired to suppress and eliminate competition by fixing prices of and
rigging bids and offers for CEEMEA currencies.  That is sufficient to state a *per se* violation of
the Sherman Act."  (Transcript of Hearing on Motions to Dismiss, ECF.  No. 76, at 43:10-14.)
As the Court noted then, the motion to dismiss standard confined the Court's inquiry at that stage
to the Indictment itself, and "[additional] evidence is improper at this stage of the case and
cannot be considered."  (*Id.* at 42:2-3 (citing *United States v. Alfonso*, 143 F.3d 772, 776 (2d Cir.
1998).)  The Court relied on this finding in denying Mr. Aiyer's initial Rule 29 motion, made at
the conclusion of the Government's case.  (*See* Tr. at 1597:6-9 ("But the indictment charges that
the defendant entered into a conspiracy with others to fix prices and rig bids.  That is conduct
which, at least up until now, has been defined as *per se* conduct in violation of Section 1 of the
Sherman Act.").)  The Court noted that "I denied prior to trial a motion to dismiss the indictment
as a whole, and the indictment is similar to other indictments that have been sustained."  (Tr. at
1596:19-21.)

But characterizing the actual conduct at issue requires looking beyond the Indictment and
the standards applicable to the motion to dismiss stage, and looking beyond the characterization
given by the Government (and its witnesses).  Whether price fixing and bid rigging are
categorically defined as per se violations of the Sherman Act is irrelevant for the purpose of
determining whether the specific factual allegations against Mr. Aiyer are subject to per se
condemnation.  The Court must characterize this conduct—and not merely the broad allegations
of price fixing and bid rigging—by examining it in detail and in proper context and only then

determining, as a matter of law, whether the per se label applies.  *See, e.g.*, *Granite Partners,*

*L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998) ("Affixing certain labels

to alleged conduct is insufficient to invoke *per se* treatment.").

     C.     <u>Characterization Is Guided By The Presence Or Absence Of Productive
Collaboration</u>

In undertaking a characterization analysis, the context of the alleged restraint must be

examined to assess whether the restraint is nakedly anticompetitive or is part of, or related to, a

collaboration that has some procompetitive potential.  A literal application of the prohibition on

price fixing, for example, does not acquit the Court's obligation to characterize the behavior as

subject (or not) to per se evaluation.  *BMI*, 441 U.S. at 9; *see also Ratino*, 718 F.2d at 1269 ("It is

well settled … that the *per se* characterization is not to be applied as a talisman to every

arrangement that involves a 'literal' fixing of prices.").

Nor do labels or charging allegations control.  Rather, per se conduct, in substance and

context, must be a "naked restraint of trade with no purpose except stifling of competition."  *See,*

*e.g., BMI*, 441 U.S. at 20 (quoting *White Motor Co. v. United States*, 372 U.S.  253, 263 (1963));

*Apex Oil*, 713 F. Supp. at 595-96 (holding that an allegation of price fixing does not foreclose

consideration of the procompetitive aspects in order to properly characterize the challenged

conduct).

Numerous examples demonstrate that allegedly per se conduct that involves productive

collaboration is not properly characterized as subject to the per se rule.  *See, e.g.*,  *Medical*

*Center at Elizabeth Place*, 922 F.3d at 726 (a defendant need show only a "plausible

procompetitive rationale for the restraint" to avoid evaluation under the per se rule); *In re*

*Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010-11 (7th Cir.  2012) ("we know … that even

price fixing by agreement between competitors … [is] governed by the rule of reason, rather than

being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity'"); *Polk Bros., Inc. v. Forest City Enters., Inc.*, 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.  If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment.").

In characterizing the allegations against Mr. Aiyer, the Court must assess whether the conduct, in substance and context, had some redeeming, legitimate, or productive (and therefore procompetitive) aspect or explanation that would take the conduct outside of the per se category. Further, where the evidence reflects a plausible relationship between the challenged conduct and a procompetitive rationale, the Court must characterize the conduct as outside the per se rule. *See Medical Center at Elizabeth Place*, 922 F.3d at 724; *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d at 1010-11.

D.    Mr. Aiyer's Challenged Conduct Was Plausibly Related To, And Part Of, A Productive Collaboration

Significant evidence was admitted at trial regarding the clear benefits of collaboration among Mr. Aiyer and his alleged coconspirators.  Perhaps most prominently, direct dealing among these traders was described by cooperating witnesses Christopher Cummins and Jason Katz as an important benefit of their chat room communications.  (*See, e.g.*, Tr. at 692:20-693:2 (Mr. Cummins agreed that "one of the benefits of the chatroom" was finding a "match-off").) Importantly, matching off would not have been possible without traders disclosing their positions, and this disclosure would not have been possible absent an understanding that the disclosed information would not be used against the disclosing trader.  Mr. Cummins agreed that "your expectation would be:  If you want to trade with me, other side, you're not going to go against me because then I'll stop reaching out to you."  (Tr. at 693:9-13.)  Mr. Katz similarly

agreed that "your expectation was that if you told somebody what your position was because you wanted to match, your expectation was they wouldn't use that and try and run in front of you to make a little bit of money." (Tr. at 1205:14-17.)

