UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------x

UNITED STATES OF AMERICA          :          18 Cr. 333 (JGK)
                         v.          :

AKSHAY AIYER,                          :
                    Defendant.          :

------------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S
## MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE ALTERNATIVE, FOR
## THE DECLARATION OF A MISTRIAL OR A NEW TRIAL

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
Samuel M. Kalar
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ....................................................................................1

ARGUMENT ..............................................................................................................5

I.    The Court Should Have Evaluated And Characterized The Conduct Challenged By The Indictment And Determined That It Was Not Per Se Price Fixing Or Bid Rigging.................................................................................................................5

    A.    The Court, And Not The Jury, Must Evaluate And Resolve Whether The Challenged Conduct Constitutes A Per Se Violation Of The Sherman Act. ...........6

        1.    Characterization Requires The Consideration Of Complex Economic Principles And A Careful Evaluation Of The Potential Procompetitive Effects Of The Challenged Conduct. ...............................................................................................10

        2.    Characterization Requires The Court To Closely Scrutinize The Means And Methods Alleged In The Indictment. .................14

    B.    The Court Had A Full Record At The Close Of The Government's Case, And Certainly At The Close Of The Evidence, To Evaluate And Determine Whether The Challenged Conspiracy, And The Practices Identified, Constituted A Per Se Violation Of The Sherman Act.........................18

        1.    The Court Should Have Characterized Conduct Involving The Ruble And Zloty As Neither Price Fixing Nor Bid Rigging Governed By The Per Se Standard. ................................20

        2.    The Court Should Have Characterized Conduct Involving Interdealer Transactions On Reuters As Neither Price Fixing Nor Bid Rigging Governed By The Per Se Standard.........27

II.    The Court Should Enter A Judgment Of Acquittal For Mr. Aiyer Pursuant To Rule 29.................................................................................................................33

    A.    The Evidence Was Insufficient To Prove That Mr. Aiyer Entered Into A Price Fixing Or Bid Rigging Agreement. ................................................34

        1.    Russian Ruble and Polish Zloty Transactions. .............................37

            a.    October 14, 2010....................................................40

            b.    November 4, 2010..................................................42

            c.    November 22, 2011................................................43

d.      February 23, 2012 ....................................................45

e.      February 28, 2012 ....................................................46

f.      March 1, 2012 ..........................................................48

2.      Reuters Trading...........................................................50

a.      Cancelled Trades and Spoofing .........................50

i.      Cancelled Trades....................................51

ii.     Spoofing...................................................54

b.      "Iceberg" Orders .................................................60

c.      April 2, 2012 ..........................................................62

d.      May 20, 2013 (Morning)......................................63

e.      May 20, 2013 (Afternoon) ..................................64

f.      January 18, 2012 Stop-Loss Orders ...................65

g.      Fix Episodes on January 27, 2012 and May 8, 2012 .........69

III.    The Court Should Grant Mr. Aiyer A New Trial Pursuant To Rule 33............................72

A.      The Verdict Was Likely Based On Impermissible Evidentiary Grounds..............74

B.      The Jury Was Likely Confused About The Proper Legal Standard. ....................76

C.      The Jury Was Likely Misled By The Prejudicial Content Of The Government's Summations....................................77

D.      Evidence Probative of Procompetitive Justifications and Lack of Anticompetitive Effect Was Erroneously Excluded. ............................80

E.      Both of The Government's Principal Witnesses' Testimony Lacked Credibility And Cannot Fairly Support The Conviction......................81

F.      The Verdict Was Contrary To the Weight Of The Evidence..............84

CONCLUSION....................................................................87

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Apex Oil Co. v. DiMauro,*
    713 F. Supp. 587 (S.D.N.Y. 1989)....................................................9, 10, 11, 30, 37

*Blanksteen v. N.Y. Mercantile Exch.,*
    879 F. Supp. 363 (S.D.N.Y. 1995)............................................................2, 10, 12

*Board of Trade of City of Chicago v. United States,*
    246 U.S. 231 (1918)......................................................................................2, 12

*Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,*
    441 U.S. 1 (1979) ..................................................................................... *passim*

*Cement Mfrs. Protective Ass'n v. United States,*
    268 U.S. 588 (1925)..........................................................................................26

*Cenedella v. Metro. Museum of Art,*
    348 F. Supp. 3d 346 (S.D.N.Y. 2018) (Koeltl, J.) ...................................34

*Chicago Prof'l Sports Ltd. P'ship v. NBA,*
    95 F.3d 593 (7th Cir. 1996) ...........................................................................51

*Craftsmen Limousine, Inc. v. Ford Motor Co.,*
    363 F.3d 761 (8th Cir. 2004) .............................................................................6

*F.T.C. v. Superior Court Trial Lawyers Ass'n,*
    493 U.S. 411 (1990)....................................................................................29, 51

*Gatt Commc'ns, Inc. v. PMC Assocs., LLC,*
    No. 10 Civ. 8 (DAB), 2011 WL 1044898 (S.D.N.Y. Mar. 10, 2011) ....................................25

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
    17 F. Supp. 2d 275 (S.D.N.Y. 1998)..............................................................11

*Granite Partners, L.P. v. Bear, Stearns & Co.,*
    58 F. Supp. 2d 228 (S.D.N.Y. 1999)........................................................26, 30

*In re Interest Swaps Antitrust Litig.,*
    261 F.Supp.3d 430 (S.D.N.Y. 2017)..............................................................36

*Kolender v. Lawson,*
    461 U.S. 352 (1983)..........................................................................................34

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.,*
    551 U.S. 877 (2007)..............................................................11, 12, 25, 34, 36

*Major League Baseball Properties, Inc. v. Salvino, Inc.,*
    542 F.3d 290 (2d Cir. 2008).................................................................................51

*Matsushita Electric Industrial Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986)............................................................................................81

*Medical Center at Elizabeth Place, LLC v. Atrium Health Systems,*
    922 F.3d 713 (6th Cir. 2019) ..........................................................................8, 13

*Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.,*
    270 F. Supp. 2d 1043 (E.D. Wis. 2003).........................................................26, 30

*Polk Bros., Inc., v. Forest City Enters., Inc.,*
    776 F.2d 185 (7th Cir. 1985) ..............................................................................13

*Ratino v. Medical Service of District of Columbia (Blue Shield),*
    718 F.2d 1260 (4th Cir. 1983) ...........................................................................8, 14

*Sanchez v. United States,*
    No. 19-288 (August 30, 2019) ..............................................................................6

*Skilling v. United States,*
    561 U.S. 358 (2010).............................................................................................34

*In re Southeastern Milk Antitrust Litig.,*
    739 F.3d 262 (6th Cir. 2014) ................................................................................6

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997)...........................................................................................5, 11

*In re Sulfuric Acid Antitrust Litig.,*
    703 F.3d 1004 (7th Cir. 2012) ...............................................................13, 15, 16

*Texaco Inc. v. Dagher,*
    547 U.S. 1 (2006)..................................................................................................5

*United States Robinson*, No. 01-cr-131 (LEK), 2003 WL 21095584
    (N.D.N.Y. May 14, 2003)....................................................................................82

*United States v. Apple, Inc.,*
    791 F. 3d 290 (2d Cir. 2015)...................................................................13, 17, 24

*United States v. Aracri,*
    968 F.2d 1512 (2d Cir. 1992)...............................................................................14

*United States v. Bogucki,*
    No. 18-CR-00021-CRB-1, 2019 WL 1024959 (N.D. Cal. Mar. 4, 2019) ..............34

*United States v. Cassese,*
   428 F.3d 92 (2d Cir. 2005)..................................................................................34, 37

*United States v. Citizens & Southern Nat'l Bank,*
   422 U.S. 86 (1975)........................................................................................................25

*United States v. Diatlova,*
   No. 12 cv 626 (SJ), 2017 WL 1755967 (E.D.N.Y. May 3, 2017) ..........................74

*United States v. DiNome,*
   954 F.2d 839 (2d Cir. 1992)........................................................................................74

*United States v. Ferguson,*
   246 F.3d 129 (2d Cir. 2001)..................................................................................72, 73

*United States v. Ferguson,*
   49 F. Supp. 2d 321 (S.D.N.Y. 1999), *aff'd* 246 F.3d 129 (2d Cir. 2001) ..............73

*United States v. Finnerty,*
   474 F. Supp. 2d 530 (S.D.N.Y. 2007), *aff'd*, 533 F.3d 143 (2d Cir. 2008)...........34, 73, 77

*United States v. Galanis,*
   366 F. Supp. 3d 477 (S.D.N.Y. 2018).................................................................73, 84

*United States v. Gotti,*
   457 F. Supp. 2d 403 (S.D.N.Y. 2006).......................................................................34

*United States v. Guiliano,*
   644 F.2d 85 (2d Cir. 1981)....................................................................................74, 75

*United States v. Heffernan,*
   43 F.3d 1144 (7th Cir. 1994) .....................................................................................32

*United States v. McIntosh,*
   No. 11 CR. 500 (SHS), 2014 WL 199515 (S.D.N.Y. Jan. 17, 2014) ......................34

*United States v. Pauling,*
   924 F.3d 649 (2d Cir. 2019)........................................................................................33

*United States v. Realty Multi-List, Inc.,*
   629 F.2d 1351 (5th Cir. 1980) ......................................................................................5

*United States v. Riley,*
   No. S1 06 CR. 80 (NRB), 2008 WL 2875432 (S.D.N.Y. July 16, 2008),
   *aff'd sub nom. United States v. Barris*, 377 F. App'x 93 (2d Cir. 2010)...............86

*United States v. Robinson,*
   430 F.3d 537 (2d Cir. 2005)........................................................................................73

*United States v. Rooney,*
   37 F.3d 847 (2d Cir. 1994) ............................................................................74

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978) ............................................................................ *passim*

*United States v. Valle,*
   807 F.3d 508 (2d Cir. 2015) ............................................................................33

*Volmar Distributors, Inc. v. New York Post Co.,*
   825 F. Supp. 1153 (S.D.N.Y. 1993) ...............................................................51

*Volvo North America Corp. v. Men's International Professional Tennis Council,*
   857 F.2d 55 (2d Cir. 1988) ................................................................7, 11, 13

*White Motor Co. v United States,*
   372 U.S 253 ............................................................................................1, 5

## Statutes, Rules and Regulations

Fed. R. Crim. P. 29(a) ............................................................................................33

Fed. R. Crim. P. 33(a) ............................................................................................72

Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 1909b (2018) ...........................6

## Other Authorities

U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION: ANTITRUST DIVISION MANUAL
   (Apr. 2015) ............................................................................................5

U.S. DEPARTMENT OF JUSTICE ANTITRUST RESOURCE MANUAL (Nov. 2017) ..............................25

Defendant Akshay Aiyer respectfully submits this Memorandum of Law in Support of his Motion for a Judgment of Acquittal or, in the Alternative, for the Declaration of a Mistrial or a New Trial pursuant to Federal Rules of Criminal Procedure 29 and 33 and a renewal of arguments made by Mr. Aiyer during earlier stages of the proceedings based upon the full trial record.

## PRELIMINARY STATEMENT

Mr. Aiyer requests the following alternative forms of post-verdict relief: 1) a judgment of acquittal or a new trial based on the full trial record and the arguments asserted by Mr. Aiyer at prior stages of the proceedings; and 2) a judgment of acquittal under Rule 29 because the evidence presented by the Government at trial was insufficient to sustain the verdict, and no reasonable jury could find guilt beyond a reasonable doubt; and 3) the granting of a new trial under Rule 33 because the interests of justice so require. While the applicable standards for each form of relief are different, the principal substantive law and the facts adduced—or not proven—during the trial support each form of relief.

An unbroken line of Supreme Court precedent provides the starting point for the legal analysis. Violations under Section 1 of the Sherman Act take one of two forms, either a per se violation or a violation under the rule of reason. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 438-440 (1978). Only per se violations of the Sherman Act are criminal. *Id.* at 440-443. The Supreme Court has identified the very narrow types of behavior that can be characterized as per se violations, including "certain agreements or practices that are 'so plainly anticompetitive' … and so often "'lack … any redeeming virtue that they are conclusively presumed illegal. …,'" *Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.*, 441 U.S. 1, 9 (1979) ("*BMI*"); conduct that is a "naked restraints of trade with no purpose except stifling of competition," *White Motor Co. v United States*, 372 U.S 253, 263; and "agreements among competitors to fix prices

on their individual goods or services." *U.S. Gypsum*, 438 U.S. at 438. Time and again, the Supreme Court has cautioned that "easy labels do not always supply ready answers." *BMI,* 441 U.S. at 8; *see also Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 238-39 (1918) (rejecting the "bald proposition" that the conduct at issue constituted price fixing). In evaluating whether a particular practice constitutes a per se violation, "[l]iteralness is overly simplistic and often overbroad." *BMI,* 441 U.S. at 9.

Consistent with this rule of law, the Supreme Court has held that a court must "*characterize the challenged conduct* as falling within or without that category of behavior to which we apply the label '*per se* price fixing.'" *Id.* (emphasis added). To fulfill this obligation, a court may not accept the Government's allegations as controlling, even if sufficient to survive a motion to dismiss. *See Blanksteen v. N.Y. Mercantile Exch.*, 879 F. Supp. 363, 369 (S.D.N.Y. 1995) (Koeltl, J.).

Against this background, Mr. Aiyer submits that the Court should either enter a judgment of acquittal or order a new trial for the following reasons:

*First*, under Second Circuit precedent and consistent with other case law following the mandate of the Supreme Court, the Court was required to conduct a sophisticated economic inquiry, carefully consider whatever arguments Mr. Aiyer has to offer in support of the practices at issue, and determine whether the per se rule or the rule of reason should apply to the conduct at issue. Mr. Aiyer respectfully submits that, had the required analysis and characterization occurred, the Court would have determined that many, if not all, of the practices and episodes challenged by the Government were not per se violations of the Sherman Act, and evidence about them should have been excluded or stricken. The Government would have been unable to provide any evidence sufficient to prove that Mr. Aiyer knowingly entered into a conspiracy to

fix prices or rig bids as those terms are defined under the law.  Mr. Aiyer requests that the Court

enter a judgment of acquittal or grant a new trial, during which the evaluation and

characterization of the conduct at issue can occur and the admission of evidence and charges to

the jury can be tailored to conform to the Court's legal findings.

*Second,* even if the Court was not required to analyze and determine before the jury

deliberated whether the conduct shown was nakedly anticompetitive and a per se violation, the

evidence presented by the Government was insufficient to sustain the verdict, and no reasonable

jury could find beyond a reasonable doubt that Mr. Aiyer committed the crime charged, as

required under Rule 29.  Viewed in a light most favorable to the Government, the evidence

adduced at trial is at least as consistent with innocence as with guilt.  The jumble of vague,

internally inconsistent, and at times incoherent testimony by the cooperating witnesses,

combined with the ambiguous chats and all the other evidence adduced at trial, was insufficient

to prove Mr. Aiyer knowingly joined a criminal conspiracy to violate Section 1 of the Sherman

Act.

In addition, the Government failed to provide legally sufficient evidence to prove beyond

a reasonable doubt that *any* of the trading practices and episodes cited by the Government

constituted price fixing or bid rigging.  Based on the full record in this case, therefore, a

reasonable jury could not conclude beyond a reasonable doubt that Mr. Aiyer entered into

agreement to commit illegal acts that never occurred during the entire multi-year period at issue.

Even if there had been *some evidence* to enable a reasonable jury to conclude that one (or even a

handful) of the episodes cited by the prosecution had an anticompetitive effect, the

overwhelming body of evidence established obvious and legal alternative explanations for such

episodes, making the evidence as a whole much more consistent with innocence than with guilt.

*Third*, and in the alternative, Mr. Aiyer submits that the Court should order a new trial in the interests of justice. Under Rule 33, the Court is to examine the entire record and decide whether competent, satisfactory and sufficient evidence fully supports the jury's verdict. The Court is not required to view the evidence in a light most favorable to the Government. Rather, the Court itself is to weigh the evidence and evaluate the credibility of witnesses, and make an objective determination as to whether a new trial is the appropriate remedy to ensure defendant the full extent of his rights.

The arguments advanced in Sections I and II alone raise substantial doubts that the evidence fully supported the jury's verdict. In addition, in light of the speed of their deliberations, the paucity of evidence they sought to review, and the complexity of the jury charges, the jurors likely were confused about the proper legal standards and misled by the mountain of Government-offered evidence of perfectly legal conduct and the prejudicial content of the Government's summations. The canned testimony of cooperating witness Mr. Katz was incredible when given, thoroughly undermined during cross-examination, and even less credible during the Government's re-direct. To the extent Mr. Cummins' testimony was credible at all, it was wholly exculpatory of Mr. Aiyer and completely lacking in substance to support the contention that Mr. Aiyer had agreed with Mr. Katz, Mr. Cummins, and Mr. Williams to fix prices and rig bids. Mr. Cummins' repeated mantra that his conduct was "wrong" fell far short of demonstrating beyond a reasonable doubt that Mr. Aiyer was part of an illegal conspiracy in violation of the Sherman Act.

For the reasons noted in Section III, Mr. Aiyer submits that the verdict was contrary to the weight and momentum of the evidence. A new trial, therefore, should be ordered by the Court.

## ARGUMENT

### I.     The Court Should Have Evaluated And Characterized The Conduct Challenged By The Indictment And Determined That It Was Not Per Se Price Fixing Or Bid Rigging.

Supreme Court precedent establishes that alleged violations of the Sherman Act should be judged under one of two standards: the rule of reason or the per se rule.  *U.S. Gypsum Co.*, 438 U.S. at 438-440.  The rule of reason standard presumptively applies to challenged restraints. *Texaco Inc. v. Dagher*,[1] 547 U.S. 1, 5 (2006) ("[T]his Court presumptively applies rule of reason analysis[.]"); *State Oil Co. v. Khan*, 522 U.S. 3, 10 (1997).  Per se condemnation, on the other hand, is understood as the exception.  The per se label applies in the narrow circumstance where the charged conduct is "plainly anticompetitive and … without redeeming virtue," *BMI*, 441 U.S. at 9 (internal quotations omitted), and where there is no purpose for the charged conduct other than "stifling of competition."  *White Motor Co.*, 372 U.S. at 263; *see also United States v. Realty Multi-List, Inc.*, 629 F.2d 1351, 1365 (5th Cir. 1980) ("When the Courts are uncertain of the competitive significance of a particular type of restraint, they decline to apply the per se label.").

While civil antitrust cases proceed under either standard, the criminal process is reserved for per se illegal conduct.  *U.S. Gypsum Co.*, 438 U.S. at 440-441; *see also* U.S. DEPARTMENT OF JUSTICE ANTITRUST DIVISION: ANTITRUST DIVISION manual, at III-12 (Apr. 2015).  When the conduct falls into the gray zone of uncertain effects, some or all of which may be procompetitive, the per se standard does not apply and criminal prosecution is not proper.  *Id.*

---

[1] As the Court's decisions in this case confirm, civil antitrust case law is applicable in a criminal case.   (*See, e.g.,* ECF No. 119, Motions *in Limine* Hearing Tr. (citing numerous civil antitrust cases in decision on motions in limine)); *see also U.S. Gypsum Co.*, 438 U.S. at 474 (Stevens, J. concurring in part and dissenting in part) ("[S]ince 1890 when the Sherman Act was enacted, the statute has had the same substantive reach in criminal and civil cases.").

With two different standards potentially applicable to challenged restraints of trade—and only one properly the basis for criminal liability—the starting point of any Sherman Act legal analysis is necessarily "characteriz[ation of] the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se* price fixing.'"  *BMI*, 441 U.S. at 9. If the conduct is not "manifestly anticompetitive," as it was not here, it cannot, as a matter of law, be criminal.

A.   The Court, And Not The Jury, Must Evaluate And Resolve Whether The Challenged Conduct Constitutes A Per Se Violation Of The Sherman Act.

"[T]he selection of a mode [of antitrust analysis] is entirely a question of law" to be decided by the Court.[2]  Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 1909b (2018); *see also Craftsmen Limousine, Inc. v. Ford Motor Co.,* 363 F.3d 761, 772 (8th Cir. 2004); *In re Southeastern Milk Antitrust Litig.*, 739 F.3d 262, 274 (6th Cir. 2014).  Before the jury could determine Mr. Aiyer's guilt or innocence, the law imposed on the Court the fact-specific task of examining the particular *behaviors* at issue—not the allegations—and deciding whether the challenged conduct was properly evaluated under the per se rule, or if, instead, the presumptive rule of reason should apply.  As the Supreme Court has put it, a court must "*characterize the challenged conduct* as falling within or without that category of behavior to which we apply the label '*per se* price fixing.'"  *BMI*, 441 U.S. at 9 (emphasis added).

---

[2] This legal proposition is being challenged by the petitioners in *Sanchez v. United States*, who filed a *certiorari* petition in August of this year asking the Supreme Court to consider the question of "whether giving a '*per se*' instruction in criminal cases transgresses the constitutional prohibition against conclusive presumptions."  Petition for Writ of Certiorari at 3, *Sanchez v. United States*, No. 19-288 (August 30, 2019).  The district court in *Sanchez* had instructed the jury that the key element of the petitioners' alleged offense—engaging in an "unreasonable" restraint of trade and commerce—had been established by a conclusive presumption that bid rigging is automatically unlawful.  *Id.*  The petitioners argue that "such a conclusive presumption violates due process and the right to jury trial" and "impermissibly removes the element of unreasonableness from the case once the [prosecution] has proved the predicate facts giving rise to the presumption."  *Id*. at 15 (internal citations and quotations omitted).  Depending on the outcome of this pending *certiorari* petition, Mr. Aiyer may be entitled to an acquittal and/or a new trial on alternative grounds.

