**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

       - against -                       **18cr333 (JGK)**

**AKSHAY AIYER,**                              <u>**OPINION AND ORDER**</u>

             **Defendant.**

---

**JOHN G. KOELTL, District Judge:**

On November 26, 2019, after a three-week trial, the jury returned a verdict of guilty against the defendant Akshay Aiyer for one count of conspiracy in restraint of trade in violation of 15 U.S.C. § 1, the Sherman Act. The verdict was signed by all the jurors and confirmed by a poll of the jurors in open court. Following the verdict, a number of allegations of juror misconduct came to the Court's attention. In response to the allegations and after hearing from the parties about all open matters, on December 13, 2019 the Court conducted an interview with Juror No. 3 in connection with the allegations. At this time, the Court declines to conduct further inquiries or grant any relief to the defendant in connection with the allegations of juror misconduct.

**I.**

**A.**

On November 26, 2019, the same day the jury returned its verdict, Juror No. 6 sent a letter to the Court. As was the case

1

for all jurors, Juror No. 6 had signed the verdict form and responded to the poll in open court affirming the verdict.

The letter made a series of allegations. Some of the allegations were that other jurors pressured Juror No. 6 into voting for a guilty verdict and that Juror No. 6 eventually acquiesced. The letter also described an incident in which Juror No. 5 asked Juror No. 6 if Juror No. 6 had taken the elevator with the defendant. The comment occurred after Juror No. 6 tried to request evidence during deliberation to support his concerns with a guilty verdict. The letter reported that at another time, Juror No. 3 noted that the defendant and someone in the gallery whom the juror mistook for the defendant's brother, smiled at a good defense examination of a witness. At that time, Juror No. 3 allegedly had commented: "They smile now, but they wouldn't be smiling at the end of this." The letter also described comments made by Juror No. 3 about the Court's instructions not to consult outside sources during the trial. Allegedly, at one point during the trial, Juror No. 6 overheard Juror No. 3 say to Juror No. 1: "The judge said we cannot talk about or lookup information about the case, he never said that my girlfriend can't" and "even my boss looked up the case." Additionally, Juror No. 3 allegedly stated at another point that "he had looked up information on members of the counsel, . . . and one member of the counsel looked skinny in her picture." Finally,

the letter suggested that various jurors were puzzled by the Court's instructions during deliberation and that most of the deliberation was spent trying to understand what the Court's instructions meant on various issues of law.

After the Court brought the letter to the attention of the parties, the parties made submissions to the Court. In one submission, the defense brought to the attention of the Court another instance of alleged juror misconduct about which the defense became aware only after Juror No. 6's letter. The allegation was that Juror No. 4 had recorded a number of podcasts during and after the trial as part of a standing weekly podcast series that Juror No. 4 released on Spotify, YouTube, and the Apple Podcast Application. For portions of these podcasts, Juror No. 4 referred to his jury service and commented on certain aspects of the case. During the trial, Juror No. 4 recorded three podcasts. His trial-related discussions primarily concerned his dismay at having been selected as a juror, the fact that it was boring to be a juror, and the fact that the judicial system should not be set up in such a way that defendants are sent to prison, or not, based upon the decision of jurors who are often bored and do not wish to be present in court. In the mid-trial podcasts, Juror No. 4 frequently mentioned the fact that he wished to say more about the trial but that he did not know how much he was allowed to say during

the trial. Therefore, he stated repeatedly that he would save many of his observations until the trial had concluded.

In the one post-trial podcast in which he discussed his service, the Juror discussed briefly the fact that the defendant had been found guilty, that the Juror believed the defendant was, in fact, guilty, and that the Juror nonetheless felt badly that the defendant would be sent to prison. To the extent the Juror discussed the trial beyond that, the Juror spent the bulk of the post-trial podcasts making a number of comments about the physical appearance and demeanor of counsel for both parties, the trial judge, and the Court's staff.

All the podcasts were recorded by the Juror and consisted of the Juror talking uninterrupted for about an hour without soliciting comments from any person or speaking with any other person.

Additionally, it was brought to the attention of the Court that Juror No. 4 and Juror No. 3 had connected on social media after the trial.

