**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                          |
UNITED STATES OF AMERICA                  |
                                          |
        v.                                |
                                          |          Case No. 1:18-cr-00333 (JGK)
AKSHAY AIYER,                             |
                                          |
        Defendant.                        |
                                          |
-------------------------------------------------------------x
```

**MEMORANDUM OF LAW IN SUPPORT OF THE UNITED STATES' OPPOSITION
TO DEFENDANT'S MOTION FOR A JUDGMENT OF ACQUITTAL OR, IN THE
ALTERNATIVE, FOR THE DECLARATION OF A MISTRIAL OR A NEW TRIAL**

# TABLE OF CONTENTS

I.   The Government Alleged and Proved a Horizontal Price-Fixing and Bid-Rigging
     Conspiracy, a *Per Se* Violation of the Sherman Act ............................................................. 2

   A.   Legal Framework ................................................................................................. 3

   B.   The Government Alleged and Proved a Horizontal Conspiracy ........................... 6

   C.   None of Defendant's Arguments Have Merit ..................................................... 11

      1.   Katz and Cummins Were Defendant's Competitors in Ruble and Zloty .................. 11

      2.   The Rule of Reason Does Not Apply to Defendant's Interbank Trading ................. 17

II.  The Jury Heard More Than Sufficient Evidence to Find Defendant Guilty ......................... 21

   A.   Legal Framework ............................................................................................... 22

   B.   A Price-Fixing and Bid-Rigging Conspiracy Actually Existed ......................... 23

      1.   Nature of the Conspiracy ......................................................................................... 24

      2.   Specific Episodes ..................................................................................................... 26

      3.   Expert Testimony and Summary Exhibits About Specific Trading Episodes............ 31

   C.   Defendant Knowingly Joined the Conspiracy ................................................... 32

      1.   Co-conspirator Testimony About Defendant's Membership in the Conspiracy ........ 34

      2.   Co-conspirator Testimony and Bloomberg Chats About Specific Trading Episodes 35

      3.   Co-conspirator Testimony and Bloomberg Chats Not Related to Specific Trading
           Episodes ................................................................................................................... 41

   D.   The Conspiracy Concerned Interstate Commerce .............................................. 42

   E.   None of Defendant's Arguments Have Merit ..................................................... 43

      1.   Conduct Involving the Russian Ruble and Polish Zloty............................................ 44

      2.   Conduct on Reuters Platform ................................................................................... 45

III. Defendant Is Not Entitled to a New Trial........................................................................... 52

   A.   The Evidence Was Properly Admitted. .............................................................. 53

   B.   The Jury Was Properly Instructed as to the Applicable Legal Standard. ........... 56

   C.   The Government's Summations Were Appropriate. ........................................... 56

   D.   Evidence of Procompetitive Justifications and Anticompetitive Effects Was Properly
        Excluded. ........................................................................................................... 59

   E.   The Government Witnesses Were Credible.......................................................... 63

   F.   The Verdict Was Consistent with the Evidence. ................................................ 65

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alaska Elec. Pension Fund v. Bank of Am. Corp.*,
   174 F. Supp. 3d 44 (S.D.N.Y. 2016)......................................................................... 21

*Am. Needle, Inc. v. Nat'l Football League*,
   560 U.S. 183 (2010)............................................................................................... 5

*Apex Oil Co. v. DiMauro*,
   713 F. Supp. 587 (S.D.N.Y. 1989)......................................................................... 20

*Arizona v. Maricopa Cty Med. Soc'y*,
   457 U.S. 332 (1982).................................................................................... 4, 5, 59

*Bd. of Trade of City of Chicago v. United States*,
   246 U.S. 231 (1918)............................................................................................... 18

*Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*,
   441 U.S. 1 (1979).................................................................................... 5, 18, 19

*Copperweld Corp. v. Indep. Tube Corp.*,
   467 U.S. 752 (1984)............................................................................................... 5

*Curley v. United States*,
   160 F.2d 229 (D.C. Cir. 1947)............................................................................. 23

*Elizabeth Place, LLC v. Atrium Health Sys.*,
   922 F.3d 713 (6th Cir. 2019) ............................................................................... 18

*Gelboim v. Bank of Am. Corp.*,
   823 F.3d 759 (2d Cir. 2016).......................................................................... passim

*Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010)................................................................................. 4

*In re DDAVP Direct Purchaser Antitrust Litig.*,
   585 F.3d 677 (2d Cir. 2009)................................................................................. 21

*In re Sulfuric Acid Antitrust Litig.*,
   703 F.3d 1004 (7th Cir. 2012) ................................................................ 5, 17, 18, 19

*Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*,
   551 U.S. 877 (2007)............................................................................................... 4

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008).................................................................... 6, 18, 19

*Nash v. United States*,
   229 U.S. 373 (1913) ................................................................. 52

*NCAA v. Bd. of Regents of Univ. of Okla.*,
   468 U.S. 85 (1984) ................................................................... 13

*N. Pac. Ry. v. United States*,
   356 U.S. 1 (1958) ...................................................................... 3

*Ratino v. Med. Serv. of Dist. of Columbia (Blue Shield)*,
   718 F.2d 1260 (4th Cir. 1983) ................................................. 18

*Richardson v. Marsh*,
   *481 U.S. 200 (1987)* ......................................................... 46, 55

*Texaco Inc. v. Dagher*,
   547 U.S. 1 (2006) ................................................................... 18

*United States v. Abelis*,
   146 F.3d 73 (2d Cir. 1998) ...................................................... 23

*United States v. Abu-Jihaad*,
   630 F.3d 102 (2d Cir. 2010) .................................................... 54

*United States v. Aleskerova*,
   300 F.3d 286 (2d Cir. 2002) .................................................... 33

*United States v. Apple, Inc.*,
   791 F.3d 290 (2d Cir. 2015) .............................................. passim

*United States v. Binday*,
   804 F.3d 558 (2d Cir. 2015) ............................................. 22, 23

*United States v. Brighton Bldg. & Maint. Co.*,
   598 F.2d 1101 (7th Cir. 1979) .................................................. 4

*United States v. Brock*,
   789 F.3d 60 (2d Cir. 2015) ...................................................... 22

*United States v. Canova*,
   412 F.3d 331 (2d Cir. 2005) .................................................... 64

*United States v. Caracappa*,
   614 F.3d 30 (2d Cir. 2010) ...................................................... 56

*United States v. Carboni*
   204 F.3d 39 (2d Cir. 2000) .............................................. 46, 54

*United States v. Casamento*,
   887 F.2d 1141 (2d Cir. 1989).......................................................................... 57

*United States v. Castro.*,
   669 F. Supp. 2d 288 (E.D.N.Y. 2009) ........................................................... 62

*United States v. Certified Envtl. Servs., Inc.*,
   753 F.3d 72 (2d Cir. 2014)............................................................................. 57

*United States v. Chavez*,
   549 F.3d 110 (2d Cir. 2008)..................................................................... 22, 23

*United States v. Daugerdas*,
   837 F.3d 212 (2d Cir. 2016)........................................................................... 57

*United States v. Desimone*,
   119 F.3d 217 (2d Cir. 1997)..................................................................... 24, 50

*United States v. Ferguson*,
   246 F.3d 129 (2d Cir. 2001)............................................................... 52, 53, 63

*United States v. Germosen*,
   139 F.3d 120 (2d Cir. 1998)........................................................................... 57

*United States v. Gordon*,
   987 F.2d 902 (2d Cir.1993)............................................................................ 33

*United States v. Guadagna*,
   183 F.3d 122 (2d Cir. 1999)........................................................................... 23

*United States v. Guiliano*,
   644 F.2d 85 (2d Cir. 1981)............................................................................. 55

*United States v. Guillory*,
   740 F. App'x 555 (9th Cir. 2018) .................................................................. 60

*United States v. Huezo*,
   546 F.3d 174 (2d Cir. 2008)........................................................................... 33

*United States v. Jackson*,
   335 F.3d 170 (2d Cir. 2003)........................................................................... 23

*United States v. Koppers Co.*,
   652 F.2d 290 (2d Cir. 1981)........................................................... 3, 16, 33, 59

*United States v. LeRoy*,
   687 F.2d 610 (2d. Cir. 1982)......................................................................... 22

*United States v. Maldonado-Rivera*,
   922 F.2d 934 (2d Cir. 1990)............................................................................ 22

*United States v. Martinez*,
   54 F.3d 1040 (2d Cir. 1995)............................................................................ 23

*United States v. Matthews*,
   20 F.3d 538 (2d Cir. 1994).............................................................................. 22

*United States v. McCourty*,
   562 F.3d 458 (2d Cir. 2009)...................................................................... 52, 63

*United States v. Mercado*,
   573 F.3d 138 (2d Cir. 2009)............................................................................ 55

*United States v. Napolitano*,
   564 F. Supp. 951 (S.D.N.Y. 1982).................................................................. 55

*United States v. Pauling*,
   256 F. Supp. 3d 329 (S.D.N.Y. 2017)............................................................. 57

*United States v. Pica*,
   692 F.3d 79 (2d Cir. 2012)........................................................................ 24, 50

*United States v. Pitre*,
   960 F.2d 1112 (2d Cir. 1992).......................................................................... 23

*United States v. Rodriguez*,
   392 F.3d 539 (2d Cir. 2004)...................................................................... 24, 50

*United States v. Roldan-Zapata*,
   916 F.2d 795 (2d Cir. 1990)............................................................................ 23

*United States v. Sanchez*,
   969 F.2d 1409 (2d Cir. 1992).............................................................. 52, 53, 63

*United States v. Smith*,
   No. 08-cr-390 (BSJ), 2009 WL 4249120 (S.D.N.Y. Nov. 25, 2009) ...................... 62

*United States v. Socony-Vacuum Oil Co.*,
   310 U.S. 150 (1940)................................................................................... 3, 23

*United States v. Soto*,
   No. 12-cr-556 (RPP), 2014 WL 1694880 (S.D.N.Y. Apr. 28, 2014) ...................... 62

*United States v. Stratton*,
   779 F.2d 820 (2d Cir. 1985)............................................................................ 22

*United States v. Topco Assocs. Inc.*,
    405 U.S. 596 (1972) ............................................................................ 4, 12, 16, 44

*United States v. Torres*,
    128 F.3d 38 (2d Cir. 1997) ............................................................................ 52

*United States v. Torres*,
    604 F.3d 58 (2d Cir. 2010) ............................................................................ 22

*United States v. Tramunti*,
    513 F.2d 1087 (2d Cir. 1975) ........................................................................ 33

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ...................................................................................... 32

*United States v. Vaval*,
    209 F. App'x 24 (2d Cir. 2006) ..................................................................... 64

*United States v. White*,
    673 F.2d 299 (10th Cir. 1982) ...................................................................... 23

*United States v. Zackson*,
    12 F.3d 1178 (2d Cir. 1993) .......................................................................... 57

*Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*,
    857 F.2d 55 (2d Cir. 1988) ............................................................................ 18

At trial, the government proved beyond a reasonable doubt that Defendant Akshay Aiyer was guilty of knowingly joining a conspiracy to fix prices and rig bids in the foreign exchange market for Central and Eastern European, Middle Eastern, and African ("CEEMEA") currencies. The government introduced evidence that proved each element of the crime, namely: (i) a conspiracy to fix prices and rig bids actually existed; (ii) Defendant knowingly joined the conspiracy; and (iii) the conspiracy concerned interstate commerce. That evidence included the testimony of two co-conspirators, three customers, and two experts, as well as a trove of documentary evidence, namely Bloomberg chats, trading data, and audio recordings. Defendant attacked the government's case through cross-examination of its witnesses, and he put on his own case with one witness and a number of exhibits. The jury weighed all of the evidence, assessed the credibility of the witnesses, and found Defendant guilty. Their verdict should not be disturbed.

The case charged by the government was a conspiracy between horizontal competitors to fix prices and rig bids, a *per se* violation of the Sherman Act. The evidence went directly to a horizontal price-fixing and bid-rigging conspiracy, the Court instructed the jury regarding such a conspiracy, and the jury found Defendant guilty of such a conspiracy. Defendant claims that the record demonstrates that he was in a vertical relationship with his co-conspirators, a position that he raised at trial. The record, however, contains abundant evidence that Defendant was in a horizontal relationship with his co-conspirators, including the testimony of two co-conspirators and three customers. The jury found that Defendant was guilty of conspiring with his competitors, thus rejecting Defendant's suggestions that his co-conspirators were not competitors. There is no basis to overturn the jury's finding in this regard.

Defendant complains that the Court failed to conduct an elaborate economic inquiry in light of his purported procompetitive justifications; such an inquiry is impermissible, however, for *per se* illegal conduct like price-fixing and bid-rigging conspiracies.  Nor does Defendant's conduct fall into the narrow category of cases where the ancillary restraints doctrine applies, because there was no evidence of a valid joint venture to which the conduct could have been ancillary.  Even if the ancillary restraints doctrine could apply, the horizontal price-fixing and bid-rigging agreement would remain subject to the *per se* rule because the agreement was not reasonably necessary to achieve any of the supposed benefits proffered by Defendant.

In his motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29(c), Defendant fails to identify any genuine gaps in the proof at trial.  Instead, he views certain portions of the evidence in isolation, views the evidence in the light most favorable to himself, draws inferences from the evidence in his favor, and challenges the jury's weighing of credibility and the evidence.  In other words, Defendant's motion is contrary to fundamental legal principles underpinning Rule 29.

Finally, Defendant moves under Federal Rule of Criminal Procedure 33 for a new trial. He offers six bases for his motion, none of which have merit.  The Court should therefore deny Defendant's motions for a judgment of acquittal or a new trial.

## I.    The Government Alleged and Proved a Horizontal Price-Fixing and Bid-Rigging Conspiracy, a *Per Se* Violation of the Sherman Act

In the indictment, the government alleged that Defendant entered into a horizontal price-fixing and bid-rigging conspiracy with his competitors, a *per se* violation of the Sherman Act. At trial, the government presented evidence of this horizontal conspiracy, the Court instructed the jury regarding this horizontal conspiracy, and the jury found Defendant guilty of this horizontal conspiracy.  In his motions, Defendant claims that the record demonstrates that his co-

2

conspirators were not competitors in the Russian ruble and Polish zloty, and that in any case he was in a vertical relationship with his co-conspirators. Memorandum of Law in Support of Defendant's Motion for a Judgment of Acquittal, or in the Alternative, for the Declaration of a Mistrial or a New Trial, ECF No. 196 ("Def.'s Mem."), at 20–26. The record, however, contains abundant evidence that Defendant was in competition with, and at the same level of the market structure as, his co-conspirators. Defendant also claims that the Court should have conducted an elaborate economic analysis and considered his procompetitive justifications, Def.'s Mem. at 27–35, but such an analysis is impermissible under the *per se* rule. Moreover, Defendant's conduct does not fall under the ancillary restraints doctrine because there was no evidence that Defendant was in a bona fide joint venture with his co-conspirators. Even if the ancillary restraints doctrine applied, Defendant's horizontal price-fixing and bid-rigging agreement with his competitors was not reasonably necessary to achieve the procompetitive benefits proffered by Defendant.

### A.     Legal Framework

Courts have long held that certain restraints of trade are *per se* illegal under the Sherman Act "because of their pernicious effect on competition and lack of any redeeming virtue." *N. Pac. Ry. v. United States*, 356 U.S. 1, 5 (1958); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940) ("Whatever economic justification particular price-fixing agreements may be thought to have, the law does not permit an inquiry into their reasonableness. They are all banned because of their actual or potential threat to the central nervous system of the economy."). Among those *per se* illegal restraints are horizontal price-fixing conspiracies. *Socony-Vacuum Oil Co.*, 310 U.S. at 223; *Gelboim v. Bank of America Corp.*, 823 F.3d 759, 771 (2d Cir. 2016) ("Horizontal price-fixing conspiracies among competitors are unlawful *per se*."). Likewise, bid-rigging conspiracies are *per se* illegal. *United States v. Koppers Co.*, 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, which has been

classified by courts as a *per se* violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'") (quoting *United States v. Brighton Bldg. & Maint. Co.*, 598 F.2d 1101, 1106 (7th Cir. 1979)).

