K3C6AIYC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,              New York, N.Y.

4              v.                          18 Cr. 333(JGK)

5   AKSHAY AIYER,

6              Defendant.

7   ------------------------------x        Trial

8                                          March 12, 2020
                                           11:45 a.m.
9

10  Before:

11                  HON. JOHN G. KOELTL,

12                                         District Judge

13

14                        APPEARANCES

15

16  U.S. DEPARTMENT OF JUSTICE
        Antitrust Division
17  BY:  KEVIN B. HART
        KATHERINE J. CALLE
18

19  WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendant
20  BY:  MARTIN B. KLOTZ
        JOCELYN M. SHER
21      JOSEPH T. BAIO

22

23

24

25

K3C6AIYC

1          (Case called)

2          THE COURT:  Good morning all.

3          This is the defendant's motion for acquittal under

4     Rule 29 and for a new trial under Rule 23.  I am familiar with

5     the papers.  I will listen to argument.

6          MR. KLOTZ:  Good morning, your Honor.

7          THE COURT:  Good morning.

8          MR. KLOTZ:  I will try not to belabor points that

9     we've argued in the past and focus on what I think are new

10     arguments that we're advancing, particularly in connection with

11     the Rule 29 motion but that also has implications for the Rule

12     23 motion as well.

13          The point I want to emphasize this morning, and I

14     guess running into the afternoon because we are just at about

15     noon, is that our contention is that the evidence submitted by

16     the government does not satisfy the Rule 29 standard to show

17     that any of the episodes of conduct were in fact criminal.  I

18     am not going to go through every one of them.  I think we did

19     address every single one of them in the briefs that we

20     submitted, but I am going to talk about three groups with a

21     couple of illustrations of each to indicate what I mean.

22          First starting with the ruble transactions, it is our

23     contention that there was absolutely no evidence with respect

24     to the ruble of any agreement that could be construed as an

25     agreement to fix prices or rig bids.  There was no evidence of

K3C6AIYC

any agreement by the parties on what price to bid to customers

who came to one or more of them simultaneously.  There was no

evidence on who was to have the winning bid, there was no

evidence as to any agreement to move the price up or down, and

there was repeated evidence during the cross-examination of the

cooperating witnesses that they set their prices independently.

What there was ample evidence of was sharing of

information about pricing because Mr. Katz and Mr. Cummings

were uncomfortable pricing the ruble, were afraid of losing

money on ruble transactions, and were reluctant to quote prices

to customers in the ruble unless they were confident that they

would turn around and pass those positions to Mr. Aiyer.  Also

the evidence in the record was overwhelming that Mr. Aiyer was

far more competent than either of them in trading the ruble,

knew more about pricing, had a dramatically higher volume of

ruble trades and had the best prices in the market.

In that context there is nothing at all illegal about

the information sharing with respect to pricing in the ruble.

To the extent there was any agreement at all, the agreement was

a standing agreement that Mr. Aiyer would take positions

acquired by either Mr. Katz or Mr. Cummings if they were the

winning bidder in a ruble transaction.  There is absolutely

nothing illegal about that.

We have scoured the record for any evidence of any

kind of illegality with respect to what the parties agreed on

K3C6AIYC

the ruble, and I submit there is one, and only one, piece of

evidence and that is that on one occasion, and only one,

Mr. Katz, and only Mr. Katz, testified that his agreement was

with Mr. Aiyer was that if Mr. Aiyer was bidding on a ruble

transaction, Mr. Aiyer was supposed to be the winning bidder

and Mr. Katz understood that he was supposed to put in a less

attractive bid.

THE COURT:  Was that the November 4th, 2010,

transaction?

MR. KLOTZ:  I believe it was in connection with that

November 4th, 2010, transaction that he said that.

I submit that that testimony has to be completely

discounted for a whole host of reasons.  First of all, there is

no evidence in any written document -- there is no chat

evidence involving Mr. Aiyer that there was any such agreement.

There is no evidence whatsoever of Mr. Aiyer on any occasion

asking Mr. Katz to give a less favorable price to a customer.

There is no evidence of Mr. Aiyer saying to Mr. Katz, *We have*

*this agreement.  Let's all follow it.*  This is simply one

statement by Mr. Katz and I believe it was in the same portion

of testimony that Mr. Katz was asked, *Well, did you actually*

*discuss this with Mr. Aiyer.*  He said, *Well, no, we have been*

*in the business a long time.  We all knew what the deal was*

*supposed to be.*  That I submit is not evidence of an agreement.

That is evidence of Mr. Katz's understanding.

K3C6AIYC

1        I think there is that evidence that even that
2   understanding is completely contradicted by other evidence.
3   The evidence was compelling that Mr. Katz couldn't compete in
4   the ruble because he felt uncomfortable in pricing ruble
5   transactions and unilaterally decided that he didn't want to
6   compete.  Mr. Aiyer didn't need any agreement from Mr. Katz not
7   to compete in the ruble.  Mr. Katz was not an effective
8   competitor.  For Mr. Katz to say, I had an agreement that I
9   wouldn't compete in the ruble is like my saying that I have an
10  agreement with Ms. Sher that I will be taller than she is.  It
11  is not a subject that an agreement is needed on.
12        The agreement also, if you think about it, makes no
13  sense whatsoever from either parties' point of view.
14  Mr. Katz's testimony that there was an agreement that he would
15  give the worst bid would only make sense if there was some quid
16  pro quo that he got in exchange.  There was no testimony of any
17  quid pro quo.
18        THE COURT:  That is not necessarily true of course.  A
19  customer comes to three banks for a bid.  Mr. Aiyer and the
20  other alleged conspirators have employment with their
21  respective banks.  They can't very well say, *Oh, I am not very*
22  *good at my job and so I am not even going to bid.*  They don't
23  do that.  What do they do?  They talk amongst themselves about
24  what the bids may be.
25        Now, it certainly is basic conspiracy law that you

K3C6AIYC

1    don't have to sit around a table and sign an agreement.

2    Conspiracies are often formed not that way.  Isn't it up to the

3    jury to determine whether there was an agreement or

4    understanding to fix prices or rig bids?  You say the evidence

5    was overwhelming that there was no agreement, but that is

6    really a jury question based upon all of the facts of all of

7    the trades and everything that people said about the trades.

8          Let me go back one step in the analysis.  You said you

9    were going to concentrate just on a few transactions.  That's

10   fine of course.  If of all the transactions that have been

11   discussed there was any one which was an example of an

12   understanding to fix prices or rig bids, the government would

13   have proven the charge, wouldn't it?

