UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------x
UNITED STATES OF AMERICA  :  18 Cr. 333 (JGK)
      v.     :

AKSHAY AIYER,     :
     Defendant.  :
---------------------------------------------------x

## <u>SENTENCING MEMORANDUM ON BEHALF OF AKSHAY AIYER</u>

<br><br>

WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ...............................................................................III

INTRODUCTION ................................................................................................1

I.      The Court Must Calculate The Applicable Guidelines Range Before Imposing A Sentence. ...........................................................................................................3

      **A.**      Mr. Aiyer Objects To The Eight-Level Enhancement Based On Volume Of Commerce.........................................................................................4

            1.      The Government Did Not Prove Any Volume Of Commerce *Affected By The Conspiracy.* .......................................................6

            2.      The Government Overstates The Volume Of Commerce By Including Trades Not Even Discussed At Trial. ......................................17

            3.      The Distinct Possibility That The Jury Convicted On An Episode With The Least Significant Volume Further Supports The Argument That Any Upward Adjustment Based On Volume Of Commerce Is Not Warranted. ......................................................19

            4.      Even If Calculated Correctly, The Government's Volume Of Commerce Number Greatly Overstates The Economic Significance Of The Trading Involved, And A Downward Departure From Mr. Aiyer's Calculated Guidelines Range Is Appropriate....................20

      **B.**      Mr. Aiyer Objects To The One-Level Enhancement For Bid Rigging...............24

            1.      Conduct Involving The Ruble And Zloty Is Not Bid Rigging...............25

            2.      Conduct Involving Interdealer Transactions On Reuters Is Not Bid Rigging.......................................................................................27

      **C.**      Mr. Aiyer Should Receive A Two-Level Downward Adjustment For His Role As A Minor Participant. ....................................................................28

            1.      Mr. Katz's And Mr. Cummins' Conspiracy With Each Other And Additional Traders Began As Early As Nine Years Before They Met Mr. Aiyer. .....................................................................30

            2.      Mr. Aiyer Was Generally A Passive Participant In The Charged Conduct..........................................................................................31

II.     The Section 3353(a) Factors Weigh In Favor Of A Sentence Of Probation With A Special Condition Of A Period Of Home Confinement. ..........................................33

      **A.**      The Conduct For Which Mr. Aiyer Was Convicted Is Not Representative Of Mr. Aiyer's History And Character. ................................................34

            1.      Mr. Aiyer's Upbringing. ....................................................34

            2.      Mr. Aiyer's Time At Vassar College.......................................35

            3.      Mr. Aiyer As A JP Morgan Trader. ........................................37

            4.      Mr. Aiyer's Commitment To His Family. ...................................40

            5.      Mr. Aiyer's Commitment To His Friends And Community....................41

6.     Mr. Aiyer's Commitment To His Partner. ...............................................43

7.     Mr. Aiyer's Desire To Remain In The United States. ..............................44

**B.**     The Unique Nature And Characteristics Of The Conduct For Which Mr. Aiyer Was Convicted Support A Sentence Of Probation With A Period of Home Confinement...............................................................................................45

**C.**     A Non-Custodial Sentence Will Be Sufficient To Punish Mr. Aiyer, Protect The Public, And Deter Others In The Financial Sector...........................50

1.     A Sentence With A Period Of Home Confinement Is A Sufficient Punishment, Considering The Numerous Collateral Consequences Mr. Aiyer Has Faced And Will Continue To Face. ....................................50

2.     A Sentence With A Period Of Home Confinement Protects The Public and Furthers The Goals Of Deterrence.........................................54

**D.**     A Sentence With A Period Of Home Confinement Is Appropriate To Avoid Unwarranted Sentence Disparities. ..............................................................57

1.     A Non-Incarceratory Sentence Avoids Unwarranted Sentence Disparities With Other Foreign Exchange Traders...................................57

2.     A Non-Incarceratory Sentence Avoids Unwarranted Sentence Disparities With Other Antitrust Defendants Sentenced In The Southern District Of New York. ........................................................61

**III.**     Special Considerations Applicable To Mr. Aiyer Weigh In Favor Of A Sentence Of Probation With A Period of Home Confinement. ..........................................63

**A.**     The Severity Of The Potential Consequences Of Mr. Aiyer's Immigration Status Supports A Non-Custodial Sentence.........................................................63

1.     The Effect Of Mr. Aiyer's Non-Citizen Status On Imprisonment Conditions. ............................................................................65

2.     The Potential Immigration Consequences Of Sentencing: Deportation And ICE Detention. .......................................................68

**B.**     A Sentence Of Home Confinement Is Appropriate Given The Unprecedented Global Pandemic.........................................................................71

CONCLUSION.........................................................................................................................75

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*Basank v. Decke*r,
   20-cv-2518 (AT) (S.D.N.Y. March 26, 2020) ...................................................74

*Coronel v. Decker,*
   No. 20-cv-2472 (AJN) (S.D.N.Y. March 27, 2020) .........................................74

*In re Foreign Exchange Benchmark Rates Antitrust Litig.*,
   74. F. Supp. 3d 581 (S.D.N.Y 2015)................................................46, 60, 61

*Gall v. United States,*
   552 U.S. 38 (2007).........................................................................3, 33, 50

*Granite Partners, L.P. v. Bear, Stearns & Co.*,
   58 F. Supp. 2d 228 (S.D.N.Y. 1999).............................................................26

*In re Joseph,*
   22 I. & N. Dec. 799 (1999) .........................................................................70

*Medley v. Decker,*
   No. 18-CV-7361 (AJN), 2019 WL 7374408 (S.D.N.Y. Dec. 11, 2019) ................70

*New York v. Hendrickson Brothers, Inc.,*
   840 F.2d 1065 (2d Cir. 1988)......................................................................25

*Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.,*
   270 F. Supp. 2d 1043 (E.D. Wis. 2003)........................................................26

*United States v. Appalachian Oil Co., Inc.,*
   No. 2:91-CR-078, 1993 WL 773572 (E.D. Tenn. Nov. 18, 1993) .........................6

*United States v. Arthur,*
   No. 04-cr-122, 2006 WL 3857491 (E.D. Wis. Dec. 22, 2006)..............................30

*United States v. Briggin,*
   No. 1:02-cr-01431 (S.D.N.Y. May 4, 2006).....................................................61

*United States v. Carbajal,*
   717 F. App'x 234 (4th Cir. 2018) .................................................................28

*United States v. Caruso,*
   814 F. Supp. 382 (S.D.N.Y. 1993)................................................................23

*United States v. Chong,*
   No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014)......................51, 69

*United States v. Coughlin,*
No. 06-20005, 2008 WL 313099 (W.D. Ark. Feb 1, 2008)......................................56

*United States v. DiAmbrosio,*
No. 04 Cr. 66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008)....................................63

*United States v. Doody,*
No. 1:00-cr-00602 (S.D.N.Y. Oct. 18, 2001) ........................................................61

*United States v. Emmenegger,*
329 F. Supp. 2d 416 (S.D.N.Y. 2004)...............................................................54, 55

*United States v. Gaind,*
829 F. Supp. 669 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994).....................55

*United States v. Gupta,*
904 F. Supp. 2d 349 (S.D.N.Y. 2012)...........................................................1, 33, 55

*United States v. Heffernan,*
43 F.3d 1144 (7th Cir. 1994) ............................................................................24, 25

*United States v. Hernandez,*
18-cr-834 (S.D.N.Y. Apr. 2, 2020) .......................................................................74

*United States v. Howe,*
543 F.3d 128 (3d Cir. 2008)...................................................................................63

*United States v. Jones,*
460 F.3d 191 (2d Cir. 2006).....................................................................................4

*United States v. Leitch,*
No. 11-cr-00609 (JG), 2013 WL 753445 (E.D.N.Y. Feb. 28, 2013)................50, 55

*United States v. Montgomery,*
No. 1:02-cr-01308 (S.D.N.Y. May 6, 2004)...........................................................61

*United States v. Mullings,*
131 F. Supp. 3d 1 (E.D.N.Y. 2015) .......................................................................54

*United States v. Musgrave,*
647 F. App'x 529 (6th Cir. 2016) ....................................................................56, 63

*United States v. Nesbeth,*
188 F. Supp. 3d 179 (E.D.N.Y. 2016) ...................................................................51

*United States v. Perez,*
321 F. Supp. 2d 574 (S.D.N.Y. 2003).....................................................................29

*United States v. Petrelli,*
   306 F. Supp. 2d 449 (S.D.N.Y. 2004) ............................................................29, 30

*United States v. Prosperi,*
   686 F.3d 32 (1st Cir. 2012) ..................................................................................63

*United States v. Quintero-Leyva,*
   823 F.3d 519 (9th Cir. 2016) ...............................................................................29

*United States v. Ruiz,*
   246 F. Supp. 2d 263 (S.D.N.Y. 2002) ................................................................29

*United States v. Schenider,*
   No. 1:00-cr-00597, ECF No. 17, 19 (S.D.N.Y. Oct. 16, 2001) ...........................61

*United States v. SKW Metals & Alloys, Inc.,*
   195 F.3d 83 (2d Cir. 1999) ..............................................................6, 7, 18, 19

*United States v. SKW Metals & Alloys, Inc.,*
   6 F. App'x. 65 (2d Cir. 2001) ........................................................................7, 62

*United States v. Spadola,*
   No. 1:06-cr-00898 (S.D.N.Y. Aug. 24, 2007) ....................................................61

*United States v. Stewart,*
   590 F.3d 93 (2d Cir. 2009) ..........................................................51, 52, 55, 69

*United States v. Sturdivant,*
   244 F.3d 71 (2d Cir. 2001) ...........................................................................19, 20

*United States v. Thavaraja,*
   740 F.3d 253 (2d Cir. 2014) ................................................................................69

*United States v. Thompson,*
   No. 14-cr-00272 (S.D.N.Y. Nov. 22, 2016) .......................................................63

*United States v. U.S. Gypsum Co.,*
   438 U.S. 422 (1978) ......................................................................................46, 47

*United States v. Vigil,*
   476 F. Supp. 2d 1231 (D.N.M. 2007) .................................................................52

## Statutes

8 U.S.C. § 1226(a) ............................................................................................69

8 U.S.C. § 1226(a)(2) .......................................................................................70

8 U.S.C. § 1226(c)(1)(C) ..................................................................................70

8 U.S.C. § 1227(a)(2)(A)(i) ....................................................................................68, 70

18 U.S.C. § 3553(a) ........................................................................................................33

18 U.S.C. § 3553(a)(2)(B)-(C) .......................................................................................54

18 U.S.C. § 3553(a)(6) ...................................................................................................57

18 U.S.C. § 3624(c)(1) ...................................................................................................68

28 U.S.C. § 994(j) ...........................................................................................................54

U.S.S.G. § 2R1.1 .........................................................................................................6, 20

U.S.S.G. § 2R1.1(b)(2) ....................................................................................................6

U.S.S.G § 2R1.1, cmt. n.6 ...............................................................................................24

U.S.S.G. § 3B1.1, cmt. n.1 ..............................................................................................28

U.S.S.G. § 3B1.2 cmt. n.1 ...............................................................................................28

U.S.S.G. § 3B1.2 cmt. n.3(C) ....................................................................................28, 29

U.S.S.G. § 3B1.2 cmt. n.5 ...............................................................................................28

U.S.S.G § 5C1.1 ................................................................................................................4

U.S.S.G. § 5C1.1 cmt. n.4 ...............................................................................................49

U.S.S.G. § 5K2.0 (a)(1)(A) .............................................................................................23

Defendant Akshay Aiyer respectfully submits this memorandum to aid the Court in determining an appropriate sentence.  Sentencing is currently scheduled for May 29, 2020.

## **INTRODUCTION**

Mr. Aiyer will respectfully stand before this Court on May 29, 2020 for sentencing. Sentencing "requires a court to consider, with great care and sensitivity, a large complex of facts and factors," not the least of which is "a defendant's character."  *United States v. Gupta*, 904 F. Supp. 2d 349, 350, 354 (S.D.N.Y. 2012).  Courts in the Southern District of New York have recognized that reducing this complicated analysis to "the mechanical adding-up of a small set of numbers artificially assigned to a few … variables wars with common sense."  *Id.* at 350. Instead, the Sentencing Guidelines (the "Guidelines") are merely the starting point, and a court must "judge the man as a whole."  *Id*. at 354.  As detailed in the outpouring of letters written by Mr. Aiyer's family, friends, and former colleagues, Mr. Aiyer is a man of extraordinary decency and is deserving of leniency in his sentencing.

The conduct for which Mr. Aiyer was convicted stands in stark contrast to the person whom those closest to Mr. Aiyer describe.  As the letters attest, Mr. Aiyer is, above all else, a selfless person.  "Generous," "sensitive," and "caring" are but a few of the descriptors attributed to Mr. Aiyer repeatedly throughout these letters.  Indeed, the prominent common thread among the many letters is Mr. Aiyer's willingness to help others, especially in their times of need.  From taking care of his partner through her chronic illness, to paying for his mother's house and his sister's college education, to opening his home to his friends with financial troubles, illnesses, and other difficulties, the letters make clear that Mr. Aiyer's inclination is always to give—be it his time, his energy, his knowledge, his resources, or his kindness.  As one letter states simply, Mr. Aiyer puts others before himself.

Mr. Aiyer has always been a law-abiding, upstanding person.  He has never shown any waywardness or disrespect for the law.  He has never had any legal troubles prior to this case, much less a criminal record.  He has always exemplified just the opposite—decency and integrity—as is described at length in the many letters.

Just as Mr. Aiyer's characteristics are atypical of those convicted of crimes, the conduct at issue in this case is unlike the typical criminal antitrust case.  This case bears little resemblance to traditional price fixing or bid rigging.  This case does not feature any bid rotation scheme, as in most bid rigging cases, nor any agreed-upon, supra-competitive pricing, as in most price fixing cases.

Moreover, there are no significant pecuniary gains to the alleged coconspirators in this case, nor any significant identifiable pecuniary losses to any customers, as are ordinarily present in criminal antitrust cases.  The record does not reflect the anticompetitive effects typically present in per se cases—not an agreed-upon price, not what prices would or should have been in the absence of the alleged conduct, not harm to customers, not any reduction in output or competition, not any unfavorable terms to a transaction.

For this reason, the Government cannot prove that a specific volume of commerce attributable to Mr. Aiyer was affected, warranting the Government's proposed upward adjustment to Mr. Aiyer's offense level.  "Volume of commerce" is intended to serve as an approximation of damages, and the Government presented no evidence tending to show any volume of trading measurably affected by Mr. Aiyer's conduct.

This case has wreaked immeasurable havoc on Mr. Aiyer's life and the lives of those closest to him, including his mother, his friends, and his partner, all of whom are distraught.  Mr. Aiyer has been plagued with stress, has been without gainful employment, and has been unable

to move freely in the world to see friends or family, many of whom, including his mother and grandparents, live in India.

The consequences of this case are even worse for Mr. Aiyer because of his status as a non-citizen. Almost eighteen years ago, Mr. Aiyer moved to the United States from India, seeking to better his circumstances. Although Mr. Aiyer has lawfully resided in the United States ever since, the imposition of a sentence of imprisonment increases the risk that he may be deported. While other white collar criminal defendants generally enjoy eligibility for minimum-security facilities, Mr. Aiyer will be designated a "deportable alien" and required to serve his time in a privately-run, for-profit prison where conditions are notoriously poor and even dangerous. Following any term in prison, Mr. Aiyer would likely be taken into custody by the United States Immigration and Customs Enforcement ("ICE"), which could commence removal proceedings against Mr. Aiyer while holding him indefinitely in an unsafe detention facility with limited medical, recreational, educational, and other services.

It is incumbent upon this Court to calculate an appropriate sentence for Mr. Aiyer. The Guidelines governing this calculation are merely advisory, and do not dictate the sentence imposed. We respectfully ask the Court, when determining Mr. Aiyer's sentence, to give full consideration to the letters written in support of Mr. Aiyer and all of the factors set forth herein, especially as they relate to Mr. Aiyer's upstanding character. In Mr. Aiyer's case, we submit that a non-custodial sentence of a term of probation, with a special condition of a period of home confinement, would fully satisfy both the objectives of sentencing and the call of justice.

## I.      The Court Must Calculate The Applicable Guidelines Range Before Imposing A Sentence.

Calculation of the applicable Guidelines range is required before the Court imposes a sentence on a defendant. *Gall v. United States*, 552 U.S. 38, 49-50 (2007). In the Presentence

Investigation Report ("PSR"), the Probation Department calculated an offense level of 21, with a Guidelines range of 37 to 46 months.  (PSR at ¶ 93.)  The PSR's offense level calculation is driven by the Government's unsubstantiated calculation of the affected volume of commerce. (*Id.* at 21-22.)

The Probation Department recommended a downward departure from the Guidelines range—namely, a sentence of 24 months.  (*Id.* at 26.)  Ultimately, however, the Guidelines and the PSR's recommendation are merely advisory and courts are free to tailor the appropriate sentence based on any number of considerations.  *United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (affirming sentence and sentencing court's reliance on factors such as the defendant's "consistent work ethic," "support of his wife and son," and "assistance and support for other members of his family" for imposition of non-Guidelines range sentence).

Mr. Aiyer respectfully disagrees with the PSR's Guidelines range calculation and recommended sentence.  When calculated correctly, the defense believes the appropriate Guidelines calculation of the offense level is 10, and the appropriate Guidelines sentencing range is 6 to 12 months.  Because Mr. Aiyer is a first-time, non-violent offender, a non-custodial sentence is warranted.  *See* U.S.S.G § 5C1.1. cmt. 4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment").

### A.   Mr. Aiyer Objects To The Eight-Level Enhancement Based On Volume Of Commerce.

The PSR states that an eight-level increase in Mr. Aiyer's offense level is warranted because "[t]he volume of commerce attributable to the defendant was approximately

$276,498,963." (PSR at ¶ 46.)[1]  As an initial matter, the defense and the Court have been given limited information as to how the Government arrived at this number.  In its letter to the Probation Office, dated March 9, 2020, the Government provided very limited and general information about its calculation, including a representation that the figure excluded spoofing and cancelled trades, as well as any transactions that Mr. Aiyer "did not win."  (*See* Ex. A, March 9, 2020 Letter to Officer Paul Hay, at 2.)[2]  The Government also noted that for the Reuters trading episodes, it "limited its calculations to the time period and currency pair reflected in the corresponding [Waller] summary exhibit[,] [and] then totaled the volume of transactions entered into by Defendant during each time period in the respective currency pair, as reflected in his trading book."  (*Id.*)  However, the Government still has not specified which transactions of the 23 at issue form the basis of its calculation, and the limited information that it has provided does not, on its face, justify an enhancement for which it bears the burden of proof.

In any event, for the reasons that follow, the Government's figure is grossly overstated. Given the lack of evidence of impact presented at trial, no adjustment to the offense level based on volume of commerce is warranted.

