**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x
                          |

UNITED STATES OF AMERICA     |

      v.                     |        Case No. 1:18-cr-00333 (JGK)

AKSHAY AIYER,              |

    Defendant.         |

-------------------------------------------------------------x

**THE UNITED STATES' SENTENCING MEMORANDUM REGARDING**
<u>**DEFENDANT AKSHAY AIYER**</u>

## TABLE OF CONTENTS

I.      Trial and Offense Conduct .................................................................................... 1

   A.   Rigging Bids to Customers ................................................................................ 2

   B.   Coordinated Trading in Interdealer Market ...................................................... 5

   C.   Spoofing and Fake Trades ................................................................................ 9

II.     A Guidelines Sentence is Fair and Appropriate ................................................. 11

   A.   Applicable Law ................................................................................................ 11

   B.   History and Characteristics of Defendant ...................................................... 12

   C.   Kinds of Sentences Available .......................................................................... 13

   D.   The Presentence Report Correctly Calculates the Guidelines Range ............... 13

      1.   Base Offense Level ..................................................................................... 13

      2.   The Volume of Commerce Calculation is Correct and Reflects a Conservative ..........
           Approach .................................................................................................... 14

      3.   The Bid-Rigging Adjustment Applies in this Case .................................... 26

      4.   The Minor-Role Adjustment Does Not Apply ........................................... 31

   E.   A Term of Imprisonment is Necessary to Fulfill the Objectives of Sentencing ............. 34

   F.   A Significant Fine is Warranted ...................................................................... 36

   G.   The Government is Not Seeking Restitution from Defendant .......................... 37

      1.   Victims Have Been Able to Obtain Civil Remedies .................................. 37

      2.   It is Impracticable and Burdensome to Independently Ascertain Restitution, and .......
           Doing So Would Prolong the Sentencing Process ...................................... 39

III.    Defendant's Arguments Do Not Justify a Non-Guidelines Sentence ................. 40

   A.   That Defendant was Convicted of an Antitrust Offense Does Not Justify Deviation from
        the Guidelines ................................................................................................. 40

   B.   Negative Effects of Conviction on Personal and Professional Life Do Not Justify
        Deviation from the Guidelines ........................................................................ 42

   C.   A Guidelines Sentence Would Not Create an Unwarranted Disparity ............. 44

   D.   Defendant's Immigration Status Does Not Justify Deviation from the Guidelines .......... 47

   E.   The Coronavirus Outbreak Does Not Justify Deviation from the Guidelines ................. 53

# TABLE OF AUTHORITIES

**Cases**

*Abel v. United States*,
  362 U.S. 217 (1960).................................................................................................. 50

*Bordenkircher v. Hayes*,
  434 U.S. 357 (1978).................................................................................................. 45

*Duque v. United States*,
  No. 08 Civ. 9315 (RMB) (MHD), 2009 WL 2370639 (S.D.N.Y. July 31, 2009)................... 48

*Gall v. United States*,
  552 U.S. 38 (2007).................................................................................................... 11

*Kimbrough v. United States*,
  552 U.S. 85 (2007)............................................................................................... 34, 45

*Marshall v. Jerrico, Inc.*,
  446 U.S. 238 (1980).................................................................................................. 45

*Mosquea v. United States*,
  No. 09 Civ. 05546 (BSJ), 2010 WL 1838872 (S.D.N.Y. Apr. 28, 2010)............................... 48

*Rodriguez-Quezada v. United States*,
  No. 06 Cr. 188 (SHS), 08 Civ. 5290 (SHS), 2008 WL 4302518 (S.D.N.Y. Sept. 15, 2008)... 48

*Rosario v. United States*,
  No. 05 Civ. 6096 (HB), 07 Civ. 8260 (HB), 2008 WL 1700213 (S.D.N.Y. April 11, 2008) .. 48

*Salazar-Diez v. United States*,
  No. 07 Civ. 1871 (JSR), 2009 WL 2356426 (S.D.N.Y. July 30, 2009) ................................. 48

*United State v. Cavera*,
  550 F.3d 180 (2d Cir. 2008)........................................................................................ 43

*United States v. Booker*,
  543 U.S. 220 (2005).................................................................................................... 11

*United States v. Carpenter*,
  252 F.3d 230 (2d Cir. 2001)................................................................................... 32, 34

*United States v. Chong*,
  No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014)............................................ 44

*United States v. Crosby*,
  397 F.3d 103 (2d Cir. 2005)........................................................................................ 11

*United States v. Cutler*,
    520 F.3d 136 (2d Cir. 2008)..................................................................................... 42, 43

*United States v. Douglas*,
    713 F.3d 694 (2d Cir. 2013)........................................................................................... 44

*United States v. Duque*,
    256 F. App'x 436 (2d Cir. 2007) ................................................................................... 48

*United States v. Goodwin*,
    457 U.S. 368 (1982)...................................................................................................... 45

*United States v. Heffernan*,
    43 F.3d 1144 (7th Cir. 2007) ................................................................................... 29, 30

*United States v. Koppers Co.*,
    652 F.2d 290 (2d Cir. 1981)......................................................................................... 29

*United States v. Koziel*,
    954 F.2d 831 (2d Cir.1992).......................................................................................... 50

*United States v. Park*,
    758 F.3d 193 (2d Cir. 2014).......................................................................................... 52

*United States v. Rattoballi*,
    452 F.3d 127 (2d Cir. 2006)............................................................................... 34, 41, 52

*United States v. Restrepo*,
    802 F. Supp. 781 (E.D.N.Y. 1992) .............................................................................. 50

*United States v. Restrepo*,
    999 F.2d 640 (2d Cir. 1993)............................................................................... 48, 49, 51

*United States v. Rojas*,
    No. 08 Civ. 75A (RJA), 03 Cr. 34A (RJA), 2008 WL 495502 (W.D.N.Y. Feb. 20, 2008) ..... 48

*United States v. Romer*,
    148 F.3d 359 (4th Cir. 1998) ....................................................................................... 29

*United States v. Shyne*,
    388 F. App'x 65 (2d Cir. 2010) ................................................................................... 48

*United States v. SKW Metals & Alloys, Inc.*,
    195 F.3d 83 (2d Cir. 1999)................................................................................. 17, 18, 19

*United States v. Socony-Vacuum Oil Co.*,
    310 U.S. 150 (1940)...................................................................................................... 29

*United States v. Stein*,
   No. 09-CR-377, 2010 WL 678122 (E.D.N.Y. Feb. 25, 2010)..................................................44

*United States v. Sturdivant*,
   244 F.3d 71 (2d Cir. 2001)...................................................................................................26

*United States v. Thavaraja*,
   740 F.3d 253 (2d Cir. 2014)................................................................................................51

*United States v. Topco Assocs., Inc.*,
   405 U.S. 596 (1972)...........................................................................................................28

*United States v. VandeBrake*,
   679 F.3d 1030 (8th Cir. 2012) ...........................................................................................41

*United States v. VandeBrake*,
   771 F. Supp. 2d 961 (N.D. Ia. 2011)..................................................................................45

*United States v. Wills*,
   476 F.3d 103 (2d Cir. 2007)..........................................................................................45, 48

*Wayte v. United States*,
   470 U.S. 598 (1985)...........................................................................................................45

**Statutes**

15 U.S.C. § 1 .............................................................................................................. 1, 13, 47

18 U.S.C. § 3013(a)(2) .......................................................................................................... 13

18 U.S.C. § 3553(a) .............................................................................................................. 51

18 U.S.C. § 3553(a)(1) .......................................................................................................... 11

18 U.S.C. § 3553(a)(2) ..................................................................................................... 12, 34

18 U.S.C. § 3553(a)(6) .......................................................................................................... 44

18 U.S.C. § 3563(b)(2) .......................................................................................................... 37

18 U.S.C. § 3571(b) .............................................................................................................. 37

18 U.S.C. § 3583(b)(2) .......................................................................................................... 13

18 U.S.C. § 3583(d) .............................................................................................................. 13

18 U.S.C. § 3621(b) .............................................................................................................. 50

18 U.S.C. § 3663(a)(3)................................................................................................. 13, 37, 39

Pub. L. No. 108–237 § 213 ............................................................................................. 46

On November 21, 2019, a jury found Defendant Akshay Aiyer guilty of knowingly entering into and participating in a conspiracy to fix prices and rig bids of currencies from Central and Eastern Europe, the Middle East, and Africa ("CEEMEA currencies"), in violation of 15 U.S.C. § 1.  He, along with co-conspirators Christopher Cummins, Jason Katz, and Nicholas Williams, conspired to manipulate the foreign exchange market in order to line their pockets, with no regard for the victims they left in their wake.  They rigged bids to customers and coordinated their trading in the interdealer market to push price in their favor, and to the disadvantage of others in the market.  Each time they implemented their agreement, they positioned themselves to steal from pension funds, college savings funds, foundations, mutual funds, and retirement accounts.

Defendant shows no remorse for his conduct; instead he repackages the arguments and justifications offered and rejected at trial and seeks a sentence of probation.  Defendant should receive an appropriate custodial sentence to reflect his guilt of a serious crime.  In accordance with the United States Sentencing Guidelines (the "Guidelines"), the Court should impose a term of imprisonment of 37 to 46 months, a significant fine, and a mandatory special assessment.

## I.   Trial and Offense Conduct

Trial began on October 30, 2019, and a verdict was returned on November 21, 2019.  At trial, the government called seven witnesses: Dr. David DeRosa, a foreign-exchange expert; co-conspirator Cummins; Amy Flynn, Business Manager and Head of Trading at Mellon; co-conspirator Jason Katz; Robert Davis, Portfolio Manager at Putnam Investments ("Putnam"); Denise Simon, Portfolio Manager at Lazard Asset Management ("Lazard"); and Ross Waller, a trading-data expert.  Defendant called one witness: Prof. Richard Lyons, a finance professor at the University of California at Berkley.

The trial testimony made clear that Defendant knowingly participated in a conspiracy to fix prices and rig bids.  Both Katz and Cummins testified that they pled guilty to knowingly participating in a conspiracy to fix prices and rig bids with Defendant.  *See* Trial Tr. 164:19–165:5 (Cummins); Trial Tr. 821:22–822:11 (Katz). The co-conspirators implemented their conspiracy in two principal ways: by (1) rigging bids to customers who came to the co-conspirators for price quotes, and (2) coordinating bids and offers on the Reuters platform to raise or lower prices to their benefit.  In addition to this conduct, Defendant and his co-conspirators jointly engaged in spoofing conduct and fake trades.

### A. Rigging Bids to Customers

Rigging bids to customers occurred in the following way.  As explained by Flynn and Simon, customers, like asset management companies, transact with dealer banks when exchanging large sums of currency.  Asset management companies trade on behalf of their clients, which include foundations, endowments, pension plans, and retail investors.  Trial Tr. 762:8–10 (Flynn); Trial Tr. 1456:25–1457:4 (Simon).  In order to best serve their clients, customers often "comparison shop" to solicit multiple price quotes for a given order.  Flynn described this as Mellon's policy of "best execution," which means "ensuring that we got the best price possible for our clients."  Trial Tr. 764:2–3.  She explained that Mellon's traders implement this policy by "trading in competition, meaning they go out to bid or offer any particular trade to two or more banks."  Trial Tr. 766:23–24.  After the traders get the prices quotes from the dealer banks, they then "take the best price for the trade."  Trial Tr. 767:2–3.  Simon likewise testified that Lazard has a "policy of best execution for our clients," which means "getting the most competitive price" from counterparty banks.  Trial Tr. 1458:8–16.  She

explained that Lazard's traders ideally get price quotes from multiple banks and then execute at the best quoted price.  Trial Tr. 1458:12–1460:10.

As explained by Flynn and Simon, "trading in competition" is an essential element of their business and enables them to best serve their clients.  Katz and Cummins both testified to their understanding of this process.  Trial Tr. 857:17–23 (Katz); Trial Tr. 191:16–20 (Cummins).  And as Katz and Cummins testified, the members of the conspiracy conspired to deceive and manipulate customers like Mellon and Lazard, thereby corrupting this competitive bidding process.  Katz testified: "The banks in the chatrooms, we were talking about the customers as they came in.  So we were using the information that we had between them to price in a way that they weren't effectively comparison-shopping.  They may have the idea that they were, but in reality it wasn't."  Trial Tr. 859:20–24.   Cummins testified that they coordinated their prices "in such a way that the client still thought it was competition going on for the business."  Trial Tr. 241:21–23; *see also* Trial Tr. 195:4–11; Trial Tr. 211:13–18.  Their conspiracy was intended to help their bottom line at the expense of their customers and their customers' underlying clients— the pension funds, endowments, foundations, and investors.  Two examples of this conduct are November 4, 2010 and February 28, 2012, the instances of conduct that victimized Mellon and Lazard.

Katz testified about their coordination against Mellon.  He explained that Defendant had been asked for a price quote on a $30 million USD/RUB forward order.  Trial Tr. 931:15–16; GX-102 at 1.  Katz was asked for a price quote on the same order.  Trial. Tr. 932:1–2; GX-102 at 1.  Katz explained that "once we determined that we were both being asked a price by the same customer, we agreed what bid we were going to show them between the two of us. . . . We discussed it and then came up with the two rates that we were going to show."  Trial Tr. 933:24–

3

934:4.  Defendant communicated that his price would be 30.99, and then Katz understood that he

should show a number below Defendant so that the customer would trade on Defendant's price.

