**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
────────────────────────────────

**UNITED STATES OF AMERICA**

      **- against -**                **18cr333 (JGK)**

**AKSHAY AIYER,**                          **OPINION & ORDER**

                    **Defendant.**
────────────────────────────────

**JOHN G. KOELTL, District Judge:**

On November 20, 2019, the jury in this case found the defendant, Akshay Aiyer, guilty of participating in a conspiracy to restrain trade in violation of the Sherman Act, 15 U.S.C. § 1. The defendant now moves for a judgment of acquittal notwithstanding the jury verdict pursuant to Federal Rule of Criminal Procedure 29(c)[1] and in the alternative for a new trial pursuant to Federal Rule of Criminal Procedure 33. For the reasons explained below, both motions are **denied**.

**I.**

On May 10, 2018, the grand jury returned an indictment charging the defendant with one count of conspiracy to restrain trade in violation of Section 1 of the Sherman Act. ECF No. 1. The indictment charged that the defendant, while working at

───────────────────

[1] The defendant previously moved for a judgment of acquittal pursuant to Rule 29(a) at the close of the Government's case, which the Court denied without prejudice. Tr. at 1596. At the close of the case, the defendant renewed his motion for a judgment of acquittal, and the parties agreed that the Court should reserve ruling on the motion pending the submission of supplemental briefs. Id. at 2190.

JPMorgan Chase[2] as a trader in the foreign exchange ("FX")
market, conspired with Jason Katz, Christopher Cummins, and
Nicolas Williams[3] from at least as early as October 2010 until at
least July 2013 "to suppress and eliminate competition by fixing
prices of, and rigging bids and offers for, [Central and Eastern
European, Middle Eastern, and African Emerging Markets
currencies ("CEEMEA")] traded in the United States and
elsewhere" in violation of Section One of the Sherman Act. Id.
at 6-7. The indictment alleged that the defendant and his
coconspirators carried out the conspiracy through near-daily
conversations in private chat rooms, phone conversations, text
messages, and other means of communication in which they
revealed their trading positions, trading strategies, bids and
offers to customers, customer orders, and other relevant
information in order to coordinate their bids and offers for
CEEMEA currencies and thereby fix certain prices for CEEMEA
currencies. Id. at 7-8.

The trial began on October 30, 2019 with jury selection. On
November 20, 2019 the jury returned a verdict of guilty against
the defendant on the single count of conspiracy to restrain
trade in violation of the Sherman Act. The defendant now moves
for a judgment of acquittal pursuant to Rule 29 or in the
alternative for a new trial pursuant to Rule 33.

---

[2] The indictment referred to the defendant's employer as "Bank A."
[3] The indictment referred to Nicholas Williams as "CW-1."

## II.

To succeed on a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure, the defendant must show that no rational trier of fact, viewing the evidence in the light most favorable to the Government, could have found the defendant guilty beyond a reasonable doubt of the essential elements of the crime charged. See United States v. Desena, 287 F.3d 170, 176 (2d Cir. 2002). A defendant raising a challenge to the sufficiency of the evidence "bears a heavy burden because a reviewing court must consider the evidence in the light most favorable to the prosecution and uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Blaszczak, 947 F.3d 19, 30 (2d Cir. 2019) (emphasis in original) (internal quotation marks omitted); see also United States v. Harvey, 746 F.3d 87, 89 (2d Cir. 2014) (per curiam).

In considering the sufficiency of the evidence, the Court must "view the evidence presented in the light most favorable to the government, and . . . draw all reasonable inferences in its favor." United States v. Autuori, 212 F.3d 105, 114 (2d Cir. 2000). The Court must analyze the pieces of evidence "not in isolation but in conjunction," United States v. Matthews, 20 F.3d 538, 548 (2d Cir. 1994), and must apply the sufficiency

3

test "to the totality of the government's case and not to each element, as each fact may gain color from others," United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999).

"[T]o avoid usurping the role of the jury," the Court must "not substitute [its] own determinations of credibility or relative weight of the evidence for that of the jury." Autuori, 212 F.3d at 111 (internal citation omitted). Thus, the Court must "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence." United States v. Morrison, 153 F.3d 34, 49 (2d Cir. 1998). The jury's verdict "may be based entirely on circumstantial evidence." United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir. 1995); see also United States v. Aleskerova, 300 F.3d 286, 292 (2d Cir. 2002); United States v. Sattar, 395 F. Supp. 2d 79, 82-83 (S.D.N.Y. 2005), aff'd sub nom., United States v. Stewart, 590 F.3d 93 (2d Cir. 2009).

## III.

There was sufficient evidence introduced at trial from which the jury could have found as follows.

## A.

This case concerns the FX market and an alleged conspiracy consisting of traders working at various large, well-capitalized

4

banks to fix the prices for CEEMEA currencies in the FX market.[4] At trial, the jury heard testimony from the Government's background expert, David DeRosa; two of the defendant's alleged coconspirators, Jason Katz and Christopher Cummins, who had previously pleaded guilty to violating the Sherman Act and were cooperating with the Government pursuant to their plea agreements; three asset managers who were customers of the alleged coconspirators, Amy Flynn, Robert Davis, and Denise Simon; the Government's expert, Ross Waller; and the defendant's expert, Richard Lyons.

As early as 2007, Christopher Cummins, a trader at Citibank responsible for CEEMEA currencies, and Jason Katz, a trader at Standard Bank, Barclays, and then BNP, who was also responsible for trading CEEMEA currencies, were friendly with each other and were in an ongoing Bloomberg chat group known as "Old Gits" with

---

[4] Unlike other markets that have a centralized marketplace, such as the New York Stock Exchange, the FX "market" is decentralized. Tr. at 97. Prices at which one currency is exchanged for another are set through the spot market, in which currencies are traded nearly instantaneously, and through the forward market, in which currencies are exchanged and are settled at some point in the future. Id. at 90-91. Dealers, or traders, in the FX market work at large, well-capitalized banks, and spend their days dealing with customers, which are mostly pension funds, mutual funds, hedge funds, and international corporations. Id. at 92-95. These customers are sometimes represented by asset managers who transact with the dealers at the banks on behalf of the asset managers' clients. Id. at 762. In addition to transacting with customers, the dealers also deal directly with each other in the interbank, or interdealer, market, often by using the Reuters electronic trading platform. Id. at 101-02, 107-08. The Reuters platform operates by allowing "traders located in different states . . . [to] simultaneously see and act on the information in real time." Id. at 1562. Reuters operates by connecting both customers and traders to the Reuters data center located in Nutley, New Jersey, through which data from traders' offices are routed before being routed to a technical center in London, United Kingdom. Id. at 1563.

a number of other traders in New York. Tr. at 161-64, 286, 827-
29, 363. The defendant was not a member of the Old Gits chat
group. At all relevant times, Nicholas Williams, who was also
not a member of the Old Gits chat group, worked at Barclays Bank
in New York and traded CEEMEA currencies. Id. at 163. At all
relevant times, the defendant worked at JP Morgan Chase in New
York trading CEEMEA currencies. Id. at 164.

Katz first met the defendant in 2010. The two began
socializing outside of work and communicating almost daily
through Bloomberg chat and texting about the markets as well as
their respective trading positions. Id. at 860, 867. As time
passed, and Katz and the defendant began to trust each other,
they began to discuss trading in a way that, as Katz testified,
"could be more beneficial to each other."[5] Id. at 868. The
transactions that are central to the conspiracy alleged in this
case began in about October 2010. See, e.g., Tr. at 943; GX-101.

On May 24, 2011, the defendant told Katz over Bloomberg
chat that he "shifted a lot of usd zar recently" and told Katz
that "u shud introduce me to the zar mafia." GX-108, at 6; Tr.
at 876. Katz testified that the defendant had recently begun to
trade South African rand [ZAR] more frequently and Katz believed
that the defendant's statement was the defendant's way of asking

---

[5] Direct quotations from Bloomberg chats appear in this opinion as they appear
in the exhibits introduced at trial, which were printouts of Bloomberg chat
transcripts. The Bloomberg chats excerpted in this opinion have not been
edited.

Katz to introduce the defendant to the "bigger players" in the
South African rand market in New York and in Johannesburg. Tr.
at 876.

Cummins and the defendant met for the first time in May
2011 after being introduced to each other at a dinner for
traders working at different banks in New York City. Id. at 208-
09; GX-24. In June 2011, at the same time that Katz was about to
take an industry-mandated three-month leave of absence in
between his work at Barclays and BNP, Katz told Cummins that
Cummins should develop a relationship with the defendant in
order for Cummins and the defendant to discuss trading matters
in Katz's absence. Tr. at 209-10. Subsequently, on June 20,
2011, the defendant contacted Cummins over Bloomberg chat and
told Cummins that "I mainly caleld cause i am new to doing usd
zar [rand] and jason [Katz] was my eyes and ears so you got any
thoughts?" GX 115, at 2; Tr. at 214. After Cummins told the
defendant that trading in the South African rand was all about
information, the defendant told Cummins that "me and jason were
good at it"; Cummins replied "yeah, we got to communicate"; then
the defendant replied "done." GX-115, at 2; Tr. at 214.

After that initial conversation, the defendant and Cummins
began talking regularly during the workday via Bloomberg chat
and by phone and would spend time together socially as well. Tr.
at 210. Cummins testified that although his friendship with Katz

had been very close, over time Cummins began to become closer to the defendant than he was with Katz because Katz "kind of moved to the peripheral"; this was in part because the defendant and Cummins worked at institutions with similar trading strategies, had similar clients, and were charged with handling more risk than Katz handled. Id. at 239-40.

Cummins testified, in substance, that he, Katz, the defendant, and Nicholas Williams had an ongoing "understanding" whereby they "would help each other when another trader needed to buy or sell in the market to achieve a more advantageous price." Id. at 699. Cummins testified that pursuant to this understanding, the defendant and his coconspirators would, among other things, "only place one bid in the market rather than two or three[.]" Id. Cummins testified: "There were times when customers would call through and seek prices from one of us, and then by being in the same chatroom with the other trader, I could see they were being asked, and they would be like, Whoa, I'm being asked for the same thing as well. And everybody would input into the chatroom the prices we were showing so you could kind of figure out who was showing what and make a price accordingly." Id.

