

U.S. Department of Justice

Antitrust Division

*New York Office*
*26 Federal Plaza, Room 3630*
*New York, New York 10278*

September 10, 2020

**VIA ECF**
The Honorable John G. Koeltl
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    *United States v. Akshay Aiyer*, 18-cr-333 (JGK)

Dear Judge Koeltl:

      We write in response to the Defendant's August 28, 2020 letter alerting the Court of two recent sentencing decisions[1], several compassionate release cases, and some pandemic-related articles to request a sentence of probation, with a special condition of a period of home confinement not to exceed 364 days.  (*See* ECF No. 232).  The Court should reject his request because the Defendant (1) overstates the certainty of possible collateral consequences flowing from his alienage and any custodial sentence greater than one year; (2) claims he is "similarly situated" to two defendants sentenced in the Southern District of New York, when he is not; and (3) exaggerates safety concerns by ignoring (a) the affirmative measures the Bureau of Prisons ("BOP") has taken to protect inmates from COVID-19 and (b) the fact that, as a healthy, 37-year-old, he lacks any characteristic that would place him at greater risk of contracting, or suffering severe illness from, COVID-19.

      Moreover, the Defendant's requested sentence would severely undervalue the seriousness of the offense and the need to provide just punishment, promote respect for the law, promote general deterrence for white-collar criminals, and avoid unwarranted sentencing disparity among others convicted of the same crime.  Instead, the Court should impose a sentence that is sufficient but not greater than necessary to achieve the purposes of sentencing—namely, a period of imprisonment of between 37–46 months, supervised release of three years, and a substantial criminal fine as set out in the government's Sentencing Memorandum.

**I.    Defendant's assumptions about the Bureau of Prison and Immigration and Customs Enforcement policies are inaccurate and speculative.**

      In his sentencing submission and his August 28th letter, the Defendant states that he would be "ineligible to serve any incarceratory sentence in a minimum-security

---

[1] *United States v. Cohen*, 19-cr-741 (WHP) (ECF No. 232-2) and *United States v. Morgan*, 19-cr-209 (RMB) (ECF No. 232-3).

prison, and that he will be ineligible to serve any part of such a sentence in a halfway house" (*See* ECF No. 232 at 2). But these are mere speculations concerning the relevant BOP policies. While deportable aliens may be more likely to get a security classification that precludes designation to a minimum-security facility, *see* Inmate Security Designation and Custody Classification, BOP Program Statement 5100.08, Ch. 5, p.9, there is also a possibility of the BOP's making an exception, *id*. Ch 5., p.2 (noting the possibility that public safety factor designation can be waived "to reflect that inmate's assessed security needs"). Moreover, as we previously argued in our sentencing submission, no one is guaranteed time in a halfway house, whether citizen or alien. (*See* ECF No. 221 at 49).

The Defendant has also suggested that because of his alien status, he would be designated to a private facility. This too is inaccurate. Indeed, as the government detailed more fulsomely in its sentencing submission (*id.*), Paul Thompson—an Australian national with a health condition who pleaded guilty and who was sentenced to 3 months of incarceration by Judge Rakoff—was designated to FMC Terminal Island, *not* a private prison. Finally, the Defendant's arguments ignore that the BOP gives weight to judicial recommendations in making designation recommendations. *See* Inmate Security Designation and Custody Classification, BOP Program Statement 5100.08, Ch. 5, at p.3. Any prediction as to where the Defendant would be designated is, in addition to being an improper consideration, *see* ECF No. 221 at 47-50, premature and inaccurate speculation and should not serve as the basis for a non-custodial sentence. The government takes no position on the type of facility where the Defendant should serve out any period of incarceration.