Professor Lyons also testified about the significant benefits that direct dealing provides traders, including the ability to trade larger amounts and at better prices than would be possible on the Reuters interdealer platform. (Tr. at 1651:23-1652:7, 1653:7-14, 1657:15-19, 1671:15-1672:6.) This testimony went unrebutted. Professor Lyons testified that it is "extremely valuable" for traders to maintain ongoing relationships with other traders who can serve as sources of liquidity in direct dealing. (Tr. at 1657:1-14 ("[I]f you are a market maker, part of your value is being able to find liquidity. And if you have lots of other counterparties among other dealers that are willing to give you liquidity bilaterally, in a direct trade or otherwise, that's an extremely valuable thing.").) Professor Lyons further testified that chat rooms in particular are valuable to traders as a venue for exchanging information, which generally helps traders "manage risk more effectively" and "price more accurately." (Tr. at 1675:19-21). Using chat rooms to share position information, for example, enables traders with opposite positions to match off at mutually favorable prices. (See Tr. at 1671:20-1672:6 ("[I]f I am longer than I want to be and you are shorter than you want to be and we communicate with one another, that often is an opportunity for us to trade with one another, and we might even agree to trade at a mid point … so at a very attractive price for both of us.").)

With respect to direct trading among Mr. Aiyer and his alleged coconspirators, Professor Lyons performed an economic analysis that quantified the financial benefits of this direct trading. This analysis, which compared the prices at which the Rand Chat Room members matched off in 73 direct trades to the prices they would have received on Reuters, found that the

average per-trade savings was $7,524 for the buyer and $6,184 for the seller—a total average

benefit of $13,708 per trade.  (*See* DX-153; Tr. at 1661:15-1662:5.)  Furthermore, Professor

Lyons explained that a trader's knowledge that he can get out of a position by trading directly in

the interdealer market, and at lower prices, means that he can offer tighter spreads to his

customers.  (Tr. at 1667:9-15 ("Well, if there is lower cost of goods sold on the right-hand side,

if it's easier for me to get rid of positions, I'm willing to price more competitively on the left-

hand side.  I can narrow my spreads to customers.").)

     E.    <u>The Conduct Alleged Against Mr. Aiyer Cannot Be Characterized As Per Se<br>Price Fixing And Bid Rigging</u>

Given the productive nature of the collaboration among Mr. Aiyer and his alleged

coconspirators, and the ambiguity as to the anticompetitive nature of the charged conduct (*see*

*infra* Section III), as a matter of law the Government has not demonstrated that Mr. Aiyer

engaged in or agreed to engage in "manifestly anticompetitive" conduct of the type that is

condemned under the Sherman Act under the per se rule.  *Leegin Creative Leather Prods., Inc. v.*

*PSKS, Inc.*, 551 U.S. 877, 886 (2007).  As a result, the Indictment must be dismissed.

*     *     *

In the alternative, the Indictment should be dismissed in its entirety under Rule 29

because the trial evidence is insufficient to sustain a conviction for the charged conspiracy.

**II.**    **No Rational Juror Could Find Beyond A Reasonable Doubt That Mr. Aiyer Entered<br>Into An Agreement To Fix Prices And Rig Bids And A Judgment Of Acquittal<br>Should Be Entered Under Rule 29**

Under Rule 29(a), "after the close of all the evidence the court on the defendant's motion

must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain

a conviction."  Fed.  R. Crim. P. 29(a).  A judgment of acquittal is warranted when "no rational

trier of fact could find guilt beyond a reasonable doubt." *United States v. Pauling*, 924 F.3d 649, 655 (2d Cir. 2019) (citing *Jackson v. Virginia*, 443 U.S. 307, 317 (1979)).

Under the Sherman Act, the Government must prove that Mr. Aiyer engaged in the charged conspiracy "through 'direct or circumstantial evidence that reasonably tends to prove that [Mr. Aiyer] had a conscious commitment to a common scheme designed to achieve an unlawful objective'"—here, price fixing and bid rigging. *Cenedella v. Metro. Museum of Art*, 348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (Koeltl, J.) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)). The Government's cooperating witnesses Mr. Cummins and Mr. Katz described a conspiracy among themselves, Mr. Aiyer, and Nicholas Williams. (*See. e.g.*, Tr. at 175:5-12, 860:3-5). Based on the evidence presented at trial, no rational juror could find that, by way of this alleged conspiracy, Mr. Aiyer entered into any agreement consisting of a conscious commitment to a common scheme to fix prices and rig bids.