The Second Circuit has recognized the importance of the Court's obligation to characterize the challenged behavior independent of the allegations of the charging instrument. In *Volvo North America Corp. v. Men's International Professional Tennis Council*, the plaintiffs, who were owners and producers of men's professional tennis events, brought Section 1 price fixing claims, among others, against the defendants, the Men's International Professional Tennis Council, its chairman, and its administrator.  The main allegations relating to the price fixing claims were that the defendants "fixed the compensation that can be paid to players at other men's professional tennis events" and forced "[a]ll owners and producers … [to] agree … to ceilings on player compensation."  857 F.2d 55, 71 (2d Cir. 1988) (internal citations and quotations omitted).

The Second Circuit reversed the district court's dismissal of the Section 1 claims, finding that the allegations in the complaint sufficiently alleged price fixing.  This finding, however, as the Second Circuit recognized, did not necessarily mean that the conduct should be subject to per se condemnation.  Rather, characterization would be required after an extensive inquiry by the district court on remand:

> The relevant inquiry, however, involves more than "a question simply of determining whether two or more potential competitors have literally 'fixed' a 'price.'"  *BMI*, 441 U.S. at 9, 99 S.Ct. at 1557.  Instead, "'price fixing' is a shorthand way of describing certain categories of business behavior to which the *per se* rule has been held applicable."  *Id.  See also* Hovenkamp § 4.4, at 128 ("Once a court has properly *characterized* a practice as price fixing, it is *per se* illegal.  However, determining when a practice should be so *characterized* can be very difficult, and may involve a fair amount of sophisticated economic inquiry."). … Thus, on remand, the district court should carefully consider whatever arguments appellees may offer in support of their practices … before deciding whether the *per se* rule or the Rule of Reason should apply.

*Volvo N. Am. Corp.*, 857 F.2d at 71-72 (emphasis added).

Other circuits agree.  In *Ratino v. Medical Service of District of Columbia (Blue Shield)*, the Fourth Circuit, following *BMI,* required the characterization of the alleged restraints before

applying the per se rule.  718 F.2d 1260, 1269-70 (4th Cir. 1983).  At issue in *Ratino* were allegations of an illegal price fixing arrangement brought by a surgeon against a medical society, and the hospital and physicians of the medical society.  On appeal, the main issue was whether the activities challenged under a single count constituted unreasonable restraints of trade. Specifically, the plaintiff alleged that "provider agreements," which specified the rates that participating and non-participating physicians would receive under an insurance plan, and "peer review" activities, which consisted of practicing physicians deciding whether fees of physicians were reasonable, constituted illegal price fixing agreements.  *Id.* at 1264-65.

The Fourth Circuit ordered the district court, on remand, to "carefully scrutinize the purposes and practices of the challenged review committee to determine whether its effect on prices is merely ancillary to other legitimate purposes," *id.* at 1272 (citing *BMI*, 441 U.S. at 20), and to determine whether "standing alone," the provider agreements constituted price fixing.  *Id.* As the Fourth Circuit noted, "[i]f on remand the district court concludes that the challenged activities do not constitute a price fixing conspiracy … it must then analyze the practices under the rule of reason."  *Id.*

The Sixth Circuit similarly has acknowledged and followed the rule of characterization, following in the footsteps of the First Circuit:  "[T]he propriety of per se treatment 'is normally a question of *legal characterization*.'"  *Medical Center at Elizabeth Place, LLC v. Atrium Health Systems*, 922 F.3d 713, 724 (6th Cir. 2019) (quoting *Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I.*, 373 F.3d 57, 61 (1st Cir. 2004)) (emphasis added); *see also id.* at 727 ("Whether challenged conduct belongs in the per se category is question of law.").

*Apex Oil Co. v. DiMauro* demonstrates how the characterization analysis has been applied by a court in this jurisdiction.  In *Apex Oil*, the plaintiff, a holder of short positions in

heating oil futures, claimed that the defendants, holders of long positions, violated the Sherman Act by, *inter alia*, conspiring to nominate futures contracts for early delivery for the purpose of raising heating oil prices.  The plaintiff alleged price fixing, and thus claimed that the per se rule applied to the alleged conspiracy.  *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587, 596 (S.D.N.Y. 1989).

Judge Walker, then a judge for the Southern District of New York, noted that "[t]he decision whether to apply the Rule of Reason or the *per se* rule is a question of law even though it is predicated on a factual inquiry into the restraint's competitive effect."  *Id.* at 595 (internal citations and quotations omitted).  He then cited *BMI* for the proposition that "it is necessary to characterize the challenged conduct as falling within or without that category of behavior to which we apply the label '*per se*' price fixing," *id.* at 596 (quoting *BMI*, 441 U.S. at 9), and explained that it is typically "necessary to scrutinize a *challenged practice* and the industry affected before deciding whether the Rule of Reason should be applied or the practice condemned as a *per se* violation."  *Id.* (emphasis added).

Judge Walker then conducted an analysis of the alleged wrongful conduct and the market in which it occurred.  *Id.* at 592-93.  He looked beyond the per se label used by the plaintiff, and concluded that the rule of reason was the appropriate standard to apply.  *Id.* at 596.  He reached this conclusion even though the behavior at issue involved an agreement between competitors to take coordinated action intended to influence price to the disadvantage of another competitor. Judge Walker noted that the plaintiff "wrongly concludes that the mere talismanic invocation of the term 'price-fixing'… is sufficient to bring the *per se* rule to bear on the actions of the alleged conspirators," and determined that the conduct at issue looked more like "constructive price fixing" (meaning conduct that is not intended to fix prices but that nevertheless has some impact

9

on price) than the type of price fixing that is per se illegal, and therefore the rule of reason

applied. *Id.* at 596.

In ruling on Mr. Aiyer's initial Rule 29 Motion, the Court found the *Apex Oil* decision to

be inapposite because the decision rested on the insufficiency of the facts at the summary

judgment stage. (Trial Tr. at 1597:14-19 ("[The *Apex*] decision doesn't really help the defendant

because what the court said was … 'Apex has submitted insufficient facts to conclude at this

point that a conspiracy was formed for the purpose of price fixing'") (citing *Apex Oil*, 713 F.

Supp. at 597.) The Court concluded: "That was a decision on a motion before the court, before

the district court, and the question is whether the jury in this case will find that this was in fact a

conspiracy formed for the purpose of fixing prices." (Trial Tr. at 1597:19-22.)

But the court in *Apex Oil* did exactly what was required of the Court here. There, the

"thrust" of the defendant's motion was that the plaintiff could not prevail "*as a matter of law*."

*Apex Oil*, 713 F. Supp. at 594 (emphasis added). The finding that there were insufficient facts to

conclude that the purpose of the challenged conduct was price fixing was directly relevant to the

question of *whether* the challenged conduct should be condemned as a per se violation. Once the

*Apex Oil* court characterized the conduct as falling under the rule of reason, it concluded that the

"Rule of Reason … is a test which, as applied to the facts of this case as known, demands

resolution by a factfinder after trial and not by this Court on a summary judgment motion." *Id.* at

597.

      1.    *Characterization Requires The Consideration Of Complex Economic Principles And A Careful Evaluation Of The Potential Procompetitive Effects Of The Challenged Conduct.*

The mere fact that the Indictment uses per se labels such as "fixing prices" or "rigging

bids and offers," even if sufficient to survive a motion to dismiss, does not control the Court's

characterization determination. *See Blanksteen*, 879 F. Supp. at 369 ("Even if this case were

somehow shoehorned into the plaintiff's characterization of a group boycott, it is clear that the defendant's actions do not fall into a category of actions likely to have a predominately anticompetitive effects.  Consequently, per se analysis is not warranted.") (Koeltl, J.); *Granite Partners, L.P. v. Bear, Stearns & Co.*, 17 F. Supp. 2d 275, 296 (S.D.N.Y. 1998) ("Affixing certain labels to alleged conduct is insufficient to invoke *per se* treatment"); *Apex Oil Co.*, 713 F. Supp. at 597 ("[T]he mere talismanic invocation of the term 'price-fixing' is [insufficient] to bring the *per se* rule to bear.").

To fulfill its characterization obligation, the law required the Court to conduct an extensive examination of the economic realities of the challenged conduct.  *See Volvo N. Am. Corp.*, 857 F.2d at 71-72 ([D]etermining when a practice should be so characterized can be very difficult, and may involve a fair amount of sophisticated economic inquiry.") (citing Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law, Section 4.4, at 128); *see also BMI,* 441 U.S. at 14. ("The Sherman Act has always been discriminatingly applied in the light of economic realities.") (internal citations and quotations omitted).  The Court needed to evaluate, and find, the challenged behaviors to have "manifestly anticompetitive effects" to warrant per se condemnation and the attention of the jury.  *See, e.g., Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("To justify a *per se* prohibition a restraint must have manifestly anticompetitive effects, and lack any redeeming virtue.") (internal citations and quotations omitted); *State Oil Co.*, 522 U.S. at 10 (expressing "reluctance to adopt per se rule with regard to restraints imposed in the context of business relationships where the economic impact of certain practices is not immediately obvious") (internal citations and quotations omitted); *U.S. Gypsum Co.*, 438 U.S. at 440 (concluding that conduct can only be "regarded as *per se* illegal because of its unquestionably anticompetitive effects").

11

Throughout trial, the Court consistently maintained that evidence of the procompetitive effects of the conduct was irrelevant and inadmissible.  (*See* Trial Tr. at 1601:12-13 ("Evidence of pro-competitive effects, or the lack of harm, is not relevant and should be excluded under Rule 403…."").)  But the very evidence precluded related directly to the Court's required, preliminary legal determination.  The reason is simple.  Conduct does not rise to the level of per se illegality *regardless* of its effects on the marketplace, but *because* of the likelihood of those effects.  *See, e.g.*, *U.S. Gypsum Co.*, 438 U.S. at 440; *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 886. Absent apparent likely anticompetitive effects, conduct that may look like, or be labeled by an adverse party as, traditional per se conduct is not subject to the per se rule.  *Blanksteen*, 879 F. Supp. at 369.  Even the *literal fixing of a price* may not constitute a per se antitrust violation absent such apparent likely anticompetitive effects.  *BMI*, 441 U.S. at 8-9.

This core feature of antitrust law has persisted for more than 100 years.  In *Board of Trade of City of Chicago v. United States*, the Supreme Court addressed similar issues to the issues presented here: whether collaborative conduct in a trading venue should be condemned on the "bald proposition" that it constituted price fixing, or whether its history, purpose, and effects should be considered.  246 U.S. at 238-39 (1918).  The Supreme Court held that even when competitors literally fix a price—there, specifying that grain could only be sold at a specified price during a specified period of time—conduct runs afoul of the antitrust laws only when it was "designed to" or "had the effect of limiting [output] … or of raising or depressing prices" or when it "resulted in hardship to anyone."  *Id.* at 238.

As part of its assessment of likely anticompetitive effect, the Court needed to assess whether the conduct, in substance and context, had some redeeming, legitimate, or productive aspect or explanation that would take the conduct outside of the per se category.  The Court was

required to consider Mr. Aiyer's arguments in support of the conduct as part of the Court's characterization analysis. *Volvo N. Am. Corp.*, 857 F.2d at 71-72 ("[O]n remand, the district court should carefully consider whatever arguments [defendants] may offer in support of their practices … before deciding whether the *per se* rule or the Rule of Reason should apply).

Where evidence reflects a plausible relationship between the challenged conduct and a procompetitive rationale—as it did here—a court must characterize the conduct as outside the per se rule. *See, e.g.*, *Medical Center at Elizabeth Place*, 922 F.3d at 726 (a defendant need show only a "plausible procompetitive rationale for the restraint" to avoid evaluation under the per se rule); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1010-11 (7th Cir. 2012) ("[E]ven price fixing by agreement between competitors … [is] governed by the rule of reason, rather than being per se illegal, if the challenged practice when adopted could reasonably have been believed to promote 'enterprise and productivity'"); *Polk Bros., Inc., v. Forest City Enters., Inc.,* 776 F.2d 185, 189 (7th Cir. 1985) ("A court must ask whether an agreement promoted enterprise and productivity at the time it was adopted.  If it arguably did, then the court must apply the Rule of Reason to make a more discriminating assessment.").

On this point, the Second Circuit's decision in *United States v. Apple* is instructive.  In *Apple*, the court addressed the line of cases "in which courts have permitted defendants to introduce procompetitive justifications for horizontal price-fixing arrangements that would ordinarily be labeled per se if those agreements 'when adopted could reasonably have been believed to promote 'enterprise and productivity.'"  791 F. 3d 290, 326 (2d Cir. 2015) (internal citations and quotations omitted).  Although the Second Circuit, in the context of the *Apple* case, described that line of cases as "narrow," the court nonetheless contemplated considering procompetitive justifications "when the restraint at issue was imposed in connection with some

kind of potentially efficient joint venture." *Id.* at 326 (citation omitted).  And, in fact, the Court

of Appeals *did* consider the procompetitive justifications offered by the defendant, but ultimately

concluded that, on the particular facts at issue, "there was no joint venture or other similar

productive relationship between any of the participants in the conspiracy that Apple joined." *Id.*

> 2.   *Characterization Requires The Court To Closely Scrutinize The Means And Methods Alleged In The Indictment.*

Under traditional conspiracy law, a conspiracy "may involve a multiplicity of ways and

means of action and procedure."  *United States v. Aracri*, 968 F.2d 1512, 1522 (2d Cir. 1992)

(internal citations omitted).  But this principle must be applied with caution to a criminal antitrust

conspiracy.  When multiple behaviors make up a charged Sherman Act violation, it is both

proper and necessary for the Court to consider the actual conduct underlying the allegations.

This includes a close examination of the individual means and methods alleged to determine

whether they are either themselves per se violations of the Sherman Act or can plausibly be

argued to advance other actions that are such per se violations.

For example, in *Ratino*, the plaintiff challenged two distinct behaviors charged under a

single count in the complaint.  In reversing the district court's dismissal of the count, the Fourth

Circuit ordered the court, on remand, to consider whether the behaviors, *standing alone*,

constituted unreasonable restraints of trade:  "The district court … should carefully scrutinize the

purposes and practices of the challenged review committee to determine whether its effect on

price is merely ancillary to other legitimate purposes.  A similar inquiry is required with respect

to [the plaintiff's] argument that the provider agreements, standing alone, constitute price

fixing."  718 F.2d at 1272 (internal citations omitted).

In *U.S. Gypsum Co.*, the defendants were charged with violating Section 1 of the

Sherman Act by engaging in an alleged price fixing conspiracy.  The Supreme Court noted that

the indictment specified "13 types of actions taken by conspirators [i]n formulating and

effectuating the combination and conspiracy" but singled out one behavior in particular—

"interseller price verification"—as being "the most relevant… for [the Court's] purposes."  438

at 428.  The Court then proceeded to analyze that specific behavior, which the indictment

described as consisting of the conspirators  "telephon[ing] or otherwise contact[ing] one another

to exchange and discuss current and future published or market prices and published or standard

terms and conditions of sale and to ascertain alleged deviations therefrom."  *Id*. at 428.  The

Court noted in its specific analysis that this type of behavior is not a Sherman Act violation in

itself.  *Id*. at 441 n.16. ("The exchange of price data and other information among competitors

does not invariably have anticompetitive effects; indeed such practices can in certain

circumstances increase economic efficiency and render markets more, rather than less,

competitive.  For this reason, we have held that such exchanges of information do not constitute

a *per se* violation of the Sherman Act.").

In *In re Sulfuric Acid Antitrust Litig*, the Seventh Circuit reviewed three distinct practices

that the plaintiffs labeled as per se illegal: shutdown agreements, the grant of exclusive territories

to distributors, and the formation of a joint venture.  Buyers of sulfuric acid brought suit against

Canadian and U.S. producers of sulfuric acid, alleging that the producers conspired to fix prices.

703 F.3d at 1008.  The case arose from the Canadian producers' attempt at gaining access to the

U.S. markets by establishing a U.S. distribution network through U.S. producers of sulfuric acid.

*Id.* at 1008-09.

The first challenged practice was "shutdown agreements," agreements entered into by the

Canadian and U.S. producers, under which the U.S. producers stopped producing sulfuric acid,

and thereby stopped competing with the Canadian producers of sulfuric acid.  In return, the

Canadian producers agreed to sell sulfuric acid to the U.S. producers "cheaply enough to make distribution more profitable than production." *Id.* at 1009. The second challenged practice was the Canadian producers' grant of exclusive territories to their U.S. distributors. The third challenged practice was the alleged elimination of a U.S. producer under the guise of a joint venture. *Id.* at 1013.

The Seventh Circuit analyzed each of the challenged practices separately—considering the context of the practices, the effects of the practices, and plausible reasons for the practices— and determined that none of the behaviors could proceed under a theory of per se liability. *Id.* at 1011-13. As to the "shutdown agreements," the Seventh Circuit found "plausible" reasons for such agreements: they enabled the Canadian producers to venture into the U.S. market and "their net effect on economic welfare may well have been positive, especially since the negative effects may have been few because of the higher production costs of the U.S. companies." *Id.* at 1010-11. As to the grant of exclusive territories, the Seventh Circuit explained that while the grant of exclusive territories can "reduce competition at the distributor level," it could "increase it at the producer level and in this case may well have done so by facilitating the Canadian producers' entry into the U.S. market." *Id.* at 1013. As to the joint venture, the Seventh Circuit concluded that "[t]he joint venture enabled substantial economies in transportation and marketing and after it was launched the price of sulfuric acid in the United States dropped significantly." *Id.* In sum, the Seventh Circuit court analyzed each category of conduct in turn, as antitrust law requires, and found that the context, likely effects, and plausible procompetitive justifications counseled for non-per se treatment.

The Court, in ruling on Mr. Aiyer's motions to dismiss, relied on *United States v. Apple, Inc.*, 791 F. 3d 290, 326 (2d Cir. 2015). (ECF No. 66, Motion to Dismiss Hearing Tr. at 43:7-

16.)  But *Apple* is neither analogous to nor dispositive of the present case.  In *Apple*, the Government alleged that Apple, Inc. ("Apple") conspired with six publishers to raise prices across the ebook market through the execution of various agreements between the publishers and Apple.  Following a bench trial, a Southern District of New York court concluded that Apple had violated Section 1 of the Sherman Act by orchestrating a conspiracy among the publishers to "eliminate retail price competition [in the e-book market] in order to raise the retail prices of e-books."  *Id.* at 312 (quoting the opinion of the district court).

On appeal, Apple argued that its conduct must be subject to the rule of reason because, among other reasons, it involved merely multiple independent vertical agreements between Apple and the publishers.  The court found none of Apple's arguments to be persuasive and affirmed that the per se standard applied.  On the "vertical agreements" argument, the court concluded that Apple was part of a typical "hub-and-spoke" conspiracy—similarly constructed principal-agent contracts between major publishers and Apple became the spokes that were joined to form a rim (a horizontal conspiracy) and that were coordinated by Apple as the hub.  *Id.* at 325.  The relevant restraint was not Apple's vertical contracts with the publishers, "which might well, if challenged, have to be evaluated under the rule of reason," but rather, "the horizontal agreement that Apple organized among the Publisher Defendants to raise ebook prices."  *Id.* at 323 (distinguishing *Leegin Creative Leather Prods., Inc.*, 551 U.S. 877).

B.   The Court Had A Full Record At The Close Of The Government's Case, And
Certainly At The Close Of The Evidence, To Evaluate And Determine Whether
The Challenged Conspiracy, And The Practices Identified, Constituted A Per Se
Violation Of The Sherman Act.

Mr. Aiyer submitted separate motions before and during trial that included a request to

characterize the conduct at issue.  The Court denied each, deferring the decision of

characterization and contemplating that Mr. Aiyer would raise the issue at a later, more

appropriate time.  At the motion to dismiss stage, Mr. Aiyer requested that the Court dismiss the

Indictment, in part, to the extent it described conduct that is not properly the subject of the per se

standard.  (*See* ECF No. 50, Memorandum of Law in Support of Defendant's Motion to Dismiss

the Indictment in Part for Failure to Allege a Crime at 1-2.)  The Court denied Mr. Aiyer's

motion and reasoned that it could not make a determination about the challenged conduct

without first hearing the "evidence [the Government] will offer at trial concerning the trading

activity on those dates."  (ECF No. 66, Motion to Dismiss Hearing Tr. at 40:2-9.)

At the motion *in limine* stage, Mr. Aiyer requested that the Court exclude evidence and

argument regarding interdealer trading and ruble trading—neither of which is properly the

subject of the per se standard—at such time as the Court deemed the factual record sufficient to

support this ruling—and evidence of spoofing and cancelled trades.  (*See* ECF No. 102,

Memorandum of Law in Support of Defendant's Standing Motion *in Limine* to Exclude

Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading at 1; ECF No. 97,

Memorandum of Law in Support of Defendant's Motion *in Limine* to Exclude Evidence or

Argument Concerning 'Spoofing' or Cancelled Trades.)  The Court denied Mr. Aiyer's motions,

with the qualification that Mr. Aiyer was "free to raise any arguments [regarding interdealer

trading and ruble trading] in the course of the trial."  (ECF No. 119, Motions *in Limine* Hearing

Tr. at 28:18-29:25, 30:8-12.)

At the close of the Government's case-in-chief, Mr. Aiyer requested that the Court grant acquittal pursuant to Rule 29 because the evidence showed that none of the conduct is properly the subject of the per se standard.  (*See* Trial Tr. at 1574:5-1579:15.)  The Court relied on its denial of Mr. Aiyer's earlier motion to dismiss to deny Mr. Aiyer's Rule 29 motion.  The Court found that "the indictment charges that the defendant entered into a conspiracy with others to fix prices and rig bids.  That is conduct which, at least up until now, has been defined as *per se* conduct in violation of Section 1 of the Sherman Act."  (*See* Trial Tr. at 1597:6-9.)  The Court added that it had "denied prior to trial a motion to dismiss the indictment as a whole, and the indictment is similar to other indictments that have been sustained."  (Trial Tr. at 1596:19-21.)  Reliance on the language of an indictment may be appropriate on a motion to dismiss but is misplaced on a motion for judgment of acquittal at the close of the case.  At this point in the proceedings, the Court had a more than sufficient record to evaluate the actual conduct and undertake the characterization analysis that is required of it.  It certainly had an adequate record to undertake this evaluation at the close of all the evidence with the benefit of a *complete* record.