**B.**

Thus, the Court became aware of the following four categories of allegations of juror misconduct after the verdict was returned: 1) the allegations of juror bias against the defendant as described in Juror No. 6's letter; 2) allegations of misconduct during deliberation, including that Juror No. 6

4

was pressured during deliberations to return a guilty verdict and not to inquire about further evidence, as well as allegations of juror confusion during deliberations; 3) allegations that extraneous information about the case and parties reached Juror No. 3 during the course of the trial, including, but not limited to, a picture of defense counsel; and 4) allegations that Juror No. 4's social media use during and after trial constitutes misconduct, namely the podcasts he put out during and after trial and the fact that he connected with Juror No. 3 through social media after the trial.

The first, second, and fourth categories did not require further inquiry for reasons explained below. The third category did require further inquiry. After conducting an interview with Juror No. 3, the Court ended the post-verdict inquiry for reasons explained below.

## II.

The standard for conducting a post-verdict inquiry into allegations of juror misconduct is high because of the real risk that jurors may be harassed following a verdict and because our system of criminal justice depends upon jurors deliberating in private, secure in the knowledge that their deliberations will not become public. See Tanner v. United States, 483 U.S. 107, 119-21 (1987); United States v. Moon, 718 F.2d 1210, 1234 (2d Cir. 1983) ("[C]ourts are, and should be, hesitant to haul

jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences."). At the same time, certain allegations of juror misconduct, such as allegations of racial animus on the part of any juror or allegations that the jurors considered extraneous prejudicial information not admitted at trial, may implicate a defendant's Sixth Amendment rights. See Peña-Rodriguez v. Colorado, 137 S. Ct. 855, 871 (2017) (racial animus); Bibbins v. Dalsheim, 21 F.3d 13, 16-17 (2d Cir. 1994) (extraneous information).

To protect both interests, the defendant's Sixth Amendment rights and the public's interest in the confidentiality of jury deliberations, "a post-verdict inquiry into allegations of such misconduct is only required 'when there is clear, strong, substantial and incontrovertible evidence that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'" United States v. Baker, 899 F.3d 123, 130 (2d Cir. 2018) (alterations omitted) (quoting Moon, 718 F.2d at 1234). "Allegations of impropriety must be 'concrete allegations of inappropriate conduct that constitute competent and relevant evidence,' though they need not be 'irrebuttable because if the allegations were conclusive, there would be no need for a hearing.'" Baker, 899 F.3d at 130-31

(alterations omitted) (quoting United States v. Ianniello, 866 F.2d 540, 543 (2d Cir. 1989)).

**A.**

With respect to the first, second, and fourth categories, the allegations are not the kind of "clear, strong, substantial and incontrovertible evidence that a specific nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant." Moon, 718 F.2d at 1234.

**1.**

The allegations of juror bias arise from two specific allegations in Juror No. 6's letter. First, there is the comment that Juror No. 5 made to Juror No. 6 during deliberations after Juror No. 6 tried to request evidence to support his concerns with a guilty verdict, namely "Did Akshay took [sic] the elevator with you?" while other jurors allegedly laughed and made jokes. Second, there is the comment that Juror No. 3 made during the trial when he saw the defendant and someone Juror No. 6 believed was the defendant's brother[1] smiled during parts of the defense counsel's cross examination, that "they smile now, but they wouldn't be smiling at the end of this." Defense counsel reads into these comments a suggestion that Jurors No. 3 and 5 were biased against the defendant on the basis that the

---

[1] Defense counsel has indicated in its submissions that the person was not in fact the defendant's brother.

7

defendant is of Asian ancestry. However, there is nothing at all in the remarks that suggests any racial bias.

These comments do not rise to a "clear statement that indicates [a juror] relied on racial stereotypes or animus to convict a criminal defendant." Peña-Rodriguez, 137 S. Ct. at 869. The comments themselves contain no hint of racial bias and the defense charge of racial animus is rank speculation. See Baker, 899 F.3d at 133 (finding that speculation about a juror's comment, which "could possibly indicate that the juror determined" guilt on racial animus did not meet the "narrow exception to the no-impeachment rule" in Peña-Rodriguez).