The Supreme Court has spoken on what makes an agreement horizontal: it is "an agreement between competitors at the same level of the market structure," as opposed to "combinations of persons at different levels of the market structure, e.g., manufacturers and distributors." *United States v. Topco Assocs. Inc.*, 405 U.S. 596, 608 (1972). That being said, parties at different levels of the market structure can still be part of a *per se* unlawful agreement, such as a hub-and-spoke conspiracy, where "an entity at one level of the market structure, the 'hub,' coordinates an agreement among competitors at a different level, the 'spokes.'" *United States v. Apple, Inc.*, 791 F.3d 290, 314 (2d Cir. 2015) (citing *Howard Hess Dental Labs. Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 255 (3d Cir. 2010)). The key question is whether the agreement in restraint of trade is horizontal. *Id.* at 323.

If the government establishes a *per se* violation of the Sherman Act, such as a price-fixing or bid-rigging conspiracy, that is the end of the inquiry. *Gelboim*, 823 F.3d at 771 ("Horizontal price-fixing conspiracies among competitors are unlawful *per se*, that is, without further inquiry."). As the Supreme Court explained in *Arizona v. Maricopa County Medical Society*, the *per se* rule eliminates the need for any "elaborate inquiry into the reasonableness of a challenged business practice." 457 U.S. 332, 343 (1982). The *per se* rule "treat[s] categories of restraints as necessarily illegal" and thereby "eliminates the need to study the reasonableness of an individual restraint in light of the real market forces at work." *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007). Thus, procompetitive justifications cannot save *per se* illegal behavior:

> The respondents' principal argument is that the *per se* rule is inapplicable because their agreements are alleged to have procompetitive justifications.  The argument indicates a misunderstanding of the *per se* concept.  The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some.

*Maricopa Cty. Med. Soc'y*, 457 U.S. at 351.

Likewise, in a *per se* case, lack of anticompetitive effects is no defense.  "No further showing of actual adverse effect in the marketplace is necessary.  This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations." *Gelboim*, 823 F.3d at 776; *see also Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 768 (1984) ("Certain agreements, such as horizontal price-fixing . . . are thought so inherently anticompetitive that each is illegal per se without inquiry into the harm it has actually caused.").

There is a "narrow" line of cases where courts have considered procompetitive justifications even when there was a horizontal price-fixing agreement between competitors. *Apple*, 791 F.3d at 325.  "The Supreme Court has characterized these decisions as limited to situations where the 'restraints on competition are essential if the product is to be available at all.'" *Id.* at 326 (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 203 (2010)). Moreover, such an analysis occurs only "when the restraint at issue was imposed in connection with some kind of potentially efficient joint venture." *Id.* (citing XI Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law* ¶ 1908b (3d ed. 2010); *In re Sulfuric Acid Antitrust Litig.*, 703 F.3d 1004, 1013 (7th Cir. 2012)).  "Put differently, a participant in a price-fixing agreement may invoke only certain, limited *kinds* of 'enterprise and productivity' to receive the rule of reason's advantages." *Id.*  If a defendant could invoke procompetitive justifications outside of the joint venture context, "the *per se* rule would lose all benefits of being *per se*." *Id.* (citing *Broadcast Music, Inc. v. Columbia Broadcasting Sys., Inc.*, 441 U.S. 1, 8 & n.11 (1979)).

In the context of a joint venture, where a restraint is "reasonably necessary to achieve a joint venture's efficiency-enhancing purposes (i.e., ancillary), it will be analyzed under the rule of reason." *Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 339 (2d Cir. 2008) (Sotomayor, J., concurring).  In other words, "a challenged restraint must have a reasonable procompetitive justification, related to the efficiency-enhancing purposes of the joint venture," to be evaluated under the rule of reason.  *Id.*  If the restraint has no such justification, then the restraint is naked and subject to *per se* analysis.  *Id.*

### B.    The Government Alleged and Proved a Horizontal Conspiracy

In its indictment, the government alleged a horizontal price-fixing and bid-rigging conspiracy, a *per se* violation of the Sherman Act.  The indictment alleged that Defendant and his co-conspirators were traders at "rival banks," Indictment ¶ 17, ECF No. 1, who were in continuous competition with each other in the FX market: they competed with each other to win customer orders, Indictment ¶ 3, and they competed in the interdealer market, including on electronic platforms, as they sought to offset positions resulting from customer orders, Indictment ¶ 9.  As such, they were competitors.  The indictment alleged that, rather than competing with each other, as they should have, they agreed to "suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere."  Indictment ¶ 20.  This agreement was carried out by, *inter alia*, revealing customer information, risk positions, and trading strategies, Indictment ¶ 22(a); agreeing to coordinate, and in fact coordinating, trading in the interdealer market in order to increase, decrease, and stabilize the price of CEEMEA currencies, Indictment ¶ 22(b)–(d); filling customer orders at prices that the conspiracy sought to increase, decrease, or stabilize, Indictment ¶ 22(e); and agreeing on prices to quote to customers, Indictment ¶ 22 (f).  On June 3, 2019, the Court found that the indictment properly alleged a *per se* violation of the Sherman Act and

6

denied Defendant's motion to dismiss the indictment.  Status Conf. Tr. 40:11–43:20 (June 3, 2019), ECF No. 76.

At trial, the government presented abundant evidence that Defendant was at the same level of the market structure as his co-conspirators and that they were competitors.  Defendant, Jason Katz, Christopher Cummins, and Nicholas Williams all traded CEEMEA currencies for their respective banks, namely J.P. Morgan, Barclays, BNP Paribas, and Citibank.  Trial Tr. 161:10–164:7.  The government's expert, Dr. DeRosa, testified that dealers in the foreign exchange market, such as the ones that employed Defendant and his co-conspirators, competed with one another for customer business, and they did so by competing on price.  Trial Tr. 96:1– 23.  Likewise, Dr. DeRosa testified that dealers competed with one another in the interbank market, again on price.  Trial Tr. 108:18–22.

Co-conspirators Katz and Cummins testified specifically to the horizontal nature of their relationship with Defendant.  Cummins testified that he, Katz, Williams, and Defendant were traders at competing banks who traded similar menus of emerging market currencies.  Trial Tr. 161:10–164:7.  In other words, the conspirators were at the same level of the market structure, i.e., they were horizontal.  Cummins repeatedly acknowledged that his co-conspirators were his competitors or "the competition."  *See, e.g.*, Trial Tr. 166:22–23; 191:3–12; 213:13–18; 238:19– 20.  He explained how traders competed with one another: first, they competed to buy low and sell high in order to make a profit; and second, they competed for client business by showing better prices.  Trial Tr. 191:13–20.  In his testimony related to specific trading episodes, Cummins explained how he and his co-conspirators were competitors, and how they subverted the competitive process.  For example, on February 28, 2012, a customer approached Cummins,

Williams, and Defendant looking for a quote in the Russian ruble.  Trial Tr. 246:9–18.  Cummins

testified:

> Q. And who, to your knowledge, was in competition for this customer trade?

> A. All three of us: Citi, Barclays, and J.P. Morgan Chase.

Trial Tr. 248:5–7.  Similarly, Cummins testified that he was in competition with Williams and

Defendant for a PLN/CZK trade on February 23, 2012.  Trial Tr. 253:19–21.

Likewise, Katz repeatedly acknowledged that Cummins, Williams, and Defendant were

his competitors.  *See, e.g.*, Trial Tr. 822:7–11; 867:9–10; 877:23–878:1; 883:17–18; 885:8–12;

917:18–19.  He explained how his co-conspirators were also traders in CEEMEA currencies; in

other words, they were at the same level of the market structure.  Trial Tr. 865:21–866:2; 867:3–

8.  Katz testified how a customer would approach multiple banks when looking for a price quote

in order to comparison shop.  Trial Tr. 857:15–23.  Katz explained how he competed against

Defendant to win customer business.  Trial Tr. 930:24–931:1.  Katz testified that he competed

against Defendant in ruble.  Trial Tr. 943:1–3.  He testified that he agreed with his competitors

on prices to show customers.  Trial Tr. 975:1–5.  Katz also testified that he agreed with his

competitors to coordinate their trading on the interbank platform.  Trial Tr. 1018:19–1019:6.

The testimony from the three customers also demonstrates that Defendant and his co-

conspirators were at the same level of the market structure and were in fact competitors.  Amy

Flynn, of the asset management firm Mellon, described how Mellon put banks, such as the ones

that employed the conspirators, in competition with one another:

> Q. You mentioned best execution.

> A. Yes.

> Q. To what extent at all does that principle play into this stage of the life cycle?

8

A. So, best execution would be the specialist traders understanding and having a view into who they should be transacting the transaction with. And then it's also – for us, it's trading in competition, meaning they go out to bid or offer any particular trade to two or more banks.

Q. And if the trader goes to two or more banks, then what happens?

A. They wait for the prices to come back and they would take the best price for the trade.

Trial Tr. 766:16–767:3.  Flynn testified about the November 4, 2010 ruble transaction executed by Mellon with J.P. Morgan.  *See infra* Part II.B.2.a.  Flynn testified that there were only three or four banks capable of executing the transaction: J.P. Morgan, Barclays, and Citigroup, the banks that employed Defendant, Katz, and Cummins.  Trial Tr. 769:7–11.  The evidence showed that Mellon went to Defendant and Katz for competing price quotes, and instead of competing against one another, they colluded against Mellon.  Trial Tr. 929:18–939:9.

Robert Davis of Putnam Investments also testified how his company put banks in competition with one another for trades:

Q. Can you give some examples of these banks, Mr. Davis?

A. Sure.  Credit Suisse, UBS, Citibank, JP Morgan, Deutsche Bank, RBS.  I can give a few more if that's --

Q. Why wouldn't you use just one bank, Mr. Davis?

A.  So, we have a large volume of business.  Part of why we trade with a number of banks is we want them to compete for our business.  Our business is -- you know, we deal and we trade in large size.  And there's a lot of volume that goes through. So part of how we can measure our counterparties is the pricing that they give us when we go to trade with them.

Q. How do they compete for your business?

A. Through their pricing, generally.  I mean, that's the most important portion of how they compete for our business, is that they give us competitive prices.

Trial Tr. 771:11–24.

Finally, Denise Simon of Lazard Asset Management testified about how banks competed for Lazard's business:

> Q. And why might you go to two banks if you had time?
>
> A. To make sure that we get the best price.
>
> Q. And when you get the price quotes from two different banks, how do you choose which bank to transact with?
>
> A. Well, if we are selling U.S. dollars and buying a foreign currency, then the higher exchange rate means we get more currency for the dollar, and that's the one that we would execute on.
>
> Q. And by higher exchange rate, do you mean higher price?
>
> A. Yes, higher price.

Trial Tr. 1460:1–10. Simon testified to a February 28, 2012 ruble trade that Lazard executed with J.P. Morgan. Trial Tr. 1460:15–18. Simon testified that there were four banks who could have executed the trade with Lazard: Citibank, Bank of America, Barclays, and J.P. Morgan. Trial Tr. 1461:21–1462:3. The evidence showed that Lazard approached Cummins at Citibank, Williams at Barclays, and Defendant at J.P. Morgan for price quotes for the trade, and the three of them colluded against Lazard. Trial Tr. 245:13–251:22.

After the government and Defendant rested, the Court instructed the jury on the law. During the charge, the Court repeatedly instructed that the conspiracy needed to be between competitors for the jury to find Defendant guilty. *See, e.g.*, Trial Tr. 2138:10–13 ("A price fixing conspiracy is an agreement or mutual understanding between two or more <u>competitors</u> to fix, control, raise, lower, maintain, or stabilize the prices charged for products or services.") (emphasis added); 2141:8–11 ("Bid rigging is an agreement between two or more <u>competitors</u> to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded to the basis of competitive bids.") (emphasis added); *see also* Trial Tr. 2171:2–6 ("The existence of a

10

conspiracy is important because the part of the Sherman Act we are concerned with outlaws certain joint activities by <u>competitors</u>, but it does not outlaw actions taken by a single firm or a single person.") (emphasis added); 2136:14–18 ("The antitrust laws involved in this case are concerned only with joint action and agreements among <u>competitors</u> – not with actions taken independently by a single competitor. The independent actions of a person can never constitute a restraint of trade in violation of the Sherman Act.") (emphasis added); 2136:21–25 ("Indeed, a person may adopt policies and prices identical to those of his or her <u>competitors</u> as long as such actions are the result of an independent business decision, and not the result of an agreement or understanding among <u>competitors</u>.") (emphasis added).

After the charge and deliberation, the jury found Defendant guilty. Trial Tr. 2185:7–2187:13.

### C.    None of Defendant's Arguments Have Merit

In the face of the jury's guilty verdict, the result of proper instructions and sufficient evidence, Defendant makes two arguments: (i) Defendant was not in competition with his co-conspirators in the Russian ruble and Polish zloty; and (ii) the Court should have conducted an economic analysis, considered his procompetitive justifications, and found that the rule of reason applied to the interbank trading. Neither of these arguments has merit.

### 1.    Katz and Cummins Were Defendant's Competitors in Ruble and Zloty

Defendant first argues that Katz and Cummins were not competitors in Russian ruble and Polish zloty. With respect to Katz, Defendant argues that he was more skilled in trading ruble, and Katz did not have an interest in trading ruble. Def.'s Mem. at 21. With respect to Cummins, Defendant argues that Cummins was not responsible for trading ruble or zloty and avoided winning trades in those currency pairs. *Id.* at 22.

11

Defendant's arguments misapprehend what it means to be a competitor subject to liability under the *per se* rule. As the Supreme Court explained in *Topco*, competitors are "at the same level of the market structure" and are therefore horizontal. 405 U.S. at 608. There is no question Katz and Cummins were at the same level of the market structure as Defendant. When Katz was at Barclays, he was responsible for trading ruble, just as Defendant was responsible for trading ruble at J.P. Morgan. Trial Tr. 867:6–8; 930:18–23; 942:20–25. When a customer came to Katz looking for a ruble quote, Katz provided a price because that was his job. Trial Tr. 942:20–22. At Citibank, Cummins was the backup ruble trader, and when the primary ruble trader was off the desk, Cummins took over the responsibility of pricing ruble transactions. Trial Tr. 248:8–19. Likewise, Cummins was the backup trader for zloty. Trial Tr. 662:13–22. Thus, just like Defendant, Katz and Cummins were responsible for making prices to customers in ruble and zloty, so that all three were at the same level of the market structure.

Indeed, the evidence established that customers viewed Defendant, Katz, and Cummins as competitors in the ruble and zloty. When asked which banks could have executed the ruble trade at issue on November 4, 2010, Amy Flynn of Mellon testified that there were only three or four banks capable of doing so: J.P. Morgan, Barclays, and Citigroup, the banks that employed Defendant, Katz, and Cummins. Trial Tr. 769:7–11. In fact, the evidence showed that Mellon went to Defendant and Katz looking for price quotes for that November 4, 2010 trade. GX-102 at 1–2; GX-S02. Likewise, Denise Simon of Lazard testified regarding a February 28, 2012 ruble trade at issue, Trial Tr. 1460:15–18, and stated that there were four banks who could have executed the trade with Lazard: Citibank, Bank of America, Barclays, and J.P. Morgan. Trial Tr. 1461:21–1462:3. The evidence showed that Lazard went to Defendant, Cummins, and Williams

to look for price quotes on that trade. Trial Tr. 245:13–251:22; GX-S17. Finally, with respect to the zloty trade on February 23, 2012, Cummins testified:

> Q. Thank you, Mr. Cummins. Let's take a look at lines 21:42:43 to 21:42:59. Describe for the jury what's happening in this part of the chat.