14         MR. KLOTZ:  Not necessarily for several reasons.

15         THE COURT:  Why?

16         MR. KLOTZ:  If I started with the ruble, I am going to

17   go on to trading --

18         THE COURT:  No, no.  Let's just stay on the ruble for

19   a moment.

20         MR. KLOTZ:  If they have proven one ruble transaction

21   that there was an illegal agreement and that is all they

22   proved, the case is out on statute of limitations grounds.

23         THE COURT:  Oh --

24         MR. KLOTZ:  Done.

25         THE COURT:  -- they would also have to establish that

K3C6AIYC

1    there was an overt act in furtherance of the conspiracy that

2    occurred within the statute, and they point to a couple of

3    transactions on May 20th, I believe.

4              MR. KLOTZ:  Right.  Not involving the ruble.

5              THE COURT:  Right.  A transaction within the statute

6    of limitations doesn't even itself have to be an illegal

7    transaction if in fact it was in furtherance of the conspiracy;

8    right?

9              MR. KLOTZ:  Correct.

10             THE COURT:  So if they have proven one ruble

11   transaction that was an example of price fixing or bid rigging

12   that was pursuant to an agreement, with all of the evidence

13   that is out there that would have been enough; right?

14             MR. KLOTZ:  On the record presented to the jury, I

15   submit the answer is no.  Because there wasn't any -- if you

16   grant my argument, the Reuters trading episodes ought to be out

17   of the case if you just look at the ruble.

18             THE COURT:  No.  I am not on the Reuters evidence

19   about hiding demand if you will.  I am just on the ruble

20   transactions.  If the government proved that one of those ruble

21   transactions was in fact pursuant to an understanding to fix

22   prices or rig bids, that would have been enough; right?

23             MR. KLOTZ:  Well, there is a second reason why I don't

24   think that it would have been enough and that goes to the Rule

25   33 motion.

K3C6AIYC

1          THE COURT:  We're on the Rule 29 motion.

2          MR. KLOTZ:  I understand.  For Rule 29 purposes if

3      they showed an illegal transaction in the ruble and if they

4      showed that either that transaction or some other related

5      transaction pursuant to the same agreement occurred within the

6      statute of limitations --

7          THE COURT:  An overt act.

8          MR. KLOTZ:  An overt act.

9          -- then that would appear to satisfy for Rule 29

10     purposes.

11         THE COURT:  Okay.

12         MR. KLOTZ:  The standard but not for Rule 33 purposes

13     which I will get to.

14         THE COURT:  How do you explain the February 28th,

15     2012, transaction?  There is the discussion between the

16     defendants, Williams and Cummings, about the prices that they

17     are showing on the ruble and the defendant has the best price;

18     but after talking to Williams and Cummings about their prices,

19     he then drops his price to the disadvantage of the customer and

20     gets the bid.

21         MR. KLOTZ:  That was going to be one of my examples to

22     address, your Honor.

23         THE COURT:  Okay.  You say, among other things, in

24     your papers that it can't be price fixing because these people

25     are in a vertical relationship rather than a horizontal

K3C6AIYC

|   |   |
|---|---|
| 1 | relationship.  Customer comes with the same transaction to |
| 2 | three separate bankers.  The bankers discuss the price that |
| 3 | they are going to give to the customer.  The defendant lowers |
| 4 | his price when he finds out that his two competitors are |
| 5 | offering even worse prices for the customer and then gets the |
| 6 | bid, gets the deal, gets the transaction. |
| 7 | Now, can you really credibly argue that those three |
| 8 | bankers are in a vertical relationship to each other? |
| 9 | MR. KLOTZ:  Absolutely, your Honor.  The conversation |
| 10 | starts with Mr. Cummings who does not have responsibility for |
| 11 | pricing the ruble at his bank -- the guy who does is apparently |
| 12 | is not there -- going to Mr. Aiyer and saying I need a help on |
| 13 | a ruble right.  That is a vertical relationship.  He is asking |
| 14 | somebody to, A, give him advice in an area where he doesn't |
| 15 | know what he is doing, and B, to be prepared to take the |
| 16 | position off his hands if the customer deals with him. |
| 17 | The testimony was -- Mr. Katz didn't testify about |
| 18 | this.  So it is Mr. Cummings' testimony.  So the testimony was |
| 19 | that the prices were completely independent.  There was no |
| 20 | discussion among Katz -- not Katz -- Cummings and Williams. |
| 21 | THE COURT:  Hold on. |
| 22 | In order to establish, one would think, that there was |
| 23 | a conspiracy to fix prices or rig bids, you don't need the |
| 24 | written agreement or the admission.  It becomes a question for |
| 25 | the jury as to whether in fact there was an agreement or |

K3C6AIYC

understanding to fix prices or rig bids.  So the jury is

presented with what these people did and what they said at the

time.  And then the parties are perfectly free to argue to the

jury, as you did, that there was no agreement or understanding;

and then the jury can look at the evidence of what these people

did and come to its conclusion as to whether the government had

proved this understanding or agreement to fix prices or rig

bids.  What happened?  What actually happened in the

transaction?  A customer comes to three bankers who present

themselves as independent, established huge banks and the

customer comes for bids.

          Now, certainly the jury would be entitled to consider

the testimony by the customer, that the customer of course was

looking for the best bid.  Does the customer get the best bid?

The three bankers talk to each other, show their bids, and the

banker who has the best bid for the bank is able to get it even

better when that banker finds out what the other two bids are.

Now, you can argue that that is not price fixing or bid rigging

but that was certainly the gist of the evidence.

          The jury was instructed:  Here is what price fixing

is.  Here is what bid rigging is.  The instructions came right

out of Judge Sand and the ABA Antitrust Section Model Charges.

I don't recall that there was any substantive objection to the

charges.  So the jury was properly instructed:  Here is what

price fixing is and here is what bid rigging is.  And they

K3C6AIYC

looked at this evidence and said, *Price fixing; bid rigging.*

MR. KLOTZ:  Can I make a number of points with respect to January 28th?

THE COURT:  Sure.

MR. KLOTZ:  First of all, there is a critical piece missing from what the parties did, which is this transaction doesn't involve Katz.

THE COURT:  It doesn't involve?

MR. KLOTZ:  Katz.  So Cummings is the relevant witness.  Cummings did not testify, *I had an agreement that Aiyer would win this bid.*  You don't have to have a written agreement that he is a party to the agreement if there was an agreement.  For sure if he was prepared to testify, The reason I did this was because I had an agreement with Aiyer, the government would have asked him that question.  That is not what he testified.