The "volume of commerce" provision of Section 2R1.1 of the Guidelines is a critical determinant of the recommended sentencing range in antitrust cases.  Both the fine imposed and term of imprisonment are direct correlates of the volume of commerce proven pursuant to this provision.  Section 2R1.1 provides for a base offense level of 12 for bid rigging, price fixing, or

---

[1] Although the PSR added eight points to the offense level computation for volume of commerce, it notes that the Court is in a better position than the Probation Department to resolve this issue.  (*Id.* at 22.)

[2] All references to "Ex." or "Exhibit" are to the documents and testimony attached to the Declaration of Martin Klotz, dated April 6, 2020.

market allocation agreements among competitors, and adjustments at increasing levels as the volume of commerce increases.  U.S.S.G. § 2R1.1.

As to the definition of "volume of commerce," Section 2R1.1(b)(2) provides that "the volume of commerce *attributable to an individual participant* in a conspiracy is the volume of commerce done by him or his principal in goods or services that were *affected by the violation*." U.S.S.G. § 2R1.1(b)(2) (emphasis added).  The Second Circuit has interpreted "volume of commerce" to signify "a rough approximation of the damage *caused by* the conspiracy." *United States  v. SKW Metals & Alloys, Inc.,* 195 F.3d 83, 91 (2d Cir. 1999) (emphasis added).

In this case, the Government failed to prove any impact at all on pricing in the transactions at issue, much less the "approximation of the damage caused" that is the essence of "volume of commerce." *Id.* at 91.  The Government presented no evidence of an effect on pricing, on the terms of any transaction, or on any customer in its entire case-in-chief.  This lack of evidence demonstrates that a volume of commerce enhancement is inappropriate.

1.    <u>The Government Did Not Prove Any Volume Of Commerce *Affected By The Conspiracy.*</u>

To prove the volume of commerce affected by the conspiracy, the Government must demonstrate more than simply that a conspiracy existed and "the inception and the end of the conspiracy." *Id.* at 90; *accord United States v. Appalachian Oil Co., Inc*., No. 2:91-CR-078, 1993 WL 773572, at *1-2 (E.D. Tenn. Nov. 18, 1993) (rejecting the government's argument that "total retail sales … during the nine years of the conspiracy alleged in the indictment" constituted the volume of commerce and holding that the conspiracy "was at most periodic, affecting … 10% to 20% of its total sales).  The Government must show an anticompetitive effect on price—namely, that the "conspiracy [was] incrementally successful at impacting the terms of trade or at elevating the price above the putative market price." *SKW Metals & Alloys,*

6

195 F.3d at 90-91 (rejecting the government's argument that it need not show anticompetitive effect on prices in a per se case in order to apply the volume of commerce enhancement provision).  Put simply, proving volume of commerce entails showing an actual "influence on sales."  *Id.* at 90.

In *SKW Metals*, the defendants were convicted of a price fixing conspiracy in the ferrosilicon market in violation of Section 1 of the Sherman Act and subsequently sentenced.  *Id.* at 85.  On the issue of the volume of commerce affected by the ferrosilicon conspiracy, the district court found that the conspiracy was "successful"—i.e., that it had "affected" a specific volume of commerce—only during two short periods amounting to approximately two months during the almost two years that the conspiracy was alleged to have existed.  *See id* at 89.  The government appealed on the theory that, "because entering into a price-fixing conspiracy is a *per se* violation," all ferrosilicon sales during the entire period were "affected by" the illegal agreement.  *Id*. at 90.  The Second Circuit disagreed, rejecting the notion that sentencing should be based on a "tenuous presumption that commerce is affected by all sales within the period set forth in the indictment regardless of what effects, if any, the conspiracy may have had."  *Id*. at 92.  The court held that the government needed to "prove that the prices charged were 'affected by' the conspiracy"—i.e., that the conspiracy "*influence[d]* market transactions."  *Id*. at 90-91 (emphasis added).  On remand, the court re-imposed the same sentence of four months' home confinement and 18 months' probation, which was subsequently upheld by the Second Circuit on appeal.  *See United States v. SKW Metals & Alloys, Inc.*, 6 F. App'x. 65, 66 (2d Cir. 2001) ("With respect to quantification, the government failed to present evidence on remand concerning the volume of sales affected by the violation during the two identified periods and instead continued to argue that all sales were affected" and thus failed to satisfy its burden.").

Here, determining a relevant volume of commerce is particularly difficult because of the nature of the conspiracy shown at trial.  The Government did not show any sustained or continuing attempt by the conspirators to manipulate the price of any currency.  Similarly, the Government did not show any sustained or continuing attempt by the conspirators to coordinate pricing in competitive bidding situations.  Indeed, the participants in the Rand Chat Room were not even shown to have discussed pricing to customers in any currencies other than the ruble and zloty, currencies in which Mr. Aiyer's expertise, and Mr. Katz's and Mr. Cummins' lack of expertise, provided an obvious explanation for such discussions.  What the Government showed was a series of one-off episodes, involving different trading behaviors, selected from a general pattern of conduct that was entirely lawful.  An analysis of five representative categories of episodes concerning which the Government introduced evidence at trial shows the Government's failure to prove any identifiable impact on a specific volume of commerce.

a.     *Russian Ruble and Polish Zloty Episodes.*

Six episodes presented by the Government at trial involved trading in the ruble and zloty. All six episodes occurred against the same backdrop:  Mr. Aiyer was vastly more skilled and active in trading the ruble than Mr. Katz, Mr. Cummins, and Mr. Williams; in addition to dealing directly with clients, Mr. Aiyer acted as a wholesaler for other traders, including Mr. Katz, Mr. Cummins, and Mr. Williams, who were risk-averse and willing to quote ruble prices to their customers only if they knew in advance that another party, such as Mr. Aiyer, would offset any position they acquired in dealing with a customer.[3]  The Government contends that Mr. Aiyer and the alleged coconspirators coordinated pricing in the ruble and zloty.  But the evidence

---

[3] Ironically, what prompted these discussions about the ruble to begin with appears to have been Mr. Aiyer's impulse to be helpful to friends who were less skilled at trading the ruble than he was, a generous impulse highlighted throughout the letters submitted on his behalf.

showed only that they shared information on ruble prices.  The evidence did not show that they agreed on prices to quote to customers, or that any customer received a worse price because of the information-sharing.  Similarly, the evidence did not show that prices were at supra-competitive levels, what prices would or should have been in the absence of the communications challenged by the Government, or any other impact on a specific volume of commerce.

The episode on October 14, 2010, a date involving the ruble, is illustrative.  On this date, Mr. Aiyer was not approached for a quote by the customer, McKinsey, and at no time dealt directly with the customer.  (*See* Ex. B, Trial Tr. at 1265:2-4 (Katz).)  Instead, Mr. Aiyer was asked for a price quote by a broker, ICAP, on behalf of other traders who apparently had been approached directly by McKinsey.  Mr. Aiyer was under no obligation to provide such a quote, or to provide the same quote to anyone who asked.

Mr. Katz was also approached by McKinsey for a price in the ruble transaction.  (*See* Ex. B, Trial Tr. at 943:23-944:10 (Katz).)  By Mr. Katz's own admission, Mr. Aiyer encouraged Mr. Katz to show the "accurate price" and offered to "take [the position] into his book" if the customer accepted the quote, (Ex. B, Trial Tr. at 944:11-17 (Katz)), which is precisely what transpired.  Mr. Katz won the business and immediately offset the position by trading with Mr. Aiyer.  (*See* Ex. B, Trial Tr. at 962:25-963:14, 1269:3-14 (Katz).)

The Government contends that Mr. Aiyer, at Mr. Katz's request, changed his price quote to ICAP.  But there was no evidence that *any* of the traders who approached ICAP even submitted a bid to McKinsey in competition with Mr. Katz.  Even if they did, Mr. Aiyer had no control over what prices, if any, the traders that approached ICAP quoted McKinsey.  Mr. Aiyer had no control over whether, in formulating their quotes to McKinsey, these traders relied on Mr. Aiyer's initial quote to ICAP, his revised quote to ICAP, or neither.  And there was no evidence

that these traders were in a position, under any circumstances, to quote a better price than Mr. Katz quoted.  There was simply no evidence of any impact on McKinsey.

The ruble episode on November 4, 2010 also demonstrates the Government's failure to prove impact.  To begin with, Mr. Katz testified unequivocally that both the price that Mr. Aiyer quoted to the client and the price that Mr. Katz quoted were formulated independently, not by agreement.  (*See* Ex. B, Trial Tr. at 1241:7-24 (Katz).)  Mr. Aiyer did not change his price, and there was no evidence that his price was anything but competitive.  Later in the conversation, after discussing the possibility of alternating which of the two traders would have the most attractive bid in the future, Mr. Katz stated to Mr. Aiyer: "conspiracies are nice."  (Ex. C, GX-102 at 20:06:23.)  But Mr. Katz expressly admitted on cross examination that nothing ever came of this proposed future "conspiracy."  (Ex. B, Trial Tr. at 1243:23-1244:12 ("Q.  So you are the one who said 'conspiracies are nice,' right?  A.  Correct. … What I'm referring to [in the quote] is into the switch it up now and then, to trick the customer into keep coming back to us. … Q. And that's something you didn't do.  A.  Correct.").)

The evidence concerning the ruble episode on February 28, 2012 similarly failed to show impact.  On this date, Mr. Cummins was approached by a customer for a price in the ruble and contacted Mr. Aiyer for assistance.  (*See* Ex. B, Trial Tr. at 509:8-24 (Cummins).)  Mr. Williams and Mr. Aiyer then indicated that they were approached in the same transaction.  (*See* Ex. B, Trial Tr. 510:4-16 (Cummins).)  Mr. Cummins testified unequivocally that none of the traders directed anyone else's pricing on the transaction and that all pricing was decided unilaterally, and Professor Lyons explained that Mr. Aiyer ultimately offered to assume any risk resulting from a transaction between Mr. Cummins or Mr. Williams and the customer.  (*See* Ex. B, Trial Tr. at 513:21-515:12 (Mr. Cummins agreeing that Mr. Williams' price was "[h]is decision

entirely"); Ex. B, Trial Tr. at 516:22-517:19 (Mr. Cummins agreeing that his price was decided on his own); Ex. B, Trial Tr. at 517:20-518:2 (Mr. Cummins agreeing that Mr. Aiyer's updated price was "a decision … that [Mr. Aiyer] made himself."); Ex. B, Trial Tr. at 1857:11-1858:2 (Professor Lyons explaining that Mr. Aiyer was acting as a supplier of liquidity).)

The Government seized on the fact that Mr. Aiyer "updated" his quote on this transaction sometime after Mr. Cummins shared what price he himself quoted.  (*See* Ex. B, Trial Tr. at 249:2-5 (Cummins).)  But there was no direct evidence about the reasoning for this price update, about whether any of the traders' prices were competitive or not, or about what a "competitive" price would or should have been.  Without any point of reference, as with the previously discussed episodes, the proof concerning this episode was insufficient to show impact.

### b.     *Stop-Loss Order Episode.*

An episode that featured prominently in the Government's case, January 18, 2012, involved stop-loss orders.  Stop-loss orders required traders to evaluate, based on their experience, whether the currency price would reach a certain threshold, "the stop-loss level," which would trigger the execution of any stop-loss orders that customers had placed with the traders.  (*See* Ex. B, Trial Tr. at 530:13-532:16 (Cummins).)  The Government's theory about the stop-loss episode is that the alleged coconspirators triggered the stop-loss level to their benefit and the customers' detriment through coordinated trading.  But the Government's theory of how the customer was adversely affected assumed that the stop-loss level would not have been reached, nor the stop-loss orders executed, if the traders had not coordinated their trading to push down the price of the dollar/rand.  In fact, however, the evidence showed that the stop-loss level would have been reached, and the stop-loss orders executed, no matter what the traders did.  (*See* Ex. C, DX-168-4; Ex. B, Trial Tr. at 810:10-14 (Davis).)  After the dollar/rand reached the stop-loss level, it traded below this level for an extended period of time, indicating that the price

decline was not artificial.  After briefly rallying in the thinly-traded overnight market, it fell

below the stop-loss level again, *and stayed there for the remainder of the month of January*.

(*See* Ex. B, Trial Tr. at 810:10-14 (Davis); Ex. B, Trial Tr. at 1550:17-1551:18 (Waller); Ex. C,

DX-168-10.)  Clearly, it was the market, not Mr. Cummins, Mr. Williams, and Mr. Aiyer, that

determined that the stop-loss orders would be triggered.  Then, assuming the orders would have

been executed no matter what, the evidence showed that the order execution by Mr. Cummins

and Mr. Aiyer was skillful and advantageous to the customer.  (*See* Ex. B, Trial Tr. at 570:9-

571:3 (Cummins).)  The evidence showed no adverse impact on the customer.

c.   <em>Cancelled Trades And Spoofing Episodes.</em>

Eight of the episodes presented by the Government at trial involved cancelled trades and

spoofing.  The Government represents that none of these episodes is included in its calculation of

the relevant volume of commerce affected by the violation.  (*See* Ex. A, March 9, 2020 Letter to

Officer Paul Hay, at 2.)  However, according to the Government's letter dated March 16, 2020,

certain episodes that the Government considers "coordinated interdealer trading" are what Mr.

Aiyer contends should be properly characterized as spoofing activity.  (*See* Ex. D, March 16,

2020 Letter to Judge Koeltl, at 1-2.)  There are three such episodes, as listed in the Government's

letter: August 25, 2011, September 10, 2012, and December 12, 2012.  (*See id*.)  The inclusion of

these dates in the Government's letter strongly suggests that they were improperly included in

the Government's volume of commerce calculation.

As a general matter, cancelled trades and spoofing, by their very nature, do not suppress

supply or demand; rather, cancelled trades and coordinated spoofing, by design, *increase* output

if successful.  Professor Lyons' trial testimony established that cancelled trades and spoofing

serve to induce market participants to become active in the market and therefore *add* supply.

(*See* Ex. B, Trial Tr. at 1789:22-1790:6 (Lyons).)  As the Court instructed the jury, spoofing and

12

cancelled trades "do not, in and of themselves, constitute the charged criminal conspiracy *and are not in themselves illegal*."  (Ex. B, Trial Tr. at 2142:16-19 (Jury Instruction) (Koeltl, J.) (emphasis added).)  Episodes of cancelled trades and spoofing therefore have no place in any calculation of the volume of commerce affected by the alleged conspiracy.

Furthermore, as to the three specific trading episodes that the Government apparently included in its volume of commerce calculation, the evidence presented at trial showed both that these were examples of spoofing or cancelled trades and should not have been included at all, and that there was no apparent impact resulting from them.  For example, on August 25, 2011, Mr. Cummins and Mr. Aiyer executed two trades with each other at successively lower prices in an apparent attempt to "spoof" the market, precisely the type of behavior that is *not* an antitrust violation.[4]  The Government presented no evidence that this attempt was successful, and Mr. Aiyer did not trade for an hour after the cancelled trade because he "forgot" about his dollar/lira position.  (*See* Ex. B, Trial Tr. at 1547:6-9, 1547:20-24 (Waller); Ex. C, GX-121 at 18:12:30-36.)

The evidence concerning September 10, 2012 also failed to show any impact.  On this date, Mr. Aiyer told the Rand Chat Room members not to "touch ZAR" because he was trying to unilaterally walk the price down by spoofing (Ex. C, GX-244 at 19:16:59-19:17:02), a practice that aims to increase supply or demand.  (*See* Ex. B, Trial Tr. at 1710:5-10, 1789:20-1790:10 (Lyons)).  The evidence shows that Mr. Katz did, however, "touch ZAR," and traded on Mr. Aiyer's spoof order unintentionally.  (Ex. B, Trial Tr. at 1357:13-25 (Katz).)  Mr. Aiyer reacted by jokingly calling Mr. Katz a "dick"  (*see* Ex. B, Trial Tr. at 1358:4-8 (Katz); *see also* Ex. B, Trial Tr. at 1006:2-11 (Katz))—a reaction that Professor Lyons confirmed was not unusual, as

---

[4] Although the Government also presented August 25, 2011 as a refraining from trading episode, the evidence presented at trial contradicted this theory, showing that Mr. Cummins did not refrain from trading in the dollar/lira to help Mr. Aiyer on this date.  (*See* Ex. C, DX-123-2E at 16:51:12, 16:52:28, 16:52:55; Ex. B, Trial Tr. at 648:9-650:15 (Cummins).)

any interruption to a trader's attempts at spoofing limits the market information that can be learned (*see* Ex. B, Trial Tr. at 1710:12-24, 1711:6-10, 1712:4-19 (Lyons).) The unintentional transaction that resulted from Mr. Aiyer's unilateral attempt to spoof alerted the two traders to the fact that they had opposite risk positions and enabled them to then execute a mutually advantageous match-off trade. (Ex. B, Trial Tr. at 1358:12-17 (Katz).) There is no evidence in the record of any anticompetitive impact resulting from Mr. Aiyer's unilateral spoofing activity or the subsequent match-off trade.

The third episode that the Government appears to have erroneously included in its volume of commerce calculation, December 12, 2012, is another instance of spoofing. The Government has presented this episode as a coordinated attempt by Mr. Cummins and Mr. Aiyer to move prices, seemingly because Mr. Aiyer pulled a bid for three minutes while Mr. Cummins spoofed an algorithmic trader.[5] But the Government's theory that this episode demonstrates "coordinated interdealer trading" is completely undermined by the fact that Mr. Aiyer inadvertently paid Mr. Cummins' spoof offer. (*See* Ex. B, Trial Tr. at 655:7-12) (Cummins).) Furthermore, Mr. Cummins repeatedly testified that his spoofing on this date was completely independent of Mr. Aiyer. (*See* Ex. B, Trial Tr. at 654:14-25, 656:9-19) (Cummins).) Finally, the Government showed no impact on prices from Mr. Cummins' spoofing that would suggest Mr. Aiyer's trading—the trading relevant to a volume of commerce calculation—was tainted.

d.    *"Iceberg" Order Episodes.*

Three episodes presented by the Government, September 23, 2011, December 21, 2011, and March 16, 2012, involved "iceberg" orders, also referred to as "hiding the salami." An

---

[5] This behavior does not implicate price fixing or bid rigging concerns, as there is no reason to believe that Mr. Aiyer was artificially removing demand to influence price; it is equally plausible that he was simply refraining from disrupting Mr. Cummins' spoofing.

"iceberg" order was the product of one trader combining his buying or selling interest with that of another trader.  (*See* Ex. B, Trial Tr. at 1366:1-5, 1366:16-1367:10 (Katz).)  As to the episodes involving iceberg orders, the Government's theory is that the iceberg orders deceived the market as to true supply and demand.  But the Government presented no evidence whatsoever of any effect on supply or demand, much less any anticompetitive impact on a specific volume of commerce.  Furthermore, the evidence presented at trial affirmatively established the absence of any discernible impact from the traders' iceberg orders.