Trial Tr. 934:19–22; Trial Tr. 935:7–10; GX-102 at 1.  Katz then showed a price of 39.98, a

deliberately losing bid.  Trial Tr. 936:15–6. GX-102 at 1.  Katz described his conduct as follows:

> The customer is comparison-shopping.  They want to get multiple bids in this case
> to make their deal.  They would not expect for the two banks that they're asking to
> be discussing between the two of them what price should we show.  You know,
> they've effectively sat down at the poker table, but we're coordinating.  So it's a
> situation that's not going to work out in their best interest.

Trial Tr. 936:6–12.  The customer transacted with Defendant, then Katz and Defendant laughed

about it.  As described by Katz, they had succeeded in "direct[ing] the customer into where

[they] wanted him to go."  Trial Tr. 936:22–23.  They then discussed repeating this strategy of

tricking the customers.  Trial Tr. 937:3–939:9.  Katz commented, "conspiracies are nice" to

which Defendant replied, "hahaha . . . prolly shudnt puot this on a perma chat."  GX-102 at 2;

Trial Tr. 939:12–20.

Similarly, Cummins testified about their coordination against Lazard.  He explained that

he had been asked for a price on a $5 million USD/RUB forward order and he communicated

this to his co-conspirators.  Trial Tr. 248:1–3; GX-193 at 17.  Both Defendant and co-conspirator

Williams had been asked for a price quote as well.  Trial Tr.  248:3–4; GX-193 at 17.  Defendant

shared that he had quoted a price of 29.10, and Williams said he had quoted a price of 29.05.

Trial Tr. 248:22–249:2; GX-193 at 17–18.  Based on this information, Cummins showed a price

of 29.06, a worse price than Defendant's.  Trial Tr. 249:3; *see also* Trial Tr. 250:25–251:1.

Defendant then changed his price from 29.10 to 29.08, a better price for him and a worse price

for Lazard.  Trial Tr. 249:3–11.  Defendant won the trade at the price of 29.08.  GX-193 at 18;

GX-S17.  Katz then made a joke that he should show a price of 29.079999 (an even worse price

for the customer).  Trial Tr. 249:21–22; Trial Tr. 250:3–8; GX-193 at 18.  This joke illustrates

the nature of their collusion and their deliberate intent to manipulate customers and rig bids:

> [Y]ou're kind of steering the client towards the best price but you're showing the client, we're good but maybe we're not the best in this instance.  So it['s] kind of like still preserves the optics of a competitive price, a competitive almost auction here, even when it's not.

Trial Tr. 250:14–20; 250:23–251:1.  Cummins testified that he knew his conduct was wrong

because they should have been "pricing independently."  Trial Tr. 8–15.  He further testified that

he did not tell his customer about this conduct because "[t]he customer would be very unhappy"

because the customer "thinks they're getting competitive prices from us, and they're not."  Trial

Tr. 251:16–22.

This conduct is egregious.  As demonstrated by their communications and their

testimony, the members of this conspiracy knew how their customers tried to create competition

to benefit their clients.  Rather than compete amongst themselves, though, the members of this

conspiracy colluded to the detriment of their customers and their customers' underlying clients.

The government offered seven instances of this type of conduct at trial: October 14, 2010 (GX-

S01); November 4, 2010 (GX-S02); November 22, 2011 (GX-S10); February 23, 2012 (GX-

S16); February 28, 2012 (GX-S17); March 1, 2012 (GX-S18); and March 8, 2012 (GX-S19).

### B.  Coordinated Trading in Interdealer Market

In addition to rigging bids to customers, Defendant and his co-conspirators also

coordinated their trading in the interdealer market in an effort to move price in a direction

favorable to the conspiracy.  As was explained repeatedly at trial, price in the interdealer market

is determined by supply and demand.  Defendant and his co-conspirators worked together to

manipulate supply and demand in order to affect price.  For example, they coordinated placement

of orders on the Reuters platform in order to drive the price down in order to trigger a customer

stop-loss order (January 18, 2012 (GX-S12, GX-S12A, GX-S12B)) and to manipulate fix prices (January 27, 2012 (GX-S37) and May 8, 2012 (GX-S22)).  In addition, they refrained from trading against one another in order for one member of the conspiracy to trade at favorable prices, without competition from the other members of the conspiracy (August 25, 2011 (GX-S06); September 23, 2011 (GX-S08); December 21, 2011 (GX-S11); March 16, 2012 (GX-S20); April 2, 2012 (GX-S21); September 10, 2012 (GX-S23); December 12, 2012 (GX-S26); May 20, 2013 (USD/TRY) (GX-S29); May 20, 2013 (EUR/CZK) (GX-S28)).

        The stop-loss example from January 18, 2012 illustrates the nature and intent of their conduct as it played out in the interdealer market.  As explained by Davis, customers place stop-loss orders with banks as a form of protection, a way to avoid significant losses on their investment.  Trial Tr. 779:1–17.  Cummins likewise explained a stop-loss order as "an order that a client gives to a bank in order to help limit the client's losses at a certain price."  Trial Tr. 223:22–24.  In this case, Defendant and his co-conspirators learned at least two of them had stop-loss orders in the USD/ZAR currency pair placed by the same customer at the same level.  Trial Tr. 226:18–227:1.  After realizing this, Defendant called the customer a "fucking clown."  Trial Tr. 227:23–228:1; GX-172 at 13.  Katz then suggested they should "drive it down" to the stop level "and keep some."  Trial Tr. 228:13; GX-172 at 13.  Doing so would, as Cummins later described, "lock[] in the client's loss" but it would also give them an opportunity to make money, Trial Tr. 228:13–16.  A bit later, Cummins told Defendant, "Don't jam it yet" because Cummins was stepping off the desk to get coffee.  Trial Tr. 229:15–17; GX-172 at 13.  When he returned, Defendant and Cummins talked about the state of the market and Defendant said, "I'm sure between us we take it out," to which Cummins replied, "better get to work."  Trial Tr. 229:23–230:11; GX-172 at 14.  In saying this, Cummins testified that he meant, "let's do it,"

let's take out the stop-loss orders.  Trial. Tr. 230:10–11.  They then traded and triggered the stop-loss orders.  GX-S12.  Commending his co-conspirators for their efforts, Defendant cheered, "salute to the first coordinated ZAR effort," to which Katz responded, "yeah, many more to come."  Trial Tr. 237:9–12; GX-171 at 6.

At trial, defense counsel attempted to justify the conspiracy's conduct in this instance by positing that Defendant and his co-conspirators were simply trying to trade ahead of the stop-loss which, he argued, would ultimately benefit the customer.  Defendant's customer, however, refused to accept the premise that this type of conduct could ever be in his interest.  Trial Tr. 804:3–807:17 (Davis).  Furthermore, Cummins was clear in his testimony that they deliberately traded to trigger the stop-loss orders in this particular instance.  *See* Trial Tr. 724:21–726:23. They did so to make a profit for themselves and at the expense of their customer, Putnam.  There were dozens of Putnam accounts victimized by this conduct, including retirement accounts and college savings funds.  GX-S12A; GX-S12B.  Cummins testified that he knew this conduct was wrong, Trial Tr. 225:3–16, and the jury was presented with plenty of evidence to conclude that Defendant knew it too.

In addition to the stop-loss example, the two trading instances on May 20, 2013, also illustrate how Defendant and his co-conspirators suppressed competition in the interdealer market in order to affect price to their advantage.  A key aspect of their agreement was that when two or more of them were the same way (i.e., both short or both long in the same currency pair), the one with the smaller position would refrain from competing and let the person with the larger position trade first.  *See, e.g.*, Trial Tr. 1017:11–22.  By refraining from competing, the members of the conspiracy hoped that this would allow the person with the larger position to trade at more favorable prices.  On May 20, 2013, this aspect of the conspiracy was implemented with respect

to at least two currency pairs: the USD traded against the TRY, and the EUR traded against the CZK.

With respect to the USD/TRY currency pair, both Defendant and Katz were long and needed to sell USD.  Trial Tr. 1016:23–1017:8.  Katz explained that because Defendant had the larger position, Katz told him to sell first.  Trial Tr. 1017:15–19; Trial Tr. 1018:7–9; GX-300 at 4 (Katz: "you go in fornt of me . . . im only 10" as compared to Defendant's 40).  Ordinarily, if the two of them were selling at the same time in the market (i.e., competing), the price would likely decrease, which would have been disadvantageous to them.  Trial Tr. 1018:3–7.  Pursuant to their agreement, though, instead of competing against one another, Katz agreed to refrain from trading against Defendant so that there would be less selling pressure in the market and they would be more likely to sell at higher prices than if they had been competing.  Trial Tr. 1017:11–19; Trial Tr. 1018:1–11.  Katz testified that, as agreed upon, he did not sell.  Trial Tr.  1018:12–18.

With respect to the EUR/CZK currency pair, Defendant was short and needed to buy.  Trial Tr. 1012:12–13.  Katz was in the market buying, too, and inadvertently traded with Defendant, not knowing Defendant was trading at the time.  Trial Tr. 1011:15–1013:10.  Defendant scolded Katz for trading against him and told him to stop.  Trial Tr. 1012:23–1013:10; GX-300 at 2.  Katz then canceled the deal they had mistakenly entered into and refrained from trading against Defendant.  Trial Tr. 1014:4–9.  Katz testified that he had an agreement with Defendant as to this transaction that he "would stop buying, that [he] wouldn't push the market against [Defendant]" and that this agreement was part of his underlying agreement with Defendant.  Trial Tr. 1011:18–1012:1.

The kind of coordinated trading among competitors on display on May 20, 2013, is a perversion of what the competitive interdealer market should be. Defendant and his co-conspirators engaged in such conduct time and time again. As noted above, at trial the government presented nine instances of such conduct where the co-conspirators jointly manipulated supply or demand to affect price, in addition to the two fix instances and the one stop-loss instance. These were just some of the many instances of price-fixing and bid-rigging conduct engaged in by Defendant and his co-conspirators.

### C. Spoofing and Fake Trades

In addition to the price-fixing and bid-rigging conduct explained, *supra*, at trial, Katz and Cummins testified to five instances of conduct that could be characterized as solely spoofing or fake trades, specifically April 20, 2011 (GX-S03); April 26, 2011 (GX-S-04); June 9, 2011 (GX-112); November 30, 2012 (GX-S25); and January 15, 2013 (GX-S27). Although the jury was instructed that this conduct could not be the sole basis for their conviction, Trial Tr. 2142:19–22, such conduct was inextricably intertwined with the charged conspiracy, Hr'g Tr. 29:3–12 (Sept. 24, 2019), ECF No. 119. The jury could properly consider this evidence as demonstrating "the relationship between the defendant and his coconspirators, and his knowledge of, and intent to advance, the purpose of the conspiracy charged in the indictment, namely, to fix prices and rig bids." Trial Tr. 2142:22–2143:1.

Cummins explained spoofing as follows:

[W]e would spoof the market, meaning if someone in the chat needed to buy dollars against a certain currency, I might place offers in the market in order to try to drive the price lower into that person's hands, into someone in my chat room's hands in order to help them out or vice versa. If my friend needed to sell dollars, I might go into the market and place buy orders in the hopes of driving the price higher.

Trial Tr. 166:4–13.  Katz testified that they also employed fake trades to influence the price visible to the market.  For example, if the group wanted the market to go lower, they would create a fake trade where one of them would act as an aggressive seller.  Once the trade became visible on the trading platform, the rest of the market would think there was selling interest, and this would hopefully cause price to drop.  Trial Tr. 853:17–24.  After printing the fake trade and duping the market, the co-conspirators would then cancel the fake trade by privately entering into an offsetting trade or by voiding the trade, ensuring that they were not worse off for their trickery.  Trial Tr. 853:24–854:7.

Katz testified about a fake trade that happened on April 20, 2011.  On this day, Defendant had to sell and wanted the market price to go higher.  Trial Tr. 1031:17–19.  So, Defendant told Katz that he would place an offer on Reuters at a price of "00" ("1.5200") in the USD/TRY currency pair.  Trial Tr. 1031:23–1032:7; GX-106 at 3.  He then told Katz to pay the offer (i.e., buy from him), signaling to the market that there was an aggressive buyer in the market, which would hopefully have the effect of moving the price up.  Trial Tr. 1030:17–22; Trial Tr. 1031:23–1032:7; GX-106 at 3.  Defendant placed the offer at 1.500, and Katz paid it.  GX-627-B; GX-S03; Trial Tr. 1034:8–18.  Regarding this trade, Katz explained:

> There is no legitimate point for this trade other than to create a sense in the market that there is a buyer.  What we are doing in the back end is to get out of it.  So effectively there is no position for us, but we signified to the market, hey, there is an aggressive buyer.  Hopefully the market will go higher.  There is no underlying reason for this trade.