Cummins testified that he and the defendant worked together; when a client would call in with a price to multiple people, he and the defendant "could kind of move our pricing

accordingly to either win or lose the trade and still make the client think it was competitive," id. at 211; or "if we were both on the same side of the market, meaning we both needed to buy, I would say, Rather than risk pushing the market away from us, I'll pay for both of us, and the market will only see my interest, will only see my demand," id.; further, Cummins would do "the same things where I was kind of spoofing the market, where if he needed to buy, we'd put offers in to try to move the market lower into his hands." Id. at 211-12.

Katz similarly testified that he "agreed not to compete with competitor banks . . . I agreed to, you know, not to compete." Id. at 821-22. Katz testified that he agreed not to compete with "Akshay Aiyer, Nic Williams, and Chris Cummins." Id. at 822. Katz testified that he used the Bloomberg terminal to communicate with other traders: "So when we rigged bids and offers, prices that we show to the customers, we would use Bloomberg terminal among others to communicate." Id. at 847. Katz testified about how the bankers would communicate: "The banks in the chatrooms, we were talking about the customers as they came in. So we were using the information that we had between them to price in a way that they weren't effectively comparison-shopping. They may have the idea that they were, but in reality it wasn't." Id. at 859.

In addition to corresponding frequently on Bloomberg chat and texting during the workday, the alleged coconspirators also met in person on social occasions. On January 10, 2012, the defendant, Williams, Katz, and Cummins chatted on Bloomberg about Katz's upcoming birthday celebration, and Katz stated that he, the defendant, Cummins, and Williams needed to meet in order to discuss what Katz called "NY ZAR domination." Id. at 221; GX-152, at 2. On January 13, 2012, after Katz's birthday party, the four again chatted on Bloomberg; Katz said they needed to talk more about this plan of ZAR domination because the conversation had not happened at Katz's birthday party; and the defendant stated that "me and [Cummins] spoke briefly about it i agree." Tr. at 223; GX-154, at 2. Cummins testified that he did not have faith in the so-called ZAR domination plan, in which Katz believed that he, Cummins, Williams, and the defendant could use their collective trading volumes in South African rand during the afternoons in New York City in order to gain an advantage in trading the following day. Tr. at 684-85.

On July 26, 2012, Katz, Cummins, Williams, the defendant, and a few other traders went to the private room at Nat Sherman's cigar bar in Manhattan. Id. at 921-22. That night, the attendees discussed customers that the traders believed were splitting bids between multiple traders in order to mask the quantity of the customers' true desired purchases from the

10

traders. Id. at 923. The defendant, Katz, Cummins, and Williams also met at other times in person, mostly around the holidays. Id. at 924.

### B.

Much of the evidence adduced at trial concerned a number of discrete trading events that the parties reconstructed for the jury using the fact testimony of the defendant's alleged coconspirators, Jason Katz and Christopher Cummins, Reuters trading data, Bloomberg chat transcripts, and expert testimony in which experts analyzed the trading episodes and explained for the jury what was happening in the trading episodes. These episodes showed that the defendant, Katz, Cummins, and Williams had, in fact, repeatedly carried out their unlawful conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies.[6]

### October 14, 2010

On October 14, 2010, the defendant and Katz traded dollars for the Russian ruble with each other and with a customer.[7] The episode began when the defendant informed Katz over Bloomberg chat that the defendant's position in the dollar-ruble currency pair was "long," meaning that the defendant owned dollars and

---

[6] Evidence of many more trading events was adduced at trial than will be discussed in this opinion. It is sufficient for deciding the current motions to focus on a few of the trading events that are representative of the total conduct at issue in this case.

[7] Throughout the trial as well as in this opinion, all references to the "dollar" refer to the United States dollar.

had sold rubles, and therefore the defendant sought to buy

rubles in order to get out of his "long" position. Tr. at 943;

GX-101, at 2. Katz then informed the defendant that a customer

came to Katz asking to buy $5 million in dollars in exchange for

rubles on a two-month forward transaction.[8] Tr. at 944. Shortly

thereafter, the defendant informed Katz that he was being asked

by a broker[9] for a similar trade, $5.5 million in dollars against

the ruble on a forward transaction, and that the defendant

showed the customer a price of 22 for that deal.[10] Tr. at 946;

GX-101, at 3. The defendant won the transaction by selling the

customer dollars at a price of 22. GX-101, at 3. The defendant

and Katz believed that this buyer was still interested in buying

dollars after the transaction and thus they worked together to

move the price up. Tr. at 949. Katz told the defendant that if

---

[8] In this transaction, the customer sought to buy 5 million dollars in exchange for rubles in a deal that would settle two months in the future.

[9] Katz testified that a broker occupies a different place in the FX market than the defendant and his coconspirators. The broker's role is to match up sellers and buyers of a currency who would like to trade together. Tr. at 946.

[10] The Government's expert, David DeRosa, explained the basic mechanism by which currencies are exchanged and the terminology used by FX traders to describe FX transactions. Currencies are traded in a currency pair in which one currency is traded for another, in other words one individual or entity is selling one currency to another individual or entity and buying the other currency in the currency pair from the counterparty. See Tr. at 80-81. Thus, traders in FX are always simultaneously buyers and sellers because they are simultaneously buying one currency and selling the other in order to complete an FX transaction. Id. at 82-83. The price at which currencies in a currency pair are being exchanged at any given moment is described in standardized ways within the industry. For example, the price of the dollar-ruble currency pair consists of an exchange rate that is generally quoted in terms of the number of rubles that is equivalent to one dollar because within the industry it is the "dollar/ruble" currency pair, not the "ruble/dollar" currency pair. Id. at 82. In the October 14, 2010 transaction, the price of 22 referred to the price at which the defendant would sell dollars and buy rubles, that is at a rate of one dollar per 22 rubles. Id. at 82, 947.

the defendant's price was 19.5, which was a price Katz heard
from brokers, the defendant should raise it. Id. Katz told the
defendant that they could move the price as high as 25. Id. at
949-50; GX-101, at 3. The defendant and Katz then decided that
Katz would show the customer a new price of 21.5, which was the
price at which Katz ended up transacting with the customer after
the defendant had withdrawn his price of 19.5. Tr. at 949, 958-
59. Katz won the trade at the price that he and the defendant
set and then Katz subsequently passed off the trade to the
defendant by transacting directly with the defendant. Id. at
958-59, 963. Katz explained that the result of the coordination
between the defendant and Katz was that the price was moved
higher to the benefit, ultimately, of the defendant after Katz
passed the trade off to the defendant, and to the disadvantage
of the customer. Id.

### November 4, 2010

On November 4, 2010, the defendant and Katz coordinated
their bids to a customer for a dollar-ruble transaction. The
defendant told Katz that a customer had approached the defendant
looking to sell $30 million in dollars against the ruble on a
six-month forward transaction. Tr. at 931-33; GX-102. The
customer also came to Katz at the same time looking for a bid on
the same transaction. Tr. at 933. The defendant told Katz over
Bloomberg chat that he was showing the customer a price of

13

30.99, the price at which the defendant would buy dollars. Id.
at 934. Acting on this information, Katz then told the defendant
that he would show a price of 30.98 in order to push the
transaction toward the defendant who would be able to transact
with the customer at the higher price that the defendant was
offering. Id. at 935. This plan succeeded, and the defendant
completed the transaction at the higher price.[11]

    Following the transaction, Katz and the defendant discussed
that, going forward, they should continue to coordinate by
having one of them show the customer a bid that is slightly
lower or slightly higher than the price offered by the other
depending on whether the customer was buying or selling in order
to steer business to one of them; they further discussed that
they should switch up who would win each bid in order to
continue to attract customers to both of them. Id. at 937-39.
Katz then said that "conspiracies are nice." Id. at 939; GX-102,
at 2. The defendant responded "hahaha prolly shudnt puot this on
perma chat." Tr. at 939; GX-102, at 2.

    The customer for the November 4, 2010 trade was Mellon. Tr.
at 768. Mellon is an asset management fund whose business
manager and head of trading, Amy Flynn, lives in Hanover,
Massachusetts. Id. at 761. Flynn's job was to make investments,

---

[11] The Government's expert, Ross Waller, after reviewing Katz's and the
defendant's trading data, testified that the defendant had in fact won the
transaction in the way that Katz and the defendant planned. Tr. at 1481.

including investments in the FX market, on behalf of clients
that were mostly institutional investors. Id. at 762-63. Flynn
testified that, in November 2010, only a handful of banks were
capable of executing a $30 million six-month forward transaction
in a dollar-ruble pair including JP Morgan, Barclays, and
Citigroup. Id. at 769, 1481. In this $30 million trade, Mellon
was selling dollars and wanted a high price. Id. at 769. The
investment portfolios at Mellon that stood to benefit from this
trade included mutual funds, investment trusts, and a retirement
fund that Mellon employees could choose as part of their 401K
plans. Id. at 770-71.

### December 21, 2011

On December 21, 2011, the defendant and Katz were trading
dollars against Turkish lira. Both the defendant and Katz were
"short" dollars against the Turkish lira, which meant that they
had sold dollars and bought lira, and they were therefore hoping
that the price of dollars would go lower in order to allow them
to buy dollars and sell lira at more favorable prices. Id. at
980-83; GX-144. The defendant and Katz agreed that Katz would
hide the defendant's buying interest to avoid having the buying
interest of both Katz and the defendant appear to the market,
the combined appearance of which would potentially push the
price higher and away from Katz and the defendant. Tr. at 981.[12]

---

[12] Although the Reuters matching system allows traders to "hide" their own
demand, with the effect that someone in the interdealer market would not know

15

After a customer transacted with Katz, Katz then sold $3 million
to the defendant, which meant that, as Katz testified, the plan
"worked." Id. at 985.[13]

### January 18, 2012

On January 18, 2012, the defendant, Cummins, and Katz
worked together on the Reuters platform to "run a stop," which
meant that they attempted to trigger a customer's stop-loss
order.[14] The defendant and Cummins both had clients with a stop-
loss order in place to sell $25 million dollars against the rand
when the price hit 7.95. Id. at 226-27; GX-172. Cummins shared
his thought over the Bloomberg chat to Katz and the defendant
that the 7.95 price was a difficult level for the stop-loss
because it was unclear whether the market would go lower after
hitting 7.95 or if the market would rebound and rise back up
above 7.95. Tr. at 228; GX-172, at 13. Katz agreed, but said
that later in the afternoon, when the New York markets become

---

at what quantity a trader wished to trade, there is no function on the
Reuters platform that allows a trader to "hide" demand on behalf of traders
at other banks. Tr. at 985.