Similarly, the Defendant also makes assumptions about the certainty of Immigration and Customs Enforcement ("ICE") policy. In his sentencing memo, the Defendant argues that, following completion of any term of imprisonment, he "will likely be taken into the custody of ICE and removal proceedings will likely be commenced against him." (ECF No. 220 at 69). The Defendant repeats this argument in his letter of August 28, quoting the *Cohen* court, "And when foreign nationals complete a term of imprisonment they *are* transferred to ICE detention where they can wait for an indefinite period to be returned to their home country." (ECF No. 232 at 2) (emphasis added). But these assumptions fail to demonstrate that Aiyer would qualify for mandatory detention under 8 U.S.C. 1226(c)(1)(C) if removal proceedings were instituted against him, and fail to recognize that, even if he did qualify, he could obtain bail if he showed that the Department of Homeland Security "is substantially unlikely to establish at the merits hearing, or on appeal, the charge or charges that would otherwise subject the alien to mandatory detention." *In re Joseph*, 22 I. & N. Dec. 799, 803, 806 (1999). As with his assumptions about BOP policy, Defendant's speculation on what ICE will do should not provide the basis for a non-custodial sentence.

As we argued in our sentencing submission, detention consequences are civil in nature and so are not considered additional punishment. (EFC No. 221 at 50). This is precisely why "in comparing the punishments meted out to an alien and to a citizen, respectively, it is inapt to measure the latter's sentence against the former's sentence plus deportation-related detention." *United States v. Restrepo*, 999 F.2d 640, 646 (2d Cir. 1993). Indeed, the Second Circuit warned that considering alienage-related consequences actually could create "the very type of disparity in sentencing that the adoption of the Guidelines was intended to eliminate." *Id.*

While courts have the discretion to consider at least the uncertainties related to the prospect of removal proceedings and deportation in a 3553(a) context, *see United States v. Thavaraja*, 740 F.3d 253, 262–63 (2d Cir. 2014), such considerations should only be taken into account when they are "extraordinary in nature or degree," *United States v. Duque*, 256 Fed. App'x 436, 437 (2d Cir. 2007); *see also Restrepo*. As detailed in our sentencing memorandum, no such circumstances exist here. (*See* ECF No. 221 at 47-51).

## II.    Defendant is not similarly situated to the Defendants in *Cohen* or *Morgan* or to the inmates he cites who received compassionate release.

The Defendant's situation is materially different to the defendants in *Cohen* and *Morgan*, and therefore it is not possible to make any meaningful comparisons about sentencing. While each defendant may share certain characteristics, they are not similarly situated to warrant similar sentences. As a threshold matter underscoring this point, both Cohen and Morgan pleaded guilty and accepted responsibility, while the Defendant continues to show no remorse for his conduct.

Although the Defendant and Cohen may have comparable sentencing guidelines levels and the probation office recommended that the defendant serve 24 months in prison, the similarities stop there. Unlike the defendant in *Cohen*, the Defendant in this case did not plead guilty, has not paid $260,000 pursuant to a forfeiture order, and did not consent to deportation. The Court in *Cohen* noted "Mr. Cohen has certain medical conditions [diagnosed asthma] that puts him at higher risk and more susceptible to getting COVID-19." (Sentencing Transcript at 42:18-19, *United States v. Cohen*, 19-CR-741 (S.D.N.Y. June 9, 2020) (ECF No. 232-2).[2] Here, by stark contrast, the government is unaware of *any* medical diagnoses that would place the Defendant at a higher risk of a serious COVID-19 outcome.

Likewise, in *Morgan* though the Court considered the conditions in the Metropolitan Detention and Correctional Centers, the Court also noted that, "I do feel the purposes of deterrence, general and specific, have been met and are being met by this sentence. I think the term of incarceration, the amount of incarceration served already [14 months], is adequate for the purposes of coming up with a fair and reasonable sentence." (Sentencing Transcript at 37:10-14, *United States v. Morgan*, 19-CR-209 (S.D.N.Y. May 5, 2020) (ECF No. 232-3). The Court also considered the fact that the defendant was a single parent who had been separated from his two children. *Id.* at 37:23-24. In contrast, the Defendant here has not served any period of time incarcerated; nor does he possess the same family characteristics as the defendant *Morgan*.