Mr. Cummins testified that the alleged conspiracy did not consist of any "formal or informal" agreements as to anything, but rather centered on a general "understanding" among Mr. Aiyer and his alleged coconspirators. (Tr. at 633:24-634:4.) Mr. Cummins described the "understanding" as "work[ing] together to help each other out in trading in the markets." (Tr. at 194:25-195:1.) Asked to detail the specifics of this arrangement, Mr. Cummins testified as follows:

> Sometimes, for example, if a client would call in, you know, I would relay it pretty quickly over to Jason [Katz] and tell him, I'm being asked for this. And he might say, Well, I'm being asked the same thing. So I would tell him the price that I would show. He would—he could change his price accordingly if he wanted to. I would tell him what I thought the client wanted to do so he could maybe avoid the trade or vice versa.
>
> At different times—again, if we had the same interest in the market, I would say, Rather than push this thing away from us—rather than push the price against us, why don't I just bid for us, and that way the market won't see that there's so much demand in the market.

> Additionally, there were times, for example, if he needed to buy dollars, I might put offers to sell dollars in the market as an attempt to try to push the market lower towards his interest to buy [i.e., "spoofing"].

(Tr. at 195:4-20.)

Mr. Katz, on the other hand, testified at times that the agreement he entered into with Mr. Aiyer and the other alleged coconspirators consisted of "creating those Ps and those Gs, you know, those fake trades to move a market," "talking amongst ourselves about customer deals," "agreeing not to get in the way of each other," and "putting joint bids in the system." (Tr. at 872:20-873:3). Mr. Katz emphasized that, generally, this agreement consisted of "trying to help each other make more money." (Tr. at 920:18-21). However, at other times, Mr. Katz gave convoluted explanations that some of his improper conduct with various individuals was done pursuant to an agreement, some identical conduct was merely "one or two off" and did not require an agreement, and other identical conduct was done pursuant to an agreement that supposedly terminated in Mr. Katz's mind, although Mr. Katz and the traders in question continued to engage in wrongful conduct. (*See* Tr. at 927:2-928:3, 1083:14-1088:13, 1090:5-10, 1092:15-1093:17, 1094:15-1095:7, 1115:12-1116:10, 1222:19-1223:20.)

Mr. Cummins also testified time and again that he acted independently of Mr. Aiyer during trading episodes framed by the Government as coordinated. For instance, Mr. Cummins testified that he did not coordinate with Mr. Aiyer during the January 18, 2012 stop-loss trading episode (Tr. at 558:1-25, 559:4-13), nor did he coordinate with Mr. Aiyer at key points during the November 30, 2012 trading episode (Tr. at 595:13-20, 596:4, 11-24), the January 15, 2013 trading episode (Tr. at 601:5-21, 602:6-9), the April 2, 2012 trading episode (Tr. at 671:15-17, 674:12-18, 675:15-20), or during the trading episode on the afternoon of May 20, 2013 (Tr. at 1355:10-15).

Not only is there no basis for a rational juror to find a "common scheme" among this behavior, but an agreement consisting of conduct as ambiguous as the conduct described at trial—sharing information so a competitor could change his price if he wanted, trading on behalf of another trader in the interdealer market, spoofing on behalf of another trader, and generally working together to make more money—does not constitute an agreement to engage in "manifestly anticompetitive" conduct of the type that is condemned under the per se doctrine. *Leegin*, 551 U.S. at 886. And mere parallel conduct cannot suffice under the law, as "[a]n inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy." *In re Interest Swaps Antitrust Litig.*, 261 F.Supp.3d 430, 462 (S.D.N.Y. 2017) (internal citations and quotation marks omitted).

Additionally, there is also no way for a reasonable juror to infer that Mr. Aiyer—even if he agreed to engage in the conduct detailed at trial—acted with the requisite criminal intent to fix prices and rig bids. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 446 (1978) (defining intent in a criminal antitrust case as "knowledge of likely [anticompetitive] effects"). Even if prices were affected by the alleged conduct, this would still not suffice in making out a per se price fixing and bid rigging case. *Apex Oil*, 713 F. Supp. at 596 ("[I]f the purpose of the alleged conspiracy is not price-fixing, but prices are nevertheless affected by the challenged behavior, that behavior must be judged under the Rule of Reason.").

The trial record cannot support a rational juror finding beyond a reasonable doubt that Mr. Aiyer engaged in a "conscious commitment to a common scheme" designed to fix prices and rig bids in the foreign exchange market. *Monsanto Co.*, 465 U.S. at 764. Viewed in the light

most favorable to the Government, "the evidence, at best, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, and thus a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) (internal citation and quotation marks omitted).

*     *     *

In the alternative, Mr. Aiyer respectfully requests that any charged conduct in the interdealer market or that relates to trading the Russian ruble be excised from the case for the reasons set out below.

### III.   Certain Conduct Should Be Dismissed From The Indictment As A Matter Of Law

A.   The Indictment Should Be Dismissed As A Matter Of Law To The Extent It Challenges Conduct In The Interdealer Market Because This Conduct Does Not Constitute Price Fixing Or Bid Rigging

No reasonable juror could find that the evidence supports a conviction for price fixing or bid rigging based on conduct in the interdealer market.[2]  As applied to the interdealer trading behavior described at trial, and in particular the challenged Reuters trading activity, "price fixing" and "bid rigging," terms of art under the antitrust laws, are inapplicable.