Finally, in his proposed jury instructions, and at the charging conference, Mr. Aiyer requested that the Court instruct the jury that "[c]oordinated trading in the interdealer market, including refraining from trading, or staying out of the way, to let another Rand Chat Room member trade, or by 'spoofing' or cancelling trades on behalf of one another" and "[c]oordinated trading in the Russian Ruble" does not constitute price fixing or bid rigging.  (*See* ECF No. 123, Defendant's Proposed Jury Instructions at 24; *see also* Trial Tr. at 1898:7-23.)  The Court rejected Mr. Aiyer's proposed instructions.  (*See* Trial Tr. at 1898:7-23.)

As discussed, on a number of occasions, during different phases of these proceedings, Mr. Aiyer moved for relief based on the legal principles identified in Section I.  Mr. Aiyer

renews these applications in support of his argument for a judgment of acquittal or, in the alternative, on order requiring a new trial.  Mr. Aiyer requests that the Court enter a judgment of acquittal or grant a new trial, during which the Court should characterize the challenged practices.  If the Court concludes that certain conduct or practices do not meet the stringent test for a per se violation, and are not means for achieving per se violations—for example, all the ruble and zloty episodes, all transactions occurring on the interdealer market, and any other practices and episodes the Court so characterizes—these practices should be excluded and evidence about them may not be considered at all.  Only if the Court determines that some of the practices or episodes meet the test for a per se violation does the matter proceed to trial with appropriate limitations.

> 1.    *The Court Should Have Characterized Conduct Involving The Ruble And Zloty As Neither Price Fixing Nor Bid Rigging Governed By The Per Se Standard.*

At its foundation, and as the Government recognizes, a price fixing or bid rigging conspiracy requires "an agreement among *competitors*."  (ECF No. 122, Government Proposed Jury Instructions at 6 (emphasis added); *see also id.* at 2 ("The purpose of the Sherman Act is to preserve free and unfettered competition in the marketplace by prohibiting certain types of agreements between *competitors*, so that the marketplace may receive better products and services at lower cost.") (emphasis added).)  The ruble trading involving Mr. Aiyer and the other Rand Chat Room members, as well as the single episode of zloty trading at issue in this case, were classic vertical arrangements—Mr. Aiyer served as an upstream, risk-taking wholesaler, and the other Rand Chat Room members served as downstream distributors who did not want to assume risk and had little knowledge of competitive pricing.  The undisputed facts adduced at trial confirm that Mr. Katz, Mr. Cummins, and Mr. Williams were not competitors of Mr. Aiyer

in the ruble, and that Mr. Cummins was not a competitor of Mr. Aiyer in the zloty, making the per se label inapplicable to any purported agreement that pertains to ruble or zloty trading.

Mr. Aiyer was a preeminent trader in the ruble market.  The Government's own witness testified that Mr. Aiyer was "very skilled" in pricing the ruble, was "very insightful as to trading the market [and] as to where the market was going," had a "very strong command of the market," and showed spreads that were tight.  (Trial Tr. at 490:21-491:11 (Cummins).)  There was also ample evidentiary support for the proposition that Mr. Aiyer gave the best prices in ruble to customers.  (*See, e.g.*, Trial Tr. at 1122:4-8, 1123:18-23 ("Q.  And when you said 'will get best price,' you meant best price for the customer, right?  A.  For whoever is asking this person, yes.  Q.  Because he, Mr. Aiyer, gave the best price in the ruble, is that right?  A.  Yes.") (Katz); Trial Tr. at 496:3-12 (Cummins).)

By contrast, Mr. Katz was unskilled at trading the ruble.  Over three days of cross examination, Mr. Katz told a consistent story—he was not equipped to trade the ruble, he could not compete with Mr. Aiyer in trading the ruble, and he did not want to compete with Mr. Aiyer in trading the ruble.  (*See* Trial Tr. at 1127:10-19 (Katz); Trial Tr. at 1073:11-14 ("Q.  My question though was whether you were conveying that you have no idea at that time about how to price the ruble; yes or no?  A.  Yes.") (Katz); Trial Tr. at 1075:20-1076:10 ("Q.  And you thought it would be appropriate to leave the entire [ruble] business to HSBC and Chase because you didn't want to touch it; isn't that correct?  A.  Yes.") (Katz); *see also* DX-313 at 19:00:53-19:13:21; DX-314 at 19:15:38; DX-327-T at 1:15-22; DX-328 at 16:15:43-16:16:09; DX-336 at 12:14:45-12:15:01.)  Mr. Katz made it very clear to the Court and the jury that he "had no interest in that currency at all."  (Trial Tr. at 1078:25-1079:1 (Katz); *see also* Trial Tr. at 1253:15-16 (Katz).)

Mr. Cummins likewise was not a competitor of Mr. Aiyer's in the ruble or in the zloty. As to the ruble, he never had responsibility for trading the currency during his entire career as a foreign exchange trader. (*See* Trial Tr. at 485:2-7 (Cummins).) Because the ruble was not a primary currency of Mr. Cummins, he would not seriously compete for ruble business but would instead "show the price that doesn't win the deal." (*See* Trial Tr. at 527:9-13 (Cummins).) As to the zloty, Mr. Cummins similarly did not have responsibility for trading the currency and, in the single zloty episode at issue in the case, deliberately aimed to avoid winning the business. (*See* Trial Tr. at 662:4-25, 665:12-13 (Cummins).) Mr. Cummins cannot be said to be a true competitor in either currency.

The relevant trading data and expert analysis directly support the conclusion that the Rand Chat Room members did not compete with Mr. Aiyer in the ruble. Mr. Aiyer's ruble business was significantly greater than that of Mr. Katz, Mr. Cummins, and Mr. Williams. (*See* DX-152 (demonstrating that Mr. Aiyer's average daily trading volume in the ruble was ten times greater than that of Mr. Williams, 31 times greater than that of Mr. Katz, and 1,891 times greater than that of Mr. Cummins during the period of the charged conspiracy).)

Because of Mr. Aiyer's expertise and superior pricing in the ruble, Mr. Katz, Mr. Cummins, and Mr. Williams would seek Mr. Aiyer's advice regarding appropriate prices to show to customers. Mr. Cummins was aware that Mr. Katz "would seek advice [from Mr. Aiyer] and he would either take it or not." (Trial Tr. at 487:11-23 (Cummins).) More often than not, Mr. Katz went to Mr. Aiyer for help with pricing the ruble. (Trial Tr. at 1125:10-16 ("Q. So you got pricing from someone who was prepared to get up at 2 or 3 in the morning, stay in touch with what was happening in Moscow, and knew how to arrive at the best pricing for the ruble, namely, Mr. Aiyer, correct? A. Sometimes I did quote myself. Sometimes I went to Akshay.

Q.  Much more frequently you went to Mr. Aiyer, correct?  A.  Correct.") (Katz).)  Mr. Cummins

also admitted to turning to Mr. Aiyer for help with pricing the ruble.  (*See* Trial Tr. at 487:18-19,

492:9-17 (Cummins).)

It was both a common and perfectly permissible industry practice for a trader with less

experience or comfort trading a particular currency to contact an experienced trader for

information as to what an appropriate price would be.  (*See* Trial Tr. at 487:1-10 (Cummins);

Trial Tr. at 1121:23-1123:8 ("Q.  Was there anything wrong, first of all, with Mr. Crespo [a

trader at a different bank] coming to you to ask for a price?  A.  No.") (Katz).)  This is true of

Mr. Katz's, Mr. Cummins,' and Mr. Williams' practice of turning to Mr. Aiyer in the ruble.  (*See*

Trial Tr. at 487:18-24 ("Q.  Did you ever go to Mr. Aiyer to ask about ruble pricing?  A.  Yes.

Q.  And there is nothing wrong with that either, was there?  A.  No.  Q.  And there was nothing

wrong with him responding to you with whatever you were asking about ruble pricing; is that

correct?  A.  Yes.") (Cummins); *see also* Trial Tr. at 1253:12-1254:19 (Katz).)

When Mr. Aiyer communicated ruble prices to the other Rand Chat Room members, he

offered the price at which he was willing to trade.  (*See* Trial Tr. at 1126:13-15 ("Q.  So you

knew that he was there, if he gave a price, he was prepared to stand behind that price, is that

correct?  A.  Yes.") (Katz); *see also* Trial Tr. at 519:14-520:4 (Cummins).)  Mr. Aiyer "would

quote a price that he wanted to show, it would get passed on, and if the customer dealt, yes, he

would take it in."  (Trial Tr. at 1126:10-12 (Katz).)  Simply put, Mr. Aiyer would, "on a fairly

consistent basis," serve as the supplier for other traders' ruble needs.  (Trial Tr. at 1126:19-21

(Katz); *see also* Trial Tr. at 1722:23-1723:6 ("Q.  Based on the numbers shown in Defense

Exhibit 152 and your review of the remainder of the record in the case, what did you conclude

about Mr. Aiyer's relationship to the other rand chat room members in the ruble?  A.  Well, he,

from this table, we can see that he is clearly a lot larger … and, from the evidence that I saw, Mr. Aiyer *serves as a liquidity provider* to other market makers, including these market makers.") (Lyons); Trial Tr. at 1725:3-5 ("Q.  Have you seen evidence in the record that Mr. Aiyer served as a market maker to Mr. Katz, Mr. Cummins, and Mr. Williams?  A.  Yes.") (Lyons) (emphasis added.)

The fact that when Mr. Katz completed ruble transactions with his customers after asking Mr. Aiyer for pricing, he virtually always completed a concurrent trade with Mr. Aiyer, further supports the notion that they were in a vertical relationship.  (*See* DX-187 (demonstrating that, on thirteen of fourteen selected occasions when Mr. Katz completed a ruble transaction with a customer after asking Mr. Aiyer for pricing, Mr. Katz immediately passed his ruble position on to Mr. Aiyer).)  There was no evidence introduced at trial that this relationship was reciprocal, or that Mr. Katz, Mr. Cummins, or any other trader would serve as a ruble supplier for Mr. Aiyer.

The Government has argued on multiple occasions that Mr. Aiyer and the other Rand Chat Room members were competitors in the ruble because of the simple fact that they were situated at the same level of the "market structure" as traders at competitor banks.  (Trial Tr. at 1594:5-8 ("The essential thing to focus [on] here is the level of the market structure in which the traders were operating, and here they were operating at the same level of the market structure.") (Government Oral Argument on Defendant's Rule 29 Motion); *see also* ECF No. 102, Government Opposition to Defendant's Standing Motion *in Limine* to Exclude Evidence of Coordinated Interdealer Trading and Ruble Trading at 7.)  But "determining the orientation of an agreement can be difficult as a matter of fact and turns on more than simply identifying whether the participants are at the same level of the market structure."  *Apple*, 719 F.3d at 314.  From the trial record, it is beyond dispute that Mr. Aiyer served as the liquidity supplier in a vertical

arrangement with the Rand Chat Room members, as well as other market makers in the foreign exchange market.  (*See, e.g.*, Trial Tr. at 1732:22-23 ("In the ruble, Aiyer was serving as a market maker to Katz.  It was effectively a vertical relationship.") (Lyons).)

Even assuming there were agreements among the Rand Chat Room members with respect to ruble and zloty pricing, these agreements among market participants who were situated vertically are not the proper subject of criminal prosecution.  *See Leegin*, 551 U.S. at 882 (("[V]ertical price restraints are to be judged by the rule of reason."); *see also* U.S. DEPARTMENT OF JUSTICE ANTITRUST RESOURCE MANUAL (Nov.  2017) ("Vertical resale price maintenance, which is an agreement on price between a manufacturer and its distributors (or a distributor and its retailers), may not be prosecuted criminally.").  The same is true of mixed vertical and horizontal relationships.  *Gatt Commc'ns, Inc. v. PMC Assocs., LLC,* No.  10 Civ. 8 (DAB), 2011 WL 1044898, at *3 (S.D.N.Y. Mar. 10, 2011) (citing *Beyer Farms, Inc. v. Elmhurst Dairy, Inc.*, 35 F. App'x 29, 29 (2d Cir. 2002)).  Because the ruble and the zloty episodes at issue in this case involved participants in a vertical arrangement, or, at the least, in a mixed vertical and horizontal relationship, they cannot be condemned as per se illegal.  The Government should not have been permitted to offer these episodes as part of a criminal price fixing or bid rigging conspiracy.

Even if Mr. Katz's, Mr. Cummins,' and/or Mr. Williams' disclosure of their non-competitive bids allowed Mr. Aiyer to adjust his ruble pricing to his customers—from the evidence at trial, this happened, at most, twice—this does not convert the behavior into bid rigging subject to per se condemnation.  *See United States v. Citizens & Southern Nat'l Bank*, 422 U.S. 86, 113 (1975) ("[T]he dissemination of price information is not itself a per se violation of the Sherman Act"); *U.S. Gypsum Co.*, 438 U.S. at 441 n.16 ("The exchange of price data and other information among competitors does not invariably have anticompetitive effects; indeed

such practices can in certain circumstances increase economic efficiency and render markets

more, rather than less, competitive."); *Cement Mfrs. Protective Ass'n v. United States*, 268 U.S.

588, 600-601 (1925) (permitting exchange of customer information among competitors for their

individual use to protect their business interests).

To begin with, the Government provided no evidence that any other Rand Chat Room

member *agreed* to provide Mr. Aiyer with the ruble prices they had quoted or would quote to a

customer, or that they did so to enable Mr. Aiyer to win the bid at a favorable price.  The

evidence showed at most that they engaged in this disclosure, and only on a handful of

occasions.  Moreover, Mr. Aiyer could have learned the prices he needed to beat from any

number of sources, including the party soliciting the bids.  (*See, e.g.*, Trial Tr. at 1109:14

("Brokers will get access to prices for you.") (Katz); DX-377 at 16:58:05-16:59:28).)  The

disclosure of bids by the Rand Chat Room members to one another might be deemed to

constitute an improper interference with the bidding process, but it does not therefore constitute

criminal antitrust bid rigging.  *See Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l*

*Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1050 (E.D. Wis. 2003) (holding that "improperly,

even illegally, disclos[ing] a sealed bid" during the bidding process "does not amount to a

violation of §1" of the Sherman Act); *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 58

F. Supp. 2d 228, 237 (S.D.N.Y. 1999) (allegations that the defendants "engag[ed] in a conspiracy

to exchange 'lowball,' accommodation bids," thereby "forestall[ing] a competitive auction" did

not amount to per se bid rigging).

For these reasons, the Government should not have been permitted to offer episodes of

ruble and zloty pricing as part of its proof of a criminal antitrust conspiracy.

2.      *The Court Should Have Characterized Conduct Involving Interdealer Transactions On Reuters As Neither Price Fixing Nor Bid Rigging Governed By The Per Se Standard.*

At the trial, the Government admitted into evidence, and relied on, numerous chat conversations from the Rand Chat Room that featured interdealer trading on Reuters the Government labeled as per se illegal. The Rand Chat Room—the venue of the challenged behavior—provided two key benefits to its participants: information sharing and direct trading opportunities. Facilitated by the chat room, the Rand Chat Room participants developed continuing, vertical, buyer-seller relationships with each other that were enormously productive.

The Rand Chat Room allowed its participants to quickly exchange critical market information with other experienced traders. The types of information exchanged between the Rand Chat Room members included, but was not limited to, position information, order flow information, active participants in the market, and stop-loss order information. (*See* Trial Tr. at 1671:6-1673:14, 1674:21-1675:9 (Lyons); Trial Tr. at 846:9-25, 1206:2-9, 1225:16-20 ("Q. So he is telling you where his stops were and you are telling him where your stops were. Correct? A. Yes. Q. Nothing wrong with that, is that right? A. No.") (Katz).) Not only was this exchange of information perfectly permissible (*see* Trial Tr. at 378:8-379:17, 603:19-604:2 (Cummins)), it allowed each Rand Chat Room member to be a more efficient and effective market maker. (*See* Trial Tr. at 620:11-24 ("Q. And did those market contacts and market information serve you well in taking care of your customers? A. Yes. Q. And did that include the information that you received and gave on the various chat rooms that you participated in? A. Yes.") (Cummins); Trial Tr. at 1675:10-21 ("[M]ore information helps [traders] to manage risk more effectively and it helps them price more accurately.") (Lyons).)

The Rand Chat Room also served as a trading venue where the participants contacted one another to match off their risk positions. (*See* Trial Tr. at 692:20-693:2 ("Q. Now, you had

testified that one of the benefits of the chatroom is that you could go out, tell the other people in the chatroom: Look, I have $10 million dollar/rand and I'm looking to match off.  If you have a match-off, that will be great. … That was an advantage of the chatroom, right?  A.  That's correct.") (Cummins); Trial Tr. at 1205:14-17 ("Q.  That's one of the benefits of a chat room, to be able to match off with people who are trading in the same or similar currency pairs, yes?  A.  Yes.") (Katz); *see also* Trial Tr. at 430:23-432:13, 543:9-14, 651:6-14 (Cummins).)  Direct trading was not only permissible—it was essential to the Rand Chat Room members' jobs as market markers.  (*See* Trial Tr. at 692:20-693:2 (Cummins); Trial Tr. at 1158:2-6 ("Q.  So you knew Mr. Aiyer was short.  You were long a couple, so you matched off with him, and he accepted that, correct?  A.  Correct.  Q.  Nothing wrong with that.  Completely normal?  A. Correct.") (Katz); *see also* Trial Tr. at 128:23-25 ("Q.  Would you agree that the interbank market is where the biggest banks trade with each other?  A.  I think that's the definition of it.") (DeRosa).)  Direct trading allowed the participants to trade at mutually beneficial prices, which resulted in enormous cost savings for the Rand Chat Room members.  (*See* DX-153; Trial Tr. at 1660:19-23, 1661:13-1662:5 (Lyons).)

The Rand Chat Room members were not the only ones who benefited from the chat room.  The benefits of information exchange and direct trading were passed on, at least in part, to the Rand Chat Room members' customers.  (*See* Trial Tr. at 1666:11-1667:15, 1848:22-1849:15, 1858:4-1859:19 (Lyons).)

The Government has never attempted to dispute the benefits of the Rand Chat Room. Instead, the Government argues that these benefits are irrelevant (*see* Trial Tr. 1909:20-25)—that the Court and the jury are only to consider the challenged behavior without context.  But even

considering the interdealer conduct absent any context, none of the interdealer behaviors exhibit the typical qualities that require per se condemnation.

The Reuters trading activity challenged by the Government is either without any competitive significance at all or is in the nature of minor favors extended among parties with a continuing, vertical relationship, with little, if any, market impact. (*See infra* at Section II(A)(2).) To begin with, most of the Reuters trading challenged by the Government was episodes of cancelled trading or allegedly coordinated spoofing, conduct that, by the Government's own admission, (*see* Trial. Tr. at 1918:12-1919:15, 1920:8-12), and the Court's instruction to the jury (*see* Trial Tr. at 2142:16-2143:1 (Koeltl, J., Jury Instruction)), did *not* constitute price fixing or bid rigging. Indeed, these behaviors could not constitute price fixing or bid rigging, because instead of involving the alleged conspirators' agreeing to *restrict* their own supply or demand, they involved attempts to cause other market participants to *increase* their supply or demand. *See F.T.C. v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 (1990) ("[C]onstriction of supply is the essence of price-fixing") (internal citations and quotations omitted).

Whether or not this behavior involved an element of deception, it was not an antitrust violation.

That left the Government with a handful of episodes of alleged coordinated trading. But these episodes, too, did not tend to reduce output or raise prices. The Government offered no evidence that coordinated interdealer trading had any impact on customer prices or currency trading volume. (*See, e.g.*, Trial Tr. at 1318:13-17 (discussing the May 20, 2013 morning episode: "Q. So there is no customer involved in this on any side, not on Mr. Aiyer's side, not

on your side, correct?  A.  Not anymore.  The customer has dealt with him.  Q.  They are out.  So they are unaffected.  A.  Correct.") (Katz).)

Conduct whose effect is limited to counterparties is not price fixing or bid rigging.  *See Granite Partners, L.P.*, 58 F. Supp. 2d at 240 (finding that allegations in Amended Complaint "fail[ed] to plead adequately the anti-competitive effect that is a necessary predicate to all antitrust violations"); *Apex Oil Co.*, 713 F. Supp. at 595; *Phillips Getschow*, 270 F. Supp. 2d at 1046 ("[A]ntitrust laws … were enacted for the protection of competition, not competitors.") (internal citations and quotations omitted).  Such conduct is properly subject only to the rule of reason.  *Id.*  The Government itself recognizes this principle.  As the Government has noted, traditional price fixing agreements occur when competitors "agree[ ] on a price to quote to their *customers.*"  (ECF No. 55, Government's Omnibus Opposition to Motion to Dismiss at 5 (emphasis added).)

Moreover, contrary to the Government's contentions, a court, in determining what mode of analysis applies to the challenged interdealer conduct, *must* assess the context in which the behavior took place, and the possible procompetitive benefits or explanations for the behavior. (*See supra* at Section I(A)(1).)  When this assessment is carried out, it is clear that the interdealer behavior featured by the Government in its case-in-chief was ancillary and integral to a continuing productive buy-sell vertical relationship among the Rand Chat Room members.  The behaviors facilitated matching off transactions, risk management, and informational efficiencies, all of which lowered customer prices and expanded trading volume.  (*See* Trial Tr. at 1666:11-1670:22 (Lyons).)