Nor does the comment by Juror No. 3 that the defendant "wouldn't be smiling at the end of this" suggest any kind of pre-trial bias, ethnic or otherwise, that would rise the level of clear evidence needed to require a post-trial evidentiary hearing. The comment does not rise to the level of the comment at issue in United States v. Haynes, in which an alternate juror reported that, prior to deliberations, "some of the women on the jury had said that [the defendant] might be guilty, [because] she's here." 729 F.3d 178, 191 (2d Cir. 2013). Moreover, the comments in Haynes were brought to the Court's attention before the jury reached its verdict, and therefore inquiry into those comments did not implicate the important cautions against post-verdict inquiries. See id. In any event, the comment in this

case does not demonstrate pre-existing bias against the defendant, but rather demonstrates a Juror's contemporaneous view of the evidence. And the comment falls far short of the comment in Baker, in which there was an allegation that, after the trial was over, a Juror said that "he knew the defendant was guilty the first time he saw him." Baker, 899 F.3d at 134. The Second Circuit Court of Appeals found that even that comment did not necessitate a post-trial inquiry. See id.

In short, the allegations of juror bias are speculative and do not meet the standards set forth in Peña-Rodriguez and Baker for impeaching the verdict or conducting a further inquiry.

## 2.

As for the second category of allegations, that Juror No. 6 was pressured during deliberations to vote for a guilty verdict, those allegations do not rise to the level of coercion that would be sufficient to conduct a post-verdict inquiry or to impeach the verdict. The allegations of intrajury pressure are not specific enough to require a post-verdict inquiry. See United States v. Sattar, 395 F. Supp. 2d 66, 76-77 (S.D.N.Y. 2005), aff'd sub nom., United States v. Stewart, 590 F.3d 93 (2d Cir. 2009). It is true that the Second Circuit Court of Appeals has suggested that in extreme circumstances, allegations of intrajury pressure may rise to the level necessary to impeach the verdict, such as "credible allegations of threats of

violence leveled by one juror by another[.]" Anderson v. Miller, 346 F.3d 315, 327 (2d Cir. 2003). In general, however, mere intrajury verbal pressure is not an "outside influence" for purposes of an inquiry of juror misconduct and "vague and conclusory" allegations of intrajury pressure will not give rise to a post-verdict inquiry. See United States v. Yeagley, 706 F. Supp. 2d 431, 434-35 (S.D.N.Y. 2010); Sattar, 395 F. Supp. 2d at 76-77.

Further, in this case, Juror No. 6 eventually voted guilty, signed the verdict form, and affirmed his verdict when polled by the Court. The juror never brought any concerns to the Court's attention during jury deliberations. The stability of jury verdicts would be imperiled if any dissatisfied juror could vote with the other jurors and then upset a unanimous verdict solemnly arrived at and affirmed in open court by the simple expedient of alleging pressure after the jury was discharged. See id.

Nor do allegations that the jury was confused by certain legal principles in this case warrant further inquiry. Those matters pertain to the jurors' mental processes and should not become the subject of inquiry absent extraordinary circumstances not present in this case. See Yeager v. United States, 557 U.S. 110, 122 (2009) ("Courts properly avoid such explorations into the jury's sovereign space[.]"); Tatum v. Jackson, 668 F. Supp.

10

2d 584, 594 (S.D.N.Y. 2009) (refusing to overturn a verdict on the basis of alleged juror confusion). Moreover, there was no suggestion during deliberations that the jurors were confused in any way, such as a note to the Court requesting clarification on some point. The post hoc misgivings of a single juror are an insufficient basis to conduct a post-verdict inquiry.

### 3.

The fourth category of allegations related to Juror No. 4's social media use also does not raise any concerns that necessitate a post-verdict inquiry. In certain circumstances, a juror who connects with other jurors over social media or makes public comments about the trial over social media may threaten a defendant's Sixth Amendment right to an impartial jury. See United States v. Ganias, 755 F.3d 125, 132 (2d Cir. 2014). However, the use of social media alone is not, without more, prejudicial to the defendant because "[a] mistrial or other remedial measure is required only if juror misconduct and actual prejudice are found." United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003); see also United States v. Feng Ling Liu, 69 F. Supp. 3d 374, 385-86 (S.D.N.Y. 2014) (finding no prejudice when jurors made public tweets during and after the trial because the nature of the communications did nothing to indicate that the jurors did not deliberate impartially or take their civic duties

seriously), aff'd sub nom., United States v. Feng Li, 630 F. App'x 29 (2d Cir. 2015).