>
> A. I tell the other guys that I'm quoting Poland/Czech. Nick indicates that he was asked as well. And Akshay indicates that he is being asked as well and publishes his price.
>
> Q. So in this case, who, to your knowledge, is in competition for this customer business?
>
> A. All three of us.

Trial Tr. 253:12–21. In other words, a customer came to Defendant, Cummins, and Williams looking for a price quote in zloty, and the three gave price quotes.

In short, Defendant, Katz, and Cummins were at the same level of the market structure with respect to ruble and zloty, since they were responsible for providing price quotes to customers in those currencies, and customers viewed them as competitors in those currencies. Neither their varying levels of skill in trading those currencies, nor their varying levels of interest in trading those currencies, changes the fact that they were at the same level of the market structure. *See NCAA v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 99 (1984) (restraints imposed by agreements between "competitors on the way in which they will compete with each other" are horizontal). Defendant cites to *Apple*, Def.'s Mem. at 24, and the language in that case that states "determining the orientation of an agreement can be difficult as a matter of fact and turns on more than simply identifying whether the participants are at the same level of the market structure." 791 F.3d at 314. But the *Apple* court was explaining how a party at a different level of the market structure (Apple) could be in a price-fixing conspiracy when it orchestrated an agreement between parties at the same level of the market structure (the

13

publishers). *Id.* *Apple* simply does not stand for the proposition that parties at the same level of the market structure are not horizontal for *per se* analysis.

Defendant then argues that he was a supplier of rubles to his co-conspirators and so was in a vertical (or mixed horizontal and vertical) relationship with them. Def.'s Mem. at 23–25. But in the trading episodes presented at trial regarding ruble, in only one episode did Defendant "supply" ruble to another co-conspirator;[1] in all other instances, Defendant did not trade with his co-conspirators, so he did not supply them with ruble and could not have been in a vertical relationship with them, even according to Defendant's logic.

In any event, Defendant misunderstands that even if there were vertical elements in his relationship with his co-conspirators with respect to ruble, the key question is whether the

---

[1] In one trading episode, which took place on October 14, 2010, Defendant did trade ruble with Katz in connection with their collusion, but the restraint was still horizontal. In that episode, a customer came to Katz for a ruble trade, and a broker came to Defendant for the same trade (meaning that the customer was the ultimate counterparty); Katz showed a price of 20/23 (buying price/selling price), Defendant showed a price of 19/22, the customer was a buyer, so Defendant won the trade with his lower selling price of 22. Trial Tr. 945:20–947:16. That same customer appeared to come to Katz again asking for a ruble price in a similar quantity as the trade Defendant won. Trial Tr. 947:5–22. Defendant then suggested that they shift price up against the customer to 22/25. Trial Tr. 947:23–948:10. Katz then told Defendant to show this higher price through the brokers, and then he (Katz) would undercut the price slightly to win the customer trade in order to give it to Defendant, all as part of a plan to deceive the customer. Trial Tr. 949:25–950:20. The two executed the plan using slightly different prices, with Defendant moving his price from 16.5/19.5 to 19/22 through the brokers, Katz showing the slightly lower selling price of 21.5 to the customer, Katz winning the trade, and then Katz transferring the trade to Defendant. Trial Tr. 957:5–959:17.

Because Katz transferred the trade to Defendant, Defendant claims that he was supplying liquidity to Katz in a vertical relationship. Def.'s Mem. at 23–25. But the key inquiry here is the nature of the restraint. *Apple*, 791 F.3d at 322. The issue is not Defendant trading with Katz; the issue is Defendant coordinating with Katz, moving his price in the brokers from 16.5/19.5 to 19/22 to deceive the customer as to the state of the market, and Katz taking advantage of this deception by pricing slightly under at 21.5 to the customer. Though Defendant was making a price in the brokers, and Katz was making a price directly to the customer, they were both making prices in their capacity as competing dealers in the ruble market, which means that they were at the same level of the market structure and their restraint was horizontal.

restraint amongst them was horizontal. *Apple*, 791 F.3d at 322. In explaining the agreement

with respect to customer trades, Cummins testified:

> Q. Who else was involved?
>
> A. The other guys in the chat room, Nic, Akshay, and Jason.
>
> Q. You said that you rigged bids. What exactly did you do?
>
> A. There were times, for example, when a client would call up and ask a number of us in the chat room for the same thing all at the same time, so we would convey to the others what we were being asked, as far as what currency and what size, and then indicate what price we were showing to the client, and in that way we could kind of coordinate what we would show and whether or not we wanted to win the trade and kind of denote who might be the winner of the trade but still maintain the look of a competition in the eyes of the client.

Trial Tr. 165:4–15. Likewise, Katz testified:

> Q. What did you do to violate the Sherman Antitrust Act?
>
> A. Sure. I submitted false trades into a global trading system. I agreed not to compete with competitor banks. And basically, you know, overall -- excuse me. I agreed to, you know, not to compete.
>
> Q. What, if anything, did you do with customers?
>
> A. I rigged bids and offers for customer prices.
>
> Q. Is this something that you did alone?
>
> A. It is not.
>
> Q. With whom did you agree not to compete, submit fake bids, and agree to specific prices to customers?
>
> A. Sure. Akshay Aiyer, Nic Williams, and Chris Cummins.
>
> Q. Were these traders your competitors?
>
> A. They were.

Trial Tr. 821:23–822:11.[2]  The coordination of traders employed by different banks in fixing prices and rigging bids to customers is a horizontal restraint because it goes to how the traders, operating at the same level of the market structure, agreed not to compete with one another for customer business.

   *Koppers* is particularly instructive in this regard.  In that case, the state of Connecticut solicited bids for the sale and application of road tar, which was used to resurface and repair roads.  652 F.2d at 291–92.  The conspiracy was between two companies, Dosch-King and Koppers, where they agreed to divide the state with respect to road tar bidding, with Dosch-King to be the low bidder in the western half of the state, and Koppers to be the low bidder in the eastern half of the state.  *Id.* at 292.  Critically, Dosch-King purchased some road tar from Koppers in the beginning of the indictment period, but it subsequently purchased all of its road tar from Koppers through the remainder of the indictment period.  *Id.*  Quoting *Topco* and its language regarding competitors at the same level of the market structure, the Court of Appeals for the Second Circuit held that the market allocation between Dosch-King and Koppers was a horizontal restraint and a *per se* violation of the Sherman Act.  *Id.* at 294 (quoting *Topco*, 405 U.S. at 608).  The court also rejected the contention that the district court erred in refusing to give a vertical jury instruction.[3]  *Id.* at 296.  The court focused on the horizontal agreement between Koppers and Dosch-King as competing retailers of road tar, which was not transformed into something different because of the vertical elements between the companies.  *Id.* at 297.

---

[2] The agreement to fix prices and rig bids to customers therefore went far beyond mere information sharing or the disclosure of bid information, as Defendant claims.  Def.'s Mem. at 25–26.

[3] Defendant in this case never asked for a vertical jury instruction.  *See* Defendant's Proposed Jury Instructions, ECF No. 123; Defendant's Supplemental Submission Regarding Jury Instructions, ECF No. 144.

Likewise, the horizontal price-fixing and bid-rigging agreement between Defendant and his co-conspirators was not transformed into something different merely because Defendant "supplied" ruble to his co-conspirators on occasions not relevant to the government's case.

The government notes that Defendant presented the narrative throughout trial that Defendant was a more skilled ruble trader than Katz and Cummins, that Katz and Cummins did not want to trade ruble, and that Defendant supplied ruble to his co-conspirators so that they were not, in fact, competitors. *See* Def.'s Mem. at 20–25. The jury had the opportunity to weigh the evidence, assess the credibility of the witnesses, and consider Defendant's narrative. However, as the Court noted when it denied Defendant's Rule 29 motion at the close of the government's case:

> The defendant argues that transactions in the ruble couldn't be part of a price-fixing conspiracy because the alleged coconspirators were in fact in a vertical, rather than a horizontal, relationship with the defendant, but the jury could well conclude that in fact the members of the conspiracy were in a horizontal relationship in offering dollar/ruble pairs to customers and setting the price at which those dollar/ruble pairs would be offered to customers.

Trial Tr. 1598:4–11. The jury found Defendant guilty of conspiring with his competitors to fix prices and rig bids, and it rejected Defendant's arguments that his co-conspirators were not competitors. The Court should defer to the jury's well-supported factual finding in this respect.

## 2.    The Rule of Reason Does Not Apply to Defendant's Interbank Trading

Defendant argues that the Court should conduct an economic analysis, consider his procompetitive justifications, and find that the rule of reason applies to the interbank trading because such trading allegedly was "ancillary and integral to a continuing productive buy-sell vertical relationship among the Rand Chat Room members." Def.'s Mem. at 6–17, 30. But such an inquiry is warranted only in a narrow line of cases where there is a joint venture. *Apple*, 791 F.3d at 326 (citing XI Areeda & Hovenkamp, *Antitrust Law* ¶ 1908b; *In re Sulfuric Acid*

17

*Antitrust Litig.*, 703 F.3d at 1013).  Indeed, most of Defendant's citations are to joint venture

cases: *BMI*, 441 U.S. at 4–6 (organizations of individual copyright holders that offered blanket

licenses); *Bd. of Trade of City of Chicago v. United States*, 246 U.S. 231, 235 (1918) (board of

trade consisting of grain brokers, merchants, dealers, malsters, manufacturers of corn products,

and proprietors of elevators); *Med. Ctr. at Elizabeth Place, LLC v. Atrium Health Sys.*, 922 F.3d

713, 719 (6th Cir. 2019) (joint venture between hospitals); *In re Sulfuric Acid Antitrust Litig.*,

703 F.3d at 1009 (contractual arrangement between Canadian producers of sulfuric acid and

American distributors); *Volvo N. Am. Corp. v. Men's Int'l Prof. Tennis Council*, 857 F.2d 55, 71

(2d Cir. 1988) (joint venture between national tennis associations, tournament owners and

directors, and professional tennis players); *Ratino v. Med. Serv. of Dist. of Columbia (Blue

Shield)*, 718 F.2d 1260, 1271–72 (4th Cir. 1983) (peer review committee composed of competing

physicians).  There must be a joint venture before the court can consider whether the horizontal

restraint was reasonably necessary (i.e., ancillary) to the asserted procompetitive benefits of that

venture.  *Major League Baseball Properties, Inc.*, 542 F.3d at 339 (Sotomayor, J., concurring).

Absent ancillarity, the restraint remains subject to *per se* treatment.

The record is devoid of any evidence that that the banks, on whose behalf Defendant and

his co-conspirators traded, formed a joint venture in connection with the trading of CEEMEA

currencies.  There was no evidence of the banks pooling their capital, sharing the risks of loss

and the opportunities for profit, or otherwise economically integrating their trading businesses

for CEEMEA currencies.[4]  *See Texaco Inc. v. Dagher*, 547 U.S. 1, 5–6 (2006) (explaining

hallmarks of a joint venture).  Because there was no joint venture between the co-conspirators or

---

[4] Defendant in this case never asked for a joint venture instruction.  *See* Defendant's Proposed
Jury Instructions, ECF No. 123; Defendant's Supplemental Submission Regarding Jury
Instructions, ECF No. 144.

their banks, the instant case falls outside the narrow exception where the Court would conduct an

economic inquiry and consider Defendant's procompetitive justifications.  It is critical that there

be an actual joint venture; as the *Apple* court noted:

> But even if read broadly, these cases, and others in this category, apply the rule of
> reason only when the restraint at issue was imposed in connection with some kind
> of potentially efficient joint venture.   XI Areeda & Hovenkamp, *supra*, ¶
> 1908b; *see, e.g., Sulfuric Acid,* 703 F.3d at 1013 (describing joint venture formed
> by defendants).   Put differently, a participant in a price-fixing agreement may
> invoke only certain, limited *kinds* of "enterprise and productivity" to receive the
> rule of reason's advantages.   As the Supreme Court has explained—including
> in *BMI* itself, *see* 441 U.S. at 8 & n. 11, 99 S.Ct. 1551—the *per se* rule would lose
> all the benefits of being "*per se*" if conspirators could seek to justify their conduct
> on the basis of its purported competitive benefits in every case.

791 F.3d at 326.  Defendant's argument that the Court must characterize Defendant's conduct,

Def.'s Mem. at 6–10, ignores jurisprudence where the Supreme Court has already characterized

horizontal price fixing and bid rigging as *per se* illegal, and the only way a rule of reason

analysis could apply is through a joint venture defense, which is unsupported here.

Even if there were a joint venture between Defendant and his co-conspirators, which

there was not, Defendant's case would still be *per se* because the horizontal restraint was not

reasonably necessary to achieve the proffered procompetitive benefits.  *Major League Baseball*

*Properties, Inc.*, 542 F.3d at 339 (Sotomayor, J., concurring).  Defendant raises two

procompetitive justifications for the chatroom that he and his co-conspirators used to execute

their conspiracy: (i) information sharing; and (ii) matching off risk positions.  Def.'s Mem. at

27–28.  The horizontal restraints proven by the government, however, were not reasonably

necessary to achieve these purported benefits.  The conspirators did not need to fix prices and rig

bids against customers in order to share information or match off risk positions.  Likewise, the

conspirators did not need to coordinate their interbank trading, such as by staggering the timing

of their orders or trading together when they were in the same direction, in order to share

19

information or match off.  Specifically, when the conspirators shared their risk positions to match off, and then subsequently found out that they were in the same direction (i.e., both long or both short), such that they could not match off, the conspirators could have chosen at that point not to coordinate.  Instead, as the government proved, the conspirators coordinated their orders in the interbank market, where the person with the smaller position would let the person with the larger position go first, or they would trade together, with one person hiding the trading interest of the other.  *See, e.g.*, Trial Tr. 262:18–263:15; 300:7–301:5.  This is price fixing and bid rigging, and it simply has no nexus to the purported benefits of information sharing and matching off.

Defendant continues his misplaced reliance on *Apex Oil Co. v. DiMauro*, 713 F. Supp. 587 (S.D.N.Y. 1989), but as the Court pointed out in denying Defendant's Rule 29 motion at the close of the government's case, the plaintiff in *Apex Oil* failed to establish that the purpose of the conspiracy in that case was price fixing.  Trial Tr. 1597:13–19.  Instead, the facts presented by the plaintiff were at least equally susceptible to the interpretation that the defendants conspired to squeeze the plaintiff so that it would default on certain heating oil contracts or have to purchase heating oil from the physical market.  713 F. Supp. at 597.  Here, the government alleged that the purpose of the conspiracy was price fixing and bid rigging, the government presented evidence of that purpose, the Court instructed the jury regarding a price-fixing and bid-rigging conspiracy, and the jury found Defendant guilty of such a conspiracy.

Defendant also raises a number of arguments related to effect: that the interbank conduct had little, if any market impact, Def.'s Mem. at 29; that there was no tendency to decrease output or raise prices, *id.*; that the interbank conduct only affected counterparties and not customers, *id.* at 30; and that any removal of supply or demand was not permanent but instead only deferred, *id.* at 32.  These arguments ignore the rule in *per se* cases that effect, or lack thereof, is irrelevant.

"No further showing of actual adverse effect in the marketplace is necessary. This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations." *Gelboim*, 823 F.3d at 776. In a related vein, Defendant makes the quizzical argument that the spoofing and fake trade conduct was meant to trick other market participants into increasing supply or demand, and so was not an antitrust violation. Def.'s Mem. at 29. As noted, *infra* Part II.C.2.d., the spoofing and fake trades were relevant to show Defendant's relationship with his co-conspirators and his state of mind. Moreover, to the extent that Defendant argues that an increase of output is a defense to an allegation of a price-fixing and bid-rigging conspiracy, he is mistaken. In *Alaska Electrical Pension Fund v. Bank of America Corp.*, a court in this district addressed a nearly identical argument. There, the defendant banks were accused of conspiring to fix prices through manipulating a benchmark interest rate, ISDAfix. 174 F. Supp. 3d 44, 49 (S.D.N.Y. 2016). The defendant banks argued that price fixing involved a restriction of supply, and that their manipulation involved an increase of transactions. *Id.* at 57. In rejecting the defendants' "surprising" argument, the court reasoned:

> Plaintiffs allege that, instead of competing in the inter-dealer market, the Defendant Banks conspired and agreed to artificially flood the market with transactions to manipulate ISDAfix. That sort of coordinated action in a supposedly competitive market is precisely the sort of anticompetitive behavior the antitrust laws "were intended to prevent."