THE COURT:  My recollection is that there was testimony by Mr. Cummings that he preferred to call it an understanding.

MR. KLOTZ:  Not with respect to the ruble.  He gave that general testimony but he did not say that with respect to ruble.  In this case, moving on to the second point that your Honor made and it links back to something that you said earlier, each of these people is at a big institution and customers come to them whether they are comfortable with the

K3C6AIYC

1    currency or not.  They are not at liberty to say, Sorry, I am

2    not going to quote you on that.  They have to say something.

3    What they are permitted to do is what Cummings in particular

4    did all the time.  They are permitted to quote a deliberately

5    unattractive price because they don't want the business.  That

6    is what Cummings testified he did in this case.  He said, *When*

7    *I heard that Aiyer was bidding this and Williams was bidding*

8    *this, I decided to bid the other thing intending to lose the*

9    *business but not to look foolish in what I quoted.*  That was

10   the testimony.  There was no testimony we had an agreement.

11   There was no testimony we had an agreement that Aiyer was going

12   to win.  There was no testimony that the understanding was that

13   we would disclose our prices to Aiyer so he could get a better

14   price.

15          THE COURT:  I am sorry.  When three bankers get

16   together and they discuss the prices that they are going to

17   quote and you look at the three prices and you know that two of

18   the prices are going to be the losing bids and one price is

19   going to be the winning bid but can even be reduced some to the

20   advantage of the bank and the disadvantage of the customer, the

21   point is that one of the bankers who is showing the losing bids

22   has to say, Well, I deliberately did that independently in

23   order to lose the bid.  That's what the banker has to say.

24          MR. KLOTZ:  He doesn't have to say it.  That is what

25   he did say under oath.  That was Cummings' testimony.

K3C6AIYC

1        As to Mr. Aiyer changing his bid, there was no

2    testimony whatsoever as to why.  There was a perfectly

3    plausible and legal explanation as to why.

4        THE COURT:  What was that?

5        MR. KLOTZ:  There was testimony in the record that

6    larger transactions get worse pricing than smaller ones because

7    of the greater risk, and Mr. Aiyer found out as a result --

8        THE COURT:  But he told the other two bankers what the

9    price was that he had determined.

10        MR. KLOTZ:  For a $5 million transaction.

11        THE COURT:  And then after talking and finding out

12    what the proposed bids were of the other bankers, he reduced

13    it.

14        MR. KLOTZ:  After learning that the customer had gone

15    to two other bankers also with a $5 million transaction and

16    after saying to both of them, *If she trades with all of us, I*

17    *will take your positions.*  The standard on Rule 29 is when you

18    are talking about inferences if the inference that is

19    consistent with innocence is as strong as the inference that is

20    consistent with guilt, then a reasonable jury has to have had a

21    reasonable doubt.  With respect to changing the price here,

22    there was no direct testimony.  You are being asked to make an

23    inference, and there is a perfectly plausible inference about

24    why he might have changed the price.

25        Again, circling back so we have the context here.  Mr.

Cummings does not go to Mr. Aiyer knowing that Mr. Aiyer has been approached for this transaction for the purpose of let's all figure out who is going to bid what.  As far as knows, he is the only person who has been asked.  He goes to Mr. Aiyer for the purpose of saying, *I am over my head here.  What should I tell the customer?*

THE COURT:  But they all learn that they have all been given the same transaction by the same customer so that they were all bidding on the same transaction.

MR. KLOTZ:  They don't know that it is a single $5 million transaction.  They know they have been asked to bid on five million, but they don't whether the customer is trading five or 15.  That according to the testimony potentially influences the price quote.

THE COURT:  Go ahead.

MR. KLOTZ:  I will not go into the other ruble -- well, I will go into the other ruble transactions quickly.

October 14th is the one where Aiyer is approached by a broker for a price and the critical fact here is that the broker is not the customer's broker.  This is October 14, 2010.  Mckenzie is the customer.  They go to Katz and they apparently go to multiple other banks and those multiple other banks go to a broker and the broker go to Aiyer.  In that transaction, Aiyer is not competing with Katz and he is not competing with the other banks because nobody has asked him to quote the price

K3C6AIYC

to the customer.  He has been asked to quote prices to other

banks.  In that situation his relationship to the other banks

is a purely vertical relationship.  He is under no obligation

to quote any of them and if he decides to quote any of them, he

is perfectly free to quote different prices to different

people.  Favor somebody he likes.  Disfavor somebody he doesn't

like.  There simply is no horizontal competition on

October 14th, 2010.

        Then I will go back to November 4th, which is the one

we started with.  The testimony was that Mr. Aiyer gave his

price, 30.99 rubles to the dollar, completely independently.

He had given that to the customer without talking to Mr. Katz.

Katz's testimony was that his price quote of 30.98 he arrived

at independently, one presumes for the same reason that

Cummings arrives at lower prices when he doesn't want to get a

transaction; but there is no testimony that those prices were

coordinated.  There is no testimony that Aiyer's price was

artificially high or low or unfavorable or whatever it was.

For all the testimony shows it was the absolutely best price

anybody to get into the market.  So there is no evidence of any

injury to the customer certainly much less intent to injure a

customer in that circumstance.  Those are the best examples

that the government has.  None of them stand up to scrutiny of

showing the elements of the offense.

        January 12th, 2018, shows the same pattern.  That is

K3C6AIYC

1   the stop loss.

2           THE COURT:  Do you mean January 18, 2012?

3           MR. KLOTZ:  Sorry.  January 18th, 2012.  That is the

4   stop-loss transaction.  What happens with the stop-loss

5   transaction is there is no question that the parties shared

6   information about having stop-loss orders.  They shared all

7   kinds of information about what was happening in the market.

8   There is nothing illegal about that information sharing.

9           There was testimony from Mr. Cummings, the

10  government's witness, that if you knew that prices were

11  approaching a stop-loss level, one of the strategies that was

12  advantageous both to you and to the customer was to trade in

13  advance of that based on a prediction of what was going to

14  happen.

15          THE COURT:  Sure.  That was a defense argument on.  On

16  the other hand, one could read the chats as an effort by the

17  defendant and others to drive the price down to run a stop so

18  that their transaction would be triggered.  Yes, I understand

19  the defense argument that this was all a helpful, good trading

20  strategy to save the customer money.  On the other hand, the

21  jury could find more persuasive that the defendant and others

22  were attempting to drive the price down to run a stop in order

23  to trigger the transactions that they otherwise had and which

24  wouldn't be triggered unless they ran the stop.