On December 21, 2011, for example, Mr. Katz posted bids to buy dollar/lira on Reuters. (*See* Ex. B, Trial Tr. at 1365:17-20 (Katz).)  After learning that Mr. Aiyer had interest in the same direction, Mr. Katz offered to "hide [the] salami" for Mr. Aiyer—i.e., add extra buying interest to the amount of interest already visible on Reuters—and did so.  (*See* Ex. C, DX-167 at 1:21:17 (Mr. Aiyer announcing "get paid 10 usd try here"), 2:05:37-2:05:43; Ex. B, Trial Tr. at 1361:16-1362:8 (Katz).)

The Government did not introduce evidence of any effect on pricing or on the terms of the transaction that resulted.  To begin with, the notion that Mr. Aiyer would have entered the market and traded independently, absent Mr. Katz's proposal that he trade for both of them, is a counterfactual hypothetical based only on speculation.  (*See* Ex. C, GX-S11 (showing the absence of any trading activity by Mr. Aiyer prior to Mr. Katz's iceberg order); *see also* Ex. B, Trial Tr. at 1362:12-1363:8 (Katz).)  Furthermore, the testimony of Professor Lyons, Mr. Katz, and Mr. Cummins established that the act of combining interests has no competitive significance whatsoever on the marketplace; whether two traders show their individual interests or one trader "hides" both traders' interests, the net supply or demand on which the market can act is the same. There is similarly no difference in what is visible to a market participant when interest is

15

"hidden" behind one order versus many different orders.  (*See* Ex. B, Trial Tr. at 577:17-578:17,

653:10-654:6 (Cummins); Ex. B, Trial Tr. at 1369:25-1371:7 (Katz); Ex. B, Trial Tr. at 1676:14-

1679:17 (Lyons).)

The evidence with respect to the other two "iceberg" order episodes is the same.  (*See,*

*e.g.*, Ex. B, Trial Tr. at 577:24-578:17 (Cummins); Ex. B, Trial Tr. at 653:10-654:6 (Cummins);

Ex. B, Trial Tr. at 1676:14-1679:17 (Lyons).)  No volume of commerce adjustment is

appropriate for any of these episodes.

> e.    *Fix Episodes.*

Two episodes presented by the Government, January 27, 2012 and May 8, 2012, involved

trading around the time of the fix, a regularly scheduled window of time during which an

independent third party analyzes actual trades, bids, and offers to determine an exchange rate

between currency pairs that it then publishes.  (*See* Ex. B, Trial Tr. at 116:6-15 (DeRosa).)

These published exchange rates serve multiple purposes, one of which is that customers may

place orders with traders to be executed at the fix rate.  The Government's theory apparently is

that the alleged coconspirators placed certain bids or offers in order to move the fix rate higher or

lower, depending on their interests.  The Government, however, presented no evidence of any

effect on the fix rate or any other impact on a specific volume of commerce.

As to the May 8, 2012 fix episode, for example, Mr. Cummins purportedly placed offers

on the Reuters platform to keep the price of the dollar/rand lower, purportedly to assist Mr.

Aiyer.  The evidence adduced at trial, however, showed that Mr. Cummins placed these orders

unilaterally (*see* Ex. B, Trial Tr. at 584:24-585:9 (Cummins)), and that they had no impact on the

market at all.  Mr. Cummins testified expressly that no one in the market saw the offers, because

they were not the best offers in the market at the time.  (Ex. B, Trial Tr. at 586:12-23

(Cummins); *see also* Ex. C, GX-S33.)  Mr. Cummins also stated unambiguously that his actions "did not affect the calculated [fix] rate."  (Ex. B, Trial Tr. at 587:2-6 (Cummins).)

\*     \*     \*     \*     \*

In addition to the evidentiary shortcomings in the Government's case, as detailed above, Mr. Aiyer was prepared to present evidence in his case-in-chief through Professor Lyons that would have affirmatively shown the absence of any anticompetitive impact of any of the trades at issue.  This evidence of the lack of anticompetitive effects, however, was excluded from trial. (*See generally* Ex. B, Trial Tr. at 1599:3-1609:14 (Koeltl, J.); *see also* Ex. B, Trial Tr. at 1601:12-13 ("Evidence of pro-competitive effects, or the lack of harm, is not relevant and should be excluded under Rule 403 …") (Koeltl, J.); Ex. B, Trial Tr. at 1602:10-13 ("To the extent that the exhibits are presented to show why the alleged activities of the coconspirators did not have an effect on price, the summary exhibits are not relevant and are inadmissible under Federal Rule of Evidence 403. …") (Koeltl, J.); Ex. B, Trial Tr. at 1690:4-1703:11 (Koeltl, J.).)  Whether or not the exclusion was proper for purposes of trial, this evidence would have shown that the challenged trading activity had no anticompetitive effect on output and pricing.  It contradicts the Government's theory that the alleged conspiracy "affected" any ascertainable volume of commerce.

In sum, the Government has failed to identify any evidence of impact on pricing and thus any ascertainable volume of commerce affected by illegal conduct, as required by Second Circuit law.

2.      The Government Overstates The Volume Of Commerce By Including Trades Not Even Discussed At Trial.

Apart from the fact that the Government has failed to show that the conspiracy affected specific trades, the Government has also overstated the relevant volume of commerce by

including *other* trades that occurred close in time, without showing that or how they were affected.  In *SKW*, as discussed previously, the Second Circuit held that the sum of all sales within a relevant time period is insufficient to prove volume of commerce; instead, only the sales "'affected by' the conspiracy" should be included in the calculation.  *SKW Metals & Alloys*, 195 F.3d at 90-91.  In that case, this meant that only the sales of ferrosilicon consummated at supra-competitive prices were the proper subject of the volume of commerce calculation.  *See id*.

Here, as discussed, the Government has provided only limited information as to how it conducted its volume of commerce calculation.  (*See supra* at 5.)  However, its correspondence gives the impression that, for the episodes that the Government deems worthy of inclusion, *all* trades—on Reuters, off Reuters, internal, and otherwise—within the time period alleged to constitute the parameters of the episode were included.  (*See* Ex. A, March 9, 2020 Letter to Officer Paul Hay, at 2.)

The Government's approach is flawed for at least two reasons.  First, for all the episodes involving interdealer trading on Reuters, the Government has not proven any connection between the challenged trading activity, which occurred on Reuters, and other trades that occurred off Reuters but were apparently included in its volume of commerce calculation.  On January 18, 2012, for example, the challenged conduct centers around the stop-loss level—a threshold that is reached if this price trades on Reuters.  But the chart that Mr. Waller prepared to illustrate the January 18, 2012 episode includes Mr. Cummins' and Mr. Aiyer's off-Reuters trading activity (*see, e.g.,* Ex. C, GX-S12 at 19:53:15, 19:56:00), and the Government apparently included these off-Reuters trades by Mr. Aiyer in its calculation.  The Government did not show, however, how these off-Reuters transactions related to, or were affected by, the conspiracy.

Second, the time periods marking the "start" and "end" of the episodes—in between which the Government apparently counted all trades towards the volume of commerce—are arbitrary. *SKW* instructs that, rather than beginning the volume of commerce analysis with a time period and assuming that all trades within it were affected—as the Government appears to have done—the Government must begin its analysis with the trades themselves and the terms on which they were consummated, which *then* determines the relevant time period—not the other way around. *SKW Metals & Alloys*, 195 F.3d at 90-91. Only then can the Government ascertain a specific volume of commerce consisting of transactions that were "affected" by the conspiracy, as distinct from those that were not. *See id.*

      3.    <u>The Distinct Possibility That The Jury Convicted On An Episode With</u><br><u>The Least Significant Volume Further Supports The Argument That Any</u><br><u>Upward Adjustment Based On Volume Of Commerce Is Not Warranted.</u>

The Second Circuit has recognized that when a court cannot determine on which of multiple episodes a jury convicted, the threat of prejudice to the defendant permits a court to assume the defendant was convicted on the episode that carries the lowest recommended sentence. *See United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001) (Sotomayor, J.). In *Sturdivant*, the defendant was convicted on one count of possessing and distributing narcotics. *Id.* at 73. The indictment had charged the defendant with participating in two separate and distinct drug transactions under a single count. *Id.* On appeal, the defendant argued that he was prejudiced by the duplicitous nature of the indictment, which created uncertainty as to whether the jury's general verdict represented a unanimous finding of guilt on one transaction, the other transaction, or both. *Id.* The Second Circuit court agreed and concluded that "any prejudice to defendant resulting from the duplicity of the count of conviction can be avoided simply by resentencing defendant under the assumption that he was convicted only on the transaction

involving the lesser drug amount and was acquitted on the other transaction." *Id*. Accordingly, the court vacated the sentence and remanded the case to the sentencing court. *See id*. at 78-80.

The same risk of prejudice presented in *Sturdivant* exists here. The general verdict in this case renders it impossible to discern on which transaction or transactions of the 23 at issue the jury in fact convicted. Under *Sturdivant*, the Government is not permitted to capitalize on this uncertainty by simply adding up the nominal trading volumes associated with any transactions it wishes among the many concerning which evidence was presented. Rather, to safeguard against the risk of prejudice to Mr. Aiyer, the case law provides that this Court may make the assumption that the jury convicted on the transaction involving the trading volume of least value.

For this additional reason, no enhancement to the offense level based on the volume of commerce affected is warranted.

4.      Even If Calculated Correctly, The Government's Volume Of Commerce Number Greatly Overstates The Economic Significance Of The Trading Involved, And A Downward Departure From Mr. Aiyer's Calculated Guidelines Range Is Appropriate.

The concept of "volume of commerce" is intended to serve as a means of approximating damages without expending the time and resources needed to determine a defendant's actual profits or a victim's actual losses. *See* U.S.S.G. § 2R1.1, Background ("The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute [for such calculations]."). For most industries, the volume of commerce affected may be a reasonable proxy for the profits earned in a price fixing conspiracy; for the foreign exchange market, however, the gross dollar volume of currency traded significantly overstates the economic significance of the trading activity.

During the alleged conspiracy period, Mr. Aiyer generated, on average, an annual net income of approximately $20 million for JP Morgan on a total currency trading volume that exceeded $1 trillion per year.  (*See* Ex. C, DX-102 (not admitted); Ex. C, DX-186.)  JP Morgan's net income was thus about *1/500th* of 1% of Mr. Aiyer's gross trading volume.  Similarly, a typical spread for Mr. Aiyer on a ruble transaction was approximately 3 kopecks, or 3/100ths of a ruble, per dollar.  (*See, e.g.,* Ex. C, GX-101 at 17:57:18; *see also* Ex. C, GX-248 at 18:13:15.)  Since a ruble is worth about 3 cents, this amounts to a margin of approximately 1/10th of 1% of total volume, without taking expenses into account.  By contrast, percentages showing returns, after expenses, on the net sales of prominent Fortune 500 companies are many times more.  In 2019, for example, Walmart earned 1.3% on its net sales (*see* Ex. E, Walmart Inc. Form 10-K), Apple earned 2.12% on its net sales (*see* Ex. F, Apple Inc. Form 10-K), and Amazon earned 4.13% on its net sales (*see* Ex. G, Amazon.com, Inc. Form 10-K).  In short, using the gross dollar volume of currency traded to calculate the "volume of commerce" appears to vastly overstate the economic significance of the trading activity, perhaps by a factor of as much as 1,000.

The breakdown of profits on two of the challenged transactions in this case also demonstrates that gross trading volumes greatly overstate the relevant volume of commerce in currency trading.  On February 28, 2012, the prices at issue were Mr. Aiyer's quote of 29.10 rubles per dollar and Mr. Aiyer's subsequent quote of 29.08 rubles per dollar.  (*See* Ex. C, GX-193 at 20:21:47, 20:22:18.)  The quotes were to exchange rubles for $5 million.  (*See* Ex. C, GX-193 at 20:21:10.)  Assuming that the two-kopeck price adjustment was the result of an illegal agreement—which Mr. Aiyer disputes—the difference between these two prices is still only 2 kopecks, or 2/100ths of a ruble, per dollar.  This difference translates to about 20,000 rubles, or $665, per $ 1 million dollars traded, or about $3,300 in additional gross revenue to JP Morgan on

this entire $5 million transaction.  The $3,300 in additional gross revenue to JP Morgan is a far more accurate measure of the "size" of the transaction than the $5 million nominal volume.[6]

Similarly, on October 14, 2010, Mr. Aiyer initially quoted a price of 30.195 rubles to the dollar to a broker, then later changed his quote to the broker to 30.220 rubles to the dollar.  (*See* Ex. C, GX-101 at 18:07:35; Ex. C, GX-0015-T at 2:19.)  The size of the transaction at issue was $5.5 million.  (*See* Ex. C, GX-101 at 18:00:18-18:00:42.)  Assuming that this adjustment was the product of an illegal agreement—which Mr. Aiyer disputes—the difference between these two quotes is 2.5 kopecks per dollar.  This difference translates to 25,000 rubles, or $833, per $1 million traded.  Multiplying $833 by 5.5 to reflect the size of the transaction yields a total benefit to JP Morgan of $4,582, or one-tenth of 1% of the total volume.  Again, the $4,582 in additional gross revenue is a better marker of the "size" of the transaction than the gross nominal volume of $5.5 million.[7]

From both a general and a transaction-specific perspective, it is evident that the actual "profits" at issue in this case are almost inconsequential, even if they were the product of illegal activity, and the proposed volume of commerce adjustment is misleading and inappropriate.  For this reason, even if the Government's calculation of the relevant volume of commerce were technically accurate, Mr. Aiyer would be entitled to a downward departure from the sentencing range calculated.

A downward departure from the range established by the Guidelines is appropriate where "there exists an aggravating or mitigating circumstance" not adequately taken into consideration

---

[6] Mr. Aiyer consistently generated more than $20 million in net income for JP Morgan per year.  His annual compensation was somewhat in excess of $1 million, or about 5% of the net income he generated for JP Morgan. Using this ratio to approximate the additional compensation Mr. Aiyer might reasonably have expected to gain by changing his price to the customer, the "benefit" to Mr. Aiyer of the February 28, 2012 transaction was about $165.

[7] Conducting the same calculation as in footnote 6, the expected benefit to Mr. Aiyer was approximately $229.

by the Sentencing Commission in formulating the Guidelines.  U.S.S.G. § 5K2.0 (a)(1)(A).

Courts in the Second Circuit have acknowledged that the Guidelines do not adequately account

for the financial "magnitude"—or lack thereof—of certain types of criminal activity.  *United

States v. Caruso*, 814 F. Supp. 382, 383 (S.D.N.Y. 1993).  In *United States v. Caruso*, the

defendant pleaded guilty to the illegal use of interstate wires for wagering and gambling in

violation of 18 U.S.C. § 1084.  *Id*. at 382.  The Guidelines range for the crime was twelve to

eighteen months' imprisonment.  *Id*.  The Southern District of New York court concluded that no

part of the Sentencing Guidelines—neither § 2E3, "Offense Conduct," nor § 3B1.2, "Role in the

Offense"— accounted for the fact that, while the defendant was the "chief participant" of the

conduct, the "activity was itself of a small magnitude, indicated … by [the] income of only

$25,000, which is minute compared to amounts involved in any significant illegal gambling

operation."  *Id*. at 383.  The court held that the insignificant financial magnitude was

"information not foreseen in the Guidelines" and that "[d]eparture on such grounds is an

essential part of the sentencing scheme intended and enacted by Congress."  *Id*.  The defendant

was instead sentenced to probation for three years, including six months of home confinement.

*Id*. at 382.

Similar circumstances presenting an unusually small financial magnitude exist here.  It is

apparent, in view of the actual "profits" earned, that the gross dollar volume of currency trades

vastly overstates the economic significance of the trading activity compared to gross sales

numbers in other lines of business.  The Guidelines do not take this potential overstatement into

consideration, and a downward departure is appropriate even if the Government calculated the

relevant volume of commerce correctly.

**B.** **Mr. Aiyer Objects To The One-Level Enhancement For Bid Rigging.**

The PSR states that a one-level increase in Mr. Aiyer's offense level is warranted because "the bid-rigging scheme involved the agreement to submit non-competitive bids." (PSR at ¶ 45.)[8]  As an initial matter, Mr. Aiyer is not aware of the specific episodes that the Government contends involved bid rigging, and there is no further discussion of, or support for, this one-level enhancement in the PSR.  Given the evidence presented at trial and case law relevant to this issue, no adjustment to the offense level for bid rigging is warranted.

Bid rigging is a distinct antitrust offense that has been consistently interpreted to mean a scheme involving bid rotation.  Although the Guidelines fail to define "bid rigging," the comments to the Section on Antitrust Offenses support the proposition that it applies to bid rotation.  In its discussion regarding the possibility that the volume of commerce is understated for bid rigging schemes, the Guidelines include bid rotation as the representative example:  "If, for example, the defendant participated in an agreement not to submit a bid, or to submit an unreasonably high bid, on one occasion, *in exchange for his being allowed to win a subsequent bid* that he did not in fact win, his volume of commerce would be zero, although he would have contributed to harm that possibly was quite substantial."  U.S.S.G § 2R1.1, cmt. n.6 (emphasis added).

That bid rigging means bid rotation is consistent with the case law on this issue:  "[T]he vast majority of cases in which the term ["bid rigging"] has appeared have treated it as a synonym for bid rotation."  *United States v. Heffernan*, 43 F.3d 1144, 1146 (7th Cir. 1994) (collecting cases).  In a bid rotation scheme, "for each job the competitors agree which of them

---

[8] The PSR notes, however, that the Court is in a better position than the Probation Department to determine if this enhancement is appropriate.  (*See* PSR at 22.)

shall be the low bidder, and the others submit higher bids to make sure the designated bidder wins." *Id.*

In addition, a bid rigging scheme assumes a classic procurement auction setting in which the coconspirators control the outcome of the transaction. Fundamental characteristics of such a scheme include "a sealed-bid system of procurement," typically used by "government agencies" and "in the purchase of inputs of a simple, standardized character." *Id.* at 1149. In *New York v. Hendrickson Brothers, Inc.*, for example, the Second Circuit observed that bid rigging occurs in an auction setting in which bids are solicited from multiple bidders and the conspiracy controls the winner of the auction. 840 F.2d 1065, 1074 (2d Cir. 1988). The fact that the challenged conduct involves the placement of so-called "bids" is not dispositive. *Heffernan,* 43 F.3d at 1149 ("To punish [the defendant] more heavily than an ordinary price fixer merely because his customers asked for 'bids' rather than 'offers' would be irrational.").

None of the episodes presented by the Government at trial occurred in the context of a procurement auction, nor was there any form of bid rotation among the Rand Chat Room members. At most, the evidence at trial showed that the alleged coconspirators exchanged pricing information and that Mr. Aiyer may have used this information to his advantage on one or two occasions, without any agreement or expectation that Mr. Katz or Mr. Cummins would be "allowed" to win subsequent bids. Application of the term "bid rigging" to the conduct charged—and the one-level enhancement—is therefore inappropriate.