Trial Tr. 1032:14–19; Trial Tr. 1033:16–18 ("It's a fake trade.  There is no reason for it other than to distort a market.  We are acting together to try to create a sense in the market that really isn't there.").  The spoofing conduct and fake trades demonstrate Defendant's willingness to

employ deception and trickery with his co-conspirators to the detriment of other market participants.

## II.  A Guidelines Sentence is Fair and Appropriate

### A.  Applicable Law

The Guidelines continue to provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Although *Booker* held that the Guidelines are no longer mandatory, it also held that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  *Booker*, 543 U.S. at 264.  As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" — that range "should be the starting point and the initial benchmark."  *Gall v. United States*, 552 U.S. 38, 49 (2007); *see also id.* at 50 n.6 ("[D]istrict courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process.").

After that calculation, however, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(1)–(7); *see also Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

11

(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training,
medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### B.  History and Characteristics of Defendant

Defendant is an Indian national.  He came to the United States to attend Vassar College

in 2002.  He graduated from Vassar in 2006 with an economics major and a mathematics minor.

Immediately thereafter he commenced employment at J.P. Morgan Chase.  He started as a

foreign exchange analyst and eventually became a foreign exchange trader.  His career

progression shows that he was a talented and successful trader.  From 2006 to 2009, he had the

title of analyst.  From 2009 to 2011, he was an associate.  In 2011, he was promoted to vice

president, and in 2014, he was promoted to executive director.  During the period of the charged

conspiracy, he made, on average, $1,062,625 per year, plus an award of restricted stock each

year.  By the age of 30, Defendant was a millionaire with a lucrative finance job and a vacation

home in Martha's Vineyard—but that was not enough.  Defendant's greed and arrogance drove

him to cheat others in order to make even more money for himself.  To date, Defendant has

expressed no remorse or regret for his conduct and the effect it had on his customers and

counterparties.  Indeed, neither in his lengthy submission nor in the letters attached thereto is

there any indication that Defendant has acknowledged that he made *any* mistakes as a trader.

Defendant's sentencing memorandum sets forth exhaustive detail about his upbringing

and his life as a citizen and currency trader.  It may well be that Defendant has been a good

friend, son, brother, and partner.  However, as his submission demonstrates, Defendant lived a

privileged life.  He graduated from a well-regarded university and he was fortunate to have had a

full-time position at one of the world's largest banks.  Over time, he became a skilled currency

trader.  Accordingly, Defendant was afforded increasing levels of trust and responsibility as a currency trader, and he was compensated accordingly.  But he abused that trust and responsibility day in and day out by cheating his customers and counterparties.

### C.  Kinds of Sentences Available

A violation of 15 U.S.C. § 1 carries a maximum sentence of 10 years of imprisonment and up to three years of supervised release.  15 U.S.C. §1; 18 U.S.C. § 3583(b)(2).  The statutory maximum fine is $1,000,000.  15 U.S.C. § 1.  Pursuant to 18 U.S.C. § 3013(a)(2)(A), Defendant also must pay a $100 special assessment.  Pursuant to 18 U.S.C. § 3663(a)(3), the Court may order Defendant to pay restitution to the victims of the offense.  *See also* 18 U.S.C. § 3583(d); U.S.S.G. § 5E1.1.

### D.  The Presentence Report Correctly Calculates the Guidelines Range

As set forth in the Presentence Report, the United States Probation Office (the "U.S. Probation Office") calculates the total offense level to be 21 and Defendant's Criminal History Category to be I.  This yields a Guidelines sentence of 37–46 months of imprisonment, 1–3 years of supervised release, a fine of $20,000[1]–$1,000,000, and a mandatory special assessment of $100.  Because the applicable Guidelines range is in Zone D of the Sentencing Table, Defendant is ineligible for probation.  *See* U.S.S.G. §5B1.1, cmt. n.2.

The government agrees with the Guidelines calculations.

### 1.  Base Offense Level

There is no dispute between the parties that Defendant's base offense level is 12.  U.S.S.G. §2R1.1(a).

---

[1]   The presentence report calculates the minimum fine as $15,000.  However, U.S.S.G. §2R1.1(c)(1) states that "[f]or an individual, the guideline fine range shall be from one to five percent of the volume of commerce, but not less than $20,000."

**2. The Volume of Commerce Calculation is Correct and Reflects a Conservative Approach**

   *a. Defendant should receive an eight-level adjustment based on the volume of commerce attributable to him.*

Section 2R1.1 of the Guidelines provides for adjustments if the "volume of commerce attributable to the defendant was more than $1,000,000." U.S.S.G. §2R1.1(b)(2). The Guidelines do not contemplate any circumstance in which a volume-of-commerce calculation is unnecessary or inappropriate. Indeed, to the government's knowledge, there has been no criminal antitrust case that has not involved a calculation of the volume of commerce.

The methodology for calculating the volume of commerce in this case appropriately reflects the conduct at issue. This number was determined in the following way:

- At trial, the government presented 24 instances where Defendant actively engaged in trading conduct pursuant to the charged conspiracy. These instances were proven through Bloomberg chat communications, audio recordings, trading data, and co-conspirator testimony. In addition, for 23 of those instances of conduct,[2] the government's trading expert, Ross Waller, prepared a summary exhibit that summarized the relevant communications and corresponding trading data.

- In determining the volume of commerce attributable to Defendant, the government voluntarily limited its calculations to these trading instances rather than counting all applicable commerce during the charged conspiracy. It excluded from its calculations instances that exclusively involved spoofing conduct or fake trades, which were subject to a limiting instruction by the Court.

---

[2]     Mr. Waller did not create a summary exhibit for June 9, 2011. This instance of conduct was spoofing and is excluded from the government's calculation.

14

*See* Trial Tr. 2142:16–2143:1.  Accordingly, the government considered only the following dates in its calculations: October 14, 2010; November 4, 2010; August 25, 2011; September 23, 2011; November 22, 2011; December 21, 2011; January 18, 2012; January 27, 2012; February 23, 2012; February 28, 2012; March 1, 2012; March 8, 2012; March 16, 2012; April 2, 2012; May 8, 2012; September 10, 2012; December 12, 2012; May 20, 2013 (USD/TRY); May 20, 2013 (EUR/CZK).

- To determine the volume of commerce associated with instances of conduct that involved trading on the Reuters platform, the government limited its calculations to the time period and currency pair reflected in the corresponding summary exhibit.[3]  The government then totaled the volume of transactions entered into by Defendant during that time period in the respective currency pair, as reflected in his trading book.[4]

- For instances of conduct involving specific customer orders (e.g., November 4, 2010), the volume of commerce for each instance was the value of the deal won by Defendant, as reflected in his trading book.  If Defendant did not win such a

---

[3]     Even more specifically, the time period for each volume of commerce calculation began when a member of the conspiracy had initiated contact with another.  Accordingly, if the summary exhibit included a trade prior to any communication between members of the conspiracy, that trade was excluded from the calculation.  For example, this took place on December 12, 2012.

[4]     Despite Prof. Lyons's inclusion of swap trades in his calculation of Defendant's daily trading volume, *see* Trial Tr. 1785:13–22; Trial Tr. 1787:1–22, Trial Tr. 1859:20–2, the government excluded swap trades from its calculation of the volume of commerce.  In a swap trade, the foreign exchange spot component of the swap is held constant.  As discussed at trial, there is little risk to a foreign exchange trader associated with a swap trade.  Trial Tr. 1860:23–1861:1.

deal, there was no volume of commerce attributable to Defendant for that particular instance of trading conduct (e.g., February 23, 2012).

- Following this methodology, the volume of commerce for each instance of conduct is set forth in the chart below.  Exhibit A to this memorandum includes the summary exhibits for each date contained in this chart.  Exhibit B to this memorandum includes trading data exhibits associated with each date contained in this chart that has a non-zero volume of commerce.  These exhibits are excerpts from Defendant's trading book.[5]

| Date | Volume of Commerce (USD) |
|------|--------------------------|
| 10/14/2010 | $5,493,960 |
| 11/4/2010 | $29,617,619 |
| 8/25/2011 | $3,000,000 |
| 9/23/2011 | $0 |
| 11/22/2011 | $0 |
| 12/21/2011 | $10,000,000 |
| 1/18/2012 | $46,325,807 |
| 1/27/2012 | $47,000,000 |
| 2/23/2012 | $0 |
| 2/28/2012 | $5,000,000 |
| 3/1/2012 | $0 |
| 3/8/2012 | $0 |
| 3/16/2012 | $13,000,000 |
| 4/2/2012 | $14,800,000 |
| 5/8/2012 | $39,700,000 |
| 9/10/2012 | $8,000,000 |
| 12/12/2012 | $3,919,500 |
| 5/20/2013 (EUR/CZK) | $2,569,500 |
| 5/20/2013 (USD/TRY) | $3,000,000 |
| | |
| **Total** | $231,426,386 |

---

[5]      These exhibits were highlighted for purposes of identifying particular trades at trial; the highlighting does not indicate which trades were counted in the volume of commerce.

The government notes that after the final disclosure of the presentence report, the government identified a slight miscalculation in the volume of commerce. The final computation is $231,426,386, instead of $276,498,963, as stated in the presentence report.[6] This correction does not affect the applicable Guidelines adjustment reflected in the presentence report.

Defendant would have the Court abandon the concept of volume of commerce and instead conduct a "transaction-specific" analysis, calculating the particular price impact of the conspiracy corresponding to each instance of conduct. *See generally* Sentencing Mem. on Behalf of Akshay Aiyer ("Def.'s Mem.") at 8–17, ECF No. 220. However, doing so would fly in the face of both Second Circuit precedent and the Guidelines. In *United States v. SKW Metals & Alloys, Inc.*, the Court of Appeals for the Second Circuit clearly stated:

> A finding as to the volume of affected commerce does not require a sale-by-sale accounting, or an econometric analysis, or expert testimony. A court may consider the goals of the conspiracy and the steps taken to implement it, the market share of the conspirators, and the perceptions of the conspirators and the persons with whom they transacted business, and may otherwise deduce the effect on commerce from the pressures brought to bear on it.

195 F.3d 83, 91 (2d Cir. 1999). That there need not be a transaction-by-transaction accounting or economic analysis is consistent with the Guidelines Commentary, which states that "[t]he offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish." U.S.S.G. §2R1.1, cmt. Background.

---

[6] For additional clarification on this point, the initial calculation excluded swap trades based on codes that were assigned by the bank. However, on further inspection, although some trades were not labeled with a "swap trade" code, they appeared to be, in effect, swap trades. The government, therefore, chose to exclude those trades from the volume of commerce calculation, to Defendant's benefit.

In addition, a minor error was identified as to end time used in the initial calculation of the volume of commerce on a few dates. This error has likewise been corrected.

Under *SKW Metals*, the volume of commerce is a sum of sales affected by the conspiracy. 195 F.3d at 90. "Sales can be 'affected' by a conspiracy when the conspiracy merely acts upon or influences negotiations, sale prices, the volume of goods sold, or other transactional terms. While a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are 'affected' by the conspiracy." 195 F.3d at 90. In this case, each time a member of the conspiracy refrained from trading, placed orders pursuant to the conspiracy, or quoted particular prices pursuant to the conspiracy, he "act[ed] upon or influence[d] negotiations, sale prices, the volume of goods sold, or other transactional terms" within the clear meaning of *SKW Metals*. Indeed, at trial, co-conspirators Katz and Cummins repeatedly explained to the jury how the conspirators' conduct on these days affected supply or demand, i.e., the apparent volume of goods sold on the Reuters platform. *See, e.g.*, Trial Tr. 263:2–265:13 (September 23, 2011); Trial Tr. 1011:18–20 (May 20, 2013). Katz and Cummins likewise explained how the conspiracy's conduct affected the price they offered to pay for a given customer order. *See, e.g.*, Trial Tr. 247:18–249:11 (February 28, 2012); Trial Tr. 933:9–936:23 (November 4, 2010). Accordingly, the government's calculation is based solely on instances where it was shown at trial that the conspiracy was operating and had some influence on sales. It is, therefore, an accurate calculation of the commerce actually affected by the charged conspiracy.

Contrary to Defendant's assertions, the government's calculation of the volume of commerce attributable to Defendant is, in fact, a very conservative estimate of the volume of commerce affected by the conspiracy. As noted above, under *SKW Metals*, "[w]hile a price-fixing conspiracy is operating and has *any* influence on sales, it is reasonable to conclude that all sales made by defendants during that period are 'affected' by the conspiracy." 195 F.3d at 90.

Accordingly, under Second Circuit precedent, the government could have taken into account all trades done by Defendant in all CEEMEA currencies during the time period of the conspiracy proven at trial, October 2010 through July 2013.  Under this methodology, the volume of commerce would have been nearly $500 billion.  The government likewise could have taken into account all transactions done by Defendant on the dates (and corresponding currency pairs) that were proven at trial.  Under this methodology, the volume of commerce attributable to Defendant would have been greater than $3 billion.