[13] The Government's expert, Ross Waller, after reviewing relevant trading data
for the defendant and Katz, testified that the transactions actually occurred
in the way that the defendant and Katz intended; Katz "hid" $3 million for
the defendant, and after Katz did the transaction, he passed off $3 million
in lira to the defendant on the interbank market. Tr. at 1490-91.

[14] As Cummins testified, a stop-loss order is an order that a client gives to
a bank to help limit the client's losses after a fixed point. A client might
buy at a certain price and instruct the bank to sell the client's position if
the price goes below a certain level, known as the stop-loss level, in order
to minimize the client's loss should the price continue to fall. Tr. at 223-
24. "Running a stop" is when a trader attempts to push the market by selling
in such a way that it triggers the stop-loss order and then the trader is
able to profit once the stop loss level is hit and the client's position is
sold off because the trader can predict that the stop loss level will be hit
and place orders accordingly. Id. at 224-25.

illiquid, they would be able to use their collective trading
volume to drive the market down through the stop-loss level. Tr.
at 228; GX-172, at 13. Katz then offered to help by buying some
of the rand that Cummins and the defendant would be selling in
order to move the market towards the stop-loss level. Tr. at
230. The defendant then stated that "I'm sure between us we take
it out," to which Cummins responded, "better get to weork." GX-
172, at 14; Tr. at 230. A few minutes later, the defendant,
Katz, and Cummins discussed on Bloomberg chat how they could
trade with each other to make all three of them even in their
positions, meaning that they would be neither long nor short.
GX-172, at 14. At the same time, the defendant noted that the
market had in fact moved lower in the way they had predicted.
Tr. at 230. The Reuters matching data confirmed that the
defendant, Katz, and Cummins had successfully run the stop. GX-
628-E; Tr. at 231-35. Later in the day, the defendant told
Cummins and Katz on the Bloomberg chat that "btw salute to first
coordinated zar effort," to which Katz responded, "yep many more
to come." GX-171, at 6; Tr. at 237.

The customer during the stop-loss episode on January 18,
2012 was Putnam Investments, a Massachusetts investment firm.
Tr. at 775, 781. Robert Davis, who worked for Putnam Investments
as its portfolio manager, testified that he had a stop-loss
order in place at the time with Citibank, Credit Suisse, JP

Morgan, and UBS. Id. at 781. Davis testified that the prices
that Citibank and JP Morgan had given Davis for his stop-loss
orders were good prices, but that it would have been better for
him if the stop-loss had not been triggered because once the
stop-loss was triggered, Davis locked in a loss. Id. at 782.

### February 23, 2012

On February 23, 2012, the defendant, Williams, and Cummins
discussed over Bloomberg chat the prices they were setting for
the Polish zloty-Czech koruna currency pair. GX-189; id. at 252.
One customer approached the defendant, Williams, and Cummins
seeking to buy Polish zloty in exchange for Czech koruna. Id. at
253. Cummins testified that, after the defendant told Cummins
that the defendant had shown a price of 6.015, Cummins knew that
"[i]f I show 6.0145, the investor is likely to deal with me, and
I don't want that, so I move my price higher." Id. at 254.
Cummins then moved his price to 6.0150 based on the information
that the defendant had given Cummins about the price that the
defendant was showing the customer. Id. The price that Cummins
showed was a worse price for the customer and a better price for
Cummins, but Cummins did not want to win the trade. Id. Cummins
then offered to the defendant that Cummins show a slightly worse
price in order to give the trade to the defendant, but the
defendant said that he did not want the trade either. Id. at
255. The potential client did not respond. Id.

**February 28, 2012**

On February 28, 2012, the defendant, Williams, and Cummins discussed over Bloomberg chat that a customer was interested in selling $5 million in dollars in exchange for rubles in a forward transaction. Tr. at 246; GX-193, at 17-18. The defendant, Williams, and Cummins had each received the same customer request. Williams told the others in the chat that he was showing a price to the customer of 29.05; Cummins said he was showing a price of 29.06; and the defendant told the others he was showing a price of 29.10. Tr. at 248-49. Based on this information, the defendant moved his price to 29.08, which was a worse price for the customer, but a price at which the defendant knew he would still be able to win the bid because it was a better price for the customer than the prices shown by Williams and Cummins. Id. at 249; GX-193, at 18. In that way, by sharing the price information, the defendant knew he could provide a worse price for the customer, and a better price for his bank, and he proceeded to do so. After the defendant won the transaction, the defendant shared that information with the other members of the Bloomberg chat. Tr. at 251; GX-193, at 18.

The customer that traded with the defendant during the February 28, 2012 transaction was Lazard Asset Management, whose portfolio manager in charge of ruble trading at the time was Denise Simon. Tr. at 1456-62. Simon testified that at the time

19

Lazard executed the trade, Lazard could have executed the trade with only a few banks, including Citibank, Barclays, and JP Morgan. Id. at 1461-62.[15]

## September 10, 2012

On September 10, 2012, the defendant, Katz, and Williams discussed over Bloomberg chat a trading episode in which they were trading dollars for the rand. GX-244. The defendant wished to buy rand and therefore he was attempting to "walk" the rand market lower by placing "spoof" offers in the market. Tr. at 1004-05; GX-244.[16] Katz then accidentally hit one of the defendant's "spoof" offers because Katz could not see the defendant's identity on the anonymous Reuters platform. Tr. at 1005. The defendant told the others in the Bloomberg chat not to touch the rand because the defendant was trying to walk the price of the rand lower. Id. at 1006. Although Katz in fact intended to buy rand when he hit on one of the defendant's prices, Katz told the defendant that he would not have attempted to buy rand had he known it was the defendant's offer, rather than some other trader's, given that the defendant was

---

[15] The Government's expert, Ross Waller, after reviewing the relevant trading data for Cummins, Williams, and the defendant, testified that the plan "worked" in the sense that all three had bids in the market for Lazard's business, but that only the defendant won a transaction. Tr. at 1484-85.

[16] As explained to the jury, "spoofing" is when a trader places an order in the market that is contrary to the trader's desired result and that the trader does not intend to trade on in the hope that the order will create a perception that there is additional supply or demand in the market. The trader's hope is that the perception will then drive the market price in a direction that is favorable to the trader. Tr. at 304.

attempting to walk the price down. Id. Katz and the defendant
then traded dollars against rand directly between themselves to
help the defendant reduce the defendant's position in the
market. Id. at 1008.

### May 20, 2013

On May 20, 2013, the defendant and Katz were asked by a
customer for prices on a transaction in which euros would be
traded for Czech koruna. Id. at 1011. The defendant won the deal
and sold euros to the customer. The defendant was then short
euros and therefore sought to buy euros. Id. Katz had been
buying euros in the market when the defendant told Katz to "stop
runnig this eu4czk in my dface," meaning that the defendant
wanted Katz to stop buying euros against the Czech koruna
because Katz's trading activity was raising the price of euros.
Id. at 1012-13; GX-300, at 2. The defendant knew that Katz was
buying euros because the defendant and Katz had matched up on
Reuters when Katz sought to buy. Tr. at 1013. In response to the
defendant's request, Katz told the defendant that Katz would
cancel the Reuters trade in order to keep the market at a lower
price for the defendant. Id. at 1013; GX-300, at 2.[17] Almost two
hours later, the defendant told Katz that the defendant had

---

[17] The Government's expert, Ross Waller, after reviewing Katz's and the
defendant's trading data testified that after the defendant asked Katz to
stop trading in the koruna, Katz did not execute any more trades during this
trading event. Tr. at 1496.

successfully gotten out of his short position in the market. Tr. at 1014; GX-300, at 2.

Later in the day on May 20, 2013, both the defendant and Katz needed to buy Turkish lira in exchange for dollars. GX-300, at 4. After they realized that the defendant had the larger long position in the dollar against the Turkish lira, Katz told the defendant "you go in fornt of me im only 10." Id.; Tr. at 1016-18. The defendant then did so and proceeded to trade in the market. Tr. at 1018.

### May 31, 2013

On May 31, 2013, the defendant asked Katz over a Bloomberg chat if anyone had dealt with Katz in a dollar-Turkish lira transaction because a customer had also done a deal with the defendant and with Nic Williams trading dollars for lira. Tr. at 1054; GX-301. Katz and the defendant discussed their recent transactions and Katz asked the defendant when the defendant had done a trade with a certain customer for $100 million. Tr. at 1055. The defendant responded in the Bloomberg chat by saying "TXT," which Katz understood to mean that Katz should check his personal phone for a text message because the defendant and Katz knew at that point that the banks were recording their communications. Id. at 1055-57; GX-301, at 3. Over text, the defendant then asked Katz whether the customer who had dealt

with Katz was a customer known as MKP, to which Katz responded "yes." Tr. at 1056; GX-421.

### IV.

The defendant argues in support of his Rule 29 motion principally that the Court was required to conduct "a sophisticated economic inquiry" of the trading conduct at issue in this case to determine whether it did in fact constitute a per se violation of the Sherman Act. According to the defendant, had the Court conducted such an inquiry, the Court would have concluded that the trading conduct in this case involving the Russian ruble and the Polish zloty is not subject to per se antitrust analysis and that transactions between coconspirators in the interdealer market likewise are not governed by a per se analysis. The defendant argues that the evidence is legally insufficient for a jury to convict the defendant beyond a reasonable doubt because many, if not all, of the trading events in this case did not constitute per se violations of the Sherman Act.[18]

---

[18] The Court previously considered many of these arguments when deciding the motion to dismiss the indictment and the motions in limine. At oral argument, defense counsel acknowledged that a significant part of the defendant's opening brief is a motion to reconsider the Court's previous rulings denying the motion to dismiss the indictment and deciding the motions in limine. To the extent the defendant now asks the Court to reconsider its opinion denying the defendant's motion to dismiss the indictment or the Court's pre-trial and trial evidentiary rulings, the time for reconsideration is passed. In any event, for the reasons previously stated, the Court properly decided the motion to dismiss the indictment and the motions in limine.