Despite his different situation, the Defendant effectively proposes to bypass the normal process for seeking *post-incarceration* compassionate release,[3] and instead go

---

[2]  Note that the Court's reference to asthma as a definite risk factor appears to have come before the Centers for Disease Control revised its list of risk factors for severe illness from COVID-19. *See infra* at 6.

[3]  See *United States v. Raia*, 954 F.3d 594, 595 (3d Cir. 2020) ("The First Step Act empowers criminal defendants to request compassionate release for 'extraordinary and compelling reasons.' 18 U.S.C § 3582(c)(1)(A)(i). But before they make such requests,

3

straight to a sentence of probation, with a condition of home confinement for less than one year. The Court, of course, may not bypass the statutory process. And in any event, the Defendant's age and health would not warrant compassionate release. As the Third Circuit recently observed, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020). The Defendant's relatively young age and overall health mean that he is not similarly situated to the inmates who were granted compassionate release, and the Defendant does not and could not establish "extraordinary and compelling" reasons of the type relied on in the cases to which he cites.

In *Park*, for example, the court noted defendant's health was "very poor" prior to incarceration and that she suffered multiple pre-existing health conditions including "severe asthma," a compromised immune system, lung disease, and had undergone surgery for a brain aneurysm. *United States v. Park*, No. 16-CR-473 (RA), 2020 WL 1970603, at *3, *6 n.3 (S.D.N.Y. Apr. 24, 2020). The court also noted that, had it the authority to do so, it's preferred course of action would be to grant temporary release, but it would eventually require the defendant to serve the remainder of her sentence. *Id.* at *5. After serving 16 months of her 36-month sentence, the court ordered that the defendant "be placed on supervised release status, with home confinement until June 19, 2021, the date on which she was expected to complete her custodial sentence." *Id.* at *6.

In *Williams-Bethea*, the court found that the 50-year old defendant suffered from "a number of serious medical issues," including hypertension, and severe obesity. *United States v. Williams-Bethea*, No. 18-CR-78 (AJN), 2020 WL 2848098, at *4 (S.D.N.Y. June 2, 2020). Though the defendant had been sentenced to 40 months of incarceration followed by three years of supervised release, the court noted that the time served in prison, "has already achieved some of the original sentence's retributive, deterrent, and incapacitate purpose." *Id*. The court made clear that its finding of "extraordinary and compelling" reasons in favor of compassionate release was due to the defendant's "imminent danger of serious injury and death." *Id*. Here, there is no evidence that the Defendant faces heightened vulnerability to a severe COVID-19 outcome, if he were infected, based on his age and reported health.

In *Woodard*, the court granted compassionate release to a 77-year old defendant due to his multiple, serious medical conditions which included a series of heart attacks, severe obesity, and diabetes. *Woodard v. United States*, No. 2:12-CR-105, 2020 WL 3528413, at *2 (E.D. Va. June 26, 2020). The court found that the petitioner was "extremely vulnerable to COVID-19," and at heightened risk of a fatal disease outcome. *Id.* at *3. The court reduced the defendant's 276-month sentence to time served with supervised release and a special condition of 60 months of home confinement. *Id.* at *4.

**III.    BOP has taken affirmative steps to make its facilities safer and the Defendant's specific health characteristics do not place him at high risk from COVID-19.**

---

defendants must at least ask the Bureau of Prisons (BOP) to do so on their behalf and give BOP thirty days to respond. *See* § 3582(c)(1)(A).").