As the Government states in its Proposed Jury Instructions ("Government Proposed Jury Instructions"), price fixing has a particular meaning under the law:  "A price-fixing conspiracy is an agreement or mutual understanding among competitors about the prices for which they will buy or sell products or services.  … [Prices] are fixed because they are agreed upon."  (ECF No. 122 at 6.)  Mr. Aiyer's Proposed Jury Instructions include nearly identical language:  "Put simply, prices are 'fixed' when they are agreed upon.  Thus any agreement to fix prices is a price

---

[2] Dr. David DeRosa, the Government's expert witness, described the interdealer market as the "part of the foreign exchange market … [where] the major dealers trade with each other."  (Tr. at 101:11-17.)  The aspect of the interdealer market the Government focused on at trial is the Reuters matching system, an electronic trading platform used by dealers.  (Tr. at 55:18-20.)

fixing conspiracy." (ECF No. 123 at 30.) With respect to the interdealer conduct described at trial, the Government has provided no evidence that any "price" was ever "fixed" or that any understanding among Mr. Aiyer and his alleged coconspirators included an agreement to engage in conduct that constitutes price fixing.

Mr. Katz's testimony underscores this point. Mr. Katz clarified that a "price" means a "bid-offer spread," and he distinguished a "price" from a bid or offer that a market maker shows to a customer. (Tr. at 1314:5-13.) No evidence of fixing spreads—which, according to Mr. Katz's testimony, may be understood as "prices"—has been presented in this case. Furthermore, the Government does not contend that Mr. Aiyer and his alleged coconspirators had the ability to fix the price of the currency itself.

The Government alleges that the conspiracy with which Mr. Aiyer has been charged included an understanding or agreement that he and his alleged coconspirators would at times trade on each other's behalf on the Reuters interdealer platform, engage in spoofing on each other's behalf, or otherwise coordinate trading in the interdealer market, and there was lengthy trial testimony to this effect. (See, e.g., Tr. at 195:4-20, 821:23-822:8.) Mr. Cummins and Mr. Katz repeatedly testified that the purpose of this interdealer activity was "[removing or] hiding supply and demand for each other." (Tr. at 294:5-6; see also, e.g., Tr. at 303:16-17, 315:25-316:1, 980:22-981:1.) In general, Mr. Cummins, and Mr. Katz in particular, agreed with the Government's characterization that their "agreement could affect or intend to affect supply and demand" on the Reuters interdealer platform. (Tr. at 1012:2-4.)

Two features of the Reuters interdealer trading platform, however, make the concepts of price fixing and bid rigging inapplicable, at least on the facts of this case. First, unlike a classic cartel, in which parties on one side of the market (producers) collude to raise prices to parties on

the other side of the market (consumers), any dealer who interacts on Reuters "is always a buyer and a seller at all times."  (Tr. at 107:24 (testimony of Dr. DeRosa).)  As a result, any price movements that disadvantage a dealer in one capacity advantage him in an equal amount in the other capacity.  Second, because Reuters is a continuous auction, and because, according to the testimony, supply and demand are not withheld from the market by the practices at issue, but simply deferred, changes in supply or demand in one period of time are offset by changes in supply or demand in the opposite direction at a subsequent point in time.

Taking the Government's evidence at face value, a conspiracy to "affect or intend to affect supply and demand" on Reuters is not price fixing.  Adopting the Government's own definition, price fixing requires "an agreement or mutual understanding among competitors about the prices for which they will buy or sell products or services."  (Government Proposed Jury Instructions at 6.)  The Government has not alleged, and its witnesses have not testified to, any "agreed upon" price, or any intent or even attempt to agree upon a price, in the interdealer market.  (*Id.*)

At most, an agreement to alter supply and demand in the interdealer market may constitute some other type of wrongdoing—legal, moral, or otherwise—and may be to another dealer's detriment.  It still does not constitute price fixing.  *See Apex Oil*, 713 F. Supp. at 595 ("[A]cts that may be tortious, fraudulent, or violative of contracts between the parties do not, without more, fall within the ken of the antitrust laws.").  *Apex Oil* is not materially distinguishable from this case.  As previously discussed, in *Apex Oil* two participants in the home heating oil futures market took coordinated action to "squeeze" another participant who held a short position.  *Id.* at 597.  The coordinated activity was 1) between "competitors," at least to the same extent that participants on Reuters are competitors; 2) intended to reduce supply and

raise prices; and 3) intended to benefit the parties who coordinated their activities, at the expense of the counterparty. *See id.* at 593. In short, the conduct was intended to increase price to the counterparty to the benefit of the collaborators. Nonetheless, the court held this was not a per se antitrust violation, because the conduct was not intended to "fix prices," but only to disadvantage a counterparty. *Id.* at 597.