In particular, "staying out of the way" promoted information sharing among chat room participants.  In almost every episode that could conceivably be identified as coordinated

refraining from trading, one party had—and disclosed to the other parties—a risk position that he was attempting to eliminate.  (*See, e.g.*, August 25, 2011 (GX-121 at 16:46:54 (Mr. Aiyer stating, "i have to buy 8 usd try")); December 21, 2011 (GX-144 at 18:21:17 (Mr. Aiyer announcing, "get paid 10 usd try here")); January 27, 2012 (GX-181 at 15:27:11 (Mr. Katz stating, "short 15 eur ils if you boys get anything")); March 16, 2012 (GX-209 at 18:44:19 (Mr. Aiyer stating, "ubs pays me 7 usd try")); April 2, 2012 (GX-213 at 16:24:57 (Mr. Aiyer saying, "but anyways just get paid 37 usdc zar")); September 10, 2012 (GX-244 at 19:15:02 (Mr. Aiyer announcing, "i got paid … at 40 while off desk … but long 20)); May 20, 2013 (afternoon) (GX-300 at 18:33:09 (Mr. Aiyer saying, "i am long 40 here")).)  This disclosure invited a party with an opposing risk position to engage in a matching off transaction to reduce both parties' risk in a convenient and cost-effective manner.  (*See, e.g.*, Trial Tr. at 650:25-651:14 (Cummins).)

When no such match-off was possible, however, there was an expectation that the parties with no risk position in the relevant currency would refrain from front-running the party seeking to eliminate his risk position.  (*See* Trial Tr. 693:3-13 ("Q.  Now, when you did that, when you disclosed to people what your position was, … and you're telling them what you're looking to do, either sell or to buy, you're giving them information that they can use against you.  Isn't that right?  A.  Yes, it is.  Q.  But your expectation would be:  If you want to trade with me, other side, you're not going to go against me because then I'll stop reaching out to you.  Isn't the fair?  A.  That's fair."  (Cummins); *see also* Trial Tr. at 1716:23-1719:2) (Lyons).)  Without this guarantee, traders would not have been willing to share information with each other, making it less likely that they would have engaged in direct trading.  (*See* Trial Tr. at 1387:4-1388:7, 1389:15-1390:4 (Katz); DX-324-T at 1:3-8, 4:12-20.)

When disclosure of a risk position by one party elicited the information that another party had the same risk position, the party with the smaller risk position may have allowed the party with the larger risk position to trade out his position first, or the two parties may have coordinated their trading.  The same considerations underlie these circumstances: cost-efficient risk reduction and the avoidance of unnecessary volatility that leads to the widening of spreads.  (*See* Trial Tr. at 1668:22-1672:6; 1715:7-1716:4 (Lyons).)  Such cooperation has a procompetitive purpose and likely effect and cannot be, as a matter of law, per se illegal.  *BMI*, 441 U.S. at 9.

Moreover, trading on Reuters is different from a procurement auction vulnerable to classic bid rigging.  Foreign exchange traders are not generally independent sources of supply or demand; they reflect the supply or demand of their customers, which traders themselves generally do not alter.  (*See* Trial Tr. at 1669:19-1670:5, 1670:23-1671:5) (Lyons).)  Thus, trading on Reuters is simply a reallocation of risk rather than an alteration of supply or demand.  To the extent the Rand Chat Room members coordinated their trading on Reuters, they did not permanently remove their supply or demand from the market.  They merely deferred it, typically only for a matter of minutes.  (*See* Trial Tr. at 1713:25-1716:8 (Lyons).)  This is completely different from bid rotation, the bid rigging condemned as a per se antitrust violation, where coconspirators permanently remove their demand, allowing one person to win a "competitive" bid, and never place their demand back into the market.  *See United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994) (Posner, J.) ("[T]he vast majority of cases in which the term [bid rigging] has appeared have treated it as a synonym for bid rotation.") (collecting cases).

For these reasons, the Government should not have been permitted to offer episodes of alleged coordinated trading on Reuters as part of its proof of a criminal antitrust conspiracy.

\*   \*   \*   \*

The Court was required to analyze the conduct challenged by the Indictment, carefully consider the arguments offered by Mr. Aiyer in support of the practices at issue, and characterize the conduct as subject to the rule of reason or per se illegal.  Many, if not all, of the episodes challenged by the Government are not per se violations of the Sherman Act, and evidence about them should have been excluded or stricken.  Accordingly, Mr. Aiyer requests that the Court enter a judgment of acquittal or grant a new trial, during which the evaluation and characterization of the conduct at issue can occur.

## II.   The Court Should Enter A Judgment Of Acquittal For Mr. Aiyer Pursuant To Rule 29.

The Court should enter a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 because the evidence presented by the Government at trial was insufficient to sustain a conviction and no reasonable jury could find guilt beyond a reasonable doubt.

Under Rule 29(a), "after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction."  Fed. R. Crim. P. 29(a).  A judgment of acquittal is warranted when "no rational trier of fact could find guilt beyond a reasonable doubt."  *United States v. Pauling*, 924 F.3d 649, 655 (2d Cir. 2019) (citing *Jackson v. Virginia*, 443 U.S. 307, 317 (1979)).  However, the application of this standard "does not … mean that a reviewing court must affirm all jury verdicts," nor does it "mean that if there is any evidence that arguably could support a verdict, [the reviewing court] must affirm," since "[i]n any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution."  *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015).  Instead, the record must be assessed to determine "whether a jury could

*reasonably* find guilt beyond a reasonable doubt." *Id.* (emphasis in original) (internal citations and quotations omitted).

When the Government's evidence, viewed in the light most favorable to the Government, is "at least as consistent with innocence as with guilt," the conviction cannot stand. *United States v. Finnerty*, 474 F. Supp. 2d 530, 537 (S.D.N.Y. 2007), *aff'd*, 533 F.3d 143 (2d Cir. 2008); *see also United States v. Cassese*, 428 F.3d 92, 103 (2d Cir. 2005) ("[T]he evidence, at best, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, and thus a reasonable jury must necessarily entertain a reasonable doubt.") (internal citations and quotations omitted); *United States v. Gotti*, 457 F. Supp. 2d 403, 405 (S.D.N.Y. 2006) (same); *United States v. McIntosh*, No. 11 CR. 500 (SHS), 2014 WL 199515, at *4 (S.D.N.Y. Jan. 17, 2014) (same).[3]

A.    The Evidence Was Insufficient To Prove That Mr. Aiyer Entered Into A Price Fixing Or Bid Rigging Agreement.

Under the Sherman Act, the Government was required to prove that Mr. Aiyer engaged in the charged conspiracy "through 'direct or circumstantial evidence that reasonably tends to prove that [Mr. Aiyer] had a conscious commitment to a common scheme designed to achieve an unlawful objective'"—here, price fixing and bid rigging. *Cenedella v. Metro. Museum of Art*,

---

[3] The Court should enter a judgment of acquittal for the alternative reason that the Sherman Act is void for vagueness. Under the void-for-vagueness doctrine, a criminal statue must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983). In other words, if a "person of ordinary intelligence" cannot understand the conduct proscribed by a statute, he is not on "fair notice" and due process prohibits its application. *Skilling v. United States*, 561 U.S. 358, 416 (2010) (internal citation and alterations omitted); *see also United States v. Bogucki*, No. 18-CR-00021-CRB-1, 2019 WL 1024959, at *7 (N.D. Cal. Mar. 4, 2019) ("A touchstone of our criminal law is that no person 'shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.'") (citing *United States v. Lanier*, 520 U.S. 259, 265 (1997)). The conduct detailed by the Government's trial evidence does not demonstrate that Mr. Aiyer engaged in or agreed to engage in "manifestly anticompetitive" conduct of the type that is condemned under the Sherman Act. *Leegin*, 551 U.S. at 886. Simply stated, a person of normal capacity could not be expected to understand that the conduct at issue here was prohibited by law.

348 F. Supp. 3d 346, 358 (S.D.N.Y. 2018) (Koeltl, J.) (citing *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 764 (1984)).

Based on the evidence presented at trial, no reasonable jury could find that Mr. Aiyer entered into an agreement to fix prices and rig bids with Mr. Katz, Mr. Cummins, and Mr. Williams.  Mr. Cummins, one of the two cooperating witnesses that the Government offered to prove the existence of such an agreement, in fact said the opposite—that he and his fellow Rand Chat Room members did not have any agreement, "formal or informal," to engage in any kind of activity whatsoever.  (Trial Tr. at 633:16-634:4.)  Mr. Cummins suggested that there was a general "understanding" among Mr. Aiyer and his alleged coconspirators (Trial Tr. at 633:24-634:4), describing the "understanding" as "work[ing] together to help each other out in trading in the markets."  (Trial Tr. at 194:21-195:1.)  More importantly, however, Mr. Cummins testified as to every single trading episode he was questioned about that nothing improper happened, and/or that he acted independently, and/or that he did not coordinate his trading activity with Mr. Aiyer.  (*See infra* at Section II(A).)  This specific testimony trumps any generic testimony about any generic "understanding" to engage in criminal antitrust behavior.

Mr. Katz testified that the Rand Chat Room members agreed to fix prices and rig bids.  (Trial Tr. at 822:12-16.)  He never attempted to explain what this meant, however, (*see, e.g.*, Trial Tr. at 1114:21-1115:1) ("Q.  But do you remember whether you violated any antitrust laws in your dealings with Mr. Howes?  A.  I'm not – antitrust?  I'm not an attorney.  We did – we traded together.  I was at Barclays when he was at Absa, which were the same bank.  When I was at BNP, we were different banks.  I don't remember any particular deals, no.") (Katz)), and, like Mr. Cummins, testified on numerous occasions that he did not coordinate his trading with Mr. Aiyer or that he and/or Mr. Aiyer acted independently.  (*See, e.g.*, Trial Tr. at 1241:20-24,

1234:16-18, 1235:17-23.)  Mr. Katz also gave nearly incomprehensible explanations that some of his improper conduct with various individuals was done pursuant to an agreement, some identical conduct was merely "one or two off" but not pursuant to an agreement, and other identical conduct was done pursuant to an agreement that supposedly terminated in Mr. Katz's mind, although general wrongful conduct continued.  (*See* Trial Tr. at 927:2-928:3, 1083:14-1088:13, 1092:15-1093:17, 1094:15-1095:7, 1115:12-1116:10, 1222:19-1223:20.)

On the basis of the evidence presented, no reasonable jury could find, beyond a reasonable doubt, that there was a "common scheme" in the challenged behavior.  Not only is there an insufficient basis for such a finding, but an agreement consisting of conduct as ambiguous as the conduct described at trial—such as sharing information so a competitor could change his price if he wanted, trading on behalf of another trader in the interdealer market, spoofing on behalf of another trader, and generally working together to make more money—does not constitute an agreement to engage in "manifestly anticompetitive" conduct of the type that is condemned under the per se doctrine.  *Leegin*, 551 U.S. at 886.

As discussed above and in further detail below, Mr. Cummins and Mr. Katz testified time and again that they acted independently of Mr. Aiyer during trading episodes framed by the Government as coordinated.  Mere parallel conduct cannot suffice under the law, as "[a]n inference of conspiracy will not arise when the conspirators' parallel conduct made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as [they] suggest anticompetitive conspiracy." *In re Interest Swaps Antitrust Litig.*, 261 F.Supp.3d 430, 462 (S.D.N.Y. 2017) (internal citations and quotation marks omitted).  Because, in none of the episodes cited by the prosecution, the

Rand Chat Room members *acted* pursuant to an agreement to fix prices or rig bids, the evidence seriously calls into question whether there was an *agreement* to fix prices or rig bids at all.

Finally, there is no way for a reasonable juror to infer that Mr. Aiyer—even if he agreed to engage in the conduct detailed at trial—acted with the requisite criminal intent to fix prices and rig bids. *U.S. Gypsum Co.*, 438 U.S. at 446 (defining intent in a criminal antitrust case as "knowledge of likely [anticompetitive] effects"). Even if prices were affected by the alleged conduct, this would still not suffice in making out a per se price fixing and bid rigging case. *Apex Oil*, 713 F. Supp. at 596 ("[I]f the purpose of the alleged conspiracy is not price-fixing, but prices are nevertheless affected by the challenged behavior, that behavior must be judged under the Rule of Reason.").

Viewed in the light most favorable to the Government, "the evidence, at best, gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, and thus a reasonable jury must necessarily entertain a reasonable doubt." *Cassese*, 428 F.3d at 103 (internal citations and quotations omitted).

1.   *Russian Ruble and Polish Zloty Transactions.*

As discussed in Section I(B)(1), episodes of trading in the ruble and the zloty should have been ruled to be not per se antitrust violations and should not have been submitted to the jury. Even if the jury were properly asked to decide whether these episodes constituted price fixing or bid rigging, however, no reasonable jury could find beyond a reasonable doubt that any transaction related to the ruble or zloty constituted price fixing or bid rigging under the Sherman Act.

With respect to the ruble and the zloty, from the testimonial and documentary evidence presented at trial, no reasonable jury could conclude that any of the members of the Rand Chat Room agreed what price or prices they would quote to a customer that inquired about a

transaction in either currency.  There was no evidence, testimonial or documentary, of an agreement that other Rand Chat Room members would disclose their prices to Mr. Aiyer for the purpose of allowing him to quote a customer a price or prices more favorable to himself and less favorable to the customer.  Although Mr. Katz suggested that he "agreed" not to compete with Mr. Aiyer in the ruble, he did not testify that Mr. Aiyer asked him to agree to this, and it is clear in context that Mr. Katz unilaterally decided not to compete.  In actuality, all the evidence showed was that: (1) Mr. Katz, Mr. Cummins, and (sometimes) Mr. Williams consulted Mr. Aiyer about the pricing of ruble or zloty transactions because of his expertise; (2) Mr. Aiyer agreed to take on the ruble or zloty positions that Mr. Katz, Mr. Cummins, or Mr. Williams acquired from customers if they engaged in customer transactions, and advised them of the prices at which he was willing to do so; and (3) Mr. Katz, Mr. Cummins, and (sometimes) Mr. Williams used information, including pricing information, provided by Mr. Aiyer to make independent decisions to avoid risky transactions in which they did not want to engage.  This is neither price fixing nor bid rigging.

The evidence adduced at trial as to the six dates involving the ruble and zloty failed to establish beyond a reasonable doubt any of the essential elements of the charged antitrust crime: an agreement for the purpose of fixing prices or rigging bids, which Mr. Aiyer knowingly joined. Rather, the evidence affirmatively established that all six episodes followed the same pattern: Mr. Aiyer was vertically situated with respect to Mr. Katz, Mr. Cummins, and Mr. Williams, and the trading activity at issue was the product of the traders' independent decision-making, including numerous instances in which Mr. Cummins and Mr. Katz independently decided to quote poor prices to *avoid* winning the business.  Either verticality or independent action, standing alone, separately precludes a finding that Mr. Aiyer committed the crime charged here;

that both are present throughout these episodes definitively forecloses a finding of a criminal

antitrust violation as a matter of law.  (*See supra* at Section I(B); *see also* Trial Tr. at 2136:14-

2137:9 ("The antitrust laws involved in this case are concerned only with joint action and

agreements among competitors – not with actions taken independently by a single competitor.

The independent actions of a person can never constitute a restraint of trade in violation of the

Sherman Act. …") (Koeltl, J., Jury Instruction).)

 As a general matter, Mr. Katz testified that he was not a competitor of Mr. Aiyer in the

ruble.  (*See* Trial Tr. at 1128:6-8 ("I could not compete with [Mr. Aiyer], no.") (Katz); *see also*

*supra* at Section I(B).)  This admission eliminates from the ruble episodes a required component

of the Government's antitrust case: a horizontal competitor.  (*See* ECF No. 122, Government

Proposed Jury Instructions at 6; *see also id.* at 2 ("The purpose of the Sherman Act is to preserve

free and unfettered competition in the marketplace by prohibiting certain types of agreements

between *competitors*, so that the marketplace may receive better products and services at lower

cost.") (emphasis added).)

 But even if this fact were not fatal to the episodes as a strictly technical matter, Mr.

Katz's admitted lesser competency in, and aversion to, the ruble makes an antitrust conspiracy

with Mr. Aiyer implausible for other reasons:  it undermines any motive for Mr. Aiyer to enter

into a conspiracy with someone far less skilled than he in order to "maximize profitability" in the

first place (Trial Tr. at 212:2-4, 319:11-12 (Cummins)); it undermines the notion that Mr. Katz in

fact could restrict competition or reduce output at all; and, most significantly, it provides a

framework to understand each and every ruble transaction involving Mr. Katz: he elected on his

own not to compete.

a.   *October 14, 2010*

The evidence concerning October 14, 2010, a date involving the ruble, shows that Mr. Aiyer was in a vertical relationship with two intermediaries, Mr. Katz and a broker, and that Mr. Aiyer had no control over what price any other market maker quoted to the customer. These facts are inconsistent with a finding of a conspiracy between Mr. Katz and Mr. Aiyer to fix prices and harm the customer.

On this date, Mr. Katz was approached by a customer, McKinsey, for a price in a ruble transaction. (*See* Trial Tr. at 943:23-944:10 (Katz).) At the same time, Mr. Aiyer was asked by a broker, ICAP, on behalf of three different banks, for a price in the same ruble transaction. (*See* Trial Tr. at 945:21-946:21, 1264:11-19, 1265:5-15 (Katz).) The customer did not approach Mr. Aiyer directly. (*See* Trial Tr. at 1267:8-10 (Katz).)

Both the chat and Mr. Katz's own testimony establish that on this date Mr. Aiyer was vertically situated with respect to both Mr. Katz and the broker, ICAP, and at no time dealt directly with the customer. (Trial Tr. at 1265:2-4 ("Q.  And for Mr. Aiyer, there is no customer involved.  He is only dealing with the broker.  A.  Correct."); Trial Tr. at 1267:8-10 ("Q.  Well, he [Mr. Aiyer] didn't deal with the customer at all.  You dealt with the customer.  A.  Correct.").) Mr. Aiyer stated, "sh[ow] it [the price] neu[t]ral … i ll support it … b[o]th ways." (GX-101 at 17:51:15.) Mr. Katz testified on direct examination that what Mr. Aiyer meant by this statement was that Mr. Aiyer "doesn't care whether he gets out of his position, reduces it or not.  He said just show the accurate price, whichever way it is, he'll take it into his book … [I]f they [the customer] deal[s], he'll take it." (Trial Tr. at 944:11-17.)

And that is precisely what happened on this date.  Mr. Katz's quote was accepted by the customer, and Mr. Katz simultaneously offset his position by transacting with Mr. Aiyer. (*See* Trial Tr. at 963:6-10 ("[T]his is the offsetting trade where I sold to the customer and … to flatten

myself out, I would have to buy from Akshay. … I have no position.  I have passed it on.")
(Katz); Trial Tr. at 1269:3-14 ("Q.  So [Mr. Aiyer] traded with you *to supply you with the
liquidity* to fill this customer's order, correct?"  A. *Yes*.  We did the deal and then transferred it
over to him [Mr. Aiyer].  Q.  You didn't have – take on any risk.  Is that fair?  A.  Correct.")
(Katz) (emphasis added).)

     Mr. Aiyer had no control over what prices, if any, the banks that approached ICAP
quoted to the customer on October 14, 2010.  He had no control over whether, in formulating
their quotes to the customer, they relied on Mr. Aiyer's initial quote to ICAP, his revised quote to
ICAP, or neither.  Mr. Aiyer was under no obligation to provide a price quote to ICAP or to any
of the banks that approached ICAP, and if he elected to provide quotes to any other market
maker or broker, he was under no obligation to treat them equally: he was free, if he chose, to
favor Mr. Katz or any other party.

     The record makes clear that Mr. Aiyer posted the most competitive bid for this
transaction and that it was available in the market for a period of time during which "a lot can
happen on the trading floor."  (Trial Tr. at 1746:24-1747:10 (Lyons); *see also* Trial Tr. at 123:2-
17 (DeRosa).)  The customer could have approached Mr. Aiyer directly and gotten this quote, or
any other market maker could have used it to formulate his own quote.  After no one—customer
or market maker—acted on Mr. Aiyer's initial quote, Mr. Aiyer refreshed his quote. (Trial Tr. at
949:18-24 ("Q.  And what do you understand Mr. Aiyer to refer when he says, 'Three banks are
asking him FYG'?  A.  Sure.  So he's going into -- you know, he'll call the broker, he'll ref the
price. … And he's informing me that three other banks are asking him for the same deal at the
moment."); Trial Tr. at 1274:14-19 (Katz).)  As shown by the McKinsey Trade Ticket, only two
prices reached the end-user customer, McKinsey, for this transaction, one of which was Mr.

Katz's.  (*See* DX-247; Trial Tr. at 1272:12-24 (Katz).)  Mr. Katz's quote was the most competitive price and the one on which the customer transacted.  (*See* DX-247.)

On the basis of the evidence presented, no reasonable jury could find beyond a reasonable doubt that this transaction, in which Mr. Aiyer's relationship to both Mr. Katz and ICAP was purely vertical, and in which Mr. Aiyer had no control whatsoever over the other banks approached by McKinsey for a price quote, was the product of a conspiracy to fix prices or rig bids.

> b.    *November 4, 2010*

On November 4, 2010, Mr. Aiyer was approached for a price in a ruble transaction.  (*See* Trial Tr. at 934:5-9 (Katz).)  Mr. Aiyer informed Mr. Katz about the transaction and, without any input or discussion from Mr. Katz, told Mr. Katz what price he decided to quote.  (*See* Trial Tr. at 934:10-13, 1241:11-19 (Katz); *see also* GX-102 at 20:03:02-20:03:16.)  Mr. Katz informed Mr. Aiyer that he, too, was approached for a price in the same transaction and subsequently informed Mr. Aiyer, without any input from Mr. Aiyer, what price he decided to quote.  (*See* Trial Tr. at 1241:20-24; see also GX-102 at 20:03:37.)