The Court has reviewed Juror No. 4's mid-trial and post-trial podcasts cited by the defense. The Juror's mid-trial podcasts did not contain any evidence of prejudice or evidence that the Juror did not deliberate fairly and impartially. Juror No. 4 stated repeatedly that he would refrain from discussing the case during the trial because he did not know the extent to which he was allowed to discuss the trial. Rather, Juror No. 4 stated that he would write his thoughts down in order to discuss after the trial concluded. The Juror did not discuss the facts of the case itself and mostly complained about jury duty and his levels of boredom. Nothing in his statements indicated bias against the defendant. Moreover, he stated explicitly that he would be unbiased in deliberations, at the end of the day. He also said that he understood the gravity of his role and that he would render a fair and just decision. In another podcast, he said that he was going to be fair and would not say the defendant was guilty if the defendant was not or that the defendant was not guilty if it was not true. Nothing that Juror No. 4 discussed during his mid-trial podcasts could be construed as indicating any bias towards the defendant and it did not amount to prejudice. See Feng Ling Liu, 69 F. Supp. 3d at 385

(discussing juror tweets in which "an actual showing or reasonable inference of bias" was absent).

To the extent that the Juror's comments indicate that he may not have been paying full attention during the trial or that he was bored, his comments appeared to be hyperbolic exaggerations made in the course of what the Juror describes as a comedy podcast. Moreover, those comments are undermined by the Court's own observations of the Juror during trial in which he appeared to be attentive. See United States v. Steele, 390 F. App'x 6, 14 (2d Cir. 2010) ("[T]he trial judge is in a unique position to ascertain an appropriate remedy, having the privilege of 'continuous observation of the jury in court.'") (quoting United States v. Panebianco, 543 F.2d 447, 457 (2d Cir. 1976)).

The Juror's post-verdict statements likewise do not indicate that the Juror was biased against the defendant or that anything occurred during the trial or deliberations that was prejudicial to the defendant and that would warrant a post-verdict inquiry. In the post-verdict podcast, the juror spent most of the time describing the mannerisms and physical attributes of counsel for the parties and the Court's staff. The Juror also noted that the defendant had been convicted. To the extent the Juror revealed anything about deliberations or his personal feelings about the verdict, the Juror stated, in

13

substance and in between jokes on the topic, that he did not feel good about the fact that the jury convicted the defendant and sent the defendant to prison.

In short, nothing spoken by Juror No. 4 during his podcasts suggests that he was biased against the defendant or that the defendant was prejudiced by Juror No. 4's podcasts in a way that would necessitate a post-verdict inquiry. Indeed, the Juror's YouTube channel indicates that his podcasts receive very little publicity, and that at most several dozen people listen to each, making the podcasts even less capable of causing prejudice to the defendant.

Moreover, the fact that Juror No. 3 and Juror No. 4 may have connected on social media after the trial does not demonstrate prejudice to the defendant. There is no indication that they discussed the case or the defendant at all during the trial. There is therefore no showing of prejudice or the possibility of prejudice based on Juror No. 4's social media activities and therefore no need for the Court to conduct a further inquiry.

**B.**

The third category of allegations raised a different question because it was the only one of the four categories that raised a real possibility that "extraneous prejudicial information was improperly brought to the jury's attention."

14

Fed. R. Evid. 606(b)(2)(A). In particular, the second category contained allegations that Juror No. 3 had looked up information about defense counsel, which raised a possibility that he had conducted further outside research during the case in violation of the Court's repeated instructions. Additionally, there were allegations that Juror No. 3's girlfriend and boss had looked up information about the case. Because these allegations fell into a "narrow" exception for extraneous information, see Bibbins, 21 F.3d at 17, the Court conducted an interview with Juror No. 3 on December 13, 2019 to determine whether any extraneous information came to the Juror's attention and if so whether the information was the kind that could be classified as prejudicial.