*Id.* (quoting *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009)). Likewise, any suggestion that spoofing or fake trades can escape antitrust scrutiny simply because the conduct tricked others into increasing supply or demand is incorrect.

## II.  The Jury Heard More Than Sufficient Evidence to Find Defendant Guilty

As instructed by the Court, in order to prove that Defendant engaged in a price-fixing and bid-rigging conspiracy, the government needed to prove three elements: (i) the conspiracy actually existed; (ii) Defendant knowingly joined the conspiracy; and (iii) the conspiracy

concerned interstate commerce.  Trial Tr. 2131:12–21.  At trial, the government introduced more than sufficient evidence for the jury to find all three elements proven beyond a reasonable doubt. In his Rule 29 motion, Defendant attempts to recast the evidence to support his own narrative rejected by the jury.  In doing so, Defendant ignores the bedrock legal principles that the evidence must be viewed in its totality and in the light most favorable to the government, that all inferences must be drawn in favor of the government, and that the Court must defer to the jury's credibility determinations and weighing of the evidence.  Properly viewing the evidence through this prism, the Court should deny the motion.

### A.      Legal Framework

A defendant making an insufficiency claim under Rule 29 faces a "heavy burden, as the standard of review is exceedingly deferential."  *United States v. Binday*, 804 F.3d 558, 572 (2d Cir. 2015) (quoting *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015)).  The sufficiency of the evidence is analyzed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Id.* (quoting *United States v. Chavez*, 549 F.3d 110, 124 (2d Cir. 2008)).  "[I]n assessing whether the government has met its burden, [the court] view[s] pieces of evidence 'not in isolation but in conjunction.'"  *United States v. Torres*, 604 F.3d 58, 67 (2d Cir. 2010) (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 978 (2d Cir. 1990)).  When there are conflicts in the testimony, the court "must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses."  *United States v. Matthews*, 20 F.3d 538, 548 (2d Cir. 1994) (citing *United States v. Stratton*, 779 F.2d 820, 828 (2d Cir. 1985); *United States v. LeRoy*, 687 F.2d 610, 616 (2d. Cir. 1982)).  Likewise, the court must defer to the jury's choices regarding

competing inferences that can be drawn from the evidence. *United States v. Jackson*, 335 F.3d 170, 180 (2d Cir. 2003) (citing *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995)).

"The traditional deference accorded to a jury's verdict 'is especially important when reviewing a conviction for conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel.'" *Id.* (quoting *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992)). To sustain the jury's verdict, the government need not disprove "every possible hypothesis" of the defendant's innocence. *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998) (quoting *United States v. Roldan-Zapata*, 916 F.2d 795, 802 (2d Cir. 1990)).

A conviction must be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Binday*, 804 F.3d at 572 (quoting *Chavez*, 549 F.3d at 124). "[I]f the court 'concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter.'" *United States v. Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (quoting *Curley v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)) (second alteration in the original). "[T]he court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is 'nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. White*, 673 F.2d 299, 301 (10th Cir. 1982)).

### B.    A Price-Fixing and Bid-Rigging Conspiracy Actually Existed

The government demonstrated through sufficient evidence that a price-fixing and bid-rigging conspiracy actually existed. As instructed by the Court, a price-fixing conspiracy is an agreement or mutual understanding between two or more competitors to fix, control, raise, lower, maintain, or stabilize price. Trial Tr. 2138; *see also Socony-Vacuum Oil Co.*, 310 U.S. at 223 (defining a price-fixing conspiracy as "a combination formed for the purpose and with the

effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity"). Bid

rigging is an agreement between two or more competitors to eliminate, reduce, or interfere with

competition in the bidding process, including an agreement about the price to be bid, who should

be the successful bidder, who should bid high, who should bid low, or who should refrain from

bidding. Trial Tr. 2141. As a general matter, "the conspiratorial agreement itself may be

established by proof of a tacit understanding among the participants, rather than by proof of an

explicit agreement." *United States v. Desimone*, 119 F.3d 217, 223 (2d Cir. 1997). "[I]n a

conspiracy case, as in any other, 'the government is entitled to prove its case solely through

circumstantial evidence.'" *United States v. Pica*, 692 F.3d 79, 86 (2d Cir. 2012) (quoting *United

States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)).

At trial, the government proved the existence of the conspiracy through documentary

evidence, in the form of Bloomberg chat communications, audio recordings, and trading data; the

testimony of Katz and Cummins about the nature of the conspiracy; their testimony about

specific trading episodes, contained in Bloomberg chats, executed in furtherance of the

conspiracy; and the testimony and summary exhibits of the government's expert, Ross Waller,

analyzing the data for those specific trading episodes.

### 1.    Nature of the Conspiracy

Both Katz and Cummins testified that they were in a price-fixing and bid-rigging

conspiracy with Defendant, and both testified as to the nature of that conspiracy. For example,

both co-conspirators testified that they coordinated their bidding to customers to affect price.

*See, e.g.*, Trial Tr. 165:4–15 (Cummins); 821:23–822:11 (Katz). As Katz testified:

> Q. Mr. Katz, this process that you just described in terms of quoting a customer,
> did that always happen?
>
> A. No.

24

Q. Why not?

A. Because we were communicating.  The banks in the chatrooms, we were talking about the customers as they came in.  So we were using the information that we had between them to price in a way that they weren't effectively comparison-shopping. They may have the idea that they were, but in reality it wasn't.

Trial Tr. 859:16–24.

In addition to this customer-facing conduct, Katz and Cummins testified about how their conspiracy was carried out in the interbank market, where banks traded with each other. Specifically, both co-conspirators testified how they coordinated their bids and offers in the interbank market to affect supply and demand, with the ultimate goal to affect price.  For example, Cummins testified:

Q. Mr. Cummins, I'm going to shift focus now from customers to the interbank market. And part of your testimony you testified that under your understanding, when you guys were both the same way.  Can you describe that conduct for the jury again?

A. Yes. What that means is if I need to buy, and someone else needs to buy, or three of us need to buy, if we all rushed into the market at the same time to buy, we'd risk pushing the market higher and we would pay more and earn less money or concur losses.  So I would suggest – I'll put in a price and if I'm able to buy any, we'll all split it; that way, we won't create a commotion in the market and risk pushing the market against us.

Q. So in supply-and-demand terms, can you translate your conduct?

A. So if three of us entered the market at the same time, that would indicate to the market that there is more demand. If only one of us enters the market at a time, the market won't see the full demand to buy, and, therefore, we don't risk pushing the market away from us with all of our demand.

Q. When you say "pushing the market away" from you, what does that mean in pricing terms?

A. That means the price would go higher if the market gets pushed away from us.

Trial Tr. 259:19–260:18.  Likewise, Katz testified:

Q. Were there other ways in which you use the Reuters matching machine for your agreement?

A. Yes.

Q. What were they?

A. Another way would be to influence the volume numbers.  So if you go back next to the best and you see the one-by-two with the parentheses two, you could do a couple things there.

Q. And could you just share with the jury what you could do there?

A. One you could do is we would try to -- if we both had similar interests to sell, if we both put our interests in the market, you know, that volume number would get bigger, and people could take that number and say, Oh, there's good sellers here, and maybe move the market against us.  Or someone could go in front of us to sell. So what we do is say, Okay, we both want to sell, I'll do it for both of us, or you do it for both of us, and we'll hide our interest from the market that there's actually two sellers here.

Trial Tr. 854:11–855:3.

The testimony of Katz and Cummins regarding the nature of their price-fixing and bid-rigging conspiracy with Defendant is more than sufficient to establish the actual existence of the conspiracy.

### 2.    Specific Episodes

In addition to testifying about the nature of their conspiracy with Defendant, both Katz and Cummins testified about specific trading episodes where the co-conspirators effectuated the conspiracy using Bloomberg chats and phone calls.  The testimony and the documentary evidence related to these episodes corroborated the existence of the charged conspiracy.  The government presented evidence of twenty-four trading episodes:

- October 14, 2010 (GX-101)
- November 4, 2010 (GX-102)
- April 20, 2011 (GX-106)
- April 26, 2011 (GX-107)
- June 9, 2011 (GX-112)

- August 25, 2011 (GX-121)
- September 23, 2011 (GX-128)
- November 22, 2011 (GX-139)
- December 21, 2011 (GX-144)
- January 18, 2012 (GX-171 and 172)
- January 27, 2012 (GX-181)
- February 23, 2012 (GX-189)
- February 28, 2012 (GX-193)
- March 1, 2012 (GX-197)
- March 8, 2012 (GX-199)
- March 16, 2012 (GX-209)
- April 2, 2012 (GX-213)
- May 8, 2012 (GX-220)
- September 10, 2012 (GX-244)
- November 30, 2012 (GX-278)
- December 12, 2012 (GX-279)
- January 15, 2013 (GX-283)
- May 20, 2013 for EUR/CZK (GX-300)
- May 20, 2013 for USD/TRY (GX-300)

For each episode, the relevant co-conspirator testified about the conduct contained in the Bloomberg chat, and he explained how the conduct was part of the price-fixing and bid-rigging conspiracy with Defendant. For the sake of brevity, the government will go through three examples.

a)      November 4, 2010

On November 4, 2010, Defendant and Katz coordinated their bidding to a customer so that Defendant would win the trade at his desired price. Communicating via Bloomberg chat, they wrote the following:

```
20:02:57 AIYER:   May10
20:03:02 AIYER:   im getting asked 30 usd rub now
20:03:07 KATZ:    here too
20:03:14 AIYER:   30.99
20:03:16 AIYER:   i have shown
20:03:37 KATZ:    ok will show 30.98
20:03:39 AIYER:   haha
20:03:42 KATZ:    you can have ahah
. . .
```

```
20:04:08 KATZ:    showing 30.98
20:04:09 KATZ:    ahhahaha
20:05:07 KATZ:    he passes slightly better away
20:05:23 AIYER:   hahahahaha
20:05:25 AIYER:   yep
20:05:30 AIYER:   u shud show it 98.5
20:05:34 AIYER:   then we both look good
20:05:44 KATZ:    if you win this we should coordinate you can show a real low
                  one and i will still mark it little lower haha
20:05:50 KATZ:    sales says sooo close
20:06:00 AIYER:   yeah
20:06:05 AIYER:   and switch it up now and then
20:06:09 AIYER:   tht way u get called
20:06:09 KATZ:    yep
20:06:11 AIYER:   and not like hypo
20:06:16 KATZ:    true haha
20:06:23 KATZ:    conspiracies are nice
20:07:01 AIYER:   hahaha
20:07:06 AIYER:   prolly shudnt puot this on perma chat
20:08:18 KATZ:    ahahahahah
```

GX-102 at 1–2.  At trial, Katz testified that he and Defendant both traded ruble for their respective banks, and that they competed for customer business.  Trial Tr. 930:18–931:1.  He noted that in the specific chat, a customer had come to both Defendant and Katz for ruble pricing.  Trial Tr. 931:25–932:2.  Katz testified that he and Defendant agreed to coordinate on the prices that they showed the customer, and that this conduct was part of the underlying agreement between the two.  Trial Tr. 933:16–934:4.  Katz testified that, pursuant to this agreement, he showed the customer an intentionally worse bid so that Aiyer would win.  Trial Tr. 935:7–25.  In other words, Defendant and Katz coordinated their bidding to select a winner.

          b)        September 23, 2011

On September 23, 2011, Defendant and Cummins coordinated their bids in the interbank market, specifically on the Reuters platform, in an effort to affect the price of the USD/TRY currency pair.  The two had the following conversation via Bloomberg chat:

```
16:59:03 CUMMINS:  you bidding try at 15?
16:59:07 CUMMINS:  I was at 10
```

```
16:59:14 CUMMINS:  dont want to get in front of each other
16:59:22 CUMMINS:  i pull my bids
16:59:48 AIYER:  hey its me for 2 usd
16:59:50 AIYER:  sry i ll pull
16:59:55 CUMMINS:  no worres
16:59:56 AIYER:  but i am eating lunch
16:59:57 CUMMINS:  leav eit
16:59:59 CUMMINS:  hide $3 for me
17:00:01 AIYER:  so dont want to miss it
17:00:11 CUMMINS:  hah anow orries
17:00:11 AIYER:  ok me at 16
17:00:13 AIYER:  hid for ou
```

GX-128 at 3–4.  At trial, Cummins testified:

> Q. Can you describe for the jury the big picture of what you're trying to achieve in this part of the chat?
>
> A. Yes. Both Akshay and I are interested in buying dollars against Turkish lira. And I ask if he's bidding in the market at a certain price.  I tell him where I've been bidding.  And then we kind of go back and forth and saying, "I will bid," "You bid," bid at this level.  Eventually we agree that he would leave his price in the market and bid for me as well as his interest.
>
> Q. Mr. Cummins, would you mind using the demonstrative and the microphone for the next couple of questions -- Well, actually, could you describe for the you jury supply-and-demand terms, what your conduct looked like?
>
> A. Okay.  So we both have interests to buy dollars.  So we're both on this side. We both have demand.  So we're on this side of the market.  And it's better for us if we buy at a lower price.  So we go back and forth and discuss.  And I suggest rather than the market see us bidding, both of us, which may push the price higher against us, why don't we leave one price in there and you pay for me, and then the market will only see this much demand; and in that way, there's a chance the price won't move higher and will move lower toward us, because we won't represent that much demand.

Trial Tr. 262:18–263:15.  In other words, Defendant and Cummins coordinated their bidding to mask their demand, with the intention to stabilize or lower price.

c)      January 18, 2012

On January 18, 2012, Defendant and Cummins coordinated their trades in the interbank market, specifically on the Reuters platform, in an effort to drive down the price of the

USD/ZAR currency pair to trigger a customer stop-loss order.  Using Bloomberg chat, the two

had the following conversation:

```
19:40:06 AIYER:   i have a  7.9500
19:40:15 AIYER:   s/l
19:40:17 AIYER:   25 usd zar
19:40:19 AIYER:   hmmm
19:40:26 KATZ:    i have a buy of 1.5 there if you want me to hold
19:40:31 KATZ:    nic is running stops now
19:40:53 CUMMINS:  hold on
19:41:00 CUMMINS:  ditto 7.95
19:41:08 AIYER:   25 usd?
19:41:11 CUMMINS:  yup
19:41:13 KATZ:    nice
19:41:16 AIYER:   fking clonw
19:41:23 CUMMINS:  prob is 7.95 should be a good lvl
19:41:26 KATZ:    yep
19:41:46 KATZ:    will get done in asia though
19:42:04 KATZ:    why dont we drive it down there and keep some
19:42:22 AIYER:   i think we re gonna run ino bids
19:42:26 AIYER:   lets see how stocks close?
19:42:38 AIYER:   alktho nic has some at 9600
19:42:45 KATZ:    yep  do it at 4 when no one paying attention
19:45:37 CUMMINS:  grabbing coffee
19:45:41 CUMMINS:  dont jam it yet
19:45:42 CUMMINS:  ahahaha
19:48:07 AIYER:   ahah
. . .
19:54:24 AIYER:   cc u there?