25          MR. KLOTZ:  There is another piece to the defense

K3C6AIYC

1   argument, your Honor, and that piece is there is no testimony

2   that the parties coordinated their trading to run the stop.  On

3   the contrary, Mr. Cummings testified repeatedly on

4   cross-examination that his trading was not coordinated with Mr.

5   Aiyer's.  We presented expert testimony to that, too.  Now, if

6   Mr. Cumming had said, I had an agreement with Mr. Aiyer that we

7   were going do drive the price down through the stop level and

8   by golly that is what we did, and I were here arguing, Well,

9   that is not very believable because here are inferences that

10  you could draw to the contrary, then I think your Honor's

11  argument would make perfect sense.  That is not what Cummings

12  testified.  There is an evidentiary link missing in the

13  evidence that the government presented.  There was no evidence

14  of coordinated trading.

15          Indeed, when Cummings was talking about what he did,

16  it was consistently about his own conduct and only his own

17  conduct -- here is what I was trying to do with my trading and

18  here is the only reason I did it the way I did, but not any

19  implication of Mr. Aiyer being involved in that.  On

20  cross-examination he said, *Nope, I had no idea what trading Mr.*

21  *Aiyer was doing.  I was not coordinating my trading with Mr.*

22  *Aiyer.*  If you say, Well, a jury could infer from the facts and

23  circumstances, we're back to where we were before I submit,

24  which is if you have one inference that is consistent with

25  innocence, namely, parties who know certain information are

K3C6AIYC

likely to act in a particular way unilaterally and another
inference that is consistent with guilt, the Rule 29 standard
says that that is not sufficient evidence.  A reasonable jury
has to have had a reasonable doubt as to that.

Then the final category of trades is the Reuters
trade, which was on the one hand the most numerous of the
government examples; but on the other hand, the majority of the
examples were examples of spoofing and canceled trades, which
the government conceded and your Honor quite properly
instructed the jury that these are not antitrust violations.
If you take those out of the picture, you then have two or
three examples of iceberg orders.  You have two or three
examples of iceberg orders where although Katz or Cummings or
both of them said, *Oh, this was the purpose and this was to
disguise the volume of supply or demand in the market,* in every
single instance on cross-examination, they agreed that there
was no change whatsoever in the perceived supply and demand
that customers saw in those instances.  I submit that those
instances are just silly.

Then you have a handful of instances where one person
or another stays out of somebody else's way while they are
trading.  I think four or five instances spread over two and a
half years and umpteen thousand different transactions.  In a
context where all of these people are sharing information
because they have an extraordinarily economically important,

K3C6AIYC

1  completely legal buy-sell relationship among each other and I

2  think you cannot infer in those circumstances that it was the

3  intent of the parties to manipulate price.  I think the most

4  you could conceivably infer -- I don't think even this works --

5  is that what is going on with those very limited number of

6  Reuters trades is what was going in Apex Oil, which is you have

7  in a dealer market a couple of people who were both dealers and

8  who were both counterparties and competitors ganging up to

9  disadvantage another party who was a counterparty and

10  competitor, and the Court held that is not a per se violation.

11      As I say, I will breeze through the other examples as

12  well, I don't think any of the government's examples stand up

13  to scrutiny.  I think the entire case can be dismissed on Rule

14  29 grounds.  Then my argument is even if the entire case can't

15  be dismissed on Rule 29 grounds, if any of these groups of

16  episodes, theories of what the offense was went to the jury

17  improperly, then you've got prejudice to the defendant because

18  you can't tell whether the jury convicted on a permissible

19  theory or impermissible theory.

20      THE COURT:  Before you get to that, the first part of

21  your brief, pages 1 to 33, it seemed to me to be an argument

22  that the Court erred in denying the motion to dismiss portions

23  of the indictment in rejecting your motions in limine.  I think

24  you even say that essentially in the brief that you made these

25  arguments before.

K3C6AIYC

1          Am I right?

2          MR. KLOTZ:  Yes, your Honor, that is why I didn't

3    address it today.

4          THE COURT:  Okay.

5          MR. KLOTZ:  I felt I have done my best to persuade

6    your Honor on this.  I have been unsuccessful.

7          THE COURT:  If that is true, pages 1 through 33 of

8    your brief are a motion for reconsideration.

9          MR. KLOTZ:  I think in effect that is what they are.

10   Hopefully we put it more persuasively this time through than

11   prior times through.  I felt we had to make the argument less

12   there be some argument down the road that we waived that

13   argument because we didn't reraise it on Rule 29 motion.

14         THE COURT:  Isn't that an untimely motion for

15   reconsideration?

16         MR. KLOTZ:  I think it is perfectly permissible as

17   part of a Rule 29 motion.

18         THE COURT:  The gist of the first part of the belief

19   is that the Court should have engaged in a sophisticated

20   economic analysis of all of the transactions deciding which

21   ones were in fact per se price fixing or bid rigging; and only

22   after the Court had engaged in that sophisticated economic

23   analysis should the Court have allowed evidence of that

24   transaction to go to the jury.

25         Is that fair?

K3C6AIYC

1          MR. KLOTZ:  I put it a little bit differently.  First

2   of all, the level of sophistication of the analysis is going to

3   vary from situation to situation.  What your position was is

4   the Court needs to do sufficient analysis to reach a conclusion

5   whether the conduct actually at issue, not just as alleged in

6   the indictment, amounts to a personal violation of the

7   antitrust laws.

8          THE COURT:  What criminal cases do you rely on for

9   that proposition?

10         We have an indictment that alleges price fixing and

11  bid rigging.  In the civil context there are motions for

12  summary judgment, which don't exist in the criminal context.

13  In the criminal context we have an indictment, we have a motion

14  to dismiss, we have the charge to the jury which asks them

15  whether the government has proven the elements of the offense

16  beyond a reasonable doubt and here are the elements of the

17  offense and the offenses here were price fixing and bid rigging

18  and there is no issue raised in the briefs that the elements of

19  the offense were not properly given to the jury.  So what cases

20  in the criminal context do you rely on for the notion that

21  there had to be this proceeding of some sort in which the Court

22  went through a "sophisticated economic analysis" before either

23  allowing evidence in or the charge to the jury?