1. <u>Conduct Involving The Ruble And Zloty Is Not Bid Rigging.</u>

The Government is incorrect to the extent it contends that any of the episodes involving trading in the ruble and zloty amount to bid rigging. The Government failed to present any evidence at trial of the Rand Chat Room members *agreeing* to provide Mr. Aiyer with ruble or zloty prices they had quoted or would quote to a customer, or that they were doing so to enable

Mr. Aiyer to win, or that they had the expectation that they would win a later transaction.  The evidence demonstrated, at most, the disclosure of bid and offer information among the Rand Chat Room participants, including instances in which Mr. Cummins and Mr. Katz independently decided to quote prices that would not win the business.

The zloty episode on February 23, 2012 is illustrative.  In this episode, a customer approached Mr. Cummins for a price in the zloty against the koruna.  (*See* Ex. B, Trial Tr. at 661:2-12 (Cummins).)  Mr. Williams and Mr. Aiyer responded that they were approached for a price in the same transaction.  (*See* Ex. B, Trial Tr. at 661:13-15 (Cummins); Ex. C, GX-189 at 21:42:43-21:42:54.)  Mr. Aiyer and Mr. Cummins disclosed what prices they had decided to quote, and Mr. Cummins expressed his desire not to win the business.  (*See* Ex. B, Trial Tr. at 664:11-665:13 (Cummins); Ex. C, GX-189 at 21:42:43-21:46:04.)

Mr. Cummins admitted several times that he and Mr. Aiyer independently priced the transaction at issue and did not coordinate.  (*See* Ex. B, Trial Tr. at 664:11-665:11, 666:9-11 (Cummins.)  In addition to the substantial evidence supporting a finding of no coordination, there was no evidence that *any* of the Rand Chat Room members won this transaction—a typical result, and the entire purpose, of a bid rigging scheme.

Even if the disclosure of bids by the Rand Chat Room members to one another—such as in the February 23, 2012 episode—could be interpreted as an improper interference with the bidding process, it does not therefore constitute criminal antitrust bid rigging.  *See Phillips Getschow Co. v. Green Bay Brown Cty. Prof'l Football Stadium Dist.*, 270 F. Supp. 2d 1043, 1050 (E.D. Wis. 2003) (holding that "improperly, even illegally, disclos[ing] a sealed bid" during the bidding process "does not amount to a violation of §1" of the Sherman Act); *see also Granite Partners, L.P. v. Bear, Stearns & Co.*, 58 F. Supp. 2d 228, 237 (S.D.N.Y. 1999)

(allegations that the defendants "engag[ed] in a conspiracy to exchange 'lowball,' accommodation bids," thereby "forestall[ing] a competitive auction," did not amount to per se bid rigging).

2.  <u>Conduct Involving Interdealer Transactions On Reuters Is Not Bid Rigging.</u>

Any argument that coordinated conduct involving the placement of bids and offers on the Reuters platform constitutes bid rigging is mistaken. Most of the Reuters trading challenged by the Government involved episodes of cancelled trades or allegedly coordinated spoofing, conduct which the Court instructed the jury did *not* constitute bid rigging. (*See supra* at 5, 12-14.)

Moreover, the Reuters platform has none of the hallmarks of a classic auction. The Reuters platform consists of a continuous flow of bids and offers that differs in kind from the discrete and stand-alone job, contract, product, or service as to which bids are solicited in a procurement auction. In addition, the alleged conspirators could not control and determine the "winning bidder," as they constituted only three or four traders among potentially dozens of traders that may have had similar buying or selling interests.

Mr. Aiyer was prepared to present evidence in his case-in-chief, through Professor Carlton, that would have demonstrated that coordinated trading on Reuters is materially different from the bid rigging that can occur in procurement actions. However, testimony from Professor Carlton on this topic was excluded from trial. (*See* Ex. B, Trial Tr. at 1605:8-1606:5 (Koeltl, J.).) Whether or not this exclusion was proper for purposes of trial, it would have affirmatively shown that coordinated trading on the Reuters platform shares none of the features of bid rigging in a procurement auction.

For purposes of sentencing, this dictates that the one-level enhancement is not appropriate.

**C.    Mr. Aiyer Should Receive A Two-Level Downward Adjustment For His Role As A Minor Participant.**

The extent of Mr. Aiyer's role in the conduct underlying his conviction, as compared to that of Mr. Katz and Mr. Cummins, is minor.  As explained below, Mr. Aiyer is less culpable than his primary coconspirators with respect to the duration, amount, and quality of his participation in the charged conduct and, therefore, Mr. Aiyer warrants a two-level mitigating role reduction.

Section 3B1.2(b) of the Guidelines provides that a sentencing judge is authorized to reduce an adjusted offense level by two levels if "the defendant was a minor participant in any criminal activity."  A minor participant is one who "is less culpable than most other participants in the criminal activity, but whose role could not be described as minimal."  U.S.S.G. § 3B1.2 cmt. n.5.  For the purposes of Section 3B1.2(b), the other participants in the criminal activity— compared to which the minor participant is "less culpable"—are those who are "criminally responsible for the commission of the offense, but need not have been convicted."  *Id*. at §§ 3B1.1, cmt. n.1; 3B1.2, cmt. n.1.  In considering whether to apply the reduction, a sentencing court "must compare the culpability of the defendant to her codefendants in the criminal enterprise for which she has been convicted, not other defendants convicted of the same offense generally."  *United States v. Carbajal*, 717 F. App'x 234, 240 (4th Cir. 2018).  Furthermore, "[t]he fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative.  Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity."  U.S.S.G. § 3B1.2 cmt. n.3(C).

The district court's inquiry into the minor role reduction is "based on the totality of the circumstances" and "heavily dependent upon the facts of the particular case." *Id.*; *see also United States v. Ruiz*, 246 F. Supp. 2d 263, 268 (S.D.N.Y. 2002) ("[T]he Court of Appeals has … repeatedly emphasized that the 'assessment of the defendant's role in criminal activity is highly fact-specific.'") (internal citation omitted); *United States v. Perez*, 321 F. Supp. 2d 574, 584 (S.D.N.Y. 2003).  The district court may consider a non-exhaustive list of factors when applying Section 3B1.2, including, *inter alia*, "the degree to which the defendant participated in planning or organizing the criminal activity," "the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority," and "the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts."  U.S.S.G. § 3B1.2 cmt. n.3(C); *see also United States v. Quintero-Leyva*, 823 F.3d 519, 523 (9th Cir. 2016) (in considering the list of factors, the sentencing court "may grant a minor role reduction even if some of the factors weigh against doing so" and "may also consider other reasons for granting or denying a minor role reduction").

A defendant who participates in a scheme of criminal activity nonetheless merits a minor participant reduction if his role is less culpable than that of his coconspirators.  In *United States v. Petrelli*, for example—a case involving a mail fraud conspiracy—the defendant was granted a two-level minor role reduction notwithstanding the many acts that he undertook to carry out the crime.  8 F. Supp. 2d 449, 452 (S.D.N.Y. 2004).  The court found that, even though the defendant "took various steps in carrying out the scheme, including opening bank accounts, establishing post-office boxes, and printing fraudulent invoices and business envelopes, among other acts," the defendant's conduct "was less culpable than the conduct of [his co-conspirator],

who admittedly devised and orchestrated the scheme and recruited [the defendant's] participation." *Id*.; s*ee also United States v. Arthur*, No. 04-cr-122, 2006 WL 3857491, at *5 (E.D. Wis. Dec. 22, 2006) (finding that the defendant, who was convicted of various counts in a bankruptcy fraud scheme, qualified for a two-level "minor participant" reduction where "[i]t was clear from the evidence at trial that this was [the defendant's husband's] scheme," even though the court concluded that the defendant "engaged in conduct to facilitate the scheme" and "largely understood the scheme.").

      1.     <u>Mr. Katz's And Mr. Cummins' Conspiracy With Each Other And Additional Traders Began As Early As Nine Years Before They Met Mr. Aiyer.</u>

First, Mr. Aiyer should receive the minor participant downward adjustment because his participation in the criminal activity was substantially less extensive than that of Mr. Katz and Mr. Cummins, who engaged in the same conduct with each other and numerous other traders—and completely without any involvement from Mr. Aiyer—beginning as early as 2001. Mr. Aiyer allegedly joined a pattern of behavior initiated by Mr. Katz and Mr. Cummins that was in full force many years before they met Mr. Aiyer.

Mr. Katz and Mr. Cummins pleaded guilty to "knowingly entering into and engaging in a combination and conspiracy to suppress and eliminate competition by fixing prices for … 'CEEMEA' currencies … *from at least as early as January 2007* and continuing until at least July 2013, in violation of Section One of the Sherman Antitrust Act, 15 U.S.C. § 1." (Ex. C, GX-663, *United States of America v. Jason Katz*, Plea Agreement, ¶ 1 (emphasis added); Ex. C, GX-664, *United States of America v. Christopher Cummins*, Plea Agreement, ¶ 1) (emphasis added). Mr. Cummins did not know Mr. Aiyer until approximately 2011 and agreed that Mr. Aiyer had "nothing to do with" the first four years of the conspiracy to which Mr. Cummins pleaded guilty. (*See* Ex. B, Trial Tr. at 362:15-363:7 (Cummins).) Mr. Cummins testified that,

starting in 2007, he and Mr. Katz conspired with each other and at least five additional traders working at competitor banks, including members of the "Old Gits" chat room—a group of coconspirators of which Mr. Aiyer was not a part (*see* Ex. B, Trial Tr. at 376:22-377:3, 433:2-14 (Cummins))—namely Gavin Cook, Jim Mullaney, Chris Hatton, Matthew Sweeney, Patrick McInerney, Mark Sheppard, Bernard Barasic, and Chris Chan, as well as individuals outside of the Old Gits chat, such as Louis Friedman and potentially others.  (*See* Ex. B, Trial Tr. at 363:8-365:5, 366:14-368:7 (Cummins).)

Mr. Katz testified that he began conspiring to violate antitrust laws with Mr. Cummins as well as with at least two members of the Old Gits chat room as early as 2001—six years earlier than the year Mr. Cummins said he and Mr. Katz began to conspire—and possibly with others. (*See* Ex. B, Trial Tr. at 866:11-16, 1083:12-1087:7; 1089:19-24, 1090:22-1091:13, 1092:15-1093:8, 1094:15-1095:7, 1114:16-1115:4, 1115:12-1116:10, 1222:19-1223:18 (Katz).)  Mr. Cummins and Mr. Katz continued to conspire with some or all of these individuals and each other until at least 2013.  (*See* Ex. B, Trial Tr. at 365:16-366:13, 433:12-22 (Cummins).)

2.      Mr. Aiyer Was Generally A Passive Participant In The Charged Conduct.

Mr. Aiyer further merits the mitigating role reduction because, even once he began trading with Mr. Katz and Mr. Cummins in 2010 and 2011, his role in the challenged conduct underlying his conviction was generally passive; in the majority of trading episodes offered at trial, Mr. Aiyer did not initiate the conduct or request it from his coconspirators.

Mr. Cummins testified that, in several of the episodes presented by the Government, he volunteered to purportedly "help" Mr. Aiyer, such as by spoofing, without being asked, prompted, or encouraged to do so.  (*See* Ex. B, Trial Tr. at 315:8-13, 322:9-14, 584:24-585:9, 591:18-592:1, 601:6-22, 602:24-603:3, 680:15-20 (Cummins).)  For example, in the January 15, 2013 episode, Mr. Aiyer announced his risk position to Mr. Cummins and Mr. Katz in a

Bloomberg chat—a statement that, as established at trial, often signaled an invitation to match off (*see, e.g.*, Ex. B, Trial Tr. at 651:2-14 (Cummins))—and told Mr. Cummins that he had been walking down the price of the euro/forint by unilaterally spoofing.  (Ex. B, Trial Tr. at 599:20-600:18 (Cummins).)  In response, Mr. Cummins offered that he would "try[] sticking in a few offers," to which Mr. Aiyer replied that he thought the "low hanging fruit [was] gone" and that "it[']s just one where we sit and wait."  (Ex. C, GX-283 at 18:36:40-18:37:48; *see also* Ex. B, Trial Tr. at 601:6-18 (Cummins).)  Mr. Cummins confirmed in his trial testimony that he "volunteered" to spoof for Mr. Aiyer, and that Mr. Aiyer did not ask him to do so and in fact discouraged Mr. Cummins from attempting to spoof on his behalf, telling Mr. Cummins to "do nothing."  (Ex. B, Trial Tr. at 601:6-603:3 (Cummins).)

Mr. Cummins and Mr. Katz did not just make these unsolicited offers to purportedly "help" Mr. Aiyer during spoofing episodes.  In the episodes featured by the Government involving "iceberg" orders on December 21, 2011 and March 16, 2012, both Mr. Katz and Mr. Cummins, respectively, voluntarily offered to "hide" interest for Mr. Aiyer after Mr. Aiyer announced his position in an attempt to match off.  (*See* Ex. B, Trial Tr. at 652:23-653:4 (Cummins); Ex. B, Trial Tr. at 1367:1-14 (Katz).)  Mr. Aiyer did not ask for this trading activity on his behalf.

Finally, Mr. Aiyer did not initiate the pricing discussion in *any* of the ruble or zloty episodes.  In every instance, it was Mr. Katz or Mr. Cummins who approached him, seeking advice on how to price a transaction.  And although Mr. Aiyer, on occasion, told Mr. Katz or Mr.

Cummins what price he had quoted—and presumably therefore the price at which he would buy from or sell to them—he never, with one exception, told them what price they should quote.[9]

Because Mr. Aiyer's involvement in the activity underlying his conviction is less culpable than that of his primary coconspirators, he should receive a two-level reduction for his status as a minor participant.

*   *   *   *   *

For the foregoing reasons, Mr. Aiyer respectfully disagrees with the PSR's calculation of the applicable Offense Level.  Mr. Aiyer submits that, when calculated correctly, the applicable Offense Level should be 10, and the Guidelines sentencing range between 6 to 12 months.

## II.    The Section 3353(a) Factors Weigh In Favor Of A Sentence Of Probation With A Special Condition Of A Period Of Home Confinement.

As discussed above, a calculation of the Guidelines range is the starting point for any sentencing court.  *Gall*, 552 U.S. at 49.  The Guidelines range calculation, however, "[is] not the only consideration" and is not binding on the sentencing court.  *Id.*  That calculation, in fact, falls "second" to "the bedrock" of federal sentencing, 18 U.S.C. § 3553(a), which "requires a court to take account of a defendant's character in imposing a sentence."  *Gupta*, 904 F. Supp. 2d at 354.

Pursuant to Section 3553(a), the Court must additionally consider: (1) the history and characteristics of the defendant, (2) the nature and circumstances of the offense, (3) the need to protect the public, (4) deterrence, and (5) unwanted sentencing disparities.  18 U.S.C. § 3553(a).  The overarching aim of Section 3553(a) is for the defendant to receive a sentence that is "sufficient, but not greater than necessary, to comply with the purposes" of sentencing.  *Id.*

---

[9] The exception is November 21, 2011, when Mr. Aiyer told Mr. Katz to quote a *better* price to the customer than he initially proposed.  Since Mr. Aiyer intended to take Mr. Katz's position if he was the successful bidder, this advice reflects Mr. Aiyer trying to improve his chances of winning the transaction through aggressive pricing; he was indifferent whether he won directly or through Mr. Katz.

Here, all of the Section 3353(a) factors weigh heavily in favor of sentencing Mr. Aiyer to probation with a special condition of a period of home confinement.

### A.   The Conduct For Which Mr. Aiyer Was Convicted Is Not Representative Of Mr. Aiyer's History And Character.

More than fifty individuals have written letters to the Court on Mr. Aiyer's behalf, attesting to his good character, his commitment to his friends and family, and his selflessness. Individuals who have known him his whole life and those who met him later in life describe Mr. Aiyer as a person who puts others' needs before his own, who has talent and intelligence, and who loves the United States—the place he has called home for almost 18 years.

Mr. Aiyer has never before been charged with or convicted of a crime, and during the pendency of this matter, there have been no issues with respect to his bail.  As the letters make clear, the conduct for which Mr. Aiyer was convicted is not representative of Mr. Aiyer's character, and the letters plead with the Court to exercise leniency for a man who has already suffered tremendously.

### 1.   Mr. Aiyer's Upbringing.

Mr. Aiyer was born and raised in Pune, India—a city two hours outside of Mumbai—where he lived until he was eighteen years old.  (PSR at ¶ 62.)  He is the elder of two children; his sister, Ashima, is three years younger.  (*Id.* at ¶ 62-63.)  Mr. Aiyer grew up in a home with both his parents and his maternal grandparents.  (*Id.* at ¶ 64.)

Mr. Aiyer was an extremely bright and positive child, who always focused on, and excelled in, school.  As Mr. Aiyer's mother explains, "primary school in India is extremely competitive as there are hundreds of 5-year olds vying for only 60 odd available seats."  (Ex. H, Letter from A. Ganapathi at H-1.)  At the age of five, Mr. Aiyer took "an exam which would determine his future accessibility to good schooling and a good career" and was awarded one of

those coveted seats.  (*Id.*)  For the next ten years, Mr. Aiyer attended "an all boy's school in India that didn't have any electricity, running side by side up and down a dirt hill for his Physical Education classes alongside students who could afford just one uniform."  (Ex. H, Letter from Alexandra Kislevitz at H-6.)

Mr. Aiyer's school years were marked by hard work, positivity, and curiosity.  In middle school, Mr. Aiyer was selected as a "National Talent Scholar."  (Ex. H, Letter from A. Ganapathi at H-1.)  To qualify for this prestigious award, Mr. Aiyer was selected out of the "thousands of children across the country [who] appear[ed] for this exam."  (*Id.*)  But Mr. Aiyer's successes were not limited to his academics—he "participated in every sport and cultural event and was a darling of all the teachers not just because he was a very bright and intelligent child but also because he was such a happy person, always ready to help in any way he could with extra-curricular activities, to represent the school at any competition, and win accolades."  (*Id.*)  One of Mr. Aiyer's closest friends and former classmates describes Mr. Aiyer during his childhood as someone that "focused on his studies[, but] always took time to help out his peers."  (Ex. H, Letter from S. Singh at H-13.)

> 2.   Mr. Aiyer's Time At Vassar College.

As a young man, Mr. Aiyer's "dream was to study in the United States."  (Ex. H, Letter from A. Ganapathi at H-2.)  Although Mr. Aiyer excelled on entrance exams for colleges in India—with "an overall result of 80% and 98% in Maths & Science"—in 2002, he decided to immigrate to the United States to attend Vassar College ("Vassar"), located in Poughkeepsie, New York, where he had earned admission and a scholarship.  (*See id.*; PSR at ¶¶ 65, 68.)  As Mr. Aiyer's mother explains, she "had no reason to worry about Akshay going so far away … [because] he always showed such a strong sense of responsibility and of right and wrong."  (Ex. H, Letter from A. Ganapathi at H-2.)