Furthermore, under §2R1.1, "the volume of commerce attributable to an individual participant in a conspiracy is the volume of commerce done by him *or his principal* in goods or services that were affected by the violation."  U.S.S.G. §2R1.1(b)(2) (emphasis added).  Had the government considered the volume of commerce done by Defendant's principal, J.P. Morgan Chase, in CEEMEA currencies, as opposed to the volume of commerce done by Defendant in CEEMEA currencies, the volume of commerce attributable to Defendant under any calculation would have been exponentially larger.  Rather than employing any of these methods of calculating the volume of commerce attributable to Defendant, the government chose a far more conservative methodology in this case.

### b. *Defendant's arguments have no merit.*

As a threshold matter, Defendant erroneously argues that the principle of volume of commerce is inherently inapplicable to the foreign exchange market.  *See* Def.'s Mem. at 20–23. This argument is not unique to Defendant or the foreign exchange market; it is often made by antitrust defendants in a variety of markets and repeatedly has been rejected by courts.  *See, e.g.*, Sentencing Tr. 8:25–9:4, 9:9–13 (Sept. 10, 2012), ECF No. 963, *United States v. AU Optronic Corp.*, 9-cr-110-SI (N.D. Cal. 2009) (concluding that the volume of commerce affected was

$2,340,000,000 and rejecting defendant's request to use an overcharge/loss analysis instead of a volume of commerce analysis). Tellingly, Defendant cites no case law applying, or upholding application of, a §5K2.0 departure on such a ground.

Contrary to his assertion, the concept of volume of commerce is particularly well-suited to the foreign exchange market because of the difficulty of doing an individual, transaction-by-transaction analysis of damages. Indeed, the Guidelines contemplate this scenario. The Commentary to §2R1.1. states, "The offense levels are not based directly on the damage caused or profit made by the defendant because damages are difficult and time consuming to establish. The volume of commerce is an acceptable and more readily measurable substitute." U.S.S.G. §2R1.1, cmt. Background. This statement is especially applicable here where it would be nearly impossible to calculate prices in a "but for" world because prices in the foreign exchange market change quickly and are responsive to even the most miniscule changes in market conditions.

The mechanics of calculating volume of commerce, moreover, work in the context of the foreign exchange market in essentially the same, straight-forward manner as in other markets. Through volume of commerce, the Guidelines explicitly provide that a sentence be determined not based on a calculation of profit or loss but instead on the total volume of sales of the relevant product by Defendant during periods when the conspiracy was active—whether that relevant product is cars, computers, or foreign currency. This is exactly what the government's calculation does. The government has not used any advanced mathematics, but has simply summed the dollar value of affected sales of foreign currency by Defendant on particular days, as presented to the jury, during the time period when the conspiracy was active. In short, Defendant's protestation that the very concept of volume of commerce is a poor fit for the relevant market in this case rings hollow. The concept applies well in this market, and the

government's conservative application of volume of commerce in this case negates Defendant's unfounded arguments.

Defendant further suggests that the volume of commerce overstates his culpability merely because the sum is so substantial. Def.'s Mem. at 20–23. The sum, however, is commensurate with the size of the market and the amount of commerce engaged in by Defendant. There is no dispute that the foreign exchange market is massive. Every day, hundreds of participants trade billions of dollars on behalf of countless customers, and this great engine of currency exchange helps fuel every other aspect of international commerce. Defendant was a significant player in this market, trading billions of dollars in currency each day. Defendant manipulated this market, abusing his position of power within it. That his conduct took place on a worldwide stage in arguably the world's most important market does not absolve him of culpability, it only underscores the need for accountability.

Defendant also makes several arguments as to the types of transactions that the government included in its methodology. He first argues that under the government's methodology, the conduct on August 25, 2011, September 10, 2012, and December 12, 2012, should be characterized as days of spoofing conduct or fake trades and, therefore, excluded from the government's calculations. Def.'s Mem. at 12–14. The government disagrees. In each of these cases, the members of the conspiracy engaged in bid suppression.

- The August 25, 2011 instance was discussed in the government's motion in limine in opposition to Defendant's motion to exclude evidence of spoofing and fake trades. *See* United States' Mem. Law Opp. Def's Mot. in Lim. to Exclude Evid. or Arg. Concerning "Spoofing" or Cancelled Trades at 4–6, ECF No. 103. On August 25, 2011, Defendant and Cummins were both short in the USD/TRY currency pair. Defendant checked in

with Cummins before he traded, saying "i have to buy 8 usd try…u are out?" to which
Cummins replied, "still short . . . go ahead."  GX-121 at 3.  Cummins testified that this
meant, "go ahead in the market, you can buy."  Trial Tr. 332:9–10; Trial Tr. 334:10–16.
Cummins testified that he knew that he should not be telling a competitor, "go ahead in
front of me."  Trial Tr. 334:17–20.  Here, two competing traders both needed to buy and,
rather than compete, one refrained from trading against the other.  This kind of bid
suppression is bid rigging.  Several minutes later, Defendant suggested that he "put up a
60 . . . in 1 . . . i'll hit you . . . then i do 59 . . . u hit me back . . . we make it offers."  GX-
121 at 4–5.  Defendant and Cummins did as Defendant suggested.  GX-S06.  That they
engaged in such "fake" trades does not discount the fact that they also engaged in bid
rigging when Cummins agreed to refrain from trading against Defendant.

- On September 10, 2012, Defendant was short in the USD/ZAR currency pair.  He wanted
  the price lower, so he told the members of the conspiracy, "dont touch zar guys . . . gonna
  walk it lower."  GX-244 at 9; Trial Tr. 1004:20–1005:9.  Katz explained that Defendant's
  strategy to move the price lower was two-fold: (1) Defendant was placing consecutively
  lower offers on the Reuters platform to try to show increased supply, and (2) Defendant
  asked the members of the conspiracy to remove any demand (i.e., bids) from the market.
  Trial Tr. 1004:20–24; Trial Tr. 1005:20–24.  Katz did not see Defendant's directive to
  refrain from trading, and he inadvertently traded against Defendant.  Trial Tr. 1005:7–9;
  Trial Tr. 1006:8–9.  Katz apologized and Defendant then called him a "dick."  GX-244 at
  9; Trial Tr. 1006:8–18.  Katz explained that he apologized because if he had seen
  Defendant's request, he "would have removed demand" because they "were not
  competing, [they] were trying to help each other."  Trial Tr. 1006:12–18.  Katz then sold

22

$5 million to Defendant to reduce his position.  Trial Tr. 1008:5–16.  Katz did not trade

against Defendant on the Reuters platform for at least seven minutes.  During this time

period, Aiyer traded $7 million of the $8 million in volume of commerce attributed to

him on this day.  Katz explained the wrongfulness of Defendant's request for him to

refrain from trading as follows:

> The market is based on competition, you know.  It is me removing
> interest to buy or sell.  The rest of the market doesn't know that we
> are doing this.  It distorts it.  So, you know, we are built as
> competitors to be in there, with our own interest, and not to be
> moving out of the way to make it easier for someone else to do what
> they need to do.

Trial Tr. 1009:14–19.  Refraining from bidding against a competitor pursuant to an

agreement is bid rigging.

- Finally, on December 12, 2012, Cummins needed to buy and wanted price low.  As

  Cummins was trying to walk down the market, he inadvertently traded with Defendant.[7]

  After realizing this, Cummins then told Defendant, "pull that bid AA . . . this guy got

  more to go . . . ill walk hi down."  GX-279 at 1.  Cummins explained that by telling

  Defendant to remove his bid, he was telling him to remove demand from the market in an

  attempt to move the market price lower.  Trial Tr. 326:14–327:9.  Defendant then

  canceled his bid and apologized to Cummins.  GX-S26; GX-279 at 2.  About two minutes

  later, Defendant then asked Cummins, "u out? . . . i got 4 left."  GX.279 at 2–3.

  Cummins indicated that he was finished, so Defendant said, "im taking tht offer then" to

  which Cummins replied, "go for it."  GX-279 at 3; Trial Tr. 328:14–23 ("So I'm

---

[7]     The volume of commerce calculation for this day does not include the inadvertent 1
million EUR/CZK trade because it took place before either Aiyer or Cummins initiated any
communication.

confirming I'm finished.  I've already moved the market lower where I wanted it, then I was able to buy.  'Go for it' means go ahead and do what you need to do in the market now.").   Defendant's agreement to refrain from trading against Cummins, evidenced by his canceled bid and his checking in with Cummins before trading again, is bid rigging.

These three instances of conduct—August 25, 2011; September 10, 2012; and December 12, 2012—are properly considered in the volume-of-commerce calculations.  However, even if the Court were to exclude these instances of conduct from the volume of commerce calculation, the total volume of commerce attributable to Defendant would be $216,506,886, which would have no effect on Defendant's Guidelines range.

Defendant next argues that the government's methodology is flawed because it includes trades that were not conducted on the Reuters platform, but rather through other means of trading, such as via brokers or direct booking with customers.  *See* Def.'s Mem. at 18–19. Defendant's argument belies the fact that there is *one* foreign exchange market, Trial Tr. 109:1– 5, and Defendant was charged with fixing prices and rigging bids in that market.  The Reuters platform is one of several means of executing trades in this market; it does not stand alone as a market, nor was Defendant charged with a conspiracy to fix prices or rig bids in any "Reuters market."  The Reuters platform, moreover, is inseparable from other trading locations in the foreign exchange market with regard to supply, demand, and price, and has a direct effect on the price of trading done in certain currencies off Reuters.  As Katz explained, the Reuters platform, particularly for a CEEMEA trader, "is the most important thing that you're looking at.  That is how you trade.  It allows you to, you know, put bids in the machine, put offers in the machine, to transact.  It provides a good amount of information that is in your day-to-day pricing and your day-to-day trading."  Trial Tr. 848:22–849:2; Trial Tr. 849:25–850:4; *see also* Trial Tr. 172:21–

24 (Cummins explaining Reuters as a means of placing orders); Trial Tr. 179:15–180:4

(Cummins explaining how the Reuters screen can indicate market trends to the traders).  Because

traders consult the price on the Reuters platform constantly throughout the day, including when

making price quotes to customers, even when members of the conspiracy were manipulating the

price on Reuters, that conduct affects the broader market.  Katz, for instance, testified that when

he quoted customers he "absolutely" consulted the Reuters platform to formulate his price.  Trial

Tr. 857:12–14.  In other words, even if the conduct took place on Reuters, it is fair to consider

sales both on and off the platform during that time period and in that currency pair to accurately

capture the market conditions.  Indeed, it is likely for this reason that Defendant included non-

Reuters trades in his summary exhibits as well.  *See, e.g.*, Def.'s Mem. Ex. C at 41–43 (DX-167).

Defendant next argues that the government's volume of commerce calculation is flawed

because the choice of start and end times of the instances of collusive conduct, as shown in

summary exhibits used by the government at trial, were "arbitrary."  *See* Def.'s Mem. at 18–19.

The choice was not arbitrary; it was part of the trial proof upon which the jury based its verdict.

The government's summary exhibits captured a *very* narrow time period that accurately captured

the most relevant portion of collusion as to that day and currency pair—the time period when the

conspiracy was operating and influencing sales.  It is, in fact, surprising that Defendant argues

now that these summary exhibits are over-inclusive when at trial, defense counsel argued the

exact opposite.  *See* Trial Tr. 1500:11–13 (positing to Mr. Waller, "in some instances you

omitted sections that at least arguably relate to the transaction that you are talking about in the

chronology").

Finally, Defendant resurrects a previously rejected argument as to duplicity.  In a motion

to dismiss the indictment, Defendant argued that the indictment was duplicitous in that it

inappropriately "force[d] multiple independent trading behaviors . . under the umbrella of a single broad conspiracy count."  *See* Mem. Supp. Def.'s Mot. Dismiss Indictment at 1, ECF No. 48.  The Court rejected this argument.  Hr'g Tr. 36:1–38:12 (June 3, 2019), ECF No. 87.  Notwithstanding the Court's conclusion that the indictment properly alleged one crime in one count, Defendant now accuses the government of "capitaliz[ing]" on such alleged duplicity.  Def.'s Mem. at 20.  Because here, unlike in *United States v. Sturdivant*, 244 F.3d 71 (2d Cir. 2001), the indictment was not duplicitous, Defendants' argument that the volume of commerce should reflect only the single transaction involving the trading volume of least value has no merit.

### 3.  The Bid-Rigging Adjustment Applies in this Case

A one-level increase for bid rigging is appropriate in this case.  Defendant was charged with "knowingly enter[ing] into and participat[ing] in a combination and conspiracy to suppress and eliminate competition by fixing prices of, and rigging bids and offers for, CEEMEA currencies traded in the United States and elsewhere."  Indictment ¶ 20, ECF No. 1; *see also* Trial Tr. 2138:6–9 ("The indictment charges the defendant with knowingly joining a conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies.").  At trial, the Court properly instructed the jury on both price fixing and bid rigging.  Trial Tr. 2138:10–2141:4 (price fixing); Trial Tr. 2141:5–2142:15 (bid rigging).  The jury returned a guilty verdict against Defendant, finding him guilty of the charged price-fixing and bid-rigging conspiracy.  Hr'g Tr. 10:20–11:1 (Mar. 12, 2020).  Accordingly, a bid-rigging adjustment is warranted.