The defendant's argument is misplaced. As the Court repeatedly noted during pre-trial motions as well as during trial, the per se rule operates to prevent parties from justifying an alleged illegal conspiracy to restrain trade under the Sherman Act on the ground that there may be some procompetitive justification when the object of the conspiracy is a category of conduct that the Supreme Court has instructed is per se unlawful, such as horizontal price fixing or bid rigging. See Arizona v. Maricopa Cty. Med. Soc'y, 457 U.S. 332, 351 (1982) ("The anticompetitive potential inherent in all price-fixing agreements justifies their facial invalidation even if procompetitive justifications are offered for some."). The per se rule means that certain activities, such as price fixing, automatically run afoul of the Sherman Act's prohibition on "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce," 15 U.S.C. § 1, without the need for a civil plaintiff or the government in a criminal case having to prove that the price fixing scheme actually resulted in an unreasonable restraint on trade. See Leegin Cretive Leather Prods., Inc. v. PSKS, Inc., 551 U.S. 877, 886 (2007) ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices or to divide markets.") (internal citations omitted); Gelboim v. Bank of Am. Corp., 823 F.3d 759, 771 (2d Cir. 2016) ("Horizontal

24

price-fixing conspiracies among competitors are unlawful per se,
that is, without further inquiry.").

The per se rule removes from the jury the question whether
the alleged unlawful conspiracy had anticompetitive effects. It
is for the jury, properly instructed, to determine whether the
defendant knowingly participated in a conspiracy to fix prices
and rig bids.[19] The ultimate question for the fact-finder in any
per se case is whether the conduct at issue amounts to a
category of behavior, such as price fixing or bid rigging, that
the Supreme Court has declared constitutes one of the categories
of conduct for which per se condemnation is appropriate. As a
result, the role of the Court on this Rule 29 motion is limited
to determining whether there was sufficient evidence from which
a reasonable jury could conclude beyond a reasonable doubt that
a conspiracy whose object was fixing prices and rigging bids
actually existed and that the defendant knowingly participated
in that conspiracy.

The defendant relies on Apex Oil Co. v. DiMauro, 713 F.
Supp. 587 (S.D.N.Y. 1987), for the proposition that the Court
must conduct a "sophisticated economic analysis" of the trading
conduct at issue in this case to determine whether the conduct

---

[19] The defendant has not disputed that the Court properly instructed the jury
on the meaning of price fixing and bid rigging. See infra note 26.

constitutes a <u>per se</u> violation of the Sherman Act.[20] In <u>Apex Oil</u>,

the court considered on a motion for summary judgment whether

the supposed anticompetitive conduct in that case fell "into one

of the categories considered <u>per se</u> unlawful." <u>Id.</u> at 596.

Analyzing the undisputed facts underlying one count in the case,

the court found that the plaintiff had "submitted insufficient

facts to conclude at this point that a conspiracy was formed <u>for</u>

<u>the purpose of price-fixing</u>." <u>Id.</u> at 597 (emphasis in original).

<u>Apex Oil</u> underscores that whether a conspiracy to fix prices

actually existed is a question of fact. That question may be

decided by the court in a civil case on a motion for summary

judgment as a matter of law if there is no material dispute of

fact that needs to be submitted to the jury.[21] However, there are

---

[20] In his briefing for the current motions, the defendant does not cite to a single criminal antitrust case in support of the defendant's argument that the Court is required to conduct a "sophisticated economic analysis" of the trading conduct at issue to determine whether it constitutes a <u>per se</u> violation of the Sherman Act. At oral argument, defense counsel stated that its argument rests exclusively on civil antitrust case law.

[21] The defendant also calls the Court's attention to <u>In re Processed Egg Products Antitrust Litigation</u>, -- F.3d --, 2020 WL 3407761 (3d Cir. June 22, 2020), which the defendant claims further supports the defendant's argument that the Court must undertake the fact-specific task of examining the particular behavior at issue in the case and determine whether the behavior at issue is properly evaluated under the <u>per se</u> rule or the rule of reason. The case is inapposite for the same reason that <u>Apex Oil</u> is inapposite. In <u>Processed Egg Products</u>, the Third Circuit Court of Appeals affirmed a district court's application of the rule of reason to separate components of an alleged antitrust conspiracy. <u>Id.</u> at *7. The district court in <u>Processed Egg Products</u>, like the district court in <u>Apex Oil</u>, determined, at the motion for summary judgment stage in a civil case, whether the rule of reason or the <u>per se</u> rule would apply to the case. <u>Id.</u> at *2. Moreover, unlike the conduct at issue in this case, which constituted classic agreements between horizontal competitors to fix prices and rig bids, the Court of Appeals recognized that in the <u>Processed Egg Products</u> case, the "record both before and after trial paints a far more complex picture than the black and white caricature drawn by the plaintiffs' arguments." <u>Id.</u> at *8. <u>Processed Egg</u>

no motions for summary judgment in a criminal antitrust case,
and it is a question for a properly instructed jury to determine
whether the Government has proved beyond a reasonable doubt that
the defendant knowingly participated in a conspiracy to fix
prices and rig bids.[22]

The question on this Rule 29 motion is whether the evidence
adduced at trial was sufficient for the jury to find, beyond a
reasonable doubt, that the conspiracy to fix prices and rig bids
alleged in the indictment actually existed and that the
defendant knowingly joined that conspiracy.

## V.

The defendant argues that there was insufficient evidence
at trial from which a reasonable jury could conclude beyond a

---

Products has no bearing on the question for the Court on this motion, which
is whether the jury could have found, beyond a reasonable doubt, that the
conspiracy charged in the indictment actually existed, namely a conspiracy to
fix prices and rig bids in the FX market for CEEMEA currencies and that the
defendant knowingly participated in that conspiracy.

[22] Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council, 857 F.2d 55 (2d
Cir. 1988), is also not helpful to the defendant. In that case, the district
court had dismissed a complaint alleging violations of Sections 1 and 2 of
the Sherman Act. The Court of Appeals reversed, finding that the "amended
complaint clearly alleges that MIPTC has engaged in price fixing." Id. at 71.
The Court of Appeals observed that "[a]ssuming that appellants succeed in
proving the foregoing allegations, however, we express no opinion at this
time as to whether appellees' conduct should be condemned as per se unlawful
or, instead, should be analyzed under the Rule of Reason." Id. The Court of
Appeals instructed the district court on remand to "consider whatever
arguments appellees may offer in support of their practices . . . before
deciding whether the per se rule or the Rule of Reason should apply" because
there was a possibility that the case fell into a narrow exception to the per
se rule for circumstances in which price fixing is not subject to per se
condemnation because of special circumstances particular to the industry in
question, namely the market for the production of men's professional tennis
events and related markets. Id. at 72. Those special circumstances are not
present in this case.

reasonable doubt that the alleged conspiracy to fix prices and rig bids actually existed.[23]

The defendant has not met his "very heavy burden" on a Rule 29 motion because the evidence at trial was more than sufficient to establish that the alleged conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies actually existed. See Desena, 287 F.3d at 177.[24]

Under the Sherman Act, "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign

---

[23] In addition to making a sufficiency of the evidence argument, the defendant argues that the Court should enter a judgment of acquittal on the ground that the Sherman Act is void for vagueness in violation of due process. This argument is foreclosed by Nash v. United States, 229 U.S. 373, 377-78 (1913), in which the Supreme Court held that the Sherman Act was not void for vagueness in the context of criminal prosecutions. See also Columbia Nat. Res., Inc. v. Tatum, 58 F.3d 1101, 1107 (6th Cir. 1995) ("No one will claim that the Sherman Act is a model of specificity . . . However, the claims of void for vagueness lodged against it have failed.").

[24] The defendant does not appear to challenge the sufficiency of the evidence with respect to the other elements of a per se violation of the Sherman Act, namely that the defendant knowingly joined the alleged conspiracy, and that the alleged conspiracy affected foreign or interstate commerce. There was ample evidence adduced at trial from which the jury could have concluded beyond a reasonable doubt that the defendant "knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it" based on the testimony of Cummins and Katz, the defendant's own comments during the trading episodes, and the Bloomberg chat transcripts that showed the defendant actively participating in the alleged unlawful activities. See United States v. Hawkins, 547 F.3d 66, 71 (2d Cir. 2008) (internal quotation marks omitted). Nor does the defendant appear to challenge the fact that the alleged conspiracy affected foreign or interstate commerce and that the jury could have so concluded beyond a reasonable doubt based on, among other things, the testimony of the asset managers who were located outside the State of New York and who entered into transactions with the defendant and his alleged coconspirators, as well as based on evidence that much of the trading data in this case traveled by wire from New York to New Jersey and then on to the United Kingdom. See United States v. Giordano, 261 F.3d 1134, 1139 (11th Cir. 2001) (interstate commerce requirement of Sherman Act was satisfied where the subject of the price-fixing agreement was alleged to have traveled in interstate commerce).

nations, is declared to be illegal." 15 U.S.C. § 1. In construing this statutory language, the Supreme Court has held repeatedly that certain horizontal agreements between competitors, including agreements to fix prices and rig bids, are per se unlawful under the Sherman Act. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940) ("Thus for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act . . . .").[25]

A horizontal conspiracy exists when the coconspirators are "competitors at the same level of the market structure" rather than "combinations of persons at different levels of the market structure, e.g., manufacturers and distributors, which are termed 'vertical' restraints." United States v. Topco Assocs., Inc., 405 U.S. 596, 608 (1972).

---

[25] Supreme Court cases developing the per se rule discuss price fixing conspiracies, but not bid rigging conspiracies. The Second Circuit Court of Appeals has held that conspiracies among competitors to rig bids are subject to the per se rule rather than the rule of reason. See United States v. Koppers Co., 652 F.2d 290, 294 (2d Cir. 1981) ("In cases involving behavior such as bid rigging, which has been classified by courts as a per se violation, the Sherman Act will be read as simply saying: 'An agreement among competitors to rig bids is illegal.'") (quoting United States v. Brighton Bldg. & Maint. Co., 598 F.2d 1101, 1106 (7th Cir. 1979)). Other courts have similarly classified bid rigging conspiracies as per se illegal. See, e.g., United States v. Joyce, 895 F.3d 673, 678 (9th Cir. 2018) ("In 1982, the [Supreme] Court held that the per se rule is applicable to price-fixing agreements (of which bid rigging is a form) regardless of the industry in which the conduct occurred.") (citing Maricopa Cty., 457 U.S. at 349-51); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 336 (3d Cir. 2010) ("Bid rigging – or more specifically, as alleged in this case, bid rotation – is quintessentially collusive behavior subject to per se condemnation under § 1 of the Sherman Act.").