4

In response to the pandemic, BOP has taken significant measures to protect the health of the inmates in its charge. In addition to the affirmative steps detailed in our sentencing memorandum (*See* ECF No. 221 at 53-54), BOP has and continues to, *inter alia*: (a) require that all inmates in every BOP institution be secured in their assigned cells/quarters for a period of at least 14 days, in order to stop any spread of the disease; (b) limit group gatherings, with attention to social distancing to the extent possible to facilitate commissary, laundry, showers, telephone, and computer access; (c) issue masks and appropriate face coverings to all inmates and staff and strongly encourage them to wear the face coverings when in public areas when social distancing cannot be achieved; (d) screen every newly admitted inmate for COVID-19 exposure risk factors and symptoms; and (e) screen all staff for symptoms, with those registering a temperature of 100.4 degrees Fahrenheit or higher being barred from the facility on that basis alone. *See* www.bop.gov/coronavirus; *see also* www.bop.gov/coronavirus/docs/ correcting_myths_and_misinformation_bop_covid19.pdf.

Moreover, implementing AG directives of March 26 and April 3, 2020, BOP also has increased its use of home confinement to protect particularly vulnerable inmates and reduce infection rates at its facilities. *See* www.bop.gov/coronavirus.

Because there is no indication that the Defendant's age and health make him particularly vulnerable to infection or extremely serious COVID-19 outcome, he should not reap a sentencing windfall because of the current pandemic. According to his final PSR, Defendant is 37 years old, 5' 10" tall, and weighs 155 lbs. He has no chronic illnesses, has never been hospitalized, and has "slight traces of asthmatic symptoms due to seasonal allergies of tree pollen." (ECF No. 215, PSR ¶¶ 74-75.)

While the SARS-COV-2 pandemic is unquestionably serious and its eventual resolution is an unknown, male individuals in the Defendant's age bracket rarely suffer a life-threatening or fatal COVID-19 disease outcome, regardless of underlying pre-existing medical conditions. The latest published CDC data indicate that individuals in the Defendant's age range accounted for only 1.3% of reported deaths from COVID-19, irrespective of gender and underlying medical conditions.[4] Centers for Disease Control and Prevention: *Demographic Trends of COVID-19 cases and deaths in the US reported to CDC* (updated Sept. 8, 2020), *available at* https://covid.cdc.gov/covid-data-tracker/#demographics (attached as Gov't Ex. A).

---

[4] A more recent meta-analysis of several studies estimated the "Incident Fatality Rate" for those between the ages of 35 to 44 at under 0.04%. As the study explains, "The case fatality rate (CFR), the ratio of deaths to reported cases, is commonly used in gauging disease severity. However, this measure can be highly misleading for SARS-CoV-2, the virus that causes COVID-19, because a high proportion of infections are asymptomatic or mildly symptomatic (especially for younger people) and may not be included in official case reports. Consequently, the infection fatality rate (IFR), the ratio of fatalities to infections, is a more reliable metric than the CFR in assessing the hazards of COVID-19. *See* medRvix: *Assessing the Age Specificity of Infection Fatality Rates for COVID-19: Systematic Review, Meta-Analysis, and Public Policy Implications* (August 27, 2020), *available at* https://www.medrxiv.org/content/10.1101/2020.07.23.20160895v4.full.pdf (attached as Gov't Ex. B).

And laboratory-confirmed, COVID-19-associated hospitalizations in the Defendant's age range have been trending downwards since July 18, 2020. U.S. Department of Health & Human Services: *Laboratory-Confirmed COVID-19-Associated Hospitalizations* (August 29, 2020), *available at* https://gis.cdc.gov/grasp/COVIDNet/COVID19_5.html (attached as Gov't Ex. C).

To date, the data reveals that infection and death rates at BOP facilities are consistent with infection and death rates from the nation as a whole. The BOP has 126,748 federal inmates in BOP-managed institutions and 14,021 in community-based facilities. The BOP staff complement is approximately 36,000. There have been 118 federal inmate deaths, and 2 BOP staff member deaths attributed to COVID-19 disease. The BOP has 13,962 inmates in Privately-Managed Facilities. There are 122 inmates who have open lab-confirmed positive cases, 484 inmates have recovered, and 8 inmates have died due to COVID-19. *See* Federal Bureau of Prisons: *COVID-19 Coronavirus* (updated Sept. 9, 2020), *available at* https://www.bop.gov/coronavirus/.[5] A review of BOP press releases relating to COVID-19 deaths turns up only three deaths in inmates aged 37 years or younger, with two of those deaths also listed as having CDC-identified pre-existing conditions. *See* https://www.bop.gov/resources/press_releases.jsp (accessed Sept. 9, 2020).