None of the interdealer conduct evidenced at trial involved an agreement on price. Even if an agreement existed to coordinate trading on the Reuters platform, and this coordination ultimately influenced a price, this would still not suffice, as interference with the mechanisms through which price may be determined does not constitute price fixing. *See Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1051 (E.D. Wis. 2003) ("[While plaintiff] has characterized the defendants' alleged conduct as 'price fixing,' it has actually alleged only that the defendants improperly disclosed what should have been a sealed bid. Although [plaintiff] alleges that this allowed its competitor to submit a reduced bid, there is no allegation that the price was 'fixed,' except in the sense that prices are normally fixed, i.e., by voluntary agreement of the buyer and seller."). On the record presented, as a matter of law, Mr. Aiyer is not guilty of price fixing for conduct that occurred in the interdealer market.

The same is true for the Government's charge of bid rigging. As an initial matter, bid rigging is a subset of price fixing, and conduct that does not constitute price fixing cannot, by definition, constitute bid rigging. (*See, e.g.*, Government Proposed Jury Instructions at 6 ("One type of price fixing is bid rigging.").) Beyond this, the interdealer conduct described during trial fails to meet the criteria for big rigging, a distinct antitrust offense that can only exist within a distinct type of marketplace—namely, a procurement auction.

As Judge Posner has concluded, "the vast majority of cases in which the term [bid rigging] has appeared have treated it as a synonym for bid rotation." *United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994) (collecting cases). In a bid rotation conspiracy, "for each job the competitors agree which of them shall be the low bidder, and the others submit higher bids to make sure the designated bidder wins." *Id.* There has been no evidence submitted at trial that an agreement of this nature existed among Mr. Aiyer and his alleged coconspirators, and neither the Reuters interdealer platform nor the interdealer market in general even approximate the type of auction in which bid rotation would be possible. Such a scheme assumes an auction setting in which unspecified bids are solicited to determine the winner and price of the proposed transaction. As Dr. DeRosa testified, Reuters is merely "a platform that allows traders to express their buying and selling interests to other traders in the market," and "[t]he buying and selling interests and the prices on Reuters can change constantly for all of the currencies that the trader is watching." (Tr. at 55:18-20; Tr. at 57:18-21.)

As the Second Circuit has observed, bid rigging occurs in an auction setting in which a purchaser solicits pricing bids from numerous bidders, with the bid riggers controlling the winner. *State of N.Y. v. Hendrickson Bros.*, 840 F.2d 1065 (2d Cir. 1988). Reuters is simply a marketplace. (*See* Tr. at 112:11-13 (testimony from Dr. DeRosa contrasting Reuters with "an auction market" such as "the stock market").) The Government has presented no evidence that Mr. Aiyer and his alleged coconspirators had any intent, or even any ability, to control the "winner" of any posted bid or offer on Reuters. Given the complete lack of such evidence, and the attributes of the market itself, as a matter of law Mr. Aiyer did not engage in a bid rigging conspiracy based on conduct in the interdealer market.

B.    The Indictment Should Be Dismissed As A Matter Of Law To The Extent It
      Challenges Conduct Involving Transactions In The Ruble Because This Conduct
      Does Not Constitute Price Fixing Or Bid Rigging

As Mr. Katz explicitly testified, he "could not compete with" Mr. Aiyer in the market for

the Russian ruble.  (Tr. at 1128:8.)  Mr. Katz also agreed that "it would be appropriate to leave

the entire [ruble] business" to Mr. Aiyer and another competitor, as Mr. Katz "had no interest in

that currency at all."  (Tr. at 1076:7-10, 1078:25-1079:1.)  Similarly, Mr. Cummins testified that

he was not the ruble trader at Citi.  (Tr. at 248:8-9.)  He also testified that, because the ruble was

not a primary currency of his, he wouldn't seriously compete for ruble business but would

instead "just want to show the price that doesn't win the deal."  (Tr. at 527:12-13.)  In contrast to

Mr. Katz and himself, Mr. Cummins testified that Mr. Aiyer was "very skilled" in pricing and

trading the ruble, and he had a "very strong command of the market."  (Tr. at 490:23-15.)  Mr.

Katz agreed, testifying that Mr. Aiyer "was very big in Russian ruble."  (Tr. at 934:16-17.)

Evidence introduced at trial further demonstrated that Mr. Aiyer's ruble business was

significantly greater than that of Mr. Katz or Mr. Cummins.  (*See* DX-152 (demonstrating that

Mr. Aiyer's average daily trading volume in the ruble was 31 times greater than that of Mr. Katz

and 1,891 times greater than that of Mr. Cummins during the period of the charged conspiracy).)

At its foundation, and as the Government recognizes, a price fixing or bid rigging

conspiracy requires "an agreement among *competitors*."  (Government Proposed Jury

Instructions at 6 (emphasis added); *see also id.* at 2 ("The purpose of the Sherman Act is to

preserve free and unfettered competition in the marketplace by prohibiting certain types of

agreements between *competitors*, so that the marketplace may receive better products and

services at lower cost.") (emphasis added).)  With respect to the ruble, based on the facts

adduced at trial, it is undisputed that Mr. Aiyer was not a competitor of Mr. Katz and Mr.

Cummins in trading the ruble, and the challenged conduct and any purported agreement that pertains to ruble trading cannot constitute a price fixing or bid rigging conspiracy.