On cross examination, Mr. Katz admitted that Mr. Aiyer's price on the transaction at issue on this date was the product of Mr. Aiyer's own independent judgment.  (Trial Tr. at 1241:11-19 ("Q.  And Mr. Aiyer tells you what price he quoted.  Isn't that right?  A.  Correct.  Q. 30.99.  Now, that was his price, wasn't it?  A.  Yes.  Q.  He didn't ask you for any advice on that, did he?  A.  No.  Q.  You didn't give him any advice on that, not on the ruble.  A.  No.")).  Mr. Katz also admitted that the price that *he* quoted on the transaction at issue was the product of *his own* independent judgment.  (Trial Tr. at 1241:20-24 ("Q.  So you decide, with [Mr. Aiyer] having done 30.99, that you would go 30.98, correct?  A.  Correct.  Q.  And that was your decision, to go 30.98, yes?  A.  Yes.")).

On the basis of the evidence presented, no reasonable jury could find beyond a reasonable doubt that a transaction that was independently priced by both of the parties involved, according to the alleged coconspirator's own testimony, was the product of a price fixing or bid rigging conspiracy.

November 4, 2010 was also the day on which Mr. Katz said to Mr. Aiyer, "conspiracies are nice," the hallmark quote of the Government's case.  (*See* GX-102 at 20:06:23.)  When questioned about this quote, Mr. Katz expressly admitted on cross examination that the so-called "conspiracy" never happened.  (Trial Tr. at 1243:23-1244:12 ("Q.  So you are the one who said 'conspiracies are nice,' right?  A.  Correct. … What I'm referring to [in the quote] is into the switch it up now and then, to trick the customer into keep coming back to us. … Q.  And that's something you didn't do.  A.  Correct.").)

### c.    *November 22, 2011*

The evidence concerning November 22, 2011, a date involving the ruble, again, shows the verticality of Mr. Aiyer and Mr. Katz's relationship and Mr. Katz's independent decision-making to price less competitively than Mr. Aiyer.  The evidence further establishes that both Mr. Katz and Mr. Aiyer were pleased not to have won the transaction, which contradicts the theory that Mr. Katz and Mr. Aiyer conspired to fix prices or rig bids to the detriment of the customer.

On this date, Mr. Katz was asked for a price in a ruble transaction and contacted both Mr. Cummins and Mr. Aiyer for assistance with pricing it.  (*See* Trial Tr. at 1231:18-23, 1232:7-20, 1233:4-21; 1234:19-22 (Katz); *see also* GX-139 at 20:18:36-20:19:20.)  Mr. Aiyer informed Mr. Katz that he, too, was approached to price the transaction and told him what price he decided to quote.  (*See* Trial Tr. at 1234:19-1235:3; GX-139 at 20:19:18-27.)  Mr. Katz then decided, without any input from Mr. Aiyer, to "show worst [sic]."  (Trial Tr. at 1235:17-23 (Katz).)

Neither won the business, and both confirmed that was the result that they had intended.  (*See* Trial Tr. at 1236:3-8, 1236:17-18 (Katz); GX-139 at 20:19:52-37.)

Mr. Katz's own testimony confirmed the vertical relationship between himself and Mr. Aiyer on this date, and Mr. Katz's general inability to price the ruble and dependence on Mr. Aiyer.  When faced with a complicated ruble forward transaction on this date, Mr. Katz reached out to Mr. Cummins and Mr. Aiyer for assistance with pricing it.  (*See* Trial Tr. at 1232:17-20, 1233:11-21, 1234:5-7, 1234:19-22 (Katz).)  Mr. Katz confirmed that his initial strategy as to this particular transaction was to "see if Mr. Aiyer" had interest in pricing the transaction, after which he would pass Mr. Aiyer's price along to the customer and transfer to Mr. Aiyer any assumed position:  If Mr. Aiyer "wanted it [the transaction], he could have it," according to Mr. Katz. (Trial Tr. at 1233:25-1234:9, 1234:19-1235:6.)  Mr. Aiyer then informed Mr. Katz what price he independently decided to show on the transaction, and Mr. Katz subsequently decided *on his own* to "show wors[e]."  (Trial Tr. at 1234:16-18; Trial Tr. at 1235:17-23 ("Q.  So you made a decision that you were going to show worse, whatever it was that you were going to show, this is you making a decision as to what you would do, correct?  A.  Correct.") (Katz).)

Neither Mr. Aiyer nor Mr. Katz won the transaction, and the record amply supports that they were *aiming* for this result.  (*See* Trial Tr. at 1236:3-6, 1236:17-18 ("Q.  And you were happy not to get the trade, correct?  A.  Yes.") (Katz); GX-139 at 20:19:52-20:20:37 (Mr. Aiyer and Mr. Katz discussing not winning the business as "good" and "one less thing to worry about.").)  Mr. Katz testified that this date was approaching Thanksgiving, and neither trader wanted to assume a risk position.  (*See* Trial Tr. at 1277:12-1278:15.)  No reasonable jury could find beyond a reasonable doubt that the clearly vertical arrangement between Mr. Katz and Mr.

Aiyer, coupled with the admittedly independent judgments and the *avoidance* of business on this date, is at all consistent with a conspiracy to fix prices and rig bids.

                  d.     *February 23, 2012*

The evidence concerning February 23, 2012, a date involving the zloty and koruna, shows, by Mr. Cummins' own admission, that no coordination took place on this date and that Mr. Cummins, like Mr. Katz on November 22, 2011, independently priced a transaction to *avoid* winning the business.

On this date, Mr. Cummins was approached for a price in the zloty against the koruna. (*See* Trial Tr. 661:2-12 (Cummins).) Mr. Williams and Mr. Aiyer responded that they were approached for a price in the same transaction. (*See* Trial Tr. at 661:13-20 (Cummins); GX-189 at 21:42:43-21:42:52.) Mr. Aiyer and Mr. Cummins discussed what prices they had decided to quote, and Mr. Cummins made clear that he hoped not to win the business. (*See* Trial Tr. at 664:11-665:13 (Cummins); GX-189 at 21:42:43-21:46:04.)

Mr. Cummins admitted several times that he and Mr. Aiyer independently priced the transaction at issue and did not coordinate. (Trial Tr. at 664:11-665:11 ("Q. And what were you communicating [when you stated, 'I showed 66.0145.']? A. I am communicating the price that I showed to the client for this cross of Poland versus Czech. Q. And that was a price that *you decided on*, you selected, you actually provided to the customer. *No one told you what to do there*, right? A. Correct. There is *no coordination* between you and Mr. Aiyer and Mr. Williams as to what you showed the customer, correct? A. That's correct. Q. You then say "reffed" [meaning "refreshed" the price] … Do you see that? A. Yes. And *that was your decision*, correct? No one here is telling you to do that? A. Correct. … Q. A decision that you made on your own, correct? A. Yes.") (emphasis added).) If there were any doubt remaining, when Mr. Cummins was directly asked, "You are *not coordinating anything about this*

*particular transaction*, is that right?," he testified, "That's correct." (Trial Tr. at 666:9-11 (emphasis added).)

Moreover, Mr. Cummins testified that he was not responsible for trading the zloty, just as he was not responsible for trading the ruble, and that he was trying *not* to win this business, an objective that directly conflicts with that of a price fixing or bid rigging conspiracy. (*See* Trial Tr. at 662:4-25, 665:12-13.) With Mr. Cummins' direct admissions on the lack of coordination, the independence of his pricing, and his admitted intent to avoid the business, no reasonable jury could find beyond a reasonable doubt that the activity on this date was the product of a conspiracy to fix prices or rig bids.

e. *February 28, 2012*

The evidence concerning February 28, 2012, a date involving the ruble, established that Mr. Cummins and Mr. Aiyer were in a vertical relationship, that the pricing of the transaction at issue was independent, and that a perfectly benign alternative explanation existed for the price "update" by Mr. Aiyer on which the Government focused.

On this date, Mr. Cummins was approached for a price in the ruble and contacted Mr. Aiyer for assistance. (*See* Trial Tr. at 509:8-24 (Cummins).) Mr. Williams and Mr. Aiyer indicated that they were approached in the same transaction. (*See* Trial Tr. 510:4-16 (Cummins).) None of the traders directed anyone else's pricing on the transaction, and Mr. Aiyer ultimately offered to "take [the risk] from everyone" if the customer dealt on the other traders' quotes. (*See* Trial Tr. at 513:21-515:12, 515:15-516:11, 516:22-517:16, 517:20-518:2 (Cummins); Trial Tr. at 1857:11-1858:2 (Lyons).)

The chat itself makes evident that Mr. Cummins sought Mr. Aiyer's ruble expertise on this day and that he and Mr. Williams were situated vertically with Mr. Aiyer. Mr. Cummins wrote to Mr. Aiyer: "can you help me w/a lvl … Mar-Jun6 RUB." (GX-193 at 18:16:17-22.)

Two hours later, Mr. Cummins sought Mr. Aiyer's help with the transaction at issue in the case: "where 1m RUB NDF? … asked for bid in $5," meaning that Mr. Cummins was asking for the price of a certain instrument, a one month ruble non-deliverable forward in an amount of $5 million, according to Mr. Cummins' own testimony.  (*See* GX-193 at 20:21:05-10; Trial Tr. at 509:8-16, 509:25-510:3.)

Mr. Cummins himself confirmed that he was reaching out to Mr. Aiyer here, an expert in the ruble, because Mr. David O'Shea, the expert in the ruble at Mr. Cummins' bank, was unavailable.  (Trial Tr. at 248:10-13, 509: 17-24 ("Q.  And you were asking [about the one month non-deliverable forward transaction] because your ruble trader, Mr. O'Shea, wasn't in.  Is that right?  A.  Yes.  Q.  So you were going to, among others, Mr. Aiyer, who is an expert, is that right?  A.  Yes.  Q.  Nothing wrong with that.  A.  Nothing wrong with asking for it, no.") (Cummins).)  The chat also shows, in conjunction with Professor Lyons' testimony, that Mr. Aiyer was acting as a potential supplier of liquidity for Mr. Cummins and Mr. Williams as to this transaction, reaffirming the vertical structure of Mr. Aiyers' relationship to the other traders. (GX-193 at 20:23:10-13 ("if she [the customer] gives [to] everyone, I can take from everyone."); Trial Tr. at 1857:11-1858:2 (Mr. Aiyer "is acting as a supplier of liquidity in this instance or he's offering to supply liquidity.") (Lyons).)

Furthermore, Mr. Cummins admitted on cross examination that each and every individual involved with this transaction priced the transaction independently.  (*See* Trial Tr. at 513:21-515:12 (Mr. Cummins agreeing that Mr. Williams' price was "[h]is decision entirely"); Trial Tr. at 516:22-517:16 (Mr. Cummins agreeing that his price was "decided on [his] own"); Trial Tr. at 515:15-515:25; Trial Tr. at 517:20-518:2 (Mr. Cummins agreeing that Mr. Aiyer's updated price was "a decision … that [Mr. Aiyer] made himself.").)

The evidence also affirmatively shows that there was an equally plausible, benign explanation for Mr. Aiyer's challenged trading activity.  The Government seized on the fact that Mr. Aiyer "updated" his quote on this transaction sometime after Mr. Cummins shared what price he himself quoted.  (*See* Trial Tr. at 249:2-5 (Cummins' testimony).)  But the record demonstrates the possibility that the customer was splitting its order on this date, and thus Mr. Aiyer's updating his price would have been a permissible and logical response to that type of market information.  (*See* GX-193 at 20:21:05-20:23:13; Trial Tr. at 511:1-513:20 (Cummins); Trial Tr. at 1504:4-1505:11 (Waller).)  Moreover, there was *no* testimony—none—that either Mr. Cummins or Mr. Williams *agreed* to disclose their own quotes to the customer to Mr. Aiyer *so that* Mr. Aiyer could adjust his own quote more advantageously.  With ample evidence on the vertical structure of this transaction, multiple admissions that each trader priced the transaction independently, no evidence of an agreement to disadvantage the customer, and the equally plausible alternative explanation for Mr. Aiyer's own pricing behavior, no reasonable jury could find beyond a reasonable doubt that that this transaction was the product of a horizontal conspiracy to fix prices or rig bids.

> f.    *March 1, 2012*

On March 1, 2012, Mr. Williams expressed confusion about the market activity in the ruble and Mr. Aiyer explained that there had been an "oil explosion," impacting the price of the ruble.  (*See* Trial Tr. at 521:2-524:5 (Cummins); GX-197 at 20:24:55-20:26:39.)  Based on this information from Mr. Aiyer, and encouraged by Mr. Williams, Mr. Cummins decided to avoid being a buyer of the ruble in a transaction he was approached to price.  (*See* Trial Tr. at 526:22-527:2 (Cummins).)

The chat itself and Mr. Cummins' own testimony establish that Mr. Cummins utilized Mr. Aiyer's ruble expertise on this date and ultimately formulated his own independent ruble

price.  When Mr. Williams expressed confusion about market activity in the ruble on this day,

Mr. Aiyer dispelled the confusion and explained to Mr. Williams and Mr. Cummins that an "oil

explosion" was impacting the price of the ruble.  (*See* GX-197 at 20:24:55-20:26:39; Trial Tr. at

522:20-5:24:5 (Cummins).)  Mr. Cummins admitted that he received this market information

from Mr. Aiyer, formulated his own strategy based on the information, and decided to avoid the

business:  "I concluded, based upon the feedback I saw here in the chat, that I should show a

much lower price; that the last thing that I wanted was to buy."  (Trial Tr. at 526:22-527:2.)

Elsewhere, Mr. Cummins admitted again: "[F]or me with the ruble, because it was

complex, … I just want to show the price that doesn't win the deal. … I'll move my price

lower."  (Trial Tr. at 527:11-18.)  When asked again whether that decision to lower the price was

his own, Mr. Cummins testified that the price was the product of his own decision and that no

one—not Mr. Aiyer or Mr. Williams—told him what to price.  (Trial Tr. at 527:19-528:3 ("Q.

And you made that decision yourself, correct?  A.  Yes.  Q.  Based on the information that you

had?  A.  Yes.  Q.  Mr. Aiyer didn't tell you what to do.  A.  He did not.  Q.  Mr. Williams didn't

tell you what to do, correct?  A.  Correct.  Q.  And no one told you what to do.  You made up

your own mind.  A.  Yes.").)

No reasonable jury could find beyond a reasonable doubt that Mr. Aiyer's sharing of

market color as a ruble expert, Mr. Cummins' independent pricing of the transaction, and Mr.

Cummins' admitted aim of avoiding the business, amounted to a conspiracy to fix prices or rig

bids.

Mr. Aiyer should be acquitted to the extent the charged Sherman Act conspiracy is

predicated on improper trading in the ruble or zloty.

2.      *Reuters Trading.*

As discussed in Section I(B)(2), episodes of trading on Reuters should have been ruled to be not per se antitrust violations and should not have been submitted to the jury.  Even if the jury were properly asked to decide whether these episodes constituted price fixing or bid rigging, however, no reasonable jury could find that any episode of trading on Reuters was in fact price fixing or bid rigging under the Sherman Act.  The evidence adduced at trial as to the dates concerning trading on Reuters failed to establish beyond a reasonable doubt any of the essential elements of the charged antitrust crime: an agreement with the purpose of fixing prices or rigging bids, which Mr. Aiyer knowingly joined.  Rather, the evidence affirmatively established that the trading activity concerning the at-issue transactions was the product of traders' independent decision-making, and that the behavior had no impact on the price, or the supply or demand visible, on Reuters.

a.      *Cancelled Trades and Spoofing*

To begin with, most of the episodes of Reuters trading concerning which the Government offered evidence at trial were episodes of cancelled trades or allegedly coordinated spoofing.  As the Government conceded, and as the Court properly instructed the jury, these episodes were not proof of the price fixing/ bid rigging conspiracy charged in the Indictment, and were offered only as background and to show the relationship of the parties.  (*See* Trial Tr. at 2142:16-2143:1 ("You have heard evidence in this case about 'spoofing' conduct or canceled trades which do not, in and of themselves, constitute the charged criminal conspiracy and are not in themselves illegal.  You may not return a verdict of guilty solely because you find the defendant alone or in combination with others engaged in spoofing or trades that were subsequently canceled. However, such evidence may be considered to determine the relationship between the defendant and his coconspirators, and his knowledge of, and intent to advance, the purpose of the

conspiracy charged in the indictment, namely, to fix prices and rig bids.") (Koeltl, J., Jury Instruction).)

Cancelled trades and spoofing do not implicate the concerns typically associated with antitrust violations because these trades do not suppress supply or demand by the parties; instead, cancelled trades and coordinated spoofing are intended to *increase* supply or demand by *other* parties.  As Professor Lyons testified, engaging in cancelled trades and spoofing can serve as an "important inducement" tool for traders that enables them to induce other market participants to enter the market and therefore add supply.  (Trial Tr. at 1789:22-1790:6.)

Even if it were determined, therefore, that the cancelled trade and spoofing episodes involved behavior resembling manipulation or fraud, they do not involve the restriction of output, and therefore do not amount to an antitrust violation.  *See Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 423 ("[C]onstriction of supply is the essence of price-fixing") (internal citation and quotation marks omitted); *Chicago Prof'l Sports Ltd. P'ship v. NBA*, 95 F.3d 593, 597 (7th Cir. 1996) ("The core question in antitrust is output.  Unless a contract reduces output in some market, to the detriment of consumers, there is no antitrust problem"); *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (affirming the district court's order granting summary judgment of a Sherman Act claim in part because the claimant "adduced no evidence of any reduction of or agreement to reduce 'output'"); *Volmar Distributors, Inc. v. New York Post Co.*, 825 F. Supp. 1153, 1160 (S.D.N.Y. 1993) (an antitrust injury allegation requires a showing that the "loss comes from acts that reduce output or raise prices to consumers") (internal citations and quotations omitted).

*i.     Cancelled Trades.*

Three of the trading episodes identified by the Government as problematic—the April 20, 2011, April 26, 2011, and August 25, 2011 episodes—involved cancelled trades.  The evidence

presented at trial demonstrated that Mr. Aiyer either failed to achieve his supposed goal for these trades—raising or lowering prices to his advantage—or that the cancelled trades were not made in order to impact price.

The Government's theory with respect to these cancelled trades is that Mr. Aiyer and the Rand Chat Room members placed "fake bids and offers" to "drive [the] price of currencies to their advantage."  (Trial Tr. at 42:10-13, 44:22-24 (Government Opening Statement).)

Contrary to the Government's assertions, however, not one of the three instances of cancelled trades resulted in the impact on price that was supposedly intended, and the Government's own witnesses confirmed this.  With respect to the April 20, 2011 episode, Mr. Katz testified on direct examination that Mr. Aiyer wanted to execute the cancelled trade with Mr. Katz in order to push the price of dollar/lira up because Mr. Aiyer wanted to sell.  (Trial Tr. at 1031:9-22 (Katz).)  However, as Mr. Katz conceded during cross examination, the Reuters price for dollar/lira did not change at all as a result of the cancelled trade he executed with Mr. Aiyer—the price was "the same" before and after their trade.  (Trial Tr. at 1293:5-1293:17 ("Q. So this is after the canceled trade; is that right?  A.  Yes, it is.  Q.  And that's the same price, or a slightly lower price, than Mr. Aiyer's sales right before the canceled trade; isn't that true?  A. It's the same price as the Standard Charter[ed] one.  Q.  Right.  So it was the same as it was with Standard Charter[ed] before the canceled trade, correct? … It was the same price as it was before the canceled trade?  A.  It looks like he dealt at the same level, correct.  Q.  And same level means same price?  A.  Yes.").)

Similarly, in discussing the April 26, 2011 episode, Mr. Katz testified that the purpose of the bid he hit for Mr. Aiyer was to move the price of the euro/forint *down*, but prices actually moved in the opposite direction.  (*Compare* Trial Tr. at 1038:13-25 (Katz), *with* DX-589 at rows

497, 504 (JP Morgan Data from April 26, 2011, showing the price of the euro/forint in

transactions with Morgan Stanley at 264.45 and 264.6, respectively).)  The bid Mr. Katz placed

for Mr. Aiyer to hit in order to reverse their original trade (which had been at the same price,

264.45) was at a "legitimate market price," as indicated by the fact that it was the exact same

price as Morgan Stanley's bid, which is why Mr. Aiyer inadvertently hit Morgan Stanley's bid

instead of Mr. Katz's.  (Trial Tr. at 1302:11-1303:2 ("Q.  So Morgan Stanley's bid was totally

unrelated to anything you were doing with Mr. Aiyer; isn't that right?  A.  Yes.  Q.  It was just

another bank in the Euro/HUF market that put up a bid for the exact price that you did?  A.

Right. … Q.  That was the legitimate market price at that time, wasn't it?  A.  Yes.  Q.  So your

original trade with Mr. Aiyer was at what level, [264.]45?  A.  Correct.  Q.  And Morgan

Stanley's bid was for the same price following that trade, correct?  A.  Correct.").)  Then, when

Mr. Aiyer subsequently traded in the opposite direction with Morgan Stanley, it was at the price

of 264.6—a *higher*, not a *lower*, price.  (DX-589 at row 504.)

As to the third cancelled trade episode on August 25, 2011, Mr. Waller testified that the

price differential between Mr. Aiyer and Mr. Cummins' dollar/lira trades was just $50, and Mr.

Aiyer did not trade for an hour after the cancelled trade.  (Trial Tr. at 1547:6-9, 1547:20-24.)

The fact that Mr. Aiyer did not trade for such a long period after this cancelled trade clearly

demonstrates that he was not intending to take advantage of any price movement resulting from

the trade.  This is also evident from Mr. Aiyer's comment in the chat, over an hour after the

cancelled trade, saying "still need 5 usd try, if u get … forgot about it."  (GX-121 at 18:12:30-

36.)  Mr. Cummins testified that if a trader has forgotten his risk position, that trader perhaps is "not following the market."  (Trial Tr. at 617:3-4.)[4]

The Government emphasized throughout trial its stance that there was "no legitimate reason" for engaging in cancelled trades.  (Trial Tr. at 42:19-20 (Government Opening Statement); *see also* Trial Tr. at 2087:7-9 (Government Summation).)   But as Professor Lyons testified, there are many reasons why a trader may engage in trading activity that is not primarily aimed at buying or selling.  (*See, e.g.*, Trial Tr. at 1670:17-22 ("[A]s we are trading in the interdealer market, we are trying to pick up signals of what the other bank's customers have done, and ultimately we are arriving at a price in the interdealer market that is aggregating, pulling together all of that information about the end user buying and selling interests."); Trial Tr. at 1712:4-8 ("[S]ometimes even when I want to buy … sometimes I will put in orders that are what most participants call exploratory.  They are putting in an order for me to learn something about the marketplace.").)