The Court was mindful, when conducting the interview, not to allow the juror to "go on to testify about the effect of that information on the juror's mental processes or the jury's deliberations." Id. The Court invited the parties to submit questions to the Court before the interview. Counsel for the defense and the Government were present for the on-the-record interview and, after the interview, out of the presence of the juror, the Court asked if there were any further questions for the juror and there were none.

At the interview, the Court asked whether Juror No. 3 had done any research into the case or about any of the parties or

lawyers. The Juror answered that he had not done any research into the case during the trial and that he had followed the Court's instructions throughout the course of the trial and deliberations. The Juror explained that after the case was over, he learned that his office manager, who had received letters from the Court informing her that the Juror would be away from work, had conducted some research into the trial. The Juror also noted that his father, for whom he worked, saw the letter from the Court about the Juror's service, and that he was therefore aware of the title of the case. The Juror further explained that the Juror looked at something once the trial was over, but that he had not looked at any outside sources during the course of the trial. Additionally, the Juror explained that during the course of the trial, some of the jurors would comment on the physical appearance and trial mannerisms of the lawyers. The Juror also explained that on one occasion his girlfriend asked him about the case, but he told her he was not allowed to speak about it. Finally, the Juror volunteered that on the day of the verdict, he overheard some of the Marshals assigned to the trial courtroom commenting on how much certain expert witnesses called by the parties were paid.

    There is no basis to pursue any further inquiries of any of the jurors. At this time, the inquiry into juror misconduct will end because there is no reason to suggest that there was any

prejudicial information improperly brought to the attention of the jury in this case. See United States v. Stewart, 433 F.3d 273, 303 (2d Cir. 2006) ("The inquiry should end whenever it becomes apparent to the trial judge that 'reasonable grounds to suspect prejudicial jury impropriety do not exist.'") (quoting Moon, 718 F.2d at 1234). Similarly, nothing that has come to light rises to the level that would warrant a new trial or any other sort of relief that the defendant might seek.

Indeed, the interview of Juror No. 6 confirmed the decision not to conduct further inquiries. During the interview, the Juror was forthcoming in his answers and explained in matter-of-fact and credible terms how his father and boss could have learned about the case by virtue of the Court's letter sent to the Juror's employer. He further credibly explained that he had not looked up information about the case or counsel during trial. To the extent that there is any conflict between Juror No. 3's testimony and the allegations contained in Juror No. 6's letter, Juror No. 3's direct statements are more credible than the alleged comments that Juror No. 6 claims to have overheard, particularly when the Court instructed the jurors to bring to the Court's attention during the trial if any juror violated the Court's instructions not to look at or listen to anything about the case outside the courtroom. Further, Juror No. 6 brought his concerns to the Court only after he became dissatisfied with the

17

unanimous verdict. Moreover, even crediting Juror No. 6's hearsay account that some information came to the attention of the jury in the form of information about defense counsel, such extraneous information does not rise to the level that it would likely influence a typical juror. See Bibbins, 21 F.3d at 17 (citing Miller v. United States, 403 F.2d 77, 83 n.11 (2d Cir. 1968)). Thus, the defendant has failed to show that there is any basis for a continuing juror inquiry and no basis to overturn the verdict based on alleged extraneous information considered by any juror.

There is no "clear, strong, substantial and incontrovertible evidence" that "extraneous prejudicial information was improperly brought to the jury's attention" warranting further post-verdict inquiry. See Baker, 899 F.3d at 130-31; Fed. R. Evid. 606(b)(2)(A).

**CONCLUSION**

After considering all the allegations brought to the Court's attention, all the arguments of the parties, and after conducting a post-verdict interview with one Juror in this case, the Court declines at this time to conduct any further inquiries

and finds no basis to vacate the jury's verdict based on these allegations.

**SO ORDERED.**

**Dated:     New York, New York**
            **January 13, 2020**            _____/s/ John G. Koeltl_____
                                            **John G. Koeltl**
                                            **United States District Judge**