19:54:29 CUMMINS:  yo
19:54:37 AIYER:   this is going to go
19:54:39 AIYER:   on any uptick
19:54:42 CUMMINS:  yea h it is
19:54:44 AIYER:   in stocks
19:54:52 KATZ:    i have small bid at 95
19:55:07 AIYER:   im sure between us
19:55:09 AIYER:   we take it out
19:55:19 CUMMINS:  better get to weork
```

GX-172 at 13–14.  At trial, Cummins testified that through the chat, Defendant revealed that he

had a $25 million stop-loss order at a trigger price of 7.9500, and Cummins revealed that he had

an identical order.  Trial Tr. 227:9–228:1.  In the chat, Katz suggested that they drive down the

price in order to profit if the market bounced higher.  Trial Tr. 228:13–16.  In the chat, Defendant

suggested that they wait and see, and Katz suggested that they drive down the price at 4 pm,

when no one was paying attention.  Trial Tr. 228:17–229:10.  In the chat, Cummins said that he

was going to grab coffee, and he said, "don't jam it yet," which meant not to push the order

through; Cummins testified that jamming a stop was the same thing as running a stop.  Trial Tr.

229:15–20.  With respect to the portion of the chat where Aiyer stated "im sure between us . . .

we take it out" and Cummins responded "better get to weork."  Cummins testified: "And Akshay

says, 'I'm sure between us we take it out,' meaning we have got enough to sell to push the

market through 95.  And I say 'better get to work,' like, okay, let's do it."  Trial Tr. 230:7–11.  In

reviewing his trading on Reuters, Cummins testified that he then traded aggressively and through

the stop level of 7.9500, thereby triggering the stop.  Trial Tr. 232:6–234:10.

Later that day, the group had the following exchange in the Bloomberg chat:

21:56:09 AIYER:   btw
21:56:14 AIYER:   salute to first coordinated
21:56:16 AIYER:   zar effort
21:56:19 KATZ:   yep
21:56:23 KATZ:   many more to come

GX-171 at 6.  The chats and Cummins' testimony demonstrate the coordination between

Defendant and Cummins to drive price down.

### 3. Expert Testimony and Summary Exhibits About Specific Trading Episodes

At trial, Ross Waller testified as an expert witness in foreign exchange trading.  Trial Tr.

1473:8–12.  In connection with his testimony, Waller created summary exhibits for each trading

episode that compiled the relevant communications, Reuters data, and bank data into a single

document.  Trial Tr. 1475:22–1476:24.  These summary exhibits, and Waller's related testimony,

corroborate the existence of the price-fixing and bid-rigging conspiracy evidenced in the Bloomberg chats and discussed by Katz and Cummins in their testimony.

For example, Waller created and testified about GX-S02, the summary exhibit for the November 4, 2010 episode.  As Waller testified, he found data from Defendant's trading book that was consistent with the chat, namely a number of trades that totaled $30 million in the USD/RUB currency pair, at a price of 30.99, with a forward date of May 10, 2011.  Trial Tr. 1481:1–4.  Waller also testified that the counterparty to the relevant trades was Bank of New York Mellon.  Trial Tr. 1481:6–11.

Similarly, Waller created and testified about GX-S08, the summary exhibit for the September 23, 2011 episode.  Waller found that the Reuters data was consistent with the chat: the data showed that Cummins placed a bid for USD/TRY at a price of 10, Defendant placed a bid at a price of 15, Cummins then canceled his bid, and Defendant placed a bid of 16 with a hidden quantity of 7.  Trial Tr. 1491:16–1492:24.  In other words, the chat between Defendant and Cummins was actually carried out in substance by their actions on the Reuters platform.

Waller's summary exhibits and testimony further support the existence of the price-fixing and bid-rigging conspiracy by demonstrating that Defendant and his co-conspirators traded in a manner consistent with their statements in Bloomberg chats.

### C.     Defendant Knowingly Joined the Conspiracy

The government introduced sufficient evidence to demonstrate that Defendant knowingly joined the conspiracy.  As the Court instructed, the government needed to prove that Defendant joined the conspiracy with the intent to aid or advance price fixing and bid rigging, and not because of mistake, accident, or some other innocent reason.[5]  Trial Tr. 2144:4–9.  The

---

[5] To the extent that Defendant cites *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 446 (1978), for the proposition that intent in a *per se* criminal case requires knowledge of likely

government may prove the defendant's knowing participation in a conspiracy through circumstantial evidence. *United States v. Huezo*, 546 F.3d 174, 180 (2d Cir. 2008); *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir.1993). Circumstantial evidence probative of participation in a conspiracy may include, for example, a defendant's association with conspirators "in furtherance of the conspiracy." *United States v. Aleskerova*, 300 F.3d 286, 292–93 (2d Cir. 2002). Additionally, acts that exhibit "a consciousness of guilt" may establish Defendant's participation. *Gordon*, 987 F.2d at 907. "[A] single act may be sufficient for an inference of involvement in a criminal enterprise of substantial scope at least if the act is of a nature justifying an inference of knowledge of the broader conspiracy." *United States v. Tramunti*, 513 F.2d 1087, 1112 (2d Cir. 1975).

The government proved that Defendant knowingly joined the conspiracy in a number of ways: the testimony of Katz and Cummins about Defendant's membership in the conspiracy; their testimony about the underlying Bloomberg chats related to specific trading episodes; and their testimony about other Bloomberg chats not related to specific trading episodes.

---

anticompetitive effects, Def.'s Mem. at 37, Defendant is mistaken. The Second Circuit explicitly rejected this argument in *Koppers*:

> Since the per se rule makes certain conspiracies illegal without regard to their actual effects on trade, it would be illogical to refuse to allow a jury to consider whether the defendant's acts had resulted in an unreasonable restraint, on the one hand, and then require it to find the specific intent to produce those effects, on the other. Where per se conduct is found, a finding of intent to conspire to commit the offense is sufficient; a requirement that intent go further and envision actual anti-competitive results would reopen the very questions of reasonableness which the per se rule is designed to avoid.

652 F.2d at 295 n.6.

1.      **Co-conspirator Testimony About Defendant's Membership in the Conspiracy**

Both Katz and Cummins testified that Defendant was an active and knowing participant

in the conspiracy to fix prices and rig bids.  For example, Cummins testified:

Q. Mr. Cummins, did there come a time when you came to an understanding with Mr. Aiyer regarding your trading?

A. Yes.

Q. Was this the same understanding or a different understanding than the one you had with Mr. Katz?

A. It was the same.

Q. Pursuant to this understanding, what did you do?

A. We helped each other out during the trading day.

Q. What does that mean? How did you do that?

A. I did the same things that I did with Katz.

Q. Like what? Give me an example.

A. Like if a client called in for price, called a few of us at once, I would indicate what I was showing or what I thought the client wanted to do, pass that along to the other guys in the chat.  They would pass it along to me.  And then we could kind of move our pricing accordingly to either win or lose the trade and still make the client think it was competitive.

Q. What else?

A. Again, if we were both on the same side of the market, meaning we both needed to buy, I would say, Rather than risk pushing the market away from us, I'll pay for both of us, and the market will only see my interest, will only see my demand.  And, in addition, I did the same things where I was kind of spoofing the market, where if he needed to buy, we'd put offers in to try to move the market lower into his hands.

Trial Tr. 211:2–212:1.  Likewise, Katz testified:

Q. Mr. Katz, now that we've talked about how you implemented the agreement, let's spend some time talking about the agreement itself.  Can you remind the jury with whom you had this agreement with?

34

A. Akshay, Chris Cummins, Nic Williams.

Q. And how often did you agree to do this conduct with the defendant, Mr. Cummins, and Mr. Williams?

A. When the opportunity manifested itself.  It wasn't every day.  I think from the point of not competing with each other, that was kind of an undercurrent that would just be there on a constant basis.  We were always trying to, you know, lift the ship, have everyone make more money.  So that was kind of there on a more constant basis.  But in terms of inputting the fake trades to the global system to try to influence which direction it was going, it was when the opportunity came up.  It wasn't on an everyday basis.

Q. When did you have the agreement with the defendant, Mr. Aiyer?

A. From when I joined Barclays in around 2010.

Q. Until when?

A. When I left in July 2013.

Trial Tr. 859:25–860:21.  In short, both Katz and Cummins testified that Defendant was an active and knowing member of the conspiracy.

## 2. Co-conspirator Testimony and Bloomberg Chats About Specific Trading Episodes

Defendant's intent was further established by the testimony of Katz and Cummins and the Bloomberg chats related to specific trading episodes.  In each episode, Defendant was a knowing and willing participant in the price-fixing and bid-rigging conduct.  The government will go through the three examples from above, as well as a spoofing example.

a) November 4, 2010

On November 4, 2010, Defendant and Katz coordinated their bids to a customer related to a quote for a $30 million Russian ruble forward trade.  *See supra* Part II.B.2.a.  In the chat, Defendant revealed the price that he quoted to the customer, 30.99.  GX-102 at 1.  Katz testified what he understood from Defendant's action:

Q. To what did you understand the defendant to refer when he said, "30.99, I have shown"?

A. He's telling me the actual price that he has shown the customer.

Q. What do you understand the defendant to be saying to you by providing the price he has shown to a customer?

A. Russian ruble was one of the -- Akshay was very big in Russian ruble.  That's what he wanted to try to do well in.  For me, it was a secondary currency, not one that I had much interest in.  So by him giving me that number, I knew that I could go under him.  He's telling me, you know, go under that, he'll still win the deal and basically the customer will deal at his rate.

Q. Did the defendant specifically ask you to do anything?

A. No.

Q. How did you know what to do?

A. Because we were both doing it. We had been in the markets for a number of years. We understood that if the business -- if we're going to shift the business -- the ruble -- to him, that if he tells me the rate, I know I can use that information to put a rate that would make it work so that it goes in the direction that we want it to go.

Q. What did you understand the point of the defendant showing you his price?

A. So that I would go with the rate below that, so that he would win.

Q. Did you follow through with what you understood the defendant wanted?

A. Yes.

Trial Tr. 934:10–935:13.  Katz understood that when Defendant revealed the price he showed the customer, he was inviting Katz to show a worse price, which Katz did.  Katz's understanding is consistent with what Defendant said later in the chat, when he told Katz "u shud show it 98.5 . . . then we both look good."  GX-102 at 2.  In other words, Defendant was telling Katz that for the next time, Katz should show a worse price just under Defendant's price of 30.99, which would make Defendant and Katz look good to the customer, causing the customer to come back to the

two traders.  Trial Tr. 937:3–19.  Defendant was explicitly suggesting that Katz rig his bid so that it was just slightly worse than Defendant's bid in order to fool the customer.  This was not an accident or mistake; Defendant suggested this price fixing and bid rigging, which demonstrates his active and knowing participation in the conspiracy.

Defendant's intent is further revealed when Katz wrote in the chat "conspiracies are nice," and Defendant responded "hahaha . . . prolly shudnt puot this on perma chat."  GX-102 at 2.  In the light most favorable to the government, there is a fair inference that Defendant exhibited consciousness of guilt; he was telling Katz not to memorialize their conspiracy in the permanent chat.  This consciousness of guilt likewise demonstrates that Defendant knew what he was doing.

### b)  September 23, 2011

On September 23, 2011, Defendant and Cummins coordinated their bids on the Reuters platform when they both had an interest to buy.  *See supra* Part II.B.2.b.  During their coordination, Defendant offered to pull his bid from the market, since Cummins was bidding.  GX-128 at 4.  Cummins declined Defendant's offer, but he then asked Defendant to hide buying interest for Cummins, which Defendant did.  *Id.*  Defendant's affirmative act of offering to pull his bid for Cummins, as well as his affirmative act of hiding demand for Cummins, demonstrate Defendant's knowing participation in the price-fixing and bid-rigging conspiracy.

### c)  January 18, 2012

On January 18, 2012, Defendant and Cummins coordinated their trading on the Reuters platform to drive price lower, in an effort to trigger a large customer stop-loss order.  *See supra* Part I.B.2.b.  In the chat, Defendant suggested to Cummins "im sure between us . . . we take it out," and Cummins responded "better get to weork."  GX-172 at 14.  In the light most favorable government, there is a fair inference from the chat that Defendant was suggesting that the two of

them sell aggressively in order to drive the price through the stop level, and that trading in fact

occurred.  Trial Tr. 232:6–234:10.  Later in the day, Defendant wrote "btw . . . salute to first

coordinated . . . zar effort."  GX-171 at 6.  Both Defendant's suggestion that he and Cummins

take out the stop-loss level, and his subsequent congratulations on their efforts, are strong

evidence that Defendant knew what he was doing: coordinating with his competitor to affect

price, which is price fixing.

d)      Spoofing and Fake Trades

Defendant and his co-conspirators engaged in spoofing and fake trades to push price up

and down on the Reuters platform.  Cummins explained:

> Q. What other conduct?
>
> A. There was a – I'm not sure if you have gone through spoofing but, anyway, we
> would spoof the market, meaning if someone in the chat needed to buy dollars
> against a certain currency, I might place offers in the market in order to try to drive
> the price lower into that person's hands, into someone in my chat room's hands in
> order to help them out or vice versa.  If my friend needed to sell dollars, I might go
> into the market and place buy orders in the hopes of driving the price higher.

Trial Tr. 166:4–13.  In a similar fashion, Defendant and his co-conspirators used fake trades on

Reuters, subsequently offset or canceled, to drive price.  As Katz testified, the group would use

fake trades to influence what the rest of the market saw.  Trial Tr. 853:16–17.  For example, if

the group wanted the market to go lower, they would create a fake trade with an aggressive

seller, so that the rest of the market would think there was selling interest.  Trial Tr. 853:17–24.

The group would then cancel the fake trade by privately entering into an offsetting trade.  Trial

Tr. 853:24–854:7.

As the Court instructed, the spoofing and the fake trades did not, in and of themselves,

constitute the charged conspiracy, and the jury could not return a verdict of guilty solely because

they found that Defendant engaged in spoofing or fake trades.  Trial Tr. 2142:16–22.  The jury

38

could, however, consider such evidence to determine the relationship between Defendant and his

co-conspirators, and to examine Defendant's knowledge of, and intent to, fix prices and rig bids.

One example of spoofing took place on June 9, 2011.  In the chat, Defendant and Katz

had the following communication:

> 18:02:26 KATZ:   ssbb attack
> 18:02:30 AIYER:   in?
> 18:02:33 AIYER:   zar?
> 18:02:34 KATZ:   zar
> 18:02:42 AIYER:   shud we bid it up?

GX-112 at 3.  As Katz explained in his testimony:

> Q. And will you please share with the jury an overview of what's happening in the
> portion of the chat?
>
> A. I'm starting by giving some information: "SSBB attack."  So SSBB stands for
> "State Street Boston," a bank that – it's one of those ones where they're not there
> every day, but they will occasionally get a big flow.  But they're not one of the
> regulars.  So they've attacked, they have a flow right now and they're in the rand
> market.  So they're doing something in the South African rand.   Akshay is
> suggesting: Hey, should we bid it up?  Should we work together and, you know, try
> to buy dollars and try to move the market higher against them?

Trial Tr. 884:1–11.  Later in the chat, the two discuss and actually attempt to push the market

lower:

> 19:18:34 KATZ:   dude we nneed to start bullying zar noone wants to play unless
>                   they have to
> 19:18:46 AIYER:   yeah
> 19:18:48 AIYER:   i am damn bored
> 19:18:50 AIYER:   ahhaha
> 19:18:53 AIYER:   what should we do?
> 19:18:56 KATZ:   and brokers scare people now
> 19:19:05 KATZ:   put prices in they run away
> 19:19:10 KATZ:   think you have somthiong
> 19:19:10 AIYER:   are u long or short?
> 19:19:16 KATZ:   short 10
> 19:19:22 AIYER:   im long 5
> 19:19:23 AIYER:   hahaha
> 19:19:26 KATZ:   hahaha
> 19:19:33 AIYER:   shud we try and push it lower?

```
19:19:38 AIYER:   and get long at 72 ish?