24         The cases that you rely on are civil cases with

25  sophisticated transactions such as licensing deals and the like

K3C6AIYC

| | |
|---|---|
| 1 | rather than what could be described as straightforward |
| 2 | allegations of price fixing or bid rigging.  So tell me the |
| 3 | cases that I should look at in the criminal context that say |
| 4 | that the Court has to go through a sophisticated economic |
| 5 | analysis of alleged price fixing or bid rigging before giving |
| 6 | the case to the jury or admitting the evidence.  What are the |
| 7 | criminal cases and I will go and look at them carefully? |
| 8 | MR. KLOTZ:  So in this our motions to dismiss, your |
| 9 | Honor, we cited criminal cases at the time -- |
| 10 | THE COURT:  Just tell me. |
| 11 | MR. KLOTZ:  It's the -- |
| 12 | THE COURT:  Tell me what the major criminal case -- |
| 13 | MR. KLOTZ:  There is only one criminal case in which a |
| 14 | Court dismissed an indictment because it found that the conduct |
| 15 | at issue was not governed by the per se rule. |
| 16 | THE COURT:  Because it was not price fixing or bid |
| 17 | rigging. |
| 18 | MR. KLOTZ:  Right.  That case was reversed on appeal. |
| 19 | So that is a criminal case.  We also cited-- |
| 20 | THE COURT:  Hold on.  Hold on.  Hold on.  That is what |
| 21 | I am trying to get.  The only case which you rely on as you |
| 22 | think comparable was a district court case that was reversed on |
| 23 | appeal.  Not great authority. |
| 24 | MR. KLOTZ:  It isn't that case.  Great authority -- |
| 25 | THE COURT:  Hold on.  Hold on. |

K3C6AIYC

1          All I am asking simply is if I were to write an

2     opinion supporting your view that I should have gone through a

3     sophisticated economic analysis in order to be able to look at

4     such things as the total effect on competition of the

5     transactions involved in this case, what cases do I cite in the

6     criminal context that would support that proposition?

7          MR. KLOTZ:  The cases you would cite would not be

8     criminal cases.  They would be civil cases that stand for

9     propositions --

10          THE COURT:  Hold on.  Hold on.  Hold on.

11          First, the procedural context is noticeably different

12    in the criminal and in the civil context for good reasons.

13    Even if I were to go to the civil context, it appeared to me --

14    I think I said this on the motion to dismiss -- that the cases

15    that you were relying on were cases where the transactions were

16    complicated arrangements among parties, including licensing

17    agreements and the like -- *BMI*, *Apple* -- not comparable to the

18    transactions here where you have at least three major banks,

19    competitors for customer bids, discussing what they were

20    bidding to a customer.

21          So you say no criminal cases, but then on the

22    substance what cases do you think -- I will look at them

23    carefully -- are most comparable to your argument that you need

24    a sophisticated economic analysis of the total transaction to

25    see whether it really is price fixing or bid rigging?

K3C6AIYC

1          MR. KLOTZ:  So I think to answer your Honor's question

2     I don't know that I can cite a case that I would call

3     comparable on the facts.  Although, I disagree that any

4     suggestion the facts in this case are simple and

5     straightforward.  I think they are incredibly complex.  What I

6     think there is no disagreement about, though, is the

7     determination of whether a conduct is governed by the per se

8     rule or the rule of reason is a question of law for the Court.

9          THE COURT:  I am not quite sure --

10          MR. KLOTZ:  We cited --

11          THE COURT:  Hold on.

12          I am not quite sure you correctly captured whether

13     there is any disagreement.  The Supreme Court has told us that

14     price fixing and bid rigging are in fact per se violations of

15     the Sherman Act; right?  Both the Supreme Court and the Second

16     Circuit.

17          MR. KLOTZ:  Both the Supreme Court and the Second

18     Circuit have also said that agreements that on their face are

19     price fixing and bid rigging aren't necessarily per se

20     violations because the label is not determinative and it takes

21     an analysis.

22          THE COURT:  The jury was not asked, "Are these per se

23     violations?"

24          MR. KLOTZ:  Correct, and they shouldn't have been.

25          THE COURT:  Right.  They are asked, *Was this price*

K3C6AIYC

*fixing or bid rigging?*  They were then properly instructed, no

objection, here are the elements of price fixing and the

elements of bid rigging.  So that as a matter of fact the jury

was asked:  Is this price fixing?  Here is what price fixing

is.  The government must establish beyond a reasonable doubt

that this was price fixing or beyond a reasonable doubt that

this was bid rigging.  If they said no, then they find for the

defendant.

        MR. KLOTZ:  If that is what they were asked to do--

        THE COURT:  Well, they were, weren't they?  They were

properly instructed this is price fixing, this is bid rigging,

do you find the government has proven this beyond a reasonable

doubt.

        MR. KLOTZ:  That would demonstrate by itself only that

the conduct appeared to be price fixing and bid rigging in the

sense that the Supreme Court and the Second Circuit have held

that that doesn't establish a per se violation.  That doesn't

mean it is not subject to the rule of reason.

        THE COURT:  I am sorry.

        MR. KLOTZ:  It can't be dispositive on this.

        THE COURT:  I don't understand that argument.  I

really don't.

        MR. KLOTZ:  Our argument is that it is for the Court

to determine whether the conduct is governed by the per se rule

or rule of reason.  And if it is governed by the rule of reason

K3C6AIYC

1    as we submit it is, it can't be the subject of criminal

2    prosecution.

3              THE COURT:  Hold on.  Hold on.

4              I had thought that we agreed that the Supreme Court

5    and the Second Circuit have held that price fixing and bid

6    rigging are violations of the criminal violations of the

7    Sherman Act.  You don't even have to talk about per se

8    violations.  All you have to do is to understand that the

9    Supreme Court and the Second Circuit have said price fixing and

10   bid rigging are criminal violations of the Sherman Act.  Here

11   is the definition of price fixing.  Here is the definition of

12   bid rigging.  The government must prove beyond a reasonable

13   doubt all of the elements of price fixing and/or bid rigging.

14             MR. KLOTZ:  If that were the correct analysis, your

15   Honor, then the defendants in BMI could all be sent to jail.

16   Because the Court there said, *What these people have done, no*

17   *question about it, is price fixing.*  But that doesn't end the

18   analysis.  Those are the cases that we have cited.