Mr. Aiyer is deeply grateful to have had the opportunity to study in the United States. (*See* Ex. H, Letter from R. Lulla at H-14.)  As a "scholarship and financial-aid recipient," Mr. Aiyer "understood the importance of being fiscally responsible, performing well in school, and giving back to the community."  (Ex. H, Letter from G. Thacker at H-16.)  And that is exactly what Mr. Aiyer achieved.

Mr. Aiyer was an exceptional student.  He was "one of the top economic students at Vassar."  (Ex. H, Letter from G. Kantrowitz at H-19.)  Because of his abilities in the study of economics, Mr. Aiyer "was picked by the Economics faculty to be a TA [teaching assistant]" during his sophomore year—a "post normally reserved for seniors."  (Ex. H, Letter from G. Thacker at H-16.)

Beyond his academic successes, Mr. Aiyer built a strong and far-reaching social network; his peers were drawn to him because of his kindness, generosity, and thoughtfulness.  (*Id.*)  He always remained ready to share his knowledge and academic aptitude with others.  One of Mr. Aiyer's Vassar classmates "recall[s] several instances of Akshay's holding extra office hours—gratis—for underclassmen struggling with intermediate economics courses," notwithstanding the fact that these sessions were extremely time-consuming.  (Ex. H, Letter from G. Thacker at H-16-17)  This same classmate also credits Mr. Aiyer with helping him to navigate "an academic system that was foreign to [him]" and to "integrate effectively into the broader Vassar community."  (Ex. H, Letter from G. Thacker at H-16.)

Mr. Aiyer was as kind and caring towards others as he was generous with his knowledge. His first-year neighbor recalls how he suffered from an injured foot when he arrived to Vassar, and Mr. Aiyer "insisted on carrying [his] luggage up the stairs …, helping [him] walk around campus, or carrying [his] tray of food, … despite having just arrived" to the United States

himself.  (*See* Ex. H, Letter from J. Bernstein at H-21.)  While college—and the United States generally—was as new to Mr. Aiyer as to anyone, Mr. Aiyer sought to make his injured peer "feel comfortable and welcome."  (*Id*.)

This same inclination to give to others extended to Mr. Aiyer's time on the squash team. Mr. Aiyer was highly regarded among his teammates for his character above all else.  (*See* Ex. H, Letter from R. McGinley-Stempel at H-24.)  One teammate describes Mr. Aiyer as "thoughtful, compassionate, and hardworking" and like a "big brother" to him.  (Ex. H, Letter from R. McGinley-Stempel at H-23)  This teammate attests, Mr. Aiyer "welcomed everyone to the team—regardless of experience or background—just as he would his own family."  (Ex. H, Letter from R. McGinley-Stempel at H-24)  For this teammate, Mr. Aiyer's "character and supportive outlook was fundamental to feeling welcomed in that community."  (*Id*.)  Mr. Aiyer was a constant source of support and inspiration to his teammates on the squash team and beyond.  (*See id*.)

### 3.  Mr. Aiyer As A JP Morgan Trader.

After college, Mr. Aiyer secured "a highly coveted job" at JP Morgan.  (Ex. H, Letter from S. Singh at H-13)  Securing this job was no small feat for Mr. Aiyer—"it required taking the hardest classes at college, working extra jobs and interning at offices in the city while concurrently completing his studies."  (*Id*.)  Mr. Aiyer had "hopes for a meaningful career in financial services" and was particularly skilled and well-suited for the industry.  (*See* Ex. H, Letter from R. Lulla at H-15; Ex. H, Letter from Y. Roso at H-84.)

During his almost ten-year long career at JP Morgan, Mr. Aiyer experienced tremendous success.  He started in an entry-level position as an analyst, but quickly impressed his superiors and, after two years, was promoted to the role of currency trader.  Mr. Aiyer continued to develop into a great trader, even receiving a promotion in 2014, after the start of JP Morgan's

internal investigation and shortly before he was fired.  (*See* Ex. C, DX-70 at JPMC-0000068652

(not admitted).)

Over the entirety of his career, Mr. Aiyer consistently received praise for his excellent

pricing and market knowledge and was "well regarded by his peers and seniors throughout the

firm."  (*See, e.g.*, Ex. C, DX-649 at JPMC-0000068660, 2008 JP Morgan Performance Review

of Akshay Aiyer.)  For example, Mr. Aiyer's 2009 performance review notes:

> Akshay has developed a solid franchise and continues to build his reputation with many
> important clients as the go-to person for the currencies he trades … Akshay continues to
> receive excellent marks for partnership from sales and trading colleagues alike.  He has
> been cited by sales for sharp pricing, being knowledgeable and providing good color,
> being client friendly and easy to work with.  Trading colleagues compliment him for his
> team spirit and on his understanding of markets and liquidity. …  He shows a genuine
> concern for others and goes out of his way to help people whenever he can.

(Ex. C, DX-650 at JPMC-0000068662-68663, 2009 JP Morgan Performance Review of Akshay

Aiyer.)  Similarly, Mr. Aiyer's 2012 review describes him "as the go to person for EMEA EM

FX in NY; … Totally selfless when working with other centres across the group; … Very strong

sales feedback[;] Consistently aggressive, Demonstrates leadership, very sharp pricing, provides

seem-less [sic] access to the instruments he trades."  (Ex. C, DX-651 at JPMC-0000068672,

2012 JP Morgan Performance Review of Akshay Aiyer.)

The positive performance reviews that Mr. Aiyer received are corroborated by the

numerous letters submitted to the Court by Mr. Aiyer's former industry colleagues.  What the

reviews and letters make clear is that Mr. Aiyer's success was not dependent on, or linked to, the

money that he earned for JP Morgan.  He succeeded as a currency trader because he was "always

hard working and diligent, as well as smart."  (Ex. H, Letter from C. Ponsonby at H-28.)  Mr.

Aiyer had a willingness to "wake up in the middle of the night in Eastern European trading hours

to trade and manage his risk," (Ex. H, Letter from Y. Roso at H-86) and a "willing[ness] to help

colleagues … beyond the scope of his day-to-day requirements."  (Ex. H, Letter from D. Civitillo

at H-29.)  He was a constant source of support for his colleagues, including female colleagues

who felt marginalized in a male-dominated industry.  (Ex. H, Letter from D. Civitillo at H-30.)

As one former colleague explains, Mr. Aiyer "strived for excellence, and his vision of

excellence is one where he did not maximise the short-term profits for the bank, but rather was a

great professional, valuable colleague, mentor and friend, and this of course meant that his

clients received a service that was extremely competitive and among the best in the industry."

(Ex. H, Letter from V. Lazurenko at H-31.)  Another colleague emphasizes that "he was one of

the few traders respected both by his managers on the trading side as well as his counterparts on

the sales side."  (Ex. H, Letter from Y. Roso at H-85.)

Not only was Mr. Aiyer highly-regarded as an excellent colleague, but he also developed

a reputation for his dedication to the bank's customers.  When a former colleague "spoke with

clients, ranging from hedge funds to pension funds and central banks, Akshay's name came up

repeatedly as someone the clients had dealt with and been helped by.  Very few traders build that

sort of reputation with clients as quickly as he did, and that can only be done by 'stepping up'

and being there for them when needed."  (Ex. H, Letter from R. Usher at H-33.)  "[C]lients …

would mention Akshay as a trader they trusted and respected, and he was often praised for good

pricing."  (Ex. H, Letter from C. Ponsonby at H-28.)

One former colleague views Mr. Aiyer as "one of the best traders on the currency desk in

terms of … client-orientation.  He was hard-working, honest, and dedicated to his job [and] his

clients."  (Ex. H, Letter from H. MacDonald at H-34.)  A former Executive Director of

Institutional Sales remembers Mr. Aiyer as "a favorite of sales people for his ability to provide

unrivaled service to [JP Morgan] clients."  (Ex. H, Letter from C. Lemee at H-35.)  Mr. Aiyer

was even acknowledged for his ability to "provide[ ] much tighter spreads than the traders in

London," which ultimately led the London desk "providing competitive prices and growing its business with the multinational development banks."  (Ex. H, Letter from Y. Roso at H-86.)

Mr. Aiyer was also respected for his professionalism.  A broker that worked with Mr. Aiyer for his entire career describes him as "one of the most professional [ ] market makers [ ] in the market, he was quick and clear and his prices were among the best and tightest in the whole market."  (Ex. H, Letter from T. Vaux at H-36.)   Another broker explains that "Akshay gave the impression that he was not interested in short term gains or making a quick buck at other market [ ] participants expense.  He gave the impression that he wanted to build the market into something bigger."  (Ex. H, Letter from R. Kelly at H-37.)

4.    Mr. Aiyer's Commitment To His Family.

Notwithstanding all of Mr. Aiyer's successes, and the life that he built in the United States, Mr. Aiyer has remained extremely close with, and committed to, his family, including the members of his family living in India.  As Mr. Aiyer's partner explains, "[h]is upbringing in India deeply contributed to the person who is today … [and,] he has never forgotten where he came from."  (Ex. H, Letter from Alexandra Kislevitz at H-6.)

In fact, Mr. Aiyer's drive to succeed was based, in part, on his "desire to better the lives of [his] famil[y members] who sacrificed so much for [him] to come to the U.S.  (Ex. H, Letter from Y. Roso at H-84.)  After Mr. Aiyer moved to the United States, his parents' marital problems intensified, which led Mr. Aiyer's mother and sister to leave Mr. Aiyer's father and find a new home.  (Ex. H, Letter from A. Ganapathi at H-2.)  His mother, for the first time, "struggl[ed] to reshape [her] career as a startup entrepreneur" and "to secure financial security." (Ex. H, Letter from A. Ganapathi at H-3.)  Mr. Aiyer, recognizing how fortunate he was to have the many opportunities afforded to him in the United States, stepped up immediately to emotionally and "financially support[ ] his mother, grandparents, and his sister."  (Ex. H, Letter

from Y. Roso at H-84.)  He provided his mother with money that allowed her to purchase a

home, renovated his maternal grandparents' newly purchased home, and paid for his sister's

college—never expecting anything in return.  (*See id.*; PSR at ¶ 87.)

      Mr. Aiyer's mother describes her son as "a good person, a good friend, a good partner, a

good brother and a great son and grandson."  (Ex. H, Letter from A. Ganapathi at H-4.)  She

remains deeply committed to her son, traveling from India to the United States to support Mr.

Aiyer during his trial and hoping to travel again for his sentencing.  (Ex. H, Letter from

Alexandra Kislevitz at H-9.)  This is also true of Mr. Aiyer's grandparents—they stand "stoically

with [their] grandson" and "eagerly await[ ] to hug him again."  (Ex. H, Letter from A.

Ganapathi at H-4.)

5.    <u>Mr. Aiyer's Commitment To His Friends And Community.</u>

      From the numerous letters submitted on Mr. Aiyer's behalf, it is clear that he has formed

unshakeable friendships with individuals from all different walks of life—many of these same

individuals attended Mr. Aiyer's trial and submitted letters on his behalf.  These letters paint a

picture of Mr. Aiyer as a generous and kind-hearted person, who consistently puts others before

himself.  (*See e.g.,* Ex. H, Letter from L. Casfikis at H-39.)

      Mr. Aiyer has been described in these letters as "the first one to call when there is a

problem" because of his fierce loyalty and his unquestionable support.  (*See, e.g.*, Ex. H, Letter

from G. Kantrowitz at H-20; Ex. H, Letter from E. Boldenow at H-41.)  Letter after letter

recounts the lengths that Mr. Aiyer goes to in order to support the people that mean the most to

him.  He has offered his time, his support (emotional and financial), and even his home to his

friends, going as far as moving out of his own apartment when his friends were renovating their

own and needed a place to live.  (*See* Ex. H, Letter from G. Shetty at H-42; Ex. H, Letter from J.

Bernstein at H-21; Ex. H, Letter from G. Thacker at H-17; Ex. H, Letter from Y. Roso at H-85.)

41

As one friend shares, at a time when his wife was separating from her business partner and he was "burned out from the stress of [his] own job," Mr. Aiyer "offered [them] his house in Martha's Vineyard" for a six-month period "so that [they could] rest and find some peace.  He did not ask for anything and helped us in the most selfless way possible."  (Ex. H, Letter from Y. Roso at H-85.)  Another friend explains how Mr. Aiyer stood by his side during a personal crisis, ultimately "play[ing] an integral role in [his] recovery," and for which he "owe[s] an enormous debt of gratitude to him."  (*See* Ex. H, Letter from G. Thacker at H-17.)  In another example, a friend recounts how "a few months ago during a medical emergency, Akshay was the first person [he] called while on route to the ER. … After his ER trip Akshay continued to invite himself over until [his] wife got back from abroad, just to keep [him] company as [he] recovered."  (Ex. H,  Letter from N. Lehmann at H-44-45.)  These are but a few of the many examples depicting the continual support that Mr. Aiyer provides to those who are "truly grateful to have [him] as a friend."  (*See, e.g.,* Ex. H, Letter from J. Douglas at H-47.)

In addition to Mr. Aiyer's devotion to his friends, Mr. Aiyer remains committed to his community.  Mr. Aiyer serves as a "Top Honors volunteer math tutor," "provid[ing] free weekly one-on-one math tutoring and mentorship to under-resourced New York middle school students."  (Ex. H, Letter from N. Deshmukh at H-48.)  Through this mentorship program, Mr. Aiyer spends three hours every Wednesday with a seventh-grade student with "skills [that] translate to roughly a fourth-grade level."  (*Id.*)  The friend that introduced Mr. Aiyer to the program explains that because of Mr. Aiyer's "phenomenal tutor[ing] and mentor[ing]," his student "has been thriving."  (*Id.*)  Mr. Aiyer has also "participat[ed] in alumni panels, career days, and other volunteer opportunities at" high schools in "under-resourced neighborhoods in Brooklyn."  (Ex. H, Letter from L. Louis at H-49.)

6.    <u>Mr. Aiyer's Commitment To His Partner.</u>

Unquestionably, the most important aspect of Mr. Aiyer's life is his relationship with his partner, Alexandra Kislevitz.  Mr. Aiyer and Ms. Kislevitz first met in September 2017, a particularly uncertain and difficult time in Mr. Aiyer's life.  (*See* PSR at ¶70.)  Despite the challenges they have faced—and will continue to face—as a result of Mr. Aiyer's legal situation, Ms. Kislevitz "has stood by him no matter what," (Ex. H, Letter from A. Ganapathi at H-4), and their "relationship remains stronger than ever" (Ex. H, Letter from Alexandra Kislevitz at H-5).

Ms. Kislevitz describes Mr. Aiyer as "a caring, considerate and devoted partner."  (Ex. H, Letter from Alexandra Kislevitz at H-7.)  She suffers from a chronic health condition, which can cause debilitating pain in her joints, among other complications, and requires frequent medical treatments.  Mr. Aiyer has never wavered in his care and compassion for Ms. Kislevitz.  As Ms. Kislevitz's father explains, "Akshay has been beyond devoted to her.  He attends to her needs ranging from simply keeping her company during her 2 hour plus monthly infusions to helping her monitor her diet[.]  But more importantly, it is the level of care and understanding he brings to someone who has a chronic illness."  (Ex. H, Letter from Adam Kislevitz at H-50-51.)  Ms. Kislevitz's mother expresses that Mr. Aiyer's "emotional support has been invaluable to [her] daughter."  (Ex. H, Letter from K. Kislevitz at H-52.)

One particularly striking example of Mr. Aiyer's loyalty is how Mr. Aiyer reacted during their first trip as a couple, when Ms. Kislevitz fell very sick.  The two had traveled to London to witness one of Mr. Aiyer's close friends get married.  Because of her chronic condition, Ms. Kislevitz "was so sick and exhausted that even keeping [her] eyes open felt like a challenge." (Ex. H, Letter from Alexandra Kislevitz at H-7.)  But true to Mr. Aiyer's character, "[t]hough this was early in [their] relationship, and this was the wedding of a good friend, Akshay refused to leave [her] side."  (*Id.*)  As Ms. Kislevitz explains, "[h]e made sure I had water to drink and

that I stayed warm because I was breaking through a fever.  He had the hotel wheel in a heater to place next to the bed and he stayed by my side all day playing different podcasts for me to keep my mind distracted.  It was on this trip I realized Akshay is one-of-a-kind with a tremendous ability to think of other people and put others needs before his own."  (*Id.*)

To Ms. Kislevitz, Mr. Aiyer is her "rock," and it is clear that the two share a special partnership.  According to one of Mr. Aiyer's close friend, Ms. Kislevitz "has undoubtedly made [Mr. Aiyer] happier than [he] ha[s] ever seen him."  (Ex. H, Letter from L. Thiagarajah at H-54.) Mr. Aiyer and Ms. Kislevitz dream of one day "get[ting] married and hav[ing] a family together."  (Ex. H, Letter from Alexandra Kislevitz at H-8.)  This sentiment is echoed by both Ms. Kislevitz's parents and Mr. Aiyer's mother, who strongly support and admire the two as a couple.  (Ex. H, Letter from A. Ganapathi at H-4; Ex. H, Letter from K. Kislevitz at H-53.)

### 7.  Mr. Aiyer's Desire To Remain In The United States.

Over the past almost 18 years, Mr. Aiyer "has built a life in the United States and has become so important in the lives of so many other people."  (Ex. H, Letter from J. Bernstein at H-22.)  The United States is where Mr. Aiyer has spent almost all of his adult life, and because of that, he "has built an immense network of colleagues, friends, and quasi-family in New York." (Ex. H, Letter from M. Renda at H-57.)

Although more than five years elapsed between the beginning of his criminal investigation and his indictment, Mr. Aiyer was never interested in leaving the United States.  As one of Mr. Aiyer's closest friends explains, "[h]e would have had numerous opportunities between 2015 and 2018 to leave the U.S. and create a new life for himself in India or elsewhere." (Ex. H, Letter from R. Lulla at H-15.)  In fact, "[o]n numerous occasions prior to his indictment, friends urged Akshay to seriously consider a life outside the United States, to take his considerable talents and seek shelter elsewhere … [But] Akshay chose to face his troubles head

on, and stay in the one place he truly considers home: New York."  (Ex. H, Letter from G.

Thacker at H-18.)  Mr. Aiyer "was resolute about standing up to the charges / claims that would

be levelled against him and ready to take on the consequences."  (Ex. H, Letter from R. Lulla at

H-15.)

Mr. Aiyer wants nothing more than to remain in the United States, to begin a new chapter

with his partner, and to once again meaningfully contribute to society.  His friends believe that if

Mr. Aiyer "were ever forced to leave New York, … it would absolutely turn his life upside

down, removing him from his support system and the only life he has known over his adult life."

(Ex. H, Letter from N. Lehmann at H-45.)

**B.      The Unique Nature And Characteristics Of The Conduct For Which Mr.
        Aiyer Was Convicted Support A Sentence Of Probation With A Period of
        Home Confinement.**

Mr. Aiyer is a non-violent, first-time offender, who was convicted of a crime in

connection with conduct that was widespread in the foreign exchange industry, required no

knowledge of illegality nor any showing of harm, and from which Mr. Aiyer did not profit

significantly.  The unique characteristics and nature of the offense for which Mr. Aiyer was

convicted warrant a non-incarceratory sentence.