The evidence at trial amply supports the jury's verdict.  As the Court instructed the jury,

Bid rigging is an agreement between two or more competitors to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded to the basis of competitive bids. Bid rigging may take many forms. For example, it may involve an agreement about the price to be bid, who should be the successful

bidder, who should bid high, who should bid low, or who should refrain from
bidding. Whatever form it takes, any agreement that limits or avoids competition
in competitive bidding is an unlawful bid rigging conspiracy.

Trial Tr. 2141:8–16. The government put forth evidence at trial that Defendant and his co-

conspirators regularly rigged bids to customers and agreed to suppress/withhold their bids on the

interdealer platform. As described above, Defendant's conduct on November 4, 2010 and

February 28, 2012 illustrate how the members of the conspiracy rigged bids to customers. As to

the November 4, 2010 transaction, Flynn testified that at the time, only three or four banks could

have fulfilled the $30 million-ruble forward order for Mellon, including J.P. Morgan, Barclays,

and Citigroup. Trial Tr. 769:7–11. Mellon approached at least two of these banks—J.P. Morgan

and Barclays—to get competitive prices. Little did Mellon know that these two banks were in a

conspiracy. Pursuant to this conspiracy, Defendant and Katz rigged the prices they offered to

Mellon, and Defendant won the deal at his chosen price. Coordination among competitors as to

who should be the successful bidder is bid rigging.

Similarly, on February 28, 2012, three members of the conspiracy—Defendant,

Cummins, and Williams—were all approached by Lazard for a price quote on a ruble forward.

Simon, testified that in 2010, three banks could have fulfilled this order for Lazard. Trial Tr.

1461:23–1462:3. Again, unbeknownst to Lazard, of the four banks that could have executed this

transaction, three of them were colluding with one another against Lazard. Defendant,

Cummins, and Williams, discussed their prices and Defendant lowered the price he had

previously offered, a price adjustment that inured to his advantage and to the disadvantage of the

customer. Defendant won the deal.

Defendant repeats his pre-trial arguments that he and his co-conspirators were in a

vertical, non-competitive relationship and thus could not have engaged in *per se* illegal bid-

rigging.  However, as illustrated in these examples, customers approached the conspirators in their capacity as independent, competing dealer banks; when competing for these orders, they were at the same level of the market structure.  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608 (1972) (explaining that a horizontal agreement is "an agreement between competitors at the same level of the market structure," as opposed to "combinations of persons at different levels of the market structure, e.g., manufacturers and distributors").  It cannot credibly be said that they were in a vertical relationship.  *See* Hr'g Tr. 8:23–9:6 (Mar. 12, 2020) ("Customer comes with the same transaction to three separate bankers.  The bankers discuss the price that they are going to give to the customer.  The defendant lowers his price when he finds out that his two competitors are offering even worse prices for the customer and then gets the bid, gets the deal, gets the transaction.  Now, can you really credibly argue that those three bankers are in a vertical relationship to each other?").  Defendant and his co-conspirators were in a horizontal relationship, and they coordinated their bids to their customer.  This is bid rigging.

Defendant's additional arguments to the contrary have no merit.  To start, Defendant erroneously defines "bid rigging" as a scheme only "involving bid rotation."  Although bid rotation is one of the "many variations" of bid rigging, bid rigging is not so narrowly defined.  12 Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 2005a (3d Ed. 2012); *id.* at nn.3–4 (collecting bid-rigging cases, including several that did not involve bid rotation); *see also* Trial Tr. 2141:11 ("Bid rigging may take many forms.").  The Guidelines likewise do not so narrowly define bid rigging; §2R1.1(b)(1) provides that "[i]f the conduct involved participation in an agreement to submit non-competitive bids, increase by 1 level."  U.S.S.G. §2R1.1(b)(1).  As noted by the Court of Appeals for the Fourth Circuit, "[i]f the Sentencing Commission intended the enhancement to apply only to bid-rotation

28

cases, it is reasonable to believe that the general term 'non-competitive bids' would have been replaced by a more particular term, like 'bid-rotation' or 'complementary bids.'" *United States v. Romer*, 148 F.3d 359, 371 (4th Cir. 1998). This Court's instruction properly reflected the correct definition of bid rigging. As noted above, the Court instructed that bid rigging "may involve an agreement about the price to be bid, who should be the successful bidder, who should bid high, who should bid low, or who should refrain from bidding." Trial Tr. 2141:12–16; *see also* Hr'g Tr. 35:21–25 (June 3, 2019), ECF No. 76 ("Bid-rigging conspiracies, agreements to coordinate the submission or withholding of bids and price fixing have been found to be *per se* violations.") (citing *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940); *United States v. Koppers Co.*, 652 F.2d 290, 293–94 (2d Cir. 1981)).[8]

Defendant's comparison to *United States v. Heffernan*, 43 F.3d 1144 (7th Cir. 2007), is inapt. In *Heffernan*, the defendant was charged with participation in a price-fixing conspiracy and only at sentencing did the district court determine that the conspiracy also involved bid rigging. *Id.* at 1145. In this case, however, the *jury* concluded that the facts supported the allegation that Defendant was involved in a price-fixing and *bid-rigging* conspiracy. Because here Defendant was charged with a price-fixing and bid-rigging conspiracy, the jury convicted

---

[8]     In advance of trial, the Court repeatedly rejected similar claims by Defendant that the charged conspiracy did not involve bid rigging. The Court rejected such arguments when it denied Defendant's motion to dismiss. Hr'g Tr. 42:9–13; 43:10–20 (June 3, 2019), ECF No. 76. The Court again rejected similar arguments raised in Defendant's motions in limine. *See* Hr'g Tr. 47:18–48:2 (Sep. 24, 2019), ECF No. 119. The Court also rejected this argument when it denied Defendant's Rule 29 motion brought at the close of the government's case. Trial Tr. 1597:23–1598: 3 ("The remainder of the arguments are factual disputes as to whether in fact this was a conspiracy to fix prices and rig bids, and that is a question whether the jury concludes that the government has proved that beyond a reasonable doubt. There is sufficient evidence from which the jury could conclude that at this point.").

him of this conspiracy, and its verdict was well-supported by the evidence, the bid-rigging adjustment is applicable.

Finally, Defendant takes issue with this adjustment because he contends his conduct was simply "information sharing" or "independent decision making."  The jury rejected these theories, however, when it convicted him of the charged crime.  The Court specifically instructed the jury that neither information sharing nor independent decision making is illegal.  Trial Tr. 2140:14–23 ("[E]vidence has been introduced in this case concerning the exchange of information among the defendant and his competitors at other firms about their prices.  I caution you that the exchange of information about price is not, by itself, illegal.  The fact that the defendant exchanged such information with others does not establish an agreement to fix prices.  There may be other legitimate reasons that would lead competitors to exchange information about prices, and the law recognizes that exchanges of such information may enhance competition and benefit consumers."); Trial Tr. 2136:14–18 ("The antitrust laws involved in this case are concerned only with joint action and agreements among competitors – not with actions taken independently by a single competitor.  The independent actions of a person can never constitute a restraint of trade in violation of the Sherman Act."); Trial Tr. 2142:9–15 ("As long as an individual is exercising that individual's own independent judgment – and not acting under an agreement with a competitor – that individual may bid any price that individual wishes, whether that price is the same as, higher, or lower than a competitor's, and may choose not to seek the award of a particular contract at all.").  Notwithstanding these instructions, the jury convicted Defendant, rejecting his arguments as to information sharing and independent decision making.

The jury's verdict is well-supported by the evidence.  For example, Defendant argues that the February 23, 2012 instance illustrates his "information sharing" and "independent decision making" theory and that it cannot constitute bid rigging.  However, in so arguing, he ignores trial testimony from Cummins regarding that conduct.  Cummins testified that on this day, he, Defendant, and co-conspirator Williams were in competition for a particular customer order. Trial Tr. 253:19–21.  Cummins testified that he had quoted a price to the customer, but after conferring with his co-conspirators, he revised his bid to make it less attractive to the customer than his previous bid, matching the price quoted by Defendant.  Trial Tr. 253:22–254:12.  He testified that the customer thought it was getting a competitive price quote, but it was not.  Trial Tr. 255:17–18.  And he testified that he acted pursuant to his agreement with Defendant.  Trial Tr. 253:1–3.  Although no member of this conspiracy won the particular deal, their coordination was not mere information sharing; it was bid rigging.

In sum, Defendant was charged with, and convicted of, knowingly entering into and participating in a price-fixing and bid-rigging conspiracy.  Accordingly, a bid-rigging adjustment is appropriate.

### 4.  The Minor-Role Adjustment Does Not Apply

Defendant was not a minor participant in the conduct, and a downward adjustment pursuant to §3B1.2 is not merited.  As set forth in §2R1.1, Commentary Note 1, "For purposes of applying §3B1.2, an individual defendant should be considered for a mitigating role adjustment only if he were responsible in some minor way for his firm's participation in the conspiracy."  *Id.* Defendant was the sole J.P. Morgan employee involved in the conspiracy.  Accordingly, he is *exclusively* responsible for his firm's participation in the conspiracy and is precluded from receiving a downward adjustment under §3B1.2.  Even if this constraint did not preclude such an

31

adjustment, as explained in the Commentary to §2R1.1, such an adjustment is considered only in "rare instances."  U.S.S.G. §2R1.1, cmt. Background.  This is not such a rare instance that might merit an adjustment.

It is well-established that "[t]he defendant bears the burden of establishing by a preponderance of the evidence that he is entitled to a mitigating role adjustment under section 3B1.2 of the Sentencing Guidelines."  *United States v. Carpenter*, 252 F.3d 230, 234 (2d Cir. 2001).  An adjustment under §3B1.2 is only appropriate where a defendant is "*substantially less culpable* than the average participant in the criminal activity."  U.S.S.G. §3B1.2, cmt. n.3(A) (emphasis added).  When considering whether a minor role adjustment is warranted, a district court considers the "totality of the circumstances," including the following:

> (i)     the degree to which the defendant understood the scope and structure of the criminal activity;
> (ii)    the degree to which the defendant participated in planning or organizing the criminal activity;
> (iii)   the degree to which the defendant exercised decision-making authority or influenced the exercise of decision-making authority;
> (iv)    the nature and extent of the defendant's participation in the commission of the criminal activity, including the acts the defendant performed and the responsibility and discretion the defendant had in performing those acts;
> (v)     the degree to which the defendant stood to benefit from the criminal activity.

U.S.S.G. §3B1.2, cmt. n.3(C).  Each of these factors weighs against a minor role adjustment in this case.  Notwithstanding the fact that Katz and Cummins were engaged in the conduct prior to Defendant's involvement, the evidence at trial showed that Defendant actively sought to join the conspiracy, affirmatively proposed and directed conduct pursuant to the conspiracy, and willingly performed acts pursuant to the conspiracy.

Defendant's deliberate, active, authoritative role in the conspiracy is apparent, *inter alia*, in his affirmative requests to his co-conspirators and his chastisement of them when they did not behave as expected under the terms of the agreement.  For example, on January 27, 2012,

Defendant had a USD/ILS fix order.  He wanted the fix price to be low, so he directed Katz, "Jason . . . pull ur bids . . . in il . . . s," and Katz did so.  GX-181 at 7; GX-S37; Trial Tr. 991:25–992:11; 992:16–993:8; 994:11–13; 995:12–18.  On April 20, 2011, Defendant wanted to move the price higher in the USD/TRY currency pair.  He directed Katz, "i will pu[t] a 00 offer in usd try . . . pay me for 12."  GX-106 at 3.  Katz did as Defendant directed.  GX-S03; Trial Tr. 1032:22-23.  Defendant made this request in order to increase the illusion of demand and push the price higher.  He then directed Katz not to quote a price to a broker, JR, so that he could deal at a higher, more desirable price.  GX-106 at 4 ("don't make jr"); Trial Tr. 1033:1–11.  Katz again agreed.  GX-106 ("cool").  As illustrated by these examples, Defendant was neither a passive nor unwitting participant in the conspiracy; he was an active director.

Defendant's awareness of the rules of the conspiracy and expectations of his co-conspirators are also apparent in his chastisements of his co-conspirators when they did not behave as he expected.  On September 10, 2012, Defendant issued another order to his co-conspirators, directing them to refrain from trading against him in the USD/ZAR currency pair.  When Katz mistakenly traded against Defendant, Defendant reprimanded him, and Katz apologized because his inadvertent conduct ran contrary to the agreement.  GX-244 at 9; Trial Tr. 1006:13–18.  Similarly, on May 20, 2013 (EUR/CZK), Defendant again chastised Katz for trading against him.  GX-300 at 2 (Aiyer: "stop . . . running this eu4czk . . . in my dface . . . i got paid"; Katz: "ah okay . . . cxl the deal i did on reuters"); Trial Tr. 1012:21–1013:10.  After being scolded by Defendant, Katz canceled the deal.  Trial Tr. 1014:4–9.  In these examples, it is apparent that Defendant understood the contours of the illegal agreement and expected his co-conspirators to respect the agreement and his authority.

Under §2R1.1, Defendant is not entitled to a minor-role adjustment.  Furthermore, even setting aside §2R1.1, Defendant does not meet the criteria for a downward adjustment under §3B1.2.