To establish the existence of a conspiracy, "[i]t is not necessary to prove that the defendant expressly agreed with other conspirators on a course of action; it is enough, rather, to show that the parties had a tacit understanding to carry out the prohibited conduct." United States v. Anderson, 747 F.3d 51, 61 (2d Cir. 2014) (quotation marks, alteration, and citation omitted); see also United States v. Ullbricht, 31 F. Supp. 3d 540, 559 (S.D.N.Y. 2014) ("There is no requirement that any words be exchanged at all [to establish the act of agreement], so long as the coconspirators have taken knowing and intentional actions to work together in some mutually dependent way to achieve the unlawful object.").

Under the Sherman Act, "if lawful acts are used as the means to effectuate an antitrust conspiracy, the conspiracy itself is still unlawful. Acts done to give effect to the conspiracy may be in themselves wholly innocent acts. Yet if they are part of the sum of the acts which are relied upon to effectuate the conspiracy which the statute forbids, they come within its prohibition." In re Rail Freight Fuel Surcharge Antitrust Litig., 587 F. Supp. 2d 27, 35 (D.D.C. 2008) (internal quotation marks and alteration omitted). Moreover, it is not necessary that the unlawful conspiracy actually be successful in carrying out its intended unlawful purpose, in this case of fixing prices and rigging bids; "[i]t is the contract,

30

combination, or conspiracy, in restraint of trade or commerce which [§] 1 of the Act strikes down, whether concerted activity be wholly nascent or abortive on the one hand, or successful on the other." <u>Socony-Vacuum</u>, 310 U.S. at 224 n.59 (alteration and internal quotation marks omitted).

With respect to the first element of the offense, the Court charged the jury that a "price fixing conspiracy is an agreement or mutual understanding between two or more competitors to fix, control, raise, lower, maintain, or stabilize the prices charged for products or services" and that "[p]rices are fixed if the range or level of prices is agreed upon or, if, by agreement, various formulas are used in computing them." Tr. at 2138. The Court charged the jury that "[b]id rigging is an agreement between two or more competitors to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded to the basis of competitive bids." <u>Id.</u> at 2141.[26]

### A.

The evidence in this case established beyond a reasonable doubt that a conspiracy existed whose object was to fix prices and rig bids in the FX market for CEEMEA currencies. The conspiracy was established by the testimony of Cummins and Katz as well as by the individual trading events through which the

---

[26] The defendant did not object to these portions of the jury charge. At oral argument, defense counsel acknowledged that the jury was properly instructed on the elements of a <u>per se</u> violation of the Sherman Act in which the defendant is alleged to have engaged in a conspiracy whose object was price fixing and bid rigging.

coconspirators carried out their unlawful agreement. The testimony from Katz and Cummins was clear and unambiguous that a conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies existed and that both of them as well as the defendant and Williams were members of that unlawful agreement. That credible testimony was supported by the evidence of the individual transactions. The evidence shows that Katz and the defendant had a relationship from October 2010 onwards in which they began to work together to move prices, for example during the October 14, 2010 and November 4, 2010 trading events. In May and June 2011, at the time that Katz was about to leave Barclays for BNP, Katz introduced the defendant to Cummins. The defendant and Cummins then began discussing ways in which they could help each other out in their trading activities in the FX market. The defendant, Katz, Cummins, and Williams were in an ongoing Bloomberg chat in which they frequently exchanged information about their market positions, price information, and information about customers, and engaged in coordinated trading efforts to move prices in favorable directions for each other whenever the opportunity arose.

The evidence at trial consisting of the communications between the defendant and the other alleged coconspirators was more than sufficient for the jury to conclude, beyond a reasonable doubt, that pursuant to this agreement, the

defendant, Cummins, Katz, and Williams coordinated their trading with the goal of fixing prices and rigging bids in the FX market for CEEMEA currencies. The jury saw evidence of communications between Katz and the defendant in 2010 and early 2011 and then saw Katz's encouraging Cummins that Cummins have a relationship with the defendant, which the defendant then commenced with Cummins. The jury saw evidence of the defendant's asking Katz to introduce the defendant to the "ZAR mafia."

Further, the jury saw evidence of certain communications between the defendant and his alleged coconspirators that demonstrated that the coconspirators had a unity of purpose with respect to fixing prices and rigging bids in the FX market for CEEMEA currencies. For example, during the stop-loss episode on January 18, 2012, the defendant told his alleged coconspirators that, by working together, they could run the stop, suggesting that the defendant and his alleged coconspirators were working together to move the market. During another episode, the defendant saluted the "first coordinated ZAR effort." On another occasion, when he and Katz discussed their future plans to work together to fix prices, the defendant stated that the two of them should probably not discuss such matters in the Bloomberg chat.

Additionally, the jury saw evidence of frequent communications between the defendant and his alleged

coconspirators in which they shared price information, customer information, trading positions, and other information that they used to facilitate the price fixing and bid rigging conspiracy. The sum total of the communications between the defendant and his alleged coconspirators, primarily through near daily Bloomberg chats, was powerful evidence of a conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies. See In re Foreign Exch. Benchmark Rates Antitrust Litig., 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (finding allegations sufficient to state a conspiracy to fix prices where "FX traders from the Defendant banks used various electronic communications platforms, particularly chat rooms and instant messaging, to share 'market-sensitive information with rivals' including price-information, customer information and their net trading positions" in order to fix their desired prices).

There was also ample evidence placed before the jury of discrete trading events themselves, during which the jury saw that the defendant and his alleged coconspirators repeatedly worked together to fix prices and rig bids in the FX market for CEEMEA currencies.

For example, during the October 14, 2010 ruble transaction, the defendant and Katz worked together to set the price at which Katz would win a transaction and then pass it on to the defendant. See Tr. at 958, 963. This event constituted an effort

34

by the defendant and Katz to set the price at which Katz would win the bid for the transaction before passing the transaction on to the defendant. On November 4, 2010, the defendant and Katz coordinated bids that they were offering to a customer in order to simulate a competitive bidding process for a ruble transaction that was not in fact competitive but rather the product of an agreement. See Koppers, 652 F.2d at 295 (finding bid rigging where competitors acted in concert "to bid according to agreed-upon prices."). On December 21, 2011, the defendant and Katz worked together to hide the defendant's buying interest for Turkish lira, which involved the defendant's agreeing with Katz to refrain from trading in his own name, with the intent to set prices at a level that would be favorable to Katz and the defendant. See In re Foreign Exch., 74 F. Supp. 3d at 588 (discussing allegations in which traders agreed to break up large orders into smaller amounts in order to mask their trading volume). During the stop-loss episode on January 18, 2012, the defendant and his coconspirators worked together to drive the market through the stop-loss level, thereby fixing the price at which the rand traded.

On February 28, 2012, the defendant, Williams, and Cummins coordinated the bids they showed customers for a ruble transaction. During the February 28, 2012 transaction, the defendant, Williams, and Cummins communicated with each other

35

about the prices that each was showing to the same customer for a dollar-ruble transaction. As a result, the defendant was able to reduce his price to his advantage and to the disadvantage of the customer and still complete the transaction because he knew that his bid was still better than his competitors' bids. On September 10, 2012, the defendant and Katz agreed that Katz would not interfere with the defendant's "spoofing" plan in order to keep the price of the rand lower than it would have been had Katz and the defendant been competing with one another. On May 20, 2013, there were two trading events in which Katz and the defendant coordinated their trading activities in an attempt to set prices for Czech koruna and Turkish lira.

These activities constituted classic price fixing and bid rigging because the defendant and his alleged coconspirators agreed to trade, agreed to refrain from trading, and agreed to place bids and offers in certain ways all with the intent and effect of artificially lowering, raising, or stabilizing prices for CEEMEA currencies. See, e.g., Gelboim, 823 F.3d at 771 (finding that a collection of banks, as sellers, colluding to depress prices to increase costs to buyers constitutes a horizontal price-fixing conspiracy – "perhaps the paradigm of an unreasonable restraint of trade.") (quoting NCAA v. Bd. of Regents of Univ. of Okla., 468 U.S. 85, 100 (1984)); Koppers, 652 F.2d at 297 (coordinating bids in order to ensure that one

competitor wins some bids and another competitor wins others

constituted a "clearly unlawful . . . per se violation"); In re

GSE Bonds Antitrust Litig., 396 F. Supp. 3d 354, 366 (S.D.N.Y.

2019) ("Mutually agreeing to keep the price of the bonds as high

as possible sounds like a classic case of price-fixing.").

    In order to fix prices and rig bids for CEEMEA currencies,

the defendant and his alleged coconspirators used a variety of

methods including "spoofing" and canceled trades and interdealer

transactions, methods which the defendant argues cannot form

part of a per se antitrust conspiracy because those activities

were not in and of themselves unlawful.[27]

    The defendant's argument ignores the fact that the

coconspirators used interdealer trading and "spoofing" as "means

and methods" to effectuate the unlawful conspiracy. See United

States v. Gardell, No. 00-cr-632, 2001 WL 1135948, at *5

(S.D.N.Y. Sept. 25, 2001) (finding conduct relevant to

substantiate a conspiracy when it was alleged to be part of the

"means and methods" of the conspiracy). The defendant's argument

also ignores the fact that the means and methods by which an

unlawful conspiracy is carried out do not need to be unlawful in

and of themselves if the means and methods are used to further

the unlawful agreement. See In re Rail Freight Fuel Surcharge,

---

[27] To the extent that the defendant argues that the Court erred by failing to
exclude evidence concerning "spoofing" or canceled trades from the jury
altogether, that argument is addressed more fully below in the context of
deciding the Rule 33 motion. See infra Part VII.A.

587 F. Supp. 2d at 35. For example, on December 21, 2011, Katz "hid" the defendant's buying interest and after someone transacted with Katz, Katz and the defendant transacted directly for $3 million, which is just another way of saying that the defendant refrained from trading in the market in order to let Katz trade on behalf of both himself and the defendant. See United States v. Usher, No. 17-cr-19, 2018 WL 2424555, at *4 (S.D.N.Y. May 4, 2018) (finding that an indictment sufficiently alleged a per se violation of the Sherman Act where traders in the FX market "agreed to coordinate their bidding, offering, and trading (including their agreement to refrain from bidding, offering, and trading) . . . ."). On September 10, 2012, after Katz accidentally matched with one of the defendant's "spoof" trades, Katz and the defendant undid the effect of the trade by transacting directly with one another. See In re Foreign Exch., 74 F. Supp. 3d at 588 (describing a method by which FX traders would manipulate prices in the FX market by working with other traders to break up larger orders into smaller amounts and concentrate the trades before and after a fixing window); id. (describing a method by which traders would fix prices in the FX market by placing "fake orders with other Defendants to create the illusion of trading activity in a given direction to move rates").