Furthermore, under the latest guidance from the CDC, the list of underlying medical conditions that are *known* to increase the risk of severe illness from COVID-19 does not include asthma, the single condition to which the Defendant alludes in his recent letter. *See* Centers for Disease Control and Prevention: *People with Certain Medical Conditions* (revised July 17, 2020), *available at* https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (attached as Gov't Ex. E). The CDC observed that, due to limited data and information, individuals with "moderate-to-severe" asthma (as opposed to the Defendant's reported "slight traces of asthma-like allergy symptoms") *may* be at increased risk for severe illness.[6]

As the Defendant's own New York Times article, "Coronavirus Cases Rise Sharply in Prisons Even as They Plateau Nationwide," noted "[t]he vast majority of inmates who have tested positive have been asymptomatic." (ECF No. 232-4, at 5). And this is true regardless of pre-existing medical conditions.

Additionally, treatment and care for COVID-19 illness has also markedly improved over the past few months. Inexpensive, readily available, steroid drugs to treat hospitalized COVID-19 patients have reduced the risk of death by one-third, according to seven different clinical trials reviewed by the World Health Organization. STAT NEWS:

---

[5] *See also*, ACLU: *COVID-19, Death by Incarceration* (accessed Sept. 9, 2020) *available* at https://docs.google.com/spreadsheets/d/1bTMdmt2IG2UrRDcDhKK2ws_ZS-sXqDsPMVC_2SDb3Lw/edit#gid=634242190 (reporting 4 inmate deaths related to COVID-19 to date in ICE facilities, and 119 inmate deaths related to COVID-19 in federal BOP facilities).

[6] Asthma has not turned out to be a significant risk factor in either contracting COVID-19, or for more severe disease outcomes. *See* AARP: *COVID-19 Risks to People with Asthma Much Lower Than Expected* (accessed September 9, 2020) *available at* https://www.aarp.org/health/conditions-treatments/info-2020/coronavirus-and-asthma.html (attached as Gov't Ex. H).

*Inexpensive steroids reduce deaths of hospitalized Covid-19 patients, WHO analysis confirms* (Sept. 2, 2020), *available at* https://www.statnews.com/2020/09/02/covid19-steroids-reduce-deaths-of-hospitalized-patients-who-analysis-confirms/ (attached as Gov't Ex. F).

Simply put, health care providers know more about appropriate courses of treatment for severely ill COVID-19 patients than they did back in March. Turning patients on their side or belly ("proning"), administering inexpensive steroids, administering anticoagulants, and placing patients on supportive oxygen rather than rushing to intubate them are not complicated medical procedures. Defendant does not persuasively argue otherwise or demonstrate that these basic treatments would be unavailable to him regardless of where he might be incarcerated.

Despite the improving prognosis for most COVID-19 patients, and despite his relatively young age and good health, the Defendant asks the Court to speculate about what might happen if the Defendant is incarcerated, what might happen if he contracts COVID-19, and what might happen if he were to petition the Bureau of Prisons for a compassionate release or other relief. Speculation of this sort does not establish "extraordinary and compelling" reasons that might lead a court to grant compassionate release from present incarceration, much less to sentence a defendant who has never expressed remorse and who was convicted of a Class D felony to no incarceration whatsoever.

For these reasons, the government stands by its recommended sentence as set out in its Sentencing Memorandum.

                                          Respectfully submitted,

                                          /s/
                                        Kevin Hart
                                        Eric Hoffmann

                                        U.S. Department of Justice
                                        Antitrust Division
                                        New York Office
                                        26 Federal Plaza, Room 3630
                                        New York, NY 10278
                                        212-335-8000

cc: Counsel for Defendant (by email)