Even if Mr. Aiyer is, in some generic sense, considered a competitor of Mr. Katz and Mr. Cummins in trading the ruble, their relationship had clear vertical components. Mr. Cummins agreed that it was both common and perfectly permissible for a trader who was inexperienced or uncomfortable with a particular currency—such as Mr. Cummins and Mr. Katz in the ruble—to contact "Mr. Aiyer, [a] very experienced and talented person in the ruble pricing, to occasionally get information as to what an appropriate price would be." (Tr. at 492:9-17.) Mr. Cummins also agreed that Mr. Katz "would seek advice [from Mr. Aiyer] and he would either take it or not," and there was similarly nothing wrong with Mr. Cummins "go[ing] to Mr. Aiyer to ask about ruble pricing" and Mr. Aiyer responding with his price. (Tr. at 487:14-23.)

When Mr. Aiyer communicated ruble prices to his alleged coconspirators, he "would stand behind his pricing," as Mr. Katz testified. (Tr. at 1126:5.) "He would quote a price that he wanted to show, it would get passed on, and if the customer dealt, yes, he would take it in." (Tr. at 1126:10-12.) In other words, Mr. Aiyer would, "on a fairly consistent basis," serve as the supplier for other traders' ruble needs. (Tr. at 1126:19-21.) Evidence admitted at trial confirmed that Mr. Aiyer often functioned as a ruble supplier for Mr. Katz. (*See* DX-187 (demonstrating that, on thirteen of fourteen selected occasions when Mr. Katz completed a ruble transaction with a customer, Mr. Katz immediately passed his ruble position on to Mr. Aiyer).) There was no evidence introduced at trial that this relationship was reciprocal, or that Mr. Katz, Mr. Cummins, or any other trader would serve as a ruble supplier for Mr. Aiyer.

This is clearly a vertical relationship: "a 'combination[] of persons at different levels of the market structure.'" *In re Zinc Antitrust Litig.*, 155 F. Supp. 3d 337, 376 (S.D.N.Y. 2016)

(quoting *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972)). Professor Lyons

testified to this directly from an economics standpoint: "In the ruble, Aiyer was serving as a

market maker to Katz. It was effectively a vertical relationship." (Tr. at 1732:22-23; *see also*

Tr. at 1816:6 (Mr. Aiyer was a "market maker to market makers" in the ruble).) Agreements

among market participants situated vertically are not the proper subject of criminal prosecution.

*See Leegin*, 551 U.S. 882 (("[V]ertical price restraints are to be judged by the rule of reason.");

*see also* U.S. DEPARTMENT OF JUSTICE ANTITRUST RESOURCE MANUAL (Nov. 2017) ("Vertical

resale price maintenance, which is an agreement on price between a manufacturer and its

distributors (or a distributor and its retailers), may not be prosecuted criminally."). The same is

true of mixed vertical and horizontal relationships. *Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*

No. 10 Civ 8 (DAB), 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) (citing *Beyer Farms,*

*Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002)). Under the law, the vertical

nature of the relationship among Mr. Aiyer and his alleged coconspirators in the ruble requires

that this aspect of the case be dismissed.

       C.     <u>The Indictment Should Be Dismissed As A Matter of Law To The Extent It</u>
<u>Challenges Trading Around the Alleged Coconspirators' January 18, 2012 Stop-</u>
<u>Loss Orders</u>

Mr. Cummins testified about a trading episode on January 18, 2012 during which a stop-

loss level was hit: "[Mr. Aiyer] has an order to sell $25 million against South Africa as a stop-

loss at a price of 7.95, and I mention that I have exactly the identical order that I am watching,

and then we go back and forth discussing whether or not this order will be executed, whether or

not it is going to happen, and then later in the chat, we agreed that it is going to happen and then

we execute the orders." (Tr. at 226:18-227:5.) While Mr. Cummins agreed with the

Government's characterization that "this conduct [was] part of [his] understanding with Mr.

Aiyer" (Tr. at 227:6-8), the evidence at trial cannot support the inclusion of this episode as part of a price fixing or bid rigging conspiracy.

There was no evidence introduced at trial indicating that Mr. Aiyer and Mr. Cummins coordinated their trading on January 18, 2012, let alone to the detriment or intended determinant of the customer who had placed their stop-loss orders. To the contrary, the evidence indicates that Mr. Aiyer and Mr. Cummins did *not* coordinate their trading on this date. During Mr. Cummins' direct examination, the Government focused on a comment that he made in the Rand Chat Room shortly before the market went through the stop-loss level: "better get to work." (Tr. at 245:5-6.) Mr. Cummins testified that, by this comment, he meant to tell Mr. Aiyer "[l]et's go. Let's sell" dollar/rand to push the market through the stop-loss level. (Tr. at 245:7.) However, evidence introduced at trial definitively showed that, while Mr. Cummins sold dollar/rand immediately after his "better get to work" comment, Mr. Aiyer did not. Mr. Aiyer only began selling dollar/rand again once the market had already gone through the stop-loss level. (*See* DX-168-11.)