No reasonable jury could find beyond a reasonable doubt that the activity involving cancelled trades was the subject of a conspiracy to fix prices or rig bids.

> ## ii.    *Spoofing.*

Five of the episodes identified by the Government—June 9, 2011, September 10, 2012, November 30, 2012, December 12, 2012, and January 15, 2013—involved instances of spoofing. As with cancelled trades, the jury was instructed that spoofing does not constitute the charged crime and is not illegal in itself, whether conducted alone or in combination with others.  The Government attempted to sidestep this important point by, for example, eliciting testimony from

---

[4] The Government also tried to depict this episode as a refraining from trading incident.  But the evidence was clear that Mr. Cummins did not refrain from trading the dollar/lira on Reuters to help Mr. Aiyer on this date.  (*See* DX 123-2E at 16:51:12, 16:52:28, 16:52:55, 16:54:38; Trial Tr. at 648:9-650:15 (Cummins).)

Mr. Katz agreeing that "bidding it up together" is not "permissible." (Trial Tr. at 885:5-12.) But the evidence regarding these spoofing episodes, even "bidding it up" episodes, shows there was no genuine coordination between Mr. Aiyer and the other individuals in the chat, and/or that the spoofing had no effect on price.

Spoofing is not only legal but it can also serve as a helpful informational tool for traders. Professor Lyons explained that spoofing is a way for traders to "see what [is] going on in the market" (Trial Tr. at 1710:23.) Even if a trader wants to buy, he may put in an "exploratory" offer to sell "in order for [the trader] to learn something about the marketplace." (Trial Tr. at 1712:4-8 (Lyons); *see also* Trial Tr. at 571:19-575:12 (Mr. Cummins agrees that spoofing can be used to "find out what kind of demand and liquidity there [is] out in the market").) Spoofing may allow a trader to walk a price up or down by inducing market participants or algorithmic traders to "come[] in and say[], I'm going to do better than your offer." (Trial Tr. at 1709:8-14 (Lyons).) But because a spoof order is "a very real actionable order in the marketplace," another market participant can actually trade on it, which would cause the price to go in the "wrong direction" for the spoofing trader. (Trial Tr. at 1708:19-1709:2 (Lyons); *see also* Trial Tr. at 574:17-575:9 (Cummins).)

As with cancelled trades, spoofing elicits additional supply in the market, rather than restricting supply. As Professor Lyons testified, spoofing is useful to a trader both because it serves as an "important inducement"—to induce other traders to place orders in the market—and because it allows traders to gain "valuable information" about who is in the market. (Trial Tr. at 1789:20-1790:6; *see also* Trial Tr. at 1709:8-1710:4 (Professor Lyons explains the use of spoofing to induce activity from market participants, including algorithmic traders); Trial Tr. at 1710:5-10 (Professor Lyons summarizing spoofing: "I'm putting in orders. The market is seeing

my orders.  I'm hoping the market will respond to my orders in a way that helps me.  I don't

know [how] the market will respond to my orders[.]").)  Because spoofing does not reduce

output, it does not fit the description of an antitrust violation.

In two of five episodes—November 30, 2012 and January 15, 2013—Mr. Cummins

volunteers to place spoof bids or offers in order to "help" Aiyer.  In both of these instances, Mr.

Aiyer neither requested nor encouraged Mr. Cummins to provide this "help," and in one

instance, Mr. Aiyer actively discouraged it.  Furthermore, in each episode, Mr. Cummins'

spoofing had no effect on the market whatsoever, nor did it benefit Mr. Aiyer in any way.  This

aligns with Professor Lyons testimony that there is no difference—from the market's

perspective—between a trader spoofing unilaterally or spoofing on behalf of another trader.

(Trial Tr. at 1713:4-12 ("Q.  Is there any difference in what the market sees if one person spoofs

on behalf of another?  A.  What the market sees on the screen are the prices, the best bids and the

best offers, so the market can't see who is on the other side of those offers when looking at the

screen.  Q.  Is there any difference in what the market sees between Mr. Aiyer spoofing for

himself and Mr. Cummins spoofing to assist him?  A.  Nothing on the screen.").)  Spoofing to

help another trader therefore accomplishes nothing.

With respect to the November 30, 2012 episode, Mr. Cummins testified that not only was

his spoofing unsolicited by Mr. Aiyer, but he and Mr. Aiyer were not coordinated in their trading

at all.  (Trial Tr. at 595:15-20 ("Q.  And do you know what [Mr. Aiyer's] trading was around this

time?  Do you know whether he was buying or selling and what volume?  A.  I do not know.  Q.

So whatever he was doing, he wasn't coordinating with you; is that correct?  A.  He was not.").)[5]

---

[5] Mr. Cummins also repeatedly confirmed that he volunteered to place spoof offers for Mr. Aiyer of his own volition
and not in response to any request from Mr. Aiyer.  (Trial Tr. at 591:7-11 ("Q.  And you then offer on your own at
21:23[:]02, 'I'll put in a phony offer at like 8.90.'  And Mr. Aiyer says 'Thanks.'  This is something you decided to
do on your own again, correct?  A.  That's correct."); Trial Tr. at 591:25-592:1 ("Q.  And did Mr. Aiyer ask you to

The evidence relating to the remaining episodes of spoofing—June 9, 2011, September 10, 2012 and December 12, 2012—is similarly insufficient to maintain a conviction.  With respect to June 9, 2011, the evidence shows that on Friday afternoon, on an occasion when Mr. Aiyer was particularly bored—which Mr. Aiyer expressed to Mr. Katz in the chat more than once—he and Mr. Katz engaged in spoofing in dollar/rand to bid the price up, then to push the price down.  (Trial Tr. at 1206:13-21 ("Q.  And in part you [Mr. Katz] testified you were bidding it up together [with Mr. Aiyer], correct?  A.  Yes.  Q.  And then later you were going in the opposite direction.  Is that correct?  A.  Yes.  Q.  And in fact, Mr. Aiyer told you on a number of occasions he was just bored.  Do you remember that?  A.  Yes.") (Katz).)

As Mr. Katz testified, however, their spoofing had no impact whatsoever.  (Trial Tr. at 1206:22-24 ("Q.  And the activity that you did, it didn't lead to anything, right?  It didn't do anything.  A.  Correct.").)  Mr. Katz testified that their "plan to push price" did not work because "it was Friday and it was late and everyone was tired and no one was paying attention."  (Trial Tr. at 888:9-10.)  Furthermore, Mr. Katz and Mr. Aiyer held opposite risk positions during this episode, meaning that any price movement they could have caused as a result of their spoofing in one direction and then the other would actually be hurting one of them at any given time.  Clearly, then, this instance of spoofing could not have constituted a genuine agreement to fix prices and rig bids, and no reasonable jury could have concluded it did.

In the September 10, 2012 spoofing episode, Mr. Aiyer tells the Rand Chat Room participants not to "touch ZAR" because he is trying to unilaterally walk the price down by spoofing.  (GX-244 at 19:16:59-19:17:02.)  The evidence shows that Mr. Katz did, however,

---

do it?  A.  No."); Trial Tr. at 595:10-14 ("Q.  You then state at 12:28:04, 'I'm at 8949.' … And, again, Mr. Aiyer didn't ask you to do that, correct?  A.  That's correct."); Trial Tr. at 601:6-13 ("Q.  You then state at 18:36:40, 'I'll try sticking in a few offers.' … [Mr. Aiyer] didn't ask you to do that, correct?  A.  Correct.  Q.  You were volunteering to do that here?  A.  Yes.").)

"touch ZAR," and traded on Mr. Aiyer's spoof order.  (Trial Tr. at 1357:13-25 (Katz).)  Mr.

Aiyer reacted to this unintended transaction by jokingly calling Mr. Katz a "dick."  (Trial Tr. at

1358:4-8 (Katz); *see also* Trial Tr. at 1006:9-11 (Katz).)

As Professor Lyons testified, it is understandable that a trader who is spoofing in order to

get an algorithm to go lower might be frustrated if someone hit his spoof offer, because his

"strategy, the order that [he] put in, in order to see what was going on in the market and

hopefully get the market to move downward, has been removed from the market."  (Trial Tr. at

1710:12-24.)   Professor Lyons also testified that a trader who is spoofing to find out information

about the market might similarly be frustrated if one of his fellow chat room members hit his

spoof offer because it limits the information the trader learns about who is an aggressive buyer in

the market in general, as opposed to in his chat room, which he already knows.  (Trial Tr. at

1711:6-10, 1712:4-19.)

Moreover, in asking other chat room participants not to touch the rand, it is equally

plausible that Mr. Aiyer was not attempting to restrict supply or demand to move prices, he was

attempting to spoof without interference.  (GX-244 at 19:16:59-19:17:02 (Mr. Aiyer announcing

"dont touch zar guys … gonna walk it l[ower]"); Trial Tr. at 1706:18-1709:21 (Lyons)

(describing "walking down" the price as an example of spoofing).  This trading strategy actually

increases supply or demand by other parties, (Trial Tr. at 1710:5-10, 1789:20-1790:10 (Lyons),

and by the Government's own concession, is not price fixing or bid rigging

The fact that Mr. Aiyer unintentionally hit Mr. Katz with his spoofing alerted the two

traders to the fact that they had opposite risk positions and therefore enabled them to then

execute a mutually advantageous match-off trade.  (Trial Tr. at 1358:12-17 ("[Q.] So as a result

of your meeting, you then realize that you and he were on opposite sides, correct?  A.  Yes.  Q.

And then you traded with him, matching off, perfectly normal.  A.  Correct.") (Katz).)  Far from indicating an agreement to fix prices and rig bids, this trading episode actually demonstrates the Rand Chat Room functioning as a venue for its members to match off with each other, as chat rooms are intended.

With respect to the final spoofing episode on December 12, 2012—in which Mr. Cummins was spoofing and Mr. Aiyer inadvertently paid Mr. Cummins' spoof offer—Mr. Cummins testified that his spoofing behavior with Mr. Aiyer on this date was problematic because they were working together to move prices.  (*See* Trial Tr. at 326:14-327:17, 656:9-13 (Cummins).)  Mr. Cummins may have been referring to the fact that Mr. Aiyer pulled a bid—for all of three minutes—while Mr. Cummins continued to spoof an algorithmic trader.  (*See* Trial Tr. at 1494:11-13, 1508:8-1509:6, 1511:7-12 (Waller); GX-S26 at 20:48:36, 20:50:42.)  If so, this behavior once again does not implicate price fixing or bid rigging concerns.  It is equally plausible that Mr. Aiyer was not artificially removing demand to influence price, he was refraining from disrupting Mr. Cummins' spoofing, (GX-279 at 20:47:41-20:47:48 (Mr. Cummins stating "pull that bid AA … this guy got more to go … ill walk hi[m] down"); Trial Tr. at 654:14-25 (Cummins)), which, the Government concedes, was not price fixing or bid rigging. Moreover, the idea that this episode demonstrates a coordinated scheme to fix prices and rig bids is contradicted by the fact that Mr. Aiyer was unaware of Mr. Cummins' spoofing and paid his spoof offer by accident.  (*See* Trial Tr. at 655:7-12 ("Q.  And I think you testified about this.  Mr. Aiyer had out either a snake or some other completely legitimate technique, and he actually hit your spoof.  Is that right?  A.  That's correct.  Q.  No prearranged anything.  A.  That's correct.") (Cummins).)

Indeed, Mr. Cummins conceded that his spoofing was completely independent of Mr. Aiyer.  (Trial Tr. at 654:22-25 ("Q.  And you made the decision to spoof, right?  Nobody told you to.  You didn't consult with anyone, at least in this group, before you decided to do that, right?  A.  That's right."); Trial Tr. at 656:9-19 ("Q.  Now, you testified on direct that this conduct was problematic because you and Mr. Aiyer were working together to push the price lower toward [y]our buying interest.  Is that correct?  A.  Yes.  Q.  But your spoofing was done all on your own, right?  A.  The spoofing was done on my own.  Q.  And Mr. Aiyer didn't ask you to spoof for him.  A.  He did not.  Q.  And you didn't ask Mr. Aiyer to spoof for you.  A. That's correct.") (Cummins); Trial Tr. at 658:15-22 ("Q.  So you don't know one way or another whether [Mr. Aiyer] went back in the market and when he went in the market and what he did. Is that fair?  A.  Yes.  Q.  So you don't know whether he went into Reuters and bought at the exact same price … You have no idea.  A.  I do not know.") (Cummins).)

No reasonable jury could find beyond a reasonable doubt that the activity involving spoofing was the subject of a conspiracy to fix prices or rig bids.

b. *"Iceberg" Orders*

Two episodes featured by the Government, December 21, 2011 and March 16, 2012, involved "iceberg" orders—also referred to as "hiding the salami" at trial.  The Government argued that, with respect to these episodes, the Rand Chat Room members coordinated their trading to deceive the market as to true supply and demand.  The evidence regarding these episodes, however, supports the equally likely consistent conclusion that Mr. Aiyer announced his position in an attempt to match off with other Rand Chat Room members, and that the subsequent addition of interest to existing bids or offers on Reuters had no impact on the supply and demand visible to the market.

On December 21, 2011, Mr. Aiyer and Mr. Katz had short positions in the dollar relative to the lira.  Mr. Aiyer announced his short position approximately thirty minutes before Mr. Katz did.  (DX-167 at 1:21:17 (Mr. Aiyer announcing "get paid 10 usd try here"); *id.* at 1:53:15 (Mr. Katz announcing "need small usd try")).)  The evidence demonstrated that when Mr. Aiyer informed the other Rand Chat Room members that he was short and needed to buy, he was interested in matching off with a Rand Chat Room member who needed to sell.  (Trial Tr. at 1361:16-1362:8 (Katz); *see also* Trial Tr. at 1363:9-15.)  Besides his interest in completing a direct trade, Mr. Aiyer was not actively trading in the market.  (*See* DX-167 (Lyons activity log for December 21, 2011 showing no trading activity on Reuters by Mr. Aiyer from 1:21:17 to 2:25:09).)  Mr. Aiyer's lack of activity is confirmed not only by the trading data, but also his comment to the other Rand Chat Room members that he is "just sitting here bored."  (*Id.* at 1:26:29-1:26:32.)  These facts support the conclusion that Mr. Aiyer was trying to engage in permissible and economically beneficial trades, rather than fixing prices and rigging bids.

After Mr. Katz announced his short position, he posted bids to buy dollar/lira on Reuters and offered to "hide [the] salami" for Mr. Aiyer, meaning hide extra buying interest behind the amount of interest visible on Reuters.  (*Id.* at 2:05:37-2:05:43.)  Mr. Aiyer did not request this favor.  Mr. Katz's decision to add extra buying interest to his bid on Reuters did not impact the supply and demand visible to the market.  As an initial matter, the Reuters platform features a mechanism that allows traders to hide their true supply or demand.  There was consistent testimony throughout trial that hiding true demand or supply on Reuters, using this mechanism, was permissible and a commonly used tool by traders.  (Trial Tr. at 576:15-577:16 (Cummins); Trial Tr. at 1369:25-1370:8 (Katz); Trial Tr. at 1679:4-17 (Lyons).)  That Reuters has a built-in feature allowing market participants to hide their true demand and supply is consistent with how

the foreign exchange operates—there is no one central place to trade, and many trades are never visible.  (Trial Tr. at 96:25-97:4 (DeRosa); Trial Tr. at 1679:20-1680:7 (Lyons).)

More importantly, whether one person or two people hide supply or demand using this feature has no competitive significance—the market cannot see the number of participants supporting any bid or offer at any particular price.  (Trial Tr. at 1369:25-1371:7 (Katz); Trial Tr. at 1676:14-1679:11 (Lyons).)  It is unlikely that any market participant was deceived by these trading behaviors, or that the intention of Mr. Aiyer was to fix prices or rig bids.

The Government also featured an episode on March 16, 2012 involving an iceberg order placed by Mr. Cummins on Reuters that was similar to the December 21, 2011 episode.  The episode started with Mr. Aiyer announcing his position in the dollar/lira with the hope of matching off.  (Trial Tr. at 650:25-651:16 (Cummins).)  After Mr. Aiyer made this announcement in the chat, and Mr. Cummins determined that he did not have an offsetting position, (Trial Tr. at 651:17-19 (Cummins)), Mr. Cummins decided to hide additional interest to his outstanding bid on Reuters.  Mr. Cummins revised his posted bids on Reuters entirely voluntarily, without any request from Mr. Aiyer.

Importantly, as with the December 21, 2011 episode, and completely contrary to the Government's theory, Mr. Cummins' revision to his existing bid had no impact on the supply or demand visible to the market.  (*See* Trial Tr. at 577:17-578:17, 653:10-654:6 (Cummins).)

No reasonable jury could find beyond a reasonable doubt that the trading behavior exhibited in these episodes constituted price fixing or bid rigging.

c.     *April 2, 2012*

The Government argued that Mr. Aiyer and Mr. Cummins coordinated their trading on Reuters on April 2, 2012 in order to stop the price from moving to their disadvantage.  But this episode is particularly instructive, because the evidence adduced at trial showed exactly the

opposite. Every action taken by Mr. Cummins on April 2, 2012 was, according to Mr. Cummins, the result of independent decision making, rather than pursuant to an agreement to fix prices or rig bids.

In the early afternoon of April 2, 2012, Mr. Aiyer and Mr. Cummins learned that they were both short dollar/rand and needed to buy. (*See* DX-177 at 12:43:58-12:44:09, 12:44:49-12:45:27.) Mr. Aiyer offered to trade Mr. Cummins' position for him, which was "a straight request as to whether [Mr. Cummins] want[ed] to trade on the other side," *i.e.*, an offer to match off. (Trial Tr. at 668:25-669:10.)

Mr. Cummins did not accept Mr. Aiyer's request to match off, and told Mr. Aiyer "you can go first, you got 2x the am[ount]." (DX-177 at 12:46:18.) This statement, according to the Government, is the indication that Mr. Aiyer and Mr. Cummins worked together to fix prices on April 2, 2012. But, Mr. Cummins testified that he "didn't stay out of the way" of Mr. Aiyer, as he suggested in the chat. (Trial Tr. at 671:15-17.) Not only did he trade on Reuters, contrary to his offer to Mr. Aiyer, but every decision he made that afternoon in the dollar/rand was independent. (*See* Trial Tr. at 674:12-18.) Mr. Cummins and Mr. Aiyer "execut[ed] different trading strategies to cover [their] separate positions," with Mr Aiyer "chos[ing] what he wanted to do [and Mr. Cummins] chos[ing] what [he] wanted to do." (Trial Tr. at 675:15-20.)

No reasonable jury could find beyond a reasonable doubt that Mr. Aiyer and Mr. Cummins had an agreement to coordinate their trading in order to fix prices and rig bids on April 2, 2012.

> d.   *May 20, 2013 (Morning)*

On the morning of May 20, 2013, Mr. Aiyer asked Mr. Katz to stop interfering with his unilateral trading strategy. (*See* DX-185 at 9:36:13-9:36:17.) Mr. Aiyer was short as a result of a recent customer transaction and needed to buy euro/koruna. (Trial Tr. at 1313:12-1314:15

(Katz).)  According to the Government, Mr. Katz refrained from trading pursuant to an agreement with Mr Aiyer to fix the price of the currency pair low.

 But the evidence from trial provided an equally plausible conclusion:  Mr. Katz had no natural interest in the euro/koruna currency pair and refrained from front-running Mr. Aiyer, who had the position.  (*See* Trial Tr. at 1315:8-23 (Katz).)  In other words, Mr. Katz was "flat" with respect to this currency pair.  Mr. Katz testified that when a trader is flat, "it doesn't really matter which way the market goes, there will be no real [profit and loss] that will be associated with it," (Trial Tr. at 1312:1-9) and "there is no urgency for [him or her] to trade one way or another." (Trial Tr. at 1312:10-12.)

Additionally, there was intense market activity in the euro/koruna on the morning of May 20, 2013, making it unlikely that Mr. Aiyer (or Mr. Katz, in refraining from trading) thought he could influence market direction.  (DX-155-1; *see also* Trial Tr. at 1320:5-1321:4 (Katz).)

No reasonable jury could find beyond a reasonable doubt that Mr. Aiyer and Mr. Cummins had an agreement to coordinate their trading in order to fix prices and rig bids in the euro/koruna on the morning of May 20, 2013.

e.      *May 20, 2013 (Afternoon)*

In the afternoon of May 20, 2013, Mr. Aiyer and Mr. Katz found themselves long dollar/lira at the same time.  (*See* DX-185-4 at 2:33:09-2:33:13, 2:33:40-2:34:05.)  Mr. Katz told Mr. Aiyer to go in front of him because Mr. Aiyer had the bigger position—which the Government suggests is evidence that the two of them acted pursuant to an agreement to fix prices higher.  (*Id.* at 2:35:27-2:35:31 (Mr. Katz writing "you go in fornt [sic] of me im only 10").)  But the evidence does not support the idea that Mr. Aiyer and Mr. Katz agreed to coordinate any of their trading in the dollar/lira that afternoon.  Mr. Aiyer did not end up selling any dollar/lira, and he canceled offers, reinstated offers, and then cancelled offers again, without

64

ever telling Mr. Katz about his trading.  (*Id.* at 2:36:05, 2:51:28-2:57:33, 3:14:07.)  Meanwhile, Mr. Katz, having said he will not trade, in fact did trade without telling Mr. Aiyer.  (*Id.* at 2:57:47-3:02:59.)  Mr. Katz testified in conclusion that he and Mr. Aiyer were "not coordinating trading at all" on the afternoon of May 20, 2013.  (Trial Tr. at 1354:17-1355:2, 1355:10-15.)