19:19:42 KATZ:   why not
19:19:52 AIYER:   my offer
19:19:57 KATZ:   i join
```

GX-112 at 4.  As Katz explained in his testimony:

> Q. What you do you understand the defendant to refer by, "Should we try to push it lower?"
>
> A. So he's saying should we try to go into the market and try to, you know, sell it down, move the market lower and then after we do that together, start to buy them back and, you know, get into a position that way.  Make some money and get into a position.
>
> Q. How could you and the defendant push it lower?
>
> A. We both sell at the same time. We could both put offers into the matching machine to signify it's going lower.  We could do fake trades where we hit a bid, signal to the market we want it to go lower and do it that way.
>
> Q. What was your understanding of the reason why the defendant suggested you push it lower?
>
> A. Because he wanted to, you know, work together with me to move a market and hopefully make money.

Trial Tr. 886:11–887:1.  On this day, their plan ultimately did not work, but Defendant suggested that they try again on a Monday for their first experiment.  Trial Tr. 888:3–7.

In this episode, Defendant first suggested that he and Katz push the price up against State Street.  Later in the chat, Defendant suggested that he and Katz push the price down, and the two attempted to do so by placing offers into the market.  The chat and the testimony of Katz demonstrate two points: the collaborative relationship between Defendant and Katz, and Defendant's knowledge and intent to affect price by trading in coordination with his competitor.  The spoofing and fake trade episodes highlight the co-conspirators' relationship with each other and Defendant's intent to coordinate his trading with his competitors to affect price.  These

episodes are relevant to Defendant's intent in joining a price-fixing and bid-rigging conspiracy,

whose object was to affect price by coordinating with the competition.

### 3.   Co-conspirator Testimony and Bloomberg Chats Not Related to Specific Trading Episodes

Both Katz and Cummins testified regarding Bloomberg chats not related to specific

trading episodes that went to Defendant's knowing participation in the conspiracy.  For example,

on May 24, 2011, Defendant and Katz had the following conversation on Bloomberg chat:

> 17:44:41 AIYER:   u shud introduce me to the zar mafia
> 17:44:42 AIYER:   once
> 17:44:45 AIYER:   i get a junior
> . . .
> 17:46:02 KATZ:   . . . im in wanted to talk to you a bit about that on thurs if you
>                  could have gotten out
> 17:46:13 KATZ:   i smell opportunity bet your seat and mine in zar
> 17:46:13 AIYER:   we ll do it
> 17:46:15 AIYER:   soon
> 17:46:19 AIYER:   yeah i think between us
> 17:46:21 AIYER:   we can ryun zar
> 17:46:24 KATZ:   i agree

GX-108 at 6.  Katz testified that when Defendant asked to be introduced to the ZAR mafia, Katz

understood that Defendant wanted to be introduced to the bigger players in the South African

rand market.  Trial Tr. 876:6–13.  With respect to Defendant's suggestion that the two could run

the rand market, Katz explained:

> Q. Mr. Katz, I want to direct you to another portion of the chat, timestamped
> 17:46:13 through 17:46:24.  What did you mean by "I smell opportunity bet your
> seat and mine in ZAR?"
>
> A. I'm saying that between our two seats -- because we have good flow, good
> information, we have big risk limits -- that there's opportunity for us to work
> together and move markets in a way that are beneficial to us.
>
> Q. And what did you understand the defendant to refer, "We'll do it soon, yeah, I
> think between us we can run ZAR"?  What you do understand that to refer?

A. That he has the same feeling that I do between our two seats and that, you know, that we can run ZAR, we can make it move in the New York time zone in ways that are beneficial to us if we act together.

Q. How can you run ZAR?

A. By jointly buying and selling, by working together to, you know, put fake bids and offers in.  You know, working by coordinating ourselves between the two of us, we can have an advantage.  It's kind of like -- if you think about it, it's like sitting at the poker table.  You expect everyone to be independent, but what you don't expect is two people to be sitting next to each other sharing their hands, giving information.  You know, it gives you an advantage.  So we'll be much more able to move things and do things if we're sharing that information and working together.

Trial Tr. 878:9–879:9.  This chat and Katz's related testimony go to Defendant's state of mind; he was ready and willing to work with his competitor to run the market, i.e., push price. Defendant was not some innocent bystander; instead, he contemplated and agreed to price fixing and bid rigging with his competition.

### D.     The Conspiracy Concerned Interstate Commerce

The final element that the government proved was that the price-fixing and bid-rigging conspiracy concerned interstate commerce.  As the Court instructed, the government could prove this element by showing that the conspiracy was imposed on goods and services in interstate commerce, or that the conspiracy had a substantial effect on interstate commerce.  Trial Tr. 2147:2–9.

The government proved the interstate commerce element in a number of different ways. The government's expert, Dr. David DeRosa, testified that foreign exchange customers existed throughout the United States.  Trial Tr. 95:20–23.  Similarly, both Katz and Cummins testified that their customer base was global.  Trial Tr. 184:24–185:1 (Cummins); 831:2–3 (Katz).  The government proffered the testimony of three of those customers: Amy Flynn of Bank of New York Mellon, Robert Davis of Putnam Investments, and Denise Simon of Lazard Asset Management.  Mellon was located in Boston, *see* GX-636, Trial Tr. 761–74; and Putnam was

also located in Boston, *see* GX-618, Trial Tr. 780:12–783:5.  Mellon, Putnam, and Lazard had

their own clients, who were located throughout the United States and the world.  Trial Tr. 762:8–

12 (Flynn); 776:8–9 (Davis); 1462:12–14 (Simon).  In another trading episode, March 1, 2012,

the customer for the rigged USD/RUB trade was Pacific Investment Management Company

("PIMCO"), referred to in the chat as "west coast."  *See* GX-197 at 11–12; GX-S18; GX-618.

PIMCO was located in Newport Beach, California.  GX-S18; GX-618.  Thus, the government

proved that, for trades with customers, foreign exchange flowed through interstate commerce.

Moreover, for trades in the interbank market, the conspirators used, among other

vehicles, the Reuters trading platform.  Trial Tr. 175:13–183:17 (Cummins); 848:17–856:18

(Katz).  The conspirators were all located in Manhattan, New York.  Trial Tr. 160:22–23

(Cummins); 162:16–21 (Cummins); 163:7–8 (Cummins); 827:24–25 (Katz); 828:21–22 (Katz);

GX-628, GX-629 (Katz's address: 757 Seventh Avenue, 31st Floor New York, NY 10019;

Cummins's address: 390 Greenwich Street, New York, NY 10013; Aiyer's address: 383

Madison Avenue, New York, NY 10167); Trial Tr. 1620:16–18 (taking judicial notice that "zip

codes 10019, 10167 and 10013 are United States Postal Service zip codes for Manhattan, New

York").  Reuters trades, including those done through Reuters Matching, as well as direct trades

through Reuters Dealing, were routed to and from Reuters' data center in Nutley, New Jersey.

GX-STIP11.  Thus, the government proved that for trades using Reuters, foreign exchange

flowed through interstate commerce.

### E.  None of Defendant's Arguments Have Merit

Defendant argues that neither the ruble/zloty conduct nor the Reuters conduct support the

jury's guilty verdict.  In doing so, he is essentially applying the legal arguments made in Part I of

his memorandum, Def.'s Mem. at 5–33, to the individual episodes featured at trial.  Each episode

of conduct was properly admitted in this *per se* case, and the conduct supports the jury's verdict.

### 1.    Conduct Involving the Russian Ruble and Polish Zloty

Defendant identifies six ruble and zloty transactions that he says cannot support the jury's verdict because (a) Defendant was in a vertical relationship with his co-conspirators, and (b) their bid-rigging conduct was merely independent decision-making.  The six transactions are as follows: October 14, 2010; November 4, 2010; November 22, 2011; February 23, 2012; February 28, 2012; and March 1, 2012.  Defendant's argument as to verticality is addressed, *supra* Part I.C.1.  The evidence is clear that Defendant and his co-conspirators were operating at the same level of the market structure at all times, including the six instances identified by Defendant.  They were, therefore, in a horizontal relationship.  *See Topco Assocs. Inc.*, 405 U.S. at 608.

Defendant's argument that these instances of conduct do not support the verdict because they exemplify independent decision-making, as opposed to collusive price fixing and bid rigging, is also belied by the evidence and testimony at trial.  Four of the transactions referenced by Defendant—October 14, 2010; November 4, 2010; February 23, 2012; and February 28, 2012—are discussed *supra* Part I.C.1.  As discussed, the evidence showed that Defendant and his co-conspirators were in a horizontal relationship, i.e., they were competitors, in each of these instances, and that they rigged their bids pursuant to their agreement.

The same is true with respect to the transactions on November 22, 2011 and March 1, 2012.  On November 22, 2011, both Defendant and Katz were approached for price quotes on a Russian ruble forward transaction.  GX-139 at 7; Trial Tr. 965:22–966:6.  Defendant shared his price with Katz, and Katz responded, "i will show worst."  GX-139 at 8.  Defendant then directed Katz what price to show.  GX-139 at 8 ("make it 28").  In arguing that Katz acted "independently" with respect to this transaction, Defendant fails to account for the fact that Katz specifically testified that he understood Defendant to be directing him as to the price to show.

44

Trial Tr. 967:14–968:2.  He further testified that he understood that Defendant did so in order

trick the customer into thinking it was getting competitive prices from the two banks so that the

customer would continue to approach both of them.  Trial Tr. 967:14–967:23.  Far from acting

independently, Defendant and Katz specifically agreed on the price to show the customer to give

the illusion of competition.  Katz did not act independently; he acted at the direction of

Defendant and provided a rigged bid to the customer.

The March 1, 2012 transaction similarly illustrates the collusive nature of the conduct

engaged in by Defendant and his co-conspirators.  On this day, Cummins was asked to bid on a

Russian ruble forward.  Trial Tr. 256:16; GX-197 at 11.  Defendant's co-conspirator Williams

told Cummins to avoid winning the deal by moving his price lower.  Trial Tr. 256:17–20; GX-

197 at 12.  Cummins did exactly that, see GX-197 at 12 and Trial Tr. 258:10–11, and he testified

that his conduct was pursuant to his agreement with Defendant and Williams. Trial Tr. 256:21–

23 ("Q. And was this conduct part of your understanding with Mr. Aiyer and Mr. Williams? A.

Yes.").  A reasonable jury could readily conclude that Cummins's submission of a low-ball

bid—an intentionally non-competitive, losing bid—was not "independent decision-making" but

rather conduct furthering a price-fixing and bid-rigging agreement.

All of the ruble and zloty transactions proffered by the government support the jury's

verdict.  The government proved that Defendant was in a horizontal relationship with his co-

conspirators and that they coordinated their bids pursuant to the charged price-fixing and bid-

rigging agreement.

### 2.    Conduct on Reuters Platform

Again, Defendant reasserts here many of the arguments he raised in his prior section,

applying them to specific episodes of conduct presented at trial.  He again argues that spoofing

and fake trades do not constitute the crime charged and that the rest of the Reuters conduct was

not done pursuant to a price-fixing and bid-rigging agreement but rather was "the product of traders' independent decision-making, and . . . the behavior had no impact on the price, or the supply or demand visible, on Reuters." Def.'s Mot at 50.  None of these arguments have merit.

a)       Spoofing and Fake Trades

Defendant argues that spoofing and fake traders do not constitute the charged offense. This argument is addressed *supra* Part I.C.2 and Part II.C.2.d.  The government's case-in-chief included five episodes of conduct that could be characterized as solely spoofing or fake trades, specifically April 20, 2011 (fake trade); April 26, 2011 (fake trade); June 9, 2011 (spoofing); November 30, 2012 (spoofing); and January 15, 2013 (spoofing).  These instances of conduct were offered to, and did in fact, show the nature of the relationship between Defendant and his co-conspirators; Defendant's knowledge of the purpose of the agreement (to move price); and his knowing intent to do so.  *See, e.g.*, *supra* Part II.C.2.d. (discussing June 9, 2011).

The Court correctly determined that this conduct was "inextricably intertwined with the evidence regarding the charged offense, and it [was] necessary to complete the story of the crime on trial." Hr'g Tr. 29: 8–10 (Sep. 24, 2019), ECF No. 119 (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)).  This evidence was properly before the jury as direct evidence of the crime charged, and the Court gave an appropriate limiting instruction, Trial Tr. 2142:16–22, that the jury is presumed to have followed.  *See Richardson v. Marsh*, 481 U.S. 200, 211 (1987).

b)       Other Reuters Conduct

As to the rest of the Reuters trading episodes presented at trial, each and every one showcases the nature of the price-fixing and bid-rigging conspiracy and Defendant's knowing participation in it.  Defendant contends that none of the episodes support the guilty verdict because (a) there was no demonstrated effect on price, and (b) the conduct was independent decision making.

46

As to the first argument, it is well-settled that to prove a price-fixing and bid-rigging agreement, the government need not show, and the jury need not find, that there was an effect on price.  *See, e.g.*, *Gelboim*, 823 F.3d at 776 ("No further showing of actual adverse effect in the marketplace is necessary.  This attribute separates evaluation of *per se* violations—which are presumed illegal—from rule of reason violations.").  Rather than effect on price, the government must show, and the jury must find, that Defendant and his co-conspirators had an agreement or mutual understanding to "fix, control, raise, lower, maintain, or stabilize the prices charged for products or services" and "to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded to the basis of competitive bids."  Trial Tr. 2138:11–13 (price fixing); Trial Tr. 2141:9–11 (bid rigging).

In this respect, the government has more than met its burden. The two examples of "hiding" identified by Defendant—December 21, 2011 and March 16, 2012—are illustrative of the charged agreement.  These examples demonstrate Defendant's and his co-conspirators' intent to affect price and the means by which they effectuated their agreement.  The relevant parts of each chat are as follows:

| December 21, 2011 | March 16, 2012 |
| --- | --- |
| 19:05:37 KATZ: thats me at 70<br>19:05:37 KATZ: want me to hid<br>19:05:40 KATZ: hide salami<br>19:05:48 AIYER: yeah<br>19:05:49 AIYER: sure<br><br>GX-144 at 5. | 18:44:35 CUMMINS: thats me at 50<br>18:44:47 CUMMINS: want me to put some more on the bid or hid some<br>18:44:49 AIYER: there he is<br>18:44:51 AIYER: where u been<br>18:44:54 AIYER: yeah pls mate<br><br>GX-209 at 19. |

47

Consistent with the chat communications, the data indicates that both Katz and Cummins hid

buying interest for Defendant.  GX-S11 (December 21, 2011); GX-S20 (March 16, 2012).  At

trial, Katz and Cummins explained the purpose of this conduct.

As to the December 21, 2011 episode, Katz explained:

If both of us had to buy, you could see a situation where the market would see
demand from both of us, which could potentially push the price higher.

In this case, because we were going to work as one unit where one of us would do
it and split it without a market knowing, effectively, it didn't look like anything had
changed in terms of the demand side.  So hopefully keeping the price stable while
we got out of our position.

Trial Tr. 981:10–17. Put another way, he explained:

If you see more demand, someone may step in front.  So, like I said earlier, you
know, if there's lots of houses and there's only a few houses, you know, the price
can go higher.  It's largely the same thing.  You know, if all of sudden, instead of
seeing -- if they only saw $1 million to buy, you know, it won't have a change.  But
if they saw both of us bidding at the same time, maybe they saw five million or
seven million, people could take that information.  Say there's better buyers in the
market, they may move in front of us.  They may go into the market and say, you
know what, I'm not even going to try to buy on the bid, I'm just going to pay that
offer to get the dollars that I need now, which could shift the whole market against
us.

So, by us hiding that extra demand, by us hiding the idea that there's more buyers
out there, we're hoping the market will stay stable and we'll get an opportunity to
buy at more attractive rates for us.