19             THE COURT:  Okay.

20             MR. KLOTZ:  Now, what our argument is, and this

21   circles back to why did we waste 33 pages of our main brief, we

22   made a motion to dismiss presenting these arguments and your

23   Honor said, and I thought fairly, *I don't have enough*

24   *information to make this judgment at this point.  I am not*

25   *persuaded that there is anything to the argument, but I*

K3C6AIYC

1    *certainly don't have enough information at this point.*  I think

2    we renewed the argument at the motion in limine stage and

3    again -- I don't want to characterize what your Honor found --

4    what I heard your Honor to find was I still don't have enough

5    information to make this determination.  Now at the close of

6    the evidence, I think enough information is there and our

7    submission is it is for the Court to decide, because it didn't

8    go to the jury and shouldn't have gone to the jury, is this

9    conduct a pro se violation or not.  That's what we ask you to

10   rule on in part on the Rule 29 motion.

11             THE COURT:  Okay.

12             MR. KLOTZ:  I think that covers everything I wanted to

13   cover unless your Honor has further questions.

14             THE COURT:  I had a few more.

15             You say in your brief that the jury was likely

16   confused about the legal standard.  You don't point to any

17   defect, if you will, in the jury instructions that were made

18   and brought to the Court's attention.  The jury instructions

19   were based as I said before on Judge Sand's instructions and

20   the ABA Antitrust Model instructions.  So I don't understand

21   the basis for saying that the jury was likely confused about

22   the legal standard.  The test surely is was the jury properly

23   instructed on the law, was there an objection that the Court

24   should have sustained and didn't or changed the jury

25   instruction in some way or was there clear error in the jury

K3C6AIYC

1   instructions.  The brief doesn't point to what was wrong in the

2   jury instructions.

3            MR. KLOTZ:  No.  On that point, your Honor, we're not

4   contending that the jury instructions were wrong.  I think

5   we're speaking to a more equitable side of the Rule 33 motion

6   of is there a sense here that the outcome was unfair and

7   inappropriate.  Certainly my concern based on everything that

8   happened with the jury was that the case was not given the

9   close attention that it should have been given and that it

10  would have been very easy notwithstanding a correct jury

11  instruction for the jury to have been over influenced by

12  testimony from Mr. Cummings with his head hung about how he did

13  wrong and testimony repeatedly about spoofing and canceled

14  trades and the fraudulent nature of them.

15           Your Honor gave the jury instruction we asked for in

16  both of those cases.  No dispute.  We did ask that the spoofing

17  and canceled trades evidence be excluded altogether.  your

18  Honor is right that argument is not based on a disagreement

19  about the adequacy of the jury instructions because we didn't

20  object to them.

21           THE COURT:  With respect to the issue of wrong, I

22  haven't done a word check; but I would have thought that the

23  use of the word "wrong" was far more prevalent in the

24  cross-examination than it was in the direct examination.  The

25  cross repeatedly said:

K3C6AIYC

1          *Nothing wrong with that, was there?*

2          *Nope.*

3          *Nothing wrong with that, was there?*

4          *Nope.*

5          *Nothing wrong with that, was there?*

6          Far more than in the direct.

7          MR. KLOTZ:  But it was --

8          THE COURT:  Sorry?

9          MR. KLOTZ:  It was provoked by the direct, your Honor,

10  when the witness testifies it was wrong.

11          THE COURT:  Hold on.  Hold on.

12          If in fact it was "provoked" by the direct, where was

13  the objection?

14          MR. KLOTZ:  There was no objection because within

15  limits I think that was a permissible question for the

16  government to put.

17          THE COURT:  If it is a permissible question for the

18  government to put and the defense used it far more, then I am

19  at a loss to understand why --

20          MR. KLOTZ:  Can I have a minute, your Honor.

21          THE COURT:  Sure.

22          (Pause)

23          MR. KLOTZ:  Thank you.

24          THE COURT:  Sure.

25          MR. KLOTZ:  Mr. Baio suggests I make two more points.

K3C6AIYC

1          With respect to whether the conduct was wrong, the
2    prosecution eliciting it was wrong on direct is not directly
3    comparable to the defense eliciting it wasn't wrong on cross
4    for this reason:  When the witness testifies that the conduct
5    was wrong, that does not mean it was illegal.  When the defense
6    however elicits the testimony it was not wrong, that does mean
7    it is not illegal.  So there is a different issue with respect
8    to both.
9          Then with respect to what it was we wanted your Honor
10   to do with respect to the Reuters transactions and the issue of
11   characterizing the conduct as either per se or subject to the
12   rule of reason --
13         THE COURT:  Hold on.  Before you get to the per se, if
14   you thought that it was wrong for the government to ask a
15   question that elicited testimony on direct that what the
16   witness did was wrong --
17         MR. KLOTZ:  Agreed.  But my point is --
18         THE COURT:  -- there should have been an objection if
19   you thought it was wrong.  A moment ago you told me it wasn't
20   really wrong for the government to elicit that on direct.
21         MR. KLOTZ:  My point is the weight of what the
22   government elicited over and over again and came back to in its
23   summations pushed the jury in a particular direction even
24   though the testimony itself is not necessarily improper in the
25   right context.

K3C6AIYC

1          THE COURT:  Go ahead.

2          MR. KLOTZ:  So the second point of what was it that we

3   wanted your Honor to do with respect to judging whether conduct

4   was a per se violation or a rule of reason violation, we think

5   your Honor actually did that with the instruction you gave on

6   spoofing and canceled trades.  You in effect determined this

7   behavior whether you like it or not is not an antitrust

8   violation -- not a per se antitrust violation.

9          THE COURT:  Not in and of itself.

10         MR. KLOTZ:  Yes.  We wanted your Honor to make the

11   same determination with respect to other categories of behavior

12   and other categories of evidence.

13         THE COURT:  In this case you have an alleged

14   conspiracy among bankers at three major banks who talk to each

15   other and cooperate with each other in a variety of ways.  Some

16   of which -- I know you disagree -- can be characterized as

17   price fixing or bid rigging.  Some of which you disagree that

18   they are price fixing or bid rigging.  In deciding the motion

19   to dismiss, one of the things that I said was in a conspiracy

20   case everything that the conspirators do with each other

21   doesn't necessarily have to be the substantive violation of the

22   law that is the object of the conspiracy.

23         Their dealings with each other in the same way that

24   you would have a RICO conspiracy or other kinds of conspiracy.

25   The way in which the conspirators deal with each other are

K3C6AIYC

1   inextricably intertwined with the conspiracy that is charged.

2   So they become admissible for reasons such as the way in which

3   the conspirators deal with each other, an ongoing relationship

4   of trust and confidence and all of the other reasons that the

5   Court of Appeals points to for introducing the way in which the

6   conspirators deal with each other during the period of the

7   conspiracy.