Foreign exchange traders at almost every major bank participated in conduct similar to

the conduct that led to Mr. Aiyer's conviction.  (*See* Ex. I, Jamie McGeever, *Timeline – The

global FX rigging scandal*, Reuters (Jan. 11, 2017); Ex. J, Trial Tr. at 2169:21-22, *United States

v. Usher*, No. 17 Cr. 19 (RMB) (S.D.N.Y. Oct. 23, 2018) ("Usher Trial Tr.") ("The stuff that

you've seen in these chats is what everyone did to do their job.") (former trader, witness for the

defense); Ex. K, Transcript of Motions *in Limine*, at 25:4-8, *United States v. Usher*, No. 17 Cr.

19 (RMB) (S.D.N.Y. Sept. 13, 2018) ("[D]uring the years in which this conspiracy operated,

2007 through 2013, … this entire industry was very, very sick from a competition standpoint.

There were problems rife throughout many, many of these different banks, many of these chat rooms.") (argument by Department of Justice).)  Mr. Aiyer's arrest stemmed from an investigation into the entire foreign exchange industry in connection with allegations that major banks were colluding with one another for over ten years to manipulate foreign exchange rates, resulting in many institutions pleading guilty and paying billions of dollars in fines.  (*See In re Foreign Exchange Benchmark Rates Antitrust Litig.*, 74. F. Supp. 3d 581, 586 (S.D.N.Y 2015) (describing the conspiracy involving the manipulation of foreign exchange benchmark rates as starting in 2003); Ex. I, McGeever, *supra* at 1 (describing "a rigging scandal that engulfed the world's largest financial market, saw dozens of traders fired and big banks fined around $10 billion.").)  The number of foreign exchange traders that lost their jobs because of behavior substantially identical to that of Mr. Aiyer is more than fifty.  (*See* Ex. J, *Usher* Trial Tr. at 1257:3-11 ("Q.  Well, I can remember, to my horror, kind of keeping count and just reading press articles … I think I lost count when the count [of FX traders that were fired] went sort of north of 50/55.") (cooperator and main witness for Government).)

Despite the pervasiveness of the challenged conduct, Mr. Aiyer was one of only six traders who were charged criminally in connection with this industry-wide crackdown, and the only one convicted after trial.  Moreover, Mr. Aiyer was not charged with or convicted of fraud, a classic crime of moral turpitude, but of an antitrust offense, proof of which does not require an intent to defraud or even an intent to injure competition, but only an intent to engage in conduct that in fact constitutes a per se violation of the antitrust laws.  *See United States v. U.S. Gypsum Co.*, 438 U.S. 422, 444 n.20 (1978) ("traditional intent" in a per se antitrust case is the "intent to effectuate the object of the conspiracy").

Antitrust concepts and Sherman Act violations are not familiar or intuitive to the average person.  (*See*, *e.g.*, Ex. B, Trial Tr. at 1114:21-1115:1 ("Q.  But do you remember whether you violated any antitrust laws in your dealings with Mr. Howes?  A.  I'm not – antitrust?  I'm not an attorney. …") (Katz); *see also U.S. Gypsum Co.*, 438 U.S. at 440-41 ("[T]he behavior proscribed by the [Sherman] Act is often difficult to distinguish from the gray zone of socially acceptable and economically justifiable business conduct").)  In fact, Mr. Aiyer, as well as his alleged coconspirators, may not have understood the illegality of their behavior.  (*See* Ex. L, Transcript of Mr. Cummins' Plea Allocution, at 23:23-24:3 ("Q.  You mentioned a moment ago that you knew that what you were doing was wrong.  Just to be clear, did you know as well you were committing a crime?  A.  I did not. …").)  It is appropriate for the Court to consider Mr. Aiyer's lack of awareness regarding the illegality of his behavior when formulating an appropriate sentence.  (*See* Ex. M, Sentencing Transcript at 53:14-54:3, *United States v. Mannix*, No. 2:16-cr-403 (D. Utah Jan. 23, 2020) ("Mannix Sentencing Tr.") ("Mr. Mannix did not believe this agreement was an obvious and per se violation of the Sherman Antitrust Act. … Though he was incorrect in his belief, Mr. Mannix operated within the terms of this agreement as if it were legal. Accordingly, his culpability is reduced.").)

Moreover, unlike in a fraud case, the Government failed to prove any intent to harm arising from the conduct at issue.  (*See supra* at 46.)  Similarly, the Government did not prove that Mr. Aiyer profited in any significant way from the alleged illegal conduct.  Prior to trial, the Government moved *in limine* to introduce evidence of the amount of Mr. Aiyer's bonus, arguing that "Defendant and his co-conspirators worked together to avoid trading losses as well as improve trading profits, which would factor into their bonus and overall compensation."  (ECF No. 93, Memorandum of Law in Support of the United States' Motions *in Limine*, at 3.)  The

Court, however, denied the Government's motion, finding that the Government failed to demonstrate "the specific amount of bonus that could be tied to the net profit to the defendant's employer from the alleged illegal trading profits." (ECF No. 119, Transcript of Motions *in Limine* Hearing, at 3:3-7.) Even if the Government could have tied Mr. Aiyer's bonus to his alleged trading profits, any increase in those profits shown at trial was insignificant. (*See, e.g., supra* at 20-23; *see also* Ex. C, DX-186 (demonstrating that only two to five percent of Mr. Aiyer's total trading volume was done on Reuters Matching or EBS).)

The lack of proven harm to others or personal gain for himself is highlighted by the Government's decision not to seek restitution in this case. (*See* PSR at ¶ 103.) As the Government seemingly recognizes, restitution is especially ill-suited for this case, where the allegedly harmed parties are sophisticated entities, including large banks that engaged in similar conduct in the interbank market. At trial, the Government did not call any of these large banks, allegedly impacted by the Reuters scheme to testify. And none of the alleged victims that the Government did decide to call as witnesses testified that Mr. Aiyer caused them specific harm, nor did they elect to provide witnesses' impact statements. (*Id.* at ¶ 40.)

From the trial record, and the many letters submitted by Mr. Aiyer's former colleagues, it is clear that Mr. Aiyer was an extremely qualified and diligent foreign exchange trader who provided his clients with excellent care and pricing. (*See, e.g., supra* at 37-40; Ex. B, Trial Tr. at 1122:4-8, 1123:18-23 ("Q. And when you said 'will get best price,' you meant best price for the customer, right? A. For whoever is asking this person, yes. Q. Because he, Mr. Aiyer, gave the best price in the ruble, is that right? A. Yes.") (Katz); Ex. B, Trial Tr. at 496:3-12 (Cummins).) This too is of significance. (*See* Ex. M, Mannix Sentencing Tr. at 53:14-54:3 ("While Kemp & Associates and Mr. Mannix engaged in an ongoing conspiracy in violation of antitrust laws, they

also legally served hundreds of rightful heirs of estates. … It should also be noted that the guideline agreement affected only 2.5 to 3.3 percent of the estates handled by Kemp & Associates.").)

Given the unique characteristics of the offense, a non-incarceratory sentence is appropriate.  This conclusion accords with the recommendation of the Report on Behalf of The American Bar Association Criminal Justice Task Force on the Reform of Federal Sentencing for Economic Crimes, published in 2014 (the "ABA Task Force Report").  While acknowledging that there is no straightforward "workable formula" for sentencing, the report itemizes several "culpability factors" for a court's consideration when sentencing a defendant convicted of an economic crime.  (Ex. N, ABA Task Force Report, at 1.)  The factors include, among others, "the gain to the defendant or to others involved in the criminal undertaking," the level of "victim impact," and whether the offense "was otherwise serious"—a factor that revisits the previously mentioned considerations in conjunction with additional ones, such as "the amount of the loss; whether loss was intended at the outset of the offense conduct; [and] whether the defendant's gain from the offense is less than the loss."  (*Id.* at 2-7.)  The report recommends that in cases where, as here, these factors tend to be minimal or absent—"where the circumstances of the offense support a finding that the offense was not 'otherwise serious'"—and where a defendant has no criminal history, "a sentence other than imprisonment is generally appropriate."  (*Id.* at 6-7; *accord* U.S.S.G. at § 5C1.1 cmt. n.4 ("If the defendant is a nonviolent first offender and the applicable guideline range is in Zone A or B of the Sentencing Table, the court should consider imposing a sentence other than a sentence of imprisonment[.]").)

**C.**   **A Non-Custodial Sentence Will Be Sufficient To Punish Mr. Aiyer, Protect The Public, And Deter Others In The Financial Sector.**

A sentence of probation with a period of home confinement is a "sufficient, but not [a] greater than necessary" punishment, which would further the aims of the Section 3553(a).  For one, a period of home confinement—although not a custodial sentence—is a significant punishment that would impose severe restrictions on Mr. Aiyer's liberty and his life.  Such a sentence also appropriately takes into account the many personal and professional collateral consequences that Mr. Aiyer has already experienced, and will continue to experience, as a result of this case, including his permanent loss of employment in the financial sector, the negative impact of this case on his reputation and relationships, the public scrutiny and humiliation he has endured, and the potential immigration consequences that he may face as a result of his sentence.

1.   A Sentence With A Period Of Home Confinement Is A Sufficient Punishment, Considering The Numerous Collateral Consequences Mr. Aiyer Has Faced And Will Continue To Face.

The defense's proposed sentence of probation with a period of home confinement constitutes a "just punishment" in this case, as required by Section 3553(a)(2)(A), as it would severely restrict Mr. Aiyer's liberty, but also account for the severe collateral consequences Mr. Aiyer has already suffered and will continue to suffer as a result of this case.  Probation is "*significant* punishment" and, as the Supreme Court has acknowledged, "substantially restrict[s]" a defendant's "liberty."  *United States v. Leitch*, No. 11-cr-00609 (JG), 2013 WL 753445, at *12 (E.D.N.Y. Feb. 28, 2013) ("[I]t bears emphasis that when a judge chooses between a prison term and probation, she is not choosing between punishment and no punishment. … And as the Supreme Court has recognized, probation is *significant* punishment. …") (emphasis in original); *Gall*, 552 U.S. at 48-49 ("Offenders on probation are … subject to several standard conditions

that substantially restrict their liberty. … Most probationers are also subject to individual 'special conditions' imposed by the court.").

As the Second Circuit has acknowledged, in determining what constitutes a "just punishment" under Section 3553(a)(2)(A), courts must consider the collateral consequences a sentence will bring for the defendant. *United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence"); *see also United States v. Nesbeth*, 188 F. Supp. 3d 179, 180, 188 (E.D.N.Y. 2016) (imposing a non-custodial sentence, despite a guidelines sentencing range of 33-41 months of imprisonment, "in part because of a number of statutory and regulatory collateral consequences [the defendant] will face as a convicted felon," and noting that "the Second Circuit['s] … embrace of the impact and significance of the collateral consequences facing a convicted felon as bearing upon a just punishment is the enlightened view"); *United States v. Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014) ("In imposing 'just punishment' for a particular offense, a sentencing judge cannot ignore the additional penalties and hardships that will attach as a result of conviction").

One of the most severe collateral consequences with which Mr. Aiyer has contended is his loss of employment.  As a result of the Government's investigation and prosecution of this case, the Office of the Comptroller of the Currency has banned Mr. Aiyer from working in the financial services industry—the only field in which he has ever been employed or trained.  Mr. Aiyer dedicated his college years to the study of economics.  Mr. Aiyer relished his career in finance and was particularly skilled and well-suited to the industry.  He was viewed by his supervisor as "on track to be one of the future leaders of the firm," with a "very bright future ahead."  (Ex. C, DX-649 at JPMC-0000068660; Ex. C, DX-650 at JPMC-0000068664.)  Mr.

Aiyer is now not only banned from working in finance but he has also "been ostracized by the financial community."  (Ex. H, Letter from B. McGuigan at H-58.)  The loss of his ability to be employed in the field that previously gave Mr. Aiyer such professional and personal fulfillment is devastating to Mr. Aiyer and should be considered in determining his sentence.  *See Stewart,* 590 F.3d at 141 (finding that the district court "appropriately" considered the fact that the defendant could no longer pursue his chosen career in determining a "just punishment").

      In addition to the professional consequences this case has brought upon Mr. Aiyer, he has suffered extensively on a personal level due to the stigma and public humiliation that have come with the Government's investigation and prosecution of this case and the highly-publicized trial. (*See* Ex. H, Letter from R. Lulla at H-15 ("He has experienced his hopes for a meaningful career in financial services end and felt the shame that comes from all the press surrounding his situation").)  Such harm is a "form[] of punishment [the defendant] has already suffered" and a collateral consequence that is rightly considered in determining a just sentence.  *See United States v. Vigil*, 476 F. Supp. 2d 1231, 1315 (D.N.M. 2007) (accounting for the "incalculable damage to [the defendant's] personal and professional reputation as a result of tremendous media coverage of his case and the case against his co-conspirators" as a collateral consequence for the purposes of "fashioning a just sentence").  Although many of Mr. Aiyer's friends have steadfastly remained by his side and lent him support during this difficult time—as evidenced by the dozens of letters appended to this memorandum—there are "many former friends and acquaintances [who have] abandoned him" as a result of this case, which has noticeably "weigh[ed] on" Mr. Aiyer, and he has had difficulty "[b]uilding new meaningful relationships." (Ex. H, Letter from G. Thacker at H-18.)  This has been an "emotionally turbulent period" for Mr. Aiyer and one that has "certainly negatively impacted his mental health."  (*Id.*)

Ever since the Government first began its investigation in 2014, all aspects of Mr. Aiyer's life have been plagued by uncertainty—his future, his career, his ability to remain in the United States, his personal relationships, and his liberty.  As a result, Mr. Aiyer's life has effectively been "on hold" for the past six years, as he anxiously awaits the resolution of this case.  The current impossibility of moving forward professionally or personally—especially with respect to starting a family with his partner, Ms. Kislevitz—has weighed on Mr. Aiyer enormously.   (Ex. H, Letter from Alexandra Kislevitz at H-9.)  As Ms. Kislevitz describes, "Each week that goes by he encounters more hurdles, either concretely or mentally as he contemplates how he will secure a stable future for himself and the family we both hope to create together. … Our lives as a couple are on hold and this is one of the many stressors that keeps us both up at night."  (*Id*.)

Furthermore, because of the travel restrictions that have been placed on Mr. Aiyer during the pendency of this case, he has been confined to the Southern and Eastern Districts of New York and the District of Massachusetts for almost two years.  As a result, Mr. Aiyer has been unable to visit his elderly grandparents, with whom he is extremely close, who live in India.  Mr. Aiyer's grandfather, "now 90 years of age, has fallen very ill and over the past year has been gradually losing all comprehension" and his grandmother, "at 86, stands stoically with her grandson and eagerly awaits to hug him again."  (Ex. H, Letter from A. Ganapathi at H-4.)  Mr. Aiyer has experienced extreme distress that he has not been able to visit his grandparents, who "helped raise him and … are both very sick," and although Mr. Aiyer tries to stay in touch with his grandparents via telephone, "their hearing is poor[,] which makes these calls challenging."  (Ex. H, Letter from Alexandra Kislevitz at H-9.)  "[I]t kills Akshay that he has not been able to see [his grandparents], and when he talks about his current travel restrictions, potential sentencing, and ongoing limitations, the thought that he may never see his grandparents again,

brings him to tears."  (*Id*.)  Mr. Aiyer has "suffered not being able to travel to see his family and friends."  (*Id*.)

        2.     <u>A Sentence With A Period Of Home Confinement Protects The Public and Furthers The Goals Of Deterrence.</u>

A sentence of probation with a period of home confinement is sufficient "to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant."  18 U.S.C. § 3553(a)(2)(B)-(C).  Mr. Aiyer is a first-time offender with no criminal history, whose 36 years of life have been otherwise characterized by law-abiding behavior.  (*See* PSR at ¶ 54-60.)  *See also United States v. Mullings*, 131 F. Supp. 3d 1, 4 (E.D.N.Y. 2015) (holding that a custodial sentence was unnecessary in part because the defendant's criminal conduct "appeared to be an 'aberration' from his otherwise law-abiding life" and noting that, "[i]n view of the excessive incarceration rates in the recent past and their unnecessary, deleterious effects on individuals sentenced, society and our economy, justifiable parsimony in incarceration is prized."); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 428 (S.D.N.Y. 2004) ("[The defendant] is young with respect to his exposure to the business world, yet relatively old for a first-time offender.  He is old enough to have a meaningful record of previous good behavior, but young enough to be given a second chance.  While the Guidelines discourage the use of age as a reason for departure … it is entirely rational to consider this factor in setting a sentence in the Court's discretion"); 28 U.S.C. § 994(j) (Congress instructing the Sentencing Commission to craft guidelines that "reflect the general appropriateness of imposing a sentence other than imprisonment in cases in which the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense.")

Furthermore, Mr. Aiyer does not pose any recidivism risk, and thus there is no need for specific deterrence in this case, because Mr. Aiyer has lost his livelihood and will never again

work in the financial markets.  Courts have recognized that in cases where the defendant's conviction has resulted in the loss of his career, "the need for further deterrence and protection of the public is lessened because the conviction itself already visits substantial punishment on the defendant."  *Stewart*, 590 F.3d at 141 (internal quotation marks omitted); *see also Emmenegger*, 329 F. Supp. 2d at 428 (noting that "there is less need for incarceration to protect the public from future crimes committed by [a] defendant" where the defendant lost his livelihood due to his conviction for an offense that was "particularly adapted to his chosen career," since "[t]hat career is over, and his potential to commit this particular type of crime has been eliminated."); *United States v. Gaind*, 829 F. Supp. 669, 671 (S.D.N.Y. 1993), *aff'd*, 31 F.3d 73 (2d Cir. 1994) ("Elimination of the defendant's ability to engage in similar or related activities—or indeed any major business activity—for some time, and the substantial loss of assets and income resulting from this … constitutes a source of both individual and general deterrence."); *Gupta*, 904 F. Supp. 2d at 355 ("As to specific deterrence, it seems obvious that, having suffered such a blow to his reputation, Mr. Gupta is unlikely to repeat his transgressions, and no further punishment is needed to achieve this result.")