### E.  A Term of Imprisonment is Necessary to Fulfill the Objectives of Sentencing

A term of imprisonment is necessary to fulfill the objectives of sentencing as set forth in 18 U.S.C. § 3553(a)(2).  Particularly relevant to this case are the needs "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense" and "to afford adequate deterrence to criminal conduct."  18 U.S.C. § 3553(a)(2)(A)–(B).  An antitrust conspiracy is, by its very nature, a serious offense.  As the Guidelines explain, "there is near universal agreement that restrictive agreements among competitors, such as horizontal price-fixing (including bid-rigging) . . . can cause serious economic harm."  U.S.S.G. § 2R1.1, cmt. Background.  This is why "[a]bsent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases." *Id.*; *id.* cmt. n.5 ("It is the intent of the Commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders."); *see also United States v. Rattoballi*, 452 F.3d 127, 136 (2d Cir. 2006), *abrogated in part on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007) ("the policy statements make plain that imprisonment is generally warranted for antitrust offenders").

In this case, Defendant was one of the most active and sophisticated traders in this market and conspired to fix prices and rig bids in a number of emerging markets currencies over a period of several years.  His actions, and those of his co-conspirators, violated important competitive principles and undermined the integrity of the large, global foreign exchange market. As the Court is aware, in connection with the charged conspiracy in this case, co-conspirators

Katz and Cummins pled guilty and accepted responsibility for their criminal conduct.  In addition, Katz's bank employer also pled guilty, based on Katz's conduct, and paid a fine of $90 million.  *See* Plea Agreement ¶ 9, *United States v. BNP Paribas USA, Inc.*, 18-cr-61-JSR, ECF No. 4 (S.D.N.Y. 2018); https://www.justice.gov/opa/pr/bnp-paribas-usa-inc-pleads-guilty-antitrust-conspiracy.

Citigroup (Cummins's employer), J.P. Morgan Chase (Aiyer's employer), Barclays (Katz's and Williams's employer), and Royal Bank of Scotland pled guilty earlier to violating the Sherman Act by conspiring to fix prices of, and rig bids and offers for, the EUR/USD currency pair.  *See, e.g.*, Information ¶ 8, *United States v. JP Morgan Chase & Co.*, 15-cr-79, ECF No. 1 (D. Conn. 2015).  The means and methods employed to effectuate that conspiracy were similar to those employed to effectuate the conspiracy in this case; they included engaging in near daily communications, including in exclusive chatrooms; coordinating trading in connection with fixes; and refraining from certain trading behaviors, by withholding bids and offers, in order to avoid moving the price of the currency in a direction adverse to a co-conspirator. *See, e.g.*, Information ¶ 11, *United States v. JP Morgan Chase & Co.*, 15-cr-79, ECF No. 1 (D. Conn. 2015).

Although the employer banks' guilty pleas only involved the EUR/USD currency pair, nothing in the plea agreements can be construed as some adjudication that the banks did *not* engage in similar misconduct in CEEMEA currencies.  In fact, the non-prosecution terms of the banks' plea agreements covered conduct related to other currency pairs, which would include CEEMEA currencies.  *See, e.g.*, Plea Agreement ¶ 16(a), *United States v. JP Morgan Chase & Co.*, 15-cr-79, ECF No. 13 (D. Conn. 2015) (explaining that the government agreed to not prosecute the defendant bank for "any combination and conspiracy occurring before the date of

signature of this Plea Agreement to fix, stabilize, maintain, increase or decrease the price of, and

rig bids and offers for, the EUR/USD currency pair, or any other currency pair exchanged in the

FX Spot Market, or any foreign exchange forward, foreign exchange option or other foreign

exchange derivative, or other financial product (to the extent such financial product was

disclosed to the United States)").  In the United States alone, the aforementioned banks paid

criminal fines totaling $2.5 billion.  The fact of these guilty pleas and the size of the fines paid by

the banks indicate the seriousness of this conduct.

It is imperative that the responsible individuals are held accountable as well.  A term of

imprisonment is the appropriate way to hold Defendant accountable for his criminal conduct and

disregard for the rule of law.  It will also serve to deter other traders driven by greed who may be

tempted to cheat the system and follow in his footsteps.  In order to hold Defendant fully

accountable for his conduct, Defendant's sentence should also take into account his conduct

related to fake trades and spoofing, pursuant to U.S.S.G. §1B1.4.  This conduct is not accounted

for in the volume-of-commerce calculation but was intrinsic to the charged conspiracy.  This

conduct demonstrates the nature of the relationship between Defendant and his co-conspirators,

as well as his knowledge of, intent to effect, the object of the conspiracy.  As discussed, *supra*

Part I. C., there was no purpose for this conduct other than to deceive market participants.

Consideration of this conduct further justifies a Guidelines sentence.

### F.  A Significant Fine is Warranted

As reflected in the PSR, Defendant has the means to pay a fine.  PSR ¶ 91.  As noted,

*supra* Part II, D., the applicable fine range is $20,000 to $1,000,000.  PSR ¶ 101; U.S.S.G.

§5E1.2(c)(3), (c)(4) and (h)(1); 18 U.S.C. § 3571(b); U.S.S.G. §2R1.1(c)(1).  The Commentary

of the Guidelines explain that "[s]ubstantial fines are an essential part of the sentence."  U.S.S.G.

§2R1.1, cmt. Background.  In light of Defendant's economic motivations for his conduct and the

need for general deterrence, the government respectfully submits that imposition of a significant

fine within the Guidelines range is appropriate.

### G.  The Government is Not Seeking Restitution from Defendant

The government is not seeking restitution from Defendant himself.  This is not because

(as Defendant suggests) no one was injured by his crime or that restitution is unimportant—to

the contrary, restitution to victims is of *great* importance to the government and is carefully

considered in every case—but because the government believes that victims of Defendant's

conduct will be fairly compensated elsewhere, through civil causes of action against the

employer banks.  In addition, calculation of restitution would be impracticable and would impose

a burden on the government and the Court, which would unnecessarily prolong sentencing.

Based on these factors, Judge Rakoff did not order Katz's employer bank, BNP Paribas, to pay

restitution as part of its sentence.  *See* Judgment, *United States v. BNP Paribas USA, Inc.*, 18-cr-

61-JSR, ECF No. 10 (S.D.N.Y. 2018); Hr'g Tr. at 24:22–25:1, 34:7–8 (May 30, 2018), *United

States v. BNP Paribas USA, Inc.*, 18-cr-61-JSR, ECF No. 14 (S.D.N.Y. 2018).

### 1.  Victims Have Been Able to Obtain Civil Remedies

In 2013, a number of civil antitrust suits related to the foreign exchange market were

brought in this District; they were eventually consolidated, in early 2014, into the class action

MDL captioned *In re Foreign Exchange Benchmark Rates Antitrust Litigation*, 13-cv-7789

(LGS), which is before Judge Schofield.  Ultimately, sixteen major international banks, including

Defendant's employer, were named as defendants.  The complaint alleges that the defendant

banks violated the Sherman Act through an overarching, worldwide antitrust conspiracy to

manipulate prices in the foreign exchange market, between 2003 and 2015. The complaint subsumes the conduct at issue in the instant case.

Fifteen of the sixteen defendant banks have settled, with Credit Suisse being the only defendant remaining. Collectively the settlement amounts total approximately $2.3 billion, with each bank's settlement ranging from $15.5 million at the low end to $394 million at the high end.

The classes of injured parties who are able to receive settlement proceeds in the civil class action are twofold: (1) those entities or individuals who, between 2003 and 2015, entered into an foreign exchange instrument directly with any of the 16 named bank defendants, including Defendant's employer; and (2) those entities or individuals who, between 2003 and 2015, entered into an foreign exchange instrument traded on an exchange, such as an foreign exchange future or options contract where the price was in part pegged to foreign exchange fix benchmarks or foreign exchange trades that were manipulated.

In addition to the *In re Foreign Exchange* case, a class of opt-out plaintiffs has also filed a case against the banks, including Defendant's employer. This case is *Allianz Global Investors GMBH v. Bank of America*, 18-cv-10364-LGS (S.D.N.Y. 2018). Like the *In re Foreign Exchange* case, this case encompasses Defendant's conduct. Complaint at ¶¶ 242–246, 18-cv-10364, ECF No. 1, *Allianz Global Investors GMBH v. Bank of America*, 18-cv-10364-LGS (S.D.N.Y. 2018). A class of indirect purchasers also filed a suit against the defendant banks at issue in *In re Foreign Exchange*. This case is *Contant v. Bank of America*, 17-cv-03139-LGS (S.D.N.Y. 2017).

The government believes that the private plaintiffs in these cases have sufficient tools at their disposal to notify victims, assign appropriate shares of the settlements to each claimant, and to efficiently compensate those claimants.

### 2.  It is Impracticable and Burdensome to Independently Ascertain Restitution, and Doing So Would Prolong the Sentencing Process

Section 5E1.1 of the Guidelines provides that a court may decline to impose restitution where (1) the number of identifiable victims is so large as to make restitution impracticable; or (2) determining complex issues of fact related to the cause of action of the victims' losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.  U.S.S.G. §5E1.1  Both factors are present in this case.

The potential victims of Defendant's conduct in this case are numerous.  They include those who conducted foreign exchange trades with Defendant's employer bank on days affected by Defendant's collusive conduct, both traditional customers as well as entities dealing with Defendant's employer in the interdealer market; those who conducted foreign exchange trades with Defendant's co-conspirator banks on those days; those who conducted foreign exchange trades with other entities, on Reuters, or on other electronic platforms that were pegged to the Reuters price that was manipulated, on certain days; and those who traded other foreign exchange instruments (such as futures and options) that were pegged to manipulated foreign exchange benchmarks or spot prices.  Over a period of three years, there are millions of trades that would fall into those categories.

Determining the loss attributable to Defendant's conduct for even one of those trades would be time-consuming and resource-intensive, likely requiring expert assistance.  An expert would have to account for variables that are at play at any given moment in the foreign exchange market in developing a "but for" scenario against which to compare the value of the trade the counterparty actually made.

The government would then have to identify victims' identities and locations based on trading data.  Although the government has trading data from several banks, and from Reuters, it does not have records to show every CEEMEA trade that was conducted in the foreign exchange market between October 2010 and July 2013.  In other words, the government is not equipped to identify, based on its present information, every potential victim of the conduct, and the number of government employees and other types of resources that would be required to even attempt such a calculation would be substantial.  Given the facts of this case, the government believes that the civil litigation process is a better forum through which to address the complexities of apportioning harm and identifying victims than this proceeding.

To be clear, the government does not take the position that the work that would be required to ascertain a restitution figure in this case simply cannot be accomplished at all.  It does believe, however, that this is a paradigmatic case of the restitution analysis complicating or prolonging the sentencing process to such an extent that it would be counterproductive, particularly given the remedies available in the civil matter.

## III. Defendant's Arguments Do Not Justify a Non-Guidelines Sentence

### A.  That Defendant was Convicted of an Antitrust Offense Does Not Justify Deviation from the Guidelines

Defendant argues that because he was convicted of an antitrust offense, and not fraud, he deserves a non-custodial sentence.  Def.'s Mem. at 46–49.  Specifically, he argues that because intent to defraud is not an element of an antitrust offense, he is less culpable than a defendant convicted of fraud and, thus should be sentenced to probation with a term of confinement.  *See* Def.'s Mem. at 47.  However, to the extent Defendant is seeking a Guidelines departure, the Guidelines already take into account the nature of every crime when assigning a base offense level, and the base offense level for antitrust crimes (12) presumptively places convicted

defendants in line for a substantial custodial sentence.  Furthermore, contrary to what Defendant argues, the Guidelines strongly recommend custodial sentences for antitrust defendants. U.S.S.G. § 2R1.1, cmt. Background ("Absent adjustments, the guidelines require some period of confinement in the great majority of cases that are prosecuted, including all bid-rigging cases."); *id.* cmt. n.5 ("It is the intent of the Commission that alternatives such as community confinement not be used to avoid imprisonment of antitrust offenders."); *see also United States v. VandeBrake*, 679 F.3d 1030, 1037 (8th Cir. 2012) (recognizing that the antitrust and fraud guidelines "attack a similar societal harm"); *see also id.* at 1040 (agreeing with dissent that, "Since '[t]he Commission ha[d] long recognized the similarity of antitrust offenses to sophisticated frauds,' the Commission amended § 2R1.1 to ensure 'that penalties for antitrust offenses will be coextensive with those for sophisticated frauds sentenced under § 2B1.1.'"). Accordingly, any argument that an antitrust offense, by its very nature, is not deserving of punishment in the form of incarceration is wholly without merit.