Moreover, the jury heard evidence from which it could
conclude that the alleged coconspirators succeeded in their
unlawful plan because, on many occasions, the conspiracy's
coordinated actions had the effect of actually setting prices.
For example, during the ruble transactions on October 14, 2010,
November 4, 2010, and February 28, 2012, the jury saw evidence
that the defendant and his alleged coconspirators coordinated to
set a price for the ruble. During the stop-loss episode on
January 18, 2012, the defendant and his alleged coconspirators
coordinated their trading activities to move the market for the
rand downward through the stop-loss level. On these, and other
occasions, the jury saw evidence that the conspiracy was not
just one of talk, but also one of action, in which prices were
set by the coordinated activities of the defendant and his
alleged coconspirators.

Therefore, there was more than sufficient evidence for the
jury to conclude beyond a reasonable doubt that the conspiracy
alleged in the indictment to fix prices and rig bids in the FX
market for CEEMEA currencies actually existed.

**B.**

Citing to the decision of the Court of Appeals for the
Second Circuit in United States v. Apple, Inc., 791 F.3d 290 (2d
Cir. 2015), the defendant argues that certain aspects of the
conspiracy were not unlawful agreements between horizontal

39

competitors subject to _per se_ condemnation, but rather were
arrangements between individuals who were vertically situated in
the market. Specifically, the defendant argues that he was in a
vertical relationship with Katz with respect to trading in the
Russian ruble and Polish zloty because the defendant was more
skilled at pricing those currencies and because the defendant
was an upstream wholesaler who supplied Katz with liquidity in
rubles and zloty. The argument is completely without merit.

The defendant cites no case for the proposition that
parties are vertically situated for purposes of antitrust
analysis, notwithstanding the fact that they occupy the same
level of the market structure and compete for the same
customers, simply because one party is allegedly more skilled in
the given market. Moreover, the evidence in this case does not
show that the defendant was an upstream wholesaler who provided
Katz with ruble liquidity. In most of the ruble transactions in
which Katz and the defendant were involved, like the ones on
November 4, 2010 and February 28, 2012, the defendant was the
winner of the transaction and was therefore not supplying Katz
with liquidity.

This case presents none of the difficult questions raised
by the Court of Appeals in _Apple_ about distinguishing between
horizontal agreements to set prices and vertical pricing
agreements. 791 F.3d at 313-14. _Apple_ involved a situation in

40

which an alleged horizontal conspiracy to fix prices encompassed
vertical agreements between manufacturers and distributors that
were used to facilitate the alleged aims of the horizontal
conspiracy to fix prices. Id. at 324-25. In any event, the court
in Apple found that the hub-and-spoke conspiracy was properly
analyzed under the per se rule even though there were vertical
agreements between Apple and ebook publishers that were part of
the overarching horizontal price-fixing conspiracy. Id. at 325.

In this case, the evidence showed that Cummins, Katz,
Williams, and the defendant were, in all respects, horizontal
competitors in the marketplace. They all worked as FX traders
trading CEEMEA currencies at large, well-capitalized banks. They
all occupied the same level of the market structure, namely
traders of FX currencies, and none of them occupied other
positions in the relevant market structure about which the jury
learned at trial, such as brokers, institutional investors, or
asset managers. See In re Foreign Exch., 74 F. Supp. 3d at 592
(finding plausible allegations of a horizontal price-fixing
conspiracy where the defendants were banks trading in the FX
market including Barclays, BNP, JP Morgan Chase, and Citigroup).
Cummins, Katz, Williams, and the defendant ostensibly competed
for the same customers, and they would discuss common customers,
such as customers that frustrated the traders by splitting their
offers to multiple banks. Further, Amy Flynn, Denise Simon, and

41

Robert Davis testified that, as customers, they viewed Citibank,
JP Morgan, and Barclays as three of the primary options for the
kinds of trades that they sought to execute, and thus a jury
could view the coconspirators as competitors for the business of
Lazard, Mellon, and Putnam in the FX market. See Gelboim, 823
F.3d at 766, 771 (finding plausible an allegation that a
horizontal price-fixing conspiracy existed where the offending
banks allegedly jointly setting LIBOR were competitors in the
sale of financial instruments).

### c.

There was ample evidence from which the jury could conclude
beyond a reasonable doubt that the alleged conspiracy continued
into the statute of limitations period, namely that the
conspiracy existed after May 10, 2013. "[A] conspiracy continues
so long as overt acts in furtherance of its purpose are
done . . . an overt act may be committed by only a single one of
the conspirators." United States v. Salmonese, 352 F.3d 608,
616-17 (2d Cir. 2003) (quotation marks and internal citations
omitted).

There was evidence of two trading events involving Katz and
the defendant on May 20, 2013 as well as a conversation between
Katz and the defendant on May 31, 2013 in which the defendant
told Katz to text him and the defendant and Katz then discussed
a common customer. Further, the jury heard testimony from Katz

42

and Cummins that their underlying agreement with the defendant
continued through July 2013. Tr. at 352 (Cummins); id. at 975
(Katz). This evidence – the two May 20, 2013 transactions, the
May 31, 2013 exchange over text between Katz and the defendant,
and the testimony of Cummins and Katz – was sufficient evidence
from which a reasonable jury could conclude beyond a reasonable
doubt that the conspiracy existed within the statute of
limitations period because an overt act was taken, in this case
several, in furtherance of the conspiracy within the limitations
period.

### D.

Because there was sufficient evidence from which a
reasonable jury could conclude beyond a reasonable doubt that
the defendant knowingly joined a conspiracy to fix prices and
rig bids that affected interstate commerce and that existed
within the statute of limitations period, the motion for a
judgment of acquittal under Rule 29(c) is **denied**.

### VI.

In the alternative, the defendant moves for a new trial
pursuant to Rule 33 of the Federal Rules of Criminal Procedure.

Rule 33 provides that the trial court may grant a
defendant's motion for a new trial "if the interest of justice
so requires." Fed. R. Crim. P. 33(a). A court will grant a new
trial only "in the most extraordinary circumstances." United

States v. Locascio, 6 F.3d 924, 949 (2d Cir. 1993) (citing United States v. Imran, 964 F.2d 1313, 1318 (2d Cir. 1992)). In evaluating the sufficiency of the evidence for purposes of Rule 33, the Court "must examine the totality of the case. All the facts and circumstances must be taken into account. An objective evaluation is required." United States v. Bell, 584 F.3d 478, 483 (2d Cir. 2009) (quoting United States v. Sanchez, 969 F.2d 1409, 1414 (2d Cir. 1992)). "There must be a real concern that an innocent person may have been convicted." Id. (quoting Sanchez, 969 F.2d at 1414); see also United States v. Alston, 899 F.3d 135, 146 (2d Cir. 2018) ("[T]he ultimate test for such a motion is 'whether letting a guilty verdict stand would be a manifest injustice.'") (quoting United States v. Aguilar, 737 F.3d 251, 264 (2d Cir. 2013)). Although the Court has "broader discretion to grant a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure than to grant a motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure," the court must nonetheless exercise that discretion "sparingly." Bell, 584 F.3d at 483 (alterations omitted) (quoting Sanchez, 969 F.2d at 1414); see also Sattar, 395 F. Supp. 2d at 83.

## VII.

The defendant raises six arguments in support of his motion for a new trial. First, the defendant argues that the verdict

44

was based on impermissible grounds because evidence relating to ruble and zloty transactions, interdealer transactions, and "spoofing" conduct was impermissibly placed before the jury. Second, the defendant argues that the jury was confused by the proper legal standard to be applied in this case. Third, the defendant argues that the Government's summations were prejudicial and misleading. Fourth, the defendant argues that the Court wrongly excluded evidence of procompetitive justifications and lack of anticompetitive effects. Fifth, the defendant argues that Cummins and Katz were not credible, and therefore their testimony cannot support the conviction. Finally, the defendant argues that the verdict was contrary to the weight of the evidence.

None of these arguments has any merit.

### A.

The defendant first argues that the jury's verdict was likely based on impermissible evidentiary grounds because evidence concerning the alleged "vertical" transactions in the ruble and zloty, interdealer transactions, and "spoofing" or canceled transactions should have been excluded.[28]

---

[28] At oral argument, defense counsel acknowledged that the Court, at the defendant's urging, instructed the jury that it could not convict the defendant solely on the basis that the defendant had engaged in "spoofing" conduct or canceled trades, behavior that did not in and of itself constitute the charged offense. At oral argument, the defense counsel also acknowledged that the Court properly instructed the jury on the proper legal standard to be applied in this case.

As an initial matter, to the extent that the defendant objects now to evidentiary rulings made by the Court prior to and during trial concerning the admissibility of ruble and zloty transactions and "spoofing" or canceled trades, those arguments are improper on a Rule 33 motion absent "manifest injustice." See United States v. Soto, No. 12-cr-566, 2014 WL 1694880, at *7 (S.D.N.Y. Apr. 28, 2014) ("[I]n the absence of a manifest injustice, a Rule 33 motion is an inappropriate vehicle to relitigate the trial court's earlier evidentiary decisions.") (collecting cases), aff'd sub nom., United States v. Ramos, 622 F. App'x 29 (2d Cir. 2015).

No "manifest injustice" occurred in this case by virtue of the jury's consideration of evidence of trading in the ruble and the zloty, interdealer transactions, and "spoofing" or canceled trading. The Court's previous evidentiary rulings were correctly decided. Evidence of ruble and zloty trading, evidence of interdealer transactions, and evidence of "spoofing" or canceled trades were all properly presented to the jury.

Evidence concerning ruble and zloty trading was plainly relevant for the jury to consider in order to determine whether the alleged conspiracy to fix prices and rig bids in the FX market for CEEMEA currencies actually existed. Trading in the ruble and zloty in this case was carried out by horizontal competitors in those currencies, as explained above in

46

connection with the Rule 29 motion, and therefore evidence
concerning trading in those currencies could be considered by
the jury to determine whether a conspiracy to fix prices and rig
bids in the FX market for, among other currencies, the ruble and
zloty, actually existed. "Spoofing" or canceled trading and
interdealer transactions were properly considered by the jury as
part of the "means and methods" by which the defendant and his
alleged coconspirators worked together to move prices of CEEMEA
currencies. See Gardell, 2001 WL 1135948, at *5.