Mr. Cummins' testimony on cross-examination confirms that he and Mr. Aiyer did not coordinate their trading on January 18, 2012. Mr. Cummins testified not only that he made his own independent decisions as to when and how to trade on this day, but also that he had no idea what trading Mr. Aiyer was engaged in and was not coordinating trading with him. (Tr. at 558:15-20, 559:4-9, 562:18-21, 571:14-16.) Moreover, Mr. Cummins testified that his trading allowed him to provide his customer with a better price than he would have received had he refrained from the challenged trading activity. (Tr. at 570:9-571:3, 571:14-16.)

Based on the trial record, the communication between Mr. Aiyer and Mr. Cummins surrounding Mr. Cummins' trading activity cannot plausibly be considered part of a price fixing

or bid rigging conspiracy, and the Indictment should be dismissed to the extent it encompasses trading behavior during this January 18, 2012 stop-loss episode.

D.     The Indictment Should Be Dismissed As A Matter Of Law To The Extent It Challenges Trading Around The Fix

The Government challenges two trading episodes—on January 27, 2012 and May 8, 2012—involving trading around the fix.  (*See* Tr. at 315:2-13, 991:2-9.)  Mr. Katz testified that, on January 27, 2012, he removed a bid from Reuters in order to "affect supply and demand" to the benefit of Mr. Aiyer, who wanted a low fix price.  (Tr. at 991:10-992:11.)  He stated that, although it is permissible for traders to "jam" the fix and trade aggressively in order to influence the fix price (Tr. at 989:5-7, 995:13-14), his pulling a bid to assist Mr. Aiyer was improper because it removed his "natural interest" from the market.  (Tr. at 992:16-17.)

As an initial matter, Mr. Katz later acknowledged that he had no actual interest to trade at this time, as he had agreed to match off his interest with Mr. Aiyer.  (Tr. at 1163:7-9 (agreeing that "[b]ecause you were going to buy from Mr. Aiyer, you didn't need to buy in the market").)  He also acknowledged that, when he pulled his bid, he was not yet aware that Mr. Aiyer had any interest in the fix (Tr. at 1451:6-9), and that the only trading he did around the fixing time was an aggressive buy that was adverse to Mr. Aiyer's interests.  (Tr. at 1451:21-1452:6.)

There is no evidence in the record that would support the conclusion that this conduct meets the legal definitions of price fixing and bid rigging, and there is no evidence that this behavior was intended to do anything improper.  Mr. Katz's actions—pulling a bid so he could match off with Mr. Aiyer, but then aggressively trading against Mr. Aiyer's interests—are, at most, completely ambiguous from a competition standpoint, and there is no evidence that would support the inclusion of this episode as part of a price fixing or bid rigging conspiracy.

With respect to May 8, 2012, Mr. Cummins testified that he "volunteer[ed] to put some offers into the [Reuters] market to help keep the market lower" to assist Mr. Aiyer with a fix order.  (Tr. at 315:11-12.)  However, he later reiterated that this was something he simply volunteered to do, agreeing that he "had no agreement that [he] would do that or not do that" and just "offered to do that here."  (Tr. 585:4-9.)  Moreover, Mr. Cummins also agreed that "nobody in the market saw the offers that [he] put in as a volunteer," and stated that his actions "did not affect the calculated [fix] rate."  (Tr. at 586:21-587:4.)

Mr. Cummins' unilateral decision to place out-of-market offers on Reuters at rates that could not have been traded upon and did not affect the fix rate cannot properly meet the legal standards required of a price fixing and bid rigging conspiracy.  Given that this and the January 27, 2012 episode were the only instances of fix-related conduct evidenced at trial, the Indictment should be dismissed to the extent it alleges improper trading around fixes as part of the charged Sherman Act conspiracy.

*       *       *

In the alternative, Mr. Aiyer respectfully requests a mistrial on the basis of the prejudicial evidence presented at trial.

## IV. The Extensive Presentation At Trial Of Evidence That Does Not Constitute Price Fixing Or Bid Rigging Has Unfairly Prejudiced Mr. Aiyer And Warrants A Mistrial

A significant portion of the Government's trial evidence consisted of detailed presentations of trading episodes its witnesses repeatedly described as "wrong," but which do not constitute price fixing or bid rigging.  (*See supra* Section III.)  The Government acknowledges that much of this conduct—certain conduct in the interdealer market, in particular—does not itself constitute price fixing or bid rigging; for example: "Spoofing conduct or cancelled trades do not, by themselves, constitute the charged criminal conspiracy." (Government Proposed Jury

Instructions at 20).  Additional interdealer trading episodes, ruble transactions, and the January 18, 2012 stop-loss episode also do not constitute price fixing or bid rigging, for the reasons detailed above.