Evidence of trading on Reuters should have been excluded altogether.  Even if properly submitted to the jury, however, no reasonable jury could find beyond a reasonable doubt that these Reuters trading episodes showed a conspiracy to fix prices and rig bids.  The Government conceded, and the Court instructed the jury, that most of these episodes—the episodes of cancelled trades or allegedly coordinated spoofing—were *not* episodes of price fixing or bid rigging.  The handful of remaining Reuters trading episodes concerning which the Government offered evidence were all as consistent with the *absence* of any agreement to fix prices and rig bids as they were with the presence of such an agreement.

Accordingly, Mr. Aiyer should be acquitted to the extent the charged Sherman Act conspiracy is predicated on episodes of allegedly coordinated trading on Reuters.  Moreover, because the only overt acts shown by the Government within the statute of limitations were episodes of alleged coordinated trading on Reuters, the elimination of these episodes requires a judgment of acquittal as to the Indictment in its entirety.

f.     *January 18, 2012 Stop-Loss Orders*

The Government, in presenting its case, spent a substantial amount of time focusing on stop-loss orders executed by Mr. Aiyer, Mr. Cummins, and Mr. Williams on January 18, 2012.  The evidence regarding this episode is equally consistent with the conclusion that the Rand Chat Room members shared information regarding their stop-loss orders, but ultimately made independent trading decisions.

When executing a stop-loss order, a trader must evaluate, based on all of his or her experience, whether the currency price will reach the stop-loss level, making the execution of these orders "a little bit of an art form." (Trial Tr. at 234:16-19 (Cummins).) Foreign exchange traders must quickly decide whether to pre-hedge (meaning sell in advance), as the price of the currency nears the stop-loss level. (*See* Trial Tr. at 532:22-533:21 (Cummins).) If there is an expectation that the currency price will reach the stop-loss level, it is advantageous to the customer when the trader engages in pre-hedging. (*See* Trial Tr. at 533:16-24 ("Q. And that actually can be advantageous for the customer – isn't that true – if you do the trading beforehand?" A. Yes. If you're correct, yes.") (Cummins).) A customer may actually be harmed if the trader waits until the stop-loss level is hit to sell. (*See* Trial Tr. at 533:25-534:8 (Cummins); *see also* Trial Tr. at 801:13-16 ("Q. But if the executing trader only starts selling at 7.95 when the price prints, and the price continues to drop, you are going to get a price that's less than 7.95, correct? A. Yes, that's correct.") (Davis).)

The Government introduced no evidence at trial indicating that Mr. Aiyer, Mr. Cummins, or Mr. Williams traded on January 18, 2012 to the detriment or intended detriment of any customer with stop-loss orders. The evidence at trial was to the contrary. Mr. Cummins explicitly testified that his pre-selling of dollar/rand in advance of the stop-loss level being hit allowed him to provide his customer with a better price than if he refrained from trading. (Trial Tr. at 570:9-571:3, 571:14-16.) And the customer's trading ticket from that date is confirmation of this—it shows the customer receiving a better price from Mr. Aiyer and Mr. Cummins than the two other banks it placed stop-loss orders with. (*See* GX-625.)

Pointedly, *no one*, including Mr. Cummins, testified that members of the Rand Chat Room coordinated their trading to run the stop-loss orders deliberately. On the contrary, the

evidence indicated that Mr. Aiyer, Mr. Cummins, and Mr. Williams did *not* coordinate their trading on this date, but independently decided how to best trade their customers' stop-loss orders in a declining market.  On January 18, 2012, Mr. Aiyer, Mr. Cummins, Mr. Williams, and Mr. Katz evaluated, and discussed, whether the price of the dollar/rand currency pair was going to fall and trigger the customers' stop-loss orders.  (*See* DX-168 at 2:48:41-2:49:32, 2:54:37-2:55:02.)  Every member of the Rand Chat Room predicted that the price of the dollar/rand would reach the stop-loss level.  (*See id.*)  The Reuters trading data from January 18, 2012 confirms what the Rand Chat Room members were anticipating—the price of the dollar started to decline sharply relative to the rand on the afternoon of January 18, 2012 (DX-168-4), consistent with the downward trend for the dollar-rand currency pair for the month of January 2012.  (Trial Tr. at 810:10-14 ("Q.  Understood.  But from your review of data on trading in the dollar/rand during January 2012, this looks roughly right.  You know that the dollar was declining in value for most of the month of January.  A.  That is a fairly broad statement, but yes.") (Davis).)

With Mr. Aiyer, Mr. Cummins, and Mr. Williams anticipating that their clients' stop-loss orders would be triggered, each of them engaged in different trading strategies.  (*See* DX-168-11; Trial Tr. at 1759:5-23 (Lyons).)  Mr. Williams engaged in no trading on Reuters after revealing his stop-loss orders to the other Rand Chat Room members.  (*See* DX-168-11; Trial Tr. at 1753:20-24 (Lyons).)  Mr. Aiyer, on the other hand, executed a few buy and sell orders leading up to the stop-loss level being hit.  (*See* DX-168-11; Trial Tr. at 1757:1-12 (Lyons).)  But notably, Mr. Aiyer also sold $5 million off of the Reuters trading platform—trades that would have no effect on the Reuters price—which is inconsistent with the notion that the trader was aggressively attempting to run through a stop-loss level.  (*See* Trial Tr. at 1755:1-19 (Lyons).)

67

Taking a different approach, Mr. Cummins aggressively sold right before and after the stop-loss level was hit.  (*See* DX-168-11; Trial Tr. at 1758:22-1759:4 (Lyons).)

During Mr. Cummins' direct examination, the Government focused on a comment that Mr. Cummins made in the Rand Chat Room shortly before the market went through the stop-loss level: "better get to work."  (Trial Tr. at 245:5-6 (Cummins).)  Between the time Mr. Cummins made this comment and the stop-loss level was hit, however, there was no coordination among the Rand Chat Room members.  Mr. Williams and Mr. Aiyer did not trade at all on the Reuters platform during that time frame.  (*See* DX-168-11; Trial Tr. at 1756:19-1757:24 (Lyons)).)

The testimony elicited from Mr. Cummins on cross examination definitively established that there was no coordination among the Rand Chat Room members the *entire day*.  Not only did Mr. Cummins make independent decisions as to when and how to trade, he also had no idea what trading Mr. Aiyer was engaged in.  (*See* Trial Tr. at 559:4-9 (Cummins); Trial Tr. at 565:2-566:3 ("Q.  So you made the decision on your own, before you were back on the chat, to begin to sell dollars as part of your hedging, is that fair? … Q.  Now if we go to the chat, when Mr. Aiyer asks you 'CC, you there?  That's at 19:54:24, and you say 'yo' at 19:54:29.  That was after you actually started to hedge, isn't that right?  A.  That's after I started selling, yes. … Q.  You decided to do that on your own.  A.  Yes.") (Cummins).)  Mr. Cummins emphatically testified on 17 different occasions that there was no coordination among the two of them.  (Trial Tr. at 558:15-25 ("Q.  Okay.  Those weren't coordinated, right?  You did what you wanted to do. Nobody told you to trade, nobody told you not to trade, correct?  A.  Yes.  Q.  You're not coordinating anything?  A.  Yes.  Q.  You're not trying to drive through a stop, are you?  A.  I am not.  Q.  And so far as you know, Mr. Aiyer isn't trying to drive through a stop?  A.  Correct.") (Cummins); *see also* Trial Tr. at 536:14-537:2, 541:10-16, 542:10-23, 542:24-543:16, 545:7-

546:2, 547:11-18, 552:22-553:2, 555:19-556:14, 557:9-558:8, 559:4-13, 562:18-21, 563:16-22, 565:2-19; 565:20-566:8, 570:9-18, 571:5-16.)

No reasonable jury could find beyond a reasonable doubt that Mr. Aiyer's, Mr. Cummins,' Mr. Williams,' and Mr. Katz's discussion and trading concerning the South African rand on January 18, 2012 amounted to price fixing or bid rigging. Mr. Aiyer should be acquitted to the extent the charged Sherman Act conspiracy is predicated on improper trading on January 18, 2012.

g.    *Fix Episodes on January 27, 2012 and May 8, 2012*

The Government challenged two trading episodes—one on January 27, 2012 and one on May 8, 2012—involving trading around the fix. (*See* Trial Tr. at 315:1-13 (Cummins); Trial Tr. at 990:10-991:9 (Katz).) The evidence concerning these two episodes was equally consistent with the conclusion that Mr. Aiyer shared information regarding his fix orders with the other Rand Chat Room members, but ultimately, that the Rand Chat Room members made independent trading decisions to benefit themselves, or, at worst, that would have ambiguous consequences for them. The notion that the purpose of Mr. Aiyer's communications and trading on both dates was to engage in beneficial off-setting transactions, rather than to fix prices or rig bids, is also equally plausible based on the trial record.

The Government's theory, with respect to the January 27, 2012 episode, was that Mr. Katz removed a bid from Reuters in order to affect supply and demand to the benefit of Mr. Aiyer, who wanted a low fix price. (Trial Tr. at 991:10-992:11 (Katz).) There was specific evidence, however, that Mr. Aiyer asked Mr. Katz to pull his bid from the Reuters platform to effectuate a match off transaction once Mr. Aiyer acquired dollar/shekel at the fix. (Trial Tr. at 1163:1-9 ("Q. Mr. Aiyer says: 'I have a left-hand sided fix so I'm going to be getting dollars, about 8 million of them. I'll do some with you.' And you said: 'Cool.' Right? A. Yes. Q.

Because you were going to buy from Mr. Aiyer, you didn't need to buy in the market, correct? A. Correct.") (Katz).)

Prior to the fix, Mr. Katz alerted Mr. Aiyer that he was short euro relative to the Israeli shekel. (*See* GX-181 at 15:27:11 ("short 15 eur ils if you boys get anything") (Katz).) As a continuation of their conversation, Mr. Aiyer asked Mr. Katz to pull his bids to buy dollar/shekel on Reuters because Mr. Aiyer would be buying dollars at the fix and could sell dollars to Mr. Katz. (*Id.* at 15:55:07-15:55:30.) The trial testimony confirmed that a desire to match off was the purpose for Mr. Aiyer's request. (*See* Trial Tr. at 1162:4-10 ("Q. So Mr. Aiyer is telling you that, look, after the fix, I'm going to be getting $8 million from this customer at the fix price, whatever it will be, and if you'd like, I can do some of it with you, because you had said you still have to buy a couple. Is that what's going on right here? A. Yes.") (Katz).)

Matching off transactions are beneficial for market makers and perfectly permissible, even when they require one of the participants to pull existing bids or offers from the Reuters platform. (*See* Trial Tr. at 1222:10-16 ("Q. And this [is] another example of pulling either a bid or an offer that's to be matched with someone else and deal directly with you? Is that correct? A. Yes. We are going to match between the two of us, so he took his interest off the machine. Q. And there was no problem with that, correct? A. Correct.") (Katz); *see also* DX-153; Trial Tr. at 1661:1-1662:5 (Lyons); Trial Tr. at 1656:20-23 ("Q. When they actually trade with each other, in whose interest are those trades? A. Well, you know, normally when they trade with each other, it's in a mutual interest, a bilateral interest.") (Lyons).)

The idea that the purpose of Mr. Aiyer's request to Mr. Katz was to affect the fixing price of the dollar/shekel is improbable. Before and during the fix window, there was significant selling pressure from other market participants, especially Goldman Sachs and RBS. (*See* DX-

70

171 at 10:59:55, 11:00:4; DX 171-3.)  This enormous selling pressure—$26 million in the

aggregate, completely dwarfing Mr. Katz's $1 million to buy—is what actually caused the price

to move lower during the fix period.  And, contrary to the notion that Mr. Katz's actions on

January 27, 2012 episode were in furtherance of a price fixing conspiracy, the only trading that

Mr. Katz executed around the fixing time was an aggressive buy that was adverse to Mr. Aiyer's

interests.  (*See* Trial Tr. at 1451:21-1452:6.)

       With respect to May 8, 2012, the Government's theory is that Mr. Cummins placed offers

on the Reuters platform to help keep the price of the dollar/rand lower, in order to assist Mr.

Aiyer, who wanted a low fix price.  The evidence at trial, however, showed that Mr. Cummins

placed these orders unilaterally, with no request from Mr. Aiyer, and that they had absolutely no

impact on the market.

       Prior to the dollar/rand fix, Mr. Aiyer announced, "I have 2 pm usd zar fix lhs."  (GX-220

at 17:56:04-17:56:32.)  There was testimony at trial that statements of this nature usually

signaled an invitation to match off.  (*See, e.g.*, Trial Tr. at 650:25-651:14) (Cummins).)  Without

any urging from Mr. Aiyer—and in fact, indicating, in response to Mr. Aiyer's statement, that

Mr. Cummins could not match off with Mr. Aiyer—Mr. Cummins replied, "wil[l] ensure there

are offersin [sic]  there."  (GX-220 at 17:58:08.)  On cross examination, Mr. Cummins agreed

that this was something he simply volunteered to do, confirming that he "had no agreement that

[he] would do that or not do that" and just "offered to do that here."  (Trial Tr. at 585:4-9.)

       Mr. Cummins also testified that nobody in the market saw the offers that he volunteered

to put in because they were not the best offers in the market at the time, and stated that his

actions "did not affect the calculated [fix] rate."  (Trial Tr. at 586:12-587:4; *see also* GX-S33.)

Mr. Cummins' unilateral decision to place out-of-market offers on Reuters at rates that could not

have been traded upon and did not affect the fix rate cannot possibly constitute price fixing or bid rigging.

No reasonable jury could find that Mr. Aiyer's, Mr. Cummins,' and Mr. Katz's trading on January 27, 2012 and May 8, 2012 amounted to price fixing or bid rigging. Mr. Aiyer should be acquitted to the extent the charged Sherman Act conspiracy was predicated on these two episodes of alleged improper trading around fixes.

*   *   *   *

In short, and completely apart from Mr. Aiyer's argument that evidence of ruble trading and allegedly coordinated trading on Reuters should have been excluded altogether, *not one* of the trading episodes concerning which the Government offered evidence at trial either constituted price fixing or bid rigging or showed the existence of an agreement to engage in price fixing or bid rigging. No reasonable jury could have concluded otherwise beyond a reasonable doubt, and the Court should enter a judgment of acquittal on Mr. Aiyer's behalf.

## III.   The Court Should Grant Mr. Aiyer A New Trial Pursuant To Rule 33.

Should any part of the charge survive Mr. Aiyer's Rule 29 motion, the Court should grant Mr. Aiyer a new trial pursuant to Federal Rule of Criminal Procedure 33. Rule 33 permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The rule affords the trial court "broad discretion to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice.'" *United States v. Ferguson*, 246 F.3d 129, 133-34 (2d Cir. 2001) (internal citations omitted). A trial court has "broader discretion to grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29." *Id.* at 134; *see also id* at 139 n.1 ("[A] guilty verdict might survive a Rule 29(c) motion—because a rational jury, viewing the evidence through the government's eyes, could

convict—but fail to meet the Rule 33 standard because the momentum of the evidence as a whole would make a guilty verdict irrational.").

In deciding whether or not to grant a new trial, a district court "must examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Id.* at 134. A court is *not* required to view the evidence in the light most favorable to the government; rather the court is to weigh the evidence and determine the credibility of witnesses. *United States v. Galanis*, 366 F. Supp. 3d 477, 491 (S.D.N.Y. 2018) (internal citations and quotations omitted); *Finnerty*, 474 F. Supp. 2d at 545; *United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005).

The court must be satisfied that "'competent, satisfactory and sufficient evidence' in the record supports the jury verdict." *Ferguson*, 246 F.3d at 133-34 (internal citations omitted). "Where there is any doubt that the evidence fully supports a jury determination, a new trial is the appropriate remedy to insure defendant the full extent of his rights." *United States v. Ferguson*, 49 F. Supp. 2d 321, 329 (S.D.N.Y. 1999), *aff'd* 246 F.3d 129 (2d Cir. 2001).

A new trial should be granted for the following reasons: (1) to the extent evidence of *any* trading episodes that did not reflect price fixing or bid rigging was admitted without an instruction that these episodes did not constitute price fixing or bid rigging, the verdict might have been based on impermissible evidentiary grounds; (2) the jury was likely confused about the proper legal standard; (3) the jury was likely misled by the prejudicial content of the Government's summations; (4) evidence probative of procompetitive justifications and lack of competitive was erroneously excluded; (5) Mr. Katz's and Mr. Cummins' testimony lacked credibility and cannot fairly support a conviction; and (6) the verdict was contrary to the weight of the evidence.

A.    The Verdict Was Likely Based On Impermissible Evidentiary Grounds.

Where there is a "distinct risk that the jury was influenced in its disposition … by improper evidence," including that which was irrelevant and prejudicial, a retrial should be ordered.  *United States v. Guiliano*, 644 F.2d 85, 88-89 (2d Cir. 1981); *see also United States v. DiNome*, 954 F.2d 839, 845 (2d Cir. 1992) (granting new trial because evidence related to the dismissed charges was "irrelevant yet highly prejudicial in the context of the remaining mail and wire fraud charges"); *United States v. Diatlova*, No. 12 cv 626 (SJ) 2017 WL 1755967, at *2-3 (E.D.N.Y. May 3, 2017) (granting new trial as to two of three counts because "the prejudicial spillover drawn from incriminating audio recordings of [the defendant's superiors], testimony by [a] co-defendant … which, notably did not implicate [the defendant] in any way, and the [conduct of] … other Arc employees, led the jury to rely on" improper circumstantial evidence); *United States v. Rooney*, 37 F.3d 847, 856-57 (2d Cir. 1994) (reversing district court's judgment on one count and ordering new trial as to two other counts because evidence related to reversed count was "irrelevant and inadmissible" and likely resulted in "prejudicial spillover" as to the remaining count).

In this case, the jury was inundated with irrelevant and prejudicial evidence that should have been excluded: all evidence related to the vertical transactions in the ruble and zloty and the interdealer transactions.  The ruble and zloty transactions were structured vertically or, at the very least, structured with both horizontal and vertical components—neither of which are properly the subject of a criminal antitrust claim.  (*See supra* at Section I(B)(1); *see also* ECF No. 99, Memorandum of Law in Support of Defendant's Standing Motion *in Limine* to Exclude Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading.)  The interdealer trading, which did not tend to reduce output or raise customers' pricing, is likewise beyond the purview of criminal antitrust scrutiny.  (*See supra* at Section I(B)(2); *see also* ECF No. 99,

Memorandum of Law in Support of Defendant's Standing Motion *in Limine* to Exclude Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading.)  The jury should not have been permitted to consider such evidence and the resulting prejudice is too great to ignore.

*United States v. Guiliano*, 644 F.2d 85 (2d Cir. 1981) is instructive.  In *Guiliano*, the defendant was convicted under federal laws of one count of aiding and abetting in the conduct of affairs of an enterprise through a racketeering activity and two counts of aiding and abetting bankruptcy fraud.  *Id*. at 86.  The Second Circuit reversed the RICO count and one bankruptcy fraud count for the insufficiency of the evidence and ordered a new trial on the second bankruptcy fraud count.  *Id*. at 87-88.  As to the remaining bankruptcy fraud count, the court held that "[a]lthough we think th[e] evidence sufficient to support the appellant's conviction on this count, we nevertheless order a retrial of this charge."  *Id.* at 88-89.  The court reasoned that the verdict on the second bankruptcy fraud count "may well have been influenced" by both irrelevant, prejudicial evidence as well as "the very allegation" of the RICO charge that was ultimately unsupported.  *Id*. at 89.

Such is the case here too.  The Government's presentation at trial of evidence on the vertical trading episodes and the interdealer episodes, which cannot support the crime as charged as a matter of law, presents the grave risk that the jury based its guilty verdict on improper evidence.  These dates constitute the vast majority of the key episodes that the Government presented in its case in chief—20 of 24—and thus, the likelihood that the jury based its verdict on one or more of these episodes is exceedingly high.  In addition, one of the interdealer dates, May 20, 2013, is the only date within the statute of limitations.  (*See* Trial Tr. at 2148:21-2149:24) ("[T]he government must also prove, beyond a reasonable doubt, that the conspiracy

existed within the limitations period. … [T]he government must prove beyond a reasonable doubt that one or more members of the conspiracy performed some act in furtherance of the charged after May 10, 2013.") (Koeltl, J., Jury Instruction).)  If the jury had not been presented with the specific evidence related to this, the jury may well have found that the Government failed to prove beyond a reasonable doubt "some act in furtherance of the charge after May 10, 2013."  Even in the highly unlikely chance that the jury did not base its verdict on any of these particular episodes, the mere allegations related to 20 additional challenged episodes inevitably amplified the jury's perception of the breadth of the conspiracy and consequently the jury's "sense" of Mr. Aiyer's guilt.

The Court mitigated the prejudicial impact of this evidence in part by instructing the jury that certain trading activities on Reuters—cancelled trades and spoofing—were not price fixing or bid rigging.  But, as has been discussed, this evidence should have been excluded altogether, as the defense requested, and the instruction still only addressed 8 of the 20 episodes in question. (*See* Trial Tr. at 2142:16-2143:1 (Koeltl, J., Jury Instruction).)  Moreover, the Government emphasized cancelled trades and spoofing to the jury in its summations.  In view of the great risk of prejudice from the magnitude of improper evidence, Mr. Aiyer should be granted a new trial.