Trial Tr. 984:12–985:3. As to the March 16, 2012 episode, Cummins explained:

Someone buys some dollars from Akshay, in the dollar/Turkish lira market. I let
him know that I'm in the market trying to buy, show him my bid. I bid for the both
of us and eventually I'm able to buy our dollars back at the price I had in the market.
. . .
So, again, we need to buy dollars, so that means we both have demand to buy
dollars. So we prefer a lower price. And I suggest that since I'm already in the
market, maybe I could bid for both of us so that if the market sees that this is already
demand -- if the market sees additional bidding, that would indicate more of a
demand. That might push the price against us, push the price higher or lower to a
less desirable price for us. So I suggest that I will bid for the both of us and hide

some so that the market only sees this, so there's less risk of the market moving against us.

Trial Tr. 268:11–15; 268:18–269:2.

Both Katz and Cummins explained that this conduct was pursuant to the conspiracy with Defendant.  Trial Tr. 985:14–16 (Katz); 269:3–5 (Cummins).  A reasonable jury could readily conclude that this coordinated conduct, which was intended to affect the price of the USD/TRY currency pair, was evidence of a price-fixing and bid-rigging agreement.  A reasonable jury could likewise conclude that Defendant was a knowing participant in this conduct, as demonstrated by his familiarity with the conduct and his agreement to the conduct as expressed in the chat.

Defendant's second argument, that the Reuters conduct merely illustrated independent decision-making, as opposed to collusion, fares no better than his first.  First, his argument is undermined by instances when members of the conspiracy explicitly directed one another to do certain things in order to move the price in a particular direction.  For example, on December 12, 2012, Cummins explicitly directed Defendant, "pull that bid AA," and Defendant did so.  GX-279 at 2; GX-S26.  Cummins explained that he directed Defendant to pull his bid so that he could move the price of the EUR/CZK currency pair down.  Trial Tr. 326:14–327:9.  On January 27, 2012, Defendant directed Katz, "Jason . . . pull ur bids . . . in il . . . s," and Katz did so.  GX-181 at 7; GX-S37.  Katz explained that Defendant asked him to pull his bids in order to keep the price of the USD/ILS currency pair low at the fix.  Trial Tr. 991:25–992:11; 992:16–993:8; 994:11–13; 995:12–18.

Second, Defendant's "independent decision-making" argument is undermined by the fact that when members of the conspiracy did not act in accordance with the agreement, Defendant chastised them.  For example, on September 10, 2012, Defendant directed his co-conspirators to

suppress their bids in the USD/ZAR currency pair.  GX-244 at 9 (Aiyer: "dont touch zar guys").

When Katz mistakenly traded against Defendant, Defendant chastised him, and Katz apologized

because his inadvertent conduct was contrary to what was expected under the agreement.  GX-

244 at 9; Trial T. 1006:13–18.  Similarly, on May 20, 2013 (EUR/CZK), Defendant again

chastised Katz for trading against him.  GX-300 at 2 (Aiyer: "stop . . . running this eu4czk . . . in

my dface . . . i got paid"; Katz: "ah okay . . . cxl the deal i did on reuters"); Trial Tr. 1012:21–

1013:10.  Katz explained that, pursuant to their understanding, he then canceled the deal they had

entered into.  Trial Tr. 1014:4–9.

Finally, Defendant's "independent decision-making" argument is undermined by the

evidence of coordinated conduct among the conspirators.  Coordinated conduct is circumstantial

evidence of an agreement.  *See, e.g.*, *Pica*, 692 F.3d at 86 ("[I]n a conspiracy case, as in any

other, 'the government is entitled to prove its case solely through circumstantial evidence.'")

(quoting *Rodriguez*, 392 F.3d at 544)); *Desimone*, 119 F.3d at 223 ("[T]he conspiratorial

agreement itself may be established by proof of a tacit understanding among the participants,

rather than by proof of an explicit agreement.").  At trial, Katz and Cummins both explained that

the co-conspirators did not need to spell out for each other every action to be taken in pursuit of

the agreement.  For example, Katz testified as follows:

> Q. And when you and the defendant engaged in this wrongdoing, did you have to
> give instructions to each other every time when you did it?
>
> A. No.
>
> Q. Why not?
>
> A. We were all in the market for a while.  We knew what we had to do in different
> situations. . . . But in terms of other things, you know, we knew people's positions
> and we knew what was going on and what they wanted.  We knew how the market
> worked.  We knew what needed to be done to get the person to get the result that
> they wanted.

Trial. Tr. 861:8–862:3.  Cummins likewise testified:

> Q. And when you guys acted to help each other and engage in this wrongdoing, did you have to spell out everything or give explicit instructions each and every time?
>
> A. No, we didn't.
>
> Q. Then how would it work? How would you know?
>
> A. I knew what he needed to do in the market, and to stay with the example of spoofing, I would say, like, all right, I will -- thinking, I will help you out in this way, and hopefully it will drive prices down to your bid, because I know the way that the market works and so did everyone else in the chat."

Trial Tr. 719:21–720:6.

Defendant and his co-conspirators engaged in a multi-year conspiracy to fix prices and rig bids and offers for CEEMEA currencies.  They were skilled traders who understood the machinations of the market and knew how best to effectuate their conspiracy in different circumstances.  For example, when two or more of them were the same way (i.e., both short or both long), the one with the smaller position would let the person with the larger position trade first (i.e., the one with the smaller position would suppress his bids or offers).  *See, e.g.*, Trial Tr. 1017:11–22.  The trading episode from August 25, 2011 is illustrative.  On that day, both Cummins and Defendant were both short in the USD/TRY.  Rather than trade according to his own independent judgment, Defendant first checked in with Cummins to see if he was still short.  GX-121 at 3.  Cummins replied, "still short . . . go ahead."  GX-121 at 3.  Similarly, on April 2, 2012, Defendant and Cummins were short in the USD/ZAR currency pair and Cummins told Defendant, "you can go first, you got 2x the amnt," to which Defendant replied, "ok but dont want to push it higher and then u lose out."  GX-213 at 8.  Likewise, on May 20, 2013, both Defendant and Katz needed to buy USD in exchange for TRY, but Defendant had the larger position.  Katz, accordingly said, "you go in fornt of me . . . im only 10," as compared to

51

Defendant's 40.  GX-300 at 4.  A reasonable jury could also infer similar coordination and

agreement with respect to the conduct on May 8, 2012.  There, Defendant disclosed that he

needed the fix price to be low and Cummins responded, "wil ensure there are offersin there."

GX-220 at 11.  Cummins did as he said, placing an offer for $10 million during the fix window.

GX-S22.  Cummins testified that this was done pursuant to their agreement.  Trial Tr. 316:3–5

("Q. . . . Mr. Cummins, was this conduct part of your understanding with Mr. Aiyer? A. Yes.").

A reasonable jury could conclude, based on the documentary and testimonial evidence,

that the conduct presented at trial was not mere "independent decision-making," but rather was

action taken pursuant to the charged price-fixing and bid-rigging conspiracy.[6]

## III.    Defendant Is Not Entitled to a New Trial

For the same reasons that acquittal is unwarranted under Rule 29, Defendant is not

entitled to a new trial, and the Court should deny his motion brought pursuant to Federal Rule of

Criminal Procedure 33.  Motions for new trials are disfavored and should be granted only in

"extraordinary circumstances."  *United States v. McCourty*, 562 F.3d 458, 475 (2d Cir. 2009)

(quoting *United States v. Torres*, 128 F.3d 38, 48 (2d Cir. 1997)).  The "ultimate test on a Rule

33 motion is whether letting a guilty verdict stand would be a manifest injustice."  *United States*

*v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001).  To grant a new trial, a district court must have "a

real concern that an innocent person may have been convicted."  *Id.* (quoting *United States v.*

---

[6] Defendant argues in a footnote that "[t]he Court should enter a judgment of acquittal for the
alternative reason that the Sherman Act is void for vagueness."  Def.'s Mem. at 34 n.3.  To the
extent he is making a facial vagueness challenge to criminal enforcement of the Sherman Act,
such an argument is foreclosed by *Nash v. United States*, 229 U.S. 373, 376–78 (1913).  To the
extent he is making an as-applied challenge, his argument is merely a tautology reasserting his
sufficiency challenge.  He essentially argues that because "[t]he conduct detailed by the
Government's trial evidence does not demonstrate that Mr. Aiyer engaged in or agreed to engage
in 'manifestly anticompetitive' conduct of the type that is condemned under the Sherman Act,"
no reasonable person could conclude that he violated the Sherman Act.  Def.'s Mem. at 34 n.3.
His "vagueness" challenge, then, fails for the same reasons that his sufficiency challenge fails.

*Sanchez*, 969 F.2d 1409, 1414 (2d Cir. 1992)).  While a district court has broader discretion to

grant a new trial under Rule 33 than to grant a motion for acquittal under Rule 29, the district

court "nonetheless must exercise the Rule 33 authority 'sparingly.'"  *Ferguson*, 246 F.3d at 134

(quoting *Sanchez*, 969 F.2d at 1414).

 As detailed above, the witness testimony, documents, and data presented at trial

established each element of the crime charged beyond a reasonable doubt.  This evidence

showed that, as charged in the indictment, Defendant participated in a conspiracy to fix prices of,

and rig bids and offers for, CEEMEA currencies.  The evidence showed that the conspiracy

charged in the indictment actually existed, that Defendant knowingly joined the conspiracy, and

that the conspiracy concerned interstate commerce.  In his motion, Defendant raises six bases for

a new trial.  None of these bases, individually or collectively, constitute a "manifest injustice"

meriting a mistrial or a new trial.  Accordingly, the Court should deny Defendant's motion.

 **A.** **The Evidence Was Properly Admitted.**

 The evidence presented at trial was properly admitted.  Defendant unpersuasively argues

that he suffered prejudice from "irrelevant and prejudicial evidence that should have been

excluded: all evidence related to the vertical transactions in the ruble and zloty and the

interdealer transactions."  Def.'s Mem. at 74.  The admission of this evidence was subject to a

motion *in limine*, *see* Defendant's Standing Motion *in Limine* to Exclude Evidence of

Coordinated Interdealer Trading and Coordinated Ruble Trading, ECF No. 98, that was fully

briefed by the parties and denied by the Court.  Hr'g Tr. 30:8–9 (Sep. 24, 2019).  For the reasons

set forth in the government's opposition to Defendant's motion, *see* The United States'

Memorandum of Law in Opposition to Defendant's Standing Motion *in Limine* to Exclude

Evidence of Coordinated Interdealer Trading and Coordinated Ruble Trading, ECF No. 102, this

evidence was relevant as direct evidence of the crime charged and admissible under Federal

Rules 401, 402, and 403.  Defendant is, therefore, not entitled to a new trial on the basis of the proper admission of this evidence.

Defendant's instant motion also seems to encompass evidence of spoofing and fake trades, conduct that was subject to another motion *in limine*.  *See* Defendant's Motion *in Limine* to Exclude Evidence or Argument Concerning "Spoofing" or Cancelled Trades, ECF No. 96; The United States' Memorandum of Law in Opposition to Defendant's Motion *in Limine* to Exclude Evidence or Argument Concerning "Spoofing" or Cancelled Trades, ECF No. 103.  The Court properly denied this motion, concluding that evidence of spoofing and fake trades was relevant and "inextricably intertwined with the evidence regarding the charged offenses, and it is necessary to complete the story of the crime on trial."  Hr'g Tr. 29:5–10 (Sep. 24, 2019) (quoting *Carboni*, 204 F.3d at 44).  The court also rightly concluded that there was "no basis to exclude the evidence under Rule 403."  Hr'g Tr. 29:13–14 (Sep. 24, 2019).  Because the evidence was admissible, Defendant's argument that he suffered prejudice because the evidence was inadmissible, *see* Def's Mot. at 75, must fail.

Furthermore, to the extent that any prejudice or confusion could have resulted from evidence of spoofing or fake trades, such prejudice was mitigated by the Court's limiting instruction:

> You have heard evidence in this case about "spoofing" conduct or canceled trades which do not, in and of themselves, constitute the charged criminal conspiracy and are not in themselves illegal.  You may not return a verdict of guilty solely because you find that the defendant alone or in combination with others engaged in spoofing or trades that were subsequently canceled.  However, such evidence may be considered to determine the relationship between the defendant and his coconspirators, and his knowledge of, and intent to advance, the purpose of the conspiracy charged in the indictment, namely, to fix prices and rig bids.

Trial Tr. 2142:16–2143:1.  Indeed, it is well-established that a district court may minimize any potential prejudice through jury instructions.  *See United States v. Abu-Jihaad*, 630 F.3d 102,

133 (2d Cir. 2010) ("In any event, the district court properly minimized the risk of unfair prejudice through limiting instructions.") (citing *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009)); *see also Richardson*, 481 U.S. at 211 ("[J]uries are presumed to follow their instructions.").

Defendant's reliance on *United States v. Guiliano*, 644 F.2d 85 (2d Cir. 1981), is misplaced. In *Guiliano*, Guiliano was convicted on two counts of bankruptcy fraud and one count of racketeering (RICO), which was predicated on both bankruptcy counts. The Court of Appeals for the Second Circuit reversed one of the bankruptcy convictions, thereby "undermin[ing] the RICO conviction." *Id.* at 88. The court also went out of its way to express its skepticism as to the application of RICO to Guiliano's activities. *Id.* Although the court concluded that there was likely sufficient evidence to support the second bankruptcy count, it ordered a new trial "because of the distinct risk that the jury was influenced in its disposition of this count by improper evidence and by the allegations of the RICO count." *Id.* at 88–89. The court noted, that "[o]ne of the hazards of a RICO count is that when the Government is unable to sustain a conviction under this statute, it will have to face the claim that the prejudicial effect of tarring a defendant with the label of 'racketeer' tainted the conviction on an otherwise valid count." *Id.* at 89. There is no such hazard here in this single-count, one-defendant case. *Cf. United States v. Napolitano*, 564 F. Supp. 951, 954–55 (S.D.N.Y. 1982) (deeming reliance on *Guiliano* "misplaced" because defendant was not found guilty on a RICO count and so the "spillover claim" was not present). The evidence challenged here was direct evidence of the single count against Defendant. It was properly subjected to Rule 403's balancing test and any potential prejudice was further mitigated by a limiting instruction. There was, therefore, no "spillover" prejudice suffered by Defendant.

**B.      The Jury Was Properly Instructed as to the Applicable Legal Standard.**

Defendant's argument that the jury was potentially "confused about the proper legal standard" because witnesses testified that they knew their conduct was "wrong," *see* Def.'s Mem. at 76–77, lacks merit.  First, Defendant never objected to the admissibility of this testimony at trial.  Second, to the extent that such testimony had any potential to confuse the jury, such confusion was mitigated by the Court's limiting instruction, which it gave at Defendant's request, *see* Defendant's Supplemental Submission Regarding Jury Instructions, ECF No. 144, at 1–4.  The Court instructed the jury as follows:

> You have heard testimony that the defendant engaged in conduct that witnesses believed was "wrong" or was likely to make customers "angry."  Such conduct does not constitute the crime of conspiracy charged in this case unless that conduct was in furtherance of a conspiracy to fix prices and rig bids as I have defined those terms for you.  I remind you that, regardless how witnesses describe certain conduct, you and you alone must determine whether the conspiracy to fix prices and rig bids did, in fact, exist, in accordance with my instructions on the elements of that crime.  You may not return a verdict of guilty against the defendant unless you find that there was a conspiracy to fix prices and rig bids and that the defendant knowingly joined that conspiracy.

Trial Tr. 2143:2–14.  Defendant did not object to this charge at the charging conference, or at any time before the charge was given.  *See generally* Trial Tr. 1888–1933.  Even now, Defendant offers no explanation as to why this charge was inadequate, and he certainly provides no basis for the Court to grant him a new trial.