8         So you point to spoofing.  I gave an instruction on

9   spoofing and I gave an instruction on canceled trades and I

10   explained how they can be relevant to the proof in the case.

11         MR. KLOTZ:  I think your Honor gave that instruction

12   less the jury misunderstand and think we can convict based on

13   spoofing and canceled trades alone.  Now, our contention is --

14         THE COURT:  I think I gave exactly the instruction you

15   asked for on spoofing and canceled check.

16         MR. KLOTZ:  I think you did.  Although, I said we had

17   previously for reasons of--

18         THE COURT:  It was a good instruction.

19         MR. KLOTZ:  -- undue prejudice asked that the evidence

20   be excluded altogether.  With respect to ruble trades and

21   trading on Reuters again it was our position that for reasons

22   of prejudice because we don't think these can be antitrust

23   violations, they should have been excluded altogether.

24         THE COURT:  You complain that I excluded evidence of

25   pro-competitive explanations, but the brief does not go through

K3C6AIYC

1   the specific evidence that I excluded.  I generously included

2   when it was brought to my attention evidence which could be

3   arguably evidence of pro-competitive effects of the transaction

4   if I thought it was necessary to understand the whole

5   transaction and to put the transaction into context and also to

6   support a defense argument that if there was no effect you can

7   read that back into the intent of the parties.  So it is not

8   clear to me what the specific evidence that could have had any

9   effect on the trial was that was in fact excluded.

10          MR. KLOTZ:  Your Honor allowed us in one instance that

11  I remember, and there may have been a couple of others, to put

12  in evidence through Professor Lyons of lack of anticompetitive

13  effect; but we were prepared to have Professor Lyons testify as

14  to each and every transaction on Reuters.  There was no effect

15  from these and we think that would have been powerful evidence

16  and that was excluded.  We offered it for precisely that

17  reason.  It goes to the intent of the parties.  It's an odd

18  pricing fixing conspiracy for sure when the participants in the

19  conspiracy never successfully fix a price or influence or price

20  or whatever.  That suggests maybe that wasn't their intent.  We

21  got to do that in one or two cases, but we didn't get to make

22  that case across the board.

23          THE COURT:  You complain in your brief about the

24  government's summation, but there was never an objection to the

25  government's summation.

K3C6AIYC

1          MR. KLOTZ:  There was not an objection to the

2     government's summation.  Again, I think we're speaking in that

3     argument to the equity portion of Rule 33.  And our sense,

4     which we urge your Honor to adopt, that the outcome here was

5     not an appropriate outcome.

6          THE COURT:  Thank you.

7          MR. KLOTZ:  Thank you, your Honor.  I appreciate your

8     Honor's indulgence.  I have taken quite a bit of time.

9          THE COURT:  Oh, no, this is perfectly fine.  Perfectly

10    fine.

11          Government.

12          MS. CALLE:  Your Honor, I will just touch on a few

13    points.  The grand jury in this case returned an indictment

14    that alleged bid rigging and price fixing.  The motion to

15    dismiss was brought alleging that this indictment didn't allege

16    a bid rigging and price fixing conspiracy.  Your Honor denied

17    that motion.

18          What is at issue at trial was whether evidence came in

19    this front of jury that could support a finding that the

20    defendant agreed in a conspiracy to fix prices and rig bids.

21    We presented evidence of coordinated pricing to customers,

22    which we spent some time discussing.  A customer viewed these

23    entities as they view themselves as competitors.  They

24    coordinated their pricing to those customers.  the Customers at

25    times were advantaged as we talked about in the February 28th,

K3C6AIYC

1    2012, episode.  This kind of coordination between competitor

2    banks as to the price to quote to a customer is bid rigging.

3    We presented evidence of coordinated conduct in the interdealer

4    platform, which courts in this circuit have consistently held

5    is price fixing, bid rigging conduct.

6              THE COURT:  Let's pause on that for a moment.

7              MS. CALLE:  Sure.

8              THE COURT:  The transactions you are talking about

9    under that branch of your argument is essentially the

10   transactions on Reuters where one alleged conspirator would

11   hide the bid for another; right?

12             MS. CALLE:  It includes that.  It also excludes

13   conduct where would one would say, I have this position.  I

14   have this position.  Okay, you have twice the amounts so you go

15   first.  I won't trade against you.  So withholding bids in a

16   bid-suppression manner.

17             THE COURT:  You say that courts have held that that is

18   per se price fixing or bid rigging.  What are the most

19   analogous cases that you think support that proposition with

20   respect to hiding the demand?

21             MS. CALLE:  I think *Usher* case would also be

22   applicable to hiding demand.  In *Usher* you had instances where

23   one trader was trading against the other.  In the instances of

24   hiding demand that we had here, one would say, Okay, I will

25   pull mine because we're trading the same way and then would

K3C6AIYC

proceed to say, You pull yours now and I will hide your demand

instead.  So in the *Usher* case you didn't have that added step

you will hide the demand in the same language, but the same

conduct of withdrawing demand from the market or withdrawing

supplies as to effect price is very analogous to what we sought

here.

THE COURT:  *Usher* was just a decision on the motion to

dismiss it; right?  I eventually resulted in acquittal.

MS. CALLE:  Yes.  Although, not a criminal case, it

was per se case, which is the *In Re Foreign Exchange* case as

well.  So it was similar conduct.  It also held it was per se

conduct.

THE COURT:  *For Ex* was which court?

MS. CALLE:  Southern District, your Honor.  I can

provide you with that.

THE COURT:  Discussions with respect to who goes

first, who takes the bid, who steps back, the cases that you

think are most persuasive on that subject are what?

MS. CALLE:  *Usher* and *In Re Foreign Exchange*, your

Honor.  Those dealt with the trading on the interdealer

platform and coordinated placing of bids and offers on the

platform.

THE COURT:  Do you contend that I don't even have to

reach those transactions if I find that there is price fixing

and bid rigging on the ruble transactions?

K3C6AIYC

1          MS. CALLE:  Your Honor, I believe that all of them are

2     per se violations.  To Mr. Klotz's point the ruble transactions

3     were outside the statute of limitations so with the same caveat

4     that the government did in fact prove that the conspiracy

5     persisted through the 2013 time period when the statute of

6     limitations ran, then that would suffice.

7          THE COURT:  With respect to the activities within the

8     statute of limitations that would bring the conspiracy within

9     the statute of limitations, it is the two trades on May 20th?

10          MS. CALLE:  With respect to particular transactions

11     there is also testimony from the co-conspirators that their

12     conspiracy continued through the statute of limitations period.