A non-custodial sentence with a period of home confinement is also sufficient to further the goal of general deterrence.  The details of Mr. Aiyer's case have been widely publicized for the world to read—a Google search for the name "Akshay Aiyer" yields over 1,300 results, most of which detail Mr. Aiyer's indictment, trial, and conviction—and his case has undoubtedly been closely followed by those in the FX industry.  Mr. Aiyer's public humiliation and the loss of his career are readily apparent to everyone in the finance world and, with the "*significant* punishment" of probation and home confinement, are sufficient to send a strong message of deterrence to any would-be offenders.  *Leitch*, 2013 WL 753445, at *12 (emphasis in original);

*see also* Ex. O, Sentencing Transcript at 90:1-14, *United States v. Connolly*, No. 16 Cr. 370 (S.D.N.Y. Oct. 24, 2019) ("Connolly Sentencing Tr.") (sentencing the defendants—who were convicted in connection with a LIBOR manipulation conspiracy—to non-custodial sentences and noting, "[A] long period of incarceration for these defendants is simply not needed to accomplish the goal of general deterrence.  The players in the market have witnessed their arrest, … the loss of jobs and employability, the financial stress on them and their families, the loss of status in the community … all collateral consequences that play into general deterrence."); Ex. M, Mannix Sentencing Tr. at 55:11-56:6 ("As for the need of this sentence to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant, a probation sentence will allow supervising officers to monitor the defendant's behavior … the public will be protected through the oversight of the probation office.  As for deterrence, this very public and publicized conviction alone will deter both the defendant through specific deterrence and others in similar occupations through general deterrence."); *United States v. Coughlin*, No. 06-20005, 2008 WL 313099, at *6 (W.D. Ark. Feb 1, 2008) (noting the "severely punitive quality of probation" and holding that a sentence of probation and home detention was "capable of deterring corporate executives like [the defendant], who cherish their freedom of movement and right of privacy, from engaging in conduct similar to [the defendant]'s"); *United States v. Musgrave*, 647 F. App'x 529, 533 (6th Cir. 2016) (affirming a sentence of probation and home confinement, and noting that the district court "correctly explained that '[t]here is no justice in imposing a sentence merely to make an example out of a defendant'").

The imposition of a sentence of imprisonment is not necessary to achieve the goal of general deterrence.  The National Institute of Justice—the research, development, and evaluation agency of the U.S. Department of Justice—has found that prison sentences are not generally

effective in deterring crime and that "it is the certainty of being caught that deters a person from committing crime, not the fear of being punished or the severity of the punishment."  (Ex. P, National Institute of Justice, *Five Things About Deterrence* at 1-2 (May 2016) (concluding, *inter alia*, that "the chance of being caught is a vastly more effective deterrent than even draconian punishment," that "[s]ending an individual convicted of a crime to prison isn't a very effective way to deter crime," and that "prison sentences … are unlikely to deter future crime," and noting that there is no "evidence that the deterrent effect increases when the likelihood of conviction increases"); *see also* Ex. Q, Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28–29 (2006) (concluding that "certainty and promptness of punishment are more powerful deterrents than severity" and "increases in severity of punishments do not yield significant (if any) marginal deterrent effects," and noting that "[t]hree national Academy of Sciences panels" and "every major survey of the evidence" have all reached the same conclusion).)

### D.     A Sentence With A Period Of Home Confinement Is Appropriate To Avoid Unwarranted Sentence Disparities.

One of the aims of Section 3553(a) is to avoid unwarranted sentence disparities among similarly-situated individuals.  18 U.S.C. § 3553(a)(6) (The Court "shall consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.").  This Section 3553(a) factor strongly supports a sentence of probation with a special condition of a period of home confinement.

#### 1.     A Non-Incarceratory Sentence Avoids Unwarranted Sentence Disparities With Other Foreign Exchange Traders.

As discussed above, Mr. Aiyer's arrest was the a result of a large, multi-year investigation into the foreign exchange industry that resulted in widely publicized settlements and major financial institutions paying billions of dollars in fines.  (*See supra* at 45-46.)  Foreign

exchange traders at many of the major financial institutions engaged in conduct similar to the behaviors at issue in this case, and at least 50 of these traders were eventually terminated from their jobs as a result.  (*See id.*)  Notwithstanding the widespread nature of the conduct, Mr. Aiyer is one of only a handful of individuals criminally prosecuted for Sherman Act violations, and the others have either been acquitted (i.e., the defendants in *United States v. Usher*), or have evaded conviction, or, in the case of Mr. Katz and Mr. Cummins, have reached agreements with the Government pursuant to which they will likely receive more lenient sentences than Mr. Aiyer.

Mr. Katz and Mr. Cummins—individuals who, as explained above, are more culpable than Mr. Aiyer (*see supra* at 28-33)—will likely receive non-incarceratory sentences because they pleaded guilty—an option not realistically available to Mr. Aiyer due to the immigration consequences that accompany a conviction—and served as cooperating witnesses for the Government.  Nicholas Williams, who engaged in the same conduct as his fellow members of the Rand Chat Room, was not even charged and likely will not receive any form of criminal punishment.  Mr. Aiyer is therefore the only member of the alleged conspiracy at risk of receiving a sentence of imprisonment—a result that would fly in the face of Section 3553(a)(6)'s recommendation to minimize sentencing disparities, particularly considering the greater culpability of his coconspirators.

Courts in the Southern District of New York have previously varied from the Guidelines' recommendation in sentencing a defendant convicted of violating Section 1 of the Sherman Act where the defendant's coconspirators, most of whom were cooperating with the government, would not serve time in prison.  (*See, e.g.,* Ex. R, Hearing Transcript at 13:8-15:14, *United States v. Savarese et al.*, No. 05-cr-516 (GEL) (S.D.N.Y. Jan. 20, 2006) ("Savarese Hearing Tr.") (stating that "it d[id]n't look right on the face of it" that the defendant was the only member of

the conspiracy who stood to serve time in prison, given that he was not alleged to be the ringleader of the conspiracy, and requesting a rationale from the prosecution for this potential disparity other than "the naked fact that some folks [the cooperating witnesses] signed on the dotted line in the way that the government likes.")[10]; *see also* Ex. S, Sentencing Transcript at 8:5-9, 41:6-19, *United States v. Savarese, et al.*, No. 05-cr-516 ("Savarese Sentencing Tr.") (S.D.N.Y. April 28, 2006).)  Similarly, in giving the defendants in *United States v. Connolly* non-custodial sentences, Judge McMahon disregarded the Guidelines recommendation of imprisonment in part because the recommendation was "out of line with similarly situated defendants who have committed the same crime," none of whom would serve any time in prison. (Ex. O, Connolly Sentencing Tr. at 87:10-88:6.)  The court also noted that it would not allow the government to "make an example" out of the defendants in that case by imposing a lengthy sentence on them as "proxy wrongdoers" for hundreds of individuals at financial institutions in

---

[10] "I'm … concerned about disparity in sentencing.  We are supposed to see what we can do to see to it that similarly situated people are treated similarly.  And, in particular, I would think that applies when we've got a number of people engaged in the same conspiracy.  A number of people have pled guilty to this conspiracy. … It is further complicated because … of the individual human beings who were running this conspiracy, of the six who have been charged, five have now been convicted, none have been sentenced and four of the five, all but [the defendant] Mr. Savarese, are cooperating with the authorities.  Now, cooperation is … necessary and cooperation usually leads to lower sentences.  On the other hand, that tends to suggest to me that if things take their normal course, … of the five who are guilty of this conspiracy, four of them are very likely not to go to jail and Mr. Savarese stands as the one who is left. … Maybe the reason is he was the ring leader and the other four cooperated against him and the government went to get him.  That would make a reason why he might have to go to jail and the others not.  On the other hand, no one is contending … that Mr. Savarese is somehow the most culpable of these individuals. … It may be rational[ ] that for whatever set of reasons it comes out that Mr. Savarese goes to jail and nobody else does.  But it doesn't look right on the face of it …"  (Ex. R, Savarese Hearing Tr. at 13:8-17:12.)

the United States and abroad who participated in the same LIBOR manipulation conduct as the

defendants but who were not charged.  (*Id.* at 85:1-86:12.)[11]

Mr. Katz and Mr. Cummins also testified at length about other foreign exchange traders

with whom they engaged in the same behaviors at issue in this case, none of whom were ever

charged.  As discussed above, these traders—including the members of the "Old Gits" chatroom,

which did not include Mr. Aiyer, as well other individuals—participated in the conspiracy to

which Mr. Katz and Mr. Cummins pleaded guilty, and which began as early as 2001.  (*See supra*

at 30-31.)  These coconspirators of Mr. Katz and Mr. Cummins, despite engaging in behavior

identical to that underlying Mr. Aiyer's conviction, were never prosecuted, much less convicted

and sentenced to prison.

*In re Foreign Exchange Benchmark Rates Antitrust Litigation* further demonstrates the

pervasiveness of coordination amongst foreign exchange traders—in that case, to manipulate fix

prices—and highlights the number of traders who participated in such conduct but who were

never charged.  74 F. Supp. 3d 581 (S.D.N.Y. 2015).  The complaint in that case alleged that

foreign exchange traders at the twelve defendant banks "used electronic communications to meet

and conspire for over a decade," starting in 2003—long before Mr. Aiyer starting working as a

foreign exchange trader—and that "chat rooms, with evocative names such as 'The Cartel,' 'The

Bandits' Club,' 'The Mafia,' and 'One Team, One Dream,' were the primary sites of

---

[11] "[The defendants] were participants along with many other people, a few of whom have been indicted here and abroad, most of them have not, in a massive effort, one that went on at many if not all of the submitting banks over a course of years to manipulate LIBOR to benefit the banks' trading positions … [T]he government has used Mr. Connolly and Mr. Black, as well as a few other people … as proxy wrongdoers, to make them an example for the wrongdoings of those two [financial] institutions … and for similar wrongdoing of other unindicted institutions as well.  … [The government] now asks the Court to impose excessively large punishments … because of a far more widespread problem in which hundreds of other people at Deutsche Bank and elsewhere were also wrongdoers, and the government asks that I do that to make an example of them.  … I yet cannot make [the defendants] scapegoats for the sins of the entire industry.  They stand convicted of crimes for which they will be punished, and that is all they will be punished for."  (*Id.*)

conspiracy." *Id.* at 587.  None of the traders whose conduct prompted the *In re Foreign Exchange* plaintiffs to pursue legal action against the defendant banks—except for the defendants in *United States v. Usher*—were ever charged.

Given the fact that many other individuals in the foreign exchange industry who engaged in the same conduct as Mr. Aiyer, including individuals who were much more culpable, have never been—and will never be—prosecuted, let alone imprisoned, Mr. Aiyer should be given a non-incarceratory sentence to avoid unwanted sentencing disparities.

> 2.  <u>A Non-Incarceratory Sentence Avoids Unwarranted Sentence Disparities With Other Antitrust Defendants Sentenced In The Southern District Of New York.</u>

Courts in the Southern District of New York have routinely given defendants convicted of Sherman Act violations non-custodial sentences or minimal prison time, often departing from the Guidelines' recommended sentences.[12]  Publicly available information about the sentences imposed on Sherman Act defendants over the past twenty years in the Southern District of New York shows that these sentences have seldom exceeded one year, and approximately half of individual defendants have received probationary sentences.  (*See* Ex. T, Chart of Sherman Act

---

[12] (*See, e.g.*, Ex. U, Sentencing Transcript at 4:8-9, 6:24-7:2, *United States v. Apfelbaum*, No. 02-cr-106 (JES) (S.D.N.Y. March 31, 2004) (varying from the Guidelines sentence of 8 to 14 months of imprisonment and sentencing the defendant to three years of probation); Ex. S, Savarese Sentencing Tr. at 8:5-9, 41:6-19 (varying from the Guidelines sentence of 12 to 18 months and sentencing the defendant to 24 months of probation, with a requirement that for the first 12 months, the defendant must reside at a community confinement corrections facility for three days of each week); Ex. V, Sentencing Transcript at 3:7-16, 51:22-52:3, *United States v. Levy, et al.*, 1:00-cr-00596 (S.D.N.Y. Oct. 17, 2001) (sentencing the defendant to six weeks in prison and one year of supervised release, despite the Guidelines recommendation of 12-18 months); *United States v. Spadola*, No. 1:06-cr-00898, ECF No. 18 (S.D.N.Y. Aug. 24, 2007) (sentencing the defendant to three years of probation on Sherman Act count); *United States v. Briggin*, No. 1:02-cr-01431, ECF No. 19 (S.D.N.Y. May 4, 2006) (sentencing the defendant to three years of probation on Sherman Act count); *United States v. Montgomery*, No. 1:02-cr-01308, ECF No. 12 (S.D.N.Y. May 6, 2004) (sentencing the defendant to two years of probation); *United States v. Doody*, No. 1:00-cr-00602, ECF No. 8 (S.D.N.Y. Oct. 18, 2001) (sentencing the defendant to 12 months of probation); *United States v. Schenider*, No. 1:00-cr-00597, ECF No. 17, 19 (S.D.N.Y. Oct. 16, 2001) (sentencing defendants to five years of probation with one year of home confinement).)

Sentences in S.D.N.Y. from 2000-2020.)[13]  The Second Circuit has also affirmed such sentences. *See, e.g., SKW Metals & Alloys, Inc.*, 6 F. App'x. at 66 (affirming a sentence of four months' home confinement and 18 months' probation).  Courts in other jurisdictions have similarly imposed probationary sentences on Sherman Act defendants.[14]

Even the shorter sentences given in Sherman Act cases may overstate the sentence length appropriate in this case, due to the unique and complex nature of the charged conduct here.  There are few, if any, factually comparable criminal antitrust cases in this jurisdiction that can serve as an effective guide for sentencing, since the vast majority of Sherman Act cases involve straightforward instances of customer allocation, procurement auctions, group boycotts, and the like—behaviors that, unlike the currency trading conduct at issue in this case, are clear-cut antitrust violations.  As discussed above (*supra* at 45-47), it is not apparent that Mr. Aiyer engaged in conduct he understood to be illegal.  As such, Mr. Aiyer is less culpable than those defendants who understood the illegality of the conduct for which they were convicted under the Sherman Act.  (*See* Ex. M, Mannix Sentencing Tr. at 53:14-54:3 (noting that because the defendant "did not believe [the] agreement was an obvious and per se violation of the Sherman Antitrust Act" and "operated within the terms of [the] agreement as if it were legal," the defendant's "culpability is reduced.").)

---

[13] Mr. Aiyer compiled most of the information contained in Exhibit T from the website of Transactional Records Access Clearinghouse (TRAC), a "data gathering, data research and data distribution organization" associated with Syracuse University that collects data from the federal government, mostly under the Freedom of Information Act (FOIA).  *See* https://trac.syr.edu/aboutTRACgeneral.html.  Mr. Aiyer also included case information gathered from targeted Westlaw and Bloomberg Law searches.

[14] (*See, e.g.*, Ex. M, Mannix Sentencing Tr. at 56:4-6 (varying from the Guidelines sentence of 18 to 24 months of imprisonment to one year of probation).)

Outside of the Sherman Act context, courts have often imposed non-custodial or minimal prison sentences in white collar crime cases where the offense conduct was both more serious and blatant than Mr. Aiyer's conduct.[15]

### III. Special Considerations Applicable To Mr. Aiyer Weigh In Favor Of A Sentence Of Probation With A Period of Home Confinement.

#### A. The Severity Of The Potential Consequences Of Mr. Aiyer's Immigration Status Supports A Non-Custodial Sentence.

Mr. Aiyer's status as a non-citizen has serious repercussions for any term of imprisonment that he may serve. The disparate treatment provided non-citizen prisoners, as compared with their citizen counterparts, means that any sentence of imprisonment given to Mr. Aiyer would be significantly harsher than the same sentence given to an identically-situated citizen defendant. Furthermore, if Mr. Aiyer receives a sentence of imprisonment, such a sentence increases the likelihood that he will afterwards be taken into in the custody of ICE and that removal proceedings will be commenced against him. Finally, if Mr. Aiyer is given a sentence of imprisonment of one year or more, as distinct from a sentence of imprisonment of less than one year, he is far more likely to be held without bail in ICE detention during the pendency of any removal proceedings, which he would contest. Given the severity of the

---

[15] *See, e.g., United States v. Thompson*, No. 14-cr-00272 ECF No. 268 (S.D.N.Y. Nov. 22, 2016) (sentencing the defendant trader to three months in jail on wire fraud charges in connection with a scheme to rig LIBOR rates); *United States v. Prosperi*, 686 F.3d 32, 44, 50 (1st Cir. 2012) (affirming variance from Guidelines range of 87 to 108 months of imprisonment to non-custodial sentences in case where defendants were convicted of years-long fraud scheme in which they provided concrete for a federally funded construction project and created false documentation); *United States v. Howe*, 543 F.3d 128, 128-132 (3d Cir. 2008) (affirming variance from Guidelines range of 18 to 24 months of imprisonment to a non-custodial sentence where government contractor was convicted of defrauding the United States Air Force of $150,000 and "engaged in a sustained effort to obstruct the investigation in order to hide his crime"); *United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (affirming variance from Guidelines range of 57 to 71 months of imprisonment to one day of imprisonment and five years of supervised release, where defendant was convicted of defrauding a bank and the Small Business Association, causing the SBA to lose approximately $1.7 million); *United States v. DiAmbrosio*, No. 04 Cr. 66, 2008 WL 732031 (E.D. Pa. Mar. 13, 2008) (varying from the Guidelines range of 46 to 57 months of imprisonment to a non-custodial sentence and $2.1 million in restitution where the defendant was convicted by a jury of defrauding a securities option trading firm of $2.8 million).

potential consequences of Mr. Aiyer's non-citizen status, as described below, his status should be considered in determining what sentence is appropriate.

The fact that Mr. Aiyer's status as a non-citizen will necessarily result in a more severe punishment than an otherwise identical citizen defendant would experience if given the same sentence is of utmost relevance in determining his sentence.  In *United States v. Connolly*, Judge McMahon concluded that the defendant, Gavin Black, who had been convicted of wire fraud charges in connection with a LIBOR manipulation conspiracy, should not be sentenced to any term of incarceration due to his status as a non-citizen and the disparate treatment he would receive as a result:

> If I could sentence Mr. Black to a term of incarceration -- a brief term of incarceration -- knowing that he would go to a facility appropriate to his criminal conduct, I would do it.  But I know that I can't.  I know that simply because he is a non[-]citizen -- and I use that term advisedly, he is not an illegal alien – [b]ut because he is a non-citizen, he will not be eligible to serve his sentence in the same way that any American citizen who stood convicted of this crime would serve.  And that's not right.  And for reasons that are incomprehensible to me, were I to sentence him to a short term of imprisonment – which would be served in a private facility and not at some place like FCI Allenwood … -- for reasons I cannot comprehend, at the end of that term he could not walk out the door and be picked up by [his attorney] Mr. Levine and taken to the airport.  He would be treated like an illegal alien, and he would be released into the custody of ICE, and at some point long after my intended sentence had expired he would be deported.  And that's not right. … I can't bring myself to impose a sentence of incarceration in the United States for Mr. Black.

(Ex. O, Connolly Sentencing Tr. at 91:8-92:13.)

As described below, Mr. Aiyer's immigration status will result in the same disparate treatment to which Mr. Black would have been subject—namely, imprisonment in a private prison, followed by prolonged detention in an ICE facility, which Judge McMahon determined was simply "not right."  *Id*.  This Court should determine for the same reasons that Mr. Aiyer also should not be sentenced to a term of imprisonment.