To the extent Defendant is seeking a variance under 3553(a) based on the absence of a willfulness requirement in antitrust offenses, such a variance is not justified in this case.  As discussed, *supra* Part II, D. 4., Defendant was aware of the existence of a conspiracy, he actively sought to join it, and time and time again, he worked with his co-conspirators to further its goals. Defendant was not an unwitting participant in this conspiracy; he played an active role as a director of it.  Both Katz and Cummins testified that they were aware of the wrongfulness of their conduct.  It is reasonable to infer that Defendant, a co-conspirator and a similarly trained market participant, was aware of the wrongfulness of his conduct as well.  Indeed, this is more than evident in his communication with Katz on November 4, 2010.  When Katz suggested that a conspiracy to coordinate price quotes to customers would be nice, Defendant laughed and

responded that they probably should not write such things in permanent chatrooms.  GX-102 at 2; Trial Tr. 939:12–20.  He knew that such coordination was wrong.  Additionally, as Katz testified at trial, the members of the conspiracy also took certain actions to avoid detection by their banks, like using code words or communicating on cell phones instead of recorded bank lines.  Trial Tr. 896:23–897:2; Trial Tr. 1056:23–1057:2.  Such evidence demonstrates their consciousness of wrongdoing.

### B. Negative Effects of Conviction on Personal and Professional Life Do Not Justify Deviation from the Guidelines

Defendant argues that he deserves a non-Guidelines sentence because as a result of his criminal conduct, he has lost his job, suffered a negative impact on his personal relationships and reputation, and been subjected to public scrutiny and humiliation.  Defendant essentially argues that having been exposed as a criminal is punishment enough.  If these collateral consequences were sufficient to justify a non-custodial sentence, then sentences of imprisonment might rarely be appropriate for any criminal defendant.  Indeed, if such collateral consequences were sufficient to justify a departure or variance, the only people who might stand to be sentenced to imprisonment would be people who were not as privileged as Defendant—those who did not have such a public profile, significant job, or robust social network and family support.  This, in and of itself, would create a grave disparity in our criminal justice system.

The Court of Appeals for the Second Circuit explained this in *United States v. Cutler*, 520 F.3d 136 (2d Cir. 2008).  In *Cutler*, the district court imposed a non-custodial sentence, concluding that "in light of the public nature of the prosecution, the public humiliation that the defendant has suffered, the loss of his law license and various other consequences, and the certainty of prosecution, both just punishment and deterrence in the general sense ha[ve] been accomplished here."  *Id.*  The Court of Appeals for the Second Circuit found this to be

42

problematic, observing that "the consequences listed by the court are hardly unusual." *Id.* at 170.

The court first observed that "[a]n attorney convicted of a felony usually loses his license to

practice law" and found that to be an improper basis for a light sentence. *Id.* The court further

observed,

> Nor is it unusual for a person convicted of participating in a conspiracy to perpetrate massive frauds to be publicly prosecuted and suffer public humiliation. Those are consequences generally suffered by anyone accused and convicted of a crime, especially a crime involving frauds causing losses of more than $100 million. Thus, the imposition of a nonincarceratory sentence on the basis that a defendant has suffered sufficiently simply because he was prosecuted and convicted would create unwarranted disparities among similarly situated defendants.
>
> Finally, the circumstances referred to by the district court do not constitute punishment. The public nature of criminal prosecutions is part of our constitutional fabric; the public humiliation suffered by one prosecuted and convicted of a crime is an ordinary consequence of his conduct, not a condition imposed by the criminal codes or the judicial process. These circumstances, though adverse, are not what § 3553(a)(2)(A) means by "punishment." Hence they cannot properly be viewed as fulfilling the need for the imposition of just punishment. And given that the more massive a fraud, the more likely it is that the prosecution will generate publicity, the logical extension of the district court's view—i.e., that Freedman's public humiliation and the public nature of his prosecution were punishment enough—would mean that the more flagrant the crime, the less actual statutorily prescribed "punishment" it would require. And of course, the less punishment that is meted out, the less deterrent effect the sentence will have on others contemplating similar crimes.

*Id.*[9] This sentiment is keenly applicable here. That Defendant has suffered personal and

professional consequences for having committed a crime should not be considered by the court

in fashioning a just sentence. Defendant cites to *United States v. Chong*, No. 13-CR-570, 2014

WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014), an opinion by Judge Weinstein, in support of his

---

[9]    Some courts misinterpreted cases like *Cutler* to have established a "more searching form of substantive review" of a district court's decision "on the question of what is sufficient to meet the § 3553(a) considerations in any particular case." *See United State v. Cavera*, 550 F.3d 180, 189 (2d Cir. 2008). In *Cavera*, the Court of Appeals clarified that *Cutler* was not meant to establish a "more searching standard," and at the same time noted that in doing so, it did not question the result reached in *Cutler*. *Id.* at 189 n.7

argument.  Of white-collar defendants, Judge Weinstein wrote, "Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed.  A serious sentence is required to discourage such crimes."  *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010).  Such is the case here.

## C.  A Guidelines Sentence Would Not Create an Unwarranted Disparity

Defendant argues that a guidelines sentence would create an "unwarranted sentence disparit[y] with other foreign exchange traders," including a host of unidentified foreign exchange traders who were never prosecuted or who were not convicted.  Def.'s Mem. at 57–60.  Despite Defendant's citation to 18 U.S.C. § 3553(a)(6), he ignores the plain language of the statute and its import.  Section 3553(a)(6) of Title 18 of the United States Code states that a sentencing court "shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."  18 U.S.C. § 3553(a)(6).  Defendant glosses over the fact that the unwarranted disparity to be avoided is one between defendants with similar records *who have been found guilty of similar conduct*.  Accordingly, the Court should not consider disparities among acquitted defendants or individuals who were not charged.  Doing so would be to engage in rank speculation about who these individuals are, the type of conduct they engaged in, the criminality of that conduct, and their relative culpability to Defendant.  *See United States v. Douglas*, 713 F.3d 694, 701 (2d Cir. 2013) ("Assuming without deciding that a district court may take patterns of prosecutorial discretion into account in determining an equitable sentence that avoids unwarranted disparities among similarly situated offenders, an appellate court is ill placed to assess whether a defendant is in fact situated similarly to others whose circumstances, because they were never prosecuted,

are unknown to us.").  Doing so would also improperly intrude on the executive branch.  As the Supreme Court has held:

> In our criminal justice system, the Government retains "broad discretion" as to whom to prosecute. *United States v. Goodwin,* 457 U.S. 368, 380, n. 11, 102 S. Ct. 2485, 2492, n. 11, 73 L.Ed.2d 74 (1982); accord, *Marshall v. Jerrico, Inc.,* 446 U.S. 238, 248, 100 S. Ct. 1610, 1616, 64 L.Ed.2d 182 (1980). "[S]o long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher v. Hayes,* 434 U.S. 357, 364, 98 S. Ct. 663, 668, 54 L.Ed.2d 604 (1978).  This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review.  Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake.  Judicial supervision in this area, moreover, entails systemic costs of particular concern.

*Wayte v. United States*, 470 U.S. 598, 607 (1985).  The Court should, therefore, confine its analysis to defendants *convicted of similar conduct* to that of Defendant.

Defendant also argues that a non-custodial sentence is necessary to avoid unwarranted disparities between him and other antitrust defendants who were convicted in the Southern District of New York.  *See* Def.'s Mem. at 61–63; Ex. T.  His representations, however, are misleading and incomplete.  First, § 3553(a)(6) does not limit the Court's comparison to cases in the district of sentencing.  To the contrary, "the primary purpose of [Section 3553(a)(6)] was to reduce unwarranted sentence disparities nationwide."  *United States v. Wills*, 476 F.3d 103, 109 (2d Cir. 2007), *abrogated on other grounds by Kimbrough v. United States*, 552 U.S. 85 (2007).  Here, a sentence that includes imprisonment would not be not consistent with sentences imposed on other criminal antitrust defendants across the country.  *See United States v. VandeBrake*, 771 F. Supp. 2d 961, 1010 (N.D. Ia. 2011) (collecting cases in which the Sherman Act sentences have ranged from 18–90 months imprisonment).  In fact, in the 2000–2018 time period, of the

twenty-three criminal antitrust defendants who were found guilty by a jury of a Sherman Act offense, *only one* defendant received a non-custodial sentence.

Second, Defendant's chart, Exhibit T, is an inadequate reference for many reasons. First, it does not even identify many of the defendants. Next, it does not contain the Guidelines range for each defendant, which would allow for more ready comparisons. Third, it does not take into account the fact that in 2004, the statutory maximum sentence for an antitrust violation was increased from three years to ten years. Antitrust Criminal Penalty Enhancements and Reforms Act of 2004, Pub. L. No. 108–237 § 213, 118 Stat. 661 (2004). Finally, it does not provide the Court with any facts that might help the Court distinguish those cases from this one. For example, although it lists which defendants pled guilty, it does not indicate which defendants subsequently provided substantial assistance to the government and received letters under U.S.S.G. §5K1.1.

A good comparison to the instant case is *United States v. Penachio*, 00-cr-583-DC (S.D.N.Y. 2000). In that case, defendant David Salomon was charged in a one-count indictment alleging violation of 15 U.S.C § 1. He proceeded to trial and was found guilty. At sentencing, Judge Chin calculated the applicable Guidelines range to be 15–21 months of imprisonment and imposed a Guidelines sentence of 18 months of imprisonment. *See* Judgment, ECF No. 113, *United States v. Salomon*, 00-cr-583-DC (S.D.N.Y. 2000); *see also* Am. Judgment, ECF No. 89, *United States v. Taubman*, 01-cr-429-JGB (S.D.N.Y. 2001) (jury found defendant Taubman guilty of one count of violating 15 U.S.C. § 1, and defendant was sentenced to 12 months plus one day of imprisonment). Contrary to Defendant's speculations, custodial sentences have likewise been imposed on antitrust defendants who pled guilty and cooperated with the government. *See, e.g.*, Judgment, ECF No. 15, *United Sates v. Rothman*, 10-cr-200-HB

46

(S.D.N.Y. 2010) (defendant sentenced to six months of imprisonment, despite having cooperated with the government for over four years and testifying at trial); Judgment, ECF No. 413, *United States v. Rubin/Chambers, Dunhill Ins. Servs. Inc.*, 09-cr-1058-KMW (S.D.N.Y.  2009) (defendant Wolmark sentenced to 18 months of imprisonment after pleading guilty to fraud and antitrust crimes and cooperating with the government); Judgment, ECF No. 412, *United States v. Rubin/Chambers, Dunhill Ins. Servs. Inc.*, 09-cr-1058-KMW (S.D.N.Y. 2009) (defendant Zarefsky sentenced to 8 months of imprisonment after pleading guilting to fraud and antitrust crimes and cooperating with the government).

In short, a Guidelines sentence would not result in an unwarranted disparity between defendant and defendants with similar records who have been found guilty of similar conduct.

### D.  Defendant's Immigration Status Does Not Justify Deviation from the Guidelines

Defendant argues that because he is a non-citizen of the United States, any term of imprisonment would create an unwarranted disparity between him and a U.S. citizen who was convicted of the same crime.  Specifically, he argues that he will receive a disparately more severe sentence because, in light of his status, he (1) is ineligible for a low-security-level institution, will likely be placed in a privately-run prison, and will not be eligible to serve the last 10% of his sentence at a halfway house; and (2) will likely be detained in the custody of United States Immigration and Customs Enforcement ("ICE") throughout the duration of his removal proceedings.

Under clear Second Circuit precedent, neither of these arguments provides a permissible basis for a district court to depart from the Guidelines.  Collateral consequences of a defendant's alienage may be considered as a valid basis for departure only "if those consequences [are] extraordinary in nature."  *United States v. Restrepo*, 999 F.2d 640, 644 (2d Cir. 1993).  Neither

of the bases raised by Defendant meets this standard.  The Court of Appeals for the Second

Circuit squarely addressed these arguments in *Restrepo*.[10]  In that case, a district court had

departed downward when sentencing a criminal defendant based on factors very similar to the

ones pointed to by Defendant here: "(1) the unavailability of preferred conditions of

confinement," which included Restrepo's ineligibility to serve his sentence in a minimum

security prison and the last 10% of his sentence in a halfway house or in home confinement, "(2)

the possibility of an additional period of detention pending deportation following the completion

---

[10]     *Restrepo* was a pre-*Booker* case, but the Court of Appeals for the Second Circuit has
affirmed its reasoning post-*Booker*.  See *Wills*, 476 F.3d at 107 ("Now, after *Booker*, we reaffirm
the reasoning of *Restrepo* and apply it to Wills's non-Guidelines sentence, which was partly
based on the purported 'additional punishment' of deportation."); *United States v. Duque*, 256 F.
App'x 436, 437 (2d Cir. 2007) ("The collateral effects of deportability—*e.g.*, '(1) the
unavailability of preferred conditions of confinement, [and] (2) the possibility of an additional
period of detention pending deportation following the completion of sentence'—generally do not
justify a departure from the Guidelines range." (quoting *Restrepo*, 999 F.2d at 644) (citing
*Wills*, 476 F.3d at 107)).