To the extent that the defendant argues that the inclusion
of this evidence constituted undue prejudice to the defendant,
that argument has no merit because the evidence had no tendency
to have the "sort of strong emotional or inflammatory impact"
that would risk unfair prejudice to the defendant by leading the
jury to convict on an impermissible basis. See United States v.
Monsalvatge, 850 F.3d 483, 495 (2d Cir. 2017) (internal
quotation marks omitted). Any impact the evidence had arose from
its proper purpose of proving the existence of the conspiracy
charged in the indictment.

With respect to "spoofing" or canceled trading in
particular, any possible prejudice to the defendant by putting
evidence of that conduct before the jury was foreclosed by the
Court's instruction to the jury that "spoofing" or canceled
trading conduct did not, in and of themselves, constitute price

47

fixing or bid rigging. Cf. Zafiro v. United States, 506 U.S. 534, 540 (1993) ("Moreover, even if there were some risk of prejudice, here it is of the type that can be cured with proper instructions, and 'juries are presumed to follow their instructions.'") (quoting Richardson v. Marsh, 481 U.S. 200, 211 (1987)).

United States v. Guiliano, 644 F.2d 85 (2d Cir. 1981), cited by the defendant, is inapposite. Guiliano involved a multi-count conviction. After explaining that there was insufficient evidence to convict the defendant of one count of aiding and abetting the conduct of the affairs of an enterprise through a pattern of racketeering activity, and one count of bankruptcy fraud, the court ordered a new trial on the third count of bankruptcy fraud in large part because "[t]he jury's guilty verdict on Count 3 may well have been influenced not only by the unwarranted inference that Guiliano was involved in an arson but also by the very allegation of the RICO charge." Id. at 89. The risk in Guiliano was that the jury had improperly convicted the defendant for bankruptcy fraud because of spillover prejudice from a RICO conviction that was based on insufficient evidence. There is no comparable risk in this single-count case.

The defendant's motion for a new trial on the ground that the jury considered improper evidence is denied.

**B.**

The defendant next argues that the jury was likely confused by the proper legal standard because the jury repeatedly heard evidence from Katz and Cummins that the challenged trading conduct was "wrong" or "immoral."

The defendant acknowledges that the Court instructed the jury, at the defendant's request, that conduct described by witnesses as "wrong" or likely to make customers "angry" "does not constitute the crime of conspiracy charged in this case unless that conduct was in furtherance of a conspiracy to fix prices and rig bids as I have defined those terms for you. I remind you that, regardless how witnesses described certain conduct, you and you alone must determine whether the conspiracy to fix prices and rig bids did, in fact, exist, in accordance with my instructions on the elements of that crime." Tr. at 2143.[29]

Moreover, defense counsel was responsible for much of the testimony at trial concerning whether certain trading behavior was "wrong." Defense counsel repeatedly asked Katz and Cummins on cross examination if certain actions taken by the defendant and his coconspirators were "wrong." See, e.g., Tr. at 431

---

[29] At oral argument, defense counsel acknowledged that there was nothing impermissible, as a general matter, about the Government's questioning of Katz and Cummins at trial as to whether they believed that their trading conduct at issue in the case was "wrong." Defense counsel further acknowledged that the defendant had not objected to the Government's questions to Katz and Cummins at trial about whether Katz and Cummins believed that their trading conduct at issue in the case was "wrong."

49

(cross examination of Cummins) ("Q. And you didn't think there was anything wrong with that, did you? A. No."); Tr. at 577 (cross examination of Cummins) ("Q. Okay. Was there anything wrong with that trick? A. No."); Tr. at 1123 (cross examination of Katz) ("Q. Was there anything wrong, first of all, with Mr. Crespo coming to you to ask for a price? A. No. Q. And was there anything wrong when you told him to go to Mr. Aiyer? Because you didn't want to give it to him, correct? A. Correct.").

The defendant does not explain how the jury could have been confused as to the proper standard to apply in this case given the Court's proper instructions to the jury. The jury is presumed to follow the Court's instructions and there is no reason to believe that the jury did not do so in this case. There is no "real concern that an innocent person may have been convicted" in this case on the ground that the jury heard testimony from witnesses, on both direct and cross examination, that certain conduct at issue in this case was wrong and that other conduct at issue in the case was not wrong. Bell, 584 F.3d at 483. The defendant's motion for a new trial on the ground of jury confusion about the proper legal standard to apply in this case is denied.

## c.

The defendant argues that a new trial is warranted because the Government's summations were prejudicial. "An improper

summation will only warrant a new trial when the challenged statements are shown to have caused substantial prejudice to the defendant; rarely will an improper summation meet the requisite level of prejudice." United States v. Daugerdas, 837 F.3d 212, 227 (2d Cir. 2016) (internal quotation marks omitted). The test for substantial prejudice "considers the severity of the misconduct, the measures adopted to cure the misconduct, and the certainty of conviction absent the misconduct." United States v. Elias, 285 F.3d 183, 190 (2d Cir. 2002). When a defendant does not object to the summation at trial, there must be "flagrant abuse" by the prosecutor. See United States v. Germosen, 139 F.3d 120, 128 (2d Cir. 1998).

The defendant argues that the Government's summations were substantially prejudicial because 1) they focused on decontextualized and inflammatory language taken from Bloomberg chats; and 2) the Government exacerbated the prejudicial nature of the excepts through oral commentary that the excerpted sound bites spoke for themselves. The defendant did not object to the Government's summations during trial, and therefore the issue is whether the prosecutors' remarks met the "flagrant abuse" standard. They did not.

There was no "flagrant abuse" on the part of the Government when the Government highlighted during its summations phrases that included "you should introduce me to the ZAR mafia,"

51

"salute to the first coordinated ZAR effort," "ZAR domination,"
and "prolly shouldn't put this on perma chat." The defendant
argues that many of these statements were not made by the
defendant or his alleged coconspirators in the context of actual
trading events, but instead concerned vague plans that were
never put into effect. The defendant's argument simply restates
one part of the defense theory of the case, which it pressed
during trial and during its own summation: that the alleged
conspiracy was never successful and amounted to nothing more
than puffery and joking. The Government's own theory of the
case, pressed during summations, was that these statements,
whether or not they were connected to discrete trading events,
demonstrated the intent of the defendant and his alleged
coconspirators, the existence of a conspiracy, and the
defendant's knowing participation in the conspiracy. The
Government is entitled to present its own theory of the case and
"has broad latitude in the inferences it may reasonably suggest
to the jury during summation." United States v. Zackson, 12 F.3d
1178, 1183 (2d Cir. 1993) (quoting United States v. Casamento,
887 F.2d 1141, 1189 (2d Cir. 1989)). There was no prejudice to
the defendant, let alone flagrant abuse by the Government, when
the Government referred to portions of exhibits that were in
evidence. See Germosen, 139 F.3d at 128.

52

The Government's repeated statements during its summations that certain discrete sound bites from exhibits in evidence "speak[] for [themselves]" also did not constitute "flagrant abuse." The defendant argues, principally, that it is not true that the sound bites speak for themselves. But the Government is entitled to argue during summations that the jury should draw a fair inference from evidence adduced at trial. See Zackson, 12 F.3d at 1183. The defense was welcome to argue during its summation that the statements did not in fact speak for themselves. But "[a] prosecutor is not precluded from vigorous advocacy, or the use of colorful adjectives, in summation." United States v. Rivera, 971 F.2d 876, 884 (2d Cir. 1992).

The defendant further argues that the repeated use of the phrase "speaks for itself" during summation is directly at odds with the Government's argument during motions in limine that lay witness opinion testimony was necessary during the trial to help the jury understand code words and jargon. The defendant fails to identify why such an inconsistency would render the Government's summations impermissible. In any event, the defendant misunderstands the Government's argument during motions in limine and summations. The Government's argument during motions in limine was directed at certain jargon that was used throughout the Bloomberg chats to describe trading activities that might otherwise be opaque to a lay juror. ECF

No. 93, at 6-11. But the alleged prejudicial statements at issue
in the Government's summations were not the kind of code words
and jargon that the motion in limine addressed. The sound bites
mentioned during summations were statements that demonstrated
the nature of the agreement between the coconspirators.

The defendant has failed to show that the Government's
summations resulted in "substantial prejudice" to the defendant,
let alone that the summations constituted a "flagrant abuse" by
the Government. The defendant's motion for a new trial on the
ground of prejudicial summations is denied.

### D.

The defendant argues that a new trial is warranted on the
ground that procompetitive justifications for conduct at issue
and evidence of the lack of anticompetitive effects of conduct
at issue was improperly excluded from trial.