The Government must prove beyond a reasonable doubt that Mr. Aiyer entered into a conspiracy to fix prices and rig bids.  Given the extensive testimony by the Government's cooperating witnesses about trading activity that is not price fixing or bid rigging but was generally characterized as "wrong" or otherwise improper, it is unavoidable that the jurors may mistakenly consider these "wrongs" as constituting the charged crime.  *See, e.g.*, *Thurman Indus., Inc. v. Pay 'N Pak Stores, Inc.*, 875 F.2d 1369, 1380 (9th Cir. 1989) (excluding from trial evidence of conduct that was "ambiguously anticompetitive" because the jury may have been "strongly influenced" by that evidence when forming its conclusion on another element of an antitrust claim).  A mistrial is the only remedy that would properly address this prejudice.

"[T]rial judges may declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity' for doing so."  *Renico v. Lett*, 559 U.S. 766, 773-74 (2010) (quoting *United States v. Perez*, 22 U.S. 579, 580 (1824)).  The Supreme Court has clarified that, in this context, "the 'manifest necessity' standard 'cannot be interpreted literally,' and that a mistrial is appropriate when there is a 'high degree' of necessity."  *Id.* at 774 (quoting *Arizona v. Washington*, 434 U.S. 497, 506 (1978)).  "The decision [as] to whether to grant a mistrial is reserved to the 'broad discretion' of the trial judge."  *Id.*  (quoting *Illinois v. Somerville*, 410 U.S. 458, 462 (1973)).

A mistrial may be granted where, as here, evidence that is irrelevant and prejudicial to the defendant has been introduced over the course of trial.  *See, e.g., United States v. DiNome*, 954 F.2d 839, 844-45 (2d Cir. 1992) (finding that a mistrial should have been granted as to two

defendants who were convicted of mail and wire fraud but acquitted of RICO charges pursuant to a Rule 29 motion where much of the evidence at trial was relevant only to the RICO charges and was "irrelevant yet highly prejudicial in the context of the remaining mail and wire fraud charges").  Testimony from the Government's witnesses about conduct that does not constitute price fixing or bid rigging but that has been characterized repeatedly as "wrong" is both irrelevant to the crime charged and prejudicial to Mr. Aiyer.  The prejudicial impact of this testimony is amplified by the amount of time dedicated by the Government to exploring issues such as conduct in the interdealer market during its direct examination of its cooperating witnesses.  As a result, evidence that is relevant to the conduct that is actually at issue in this case—alleged price fixing and bid rigging—has been "swamped by [a] mass of irrelevant evidence" regarding other trading behaviors that cannot constitute an antitrust violation.  *Id.* Accordingly, a mistrial is warranted.

*      *      *

Finally, in the alternative, Mr. Aiyer respectfully requests that the Indictment be dismissed on due process grounds.

## V.    As Applied To Mr. Aiyer And The Conduct At Issue, The Sherman Act Is Void For Vagueness

As the Supreme Court has recognized, "[t]he Sherman Act, unlike most traditional criminal statutes, does not, in clear and categorical terms, precisely identify the conduct which it proscribes."  *U.S.  Gypsum Co.*, 438 U.S. at 438.  Because of the statute's facial lack of clarity, criminal liability is confined only to per se anticompetitive conduct "that would always or almost always tend to restrict competition and decrease output," i.e., conduct that is "manifestly anticompetitive" and lacks "any redeeming virtue."  *Leegin*, 551 U.S. at 886 (internal citations and quotation marks omitted).  If criminal Sherman Act liability were extended beyond such

naked conduct, the vagueness of the statute would implicate clear due process concerns. *See, e.g.*, *Skilling v. United States*, 561 U.S. 358, 408 (2010).

Under the void-for-vagueness doctrine, a criminal statue must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). In other words, if a "person of ordinary intelligence" cannot understand the conduct proscribed by a statute, he is not on "fair notice" and due process prohibits its application. *Skilling*, 561 U.S. at 416 ("Our cases have described vague statutes as failing to provide a person of ordinary intelligence fair notice of what is prohibited, or as being so standardless that they authorize or encourage seriously discriminatory enforcement.") (internal citation and alterations omitted); *see also United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at *7 (N.D. Cal. Mar. 4, 2019) ("A touchstone of our criminal law is that no person 'shall be held criminally responsible for conduct which he could not reasonably [have] understand to be proscribed.'") (citing *United States v. Lanier*, 520 U.S. 259, 265 (1997)).

The conduct detailed by the Government's trial evidence does not demonstrate that Mr. Aiyer engaged in or agreed to engage in "manifestly anticompetitive" conduct of the type that is condemned under the Sherman Act. *Leegin*, 551 U.S. at 886. Simply stated, a person of normal capacity could not be expected to understand that the conduct at issue here was prohibited by law. As a result, the Indictment must be dismissed.

## **CONCLUSION**

For the foregoing reasons, the Court should grant Mr. Aiyer's Rule 29 motion and enter a

judgment of acquittal.


Dated:  November 18, 2019
        New York, New York


By:     /s/ Martin Klotz
        WILLKIE FARR & GALLAGHER LLP
        Martin Klotz
        Joseph T. Baio
        Jocelyn M. Sher
        Samuel M. Kalar
        787 Seventh Avenue
        New York, New York 10019
        T: (212) 728-8000

        *Attorneys for Defendant Akshay Aiyer*