B.    The Jury Was Likely Confused About The Proper Legal Standard.

Evidentiary errors also likely muddled the jury's understanding of the proper legal standard.  The jury heard evidence from Mr. Katz and Mr. Cummins at least 23 different times that the challenged trading conduct was "wrong" or "immoral."  (*See, e.g.,* Trial Tr. at 166:17-20 ("Q. Mr. Cummins, did you know whether this conduct was wrong?  A. Yes.  Q. And was it wrong?  A. Yes.") (Cummins); Trial Tr. at 195:24-196:2 ("Q. Did you know whether this conduct was wrong?  A. Yes.  Q. And was it wrong?  A. Yes.") (Cummins); Trial Tr. at 205:14-17 (same); Trial Tr. at 212:5-8 (same); Trial Tr. at 848:12-16 ("Q. Were these type of

communications with competitors permissible?  A. No.  Q.  Were they wrong?  A. Yes.") (Katz);
Trial Tr. at 861:6-7 ("Q. And was this conduct wrong? A. Yes.") (Katz); Trial Tr. at 913:8-9 ("Q.
Was it moral?  A. No.") (Katz).)  Again, the Court mitigated the impact of this evidence by
instructing the jury that a witness's belief that his conduct was "wrong" or not "independent" did
not show the charged offense of price fixing or bid rigging, but this instruction was likely
inadequate.  (*See* Trial Tr. at 2143:2-14 (Koeltl, J., Jury Instruction).)  In light of the risk of
prejudice from this evidence, a new trial is the appropriate remedy.

      C.    <u>The Jury Was Likely Misled By The Prejudicial Content Of The Government's
           Summations.</u>

A new trial is warranted for the distinct, additional reason that the content of the
Government's summations was improper and prejudicial.  *See Finnerty*, 474 F. Supp. 2d at 546
(granting defendant's motion for a new trial for reasons including the "prejudicial" content of the
Government's opening and closing statements), *aff'd* 533 F.3d 143 (2d Cir. 2008).

Apparently recognizing the weakness of the testimonial evidence, the Government's
summations avoided discussing either of the cooperating witnesses or the actual trading of the
parties and focused solely on the chats—and specifically on single, decontextualized,
inflammatory lines.  (*See, e.g.,* Trial Tr. at 1956:24-1957:11, 2098:3-2100:4.)  On rebuttal
summation, the Government displayed to the jury *37* of these incendiary sound bites.  (*See* Trial
Tr. at 2098:3-2100:4 ("'Don't touch ZAR.' … 'I just got paid.' … 'Don't make JR.'… 'I think
between us we can run ZAR' … 'You should introduce me to the ZAR mafia.' … 'Salute to the
first coordinated ZAR effort' … 'chat of trust.'").)  The only conceivable aim of such a strategy
was to exploit the inflammatory nature of the language.

Remarkably, however, the overwhelming majority of these sound bites—24 of 37—had
nothing whatsoever to do with actual trading activities that the Government contended

constituted price fixing or bid rigging.  They related, instead, either to vague plans that the testimony showed unequivocally the Rand Chat Room participants never put into effect or to activities that the Government conceded, and the Court instructed the jury, were *not* price fixing or bid rigging.

Remarks about Mr. Katz's vague aspirational ideas of "zar domination" are a case in point.  At trial, the Government elicited testimony from Mr. Katz about a "ZAR domination" idea.  (*See* Trial Tr. at 891:1-8.)  Mr. Katz conceded on cross examination, however, that he, Mr. Aiyer, and Mr. Cummins never actually executed any ZAR domination plan.  (Trial Tr. at 1206:19-1207:2 ("Q.  And in fact, you and [Mr. Aiyer] and Mr. Cummins never did the ZAR domination plan.  Is that correct?  A. Correct."); *see also* Trial Tr. at 913:15-20 ("Q.  Mr. Katz, did this [ZAR domination] scheme ultimately come to pass?  A.  No, it did not.  Q.  Why not?  A.  Very complicated to put together.  A lot of moving parts.  We had other things that we focused on instead.  It just petered out as a source of interest.").)

It is not even clear that this concept, had it been executed, would have involved price fixing or bid rigging.  Mr. Katz never explained what the "ZAR domination" plan was, or how it involved price fixing or bid rigging.  Mr. Cummins testified that he understood the idea of ZAR domination to relate only to trading in the afternoon to have a more advantageous position the next day.  (*See, e.g.*, Trial Tr. at 684:16-24 (Cummins).)  Mr. Cummins also testified that the Rand Chat Room members never executed the ZAR domination concept, nor did he, Mr. Aiyer, or Mr. Williams "buy into" it.  (Trial Tr. at 684:16-685:20 ("Q.  Okay.  And that [ZAR domination] was something that you did not buy into; is that right?  A.  That's right.  Q.  And so far as you know, Mr. Aiyer, Mr. Williams did not buy into it either; is that right?  A.  That's right.  Q.  And so you never did it?  A.  That's correct.").)

Similarly, the Government featured in its rebuttal summation Mr, Aiyer's reference to a

"ZAR mafia," even though testimony showed that this reference was innocuous, (Trial Tr. at

876:3-18 (establishing that "zar mafia" related only to Mr. Aiyer's wish to be introduced to the

"important people in the rand market … to meet other people in New York as well as in South

Africa" because he "was in the process of getting, the rand as one of his currencies") (Katz)), and

that references to "mafia" were common and not to be taken seriously.  (*See* Trial Tr. at 1202:15-

1203:13 (Katz).)  The Government also pressed nefarious interpretations of Mr. Aiyer's

description of the Rand Chat Room as a "chat of trust" and his "salute to the first coordinated

ZAR effort," even though there was no evidence linking these comments to any illegal activity or

intent.  (*See* Trial Tr. at 920:3-21 (establishing that "chat of trust" meant "[d]on't go out and start

talking to people and potentially get anyone in trouble … We trusted each other") (Katz); Trial

Tr. at 571:5-16 (establishing that "salute to the first coordinated ZAR effort" related only to "an

exchange of information" that led to "certain trading" that Mr. Cummins admitted was

independent) (Cummins).)[6]

The Government exacerbated the prejudicial nature of the excerpts by its oral

commentary.  In reference to the excerpt, "Don't touch ZAR.  Gonna walk it lower," Mr. Hart

informed the jury that it "speaks for itself,"[7] a refrain in the Government's summations.  (Trial

Tr. at 2098:3-4 (Hart); *see also* Trial Tr. at 1944:13-17 ("'conspiracies are nice' … speaks for

---

[6] Other improper sound bites included, for example, "[y]ou and I do exactly what Dave and I did," "[i]t's pretty nice
to have someone with no BS," and "probably shouldn't put this on perma chat."  (*See* Trial Tr. at 2099:20-21,
2100:4 (Hart).)  As with "ZAR mafia," "ZAR domination,"  and "chat of trust," the testimony likewise failed to
establish any connection between these phrases and the charged crime.  (*See* Trial Tr. at 879:10-25, 939:10-20
(Katz).)

[7] Eight of the 37 sound bites relate to spoofing or cancelled trades, including the sound bite that Mr. Hart was
referencing in this statement—"Don't touch ZAR. Gonna walk it lower."  As previously discussed, (*see supra*
II(A)(2)(a)), spoofing and cancelled trades, by the Government's own admission and the Court's instruction, do not
constitute price fixing or bid rigging. (*See* Trial. Tr. at 1918:12-1919:15, 1920:8-12 (Government at Charging
Conference); Trial Tr. at 2142:16-2143:1 (Koeltl, J., Jury Instruction).)

itself") (Chu); Trial Tr. at 1953:24 (same) (Chu); Trial Tr. at 1953:25-1954:2 ("'Probably

shouldn't put this on perma chart.' Again, speaks for itself." (Chu); Trial Tr. at 1955:6-10 ("'… I

think between us we can run ZAR.' …. speaks for itself.") (Chu).)  That the chats "speak for

themselves" is simply false.  Indeed, the Government previously acknowledged, many times, just

the reverse:  "Without the witnesses' lay opinion testimony explaining … ambiguous references

and code words, the jury will not understand what [the Rand Chat Room members] meant or

appreciate the significance of their actions as to the charged conspiracy."  (ECF No. 93,

Memorandum of Law in Support of the United States' Motions *in Limine* to Admit Lay Opinion

Testimony at 9; *see also id.* at 10 ("Without Katz's testimony, both the language of the chat and

the full context of the chat would be unclear to the jury."); *id.* at 12 ("Without Cummins'

testimony, the jury would not understand the chat itself, or the context in which the chat took

place.")  It is undisputed that the chats were ambiguous, circumstantial evidence, whose value

was further compromised in excerpted, decontextualized form.  To display these misleading

excerpts, along with the Government's false messaging, was highly prejudicial and misleading.

      D.      <u>Evidence Probative of Procompetitive Justifications and Lack of Anticompetitive Effect Was Erroneously Excluded.</u>

A related evidentiary issue meriting a new trial is that evidence of procompetitive

justifications and lack of anticompetitive effects was improperly excluded from trial and thus

from the jury's consideration.  (*See* Trial Tr. at 1599:3-1609:14 (Koeltl, J.); Trial Tr. at 1601:12-

13 ("Evidence of pro-competitive effects, or the lack of harm, is not relevant and should be

excluded under Rule 403 …") (Koeltl, J.); Trial Tr. at 1602:10-13 ("To the extent that the

exhibits are presented to show why the alleged activities of the coconspirators did not have an

effect on price, the summary exhibits are not relevant and are inadmissible under Federal Rule of

Evidence 403. …") (Koeltl, J.); Trial Tr. at 1690:4-1703:11 (Koeltl, J.).)

Procompetitive justifications for the challenged trading behavior and the lack of anticompetitive effects resulting from it bears significantly on the essential elements of agreement and Mr. Aiyer's intent—without which the Government cannot maintain its case. As the Supreme Court has recognized, a lack of anticompetitive effects tends to show a lack of agreement. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 592 (1986) ("The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist."). Separately, the absence of anticompetitive effects and the presence of procompetitive justifications for the trading conduct directly negates intent. *See U.S. Gypsum Co*., 438 U.S. at 444, 446 (defining intent as a function of "requisite anticompetitive effects" and the defendant's "knowledge of [those] likely effects").

The issue is simple: a three-year "conspiracy" that never realized its illicit objective (evidenced by lack of anticompetitive effects) and potentially *enhanced* efficiency or *increased* output (evidenced by procompetitive justifications) might never have been a conspiracy at all. This issue should have been put to the jury. Both types of evidence tend to suggest that there may be some other reasonable way of understanding the trading behavior at issue other than to have been in service of an illegal conspiracy. Excluding this evidence precluded the jury from considering an equally, if not more, plausible, benign way to interpret the traders' conduct. For this reason as well, justice requires that Mr. Aiyer be granted a new trial.

E.    Both Of The Government's Principal Witnesses' Testimony Lacked Credibility And Cannot Fairly Support The Conviction.

Neither of the Government's principal witnesses, Mr. Katz and Mr. Cummins, who were tasked with the critical exercise of making sense of the chats and trading activity, was worthy of belief. This, too, is grounds for a new trial. The law of this Circuit makes clear that this Court is free to assess the credibility of witnesses and, when it finds the testimony too dubious to support

a conviction, to grant a new trial. *See United States Robinson*, No. 01-cr-131 (LEK) 2003 WL
21095584 (N.D.N.Y. May 14, 2003). Mr. Katz's and Mr. Cummins' testimony is of this
especially dubious kind.

Mr. Katz's testimony was riddled with inconsistencies. On the subject of the parties with
whom Mr. Katz conspired, Mr. Katz's testimony was completely illogical: with some traders,
Mr. Katz testified he entered into a conspiracy in violation of the antitrust laws (*see* Trial Tr. at
1084:15-1086:6); with other traders, he violated the antitrust laws or otherwise engaged in illegal
conduct but did *not* enter into a conspiracy or an agreement (*see* Trial Tr. at 1094:15-1095:7,
Trial Tr. at 1115:12-23); and with other traders still, he could not remember whether he violated
the antitrust laws or entered into a conspiracy at all (Trial Tr. at 1089:19-21). Mr. Katz
articulated no meaningful distinction among these categories, and they followed no apparent
logic.

Mr. Katz's testimony on his own trading in the ruble raises even greater concerns about
credibility. Mr. Katz testified that he believed that he was a capable, skilled trader in the ruble.
(*See, e.g.,* Trial Tr. at 944:20-945:5, 1409:18-1410:14.) On one occasion, Mr. Katz even
suggested that he was in the "major leagues" of ruble trading. (*See* Trial Tr. at 1230:12-1231:2.)
On cross examination, however, when confronted with irrefutable documentary and audio
evidence of Mr. Katz discussing his own lack of skill in the ruble (*see, e.g.,* DX-314 at 19:15:38)
("any day i dont blow up in rub[le] is a good day. it is basically sticking your finger in the air
and guessing. i work it off the basket but still just dumb luck." (Katz)); DX-328 at 16:15:43-
16:16:09 ("i have no idea ab[ou]t fking rub[le]" (Dousie), "join the club and i have to quote it all
the time" (Katz)); DX-336 at 12:14:45-12:15:01 ("i hate rub" (Katz), "ahhaha me 2 … avoid
like the plague" (Dousie)), Mr. Katz finally admitted: "I could not compete [with Mr. Aiyer]."

(Trial Tr. at 1128:6-8.)  The testimony began at one end—that he was a skilled ruble trader—and ended on another—that he was not a competitor in the ruble at all.

Mr. Katz's testimony on the conduct at issue on January 27, 2012 also featured a stark contradiction on the key factual issue.  On direct examination, Mr. Katz testified that he pulled his bid to "make it easier" for Mr. Aiyer to sell during the fix window but on cross examination, Mr. Katz admitted that he had no idea about Mr. Aiyer's fix order at the time he pulled his bid. (Trial Tr. at 990:10-14, 994:7-995:7, 1450:22-1451:9 (Katz).)  Without such knowledge, the narrative of coordination does not work.

Mr. Cummins' testimony was similarly incredible.  When questioned about specific episodes on direct examination, Mr. Cummins testified that the traders coordinated; when questioned about the same episodes on cross examination, Mr. Cummins testified that no one coordinated.

Mr. Cummins' testimony about February 23, 2012 is illustrative.  On the subject of his, Mr. Williams,' and Mr. Aiyer's pricing on the transaction at issue, Mr. Cummins expressly testified, "[W]e were not pricing independently."  (Trial Tr. at 255:11; *see generally* Trial Tr. at 252:1-255:18.)  When questioned about the same transaction on cross examination, Mr. Cummins testified repeatedly to the very opposite—that every trader priced the transaction independently and and the there was no coordination at all.  (*See* Trial Tr. at 664:11-665:11 ("Q. And that was a price that *you decided on*, you selected, you actually provided to the customer. *No one told you what to do there*, correct?  A.  Correct.  There is *no coordination* between you and Mr. Aiyer and Mr. Williams as to what you showed the customer, correct?  A.  That's correct.  Q.  You then say 'reffed' [meaning 'refreshed' the price] … Do you see that?  A.  Yes. And *that was your decision*, correct?  No one here is telling you to do that?  A.  Correct. … Q.  A

decision that you made on your own, correct?  A.  Yes."); Trial Tr. at 666:9-11 ("Q.  You are *not coordinating anything about this particular transaction*, is that right?  A.  That's correct.") (emphasis added).)  Mr. Cummins' testimony concerning several other dates, including February 28, 2012 and May 8, 2012, followed the exact same pattern of contradiction.  (*See* Trial Tr. at 246:1-246:21, 513:21-515:12, 515:15-515:23, 516:22-517:17, 517:20-518:2 (February 28, 2012); Trial Tr. at 314:25-316:5, 584:24-585:9 (May 8, 2012).)

Mr. Katz's and Mr. Cummins' testimony simply lacks any indicia of credibility and cannot support a criminal conviction.  With both of the Government's key witnesses discredited and unfit to testify about the chats and underlying trading activity, the Government is left without any satisfactory evidence supporting its case.  A new trial for Mr. Aiyer is warranted.

       F.      The Verdict Was Contrary To the Weight Of The Evidence.

A new trial is warranted when, in view of the entire body of evidence, circumstantial evidence does not give rise to the inferences urged by the Government.  *See Galanis*, 366 F. Supp. 3d at 482, 507 (granting defendant's motion for a new trial when "alternative inferences. … may legitimately be drawn from each piece of circumstantial evidence" and rejecting "the government['s] attempt[ ] to read nefarious intent into" the email messages at issue).  For the reasons set forth in Sections I and II, which are incorporated by reference herein, and for the additional reasons discussed below, the evidence presented in this case does not support the inference, much less beyond a reasonable doubt, that Mr. Aiyer knowingly joined a conspiracy to fix prices and rig bids.

The Government's case, by and large, consisted of circumstantial evidence in the form of chat messages.  Layers of ambiguity characterize this type of proof:  The chats themselves are ambiguous, comprised of the traders' fragmentary shorthand.  (*See, e.g.*, GX-144 at 19:25:27 ("I'm [ ]out."); GX-139 at 20:19:28 ("I will show worst."); GX-193 at 18:16:17 ("can you help

me w/ a lvl").)  The ambiguous language of the chats corresponds to underlying trading activity

that is also ambiguous—conduct that is as likely to have been independent as it is to have been

coordinated.  (*See supra* at Section II(A).)  The Government itself has recognized this problem of

ambiguity: "Defendant often used jargon and code words . . . this language will be difficult for

the jury to understand. . . . Moreover, much of the language in these conversations is 'punctuated

with *ambiguous references to events that are clear only to [the conversants]*.'"  (ECF No. 93,

Memorandum of Law in Support of the United States' Motions *in Limine* to Admit Lay Opinion

Testimony, at 6 (internal citations omitted) (emphasis added).)

     The Government sought to resolve the inherent ambiguity of the chats and underlying

conduct through the testimony of Mr. Katz and Mr. Cummins.  (*See generally* Trial Tr. at 159-

761 (Cummins); Trial Tr. at 820-1453 (Katz); *see also* ECF No. 93, Memorandum of Law in

Support of the United States' Motions *in Limine* to Admit Lay Opinion Testimony at 7

("Cummins, Katz, and CW1 can interpret the jargon, coded reference, and ambiguous references

used in th[e] chat[s]").)  These efforts failed spectacularly.  For each and every date at issue, Mr.

Katz or Mr. Cummins made admissions that affirmatively disproved any theory of coordination.

(*See supra* at Section II(A).)  The witnesses admitted that no one engaged in coordinated trading

on February 23, 2012, November 30, 2012, April 2, 2012, or the afternoon of May 20, 2013.

(*See* Trial Tr. at 659:25-660:1, 664:11-665:11 (Mr. Cummins on February 23, 2012); Trial Tr. at

587:13-17, 595:13-20 (Mr. Cummins on November 30, 2012); Trial Tr. at 666:13-15, 671:15-17,

674:12-18, 675:15-20 (Mr. Cummins on April 2, 2012); Trial Tr. at 1345:7-13, 1355:10-15 (Mr.

Katz on the afternoon of May 20, 2013).)

     At least one of the cooperating witnesses also admitted that the traders' decisions

surrounding the conduct at issue on November 4, 2010, November 22, 2011, February 28, 2012,

March 1, 2012, January 15, 2013, January 18, 2012, and April 2, 2012, among other dates, were the product of the traders' own independent judgment.  (*See* Trial Tr. at 1241:20-24 (Mr. Katz on November 4, 2010); Trial Tr. at 1234:16-18, 1235:17-23 (Mr. Katz on November 22, 2011); Trial Tr. at 513:21-515:12, 515:15-515:23, 516:22-517:16, 517:20-518:2 (Mr. Cummins on February 28, 2012); Trial Tr. at 526:22-528:3 (Mr. Cummins on March 1, 2012); Trial Tr. at 601:6-602:23 (Mr. Cummins on January 15, 2013); Trial Tr. at 536:14-537:2, 541:10-16, 542:10-23, 542:24-543:16, 545:7-546:2, 547:11-18, 552:22-553:2, 555:19-556:14, 557:9-558:8, 558:15-25, 559:4-13, 562:18-21, 563:16-22, 565:2-566:3, 570:14-18, 571:5-16 (Mr. Cummins on January 18, 2012); Trial Tr. at 675:15-20 (Mr. Cummins on April 2, 2012).)

   A conviction in this case necessarily means that the jury made multiple inferential leaps that defy reason in light of the record: that the numerous layers of ambiguity were resolved in the Government's favor despite the countless admissions to the contrary.  No reasonable jury could properly infer from the chat messages beyond a reasonable doubt that Mr. Aiyer knowingly joined a conspiracy to fix prices and rig bids, when the alleged coconspirators repeatedly admitted that no coordination occurred and that the traders' activity was a matter of independent judgment.  The very short deliberation time—less than three hours after a three-week trial with thousands of pages of testimony and documentary evidence—further suggests a failure to engage with the evidence carefully.  (Trial Tr. at 2176:13-2184:15; *cf. United States v. Riley*, No. S1 06 CR. 80 (NRB), 2008 WL 2875432, at *3 (S.D.N.Y. July 16, 2008), *aff'd sub nom. United States v. Barris*, 377 F. App'x 93 (2d Cir. 2010) ("[I]t is telling that the jury deliberated for two days, and over the course of that period, requested the trial transcripts of all four of the government's cooperating witnesses and asked several thoughtful questions regarding the applicable legal standards.  The verdict against [the defendant] and his co-defendants appeared to have been the

product of careful consideration of the evidence presented at trial.")  The jurors' process of deducing conclusions from the evidence was flawed and irrational, and a new trial is warranted on this basis alone, as well.

*   *   *   *

In light of the evidentiary errors, issues of prejudice, lack of witness credibility, and overall insufficiency of evidence at trial, justice requires that Mr. Aiyer be granted a new trial.

## CONCLUSION

For the foregoing reasons, the Court should grant Mr. Aiyer's Rule 29 motion and enter a judgment of acquittal and/or grant Mr. Aiyer's Rule 33 motion and order a new trial as to any part of the charge remaining.

Dated: December 20, 2019
       New York, New York

By:     /s/ Martin Klotz
        WILLKIE FARR & GALLAGHER LLP
        Martin Klotz
        Joseph T. Baio
        Jocelyn M. Sher
        Samuel M. Kalar
        787 Seventh Avenue
        New York, New York 10019
        T: (212) 728-8000

        *Attorneys for Defendant Akshay Aiyer*