**C.      The Government's Summations Were Appropriate.**

Defendant unpersuasively argues that a new trial is warranted because of the "improper and prejudicial" content of the government's summations.  Def.'s Mem. at 77.  He is wrong.  "A defendant bears a substantial burden when arguing for a new trial based on prosecutorial misconduct in the summation."  *United States v. Caracappa*, 614 F.3d 30, 41 (2d Cir. 2010).  "An improper summation will only warrant a new trial when the challenged statements are

56

shown to have caused substantial prejudice to the defendant; rarely will an improper summation meet the requisite level of prejudice." *United States v. Daugerdas*, 837 F.3d 212, 227 (2d Cir. 2016). In this circuit, "the test for substantial prejudice looks to 'the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct.'" *United States v. Pauling*, 256 F. Supp. 3d 329, 339 (S.D.N.Y. 2017) (quoting *United States v. Certified Envtl. Servs., Inc.*, 753 F.3d 72, 95 (2d Cir. 2014)). Where, as here, "a defendant did not object to the challenged remarks at trial, courts have required a showing of 'flagrant abuse.'" *Id.* (quoting *United States v. Germosen*, 139 F.3d 120, 128 (2d Cir. 1998)). Defendant argues that the government's reference to Defendant's own statements, including "zar domination," was improper because his statements were merely "aspirational." Def.'s Mem. at 85. Defendant does not argue that the evidence itself was inadmissible, nor could he. Rather, he argues that reference to this properly admitted evidence during summation was misleading. However, to the extent that the statements were subject to multiple interpretations, it is well-established that "[t]he government has broad latitude in the inferences it may reasonably suggest to the jury during summation." *United States v. Zackson*, 12 F.3d 1178, 1183 (2d Cir. 1993) (quoting *United States v. Casamento*, 887 F.2d 1141, 1189 (2d Cir. 1989)). Additionally, Defendant thoroughly presented his own interpretations to the jury through cross-examination of Cummins and Katz. *See, e.g.*, Trial Tr. 684:16–685:7 ("Q. Mr. Katz had some idea that if you, and he, and others did activity in the rand in the afternoon, you might then be able to get some advantage the next day in trading. Is that a rough summary of what the ZAR domination was thinking Mr. Katz communicated to you? A. Yes that's fair. . . . Q. And so far as you know, Mr. Aiyer, Mr. Williams did not buy into it either; is that right? A. That's right. Q. And so you never did it? A. That's correct.") (Cummins); 1180:13–1187:19 ("Q. All right. Let's go to another

57

item. And this is ZAR domination. Do you remember you testified about ZAR domination?  A. Yes.  Q. And were you trying to give the impression to the jury that ZAR domination was Mr. Aiyer's idea?  A. No.  Q. It wasn't Mr. Aiyer's idea, right?  A. I believe it was a discussion, but I don't believe it was his initial idea to call it that, no.") (Katz).  Additionally, during his summation, Defendant advocated for his interpretation of these statements to the jury.  Trial Tr. 1996:2–16 ("Now, what happened to the ZAR domination plan, the plan to push the ZAR around? . . . There is no ZAR domination plan put into practice.").  With Defendant's gloss on these statements, the jury was well-equipped to evaluate any reference thereto made during summation.

Defendant further claims that the "only conceivable aim of such a strategy was to exploit the inflammatory nature of the language."  Def.'s Mem at 77.  However, Defendant ignores the value this language had in establishing, for instance, Defendant's degree of trust with his co-conspirators ("chat of trust") and Defendant's intent to coordinate his trading with his co-conspirators ("salute to first coordinated ZAR effort").  Defendant also ignores the co-conspirator testimony that linked these comments to relevant elements of the broader conspiracy such as their coordinated trading, shared confidence, and motivation.  *See, e.g.*, Trial Tr. 726:12–18 ("Q. And here you see Mr. Aiyer saying in those first three lines, 'BTW' -- by the way -- "salute to first coordinated ZAR effort."  Do you see that?  A. Yes.  Q. To your understanding, what is Mr. Aiyer saluting?  A. Working together on the stop-loss."); 902:18–21 ("Q. What made it a chat of trust?  A. We were working together. We are all in the same boat trying to help each other make more money. We trusted each other.").  Viewed in the context of the whole trial, these properly admitted statements were highly probative of Defendant's guilt and were not merely "inflammatory," as Defendant suggests.

Defendant also unpersuasively argues that the government's use of the phrase "speaks for itself" is misleading and contradicts the government's position set forth in its motion *in limine* to admit lay opinion testimony.  Def.'s Mem. at 87–88.  However, Defendant misconstrues the nature of the government's motion *in limine*.  The government's motion *in limine* to admit lay opinion testimony specifically addressed "jargon and code words to refer to customers, methods of coordinating trades, and their trading positions."  Memorandum of Law in Support of the United States' Motions *in Limine*, ECF No. 93, at 6.  Examples of such language included: "ndf . . . Mar 27," "she gave me 10 already," "made her 22 25," "not short now," "i will pur a 00 offer in usd try," "get paid in 25 by scumbag," and "machines getting their bids in front of me now." *Id.* at 7–11.  Such language is not familiar to lay people, and the Court properly permitted percipient witnesses to explain such phrases to a lay jury.  None of the language in summations that Defendant now complains of is the sort of "jargon" the lay opinion testimony was helpful to clarify.

Defendant makes out no colorable claim for misconduct, much less a flagrant abuse causing substantial prejudice.  There is no basis for granting Defendant a new trial based on the government's summations.

### D.    Evidence of Procompetitive Justifications and Anticompetitive Effects Was Properly Excluded.

The Court properly excluded evidence of procompetitive justifications and anticompetitive effects, as such evidence is not relevant in a *per se* case.  *See Koppers*, 652 F.2d at 295 n.6 ("Where *per se* conduct is found, a finding of intent to conspire to commit the offense is sufficient. A requirement that the intent go further and envision actual anticompetitive results would reopen the very questions of reasonableness which the *per se* rule is designed to avoid."); *Maricopa Cty Med. Soc'y,* 457 U.S. at 345 ("Thirteen years later, the court could report that 'for

over 40 years, this court has consistently and without deviation adhered to the principle that

price-fixing agreements are unlawful *per se* under the Sherman Act and that no showing of so-

called competitive abuses or evils which those agreements were designed to eliminate or

alleviate may be interposed as a defense.'"); *United States v. Guillory*, 740 F. App'x 555, 556

(9th Cir. 2018) ("The district court did not preclude any relevant evidence by granting the

government's motion *in limine* to prohibit Guillory from introducing evidence or argument that

the bid-rigging agreements were reasonable.  Bid rigging is a *per se* violation of the Sherman

Act.").

   Although the Court granted the government's motion *in limine* to exclude evidence of

competitive effects, the Court acknowledged Defendant's argument, raised here, that such

evidence could be relevant to his intent.  Hr'g Tr. 14:25–15:5 (Sep. 24, 2019).  At the time, the

Court concluded that it did not have sufficient evidence to determine such relevance.  *Id.* 15:5–8.

The Court, therefore, granted the motion, "*without prejudice to the ability of the parties to raise

the issue with respect to specific evidence at trial.*"  *Id.* 15:15–16 (emphasis added).

   During trial, Defendant did, in fact, raise the issue with respect to specific evidence.  *See*

Defendant's Offer of Proof Concerning the Proposed Expert Testimony of Professor Richard

Lyons, ECF No. 140, and Professor Dennis Carlton, ECF No. 141.  As to that evidence, the

Court engaged in a careful analysis of whether particular evidence could be relevant to

Defendant's intent and whether any relevance was substantially outweighed by the danger of

unfair prejudice.  *See, e.g.*, Trial Tr. 1601:18–21 ("Evidence of pro-competitive effects, or the

lack of harm, is not relevant and should be excluded under Rule 403 because its prejudicial

impact substantially outweighs any arguable relevance.  Moreover, to the extent that the analysis

of Professor Lyons is based on an analysis of market conditions to negate the intent of the

conspirators, the evidence should be excluded for the additional reason that there is no proffer that the alleged conspirators were aware of the conditions relied upon by Professor Lyons.").

Defendant was permitted to admit effect evidence when a sufficient proffer was made that Defendant would have been aware of the relevant conditions. Such a proffer was made, for example, with respect to the trading on January 18, 2012. Accordingly, Defendant was permitted to admit effect evidence as to this trading day. *See* Trial Tr. 1756:8–1761:15. The same was true for January 27, 2012. *See* Trial Tr. 1768:14–25 ("Q. -- can you explain what caused the fixed price to be lower than the price before the fix? A. Well, in general, the determination of a price is the crossing of supply and demand, buying and selling. So it is the total amount of buying and the total amount of selling that occurred during the fix window. Q. Based on your review of all of the trading activity during this period of time, do you have an opinion of how much Mr. Katz's trading affected trading activity, affected the fix outcome? A. The fix outcome would have been driven by the trading in that fixing window, so I don't see an impact there."). Elsewhere, when the Court found there "[was] sufficient evidence that Aiyer was following Reuters in order to affect his subsequent transaction," such effect evidence was admitted. *See* Trial Tr. 1832:12–14.

Defendant otherwise declined the opportunity, and in fact the Court's invitation, to make a suitable proffer of the foundation for admitting other effects evidence as probative of his intent. *See, e.g.*, Trial Tr. 1691:6–19 ("As I indicated yesterday, the defense really hasn't given me the proper purpose for the exhibits which appear to be precluded because they were originally offered for an improper purpose, and the defendant hadn't come forward with a proper purpose for the exhibits. I add both Mr. Cummins and Mr. Katz have testified. To the extent there was a question, were you aware of what was going on in the market? [W]hat were you aware of?

61

[T]hose questions plainly could have been asked.  To the extent that there is a question of lack of foundation of knowing something, it's the defense case.  The defense has no obligation to call any witnesses or present any evidence, but to the extent that there's a foundation to be laid, presumably those witnesses could be re-called.").

Notwithstanding his failure to make the additional proffers at trial, Defendant seeks to relitigate the issue here, but his efforts are to no avail.  "Where an evidentiary ruling is the basis of a defendant's Rule 33 motion, the question is not whether there was error in the evidentiary ruling, but whether there is 'manifest injustice' and a real concern that an innocent person may have been convicted."  *United States v. Soto*, No. 12-cr-556 (RPP), 2014 WL 1694880 at *5 (S.D.N.Y. Apr. 28, 2014).  "This Court joins the majority of courts in this Circuit in finding that, in the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions."  *Id.* at *7 (citing *United States v. Smith*, No. 08-cr-390 (BSJ), 2009 WL 4249120, at *8 (S.D.N.Y. Nov. 25, 2009); *United States v. Castro*. 669 F. Supp. 2d 288, 293–94 (E.D.N.Y. 2009)).

Defendant, in his Rule 33 motion, does not appear to advance arguments besides those already properly rejected by the court.  Contrary to his complaints here, this ruling did not preclude Defendant from suggesting "some other reasonable way of understanding the trading behavior at issue."  Def.'s Mem. at 88.  Defendant, for instance, elicited extensive testimony about the possibility that the traders were sharing information only to "match off" with one another.  *See, e.g.*, Trial Tr. 551:3–11; 651:6–16; 692:20–694:3; 1280:23–1282:6; 1349:12–18. This justification was apparently rejected by the jury.  Defendant was only foreclosed from admitting certain evidence of the effects of trading when there was no basis to believe that Defendant or his co-conspirators were aware of the information when they were making the

62

trades.  Defendant could not make such a proffer at trial, nor can he explain how this evidence, which was unknown to the co-conspirators, could possibly have influenced their state of mind. Defendant thus cannot show that the Court's well-reasoned evidentiary ruling constituted a "manifest injustice," and so no relief should be granted on this ground.

### E.    The Government Witnesses Were Credible.

The government's witnesses, specifically Katz and Cummins, were credible.  Although a district court may consider the credibility of witnesses in assessing a Rule 33 motion, the court "generally must defer to the jury's resolution of conflicting evidence and assessment of witness credibility."  *McCourty*, 562 F.3d at 475.  Accordingly, "[i]t is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment."  *Id.* at 475–76 (quoting *Sanchez,* 969 F.2d at 1414).  The Court of Appeals for the Second Circuit has cited testimony that is "patently incredible or defies physical realities" as examples of such exceptional circumstances.  *Id.*  Even if a district court rejects trial testimony, that "by itself does not automatically permit Rule 33 relief."  *Ferguson*, 246 F.3d at 134.  There are no such "exceptional circumstances" here that would merit the court's "intru[sion] upon the jury function of credibility assessment."  To the contrary, Katz and Cummins gave consistent, clear testimony about the nature of the conspiracy, their own participation in it, and Defendant's knowing participation in it.

Defendant's argument is based on cherry-picked moments of cross-examination and an inaccurate interpretation of the standard under Rule 33.  He argues that such testimony should be disregarded because it was "riddled with inconsistencies."  Def.'s Mem. at 82.  First, Defendant unpersuasively attacks Katz's cross-examination testimony as to his conduct with other traders. Defendant takes issue with Katz's inability, as a lay person, to identify what of his conduct (with various traders) constituted an antitrust violation or other illegality.  However, Katz is not an

attorney and his uncertainty as to such legal distinctions does not undermine his credibility.

Second, Defendant argues that Katz and Cummins testified inconsistently on direct and cross as to particular trading episodes.  Not only are the alleged inconsistencies a far cry from an "extraordinary circumstance" involving "patently incredible" testimony, but the witnesses were *extensively* cross-examined, testifying at least twice as long on cross-examination than they did on direct, which allowed the jury to effectively assess their credibility.  The Court of Appeals for the Second Circuit has spoken on precisely this issue:

> [Defendant] argues that these witnesses were not credible because their accounts were riddled with inconsistencies, and they had motives to testify falsely. These arguments, however, were forcefully presented to the jury through the vigorous cross-examinations and arguments of [Defendant's] able trial counsel. Nevertheless, the jury, which had the opportunity to see the witnesses testify, to weigh their testimony against the other evidence in the case, and to hear the arguments of the prosecution, found [Defendant] guilty beyond a reasonable doubt on four of the five charges tried. . . . Under these circumstances, the district court's decision not to grant [Defendant] a new trial fell well within its broad discretion."

*United States v. Canova*, 412 F.3d 331, 349 (2d Cir. 2005); *see also United States v. Vaval*, 209 F. App'x 24, 25 (2d Cir. 2006) ("Given the testimony at trial, the District Court reasonably concluded that Karl Lewis's inconsistent testimony was the product of his faulty, drug-addled memory, as well as normal forgetfulness over time, instead of perjury.  We thus view Lewis's inconsistent testimony as no more than impeachment evidence that is cumulative of the testimony adduced on cross examination.").

Defendant fails to contend with the fact that the testimony of co-conspirators Katz and Cummins was largely consistent between them and was corroborated by the documentary evidence.  Collectively, their testimony, and the rest of the evidence admitted at trial, supports the jury's sound verdict.  The allegations raised in Defendant's motion fall well short of the

64

"exceptional circumstances" required for the Court to intrude upon the jury's credibility function and certainly do not merit a new trial.

**F.      The Verdict Was Consistent with the Evidence.**

For the reasons discussed *supra*, the verdict was well supported by both direct and circumstantial evidence at trial.  The existence of the conspiracy, Defendant's knowing participation therein, and its interstate nature was established by chat communications, audio recordings, trading data, and the testimony of two co-conspirators, three counterparty witnesses, and two expert witnesses.  Defendant thoroughly cross-examined each witness and proffered his own expert witness.  The jury was well-positioned to weigh the evidence and render its verdict. The verdict is supported by more than sufficient evidence, and there is no basis to disturb it.

Accordingly, the Court should deny Defendant's Motion for the Declaration of a Mistrial or a New Trial, ECF No. 195.

Dated: January 27, 2020
        New York, New York

                                        Respectfully submitted,

                                        /s/ Kevin Hart

                                        Kevin Hart
                                        Katherine Calle
                                        David Chu
                                        Eric Hoffmann

                                        U.S. Department of Justice
                                        Antitrust Division
                                        New York Office
                                        26 Federal Plaza, Room 3630
                                        New York, NY 10278
                                        212-335-8000