13     The jury was very clearly instructed on this statute of

14     limitations issue as for the exhibits from the May 20th, 2013,

15     transactions.

16          THE COURT:  I know.  The jury was very attentive.

17     They focused on, among other things, the May 20th transactions.

18          MS. CALLE:  There were also communications entered

19     into the record, communications between the co-conspirators as

20     to customer orders during the 2013 time period as well.

21          THE COURT:  Within the statute of limitations?

22          MS. CALLE:  Yes, your Honor.

23          THE COURT:  In your brief you really didn't address

24     the statute of limitations.  It was referred to in the

25     defendant's brief and I don't recall it really being addressed

K3C6AIYC

1    in your brief.

2              MS. CALLE:  Your Honor, we can provide the pin sites

3    in a subsequent filing if you would like.

4              THE COURT:  Yes.

5              What do you say that the testimony was as to the

6    continuation of the conspiracy into --

7              MS. CALLE:  I believe -- I will look at the specific

8    language so I don't misquote what Mr. Katz and Mr. Cummings

9    testified that their conspiracy continued through May.  I think

10   maybe as through June or July of 2013 as alleged in the

11   indictment.

12             THE COURT:  Yes.  You can give me the pin sites that

13   you are referring to by Monday.  If defense has something they

14   want to say in response, they can do that by Tuesday.

15             Go ahead.

16             MS. CALLE:  As I was arguing that the coordinated

17   interdealer trading office reports a finding that there was a

18   bid rigging and price fixing conspiracy.  What was before the

19   jury were instructions --

20             THE COURT:  The two cases that you rely on for that

21   proposition are *Usher* and *In Re For Ex*?

22             MS. CALLE:  For the particular -- courts have

23   particularly addressed trading on the interdealer platform and

24   those two courts address it.

25             THE COURT:  Any Second Circuit or Supreme Court

K3C6AIYC

1    decisions?

2           MS. CALLE:  *Gelboim* dealt with the LIBOR transactions

3    which dealt with whether they were horizontal competitors in

4    the market agreeing to set the price of the LIBOR benchmark

5    rate.  *Gelboim* is 823 F.3d.

6           THE COURT:  Sorry.  Which?

7           MS. CALLE:  *Gelboim*, second Circuit opinion, your

8    Honor.

9           THE COURT:  Yes.

10          Go ahead.

11          MS. CALLE:  The jury then was, as your Honor discussed

12   with Mr. Klotz, adequately instructed on elements of bid

13   rigging and price fixing.  The jury was also instructed as to

14   how they might consider spoofing and fake trades.  The jury was

15   also instructed as to information sharing.  The jury was also

16   instructed as to independent decision-making.

17          THE COURT:  In your brief when you talk about spoofing

18   and canceled trades, you refer to my decision on the motion to

19   dismiss and the language about inextricably intertwined and to

20   the jury instructions.  In the course of that, you say that

21   spoofing and canceled trades were "direct evidence" of the

22   conspiracy.

23          What does that mean?

24          MS. CALLE:  It means it was evidence of a conspiracy

25   and it showed their intent and showed the background of the

K3C6AIYC

1    conspiracy that they could consider it as evidence of the

2    conspiracy existed.

3              THE COURT:  What does that mean?

4              MS. CALLE:  That when determining whether there was an

5    agreement between them, for instance, when one said, I will put

6    in a fake bid, they can consider that as evidence of the

7    relationship between the conspirators.

8              THE COURT:  I have a question in my mind as to what

9    you mean by direct evidence, presumably something different

10   from circumstantial evidence.  I would have thought that direct

11   evidence would be direct evidence of an agreement to fix prices

12   or rig bids not simply evidence of the way in which the

13   conspirators worked together or established trust with each

14   other, operated together.  So I had a question what you really

15   meant by direct evidence.  It appeared to go further than

16   inextricably intertwined with the evidence of the conspiracy in

17   this case.  This was direct evidence which suggests that it is

18   direct evidence of price fixing or bid rigging.

19             MS. CALLE:  Your Honor, that was not our intention.

20   Our intention was what we had captured in our motion in limine,

21   which we had agreed in the jury instructions and the way that

22   the jury was so instructed.

23             THE COURT:  Okay.

24             MS. CALLE:  To the extent there was confusion, we are

25   not changing our position in any way.

K3C6AIYC

1          THE COURT:  Go ahead.

2          MS. CALLE:  The jury had adequate basis to render

3     their verdict after being sufficiently instructed.  We've

4     discussed several examples in our brief.  We've added on the

5     February 28th, 2012 episode.

6          If you had specific questions as to particular

7     episodes, I am happy to answer those at this time.

8          THE COURT:  No.

9          MS. CALLE:  I want to address a couple points that

10    Mr. Klotz brought up in terms of pro-competitive

11    justifications.  As the *Apple* case makes very clear,

12    pro-competitive justifications are not permitted to be

13    considered in a pro se case except in a case of a very narrow

14    line of it cases that address joint ventures.  There was no

15    joint venture here.

16          Your Honor, in going on our motion to exclude evidence

17    of a joint venture stated that as a matter of law you didn't

18    have evidence before you to conclude that there might have been

19    a joint venture but invited defendant to proffer evidence if he

20    wanted to make a joint venture defense.  He never did that.  He

21    never asked for an instruction as to a joint venture or as to

22    ancillary.  So there was no consideration that ought to have

23    been given to any pro-competitive benefits.  In a pro se case

24    pro-competitive justifications are no excuse at all under well

25    established Supreme Court precedent.

K3C6AIYC

1          Is there anything else under Rule 29, your Honor, that

2     you have questions on?

3          THE COURT:  No.

4          MS. CALLE:  As to Rule 33 I think you sufficiently

5     covered the points about whether it was wrong.  I think it was

6     very clear the instruction that was given as to wrong or

7     immoral.  Again, we set forth the basis of the high standard

8     for evaluating whether there was error in the government's

9     summations.  Both sides put forward their theory of the case

10    and there was no objection to the government's summations

11    either.

12          We covered the pro-competitive justifications and I

13    think that is most of what you covered as to the Rule 33 with

14    Mr. Klotz.  Again, I am happy to answer any questions as to

15    that motion as well.

16          THE COURT:  Nope.

17          MS. CALLE:  Thank you.

18          MR. KLOTZ:  Nothing further, your Honor.

19          THE COURT:  I will take the motions under advisement.

20    Thank you all.

21                              o0o

22

23

24

25