1.    <u>The Effect Of Mr. Aiyer's Non-Citizen Status On Imprisonment Conditions.</u>

Mr. Aiyer is a first-time, non-violent offender who, but for his immigration status, would be eligible for placement in a minimum-security facility, such as a federal prison camp, for the duration of any sentence of imprisonment.  (*See* Ex. W, Fed. Bureau of Prisons Program Statement 5100.08, *Inmate Security Designation and Custody Classification* at ch. 1, p. 2 (Sept. 12, 2006);  *id.* at ch. 5, p. 12.)  However, because Mr. Aiyer is not a U.S. citizen, he will be designated as a "deportable alien" and required to be housed in at least a low security level institution.  (*Id.* at ch. 5, p. 9 (describing the Public Safety Factor ("PSF") designation "Deportable Alien" as: "A male or female inmate who is not a citizen of the United States.  All long-term detainees will have this PSF applied.  When applied, the inmate or the long-term detainee shall be housed in at least a Low security level institution.");  *id.* at ch. 5, p. 12.)  Mr. Aiyer will be treated as a "deportable alien" for purposes of designation to a facility simply because he is not a citizen, and despite the fact that he is and always has been lawfully in the United States and will contest deportation.

Moreover, pursuant to a 2018 BOP Memorandum, Mr. Aiyer's non-citizen status dictates that the BOP will assign him to a privately-run, for-profit prison.  (*See* Ex. X, Bureau of Prisons Memorandum for Chief Executive Officers, *Increasing Population Levels in Private Contract Facilities* (Jan. 24, 2018) (stating that "eligible inmates"—i.e., "male, non-U.S. citizen[s]" with "90 months or less remaining to serve on their sentence," who are "classified as Low security with IN custody" and assigned a low medical and mental health care level—must be submitted for "re-designation to the Designation and Sentence Computation Center for transfer consideration to private contract facilities.").)

Most non-citizen federal prisoners are placed in "Criminal Alien Requirement" or "CAR" prisons, all of which are run by for-profit corporations, and hold non-citizen prisoners.  (*See* Ex. Y,  Emma Kaufman, *Segregation by Citizenship*, 132 Harv. L. Rev. 1379, 1403 (2019); Ex. Z, Nathaniel Meyersohn, *Justice Department Seeks Increase in Private Prison Beds*, CNN (May 19, 2017) ("These [CAR] prisons hold 21,287 inmates, 96% of whom are non-US citizens, according to a Bureau of Prisons spokesman.").)  These non-citizen prisoners live "in harsh conditions with higher rates of prison violence and reduced access to family and counsel," in institutions with "unusually poor" healthcare, overcrowding, and higher rates of solitary confinement, lockdowns, and deaths in custody than comparable BOP institutions.  (Ex. Y, Kaufman, *supra* at 1408-09; *see also* Ex. AA, ACLU, *Warehoused and Forgotten: Immigrants Trapped in Our Shadow Private Prison System* at 3 (June 2014) ("ACLU Report") (investigative report finding that the men held in CAR prisons are "subjected to shocking abuse and mistreatment, and discriminated against by BOP policies that impede family contact and exclude them from rehabilitative programs"); Ex. BB, Seth Freed Wessler, '*This Man Will Almost Certainly Die*,' THE NATION (Jan. 28, 2016) (documenting, based on 9,000 pages of BOP medical records, the "inadequate medical care" available in privatized, immigrant-only prisons, which has caused the "premature deaths" of dozens of prisoners); Ex. CC, Lauren-Brooke Eisen, *Inside Private Prisons: An American Dilemma in the Age of Mass Incarceration*, at 139 (Columbia Univ. Press 2018) ("Private detention centers frequently receive complaints of substandard conditions: bad food, inadequate medical care, allegations of sexual abuse, too few lawyers, and no due process.").)

In a 2016 report, the Office of the Inspector General at the Department of Justice found that private prisons, also called contract prisons, "incurred more safety and security incidents per capita than comparable BOP institutions," and that "the BOP onsite monitors were not verifying

each month whether inmates in contract prisons were receiving basic medical care." (Ex. DD, Office of the Inspector General, United States Department of Justice, *Review of the Federal Bureau of Prisons' Monitoring of Contract Prisons* (August 2016), at i-ii, 32; *see also* Ex. EE, Cody Mason, The Sentencing Project, *Too Good to be True: Private Prisons in America*, at 11-12 (Jan. 13, 2012) ("Studies have found that assaults in private prisons can occur at double the rate found in public facilities.  Researchers also find that public facilities tend to be safer than their private counterparts and that privately operated prisons appear to have systemic problems in maintaining secure facilities.") (internal citations and quotations omitted).)  Furthermore, private prisons are exempt from requirements that would necessitate the disclosure of this troubling data. (*See* Ex. AA, ACLU Report at 5 ("[T]hese private prisons operate in the shadows, effectively free from public scrutiny.  By statute, most of their records are exempt from the open records laws that apply to other federal prisons. … BOP fails to subject its private prison contractors to adequate oversight and accountability, and it fights to avoid public disclosure of basic information about these prisons.").)  In sum, CAR prisons "represent a new model of prison management … an emergent penology in which noncitizens are punished differently than citizens of the United States." (Ex. Y, Kaufman, *supra* at 1408.)

In addition to the difficult conditions Mr. Aiyer would face in a CAR institution, the fact that Mr. Aiyer is not a U.S. citizen makes it likely that the prison where he would serve any sentence would be geographically remote from his home, partner, and friends.  Although BOP generally attempts to hold prisoners within 500 miles of the location where they have the most "community and/or family support," non-citizens are not afforded this consideration and are often placed in prisons much farther from their homes. (*Id.* at 1411 (quoting Fed. Bureau of Prisons Program Statement 5100.08 at ch. 7, p. 4).)  Nearly all non-citizen prisoners are subject

to immigration detainers, and BOP expressly exempts prisoners with detainers from its 500-mile

rule, including long-term legal residents.  (*See id*. at 1400 n.149, 1411.)  As a result, non-citizen

prisoners can be transferred anywhere in the country, and more than half of all CAR prisoners

are held over 500 miles from home.  (*Id*. at 1411.)

Mr. Aiyer's status as a non-citizen has further consequences for the prospect of prerelease

custody.  Generally, BOP is required to "ensure that a prisoner serving a term of imprisonment

spends a portion of the final months of that term (not to exceed 12 months) under conditions that

will afford that prisoner a reasonable opportunity to adjust to and prepare for the reentry of that

prisoner into the community," including a halfway house.  18 U.S.C. § 3624(c)(1).  However,

because of his status as a non-citizen, Mr. Aiyer is not eligible for placement in a halfway house.

(*See* Ex. FF, Fed. Bureau of Prisons Program Statement 7310.04, Community Corrections Center

Utilization and Transfer Procedures, at 10 (Dec. 16, 1998) ("Inmates in the following categories

shall not ordinarily participate in CCC programs: … Inmates who are assigned a 'Deportable

Alien' Public Safety Factor.").)

> 2.   The Potential Immigration Consequences Of Sentencing: Deportation And
>        ICE Detention.

Critically, Mr. Aiyer's conviction makes him subject to possible deportation.  *See* 8

U.S.C. § 1227(a)(2)(A)(i) ("Any alien … in and admitted to the United States shall … be

removed if the alien is within one of more of the following classes of deportable aliens: …  Any

alien who – (I) is convicted of a crime involving moral turpitude committed within five years …

after the date of admission,[16] and (II) is convicted of a crime for which a sentence of one year or

longer may be imposed.").  The possibility of Mr. Aiyer's deportation is a collateral effect of

sentencing that must be considered in determining his sentence.  *See United States v. Chong*, No.

13-CR-570, 2014 WL 4773978, at *4 (E.D.N.Y. Sept. 24, 2014) (holding that "Section 3553

should now be interpreted as requiring district courts to weigh the prospect of deportation, which

is 'an integral part—indeed, sometimes the most important part—of the penalty that may be

imposed on noncitizen defendants[,]' when imposing a sentence." (quoting *Padilla v. Kentucky*,

559 U.S. 356, 364 (2010))); *see also United States v. Thavaraja*, 740 F.3d 253, 262-63 (2d Cir.

2014) ("In determining what sentence is 'sufficient, but not greater than necessary,' to serve the

needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties

presented by the prospect of removal proceedings and the impact deportation will have on the

defendant and his family."); *Stewart*, 590 F.3d at 141-42 ("It is difficult to see how a court can

properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular

sentence.").)

Following the completion of any term of imprisonment, Mr. Aiyer will likely be taken

into the custody of ICE and removal proceedings will likely be commenced against him.  *See* 8

U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and

detained pending a decision on whether the alien is to be removed from the United States."); *see

also* Ex. Y, Kaufman, *supra* at 1408 ("[M]ost CAR prisoners are sent to immigration detention

---

[16] Mr. Aiyer contends that antitrust violations are not crimes of moral turpitude and will challenge this
characterization if ICE commences removal proceedings against him.  The Antitrust Division takes the official
position that antitrust offenses *are* crimes of moral turpitude, although it regularly waives this characterization in the
case of cooperating non-citizens.  (*See* Ex. GG, March 15, 1996 Memorandum of Understanding Between the
Antitrust Division of the United States Department of Justice and the Immigration and Naturalization Service of the
United States Department of Justice; *see also* Ex. HH, Grannon, Eric, *Are Antitrust Violations Crimes Involving
Moral Turpitude?*, The National Association of Criminal Defense Lawyers (April 2012).)

centers at the end of their prison sentences").  Pursuant to Section 1226(c)(1) of Title 8 of the United States Code, certain non-citizens are subject to mandatory detention requirements while removal proceedings are pending, including those who have been convicted of a crime of moral turpitude and sentenced to at least one year in prison.  *See* 8 U.S.C. § 1226(c)(1)(C) ("The Attorney General shall take into custody any alien who … is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been *sentence[d] to a term of imprisonment of at least 1 year*.") (emphasis added); 8 USC § 1227(a)(2)(A)(i).

If a non-citizen does not fall within one of the mandatory detention categories set forth in Section 1226(c)(1)(C), he or she can be released on bail pending final resolution of the removal proceedings.  *See* 8 U.S.C. § 1226(a)(2) ("[T]he Attorney General … may release the alien on … bond of at least $1,500 with security approved by, and containing conditions prescribed by, the Attorney General; or … conditional parole.").  A non-citizen will be released on bail if it is determined that he or she is (1) not a danger to society; and (2) not a flight risk.  *See Medley v. Decker*, No. 18-CV-7361 (AJN), 2019 WL 7374408, at *4 (S.D.N.Y. Dec. 11, 2019).

If, however, ICE determines that Mr. Aiyer falls within one of the mandatory detention categories, Mr. Aiyer can be released on bail only if he can establish that the Department of Homeland Security "is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention."  *In re Joseph*, 22 I. & N. Dec. 799, 803, 806 (1999)

In short, the difference between a sentence of imprisonment of less than one year and a sentence of imprisonment of one year or more is likely the difference between Mr. Aiyer's being detained in ICE custody while he contests removal, however long this process takes, and his being free on bail during these proceedings.

A review of ICE detention facilities by the Office of the Inspector General at the

Department of Homeland Security revealed "immediate risks or egregious violations of detention

standards … including nooses in detainee cells, overly restrictive segregation, inadequate

medical care, unreported security incidents, and significant food safety issues," as well as

"dilapidated and moldy" bathrooms, failure to provide detainees with "appropriate clothing and

hygiene items to ensure they could properly care for themselves," and generally "unsafe and

unhealthy conditions to varying degrees at all of the facilities [they] visited."  (Ex. II, Office of

the Inspector General, Department of Homeland Security, *Concerns about ICE Detainee*

*Treatment and Care at Four Detention Facilities* (June 3, 2019).)

**B.     A Sentence Of Home Confinement Is Appropriate Given The Unprecedented Global Pandemic.**

The Court should sentence Mr. Aiyer to home confinement, rather than a term

imprisonment, given the current unprecedented global pandemic.  As the Court is aware, since

the first case of COVID-19—also referred to as the "coronavirus"—was documented in

December 2019, the virus has spread widely and rapidly.  Although the number of cases grows

by the hour, at the time of this memorandum, United States currently has over 300,000 cases—

the highest number of cases of any nation—with New York serving as the epicenter of the virus.

One population at heightened risk of contracting the virus is the approximately 2.3

million inmates detained in state and federal prisons across the United States.  (*See* Ex. JJ,

Kimberly Kindy, Emma Brown & Dalton Bennett, '*Disaster waiting to happen': Thousands of*

*inmates released as jails and prisons face coronavirus threat*, The Washington Post (March 25,

2020); Ex. KK, Josiah Bates, *'We Feel Like All of Us Are Gonna Get Corona. Anticipating*

*COVID-19 Outbreaks, Rikers Island Offers Warning For U.S. Jails, Prisons*, TIME Magazine

(March 24, 2020) ("Once the coronavirus is introduced into the [prison or jail] setting it would

be extremely difficult to control its spread") (internal citations and quotations omitted).)  A

prison is the ideal environment for pandemics to grow and spread: "[O]vercrowded jail, prison,

and immigration detention facilities [ ] force people together in close quarters without access to

proper hygiene or medical care, sometimes living barracks-style in gyms or other open spaces,

breathing the same recycled air for up to 23 hours per day."  (*See* Ex. LL, Joint Statement from

Elected Prosecutors on COVID-19 and Addressing the Rights and Needs of Those in Custody

(March 25, 2020), at 1.)  Inmates across the country have already been infected with the virus,

and the number of confirmed cases in prisons is certain to increase in the coming weeks and

months.  (*See* Ex. KK, Bates, *supra* at 3; Ex. JJ, Kindy, *supra* at 1; Ex. QQ, Katie Benner, *Barr*

*Expands Early Release of Inmates at Prisons Seeing More Coronavirus Cases*, The New York

Times (Apr. 3, 2020).)

      To protect the prison population from the virus, prosecutors, senators, and non-profit

organizations, among others, are calling for prison reforms.  For example, a group of elected

prosecutors from across the country issued a joint statement, acknowledging that "[a]n outbreak

of the coronavirus in these custodial facilities would not only move fast, it would potentially be

catastrophic."  (Ex. LL, Joint Statement from Elected Prosecutors on COVID-19 at 1.)  The

statement "urge[s] local officials to stop admitting people to jail absent a serious risk to the

physical safety of the community" and "[p]olicymakers, prosecutors and criminal justice leaders

… [to] also take steps to dramatically reduce detention and the incarcerated population."  (*Id.* at

2.)  These prosecutors insist that individuals who "pose no immediate physical threat to the

community" should be released and assert that "[e]ven after the urgent threat of the coronavirus

subsides, these sensible and smart policies should remain."  (*Id.* at 2, 4.)

At the end of March, a group of bipartisan senators sent a letter to the Attorney General and the Director of the Federal of Bureau of Prisons "express[ing] [their] serious concern for the health and wellbeing of federal prison staff and inmates in Federal custody." (Ex. MM, Letter from Senators to Attorney General Barr and Director Carvajal (March 23, 2020), at 1.) The Senators' letter pleads for the release of the "most vulnerable inmates … or transfer[ ] to home confinement." (*Id.*)

At the local level, states have taken immediate action to protect the prison populations: "In New Jersey, over 1,000 inmates are scheduled to be released from the county jail in what's believed to be the biggest preventative act any jail or prison administration has taken in response to the pandemic. California, Ohio and Oklahoma are among other states processing inmate releases." (*See* Ex. KK, Bates, *supra* at 6.)

At the federal level, the Department of Justice submitted proposed legislation to Congress to combat the issues created by COVID-19. One of the Department of Justice's proposals would allow the Bureau of Prisons to "have the discretion to expand the use of home confinement pass [sic] our current limitations of 10% of the term of imprisonment or 6 months." (*See* Ex. NN, Department of Justice Proposals for Addressing Issues Created by the COVID-19 Pandemic, Tab H: BOP Provisions for COVID-19 Response, at II.) Seemingly in furtherance of the Department of Justice's proposed legislation, on March 26, 2020, Attorney General Barr "directed the federal Bureau of Prisons to begin identifying older and medically at-risk inmates for release to home confinement." (Ex. OO, Tom McParland, *US AG Barr Seeks to Expand Home Confinement to Halt Coronavirus Spread in Federal Prison*, New York Law Journal (March 26, 2020), at 1.) On April 3, 2020, Attorney General Barr "expand[ed] the group of federal inmates eligible for early release" and "intensif[ied] the push to release prisoners to home confinement because

'emergency conditions' created by the coronavirus have affected the ability of the bureau to function."  (Ex. QQ, Benner, *supra* at 1.)

Moreover, courts in the Southern District of New York have ordered the release of individuals with certain medical conditions from prison and the custody of ICE.  *See United States v. Hernandez*, 18-cr-834 (S.D.N.Y. Apr. 2, 2020), ECF No. 451; *Basank v. Decke*r, 20-cv-2518 (AT) (S.D.N.Y. March 26, 2020), ECF No. 11; *Coronel v. Decker*, No. 20-cv-2472 (AJN) (S.D.N.Y. March 27, 2020), ECF No. 26.  For example, Judge Engelmayer recently ordered a defendant—who pleaded guilty to multiple counts of racketeering, firearms offenses, and drug trafficking—to serve the remaining four months of his sentence in home detention, noting that "COVID-19 presents a heightened risk for incarcerated defendants … with respiratory ailments such as asthma." *Hernandez*, 18-cr-834, at *5.  Judge Nathans ordered the release of an ICE detainee because of ICE's failure to meet the needs of detainees who are particularly at risk because of COVID-19, noting that "the Department of Homeland Security's own medical subject matter experts state that the agency has a track record … of failing to develop early detection and containment protocols for infectious diseases outbreaks."  *Coronel*, No. 20-cv-2472 (AJN), at *9 (internal citations and quotations omitted).

Given the current global health crisis, and consistent with the actions taken at the state and federal levels in response to COVID-19, a sentence of probation with a period of home confinement is warranted.  Mr. Aiyer is non-violent, first-time offender and poses no risk to the safety of his community.  Moreover, Mr. Aiyer suffers from asthma, which increases his risk of becoming severely ill from COVID-19.  (*See* PSR at ¶ 75; Ex. PP, Center for Disease Control and Prevention, *What You Can Do If You Are At Higher Risk Of Severe Illness From COVID-19,* April 3, 2020, https://www.cdc.gov/coronavirus/2019-ncov/downloads/COVID19-What-You-

Can-Do-High-Risk.pdf ("[T]hose at high-risk for severe illness from COVID-19 ... includ[e] [p]eople with chronic lung disease or moderate to severe asthma").)

## **<u>CONCLUSION</u>**

For the foregoing reasons, Mr. Aiyer respectfully requests that the Court impose a sentence of probation with a special condition of a period of home confinement, which is sufficient but not greater than necessary to satisfy the objectives of sentencing.

Dated:  April 6, 2020
New York, New York

By:     <u>/s/ Martin Klotz</u>
WILLKIE FARR & GALLAGHER LLP
Martin Klotz
Joseph T. Baio
Jocelyn M. Sher
787 Seventh Avenue
New York, New York 10019
T: (212) 728-8000

*Attorneys for Defendant Akshay Aiyer*