         Courts in this Circuit have continued to rely on *Restrepo* for the propositions at issue
here.  *See, e.g.*, *United States v. Shyne*, 388 F. App'x 65, 75 (2d Cir. 2010) ("We find nothing
unreasonable about Montgomery's sentence and note that the court did not err by declining to
award a lesser sentence based on Montgomery's deportation concerns." (citing *Restrepo*, 999
F.2d at 647)); *Mosquea v. United States*, No. 09 Civ. 05546 (BSJ), 2010 WL 1838872, at *6
(S.D.N.Y. Apr. 28, 2010) ("the Second Circuit has held, both before and after *Booker*, that a
defendant's deportation is not an 'additional punishment' to be considered for
downward departure purposes"); *Duque v. United States*, No. 08 Civ. 9315 (RMB) (MHD), 2009
WL 2370639, at *7 (S.D.N.Y. July 31, 2009) ("Inasmuch as Saenz presumably would argue that
he would have to serve his sentence under harsher conditions as an alien subject to deportation,
the Second Circuit has held that the limitations or consequences of alien status, such as
ineligibility to serve a sentence in a minimal security facility or in a half-way house, do not
provide a basis for granting a downward departure." (citing *Restrepo*, 999 F.2d at 642–43, 644–
45)); *Salazar-Diez v. United States*, No. 07 Civ. 1871 (JSR), 2009 WL 2356426, at *4 & n.1
(S.D.N.Y. July 30, 2009) ("The unavailability of incarceration in less restrictive institutions to
illegal aliens is not a valid basis on which to impose a lesser sentence." (citing *Restrepo*, 999
F.2d. at 644; *Rodriguez-Quezada v. United States*, No. 06 Cr. 188 (SHS), 08 Civ. 5290 (SHS),
2008 WL 4302518 at *3 (S.D.N.Y. Sept. 15, 2008); *Rosario v. United States*, No. 05 Civ. 6096
(HB), 07 Civ. 8260 (HB), 2008 WL 1700213 at *6 (S.D.N.Y. April 11, 2008); *United States v.
Rojas*, No. 08 Civ. 75A (RJA), 03 Cr. 34A (RJA), 2008 WL 495502 at *1 (W.D.N.Y. Feb. 20,
2008)).

of sentence, and (3) the effect of deportation as banishment from the United States and separation from family . . . ."  *Id.* at 644.

The Court of Appeals concluded that none of these bases justified a downward departure. *Id.* at 644–66.  The court noted that although the Sentencing Reform Act provides that the Bureau of Prisons "'shall, to the extent practicable, assure' that a prisoner spend some portion of the last 10% of the term of imprisonment under conditions that will allow the prisoner to prepare for 're-entry into the community,'" the statute does not require the Bureau to make such a placement; it only advises the Bureau to do so if practicable.  *Id.* at 645.  The Court of Appeals explicitly noted, "if there is a defect in the Bureau's policy toward reassignment of deportable aliens, the appropriate way to remedy that defect would be pursuit of an action that challenges such a policy head-on, not the ad hoc granting of departures that have the effect of creating the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate."  *Id.* at 646.  This statement applies with equal force here.  To the extent there is still some defect with the Bureau of Prison's ("BOP's") policy, the remedy is not to grant Defendant an ad hoc departure as the district court did in *Restrepo*.

For two additional reasons, it would improper for the Court here to fashion a sentence based on Defendant's speculations regarding his potential designation.  First, doing so would impede on the province of the BOP.  As the Court is aware, Defendant's designation is ultimately within the purview of the BOP, not that of the Court or the Antitrust Division.  *See* 18 U.S.C. § 3621(b) ("The Bureau of Prisons shall designate the place of the prisoner's imprisonment.").  Additionally, Defendant's designation will not be determined until after sentencing.  It would, then, be conjecture on the part of the Court to consider where Defendant ultimately may be designated.  For example, in a recent case in this District, Paul Thompson, an

Australian national who pled guilty to manipulating the LIBOR exchange rate, was designated to FMC Terminal Island, which is not a private prison. *See United States v. Robson*, 14-cr-272-JSR (S.D.N.Y. 2014). At sentencing, Judge Rakoff recommended to the BOP that Thompson be "[i]ncarcerat[ed] in Terminal Island, California or any NON-PRIVATE facility." Order, ECF No. 268, *United States v. Robson*, 14-cr-272-JSR (S.D.N.Y. 2014). The government in this case takes no position as to where Defendant is designated.

Defendant's argument as to ICE custody fares no better than his argument as to conditions of confinement. Defendant, like Restrepo, argues that a departure is warranted because following his term of imprisonment, he, unlike a U.S. citizen, would be sent into ICE custody and detained during the course of his deportation proceedings. The district court in *Restrepo* considered the fact that the lodging of an ICE detainer "will require further incarceration of the defendant in an INS detention facility while he awaits deportation proceedings that should have been undertaken while he was serving his prison sentence." *United States v. Restrepo*, 802 F. Supp. 781, 784 (E.D.N.Y. 1992), *vacated*, 999 F.2d 640 (2d Cir. 1993). The Court of Appeals explicitly rejected this consideration, holding:

> Since a deportable alien may be detained though he has not been convicted of a crime, a detention that occurs pending deportation following a convicted alien's completion of his term of imprisonment should not be viewed as a detention resulting solely from his conviction. Nor should it be viewed as part and parcel of the punishment for his criminal offense. Rather, it is part of a penalty that has traditionally been termed civil rather than punitive, *see, e.g., Abel v. United States,* 362 U.S. 217, 237, 80 S. Ct. 683, 696, 4 L.Ed.2d 668 (1960) (deportation proceedings not subject to the constitutional safeguards that would be required for criminal prosecutions); *United States v. Koziel,* 954 F.2d 831, 835 (2d Cir.1992) (deportation "is a *civil* penalty") (emphasis in original). Hence, in comparing the punishments meted out to an alien and to a citizen, respectively, it is inapt to measure the latter's sentence against the former's sentence plus deportation-related detention.

*Restrepo*, 999 F.2d at 646.  In short, ICE detention following a sentence of imprisonment should not be a basis for departure from the Guidelines.  Accordingly, Defendant's request for the court to do exactly this is inappropriate.

Notwithstanding the fact that conditions of confinement and the prospect of ICE detention may not be grounds for departure, "[i]n determining what sentence is 'sufficient, but not greater than necessary,' to serve the needs of justice, 18 U.S.C. § 3553(a), a district court may take into account the uncertainties presented by the prospect of removal proceedings and the impact deportation will have on the defendant and his family."  *United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014).  There are no circumstances here that would warrant a variance.  In *Thavaraja*, the district court considered a defendant who had committed crimes abroad and who was extradited to the United States.  By the time he was sentenced, he had already been incarcerated for almost six years, apart from his family and friends.  *Id.* at 257.  After serving any sentence in the United States, he "faced an uncertain future because he was likely to be deported but would face possible retribution if returned to Sri Lanka."  *Id.* at 258.  Defendant's situation is significantly different and there are no facts here that might warrant a variance.  To date, Defendant has spent no time incarcerated apart from family or friends.  He likewise faces no retribution or punishment upon his return to India should he be deported.  Although he has a sister in the United States, he does not have a good relationship with her.  On the other hand, his mother and grandparents, with whom he has a close relationship, live in India.  Although deportation may strain his relationship with his girlfriend in the United States, he is not facing anything close to the circumstances at issue in *Thavaraja*, and a variance is not merited.

Indeed, a sentence that does not include a period of incarceration could well be considered substantively unreasonable.  *See e.g.*, *United States v. Park*, 758 F.3d 193, 201 (2d

Cir. 2014) (holding that a sentence of three years' probation that included six months' home confinement, for falsifying corporate tax returns was substantively unreasonable); *Rattoballi*, 452 F.3d at 128 (holding that a sentence of one year of home confinement for conviction of conspiracy to rig bids and to commit mail fraud was substantively unreasonable).

Defendant's reliance on *United States v. Connolly*, particularly the sentence imposed on defendant Gavin Black, is misplaced.  The facts at issue in Black are demonstrably different than those here.  Black was a U.K. citizen living in the U.K.  At sentencing, the court determined that his total offense level was 25, yielding a Guidelines range of 57 to 71 months.  The U.S. Probation Office recommended a sentence of five months of imprisonment followed by two years of supervised release and a fine of $300,000.  Sentencing Tr. 56:24–57:1 (Oct. 24, 2019), ECF No. 451, *United States v. Connolly*, 16-cr-370-CM (S.D.N.Y. 2016).  Black has a serious heart condition and did not plan to contest his removal.  At the sentencing hearing, the district court expressed that if Black had been a U.S. citizen, she would have sentenced him to a term of incarceration and would have strongly recommended that he serve his sentence at a medical facility.  *Id.* at 91:8–22.  However, she declined to do so in light of the fact that he would have been sent to a private prison and would then have been taken into ICE custody, notwithstanding the fact that he did not intend to contest his deportation.  *Id.* at 91:8–92:13.

Defendant is in a materially different situation than Black.  The U.S. Probation Office has recommended that Defendant serve a sentence of two years of imprisonment, not five months, as it did in the case of Black.  Additionally, unlike Black, Defendant does not have a serious medical condition that would have warranted placement at a medical facility but for his non-citizenship status.  Furthermore, whereas Black did not plan on contesting his deportation and thus may have "unnecessarily" spent time in ICE custody given his willingness to voluntarily

deport,[11] Defendant intends to contest deportation.  Def's Mem. at 63, ECF No. 220.  The circumstances of Aiyer and Black are materially different, and a non-custodial sentence for Defendant would be entirely inappropriate.

### E.  The Coronavirus Outbreak Does Not Justify Deviation from the Guidelines

The government is well aware of the recent outbreak of novel coronavirus (COVID-19) and, as part of its sentencing recommendation, has considered the additional risk that this situation poses.  Contrary to Defendant's assertions, however, the BOP is prepared to handle the risks posed by COVID-19, as with other infectious diseases and other medical conditions.  Since at least October 2012, the BOP has had a Pandemic Influenza Plan in place.  *See BOP Health Management Resources*, available at https://www.bop.gov/resources/health_care_mngmt.jsp.  Moreover, beginning approximately two months ago, in January 2020, the BOP began to plan specifically for the COVID-19 to ensure the health and safety of inmates and BOP personnel. *See Federal Bureau of Prisons COVID-19 Action Plan*, available at https://www.bop.gov/resources/news/20200313_covid-19.jsp.  As part of its Phase One response to COVID-19, the BOP began to study "where the infection was occurring and best practices to mitigate transmission."  *Id.*  In addition, the BOP launched "an agency task force" to study and coordinate its response to COVID-19, including using "subject-matter experts both internal and external to the agency including guidance and directives from the [World Health Organization (WHO)], the [Centers for Disease Control and Prevention (CDC)], the Office of Personnel Management (OPM), the Department of Justice (DOJ) and the Office of the Vice President.  BOP's planning is structured using the Incident Command System (ICS) framework."  *Id.*

---

[11]     The government disputes whether or not Black would have had to spend any time in ICE custody in light of his willingness to voluntarily deport himself, but at sentencing the district court considered this fact to be true and based its decision, in part, on it.

On March 13, 2020, the BOP, after coordination with the Department of Justice and the White House, implemented its Phase Two response "in order to mitigate the spread of COVID-19, acknowledging the United States will have more confirmed cases in the coming weeks and also noting that the population density of prisons creates a risk of infection and transmission for inmates and staff." *Id.* The BOP's national measures are intended to "ensure the continued effective operations of the federal prison system and to ensure that staff remain healthy and available for duty." *Id.* For example, the BOP (a) suspended social visits for 30 days (but increased inmates access to telephone calls); (b) suspended legal visits for 30 days (with case-by-case accommodations); (c) suspended inmate facility transfers for 30 days (with case-by-case exceptions, including for medical treatment); (d) suspended official staff travel for 30 days; (e) suspended staff training for 30 days; (f) restricted contractor access to BOP facilities to only those performing essential services, such as medical treatment; (g) suspended volunteer visits for 30 days; (h) suspended tours for 30 days; and (i) generally "implement[ed] nationwide modified operations to maximize social distancing and limit group gatherings in [its] facilities." *Id.*

In addition, the BOP has implemented screening protocols for both BOP staff and inmates, with staff being subject to "enhanced screening" and inmates being subject to screening managed by its infectious disease management programs. *Id.* As part of the BOP's inmate screening process, (i) "[a]ll newly-arriving BOP inmates are being screened for COVID-19 exposure risk factors and symptoms"; (ii) "[a]symptomatic inmates with exposure risk factors are quarantined"; and (iii) "[s]ymptomatic inmates with exposure risk factors are isolated and tested for COVID-19 per local health authority protocols." *Id.*

Notwithstanding the BOP's ability to appropriately protect staff and inmates, in light of Defendant's concerns, the government does not seek for Defendant to be remanded at sentencing

and would not oppose an order that Defendant self-surrender 60 days after sentencing. Additionally, the government is willing to postpone sentencing even later than May 29, 2020, and has communicated this to Defendant.

## CONCLUSION

For the reasons set forth above, the government respectfully submits that a Guidelines sentence is sufficient but not greater than necessary to achieve the purposes of sentencing.

Dated: New York, NY

April 17, 2020

Respectfully submitted,

/s/ Katherine Calle

Kevin Hart
Katherine Calle
Eric Hoffmann

U.S. Department of Justice,
Antitrust Division
New York Office
26 Federal Plaza, Room 3630
New York, NY 10278
212-824-1288

cc: Defense Counsel (by ECF)