As the Court previously ruled prior to and during trial, in
per se Sherman Act cases in which the question for the jury is
whether the conduct at issue amounted to a conspiracy to fix
prices and rig bids, evidence of the lack of anticompetitive
effects or the presence of procompetitive justifications is
inadmissible for the purpose of proving that the price fixing or
bid rigging conspiracy was reasonable or beneficial. See United
States v. Guillory, 740 F. App'x 554, 556 (9th Cir. 2018) ("The
district court did not preclude any relevant evidence by

granting the government's motion in limine to prohibit Guillory

from introducing evidence or argument that the bid-rigging

agreements were reasonable."). The Court's prior rulings were

properly decided.[30]

In this case, the Court gave the defendant the opportunity

to introduce evidence at trial to the effect that the trading

conduct at issue in this case had procompetitive effects or

lacked anticompetitive effects for the limited and permissible

purpose of showing that the defendant or one of his alleged

coconspirators lacked the specific intent to engage in the

conduct that comprised the object of the conspiracy, namely

fixing prices and rigging bids. See, e.g., Tr. at 1768

(questioning Professor Lyons about how much Katz's trading

activity affected market outcomes); id. at 1690-92, 1703 (the

Court explaining to the parties that, upon laying a proper

---

[30] A narrow line of cases exists in which "courts have permitted defendants to
introduce procompetitive justifications for horizontal price-fixing
arrangements that would ordinarily be condemned per se if those agreements
when adopted could reasonably have been believed to promote enterprises and
productivity." Apple, 791 F.3d at 325 (quotation marks and citation omitted).
Thus, "[w]hen restraints on competition are essential if the product is to be
available at all, per se rules of illegality are inapplicable, and instead
the restraint must be judged according to the flexible Rule of Reason." Am.
Needle, Inc. v. Nat'l Football League, 560 U.S. 183, 203 (2010) (quotation
marks and citation omitted); see also Broadcast Music, Inc. v. Columbia
Broad. Sys., Inc. ("BMI"), 441 U.S. 1, 23 (1979) ("Joint ventures and other
cooperative arrangements are not usually unlawful, at least not as price-
fixing schemes, where the agreement on price is necessary to market the
product at all."). This Court repeatedly ruled that this case does not fall
into the narrow line of cases described in BMI and that a joint venture
argument would likely fail. There is no cause to revisit those previous
rulings. Moreover, the defendant has never argued that it was error for the
Court not to instruct the jury, in substance, that the jury could not convict
the defendant if it found that the conduct at issue in the case, although
constituting price fixing and bid rigging, was necessary to bring the
products at issue in this case, namely CEEMEA currencies, to market at all.

foundation, evidence that would otherwise be excluded as irrelevant because the defendant attempted to demonstrate procompetitive justifications for conduct could be admitted for a proper purpose).[31]

The defendant does not explain in what ways the Court's evidentiary rulings were incorrect either with respect to the motions in limine or during trial.[32] The defendant does not explain why the Court's rulings were insufficient to permit the defendant to put on a case in conformity with the evidentiary rules that flow from the Supreme Court's per se antitrust jurisprudence in which evidence of procompetitive effects are generally irrelevant to proving the existence of a conspiracy that has as its object fixing prices or rigging bids, but may be admissible for some other purpose. The defendant also does not point to specific evidence that he would have placed before the jury but for the Court's rulings, and therefore the defendant does not explain how the Court's evidentiary rulings in this case raise the "real concern that an innocent person may have

---

[31] The Court's rulings during trial were consistent with direction from the Supreme Court, which has stated that evidence of the failure of a conspiracy to achieve its ends can be used to demonstrate the lack of a conspiracy or the lack of intent on the part of an alleged conspirator. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 592 (1986) ("The alleged conspiracy's failure to achieve its ends in the two decades of its asserted operation is strong evidence that the conspiracy does not in fact exist."); United States v. U.S. Gypsum Co., 438 U.S. 422, 444, 446 (1978).

[32] As explained above, a Rule 33 motion is generally an improper vehicle by which a defendant may challenge evidentiary rulings, absent "manifest injustice." See Soto, 2014 WL 1694880, at *7. The defendant has not demonstrated that it was "manifest injustice" for the Court to rule the way it did in this case with respect to evidence of procompetitive justification or lack of anticompetitive effects of the conduct at issue.

been convicted." Bell, 584 F.3d at 483. Indeed, the defendant, particularly through the defense expert, Richard Lyons, had ample opportunity to introduce evidence of market conditions or the lack of anticompetitive effects, consistent with the Court's evidentiary rulings that such evidence could be introduced for the limited and permissible purpose of negating the showing that the coconspirators intended to fix prices and rig bids.

The defendant's motion for a new trial on the ground of improper exclusion of evidence relating to procompetitive effects or lack of anticompetitive effects is denied.

**E.**

The defendant argues that a new trial is warranted because the Government's principal witnesses, Katz and Cummins, were not credible. The defendant argues that Katz's testimony was inconsistent in that 1) Katz stated that he entered into a conspiracy with some traders while also stating that he merely engaged in some illegal activity, but did not enter a conspiracy, with others; and 2) Katz's statements that he was a capable and skilled trader in the ruble were rebutted by other evidence. The defendant argues that Cummins's testimony was inconsistent because sometimes on direct examination Cummins stated that he coordinated with others with respect to specific trading events and at other times on cross examination Cummins

stated with respect to the same transactions that the
coconspirators set prices for their customers independently.

"Because the courts generally must defer to the jury's
resolution of conflicting evidence and assessment of witness
credibility, it is only where exceptional circumstances can be
demonstrated that the trial judge may intrude upon the jury
function of credibility assessment." United States v. McCourty,
562 F.3d 458, 475-76 (2d Cir. 2009) (alterations and quotation
marks omitted). Exceptional circumstances may exist where
testimony is "patently incredible or defies physical realities,"
while the district court's mere "identification of problematic
testimony does not automatically meet this standard." Id.
(internal quotation marks omitted).

There are no such exceptional circumstances in this case.
The inconsistencies identified by the defendant in the testimony
of Katz and Cummins are not, in fact, inconsistencies, but are
functions of the defendant's theory of the case, which the jury
was entitled to reject.

The Government's case involved eliciting testimony that the
trading conduct placed before the jury at trial was coordinated
among the coconspirators. The defendant's cross examinations of
Katz and Cummins consisted of repeated questions that were
intended to elicit testimony that during the trading events in
question, Katz, Cummins, Williams, and the defendant were

58

trading and making decisions independently from one another.
See, e.g., Tr. at 517 ("Q. You didn't want to win this bid, did
you? A. I did not. Q. And that was your own independent
decision, correct? A. Yes.") (cross examination of Cummins with
respect to the February 28, 2012 transaction); id. at 1241 ("Q.
30.99. Now, that was his price, wasn't it? A. Yes. Q. He didn't
ask you for any advice on that, did he? A. No.") (cross
examination of Katz with respect to the November 4, 2010
transaction). While the Government elicited testimony from which
the jury could conclude that the alleged coconspirators' trading
activities were carried out pursuant to an unlawful agreement,
the defendant attempted to elicit testimony that the alleged
coconspirators set prices independently of one another in the
narrow sense that no one compelled Katz, Cummins, Williams, and
the defendant to make the precise bids and offers that each of
them made – in other words, that no one forced them to do what
they did. The testimony of Cummins and Katz on direct and cross
examination was not factually inconsistent, but rather reflected
the dueling theories of the case presented by the Government and
the defendant. The fact that no one compelled the conspirators
to act as they did was not inconsistent with the Government's
evidence that the conspirators acted in accordance with their
unlawful agreement. Both Katz and Cummins testified credibly and
did not attempt to embellish their recollection of what they

did. The jury was entitled to choose "between competing
inferences" suggested by the theories of the case pressed by the
defendant and the Government. See United States v. Rea, 958 F.2d
1206, 1221-22 (2d Cir. 1992).

The defendant also argues that Katz's testimony was not
credible because he testified that he did not enter into a
conspiracy with other persons, including certain members of the
Old Gits chat group, but that he did enter into a conspiracy
with the defendant. As explained above, there was more than
enough evidence from which the jury could conclude that the
defendant entered into an unlawful conspiracy to fix prices and
rig bids with Katz, Cummins, and Williams. The defendant was
entitled to argue to the jury that no such conspiracy existed
because Katz had testified that other relationships with traders
in the Old Gits chat group did not constitute unlawful
conspiracies, and the jury was entitled to reject that argument.
See id.

Finally, Katz did not lack credibility as a witness on the
ground that his statements that he was skilled in ruble trading
were allegedly rebutted by other evidence. As an initial matter,
the defendant does not explain why it would be relevant whether
Katz was a skilled ruble trader, nor does the defendant explain
why all of Katz's testimony should be disregarded because he
took pride in being able to trade the ruble. The defendant does

not point to any case that establishes that persons are not
horizontal competitors because one person is allegedly more
skilled in the relevant business or industry than that person's
purported horizontal competitor. In any event, there was no
substantially conflicting evidence regarding Katz's skill in the
ruble. Taken as a whole, Katz's testimony at trial conformed to
a simple narrative that although the ruble was not Katz's
preferred currency to trade, he was able to quote prices for the
ruble to customers and he frequently did so as part of his job
trading in CEEMEA currencies.

The testimony of Katz and Cummins was neither "patently
incredible" nor did it "def[y] physical realities," and the jury
was entitled to credit the testimony of the witnesses when
considered as a whole. See United States v. Bonventre, No. 10-
cr-228, 2014 WL 3673550, at *22 (S.D.N.Y. July 24, 2014), aff'd,
646 F. App'x 73 (2d Cir. 2016).

There is no basis to challenge the jury's assessment of the
credibility of the Government's witnesses. The defendant's
motion for a new trial which asks the Court to discredit that
testimony is denied.

**F.**

Finally, the defendant argues that a new trial is warranted
because the jury verdict is contrary to the weight of the
evidence. The defendant principally argues that the Government's

case consisted of circumstantial evidence in the form of chat messages that were ambiguous and that the testimony by Katz and Cummins failed to rectify the ambiguities because Katz and Cummins admitted that they freely engaged in trading during certain trading events and that other trading events were the result of the traders' independent judgment. As a result, the defendant argues that the jury necessarily made unjustifiable inferential leaps to arrive at its verdict, which suggests that the jury did not carefully examine the evidence.

As explained above, there was more than enough evidence from which the jury could conclude beyond a reasonable doubt that the defendant was guilty of the crime charged because he knowingly joined and participated in an unlawful conspiracy to fix prices and rig bids.

Even when the evidence is viewed under the more lenient "objective evaluation" standard of Rule 33, the verdict in this case was not against the weight of the evidence. The jury saw ample evidence of chatroom conversations and witness testimony that explained the circumstances under which the defendant began communicating with Cummins, Katz, and Williams. The jury saw ample evidence of trading episodes in which the coconspirators worked in concert to fix prices and rig bids in the FX market for CEEMEA currencies. The jury heard credible testimony from Cummins and Katz that the conspiracy to fix prices and rig bids

62

existed and that the defendant knowingly participated in that conspiracy. The jury heard from Amy Flynn, Robert Davis, and Denise Simon about the ways in which the conspiracy's activities were experienced by customers. In this case, there was ample evidence in the record to support the verdict. The defendant's motion for a new trial on the ground that the verdict is against the weight of the evidence is denied.

## CONCLUSION

The Court has considered all the arguments raised by the parties. To the extent not addressed, the arguments are either moot or without merit. The motion for a judgment of acquittal is **denied**. The motion for a new trial is also **denied**.

**SO ORDERED.**

Dated:   **New York, New York**
         **July 6, 2020**                    _____/s/ John G. Koeltl\_\_\_
                                              **John G. Koeltl**
                                    **United States District Judge**